UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JAMES MALLOY,                          )
2338 Harrison Avenue                   )
Ft. Worth, Texas  76110,               )
                                       )
     Plaintiff,                        )
                                       )  Civ. Action No. 05-1117 (RCL)
          v.                           )
                                       )
ALPHONSO R. JACKSON,                   )
   Secretary Of Housing And            )
   Urban Development,                   )
   451 Seventh Street, S.W.            )
   Washington, D.C.  20410,            )
                                       )
     Defendant.                        )
                                       )

## FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

1.) This is an action by James Malloy, who was formerly employed as a supervisory Assistant Special Agent In Charge with the Office of Inspector General ("OIG") of the Department of Housing and Urban Development ("HUD") in Ft. Worth, Texas, until he was stripped of his supervisory position, coerced into resigning, and constructively discharged by senior Headquarters OIG management in Washington, D.C.

2.) Between September and December of 2002, Headquarters OIG management placed Mr. Malloy under investigation and on administrative leave, removed Mr. Malloy from his supervisory position, and subjected him to other material and adverse employment actions, in retaliation for Mr. Malloy's refusal to terminate or harshly discipline two minority agents, one of whom had filed a discrimination complaint against OIG, and because Mr. Malloy is of Native American national origin.

3.)  Defendant's discriminatory and retaliatory actions, in particular stripping Mr. Malloy of supervisory duties and subjecting him to on-going investigation, severely damaged his reputation and standing in the law enforcement community, coerced him into resigning, and constructively discharged him, effective January 6, 2003.

4.)  This action arises under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-16, and seeks relief from defendant's actions which ruined Mr. Malloy's career and prematurely brought it to an end.   By way of relief, Mr. Malloy seeks:  a.) declaratory and injunctive relief; b.) reinstatement in a supervisory Special Agent position; c.) backpay and commensurate benefits; and d.) record correction.  He also seeks compensatory damages AND an award of attorneys' fees and costs.

## Parties, Jurisdiction, And Venue

5.)  Plaintiff James Malloy was, at all times relevant until the actions which gave rise to this Complaint, a supervisory Special Agent employed by HUD OIG in Region 6 and stationed in Ft. Worth, Texas. Mr. Malloy is of Native American national origin and resides at the address recited in the caption of this Complaint.

6.)  Defendant Alphonso R. Jackson is the Secretary of Housing and Urban Development, the Cabinet official who heads HUD, and is sued in his official capacity only.  HUD is a department in the Executive Branch of the federal government, the mission of which is to provide and encourage the provision of moderate and low income housing in the United States.  HUD's Office of Inspector General is the entity within HUD which employed plaintiff.  Its mission includes preventing and

detecting fraud, waste, and abuse by individuals and entities who are engaged in the business of providing, or are the residents of, HUD-sponsored and HUD-financed housing and housing programs through administrative audits and criminal investigations.

7.) Jurisdiction of this Court is based upon 28 U.S.C. §1332; and 42 U.S.C. §2000e-16 (incorporating by reference 42 U.S.C. §2000e-5(c)). Venue lies here pursuant to 28 U.S.C. §1391, and 42 U.S.C. §2000e-16 (incorporating by reference 42 U.S.C. §2000-5(f)(3)), because all of the discriminatory and retaliatory actions committed by defendant at issue occurred in this judicial district.

## Statement Of Facts

### Background

8.) Plaintiff James Malloy was, at all times until he was removed from his position, coerced into resigning, and constructively discharged, formerly employed as the supervisory Assistant Special Agent In Charge (GS-1811-14) of the Department of Housing and Urban Development ("HUD") Office of Inspector General ("OIG") office in Region 6 in Ft. Worth, Texas.

9.) In that position, Mr. Malloy's duties and responsibilities included supervising the investigation of entities and individuals who participated in HUD and HUD-sponsored housing programs, did business with HUD, and received funding, grants, or subsidies from HUD, as well as of officials of HUD itself, for potential violations of federal law and regulation.

10.) Mr. Malloy was also responsible for the supervision of approximately ten Special Agents and four nonprofessional personnel;

for serving as his office's liaison with federal, state, and local law enforcement officials, working groups, and task forces; and for coordinating his office's activities with HUD OIG Headquarters in Washington, D.C.

11.) Until the events which gave rise to this suit, Mr. Malloy was one of OIG's most highly recognized, commended managers and received many awards for his investigative and supervisory activities, including awards from the Secretary of HUD. In 1999, Mr. Malloy was named National HUD OIG Investigation Manager of the Year. In 2001, Mr. Malloy was elected Chair of the federal government's prestigious twenty-five agency Southwest Regional Inspector General Council, which he helped found. Mr. Malloy was also responsible for HUD OIG's initial equity skimming investigations, for organizing his office's joint task force with the Federal Bureau of Investigation, for the investigation of many cases of highly complex, fraudulent transactions, and for supervising all law enforcement support activities after the bombing of the federal building in Oklahoma City.

12.) As a result of the discriminatory and retaliatory actions of senior HUD OIG management in Washington, D.C., Mr. Malloy was placed under investigation and on administrative leave, denied promotional opportunities, stripped of his supervisory position, and stigmatized in the law enforcement community. Mr. Malloy's coerced resignation and constructive discharge compromised HUD OIG's law enforcement efforts in his former region.

**The Attempt By Senior OIG Management In Washington, D.C.**
**To Force Mr. Malloy To Discipline Two Minority Agents Disparately**

13.) On or about May 2, 2001, Cortez Richardson, an African American Special Agent assigned to the HUD OIG office in Denver, Colorado, filed a formal, administrative complaint of discrimination. In pertinent part, Special Agent Richardson alleged that he had been subject to discrimination when, among other matters, former Assistant Inspector General for Investigations Robert Groves threatened to fire him on pretextual charges of misconduct and directed him to find another job.

14.) After Special Agent Richardson filed the foregoing complaint of discrimination, Mr. Groves and other senior officials in OIG Headquarters in Washington, D.C., retaliated against SA Richardson by making additional attempts to discharge him for utilizing the administrative EEO complaints process and for pursuing his complaint before the Equal Employment Opportunity Commission.

15.) On June 16, 2002, Mr. Groves' former deputy and successor, Assistant Inspector General for Investigations R. Joseph Haban, reassigned Special Agent Richardson from Denver to Ft. Worth under Mr. Malloy's supervision.

16.) The former Special Agent In Charge of the HUD OIG Office in Ft. Worth, Texas, Larry Chapman, was deeply concerned about the possibility that senior OIG management in Washington, D.C., would attempt to force his office to retaliate against SA Richardson and terminate his employment.

17.) Accordingly, Mr. Chapman secured a promise from Assistant Inspector General Haban that neither he nor Mr. Malloy would

participate in any potential disciplinary matter concerning SA Richardson that arose while he was assigned to Denver and before he was reassigned to Ft. Worth.

18.) Nonetheless, in September of 2002, Assistant Inspector General Haban forwarded a Report of Investigation concerning Special Agent Richardson for disciplinary action prepared in OIG Headquarters in Washington, D.C., one which was based entirely on SA Richardson's alleged misconduct before he was reassigned to Ft. Worth, Texas.

19.) As Assistant Special Agent In Charge, the responsibility for being the official to propose the maximum potential disciplinary action against Special Agent Richardson agent fell to Mr. Malloy.

20.) Mr. Malloy thoroughly and carefully reviewed the charges against SA Richardson and the Report Of Investigation forwarded by Assistant Inspector General Haban at least three times.  After doing so, Mr. Malloy concluded that with one exception, the charges against SA Richardson were unsupported or did not amount to misconduct. Accordingly, on September 30, 2002, Mr. Malloy only proposed a five day suspension on SA Richardson, less than an appealable adverse action, which SA Richardson accepted rather than appeal.

21.) After Mr. Malloy declined to discipline SA Richardson with disproportionate severity, senior OIG management in its Headquarters Office in Washington, D.C., made additional attempts to discharge SA Richardson, in retaliation for utilizing the administrative EEO complaints process and for pursuing his complaint before the Equal Employment Opportunity Commission.

22.) At or about the time that he transmitted the Report of Investigation concerning SA Richardson's supposed misconduct, Assistant Inspector General Haban transmitted a Report of Investigation prepared in OIG Headquarters in Washington, D.C., concerning supposed misconduct of a Hispanic Special Agent under Mr. Malloy's supervision, Steven Romero, for disciplinary action.

23.) As Assistant Special Agent In Charge, the responsibility for being the official to propose the maximum potential disciplinary action against Mr. Romero also fell to Mr. Malloy. He reviewed the Report of Investigation concerning Special Agent Romero's supposed misconduct at the same time that he reviewed the Report of Investigation concerning Mr. Richardson's supposed misconduct.

24.) Mr. Malloy thoroughly and carefully reviewed the charges against SA Romero and the Report Of Investigation forwarded by Assistant Inspector General Haban. After doing so, Mr. Malloy concluded that the Report of Investigation into Special Agent Romero's alleged misconduct was unsupported and unprofessional, that the very same alleged misconduct had been investigated thoroughly on a previous occasion and found to have been unsubstantiated, and that Special Agent Romero was under a legitimate misunderstanding about certain matters that were the subjects of his Report of Investigation.

25.) Accordingly, on September 30, 2002, Mr. Malloy refused to recommend any disciplinary action against Special Agent Romero and instead issued him a nondisciplinary Memorandum of Caution.

## Retaliation By Senior Management
## In OIG Headquarters In Washington, D.C.

26.) Immediately after senior HUD OIG management in its Headquarters Office in Washington, D.C., learned that Mr. Malloy had refused to retaliate and discriminate against Special Agent Richardson and Special Agent Romero by disciplining them with disparate severity, it placed Mr. Malloy under investigation and on administrative leave. Eventually, senior OIG management in Washington, D.C. removed Mr. Malloy from his supervisory position, coerced his resignation, and caused his constructive discharge. Senior OIG management in Washington, D.C., subjected Mr. Malloy to these and other material and adverse employment actions for pretextual reasons.

27.) On September 18, 2002, senior OIG management in Washington, D.C., directed Mr. Malloy to be interviewed by representatives of the OIG Headquarters Office of Special Investigations.

28.) The investigation that HUD OIG was conducting in Headquarters, Washington, D.C., concerned allegations that Mr. Malloy's supervisor and former Special Agent in Charge of the Southwest Region, Larry Chapman, had traveled to the site of a home he was building on government time and in a government automobile.

29.) On September 19, 2002, Mr. Malloy was interviewed concerning Mr. Chapman's alleged misconduct and answered all questions put to him about Mr. Chapman's activities.

30.) On or about October 2, 2002, Assistant Inspector General Haban in Washington, D.C., learned that Mr. Malloy had refused to propose disproportionately severe discipline on minority Special

Agents Cortez Richardson and Steven Romero, as specifically alleged above in paragraphs 13 through 25.

31.) Consequently, on October 9, 2002, senior management in OIG Headquarters in Washington, D.C., directed Mr. Malloy to return to the OIG Special Investigations Division in Washington, D.C., the next day for a follow-up interview in the investigation into Mr. Chapman.

32.) However, when Mr. Malloy reported as directed for a follow-up interview at the Special Investigations Division in OIG Headquarters in Washington, D.C., on October 10, 2002, the interview concerned, in great part, Mr. Malloy's role and actions in the disciplinary actions involving Special Agents Richardson and Romero.

33.) At that "interview," Mr. Malloy was advised by the Assistant Special Agent In Charge of the HUD OIG Special Investigations Division in Washington, D.C., that he was now himself subject to investigation for two reasons:  first, for failing to coordinate the discipline of Special Agents Richardson and Romero with OIG Headquarters in Washington, D.C.; and second, for supposedly obstructing OIG's investigation of Mr. Chapman.

34.) Mr. Malloy's "interview" with the HUD OIG Special Investigations Division concluded with his being ordered to report to the OIG Headquarters in Washington, D.C., for a meeting with Assistant Inspector General Haban and Deputy Assistant Inspector General Salas.

35.) Mr. Malloy reported as instructed and was given a Memorandum by Deputy Assistant Inspector General Daniel P. Salas placing him on indefinite administrative leave; directing him to return all HUD OIG property in his possession including, but not

limited to, his government issue weapon and personal computer; and instructing him to vacate the OIG Office in Region 6 and to have no further contact with HUD OIG personnel pending further notice from senior OIG management in Washington, D.C.

36.) Even if senior HUD OIG management in Washington, D.C. had a legitimate reason for placing Mr. Malloy under investigation – which it did not — taking the actions it did against him were contrary to the practice of senior HUD OIG management.

37.) Indeed, senior HUD OIG management in Washington, D.C., did not place anyone else being interviewed in connection with the investigation of Mr. Chapman or suspected of withholding evidence in connection with that investigation on administrative leave.

38.) Furthermore, unknown to Mr. Malloy, at the direction of former Assistant Inspector General for Investigations Robert Groves, in 2001, the allegations about Mr. Chapman's alleged misconduct had previously been investigated by OIG Headquarters Special Investigation Divisions and found to have been unsubstantiated.

39.) The reasons why senior HUD OIG management in Washington, D.C., took the foregoing action against Mr. Malloy were to retaliate against him for refusing to discipline Special Agent Richardson and Special Agent Richardson with disproportionate severity and to discriminate against him because he is of Native American national origin.

## OIG Management In Washington, D.C. Bars Mr. Malloy
## From Applying For Promotion

40.) On October 10, 2002, the same day that Mr. Malloy was placed on administrative leave, directed to have no contact with HUD OIG personnel, and instructed to turn in his OIG personal computer, senior OIG management in Washington, D.C., advertised the position of Special Agent In Charge of OIG Region 6, Mr. Malloy's former region, on the HUD OIG intranet and circulated notice within HUD OIG of the vacancy.

41.) Given his record of sustained outstanding accomplishment and his experience in OIG Region 6, Mr. Malloy was the most qualified candidate for this position, and defendant was aware of his long-standing interest in being promoted into that position.

42.) Due to the unlawful actions of OIG management in Washington, D.C., Mr. Malloy was unaware that the position of Special Agent In Charge of OIG Region 6 had been posted and that the position was open for competition.

43.) During November of 2002, Assistant Inspector General Haban in Washington, D.C., refused to consider Mr. Malloy for the position as Special Agent In Charge of OIG Region 6 and instead selected a nonminority candidate.

44.) Mr. Malloy was better qualified than the selectee for the position of Special Agent In Charge of OIG Region 6 and was denied the position due to retaliation and discrimination by senior OIG management in Washington, D.C.

**Mr. Malloy's Attempt At Being Restored To Active Duty**

45.) Deeply troubled about having been placed under investigation and on administrative leave, on October 15, 2002, Mr. Malloy dispatched a Memorandum to Deputy Assistant Inspector General Salas in Washington, D.C., which reiterated his readiness to provide copies to HUD OIG's Special Investigations Division of any and all records in his possession that pertained to official OIG business or bore any relation to its investigation of Mr. Chapman.

46.) Mr. Malloy also retained counsel who immediately sought to obtain Mr. Malloy's reinstatement.

47.) On October 18, 2002, counsel for Mr. Malloy contacted Deputy Assistant Inspector General Salas by letter in an attempt to correct whatever "misunderstanding" may have existed concerning Mr. Malloy's cooperation "with the investigation" by the Special Investigations Division into Mr. Chapman's activities.

> Apparently, during this investigation, Mr. Malloy was asked to turn over records which are personal. Mr. Malloy has reviewed these records and affirmed that there is nothing which relates to potential misconduct on the part of anyone or to the investigation of Region 6, as he has been advised of its scope. Mr. Malloy has also affirmed that upon request, he is perfectly willing to turn over all records relating to OIG's investigation, whether business or personal, so long as OIG will define the scope of the investigation for him. His offer extends to particular documents or information which OIG identifies; and to categories of documents or information, as well. The only limitation upon Mr. Malloy's offer is that OIG's request either pertain to the investigation of Region 6 or to OIG's official business.

Counsel's letter to Deputy Assistant Inspector General Salas concluded by advising defendant that Ms. Malloy had commenced the administrative complaints process because he alone, unlike others involved in that

investigation, was placed on administrative leave and directed to leave the office.

48.) On October 28, 2002, Deputy Assistant Inspector General Salas responded and denied Mr. Malloy's request for reinstatement. Mr. Salas' letter began by stating that Mr. Malloy acted "at his own peril" in refusing to provide his personal diary to HUD OIG.  Mr. Salas' letter continued by acknowledging that Mr. Malloy's placement on administrative leave had been prompted in part by his role in the proposed disciplinary actions of Special Agents Richardson and Romero, and concluded by acknowledging that Mr. Malloy had filed an administrative complaint of discrimination.

### Senior OIG Management In Washington, D.C. Removes Mr. Malloy From His Supervisory Position, Refuses To Consider Mr. Malloy For Another Supervisory Position, And Constructively Discharges Mr. Malloy

49.) On December 17, 2002, Assistant Inspector General Haban, from his duty station in OIG Headquarters in Washington, D.C., issued a Memorandum relieving Mr. Malloy of "all managerial responsibilities" and removing him from his supervisory position as Assistant Special Agent In Charge in OIG Region 6.  Upon returning to his duty station, Mr. Malloy was advised by the Special Agent In Charge of his former region that he was relieved of all duties as a Special Agent.

50.) On that same date, Assistant Inspector General Haban, from his duty station in Washington, D.C., rescinded approval for Mr. Malloy to carry over 148 hours of excess annual leave to 2003.

51.) On December 19, 2003, Mr. Malloy learned that several days earlier, HUD OIG Headquarters in Washington, D.C., had advertised a position as an Assistant Special Agent In Charge of the OIG Office in

Houston, Texas.  The position was supervisory and carried with it a higher rate of pay than the position which Mr. Malloy then encumbered.

52.) On that same day, Mr. Malloy inquired of senior HUD OIG management whether, were he to apply, he would be considered for the Assistant Special Agent in Charge of the OIG Office in Houston, Texas. Mr. Malloy was informed that he would not and that an application on his part would be futile.

53.) On January 3, 2003, senior OIG management in Washington, D.C., notified Mr. Malloy that unless he resigned from defendant's employ, he would remain subject to investigation and involuntary reassignment outside of his region.

54.) Having placed Mr. Malloy on administrative leave from his senior position in federal law enforcement for over two months, removed Mr. Malloy from his supervisory position under circumstances suggesting that he had engaged in criminal misconduct, relieved Mr. Malloy of all duties as a Special Agent, denied Mr. Malloy the opportunity to be considered for return to a supervisory position, threatened Mr. Malloy with continued investigation and involuntary reassignment, and subjected Mr. Malloy to financial loss by the rescission of approval for him to carry forward excess annual leave, senior HUD OIG management in Washington, D.C., rendered Mr. Malloy's working conditions intolerable and constructively discharged him, effective January 7, 2003.

## Exhaustion Of Administrative Remedies

55.) Mr. Malloy timely initiated the informal administrative EEO complaints process concerning the employment actions which comprise the subject matter of this Complaint on October 17, 2002.

56.) On January 2, 2003, Mr. Malloy timely filed a formal administrative complaint of discrimination.

57.) On March 1, 2004, after receipt of the Report of Investigation of his administrative complaint, Mr. Malloy timely requested a hearing before the Washington Field Office of the Equal Employment Opportunity Commission, in accordance with the directions provided by HUD.

58.) Mr. Malloy has exhausted the administrative remedies available to him, because more than 180 days have elapsed since he requested a hearing before the EEOC without action on his complaint.

## COUNT I
## (Retaliation)

59.) Plaintiff repeats the allegations contained in paragraphs 1 through 58 above, as though fully set forth here.

60.) Plaintiff engaged in protected activity on September 30, 2002, when he opposed defendant's attempt to discipline Special Agent Cortez Richardson with disproportionate severity, because Special Agent Richardson is a minority and in retaliation for his utilization of the EEO complaints processes, and for refusing to discipline Special Agent Steven Romero, because he is also a minority, practices made unlawful under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-16 (incorporating by reference 42 U.S.C. §2000e-2(a)).

61.) On October 10, 2002, senior management in OIG Headquarters in Washington, D.C., retaliated against plaintiff for the foregoing protected activity by placing plaintiff on indefinite administrative leave; directing him to return all HUD OIG property in his possession including, but not limited to, his government issue weapon and personal computer; and instructing him to vacate the OIG Office in Region 6 and to have no further contact with HUD OIG personnel pending further notice from senior OIG management in Washington, D.C.

62.) On October 18, 2002, plaintiff engaged in further protected activity when he advised senior management in OIG Headquarters in Washington, D.C., that plaintiff had initiated the administrative EEO complaints process challenging and seeking the rescission of its actions of October 10, 2002, which were groundless and/or the product of miscommunication.

63.) On October 28, 2002, senior management in OIG Headquarters in Washington, D.C., retaliated against plaintiff for the foregoing protected activities by refusing to rescind its actions of October 10, 2002, despite knowing that they were groundless and/or the product of miscommunication.

64.) During November of 2002, senior management in OIG Headquarters in Washington, D.C., retaliated against plaintiff for the foregoing protected activities by not considering or selecting Mr. Malloy for the position as Special Agent In Charge of OIG Region 6, despite knowing of his long-standing interest in being promoted into that position.

65.) On December 17, 2002, senior management in OIG Headquarters in Washington, D.C., retaliated against plaintiff for the foregoing protected activities by relieving plaintiff of all managerial responsibilities; removing plaintiff from his supervisory position as Assistant Special Agent In Charge in OIG Region 6; rescinding approval for plaintiff to carry over 148 hours of excess annual leave to 2003; and relieving Mr. Malloy of all duties as a Special Agent.

66.) On December 19, 2002, senior OIG management retaliated against plaintiff for the foregoing protected activities by denying plaintiff the opportunity to be considered for the vacant supervisory position as Assistant Special Agent In Charge of the OIG Office in Houston, Texas, despite knowing of his interest in being selected for that position, and advising plaintiff that an application for that or any other supervisory position in HUD OIG would be futile.

67.) On January 3, 2003, senior OIG management in Washington, D.C., retaliated against plaintiff for the foregoing protected activities by notifying plaintiff that unless he resigned from defendant's employ, he would remain subject to investigation and involuntary reassignment outside of his region.

68.) In retaliating against plaintiff in the manners alleged in this Complaint, defendant materially and adversely altered the terms, conditions, and privileges of plaintiff's employment and plaintiff's future employment opportunities; stigmatized plaintiff and damaged plaintiff's professional reputation and standing in the community of federal, state, and local law enforcement professional in the region in which he was formerly employed; and took materially adverse action

against plaintiff that would dissuade a reasonable worker from making or supporting a charge of discrimination.

69.) As a natural and proximate result of the retaliation by senior OIG management in Washington, D.C., effective January 7, 2003, plaintiff was constructively discharged from defendant's employ.

70.) As a natural and proximate result of the retaliation by senior OIG management in Washington, D.C., effective January 7, 2003, plaintiff was coerced into resigning from defendant's employ.

71.) Defendant violated the opposition clause of Title VII of the Civil Rights Act, 42 U.S.C. §2000e-16 (incorporating by reference 42 U.S.C. §2000e-3(a)), by retaliating against plaintiff in the manners described above.

72.) Defendant's violation of plaintiff's civil rights caused him to suffer emotional pain, embarrassment, humiliation, mental anguish, inconvenience, anxiety, and loss of enjoyment of life.

### COUNT II
### (Retaliation)

73.) Plaintiff repeats the allegations contained in paragraphs 1 through 72 above, as though fully set forth here.

74.) On October 17, 2002, plaintiff commenced the administrative EEO complaints process and thereby participated in activity protected under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-16 (incorporating by reference 42 U.S.C. §2000e-2(a)), and continued to participate in such activity through the filing of this action.

75.) On October 18, 2002, plaintiff engaged in further protected activity when he advised senior management in OIG Headquarters in

Washington, D.C., that plaintiff had initiated the administrative EEO complaints process challenging and seeking the rescission of its actions of October 10, 2002, which were groundless and/or the product of miscommunication.

76.) On October 28, 2002, senior management in OIG Headquarters in Washington, D.C., retaliated against plaintiff for the foregoing protected activities by refusing to rescind its actions of October 10, 2002, despite knowing that they were groundless and/or the product of miscommunication.

77.) During November of 2002, senior management in OIG Headquarters in Washington, D.C., retaliated against plaintiff for the foregoing protected activities by not considering or selecting Mr. Malloy for the position as Special Agent In Charge of OIG Region 6, despite knowing of his long-standing interest in being promoted into that position.

78.) On December 17, 2002, senior management in OIG Headquarters in Washington, D.C., retaliated against plaintiff for the foregoing protected activities by relieving plaintiff of all managerial responsibilities; removing plaintiff from his supervisory position as Assistant Special Agent In Charge in OIG Region 6; rescinding approval for plaintiff to carry over 148 hours of excess annual leave to 2003; and relieving Mr. Malloy of all duties as a Special Agent.

79.) On December 19, 2002, senior OIG management retaliated against plaintiff for the foregoing protected activities by denying plaintiff the opportunity to be considered for the vacant supervisory position as Assistant Special Agent In Charge of the OIG Office in

Houston, Texas, despite knowing of his interest in being selected for that position, and advising plaintiff that an application for that or any other supervisory position in HUD OIG would be futile.

80.) On January 3, 2003, senior OIG management in Washington, D.C., retaliated against plaintiff for the foregoing protected activities by notifying plaintiff that unless he resigned from defendant's employ, he would remain subject to investigation and involuntary reassignment outside of his region.

81.) In retaliating against plaintiff in the manners alleged in this Complaint, defendant materially and adversely altered the terms, conditions, and privileges of plaintiff's employment and plaintiff's future employment opportunities; stigmatized plaintiff and damaged plaintiff's professional reputation and standing in the community of federal, state, and local law enforcement professional in the region in which he was formerly employed; and took materially adverse action against plaintiff that would dissuade a reasonable worker from making or supporting a charge of discrimination.

82.) As a natural and proximate result of the retaliation by senior OIG management in Washington, D.C., effective January 7, 2003, plaintiff was constructively discharged from defendant's employ.

83.) As a natural and proximate result of the retaliation by senior OIG management in Washington, D.C., effective January 7, 2003, plaintiff was coerced into resigning from defendant's employ.

84.) Defendant violated the participation clause of Title VII of the Civil Rights Act, 42 U.S.C. §2000e-16 (incorporating by reference

42 U.S.C. §2000e-3(a)), by retaliating against plaintiff in the manners described above.

85.) Defendant's violation of plaintiff's civil rights caused him to suffer emotional pain, embarrassment, humiliation, mental anguish, inconvenience, anxiety, and loss of enjoyment of life.

## COUNT III
### (Discrimination Based On National Origin)

86.) Plaintiff repeats the allegations contained in paragraphs 1 through 85 above, as though fully set forth here.

87.) Plaintiff is of Native American national origin.

88.) On October 10, 2002, senior management in OIG Headquarters in Washington, D.C., discriminated against plaintiff on the basis of his national origin by placing plaintiff on indefinite administrative leave; directing him to return all HUD OIG property in his possession including, but not limited to, his government issue weapon and personal computer; and instructing him to vacate the OIG Office in Region 6 and to have no further contact with HUD OIG personnel pending further notice from senior OIG management in Washington, D.C.

89.) On October 28, 2002, senior management in OIG Headquarters in Washington, D.C., discriminated against plaintiff on the basis of his national origin by refusing to rescind its actions of October 10, 2002, despite knowing that they were groundless and/or the product of miscommunication.

90.) During November of 2002, senior management in OIG Headquarters in Washington, D.C., discriminated against plaintiff on the basis of his national origin by not considering or selecting Mr. Malloy for the position as Special Agent In Charge of OIG Region 6,

despite knowing of his long-standing interest in being promoted into that position.

91.) On December 17, 2002, senior management in OIG Headquarters in Washington, D.C., discriminated against plaintiff on the basis of his national origin by relieving plaintiff of all managerial responsibilities; removing plaintiff from his supervisory position as Assistant Special Agent In Charge in OIG Region 6; rescinding approval for plaintiff to carry over 148 hours of excess annual leave to 2003; and relieving Mr. Malloy of all duties as a Special Agent.

92.) On December 19, 2002, senior OIG management discriminated against plaintiff on the basis of his national origin by denying plaintiff the opportunity to be considered for the vacant supervisory position as Assistant Special Agent In Charge of the OIG Office in Houston, Texas, despite knowing of his interest in being selected for that position, and advising plaintiff that an application for that or any other supervisory position in HUD OIG would be futile.

93.) On January 3, 2003, senior OIG management in Washington, D.C., discriminated against plaintiff on the basis of his national origin by notifying plaintiff that unless he resigned from defendant's employ, he would remain subject to investigation and involuntary reassignment outside of his region.

94.) In taking the foregoing actions, defendant materially and adversely altered the terms, conditions, and privileges of plaintiff's employment and plaintiff's future employment opportunities; and stigmatized plaintiff and damaged plaintiff's professional reputation and standing in the community of federal, state, and local law

enforcement professional in the region in which he was formerly employed.

95.) As a natural and proximate result of the discrimination by senior OIG management in Washington, D.C., effective January 7, 2003, plaintiff was constructively discharged from defendant's employ.

96.) As a natural and proximate result of the discrimination by senior OIG management in Washington, D.C., effective January 7, 2003, plaintiff was coerced into resigning from defendant's employ.

97.) Defendant violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-16 (incorporating by reference 42 U.S.C. §2000e-2(a)), by discriminating against plaintiff because he is of Native American national origin in taking the foregoing actions.

98.) Defendant's violation of plaintiff's civil rights caused him to suffer emotional pain, embarrassment, humiliation, mental anguish, inconvenience, anxiety, and loss of enjoyment of life.

## PRAYER FOR RELIEF

Wherefore, plaintiff James Malloy respectfully requests that the Court enter judgment in his favor and award him the following relief.

A.    An Order declaring that defendant violated plaintiff's civil rights under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-16, and restraining and enjoining defendant from further such violations.

B.    An Order reinstating plaintiff in a supervisory position in defendant's employ retroactive to December 17, 2002.

C.    An Order retroactively promoting plaintiff to the position of Special Agent In Charge of HUD OIG Region 6 and/or promoting

plaintiff to the position of Assistant Special Agent In Charge of HUD OIG's office in Houston, Texas.

D.    Backpay and benefits commensurate with the foregoing equitable relief.

E.    Record expunction and correction.

F.    Compensatory damages in an amount to be determined at trial to compensate plaintiff for the emotional pain, embarrassment, humiliation, mental anguish, inconvenience, career loss, loss of professional reputation, and loss of enjoyment of life caused by defendant's unlawful actions.

G.    The attorneys' fees and costs incurred by plaintiff.

H.    Such other relief as may be just and appropriate.

<u>**JURY DEMAND**</u>

Plaintiff requests a trial by jury of all issues so triable.


Respectfully submitted,


/s/
_____
Robert C. Seldon, Esq.
  D.C. Bar No. 245100


/s/
_____
Molly E. Buie, Esq.
  D.C. Bar No. 483767

Robert C. Seldon & Associates, P.C.
1319 F Street, N.W.
Suite 305
Washington, D.C.  20004
(202) 955-6968

Counsel for Plaintiff