## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JAMES MALLOY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-1117 (RCL) |
| | ) | |
| ALPHONSO R. JACKSON, Secretary of | ) | |
| U.S. Department of Housing and Urban | ) | |
| Development, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, and LCvR 56.1, Defendant Alphonso R. Jackson, Secretary of the United States Department of Housing and Urban Development ("Defendant"), respectfully moves for summary judgment on the grounds that Plaintiff cannot make out a *prima facie* case on his discrimination claim and his retaliation and constructive discharge claims are defeated by defendant's legitimate and non-retaliatory reasons for temporarily placing plaintiff under investigation and on administrative leave and returning him to duty without supervisory duties.

In support of this motion, Defendant respectfully refers the Court to the attached Statement of Material Facts Not In Genuine Dispute ("DSMF") and to the attached memorandum of points and authorities.

Because this is a dispositive motion, Defendant has not sought Plaintiff's consent. See LCvR 7(m).

Dated:  June 5, 2007.

Respectfully submitted,

_____
JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney


/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


/s/_____
JANE M. LYONS, D.C. Bar # 451737
Assistant United States Attorney
555 4th Street, N.W - Room E4822
Washington, D.C. 20530
(202) 514-7161
(202) 514-8780 (facsimile)


Of Counsel:
Richard K. Johnson, Deputy Counsel to the Inspector General
Ariya McGrew, Attorney-Advisor, Office of the General Counsel
United States Department of Housing and Urban Development

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JAMES MALLOY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-1117 (RCL) |
| | ) | |
| ALPHONSO R. JACKSON,  Secretary of | ) | |
| U.S. Dept. of Housing and Urban | ) | |
| Development, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**I.     INTRODUCTION**

Plaintiff, James Malloy ("Plaintiff") is suing the Secretary of the United States

Department of Housing and Urban Development ("HUD"), alleging that officials in the Office of

Inspector General (OIG) of HUD, discriminated against him on the basis of his national origin

(Native American) (Count III) and in reprisal in violation of Title VII of the Civil Rights Act of

1964, as amended (Counts I and II).  Plaintiff is also claiming that the Agency's actions were so

intolerable that what otherwise appeared to be his voluntary retirement from the agency's

employment in January 2003 was a constructive discharge.  For relief, Plaintiff seeks, *inter alia*,

compensatory damages, reinstatement to a supervisory position, promotion, back pay, and

attorney's fees.[1]

---

[1]   Although Plaintiff's counsel informed Defendant's counsel by letter dated March 12, 2007 that Plaintiff had
"decided not to pursue claims over his not being selected for the position of Special Agent in Charge of OIG
Regions VI, instead of Lester Davis[,]" Plaintiff has not formally moved for leave to further amend his pleading to
drop the allegations of fact or prayer for relief relating to this claim.  Nevertheless, defense counsel has relied on this
representation for purposes of preparing this motion, and it no longer appears that Plaintiff is seeking a promotion.

The real story in this case is remarkably mundane, and much of the conflict Plaintiff perceived in his employment existed primarily in his own mind.  Plaintiff worked largely without incident as a Special Agent in HUD-OIG's Fort Worth, Texas for his entire career.  Toward the end of that career, Plaintiff refused to cooperate fully with an internal investigation into some alleged misconduct by his former supervisor and was himself believed to have attempted to interfere with the internal investigation.  As a result, HUD-OIG temporarily placed Plaintiff on administrative leave while it further investigated these allegations.  After Plaintiff remained on administrative leave longer than he might have otherwise at his own request, HUD-OIG eventually returned him to his Special Agent position, but not immediately to his supervisory duties based on its continuing concern that such supervision could be undermined by the recent investigation.  Just a short time after returning to work, Plaintiff retired apparently in large part, due to his subjective fear that he might be involuntarily re-assigned outside of Texas.  In the meantime, Plaintiff's non-selection for a position as an Assistant Special Agent in Charge in HUD-OIG's Houston office is fully explained by his own failure to submit an application for the position or to indicate to anyone that he had an interest in the position.

As demonstrated below, Plaintiff fails to establish a *prima facie* case of discrimination based upon his national origin because he is unable to prove that he is a Native American. Alternatively, Plaintiff also lacks evidence that the decision-makers at HUD-OIG's Washington, D.C. headquarters knew that Plaintiff claimed any Native American ancestry until after Plaintiff filed his discrimination complaint.  With regard to his retaliation claim based on the oppositional clause of Title VII, Plaintiff is unable to show a discriminatory practice by the Agency that he opposed.  His participation as the Recommending Official in the process for terminating two other Special Agents is insufficient because, among other reasons, nobody ever told Plaintiff

what penalty was appropriate, let along motivated by some unlawful discriminatory taint.

Importantly, however, Plaintiff's steadfast refusal to cooperate with a request for documents in

connection with an internal investigation of allegations of misconduct by his supervisor, as well

as evidence suggesting that Plaintiff may have attempted to obstruct that internal investigation,

establish the legitimate, non-retaliatory reason for HUD-OIG's decision to place Plaintiff

temporarily on administrative leave, remove his supervisory duties on his return to duty, and

other actions.  Lastly, Plaintiff cannot show that his working conditions became so intolerable in

the two weeks he worked while the investigation remained ongoing that his retirement amounted

to a constructive removal.  For these reasons, defendant's motion should be granted and

judgment entered for Defendant on all Counts in the Amended Complaint.

## II.    STATEMENT OF THE CASE

This case concerns a HUD OIG manager whose failures to follow proper procedure and

rigid loyalty to his immediate superior led to some unfortunate decisions that ran contrary to

Agency policies and procedures.  The Agency had not only a right but a responsibility to respond

reasonably to the situation.

Plaintiff is a former ASAC for HUD OIG in Region 6.  (DSMF 1).  He began his

employment with HUD OIG in 1983 and has only worked in the Ft. Worth office.  (DSMF 1).  In

1991, Larry Chapman became the Special Agent in Charge (SAC) at Fort Worth.  (DSMF 2).

SAC Chapman promoted Plaintiff to ASAC in 1993. (DSMF 2).

In July 2002, Jeffrey Finn, a former SAC for the Rocky Mountain Region, was convicted

of knowingly and willfully making a false document.  (DSMF 3).  Although Mr. Finn's

conviction was subsequently overturned, United States v. Finn, 375 F.3d 1033 (10th Cir. 2004),

SA Cortez Richardson had a role in falsifying the document at issue (i.e., a receipt) and he

testified for the Government at Finn's trial. (DSMF 3)  HUD OIG transferred SA Richardson

from the Rocky Mountain Region to the Fort Worth Region in about June 2002.  DSMF 4.  HUD

OIG investigated SA Richardson's role in the falsification of the receipt and other misconduct

that occurred while SA Richardson was assigned to the Rocky Mountain Region. See id.

 After SA Richardson transferred to Region 6 and after the Finn trial, AIGI Haban sent the

ROI on SA Richardson to SAC Chapman, telling SAC Chapman that the recommending official

would be the immediate supervisor and SAC Chapman would be the deciding official. (DSMF 5)

At about the same time, Region 6 also received an ROI on SA Romero for their consideration

and action. (DSMF 6)

 AIGI Haban did not know who the proposing official would be for any discipline

imposed on SA Richardson until after the disciplinary action was completed.  (DSMF 7)  It was

a coincidence that the Plaintiff was the proposing official for both SA Richardson and SA

Romero and that SAC Chapman was the deciding official.  (DSMF 8).

 The allegations against SA Richardson included damaging a tow truck by kicking it and

altering the receipt.  (DSMF 9).  SA Romero was accused of not being truthful about the reasons

for his departure from the Austin Police Department and not paying credit card bills.  (DSMF

10).  In proposing discipline in these cases, the Plaintiff consulted with SAC Chapman and

reviewed the ROIs, but he did not consult with a Human Resource specialist or the Office of

Legal Counsel after reviewing the ROI.  (DSMF 20).  Then in a highly unusual manner, and in a

way that the Plaintiff admits violated the Agency's policy, Plaintiff proposed a five-day

suspension for SA Richardson on September 30, 2002, and SAC Chapman decided to impose the

five-day suspension that same day.  (DSMFs 15, 20).  Plaintiff gave SA Romero a Letter of

Caution on September 30, 2002.  (DSMF 15).  SAC Chapman drafted most of the document

proposing a five-day suspension for SA Richardson.  (DSMF 14).  SAC Chapman then retired

that same day.  (DSMF 16).

Prior to Plaintiff proposing discipline for SA Richardson and SA Romero, SAC McCarty

opened an investigation regarding SAC Chapman.  (DSMF 21).  The Chapman investigation

involved allegations that SAC Chapman used his government-owned vehicle and official time

for personal business.  (DSMF 21).  As part of this investigation, SID interviewed Plaintiff on

September 19, 2002.  (DSMF 22).  The investigators asked Plaintiff to provide copies of the

diaries he maintained.  (DSMF 22).  Plaintiff initially agreed to provide the documents but later

told the investigators that he would not provide them with his diaries and did not provide the

diaries prior to his own retirement in January, 2003. (DSMF 22).  On September 19 or 20, 2002,

SAC McCarty advised DAIGI Salas and AIGI Haban that ASAC Malloy was not cooperating in

the investigation of SAC Chapman.  (DSMF 23).

In September 2002, immediately following Plaintiff's SID interview but before the

disciplinary actions on SA Richardson and SA Romero, DIGI Salas received allegations that at a

meeting of the special agents in Region 6, the investigation of SAC Chapman was discussed, and

the Plaintiff told the agents they needed to "circle the wagons."  (DSMF 24).  AIGI Haban was

told that the Plaintiff had made comments to his agents about how to handle the inquiry if the

investigators came around, using the phrase "circle the wagons." (DSMF 24)

On October 10, 2002, the Plaintiff was placed on administrative leave pending an

investigation into his alleged misconduct in Region 6.  The decision to place Mr. Malloy on

administrative leave was made by AIGI Haban.  (DSMF 25).  AIGI Haban placed Plaintiff on

administrative leave because he had been told that Plaintiff refused to cooperate with an

investigation of SAC Chapman and that Plaintiff had made comments to agents in Region 6

about how to handle the inquiry into SAC Chapman, using the phase "circle the wagons." (DSMF 26). It appeared to AIGI Haban that a supervisor was obstructing an on-going investigation and telling his agents how to obstruct the same investigation. (DSMF 26). For these reasons, he could not allow Plaintiff to remain a supervisor in the office during his own investigation. (DSMF 26).

Plaintiff admits that if a manager told his subordinates to "circle the wagons" in order to obstruct an official investigation, that would be improper. (DSMF 27). He also admits that either he or Chapman may have said "that type of information about circling the wagons," but not in the context of the Chapman investigation. (DSMF 28). Plaintiff filed an informal complaint of discrimination on October 17, 2002, after being placed on administrative leave.

During the course of the investigation regarding Plaintiff, three witnesses stated under oath that Plaintiff said "circle the wagons" during a staff meeting with reference to possible internal investigations. (DSMF 29). Another three recall hearing words similar to "circle the wagon," but they were unsure who said them. (DSMF 30). One agent recalled hearing Plaintiff say we "should close ranks" in relation to SAC Chapman's discussion of visits from internal affairs. (DSMF 31). AIGI Haban was briefed during the course of the investigation that some agents heard the Plaintiff say things like "circle the wagons" and some did not, but he was not briefed on what each agent said. (DSMF 32).

AIGI Haban continued to keep Plaintiff on administrative leave because he was told that Mr. Malloy wanted to stay on administrative leave until after the first of the year. (DSMF 34). Plaintiff admits that as part of the settlement negotiations his counsel proposed that Plaintiff remain on administrative until early January 2003. (DSMF 35-36). Then, by a memorandum dated December 17, 2002 -- the day after the settlement negotiations failed -- AIGI Haban

directed Mr. Malloy to return to duty.  (DSMF 36).  Plaintiff returned to duty on Thursday,

December 19, 2002.  (DSMF 36).

When AIGI Haban returned Plaintiff to duty, he made the decision to remove Plaintiff's

supervisory responsibilities because he needed to get the Plaintiff back to work but he did not

want him in a position where he could influence other people.  (DSMF 38).  He also authorized

Plaintiff to take any leave he had accumulated.  (DSMF 37).  Lester Davis, the senior agent in

the office when Plaintiff returned, told Plaintiff that he did not know what was going to happen

to the Plaintiff and no one in Headquarters ever told him why Plaintiff was on administrative

leave or why he was returning to duty.  (DSMF 39).  In any event, Plaintiff was given duties to

perform that did not involve supervision of other employees.  (DSMF 41).

On or before December 23, 2002, Plaintiff asked a personnel specialist at BPD for an

application for retirement, and he signed the application on December 26, 2002.  (DSMF 44).

On January 3, 2003, Plaintiff retired. (DSMFs 43, 44)  The primary reasons Plaintiff gave for his

retirement were that he had lost his supervisory responsibilities and he did not want any written

disciplinary action taken against him.  (DSMF 43).  He also did not want to lose 146 hours of

excess leave he had accumulated, and he was paid for it as part of his retirement.  (DSMF 43,

48).  No one at HUD OIG told Plaintiff that he had to either retire or be subject to reassignment.

(DSMF 47).

While the Plaintiff was on administrative leave, the Agency announced two vacancies

which were published on publicly available websites.  (DSMFs 50, 55).  Plaintiff was aware of

both of the openings before they closed but he did not apply for either position.  (DSMFs 51, 52,

55).  Plaintiff also failed to indicate his interest in the positions to anyone at HUD OIG.  (DSMF

53).  Plaintiff has not applied for any jobs since his retirement.  (DSMF 46).

While Plaintiff claims his great-grandmother was a full-blood Cherokee Indian, he has no documentary proof that he is a Native American, he is not a member of any organization related to his Cherokee ancestry, and he has never attempted to verify that he is truly Native American. (DSMFs 56, 57, 58, 59). AIGI Haban believes he first learned that Plaintiff was claiming to be a Native American when the Plaintiff filed his complaint of discrimination. (DSMF 60).

## III.    STATEMENT OF MATERIAL FACTS

Defendant adopts and incorporates here the Defendant's Statement of Material Facts Not In Genuine Dispute appended hereto.

## IV.    ARGUMENT

### A.    Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Diamond v. Atwood, 43 F.3d 1538, 1540 (D.C. Cir. 1995). In ruling on a motion for summary judgment, the Court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. See id. at 252. To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "failed to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." See Celotex, 477 U.S. at 322. By pointing to the absence of evidence proffered by the nonmoving party, a moving party may

succeed on summary judgment.  See id. The nonmoving party may not rely solely on allegations

or conclusory statements.  See Greene v. Dalton, 164 F.3d 671, 675 (D.C. Cir. 1999); Harding v.

Gray, 9 F.3d 150, 154 (D.C. Cir. 1993).  Rather, the nonmoving party must present specific facts

that would enable a reasonable jury to find in its favor.  See Greene, 164 F.3d at 675.

Specifically, plaintiff cannot create a factual issue—particularly that of pretext—based merely on

personal speculation of discriminatory intent.  See id. at 675.  If the evidence "is merely

colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477

U.S. at 249-50 (internal citations omitted).

        Once it is established that both parties have met their respective burdens of production

(i.e., by plaintiff presenting a prima facie case and by defendant producing a non-discriminatory

or non-retaliatory reason for its actions), the burden shifting scheme becomes irrelevant.  St.

Mary's Honor Center v. Hicks, 509 U.S. 502, 510 (1993).  In the summary judgment context, the

central inquiry remains the evidence, or lack thereof, of discrimination or retaliation in a

particular case.  The Court should weigh whether the plaintiff has proof that would permit a

reasonable jury to conclude that discrimination was a motivating factor for the challenged action,

looking to defendant's legitimate, non-discriminatory or non-retaliatory reasons for the

challenged decision and the evidence as a whole, in order to determine whether there is a need

for trial.  See, e.g., Holcomb v. Powell, 433 F.3d 889 (D.C. Cir. 2006) (quoting Lathram v.

Snow, 336 F.3d 1085, 1088 (D.C. Cir. 2003)).  See also Brown v. Small, 2006 WL 1888562 at

*5 (D.D.C. July 7, 2006) (RBW) (plaintiff must show that a reasonable jury could conclude from

all of the evidence that the adverse employment action was made for an unlawful reason).[2]

---

[2]  Under the McDonnell Douglas test, Plaintiff has the initial burden of proving by a preponderance of the evidence
a prima facie case of discrimination.  Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981).
If the Plaintiff is able to establish a prima facie case, then the Court should weigh Defendant's legitimate,
nondiscriminatory reason or reasons with any evidence plaintiff presents that defendant's stated reason merely was a

A plaintiff must present substantial and credible evidence of discrimination or retaliation in order to survive a motion for summary judgment.  See Greene v. Dalton, 164 F.3d at 675 ("Accepting [some] conclusory allegations as true, therefore, would defeat the central purpose of the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial."); Carpenter v. Federal Nat'l Mortgage Ass'n, 165 F.3d 69, 72 (D.C. Cir. 1999) (if plaintiff merely shows that the legitimate nondiscriminatory reason offered by the employer is a pretext for a decision intending to cover up an unsavory reason – but one that is not illegal under the anti-discrimination law – the plaintiff is not entitled to try issues of fact, and summary judgment for the employer is appropriate.), cert. denied, 528 U.S. 823 (1999); Hastie v. Henderson, 121 F. Supp. 2d, 72, 77 (D.D.C. 2000) ("To defeat a motion for summary judgment, a plaintiff cannot create a factual issue of pretext with mere allegations or personal speculation, but rather must point to 'genuine issues of material fact in the record.'"), aff'd, No. 00-5423, 2001 WL 793715 (D.C. Cir. 2001); Woodruff v. DiMario, 164 F. Supp. 2d 1, 5 (D.D.C. 2001), aff'd, No. 01-5321, 2002 WL 449776 (D.C. Cir. Feb. 21, 2002).  Additionally, there will be "instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory [or retaliatory]."  Weigert v. Georgetown University, 120 F. Supp. 2d 1, 22 (D.D.C. 2000), quoting, Reeves v. Sanderson Plumbing Co., 530 U.S. 133 (2000).

## B.    Deference Due to Employer's Business Decisions

Before turning to the merits, a brief word is in order concerning the scope of review in cases brought under Title VII.  Though Plaintiff might wish it otherwise, the employment discrimination statutes did not transform federal courts into review boards for local employment

---

pretext for discrimination.  Id.  At all times, plaintiff retains the ultimate burden of persuasion to demonstrate that she was in fact the victim of intentional discrimination or retaliation.  Burdine, 450 U.S. at 252-53.

decisions and there must be more than a person's bare suspicion or fear to establish a claim

under the law. "Title VII, it bears repeating, does not authorize a federal court to become 'a

super-personnel department that reexamines an entity's business decisions.'" Barbour v.

Browner, 181 F.3d 1342, 1346 (D.C. Cir. 1999) (quoting Dale v. Chicago Tribune Co., 797 F.2d

458, 464 (7th Cir. 1986)). To the contrary, a court "may not 'second-guess an employer's

personnel decision absent demonstrably discriminatory [or retaliatory] motive.'" Fischbach v.

District of Columbia Dep't of Corrections, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (quoting Milton

v. Weinberger, 696 F.2d 94, 100 (D.C. Cir. 1982)).

   C.     **Summary of Plaintiff's Claims**

   In Count III of the Amended Complaint, Plaintiff alleges disparate treatment based on his

alleged national origin when he 1) was placed on administrative leave on October 10, 2002, 2)

was subjected to an unwarranted investigation between October 2002 and December 2002, 3)

returned to duty without supervisory responsibilities, 4) was not considered for two vacancies,

and 5) was threatened with reassignment because of his national origin and because he refused to

severely punish two minority employees. As the Defendant demonstrates below, however, the

Plaintiff fails to establish a prima facie case of discrimination based upon national origin because

he is unable to prove that he is a Native American. Additionally, he has no evidence that HUD

OIG officials knew that he claimed to be Native American until he filed his discrimination

complaint. Plaintiff also cannot show that the actions taken by the Agency were adverse

personnel actions.

   In Count I of the Amended Complaint, Plaintiff also alleges that the Agency took the

above actions because 1) he opposed a discriminatory practice when he proposed discipline in

September 2002 for two special agents, and 2) he participated in protected activity when he filed

11

an EEO administrative complaint in October 2002.  Plaintiff cannot establish a prima facie case

of retaliation under the "opposition" clause of Title VII because he is unable to show a

discriminatory practice by the Agency that he opposed.  Further, in the alternative, Plaintiff

cannot show that any protected activity was the cause for the agency's actions or that the reasons

offered by Defendant were pretextual.

     Plaintiff also claims that the Agency's actions caused him to retire in January 2003.

Because Plaintiff cannot show that his work environment was so intolerable as to make his

retirement involuntary, he cannot show that his retirement was a constructive removal.

    **D.**    **Plaintiff Cannot Show Either That He Is a Member of a Protected Class for National Origin Discrimination Or that Any Adverse Action Was Taken Because of It.  (COUNT III)**

     Title VII prohibits federal agencies from discriminating in employment on the basis of

national origin.  *See* 42 U.S.C. § 2000e-16(a).  The statute also prohibits employers from

retaliating against employees either for participating in the complaint process or for opposing

discriminatory practices.  See 42 U.S.C. § 2000e-3(a).  In order to prevail in a Title VII case,

proof of intentional discrimination or retaliation is crucial.  *See* International Brotherhood of

Teamsters v. United States, 431 U.S. 324, 335 n.15 (1977).  Plaintiff can use direct evidence of

discrimination to prove intentional discrimination or he can use circumstantial evidence under

the familiar burden shifting analysis enunciated in McDonnell Douglas Corp. v. Green, 411 U.S.

792 (1973), and in Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981).  Because there

is no direct evidence of discrimination or retaliation in this case, Plaintiff must proceed using the

burden shifting analysis.

     Under the burden-shifting formula, Plaintiff must initially establish a prima facie case of

discrimination showing that: 1) he is a member of a protected class; 2) he suffered an adverse

employment action; and 3) the unfavorable action gives rise to an inference of discrimination. See Stella v. Mineta, 284 F.3d 135, 144-45 (D.C. Cir. 2002) (citing McDonnell Douglas, 411 U.S. at 802); see also Harding v. Gray, 9 F.3d 150, 152 (D.C. Cir. 1993). To establish a prima facie case of retaliation, Plaintiff must show that: 1) he engaged in activity protected by Title VII; 2) the Agency took an adverse employment action against him or took some other kind of action with material consequences that would dissuade a reasonable worker from making or supporting a charge of discrimination; and 3) there is a causal connection between the protected activity and the adverse action. Burlington Northern & Santa Fe Ry. Co. v. White, 126 S. Ct. 2405, 2414-15 (2006); Holcomb v. Powell, 433 F.3d 889, 901-02 (D.C. Cir. 2006) (citing Forkkio v. Powell, 306 F.3d 1127, 1131 (D.C. Cir. 2002)); Rochon v. Gonzales, 438 F.3d 1211, 1219-20 (D.C. Cir. 2006). Brown v. Brody, 199 F.3d 446, 453 (D.C. Cir. 1999); Lockamy v. Truesdale, 182 F. Supp. 2d 26, 33 (D.D.C. 2001).

If Plaintiff succeeds in establishing a prima facie case, the burden shifts to Defendant to articulate a legitimate, non-discriminatory reason for its actions. See Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007) (citing McDonnell Douglas, 411 U.S. at 802). Once Defendant has articulated a legitimate, non-discriminatory reason for its actions, the prima facie inference of discrimination drops from the case. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11 (1993); Burdine, 450 U.S. at 255. Plaintiff must then prove that Defendant's proffered reason was not a motivating reason for its actions and was only a pretext for unlawful discrimination. Burdine, 450 U.S. at 253; McDonnell Douglas, 411 U.S. at 804; see also St. Mary's Honor Ctr., 509 U.S. at 507-08; Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1289 (D.C. Cir. 1998). In short, "to survive summary judgment the plaintiff must show that a reasonable jury could

conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason." Czekalski, 475 F.3d at 363 (internal citation omitted).

The Court's scope of review in employment discrimination cases is limited. A court "may not 'second-guess an employer's personnel decision absent demonstrably discriminatory motive.'" Fischbach, 86 F.3d at 1183 (quoting Milton v. Weinberger, 696 F.2d 94, 100 (D.C. Cir. 1982)). As expressed in Barbour v. Browner, "Title VII . . . does not authorize a federal court to become 'a super-personnel department that reexamines an entity's business decisions'" 181 F.3d at 1346 (quoting Dale v. Chicago Tribune Co., 797 F.2d 458, 464 (7th Cir. 1986)). Count III of the complaint must be dismissed because the Plaintiff cannot make a *prima facie* case of discrimination based on his national origin or an adverse action.

  1. Plaintiff has no admissible evidence to establish that he is Native American

A fundamental, but often presumed, element of a *prima facie* case of discrimination is proof that the plaintiff belongs to a protected group. As with other elements of a *prima facie* case, the burden of proving membership in a protected class rests with plaintiff. See Perkins v. Lake County Dept. of Utils., 860 F. Supp. 1262, 1276 n.14 (N.D. Ohio 1994); see also Becker v. Federal Express Corp., 1996 U.S. Dist. LEXIS 971, at *5, aff'd, 1997 U.S. App. LEXIS 3649 (6th Cir. 1997). Some courts analyze this element under a subjective standard, while other courts use a purely objective standard to measure proof of membership in a protected class. Although the D.C. Circuit has not yet articulated the standard in this area, Plaintiff loses under either standard.

First, Plaintiff has no documentary evidence that he is Native American. See DSMF 56. Second, even under a subjective analysis, *i.e.*, plaintiff's feelings about his own ethnicity, proof of membership in a protected class must rely on admissible evidence. In Becker, the court

grappled with a case in which the plaintiff alleged discrimination based on Native American ancestry relying solely on hearsay evidence from her father to prove membership in a protected class.  Becker,  1996 U.S. Dist. LEXIS 971, at *5.   The court succinctly concluded that plaintiff's "self-serving statements are insufficient to prove Native American status."  Id. at *5-6, 7.  Similar to Becker, Plaintiff in this case has no evidence regarding his national origin other than a bare assertion that he is a Native American based on family lore.  See Exh. 1, Malloy I, 7:10-14, 9:7-10.  Specifically, Plaintiff testified in his deposition that, "What I know [about my Cherokee heritage] is based on what my family has told me . . . ." Id. at 7:10-14.  Plaintiff also places great weight for his belief on an information sheet about the Cherokee nation.  Malloy 8:6-12.  Neither of these bases is sufficient to prove that Plaintiff is part Cherokee.  The information from Plaintiff's family does not adequately prove that Plaintiff is actually Native American since it is strictly hearsay evidence.  Similarly, the document Plaintiff referred to in his deposition proves nothing about his membership in a protected class since it did not specifically address Plaintiff's ancestry.

Thus, regardless of Plaintiff's subjective belief of his ancestry, the evidence in the record is not admissible to prove that he is part Cherokee.  Plaintiff's admitted non-participation at any time in his life in any group associated with Native American heritage or culture further undermines his subjective claim to protected status under Title VII.  See DSMF 59.  Absent proof that he actually is a member of a protected category under Title VII, Plaintiff fails to make out an essential element of his discrimination claim.

> 2. Plaintiff cannot show that HUD OIG officials were aware that He claimed to be Native American at the time Plaintiff was placed on administrative leave and returned to duty without supervisory responsibilities.

Under an objective analysis of membership in a protected class, Plaintiff still cannot establish a prima facie case of discrimination based on national origin. Courts using this analysis focus on factors that give off a perception of membership in a particular group such as physical appearance, language, cultural activities, or associations. Under this objective analysis, the key issue is whether Plaintiff can show that the Agency had a reasonable belief that he was a member of a protected class. Perkins, 860 F. Supp. at 1277-78; see also Gilbert v. Babbitt, No. 92-1124, 1993 WL 468465, at *4 (D.D.C. Oct. 29, 1993) (granting summary judgment on plaintiff's claim of national origin discrimination based on declarations from decision-makers attesting to their ignorance of plaintiff's controverted protected status); Greene v. Swain County P'ship for Health, 342 F. Supp. 2d 442, 451 (W.D.N.C. 2004); Harel v. Rutgers State Univ., 5 F. Supp. 2d 246, 269 (D.N.J. 1998), aff'd, 191 F.3d 444 (3d Cir. 1999) (table), cert. denied, 528 U.S. 1117 (2000); Bennun v. Rutgers State Univ., 941 F.2d 154, 173 (3d Cir. 1991), cert. denied, 502 U.S. 1066 (1992).

Plaintiff has no proof that the decision-maker in this case knew the Plaintiff claimed to be Native American. AIGI Haban stated that he first learned of the Plaintiff's claim when he received the discrimination complaint. Exh. 5, Haban 102:4-14. While the Plaintiff claimed to be Native American in an *anonymous* diversity survey in the 1990s, there is no evidence that AIGI Haban even saw the survey or, even if he had, would have been able to correlate that the Plaintiff was identifying himself as Native American since no names were included on the diversity survey. Exh. 1, Malloy 15-16. Further, there is no evidence even to infer that Agency decision-makers had the perception of Plaintiff's claim of Native American ancestry—Plaintiff

testified that he does not belong, and has not ever belonged, to any cultural or associational organizations affiliated with Native American ancestry.  See Ex. 1, Malloy I, 19:20-25, 20:1.

Plaintiff bears the burden of showing circumstances that would allow a reasonable fact-finder to infer that discrimination based on a protected characteristic is likely the reason for the Agency's conduct.  Granting summary judgment does not require the Court to determine whether Plaintiff is Native American.  Gilbert, 1993 WL 468465, at *3-4.  In addition, a dispute of fact concerning Plaintiff's Native American status also does not warrant denying summary judgment. Gilbert, 1993 WL 468465, at *4.

In this case, Plaintiff has provided no admissible evidence that he actually belongs to the protected class and has no evidence to show that the alleged discriminatory officials knew of his protected status or held any discriminatory animus towards Native American Indians.  In sum, with the lack of evidence that he is Native American or that the alleged discriminatory officials knew of Plaintiff's contention, a rational fact-finder could not make an inference of discrimination based on national origin, and Plaintiff cannot prevail on Count III.  Gilbert, 1993 WL 468465, at *4.

**E.    PLAINTIFF CANNOT MAKE A *PRIMA FACIE* CASE BASED ON THE OPPOSITION CLAUSE OF TITLE VII (COUNT I)**

Plaintiff alleges that AIGI Haban retaliated against him under the "opposition clause" of Title VII because Plaintiff supposedly refused to impose disproportionate punishment on two subordinates who were minorities.  42 U.S.C. § 2000e-3(a).  This Circuit has held that "an employee seeking the protection of the opposition clause [must] demonstrate a good faith, reasonable belief that the challenged practice violates Title VII." George v. Leavitt, 407 F.3d 405, 417 (D.C. Cir. 2005) (quoting Parker v. Balt. & Ohio R.R. Co., 652 F.2d 1012, 1020 (D.C.

Cir. 1981)); see also Monteiro v. Poole Silver Co., 615 F.2d 4 (1st Cir. 1980).  In Monteiro, the

Court of Appeals for the First Circuit upheld the district court's judgment in favor of the

defendant, reasoning that the opposition clause of Title VII's retaliation provision is "unavailable

to protect an employee who makes unfounded claims of discrimination in order to excuse non-

compliance with legitimate employer demands."  Monteiro, 615 F.2d at 8.  The district court

concluded that Monteiro made the accusation "as a smokescreen in challenge to the supervisor's

legitimate criticism."  Id. at 8; see also Paul v. Fed. Nat'l Mortgage Ass'n, 697 F. Supp. 547, 556

(D.D.C. 1988) (quoting Smith v. Texas Dept. of Water Res., 818 F.2d 363, 366 (5th Cir. 1987)

"an employee is not immune from discharge merely by claiming that she was opposing

discriminatory practices, and . . . an employer remains entitled to loyalty and cooperativeness

from employees.").

     In addition to showing that putative opposition activity was made in good-faith, Plaintiff

must show that it was objectively reasonable for him to believe that he opposed a practice that

violated Title VII.  See Welzel, 436 F. Supp. 2d at 120, 125.  In Welzel, the court found that

"under any reasonable interpretation of the facts, plaintiff's portrayal of her conduct can hardly

be characterized as 'firmly opposed'" because, in part, 'plaintiff admits that she never received a

directive regarding the hiring or firing of African-American employees' at any time during her

employment.  Id. at 119-20.  The court concluded that plaintiff's legal argument regarding her

conduct was flawed because her statements to the supervisor merely challenged the supervisor's

opinion.  Id. at 120.  In this case, there is not even that much because Plaintiff's apparent belief

that unspecified Agency officials desired that SA Richardson and SA Romero receive more

harsh penalties than they would have if they were Caucasian is purely a matter of his own

speculation, innuendo, rumor, and intuition.  Because Plaintiff cannot establish that he

participated in protected activity when he disciplined SA Richardson or SA Romero, he cannot establish a prima facie case of retaliation based on the opposition clause.

Despite a full opportunity to take discovery in this case, Plaintiff still utterly fails to identify a discriminatory practice by the Agency, and similarly fails to adduce evidence demonstrating that he reasonably and in good faith believed that such a practice existed.  Plaintiff alleges that two officials wanted SA Richardson fired.  He says he was told in November 2001— a full nine months before he had any role whatsoever in the disciplinary decision—in a conversation about the Rocky Mountain Region in general that legal counsel in Headquarters wanted to fire SA Richardson.  See Exh. 1, Malloy I, 101:7-12.  He also claims that he was told in August 2002 that the Deputy Inspector General wanted to fire SA Richardson.  Id. at 103:19-25.  Further, he asserts that a personnel specialist called him and suggested "serious time off."  Id. at 96:10-15.  However, even accepting these communications as true, Plaintiff fails to show he had a reasonable belief he was opposing a "discriminatory practice" by the Agency because there is no evidence that the opinions allegedly held by these individuals had anything to do with SA Richardson's or Romero's protected status.

Rather, the uncontroverted evidence shows that Agency officials were motivated by the serious nature of SA Richardson's misconduct.[3]  SA Richardson falsified a receipt supporting a Federal expenditure, at the direction of his supervisor, who was convicted for that crime.  The other bases for SA Richardson's misconduct included kicking and damaging the door of a tow truck, misuse of government telephone, and lack of candor.  See Exh. 25 (Nuhfer Deposition Exhibit 10).  The law is clear that law enforcement officers are held to a higher standard than non-law enforcement personnel.  Watson v. Department of Justice, 64 F.3d 1524, 1530 (Fed. Cir.

---

[3] Further, there is no evidence that any person in HUD OIG wanted to impose any particular discipline on SA Romero.

1995). Thus, it was reasonable that HUD-OIG officials considered that SA Richardson's serious

misconduct warranted serious discipline. At most, to the extent that Plaintiff's suspension

recommendation for SA Richardson is viewed as a light penalty, Plaintiff shows that he

disagreed with that opinion, and he has no evidence that anyone ever second-guessed it. Beyond

that, Plaintiff utterly fails to show how the individuals he asserts led him to believe that SA

Richardson should be punished more harshly had any role in the things Plaintiff asserts were

retaliatory with regard to his own employment. The decision-maker for the employment

decisions Plaintiff challenges is AIGI Haban, and AIGI Haban did not believe or expect that SA

Richardson should be removed. Exh. 5, Haban Depo. at 105.

    Indeed, no one directed Plaintiff to propose any particular action, and the Plaintiff fails to

present any evidence, which a reasonable person would accept, to show that the alleged opinions

of these individuals violated Title VII. There is even less evidence regarding the discipline

Plaintiff proposed for SA Romero. See DSMF 10, 15.

## F.    PLAINTIFF'S DISCRIMINATION AND RETALIATION CLAIMS FAIL BECAUSE THERE IS NO ADVERSE ACTION

    Although actions falling short of an outright firing can be considered adverse for

purposes of establishing discrimination or retaliation claims, not all personnel decisions with

negative consequences for the employee necessarily qualify as adverse actions. To be legally

sufficient, the action must materially and adversely affect the terms, conditions, or privileges of

present or future employment or, in the case of a retaliation claim, be something that might deter

a reasonable worker from making a complaint of discrimination. See Burlington Northern, 126

S. Ct. at 2414-15; Rochon, 438 F.3d at 1219-20 (in the context of retaliation, in lieu of a

traditional adverse employment action, plaintiff may rely on conduct which might deter a

reasonable worker from making a complaint of discrimination); Brown v. Brody, 199 F.3d 446,

457 (D.C. Cir. 1999); see also Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998) ("A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.").  Actions imposing purely subjective harms, such as dissatisfaction or humiliation, are not adverse.  See Forkkio v. Powell, 306 F.3d 1127, 1130-31 (D.C. Cir. 2002); Childers v. Slater, 44 F. Supp. 2d 8, 19 (D.D.C. 1999) ("conduct that sporadically wounds or offends but does not hinder an employee's performance does not rise to the level of adverse action"), modified on reconsideration, 197 F.R.D. 185 (D.D.C. 2000).  In other words, when relying on an employment action, an employee must show that it inflicts "objectively tangible harm."  See Holcomb v. Powell, 433 F.3d 889, 902 (D.C. Cir. 2006); see also Russell v. Principi, 257 F.3d 815, 818 (D.C. Cir. 2001) (recognizing that this requirement "guards against both judicial micromanagement of business practices, and frivolous suits over insignificant slights") (internal quotation omitted).  "An employment decision does not rise to the level of an actionable adverse action . . . unless there is a tangible change in the duties or working conditions constituting a material employment disadvantage."  Stewart v. Evans, 275 F.3d 1126, 1134 (D.C. Cir. 2002); see also Russell, 257 F.3d at 818 ("not everything that makes an employee unhappy is an actionable adverse action.").

Prior to the Supreme Court's decision in Burlington Northern, several cases had held that being subject to an investigation[4] and being placed on administrative leave are not adverse

---

[4] Joseph v. Leavitt, 465 F.3d 87, 93 n.1 (2d Cir. 2006) (holding that placement of plaintiff on paid administrative leave pending criminal charges and continuation of that leave pending internal investigation were not adverse actions); Mack v. Strauss, 134 F. Supp. 2d 103, 114 (D.D.C. 2001), aff'd, No. 01-5122, 2001 WL 1286263 (D.C. Cir. Sept. 28, 2001) ("mere investigations by plaintiff's employer cannot constitute an adverse action because they have no adverse effect on plaintiff's employment;"); Moore v. Summers, 113 F. Supp. 2d 5, 23 (D.D.C. 2000) ("It is undisputed that no disciplinary action has been taken . . . as a result of the

personnel actions for purposes of Title VII.  See, e.g., Dickerson v. Sectek, Inc., 238 F. Supp. 2d

66, 79-80 (D.D.C. 2003) (placement on paid leave is not an adverse personnel action under Title

VII even though the employees were not reinstated as supervisors when they returned).  This

Court had recognized that to hold otherwise would "invite 'judicial micromanagement' of

temporary employment disputes that have already been resolved through internal processes."

Dickerson, 238 F. Supp. 2d at 80. (citations omitted).  As the Court of Appeals for the Second

Circuit Court noted, "the terms and conditions of employment do include an expectation that an

employee is subject to reasonable disciplinary procedures."  Joseph v. Leavitt, 465 F.3d 87, 93

n.1 (2d Cir. 2006) (holding that placement of plaintiff on paid administrative leave pending

criminal charges and continuation of that leave pending internal investigation were not adverse

actions).   Although placement under investigation and on administrative leave should now be

evaluated case-by-case to determine whether they are of such a nature that a reasonable person

would be deterred from making or pursuing a discrimination claim, nothing in Burlington

Northern alters the law allowing employers to react appropriately to problems in the workplace

and requiring employees to establish more than mere temporal proximity to raise an inference of

unlawful discrimination or retaliation.  See Milburn v. West, 854 F. Supp. 1, 14 (D.D.C. 1994).

The Court of Appeals' recent Holcomb decision makes clear that to be an adverse action,

a lateral move must involve an "extraordinary" change in duties or responsibilities.  Holcomb v.

Powell, 433 F.3d 889, 902 (D.C. Cir. 2006) (noting that plaintiff "never suffered a reduction in

---

investigation. Consequently, there was no adverse action.") (citing Yerdon v. Henry, 91 F.3d
370, 378 (2d Cir. 1996), which held that charges of wrongdoing in workplace alone cannot be
adverse actions because "if the charges were ultimately dismissed, [the plaintiff] would not have
suffered any adverse effect from them."); Ludwig v. Northwest Airline, Inc., 98 F. Supp. 2d
1057 (D. Minn. 2000) (even if the investigation was conducted with unusual vigor, there was no
material alteration in the terms or conditions of employment).

grade, pay, or benefits, nor does the evidence suggest her superiors ever considered these actions. She did, however, experience an extraordinary reduction in responsibilities that persisted for years . . . ."). In addition, in <u>Holcomb</u> there was evidence other than plaintiff's own testimony on this issue. The Court of Appeals found significant that a "desk audit revealed Holcomb was performing tasks commensurate with a Grade 5 position-six grades below Holcomb's Grade 11 Program Specialist position." <u>Id.</u> There is no such evidence in this case. Here, Plaintiff's supervisory duties were temporarily removed when he returned to work from administrative leave because the investigation into whether he had attempted to influence the internal investigation of SAC Larry Chapman was still open and the people Plaintiff was believed to have attempted to influence were the same people he would have been supervising. Unlike <u>Holcomb</u>, however, Plaintiff had duties assigned to him and no final decision had been made about his future assignments or possible supervisory duties over a period of weeks, not years. <u>See</u> Exh. 1, Malloy I, 151:3-13; 153:10-22.[5]

At a minimum, Plaintiff's placement on, and continuation of, administrative leave pending the internal investigation into his alleged obstruction of an investigation are not adverse actions for purposes of his discrimination claim. The question of whether any of the challenged actions were of a nature that would deter a reasonable worker from filing a discrimination claim is less clear, only because the law in this area is not well-developed due to the recency of the Supreme Court's adoption of the refined concept articulated by the D.C. Circuit in <u>Rochon</u>. Defendant respectfully suggests, however, that the circumstances in this case reflect that Plaintiff

---

[5]   Likewise, Plaintiff's gripes about the Agency's refusal to allow him to carry over an excess of annual leave he had accumulated while on administrative leave and before are sharply undermined as an adverse action by Plaintiff's admission that he did not request any annual leave between his return to duty on December 19, 2002 and his retirement on January 3, 2003 when he was paid for all of the leave he had accumulated. See Exh. 1, Malloy I, 51:21-52:1; 154-55. <u>Cf.</u> <u>Taylor v. Small</u>, 350 F.3d 1286, 1293-94 (D.C. Cir. 2003) (holding that summary judgment for employer is appropriate where there is "no unremediated adverse employment action when the suit was filed"). Simply stated, Plaintiff's election to take the money and run may not serve as the predicate for a retaliation claim because he was compensated for the leave.

made careful and deliberate choices to maximize what he believed to be in his best interests through the administrative process and otherwise throughout the period of time during which he complains of retaliation, and was not, in fact, deterred from pursuing his claims.  See Rochon, 438 F.3d at 1219 (emphasizing that actions must be material and significant to deter a reasonable person).

For example, the length of the paid administrative leave was not of such a lengthy duration to constitute an adverse action.  See Joseph, 465 F.3d at 91-92 (five-month administrative leave was not improper given the serious nature of the charges and plaintiff's initial refusal to cooperate).  Finally, Plaintiff resigned from the Agency before the conclusion of the investigations, and no disciplinary action was taken based on the investigations.  A mere investigation into an employee's conduct that does not lead to disciplinary action is not an actionable adverse employment action.  Mack v. Strauss, 134 F. Supp. 2d at 114.  Therefore, as a matter of law, the claims based on the investigation of Plaintiff do not rise to the level of an adverse action.

The claims that the administrative leave or the investigations prevented Plaintiff from applying for any vacancies should likewise be rejected.  Plaintiff has not shown that he made every reasonable attempt to convey his interest in the SAC and ASAC vacancies.  See Clipper v. Billington, 414 F. Supp. 2d 16, 22 (D.D.C. 2006); see also Nurridin v. Goldin, 382 F. Supp. 2d 79, 94 (D.D.C. 2005) (noting that speculative allegations about future benefits is not sufficient); see also Edwards v. U.S. E.P.A., 456 F. Supp. 2d 72, 86 (D.D.C. 2006) (concluding that purely speculative opportunities do not show materially adverse consequences).  Plaintiff testified in his deposition that he knew of the SAC opening before the vacancy closed.  Further, he knew well in advance of the closing date that with the retirement of SAC Chapman, Plaintiff's supervisor, the

SAC position for Region 6 would be available.  Yet, Plaintiff did not attempt to apply for the position or express his interest in the vacancy.  Plaintiff testified that the Agency designated Daniel Salas as his contact while he was on administrative leave, and Plaintiff admits he did not call Salas while he was on administrative leave to determine how he could apply for the position while on leave.  See Exh. 1, Malloy I, 141:8-19; 145:20-146:22.  As for the ASAC position in Houston, Plaintiff admits that he did not apply for this position either even though he had time to do so.  See Exh. 1, Malloy I, 148:9-17.  Thus, the fact that Plaintiff failed to apply for vacant positions, which were advertised on a publicly accessible website and which he never conveyed any interest to Defendant in applying for, defeats his claim.  See Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006); Clipper v. Billington, 414 F. Supp. 2d 16, 21 (D.D.C. 2006) (citing Cones v. Shalala, 199 F.3d 512, 518 (D.C. Cir. 2000); DSMF 51, 53, 55.[6]

Additionally, Plaintiff's contention that the Agency's actions denied him future employment opportunities, either within the Agency or at other law enforcement agencies, is too speculative to conclude that he suffered materially adverse consequences from these actions.  See Edwards, 456 F. Supp. 2d at 85-86; see also Nurridin, 382 F. Supp. 2d at 94.  As discussed above, Plaintiff did not even attempt to apply for positions within the Agency that he knew were open, and for which he had ample opportunity to apply, thus his assumption that "but for" the Agency's actions, he would have been selected for the positions does not demonstrate a discernable effect on the terms, conditions, or privileges of his employment.  See Edwards, 456 F. Supp. 2d at 86.  Further, Plaintiff testified that he has not attempted to apply for other law

---

[6]  The *prima facie* case for a non-selection requires a showing that:  (1) plaintiff is a member of a protected class; (2) **he applied for** and was qualified for an available position; (3) despite his qualifications, he was rejected; and (4) either someone filled the position or it remained vacant and the employer continued to seek applicants.  Holcomb, 433 F.3d at 895, citing Lathram v. Snow, 336 F.3d 1085, 1088 (D.C. Cir. 2003)).

enforcement positions outside of the Agency, which further undermines his contention that the Agency's actions had a materially adverse consequence on his future employment.

G.    **OTHER THAN PROXIMITY IN TIME DUE TO EVENTS, THERE IS NO CONNECTION BETWEEN THE AGENCY'S ACTIONS AND PLAINTIFF'S PROTECTED ACTIVITY UNDER TITLE VII AND PLAINTIFF CANNOT SHOW THAT THE AGENCY'S ACTIONS WERE A PRETEXT FOR RETALIATION**

Even assuming that the Plaintiff can make out a prima facie case under the first part of the McDonnell Douglas test, or assuming that the court accepts that the imposed administrative leave and investigation are adverse personnel actions, Plaintiff cannot raise a genuine issue of fact as to whether the Plaintiff's activities were the cause of the Agency's actions or that the Agency's reasons for taking its actions between October 10, 2002, and January 3, 2003, were a pretext for retaliation. This Court has held that a "subjective reason can be legally sufficient, legitimate and nondiscriminatory [and presumably nonretaliatory] if the Defendant articulates a clear and reasonably specific factual basis" for its subjective opinion. Bowdre v. Richardson, 131 F. Supp.2d 179, 188 (D.D.C. 2001). An employer may transfer an employee, remove his duties, or give him an unsatisfactory performance rating, provided the employer has a legitimate reason for doing so. See, e.g., Jones v. Lyng, 669 F. Supp. 1108, 1122 (D.D.C. 1986). Defendant's burden is de minimis, merely one of production. See, e.g., Bowdre, 131 F. Supp. 2d at 189 (citing Burdine, 450 U.S. at 254-55). Any reason may be legitimate and nonretaliatory, provided it is not based upon Plaintiff's protected status. See, e.g., Weigert, 120 F. Supp. 2d at 20 (citing Mesnick v. General Electric Co., 950 F. 2d 816, 823 (1st Cir. 1991), cert. denied, 504 U.S. 985 (1992)).

Because defendant has met its burden of articulating legitimate, nonretaliatory reasons for placing Plaintiff on administrative leave and under investigation and returning him to work

26

without his former supervisory duties, Plaintiff must demonstrate that the asserted reasons were merely a pretext for illegal retaliation to survive summary judgment.  See Reeves v. Sanderson Plumbing Products, Inc., 210 S. Ct. 2097, 2108-11 (2000); Hicks, 509 U.S. at 506-11.  To make this showing, the evidence must establish both that the reason offered by the Agency is false and that the real reason was discrimination or retaliation.  Reeves, 120 S. Ct. at 2108-09; Hicks, 509 U.S. at 511; see also Wolf v. Buss (America) Inc., 77 F.3d 914, 919 (7th Cir. 1995), quoting Russell v. Acme-Evans Co., 51 F.3d 64, 68 (7th Cir. 1995) ("Pretext means more than a mistake on the part of the employer; pretext 'means a lie, specifically a phony reason for some action.'").  Based on the evidence in the record, plaintiff cannot meet this burden, and defendant's motion should be granted.

        In deciding this matter, the question is not whether the actions taken with respect to Plaintiff were wrong; the issue is whether a reasonable jury could find AIGI Haban would not have taken the action he took except for Plaintiff's protected activity.  The Agency's reasons for its actions are quite detailed.  The nature of the allegations against the Plaintiff, which he admits would be serious misconduct, justify his placement on administrative leave and the temporary removal of his supervisory duties after he returned to duty.  Federal employees have a duty to cooperate with agency investigators unless criminal proceedings are reasonably feared.  Weston v. Dep't of Housing and Urban Dev., 724 F. 2d 943 (Fed. Cir. 1983).  The federal government recognizes that supervisors owe a duty of loyalty to the agency, and it is improper for supervisors to advise their employees not to cooperate with investigators.  Brown v. Dep't of Transp., 21 M.S.P.R. 572 (July 3, 1984), aff'd, 735 F.2d 543 (Fed. Cir. 1984).  See also, Taylor v. U.S.P.S., 49 M.S.P.R. 155 (June 19, 1991); Hanna v. Dep't of Labor, 80 M.S.P.R. 294 (Nov. 20, 1998).

"Cohesive operation of management is dependent on the loyalty of inferior management to superior management. This loyalty must be maintained in situations involving management's relations with nonmanagerial employees. For management to countenance disloyalty in such situations would be for management to render itself impotent." Brown, 735 F.2d at 547 (citing Brousseau v. United States, 640 F.2d 1235, 1248 (Ct. Cl. 1981) and Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1967)).

The undisputed events during the Fall of 2002 support HUD OIG's actions regarding Plaintiff's alleged misconduct. The Agency began an investigation into matters related to SAC Chapman prior to September 30, 2002. Plaintiff was interviewed as a witness as a part of that investigation, and there is no question that, either rightly or wrongly, he refused to release documents to the investigators based on advice from his attorney. It is also uncontested that the Agency received allegations that there was a meeting of the special agents in September 2002 at which the Plaintiff discussed the Chapman investigation and told the agents, "we need to circle the wagons." All of that transpired before Plaintiff filed any EEO complaint or HUD-OIG management became aware of his recommended penalties for SAs Richardson or Romero. This set off a chain of events which were not retaliatory. In Clark County Sch. Dist. v. Breeden, 532 U.S. 268 (2001), the Supreme Court held that the causation element of a retaliation claim was unsatisfied where, as here, an employer simply proceeds along lines already plainly contemplated, even if not yet finally determined or effectuated. Other courts have also recognized that employers do not lose the ability to respond to a perceived problem in the workplace because an employee involved in the problem engages in activity protected by Title VII. See Bush v. Engelman, 266 F. Supp.2d 97, 103 (D.D.C. 2003); Spadola v. New York City Transit Auth., 242 F. Supp.2d 284, 294 (S.D.N.Y. 2003).

That is the situation here.  Given the unusual circumstances surrounding the discipline of SA Richardson and SA Romero, it was reasonable for HUD OIG officials to be concerned that Plaintiff and SAC Chapman did not follow Agency procedures in proposing and deciding this discipline.  There is no dispute that on SAC Chapman's last day with the Agency, Plaintiff and SAC Chapman proposed and decided two disciplinary actions in violation of the Agency's disciplinary process, and in the process possibly violated the due process rights of one employee.  There is no question that Plaintiff was the correct person to propose the discipline to be imposed on the employees and SAC Chapman was the deciding official.

Beyond the failure to follow correct discipline procedure, AIGI Haban had also been informed of Plaintiff's failure to cooperate in the investigation of SAC Chapman and that Plaintiff made statements at the staff meeting tending to obstruct the Chapman investigation, instructing his agents to "circle the wagons." (DSMFs 23, 24).  AIGI Haban decided to place the Plaintiff on administrative leave, effective October 10, 2002, during the course of the investigation into Plaintiff's alleged misconduct.  AIGI Haban did this because Plaintiff refused to cooperate with an investigation of SAC Chapman and because Plaintiff had made comments to agents down in his region about how to handle the inquiry into SAC Chapman, using the phase "circle the wagons," not because of the discipline proposed by Plaintiff.  (DSMF 26).

In support of AIGI Haban's decision to place Plaintiff on administrative leave as a result of the alleged "circle the wagon" statement, AIGI Haban was briefed that some agents heard the Plaintiff say things like "circle the wagons" and some did not.  (DSMF 32).  In fact, three witnesses stated under oath that Plaintiff said "circle the wagons" during this staff meeting. (DSMF 29).  Another three recall hearing words similar to "circle the wagon," but they were unsure who said them. (DSMF 30).  One agent remembers hearing Plaintiff say we "should close

ranks" in relation to SAC Chapman's discussion of visits from internal affairs. (DSMF 31).

Nonetheless, regardless of the number of witnesses to the statements attributed to the Plaintiff, or

the precise language used, AIGI Haban clearly had a sufficient and reasonable basis for

concluding that Plaintiff had actively discouraged his subordinates from cooperating with a

legitimate internal investigation. His reaction by placing Plaintiff on administrative leave and

initiating an investigation are not suggestive of any unlawful retaliatory motive.

Management at OIG Headquarters in Washington D.C. had legitimate reasons to be

concerned that the Plaintiff has a higher sense of loyalty to SAC Chapman in Region 6 than to

the organization. A failure to cooperate with an investigation and directing subordinates to

"circle the wagons" naturally lead to a loss of confidence in the employee's reliability. It was

reasonable and appropriate for the Plaintiff's supervisors to remove the Plaintiff from the

workplace during the pendency of the investigation. Both the placement on administrative leave

and the investigation into the Plaintiff's conduct were reasonable responses to the allegations

made against the Plaintiff.

Regarding the continuation of Plaintiff's administrative leave and removing Plaintiff's

supervisory duties, the evidence clearly shows that it was reasonable to take these actions and

that they were not done because of Plaintiff's protected status. On October 17, 2002, during the

course of Plaintiff's administrative leave, Plaintiff filed an informal EEOC complaint of

discrimination. While Plaintiff was still on administrative leave, the parties began negotiations

to settle the Plaintiff's discrimination complaint. As part of the negotiations, Plaintiff's counsel

proposed that the Plaintiff be retained on administrative leave until early January 2003. (DSMF

35). AIGI Haban continued the administrative leave into December because it was his

understanding that the Plaintiff wanted to stay on administrative leave pending the negotiations

to settle his administrative discrimination complaint. (DSMF 35-36). When the settlement

negotiations failed, AIGI Haban immediately returned the Plaintiff to duty. (DSMF 37). He

decided to remove Plaintiff's supervisory duties temporarily because, he, "didn't think Jim left

[him] any choice to do – what to do what I did. I needed to get him back to work, but I didn't

want him in a position where he could influence other people." (DSMF 39). Plaintiff retired just

two weeks later.

AIGI Haban had valid reasons for placing Plaintiff on administrative leave during the

pendency of the investigation. Plaintiff was a supervisor who had already shown that he was

willing to obstruct an internal investigation. Plaintiff's role in the disciplinary actions had no

role in AIGI Haban's decision, and Plaintiff has no admissible evidence suggesting that they did.

Likewise, when AIGI Haban returned the Plaintiff to the workplace, he was obviously

uncomfortable allowing him to assume supervisory duties until he was sure what he would do

with him. Even on the date of Plaintiff's retirement, AIGI Haban still had not decided what he

would do with the Plaintiff. (DSMF 46). Given the nature of Plaintiff's misconduct, i.e.,

obstructing an investigation when he allegedly coached his subordinates in relation to the

investigation into SAC Chapman, it was reasonable for AIGI Haban to temporarily remove

Plaintiff's duties that would possibly allow him to repeat the same misconduct while the

investigation of Plaintiff was still pending. Thus, the Agency's actions were not because of

Plaintiff's protected status, and Plaintiff has failed to show that AIGI Haban's reasons were a

pretext for reprisal or discrimination.

### H. PLAINTIFF'S RETIREMENT WAS NOT A CONSTRUCTIVE DISCHARGE

Plaintiff alleges in the Amended Complaint that he was constructively discharged in

January, 2002. Am. Compl. ¶68. Plaintiff also testified in his deposition that he was forced to

retire on January 3, 2003, because he lost his supervisory responsibilities, could no longer be a supervisor in the region, because he would lose about 146 hours of "use or lose" leave after January 3, 2002, and he did not want any written disciplinary action taken against him.  Exh. 1, Malloy 34:1-12; 50:13-18; 58:12-15; 59:2-6; 154:14-22; Exh. 6, Malloy II 67:9-19.

To establish a constructive discharge based on discrimination, this Circuit has held that a plaintiff must show that the employer deliberately created intolerable work conditions that forced the plaintiff to quit.  Veitch v. England, 471 F.3d 124 (D.C. Cir. 2006) (citing Clark v. Marsh, 665 F.2d 1168, 1173 (D.C. Cir. 1981)); see also Pennsylvania State Police v. Suders, 542 U.S. 129 (2004).  Plaintiff must show more than a Title VII violation to prove constructive discharge, and even a hostile work environment by itself is insufficient to prove constructive discharge. Moore v. KUKA Welding Systems & Robot Corp., 171 F.3d 1073, 1080 (6th Cir. 1999); Mungin v. Katten Muchin & Zavis, 116 F.3d 1549, 1558 (D.C. Cir. 1997).  It is well-settled that "a finding that [plaintiff] was constructively discharged must be justified by the existence of certain 'aggravating factors.'"  Clark v. Marsh, 665 F.2d 1168, 1174 (D.C. Cir. 1981) (citing Pittman v. Hattiesburg Mun. Separate Sch. Dist., 644 F.2d 1071, 1077 (5th Cir. 1981)).  Thus, Plaintiff must not only show acts of discrimination, he must also show "that the employer deliberately made work conditions intolerable, leading the employee to quit involuntarily." See Adair v. England, 183 F. Supp. 2d 31, 67 (D.D.C. 2002).[7]

---

[7]  Critical to a finding of constructive discharge where there is no identifiable adverse action is a showing of the existence of what the Supreme Court in Pennsylvania State Police termed "an aggravated case of . . . hostile working environment."  542 U.S. at 146.  This appears to be generally consistent with the D.C. Circuit's previous requirement that required a showing of "aggravating factors."  Mungin v. Katten Muchin & Zavis, 1997 WL 370170 *11 (D.C. Cir. July 8, 1997); Dashnaw v. Pena, 12 F.3d 1112, 1115 (D.C. Cir.), cert. denied, 513 U.S. 959 (1994); Clark v. Marsh, 665 F.2d at 1174.  "Aggravating factors" are those factors that would force an employee to leave. Clark v. Marsh, 665 F.2d at 1174.  A mere finding that discrimination or retaliation has occurred – which does not exist in this case – is insufficient to establish a subsequent resignation as a constructive discharge.  See Dashnaw v. Pena, 12 F.3d at 1115; Kalinoski v. Gutierrez, 435 F. Supp. 2d 55, 78-80 (D.D.C. 2006) (finding no constructive discharge where employee denied requests for accrued medical leave and placed on leave without pay).

In determining whether the aggravating circumstances are present in a given case, "[t]he inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?"  Veitch, 471 F.3d at 130 (quoting Pa. State Police v. Suders, 542 U.S. at 141).  The objective inquiry focuses on whether "working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign."  Smith v. Henderson, 376 F.3d 529, 533-34 (6th Cir. 2004) (citations omitted); see also Suders, 542 U.S. at 134 (plaintiff must show that "the abusive working environment became so intolerable that her resignation qualified as a fitting response.").

In this case, the undeniable facts show that no aggravating circumstances were present such that Plaintiff's work environment became so intolerable as to cause his involuntary retirement.  The facts are undisputed that the only change in Plaintiff's employment upon his return to duty in December, 2002 was that he no longer had any managerial responsibilities.  Employees do not have any right to particular duties, including supervisory ones.  Plaintiff experienced no loss in pay and no demotion.  Plaintiff had been on administrative leave for two months, and only two weeks after returning to duty he decided to retire.  Though it was his suspicion, Plaintiff admits that he was never told by anyone at HUD OIG that he had to either retire or he was subject to be reassigned.  See DSMF 47.   No one ever told the Plaintiff that unless he resigned he would be subject to investigation and reassignment. Id.  Upon his return to duty, his immediate supervisor told him only that he did not know what would happen to him.  Exh. 1, Malloy I, 46:15-16; 48:12-15.  The two weeks Plaintiff waited to find out while he was given work to do and the investigation of his conduct remained open was far too short a time to conclude that Plaintiff was subjected to anything other than reasonable working conditions under the circumstances.

These facts certainly do not create the hostile "plus" environment required by the U.S. Supreme Court and this Circuit to prove a constructive discharge. The Federal Circuit has held that in cases such as this, the employee should cooperate with the investigation and challenge its results rather than resigning before the investigation was complete; to do otherwise makes the retirement or resignation voluntary, and not coerced. Woodward v. Dep't of the Treasury, 42 Fed. Appx. 436 (Fed. Cir. 2002). In this case, Plaintiff failed to provide the Agency with sufficient time to complete its investigation and he does not assert that he ever took any action to request that it be brought to a prompt conclusion after he returned to work. Plaintiff simply chose to resign under a cloud rather than remain and attempt to clear his name. Because the investigation had not dragged on and imposed the sort of two-year radical reduction in his duties as in Burlington Northern, it cannot be reasonably concluded that Plaintiff suffered a genuine adverse action. Likewise, Plaintiff does not assert that he was ever subjected to even a single comment -- let alone severe and pervasive ones -- about having filed a discrimination complaint such that his working environment was hostile on account of his protected activity. See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81-82 (1998).

Plaintiff simply fails to allege facts that would lead a reasonable person to believe he had no choice but to resign. The investigation was soon to conclude, he suffered no loss in pay or benefits, and no adverse disciplinary action was being discussed as a possible outcome of the investigation. Under these circumstances, no reasonable fact finder would have enough evidence to find a constructive discharge.

V.    **CONCLUSION**

For the reasons and arguments stated above, the Court should enter summary judgment in favor of Defendant on all claims.

Dated:  June 5, 2007.

Respectfully submitted,

_____
JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney

/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney

/s/_____
JANE M. LYONS, D.C. Bar # 451737
Assistant United States Attorney
555 4th Street, N.W. - Room E4822
Washington, D.C. 20530
(202) 514-7161
(202) 514-8780 (facsimile)

Of Counsel:
Richard K. Johnson, Deputy Counsel to the Inspector General
Ariya McGrew, Attorney-Advisor, Office of the General Counsel
United States Department of Housing and Urban Development