**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JAMES MALLOY, )<br>)<br>　Plaintiff, )<br>)<br>　　v. )<br>)<br>ALPHONSO R. JACKSON, )<br>　Secretary of the U.S. Dept. of )<br>　Housing and Urban Development, )<br>)<br>　Defendant. )<br>＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿) | Civil Action No. 05-1117 (RCL) |

**<u>DEFENDANT'S STATEMENT OF FACTS NOT IN GENUINE DISPUTE</u>**

Pursuant to Local Civil Rule 7(h) and in support of Defendant's Motion for Summary Judgment, Defendant respectfully submits this statement of material facts as to which he contends there is no genuine dispute.

<u>Employment Background</u>

1. James Malloy, the Plaintiff, is a former Assistant Special Agent in Charge (ASAC) in Region 6 of HUD OIG, assigned to Fort Worth, Texas. (Complaint (hereinafter Compl.) paras, 1, 3, 8). Plaintiff began his employment with HUD OIG in 1983. Exhibit 1, Malloy Deposition (Malloy) 12:14-16. For the entirety of his employment with the Agency, he only worked at the Fort Worth, Texas office. Exh. 1, Malloy 13:3-5.

2. Larry Chapman became the Special Agent in Charge ("SAC") at Fort Worth in 1991. Plaintiff 21:19-20. SAC Chapman promoted Plaintiff to ASAC in 1993. Exh. 1, Malloy 21:21-25.

Richardson and Romero Disciplinary Cases

3. In July 2002, Jeffrey Finn, a former SAC for the Rocky Mountain Region, was convicted of knowingly and willfully making a false document. Exhibit 2, (Richardson Deposition Exhibit 6); see also United States v. Finn, 375 F.3d 1033, 1036-37, 1040 (10th Cir. 2004).[1] Special Agent ("SA") Cortez Richardson, who worked under Finn's supervision in the Rocky Mountain Region, had a role in falsifying the document, and he testified for the Government at Finn's trial. Exhibit 3 (Richardson Deposition ("Richardson")), 11:13-17; 32:15-19; 32:1-6, 20-22; 33:1-5, and Deposition Exhibit 9; see also Finn, 375 F.3d at 1036.

4. Around June 2002, HUD OIG transferred SA Richardson from the Rocky Mountain Region to the Fort Worth Region, i.e., Region 6. (Compl. para. 15). While he was assigned to the Rocky Mountain Region, SA Richardson was investigated for his role in the misconduct at issue in the Finn case.

5. The Assistant Inspector General for Investigations ("AIGI") R. Joseph Haban sent the Report of Investigation ("ROI") regarding the SA Richardson investigation to SAC Chapman on or about September 5, 2002, telling SAC Chapman that the "recommending official for this matter will be the [ASAC] currently supervising Agent Richardson and the deciding official will [be] the [SAC], Region 6." Exhibit 4, Richardson Deposition at Exhibit 7.

6. At about the same time, Region 6 also received an ROI for a separate investigation on SA Steve Romero for consideration and action. (Compl. para. 22).

---

[1] Specifically, the Court of Appeals reversed Finn's conviction on the grounds that the government's evidence necessary to support a finding of materiality were not submitted during the government's case-in-chief. Finn, 375 F.3d at 1039-40.

2

7. AIGI Haban did not know who the proposing official would be for any discipline imposed on SA Richardson until after the disciplinary action was completed. Exhibit 5, Haban Deposition ("Haban") 27:23-25; 28:3-8. AIGI Haban was not aware that ASAC Malloy, as opposed to one of two other ASACs in the region, was SA Richardson or SA Romero's immediate supervisor. See id.

8. As the first-line supervisor for SA Richardson and SA Romero, Plaintiff was the recommending or proposing official for imposing discipline on those special agents; SAC Chapman, as the second-line supervisor, was the deciding official in both cases. Exh. 1, Malloy 94:9-18.

9. Plaintiff considered the following allegations against SA Richardson in proposing discipline: 1) damaging private property owned by a third party (i.e., a tow truck) by kicking it; and 2) altering a receipt supporting a federal expenditure in order to conceal inappropriate behavior of Finn. Exhibit 6, Malloy Deposition II ("Malloy II") 15:4-21, 16:17-25, 17:1-3.

10. For SA Romero's proposed discipline, Plaintiff considered the following allegations: 1) not being truthful about the reasons for his departure from the Austin Police Department; and 2) not paying credit card bills. Exhibit 7, Sworn Interview of James Malloy, Oct. 10, 2002, 37-39.

11. Prior to October 2002, Plaintiff testified that he had one conversation with personnel specialist, Dave Nuhfer, regarding SA Richardson's discipline. Exh. 1, Malloy I, 106:9-25; 107: 1-2; 108:21-25.

12. Plaintiff never had discussions with AIGI Haban, Deputy Inspector General ("DIG") Stephens, or Inspector General Donohue regarding his concerns as the proposing official on SA Richardson. Exh. 1, Malloy I, 109:6-15.

13. AIGI Haban did not believe SA Richardson should be fired for his misconduct, and no one ever told AIGI Haban that SA Richardson should be fired. Exh. 5, Haban 105:2-10. When AIGI Haban sent the SA Richardson and SA Romero cases to Region 6, he expected nothing would happen. Exh. 5, Haban 105:19-25 and 106:1-11.

14. Although Plaintiff was the proposing official for the discipline of SA Richardson, SAC Chapman drafted most of the document proposing a five-day suspension for SA Richardson. Exh. 1, Malloy I, 114:16-25; 114:1.

15. On September 30, 2002, the Plaintiff proposed a five-day suspension for SA Richardson, and on the same date SAC Chapman decided to impose Plaintiff's proposal. Malloy 119:8-19. In addition, on September 30, 2002, Plaintiff gave SA Romero a Letter of Caution for not accurately reporting his reasons for leaving the Austin Police Department. Exh. 1, Malloy I, 122:20-25; 123:1; 128:1-9; Compl. para. 25.

16. At the end of the business day on September 30, 2002, SAC Chapman retired from HUD OIG employment. Exh. 1, Malloy I, 20-24.

17. Under OIG's policies and procedures on employee misconduct, the Plaintiff was the proper proposing official for any disciplinary action for both SA Richardson and SA Romero. Exhibit 8, Nuhfer Deposition Exhibit 3, HUD OIG Manual

4

Chapter 1752, "Disciplinary and Adverse Actions," July 19, 2002 ("HUD OIG Manual Chapter 1752"), § 1-6(Q); Compl. paras. 19, 23).

18. The proper deciding official on an adverse action for both employees was the next level supervisor, SAC Larry Chapman. Exh. 8, HUD OIG Manual Chapter 1752, § 1-6(F).

19. The proposing and deciding officials are required to consult with the Human Resource Division and the Office of Legal Counsel before taking any disciplinary or adverse action. Exh. 8, HUD OIG Manual Chapter 1752, § 1-7(B)(3). The Bureau of Public Debt is the human resources service contractor that provides advice to the proposing and deciding officials at HUD OIG. Id. at 1-7.D.4, 1-7.E.1, 2-1.d.; Exhibit 9, Nuhfer Deposition (Nuhfer) 13, 17-18, 23, 38-40.

20. Plaintiff did not coordinate with the Bureau of Public Debt or the Office of Legal Counsel after reviewing the ROI on SA Richardson. Exh. 7, Sworn Interview of James Malloy, Oct. 10, 2002, 54:3-12. In failing to do so, Plaintiff admits that he violated OIG policy and procedures in proposing the disciple, and explains that he did so because SAC Chapman told him "we didn't need to do that, that we needed to get these adjudicated before he left so somebody else didn't have to deal with it once he was [gone]." Exh. 7 Sworn Interview of James Malloy, Oct. 10, 2002, 56:5-22.

HUD-OIG's Internal Investigation of SAC Larry Chapman

21. On August 30, 2002, John McCarty, as SAC for the Special Investigations Division ("SID"), assigned an investigation into SAC Chapman to the SID staff. The investigation concerned allegations that SAC Chapman used his government-

5

owned vehicle and official time for personal business. Exhibit 10, Affidavit of John McCarty, November 4, 2003 at page 4, ques. 16; page 5, ques. 19.

22. On September 19, 2002, SID interviewed the Plaintiff regarding the allegations against SAC Chapman. Exhibit 11, Robinson Deposition 58:6-11. The investigators asked Plaintiff to provide copies of the diaries he maintained. Exh. 11, Robinson Deposition 58:17-22, 59:17-22. Plaintiff initially agreed to provide the documents but a short time later Plaintiff recanted and told the investigators that he would not provide them with his diaries based on the advice of an attorney. Exh. 6, Malloy II, 21:8-16, 22:11-19; Exhibit 12, Sworn Interview of James Malloy, Sep. 19, 2002 at 38:8-22; 39:1-2; Exh. 11, Robinson Deposition 58:1-22, 59:5-22; Exh. 1, Malloy I, 137:12 – 138:15. Plaintiff never provided the documents to HUD OIG while he was still working at the Agency. Exh. 1, Malloy I, 138:25 – 139:2.

23. On September 19 or 20, 2002, SAC McCarty advised Deputy Inspector General for Investigations ("DAIGI") Daniel Salas and AIGI Haban that ASAC Malloy was not cooperating in the investigation of SAC Chapman. Exhibit 13, McCarty Deposition 31:8-18.

24. Further, DAIGI Salas received allegations that there was a meeting of the Region 6 special agents in September 2002 at which the SAC Chapman investigation was discussed. DAIGI Salas was informed that the Plaintiff told the agents under Chapman's command that they needed to "circle the wagons." Exhibit 14, Salas Deposition ("Salas") 15:1-12; Exh. 13, McCarty 43:1-22. AIGI Haban was told that the Plaintiff "had made comments to agents down in his region about how to

6

handle the inquiry of – if the investigators came around. They wanted to circle the wagons." Exh. 5, Haban 19:9-19, 21:1-4.

25. On October 10, 2002, DAIGI Salas informed Plaintiff that he was being placed on administrative leave pending an investigation into his misconduct in Region 6. AIGI Haban made the decision to place Plaintiff on administrative leave, which was approved by DIG Stephens. Compl. paras. 33, 35; Exh. 14, Salas 10:2-14; Exh. 5, Haban 18:15-19; 22:10-12; 65:20-25 and 66:1-4; Exhibit 15, Stephens 16:18-22.

26. AIGI Haban made the decision to place Plaintiff on administrative leave during the investigation of Plaintiff because AIGI Haban had been told that 1) the Plaintiff refused to cooperate with the SAC Chapman investigation and 2) the Plaintiff had made comments to agents in Region 6 about how to handle the inquiry into SAC Chapman, using the phase "circle the wagons." Exh. 5, Haban 19:9-15; 20:1-10; 21:1-4; 60:19-25; 72:13-25 and 73:1-5.

27. Plaintiff admits that it would be improper if a manager told his subordinates to "circle the wagons" in order to obstruct an official investigation. Exh. 1, Malloy 68:18-25 and 69:1-5.

28. Plaintiff admits either he or Chapman may have said "that type of information about circling the wagons," but not in the context of the Chapman investigation. Exh. 7, Malloy Interview Oct. 2002, 88-89

29. Max Eamiguel, Windell Durant, and Tammy Gilbert—Region 6 employees who attended the September 2002 meeting—all provided sworn statements stating that the Plaintiff said "circle the wagons" during this staff meeting. Exhibit 16

7

Affidavit of Max Eamiguel, October 15, 2002; Exhibit 17 Sworn Interview of Windell Durant, October 21, 2002; Exhibit 18 Affidavit of Tammy Gilbert, October 28, 2002.

30. Other Region 6 employees—Steve Romero, Zelma Howell, and Gary Haley—stated under oath that the words similar to "circle the wagon" were said at the staff meeting but they were unsure who said them. Exhibit 19 Affidavit of Steve Romero, October 28, 2002; Exhibit 20 Affidavit of Zelma Howell, October 28, 2002; Exhibit 21 Affidavit of Gary Haley, October 25, 2002.

31. Michael Kepler, another Region 6 employee, provided an affidavit in which he stated that the Plaintiff said we "should close ranks" in relation to SAC Chapman's discussion of visits from internal affairs. Exhibit 22 Affidavit of Michael Kepler, October 28, 2002.

32. During the course of the investigation of Plaintiff, AIGI Haban was briefed about the fact that some agents heard the Plaintiff say things like "circle the wagons" and some did not, but he was not briefed on what each agent said. Exh. 5, Haban 33:10-15; 34:14-20; 35:4-6; 39:15-18; 40:22-25 and 41:1-2.

33. While Plaintiff was on administrative leave pending the SID investigation, he continued to receive his same pay and accrue sick and annual leave. Exh. 1, Malloy 52:2-23.

34. On October 17, 2002, the Plaintiff filed an informal administrative complaint of discrimination. Compl. at para. 55.

35. AIGI Haban continued to keep the Plaintiff on administrative leave because he was told that Plaintiff wished to remain on administrative leave pending

negotiations to settle his administrative discrimination complaint. Exh. 5, Haban 63:7-11; 125:5-25; 126:1-3.

36. Plaintiff admits that as part of the settlement negotiations, Plaintiff's counsel requested that the Plaintiff be allowed to remain on administrative leave until early January 2003. Exhibit 23 Plaintiff's Responses to Defendant's Requests for Admissions.

37. By memorandum dated December 17, 2002, and one day after settlement negotiations failed, AIGI Haban notified the Plaintiff that he could return to work on December 19, 2002. Exh. 5, Haban 42:1-5 and Depo. Exhibit 7. Plaintiff returned to duty on December 19, 2002. Exh. 1, Malloy 44:19-21.

38. AIGI Haban also authorized the Plaintiff to take any leave he had accumulated. Plaintiff decided not to take any leave between his return to duty and his retirement because he wanted to check on his e-mail and work on his EEO case. Exh. 1, Malloy 51:1-25.

39. AIGI Haban made the decision to remove the Plaintiff's supervisory responsibilities because he "didn't think Jim left [him] any choice to do – what to do what I did. I needed to get him back to work, but I didn't want him in a position where he could influence other people." Exh. 5, Haban 41:3-14; 42:6-8.

40. When the Plaintiff returned to the office, Lester Davis (SAC for Region 6) told Plaintiff that he did not know what was going to happen to the Plaintiff. Exh. 1, Malloy 46:15-16; 48:12-15. No one in Headquarters ever told SAC Davis why the Plaintiff was on administrative leave or why Plaintiff was returning to duty. Exhibit 24, Davis Deposition (Davis) 33:9-16.

41. SAC Davis assigned Plaintiff non-supervisory work to do when Plaintiff returned to work in December, 2002. <u>See</u> Exh. 6, Malloy II, 68:1-69:10.

42. On Plaintiff's return to duty, Dan Truxal, another ASAC in Region 6, told him that ASAC Truxal had been reassigned to the Boston office to a supervisory position. Exh. 1, Malloy 47:1-2.

43. According to Plaintiff, he retired on January 3, 2003 because he lost his supervisory responsibilities, could no longer be a supervisor in the region, he was supposed to lose about 146 hours of annual leave after January 3, 2002,[2] and he did not want any written disciplinary action taken against him. Exh. 1, Malloy 34:1-12; 50:13-18; 58:12-15; 59:2-6; 154:14-22; Exh. 6, Malloy II 67:9-19.

44. At Plaintiff's request, a Human Resource Specialist at the Bureau of Public Debt created a retirement application for Plaintiff on December 23, 2002. Exh. 1, Malloy Depo. Exhibit 1. Plaintiff signed the application on December 26, 2002. Exh. 1, Malloy 55:1-25.

45. The Human Resource Specialist told Plaintiff he could "pull his retirement off the table at 4:25 or 4:29 if [he] was going out the door at 4:30 that last day." Exh. 1, Malloy 56:10-16.

46. As of January 3, 2003, AIGI Haban had not decided what would happen to Plaintiff nor had he made any decision regarding Plaintiff's status. Exh. 5, Haban 107:1-9.

47. No one at HUD OIG ever told Plaintiff that he had to either retire or that he would be subject to being involuntarily reassigned. <u>See</u> Exh. 1, Malloy I, 57:1-9. No

---

[2] The 146 hours of leave that Plaintiff contends he would have lost on January 3, 2003 were accumulated annual leave Plaintiff was required to take or relinquish because they exceeded the number of carry over hours allowed; it is also called "use or lose" leave.

10

one ever told the Plaintiff that unless he resigned he would be subject to investigation and reassignment. Exh. 1, Malloy I, 151:3-13.

48. When he retired, Plaintiff was compensated monetarily for the 146 hours of annual leave he had in a use-or-lose status. See Exh. 1, Malloy I, 154-55.

49. Since his retirement, the Plaintiff has not applied for any jobs. Exh. 1, Malloy 53:1-4; 54:5-8.

Vacancy Announcements

50. On October 10, 2002, the Agency published vacancy announcement 03-FESB-002 for the position of the SAC of Region 6, which was vacant because of SAC Chapman's retirement. Am. Compl. para. 40.[3]

51. Plaintiff was aware that HUD OIG advertised their vacancy announcements on a publicly available website. Exh. 1, Malloy 145:14-19.

52. Plaintiff learned about the vacancy announcement for the SAC position on October 30, 2002, and was not able to put together a package in time to meet the filing deadline. Exh. 1, Malloy 146:119.

53. Plaintiff did not make any effort to contact anyone at HUD OIG, including Daniel Salas, to make his interest in applying for the vacant SAC position known. See Exh. 1, Malloy I, 141:8-19; 145:20-146:22.

54. AIGI Haban would not have promoted the Plaintiff to the SAC vacancy in Region 6 because he had a policy of not promoting sitting ASACs to be SACs in the same region. Exh. 5, Haban 103:13-25; 104:1-14.

---

[3] By letter dated March 12, 2007, Plaintiff, through his counsel, indicated an intent to abandon his claim involving the selection of Special Agent Lester Davis to fill this position. See Exh. 23.

11

55. On December 12, 2002, the Agency published vacancy announcement No. 03-FESB-100 for the position of ASAC in the Houston, Texas office.  Malloy 148:2-4.  Plaintiff learned of the vacancy announcement for the Houston ASAC position on December 19, 2002.  Am. Compl. para. 51; Exh. 1, Malloy 148:2-8.  Although he had time to do so, Plaintiff did not apply for the position.  Exh. 1, Malloy 148:1-17.

Personal Background

56. Plaintiff has no documentary proof that he is a Native American.  Exh. 1, Malloy 7:10-14.

57. Plaintiff has never attempted to verify that he is truly Native American.  Exh. 1, Malloy 8:16-23.

58. The only information Plaintiff has regarding his Native American ancestry comes from what his relatives told him about his great-grandmother being a Cherokee Indian.  Exh. 1, Malloy 10:14-22.

59. Plaintiff is not, and has not ever been, a member of any organization related to Cherokee ancestry.  Exh. 1, Malloy 19:20-22.

60. AIGI Haban first learned that the Plaintiff was claiming to be a Native American when Plaintiff filed his complaint of discrimination.  Exh. 5, Haban 102:4-14.

Dated: June 5, 2007.

                Respectfully submitted,

                _____
                JEFFREY A. TAYLOR, D.C. Bar # 498610
                United States Attorney

/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


/s/_____
JANE M. LYONS, D.C. Bar # 451737
Assistant United States Attorney
555 4th Street, N.W - Room E4822
Washington, D.C. 20530
(202) 514-7161
(202) 514-8780 (facsimile)