Page 1

```
 1            UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF COLUMBIA
 3   - - - - - - - - - - - - - - - x
 4
 5   JAMES MALLOY,                :
 6              Plaintiff,        :
 7   vs.                         :   Case No: 05-1117 (RCL)
 8   ALPHONSO R. JACKSON,         :
 9              Defendant.        :
10   - - - - - - - - - - - - - - - x
11
12                 Washington, D.C.
13                 Tuesday, March 6, 2007
14
15
16   Deposition of:
17                  JAMES MALLOY
18   the Deponent, called for examination by counsel for the
19   Defendant, pursuant to notice and agreement as to time and
20   place, at 501 3rd Street, N.W., Washington, D.C., before
21   Jack L. Becker, a Notary Public in and for the District of
22   Columbia.
23
24
25
```

Page 2

```
 1   APPEARANCES:
 2            On Behalf of the Plaintiff:
 3            ROBERT C. SELDON, ESQUIRE
 4            1319 F Street, N.W.
 5            Suite 305
 6            Washington, D.C.  20004
 7            (202) 955-6968
 8
 9            On Behalf of the Defendant:
10            JANE LYONS, ESQUIRE
11            Assistant United States Attorney
12            555 4th Street, N.W.
13            Tenth Floor
14            Washington, D.C.  20530
15            (202) 514-7161
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 2   WITNESS:        EXAMINATION:              PAGE:
 3   James Malloy    Direct - Ms. Lyons         4
 4
 5              E X H I B I T S
 6   EXHIBIT NO.:       DESCRIPTION:           PAGE:
 7      2           Statement of Mr. Eamiguel    62
 8      3           Statement of Tammy Gilbert   78
 9      4           Chain of e-mails            134
10      5           Memos to Daniel Salas dated  141
11                  dated October 15, 2002
```

Page 4

```
 1                PROCEEDINGS
 2                    (1:07 p.m.)
 3   Whereupon,
 4              JAMES MALLOY
 5   was called as a witness and after having been first duly
 6   sworn, was examined and testified as follows:)
 7       REPORTER: Can I have you state your name and spell
 8   it for the record, please?
 9       WITNESS: James Malloy, M-A-L-L-O-Y.
10            DIRECT EXAMINATION
11       BY MS. LYONS:
12       Q. Good afternoon, Mr. Malloy.
13       A. Good afternoon.
14       Q. You and I have met before, but I'm Assistant United
15   States Attorney Jane Lyons and I'm going to be taking your
16   deposition today in connection with the lawsuit that you've
17   brought against your former employer, the Department of
18   Housing and Urban Development, Office of Inspector General.
19   Do you understand that?
20       A. Yes, ma'am.
21       Q. I'm sure your attorney has prepared you for your
22   deposition, but let me just go over a couple of basis ground
23   rules.  You've just been sworn.  Everything you're going to
24   say and everything I'm going to say is going to be taken down
25   and assembled and you'll have an opportunity to review it if
```

Page 5

1  you would like. It's just like testifying in court, but it's
2  less formal, so if you would like to take a break at some
3  point, all I would ask is that you complete your answer to the
4  pending question before we take a break. Is that acceptable?
5      A. I appreciate that.
6      Q. One of the most important rules is that you and I
7  work together well and I don't speak over you and you don't
8  speak over me. I will do everything I can to allow you to
9  finish your answer before I give you another question, and if
10 I cut you off, please tell me and I'll allow you to complete
11 your answer. Can we agree to that?
12     A. Yes.
13     Q. You're going a very good job giving verbal answers
14 so far and I appreciate that because nods of the head
15 obviously don't make it down to the paper very well. The most
16 important thing, I think, is that we have an agreement that
17 you won't answer any question I ask you that you don't
18 understand. Is that fair?
19     A. Yes.
20     Q. So if you give me an answer to a question, I'm going
21 to assume that you understood my question, okay?
22     A. Okay.
23     Q. All right. Let's start off with a letter that your
24 attorney sent this afternoon concerning your Native American
25 heritage. Have you reviewed Mr. Seldon's March 6th, 2007

Page 6

1  letter to me?
2      A. I was looking over his shoulder as he was preparing
3  it.
4      Q. Okay. Let's --
5      MR. SELDON: I'll just clarify this here. He may or
6  may not have seen the very final version that I sent to you.
7      WITNESS: I was going to say in draft form I'd seen
8  it.
9      BY MS. LYONS:
10     Q. You'd seen it. Okay. Would you like to take a look
11 at the final version?
12     A. If you don't mind, I would, yes.
13     Q. I don't mind at all.
14     A. Okay.
15     Q. Are the statements in this letter accurate, Mr.
16 Malloy?
17     A. Yes, ma'am, they are.
18     Q. It's fair to say that you adopt these statements as
19 your own?
20     A. Yes, ma'am, I do.
21     Q. All right. Let's go back a little bit because these
22 statements concern your heritage as Native American, correct?
23     A. Yes, ma'am.
24     Q. All right. Tell me how it is that you claim to have
25 Native American ancestry.

Page 7

1      A. My great-grandmother --
2      Q. Well -- yeah.
3      A. -- is Cherokee.
4      Q. Okay. Are you recognized by the Cherokee tribe as a
5  member?
6      A. Not that I know of.
7      Q. Have you ever signed a roll or other official
8  document or applied for membership in the Cherokee tribe?
9      A. No, I have not.
10     Q. Do you have any documentary proof that you are part
11 Cherokee?
12     A. What I know is based on what my family has told me,
13 and I do know that my great-grandmother was a full-blooded
14 Cherokee Indian.
15     MR. SELDON: Can we just stop? Do you think we
16 could maybe ask if they could close their door?
17     MS. LYONS: Okay.
18         (OFF THE RECORD)
19         (ON THE RECORD)
20     BY MS. LYONS:
21     Q. Have you ever made any attempts to verify your
22 Cherokee ancestry with the tribe, Mr. Malloy?
23     A. You know, I have provided quite a bit of information
24 previously to the government through EEO and through the
25 discovery process, and as part of discovery -- and I will

Page 8

1  certainly try to answer these questions as best as I can
2  recall, but I also want that to be part of the record, what
3  I've previously provided to the government.
4      Q. Okay. You understand that in this lawsuit you're
5  making a claim based on Native American heritage, correct?
6      A. That's right, but in -- as part of the discovery
7  process I provided a document discussing the Cherokee nation
8  and how -- you know, whether or not you were a Cherokee or
9  not, and it basically said if you had ancestry that went into
10 the 1900s, that you were Cherokee, and so based on that I
11 thought I was Cherokee, and I do believe that I'm Cherokee
12 based on that document.
13     Q. Please understand that I'm not questioning the
14 sincerity of your belief. I am not in any way.
15     A. All right.
16     Q. What I am trying to determine is what efforts you
17 have made to verify your ancestry with the Cherokee tribe, if
18 any. Have you?
19     A. Once -- no.
20     Q. Okay.
21     A. Once I read that document I didn't feel like I
22 needed anything further to make me feel comfortable with the
23 fact that I was Native American.
24     Q. When did you read the document that you're referring
25 to first?

Page 9

1    A. I want to say it was probably -- let me see here.
2  It was probably in the, you know -- probably 1995, somewhere
3  around then. It was in the '90s.
4    Q. I take it you had been told by members of your
5  family before that time?
6    A. Yes. We had --
7    Q. Let me finish my question. I take it that you had
8  been told by your family members prior to 1995 that your
9  great-grandmother was a full-blooded Cherokee, is that right?
10   A. Yes, ma'am.
11   Q. Are there any other members of your family to whom
12  you claim Native American ancestry?
13   A. Again, you know, I'm going to go back to the fact
14  that I have already provided answers and documents through the
15  EEO process and through discovery. I will answer your
16  question as best as I can, but I also want any information
17  I've previously provided to be a part of this record.
18   Q. Okay. Well, the only information I'm going to have
19  had access to is the information you provided in connection
20  with this lawsuit. All I'm asking you at the moment is a
21  relatively straight forward question. Are there more than one
22  member of your family through whom you claim Native American
23  ancestry?
24   MR. SELDON: If I can just make it clear, we also
25  disclosed and everyone's had access to the Report of

Page 10

1  Investigation before this lawsuit was started, and you can
2  just --
3    REPORTER: Would you speak up, please?
4    MR. SELDON: Yes. I just wanted to clarify that
5  everyone -- and we have disclosed and everyone connected with
6  the lawsuit has had access to the Report of Investigation that
7  preceded this lawsuit.
8    MS. LYONS: Of course.
9    MR. SELDON: That's all.
10   BY MS. LYONS:
11   Q. Can you answer the question?
12   A. Would you ask the question again, please? I've
13  forgotten it now.
14   Q. Sure. Do you claim Native American ancestry through
15  any relative other than your great-grandmother whom you say
16  was a full-blooded Cherokee?
17   A. I have been told that I have other Native American
18  ancestry, but I don't have any specific information about that
19  other than what my relatives have told me.
20   Q. Are you relying on any Native American ancestry
21  other than through your great-grandmother in this lawsuit?
22   A. No.
23   Q. Okay. What was your great-grandmother's name?
24   A. Martha Drake.
25   Q. D-R-A-K-E?

Page 11

1    A. Yes.
2    Q. When was she born?
3    A. I don't know. I don't recall that.
4    Q. Obviously you weren't alive?
5    A. No.
6    Q. I'm just asking for the best information that you
7  have about this person. Do you know where she was born?
8    A. No.
9    Q. Do you know what her parents' names were?
10   A. I may have that information, but I don't -- I can't
11  -- I certainly don't have it here at this -- I have some
12  family information, you know, back home, but I don't know that
13  I have heard the names of her family, her mother and father.
14  I may. I would have to research that.
15   Q. Would you be willing to do that and to provide that
16  information?
17   A. Yes, if I have it, yes.
18   Q. And we would also like to have her children's names
19  if you have those. Do you know those off the top of your
20  head?
21   A. No.
22   MR. SELDON: Let me just say that in theory those
23  requests should go through me as counsel for Mr. Malloy. I'll
24  just say that within reason we'll cooperate with any request.
25  I mean I don't know how many more volumes will be asked for

Page 12

1  today, but within reason we'll cooperate with any request.
2    BY MS. LYONS:
3    Q. When was the first time in connection with your
4  employment by HUD OIG that your Native American ancestry was a
5  factor or an issue in anything?
6    A. Would you ask that question again? Did you ask
7  about my employment or the investigation?
8    Q. I'm asking about when during your employment by HUD
9  OIG -- well, let me ask it this way. The letter that Mr.
10  Seldon sent us that you've looked at -- take a break?
11       (OFF THE RECORD)
12       (ON THE RECORD)
13   BY MS. LYONS:
14   Q. Mr. Malloy, when did you first become employed by
15  HUD OIG?
16   A. In October of 1983.
17   Q. Did you apply for a position?
18   A. I applied for a GS-12 Special Agent's position with
19  the Agency.
20   Q. Who hired you?
21   A. They actually called them Regional Inspector
22  Generals for Investigation at the time as opposed to Special
23  Agents in Charge, but the Regional Inspector General for
24  Investigation in Fort Worth, Texas at the time was a gentleman
25  named Johnny, J-O-H-N-N-Y, Lee, L-E-E.

Page 13

1    Q. Is Mr. Lee still employed by the Agency?
2    A. No, ma'am. He's retired.
3    Q. Did you work for HUD OIG in any office other than
4  the Fort Worth, Texas office?
5    A. No, ma'am.
6    Q. When you came to HUD OIG, did you agree that you
7  would be subject to nationwide availability if the needs of
8  the Agency required it?
9    A. I don't recall.
10    Q. When you came to the Agency in October of 1983, did
11  you fill out Equal Employment Opportunity information in
12  connection with becoming employed?
13    A. No.
14    Q. You didn't self-identify yourself one way or the
15  other?
16    A. No, not to my recollection.
17    Q. Mr. Seldon's letter from today makes reference to
18  racially derogatory comments about Native Americans that were
19  made to you by a person named Robert Tighe.
20    A. Yes, ma'am.
21    Q. When were those remarks made?
22    A. It would have been prior to me becoming a
23  supervisor, so it would probably have been, oh, '91, '92,
24  something like that. I used to sit next to Agent Tighe.
25    Q. And what happened that caused an investigation?

Page 14

1    A. He had filed an EEO. There was a GS-14 position
2  announcement that another person was selected on, and he filed
3  an EEO at that point in time, and I think during the -- this
4  is to the best of recollection. I believe that during the EEO
5  investigation information came out through that process that
6  Mr. Tighe had made inappropriate comments in the past.
7    Q. All right. Let me focus on you because that's the
8  best source.
9    A. Okay.
10    Q. What did you ever hear Mr. Tighe say --
11    A. During that -- well --
12    Q. -- that was inappropriate?
13    A. He made a comment that -- and I'm going to clean
14  this up some, but --
15       MR. SELDON: You probably shouldn't. She'll want it
16  verbatim.
17       BY MS. LYONS:
18    Q. I really would like it as best you can remember it.
19  Don't worry about me.
20    A. Okay. I'm worried about myself on this. But he
21  said that Indians were proof that the white man had fucked a
22  buffalo.
23    Q. Did you personally hear him make that remark?
24    A. Yes, I did.
25    Q. How many times did he make it?

Page 15

1    A. Several occasions, more than once.
2    Q. Did you tell Mr. Tighe that were of Native American
3  ancestry and that that remark was offensive?
4    A. Yes, I did.
5    Q. What was the result of the investigation conducted
6  by HUD OIG into Mr. Tighe's comments?
7    A. I don't know.
8    Q. Is that the first time you identified yourself to
9  anyone at HUD OIG as Native American?
10    A. No, it was not.
11    Q. When was the first time?
12    A. When Ms. Gaffney became the Inspector General for
13  Investigation. I don't have the exact date but, you know, I
14  think it probably would have been in the early '90s. One of
15  the first things that she did is she implemented a Diversity
16  Program, you know, with the Agency, and through that -- one of
17  the thing they did through that process was to identify, you
18  know, I guess what every person that worked for HUD OIG, you
19  know, was in terms of race.
20    Q. And when was this?
21    A. I want to say -- you know, it was right after Ms.
22  Gaffney became the Inspector General, and I think that that
23  was -- would probably have been around -- it was right after I
24  became a supervisor, which I think was probably around '92 or
25  so. It would have been '92 to '94, somewhere in there. And,

Page 16

1  you know, this was not an immediate process is why it's a
2  little confusing in my mind. It went over a two or three year
3  period, implementing this program.
4    Q. Did you complete some kind of a survey about your
5  ancestry or race?
6    A. I think initially they categorized me as being a
7  white male supervisor.
8    Q. How did that come to your attention?
9    A. I think they sent out quarterly reports identifying
10  what each, you know, employee was.
11    Q. By name?
12    A. No. It just -- what it did was, you know, basically
13  as an example, my region as an example, at the time there were
14  two supervisors. Actually I think that it probably was done
15  by grade. It was either done by grade or position, but I
16  believe it was grade. And, you know, so it would say, you
17  know, GS-14 -- you know, how many Native Americans were in the
18  region, how many African-Americans, how many Caucasians. You
19  know, it had it broken down in that way. But I mean, you
20  know, if you're a small enough region you can pretty much
21  figure out if there's just one 14 supervisor, you know, who
22  they're talking about.
23    Q. What did you do in response to finding out that you
24  had been identified as a white male, if anything?
25    A. I talked to a guy. His name was Bob Martin and he

Page 17

1  was the -- I believe he was the Director of Office of
2  Management and Policy.
3      REPORTER: Sorry. Can you repeat that name, Bob
4  Martin?
5      WITNESS: Bob Martin, and I believe his title was
6  Director of Office Management. They called it -- the acronym
7  was OMAP, O-M-A-P, and I believe it was Office Management and
8  Policy. And, you know, I was up here -- I was up in D.C.
9      BY MS. LYONS:
10     Q. Are you telling me about when you met with Mr.
11 Martin?
12     A. Yes.
13     Q. Okay. So you were physically up here in D.C. --
14     A. Yeah, and --
15     Q. -- on travel, correct?
16     A. And I was at some kind of training and we were
17 getting -- I know Cuomo was the Secretary because I had to go
18 over and accept an award from Cuomo for, you know, some
19 investigative and audit work that we had done in our region
20 that they were recognizing us for. And so Bob, for Ms.
21 Gaffney who wanted to make sure I made this meeting on time,
22 Bob actually physically came and picked me up and drove me
23 over to the meeting. I think the training was at an -- in a
24 hotel.
25     Q. Mr. Malloy, I don't want to cut you off, but I need

Page 18

1  you to get around to the answer here.
2      A. Right, right. But anyway --
3      Q. The question is what did you tell Mr. Martin? Let
4  me break --
5      A. I asked him what the process was, how they went
6  about identifying, you know, people.
7      Q. Okay.
8      A. And I did also tell him. You know, I said I have,
9  you know, Native American in my family. You know, I did tell
10 him. I said I've got -- I'm white, but I also have Native
11 American in my family. And he said there was a lady there on
12 his staff that I guess had compiled that information as best
13 as she could, and he said there are some indications -- I
14 guess some of us had been a government employee for a long
15 time. I don't know that it was required to provide
16 information about what ethnicity you were.
17     Q. Did you feel comfortable speaking to Mr. Martin
18 about your --
19     A. Yes.
20     Q. -- claim to Native American heritage?
21     A. Yes. I've never made it a secret to anyone about
22 that. I'm proud of that.
23     Q. Give me some examples of things that demonstrate
24 your pride in your Native American heritage.
25     A. Again, I feel like I've previously addressed this.

Page 19

1      Q. I understand that, Mr. Malloy, but I need you to
2  answer my questions today or we're going to be here for a very
3  long time.
4      A. Well, what I've already provided in terms of
5  information to the government, Ms. Lyons, I want to make sure
6  that it's included as part of this answer. So, you know, I
7  did -- I had a -- I certainly talked about it. You know,
8  that's the reason that Tighe brought up the information -- you
9  know, made the comment that he did to me. He was aware of
10 that. I certainly never made it a secret to any -- I didn't
11 go around, you know, dressed up in a Native American costume
12 or anything, but at the same time I certainly let everybody
13 know, you know, that that's where I -- you know, I have a lot
14 of pride about that. You know, my dad's father could not read
15 or write. My father was 1 of 13 children and, you know, he
16 made it to the eighth grade, and so it was a big deal for me
17 to get to go to college and, you know, be in the job that I'm
18 in. So, you know, but at the same time my family has a lot of
19 character and pride in it.
20     Q. Are you a member of any organizations that relate to
21 your Cherokee ancestry?
22     A. No.
23     Q. Have you ever been a member of any organization in
24 any way connected with Native American pride, heritage or
25 anything else?

Page 20

1      A. No. I would have. The Agency certainly offers that
2  opportunity for other ethnic backgrounds, but they -- my
3  agency never provided that for Native Americans.
4      Q. Where did you go to college?
5      A. University of Texas at Austin.
6      Q. Were there such organizations at the University of
7  Texas at Austin?
8      A. Not that I'm aware of.
9      Q. What was your working relationship with Mr. Tighe in
10 1991 or 1992? Were you colleagues?
11     A. At that time -- up until the time that I became a
12 supervisor, you know, we were colleagues. Yeah, at some point
13 in time -- about that time frame I became a GS-13 and I
14 believe Mr. Tighe competed for that job, as well. And
15 certainly once I got the promotion over him the relationship
16 soured, and so, you know, it was somewhere around that time
17 frame.
18     Q. All right. Let's get a general overview of your
19 progress through the Agency. You said you were hired in
20 October of 1983 as a GS-12, correct?
21     A. Yes.
22     Q. And you were promoted to GS-13 when?
23     A. Probably it would have been in '90 or '91.
24     Q. Who was the person who made the decision to promote
25 you?

Case 1:05-cv-01117-RCL   Document 29-3   Filed 06/05/2007   Page 6 of 28

## Page 21

1    A. Johnny Lee.

2    Q. What position did Mr. Lee occupy?

3    A. He was --

4    Q. The Regional --

5    A. -- the Regional Inspector General for Investigation,

6  which basically was the equivalent of the Special Agent in

7  Charge. He was a GS-15.

8    Q. Did Mr. Lee know of your claim to Native American

9  ancestry at the time he promoted you?

10    A. Yes, I believe he did.

11    Q. Okay. And when were you promoted to GS-14?

12    A. That would have been '92 to '93. Now I was an ASAIC

13  in an interim acting basis up until the time that I actually

14  got the job, but, you know, somewhere around the time frame of

15  '92 or '03, and I acted for a long period of time before they

16  actually made it permanent.

17    Q. And was that also under Mr. Lee when you were the

18  acting ASAIC?

19    A. Actually that was under -- Chapman came on board as

20  the Special Agent in Charge in 1991.

21    Q. So was it Mr. Chapman who was responsible for

22  promoting you to ASAIC permanently?

23    A. Yes, he was.

24    Q. And you said that was in 1991 or 1992, correct?

25    A. I think it was probably more like '93 that I

## Page 22

1  actually got the permanent position.

2    Q. Did Mr. Chapman know that you were Native American

3  at the time he promoted you?

4    A. Yes.

5    Q. Did you ever speak to Mr. Joseph Haban about your

6  claim to Native American ancestry?

7    A. No, not to my recollection.

8    Q. Did you ever speak to Mr. Michael Stevens about your

9  claim to Native American ancestry?

10    A. No.

11    Q. From the time that you were hired in October of 1983

12  all the way up until the events that we're going to talk about

13  that surround this lawsuit, were you ever subject to any kind

14  of disciplinary action at the Agency?

15    A. No.

16    Q. Okay. And you did receive a number of awards,

17  correct?

18    A. Yes, ma'am.

19    Q. And including in 1998 or 1999, depending on where

20  you look, you were recognized in some fashion?

21    A. Yes, ma'am.

22    Q. Can you tell me about that and which year it was

23  that you received the award?

24    A. I was recognized as the National Manager of the Year

25  for Investigations for that HUD Office of Inspector General

## Page 23

1  and, you know, I think it's probably one of those deals where

2  it's for, you know, work done in '98, but the award actually

3  wasn't given to you until '99. I actually have a plaque

4  that's got the year on it and I can confirm that for you, but

5  --

6    Q. That's okay. It's not --

7    A. That's probably what the confusion is.

8    Q. Yeah, I think that's what it is. It was for work

9  done in 1998, but you probably received it in 1999.

10    A. Yeah, but, you know, I would have to go back and

11  check on that to --

12    Q. That's okay.

13    MR. SELDON: It's the fiscal year -- the '99 fiscal

14  year. I had this is a whole other lawsuit. At HUD the fiscal

15  year starts -- like the '99 fiscal year starts in '98.

16    MS. LYONS: Yeah, that drives me insane.

17    MR. SELDON: You don't care. I'm just --

18    MS. LYONS: It's like cars.

19    MR. SELDON: Right, exactly.

20    BY MS. LYONS:

21    Q. Who was the Inspector General when you were

22  recognized as the National Manager of the Year?

23    A. Susan Gaffney.

24    Q. And who was the Deputy Inspector General for

25  Investigations at that time?

## Page 24

1    MR. SELDON: The Deputy or the -- there's an

2  Assistant Inspector General and a Deputy Assistant Inspector

3  General.

4    MS. LYONS: Okay. The Assistant Inspector General

5  for Investigations. Thank you, Mr. Seldon.

6    WITNESS: I believe that it was Phil Kesaris.

7    MR. SELDON: I'll just tell you, I think Mr. Johnson

8  and I both know it was Patrick Neri.

9    MR. JOHNSON: Neri, Pat Neri.

10    MR. SELDON: N-E-R-I.

11    MR. JOHNSON: I think it was Pat Neri.

12    WITNESS: I don't think so.

13    BY MS. LYONS:

14    Q. Well, we're interested in Mr. Malloy's testimony

15  now.

16    A. Yeah.

17    MR. SELDON: You know, you're right. It depends.

18  You're right under the dividing line.

19    WITNESS: Yeah. I went to the banquet and I don't

20  -- yeah, yeah, Neri wasn't there.

21    BY MS. LYONS:

22    Q. We'll take your answer, Phil Kesaris, in any event.

23    A. You know, one of the things that I haven't mentioned

24  is that I'm a certified fraud examiner and I have been since

25  1991.

**Page 33**

1  this is -- if it's not going to be part of the lawsuit, then
2  it seems to me this whole -- we could speed this up a bit?
3      MS. LYONS: I'm --
4      MR. SELDON: I think you asked that --
5      MS. LYONS: I'm hearing him say that he believes his
6  high cholesterol is caused by the HUD OIG.
7      BY MS. LYONS:
8      Q. If I've misunderstood you, please tell me.
9      A. Or it may be caused by the fact that I'm not running
10  or exercising. I know that probably has something do with it,
11  the fact that, you know -- yeah, I have gained weight, as
12  well, so I mean it could be -- but I mean one thing leads to
13  another, I guess possibly.
14      Q. How much weight have you gained since October of
15  2002?
16      A. Twenty pounds, twenty-five. You know, I probably
17  weighed -- you know, I weigh over 200 pounds.
18      Q. How tall are you?
19      A. 6'1". Now I used to -- you know, in fact, that was
20  the good thing about running, it was always 170, 175.
21      Q. Since we're talking anyway about your damages, it
22  seems to me that the next natural place to go is back in time
23  just a little bit and then we'll go back to the beginning a
24  little bit more. For now, tell me why you left HUD OIG's
25  employment.

**Page 34**

1      A. Again, I believe I've provided this information
2  through discovery and the EEO process. I'll answer the
3  questions as best that I can but, you know, I do want those
4  included as part of the record, my previous information
5  provided, you know. I left HUD OIG because I felt like I was
6  forced to leave.
7      Q. What made you feel that way?
8      A. They removed me as a supervisor.
9      Q. What were you told about the duration of that
10  removal of supervisory authority?
11      A. I was told that I would no longer be allowed to be a
12  supervisor in the Southwest Region.
13      Q. Who told you that?
14      A. Haban told me that in the memo that he had me
15  returning to duty, and then Lester Davis confirmed it when I
16  asked him about it.
17      Q. What exactly did Mr. Davis say?
18      A. I came back to the office off of administrative
19  leave on -- I believe it was December the 19th, 2002, and, you
20  know, I was supposed to contact Salas. You know, that was
21  supposed to be, you know, what I was supposed to do first when
22  I came in to the office at 8:00. Well, you know, as I'm about
23  to call Salas, the phone rings and it's Lester Davis. Lester
24  Davis tells me he's in town, he's the one that's going to
25  process me in, he's got a few things that he's got to do, and

**Page 35**

1  he'll be over to talk to me. And so he did tell me over the
2  phone that I needed to be thinking about some of the duties
3  that I could be performing in a non-supervisory position and,
4  you know, I was initially kind of -- you know, thought that
5  might be a challenge, but then he told me I could have nothing
6  to do with the agents and I could have nothing to do with
7  investigations.
8      Q. That's what he said?
9      A. That's what he said.
10      Q. Those were his words?
11      A. That's what he said.
12      Q. Did he say anything else?
13      A. He told me that -- to come up -- be thinking about
14  some ideas or some areas that I could be working on, and that
15  he would, you know, be over to the office soon, you know, in a
16  short time frame.
17      Q. Did he come over?
18      A. He came over about 1:30.
19      Q. Did you two speak about what duties you'd be
20  performing at that time?
21      A. Yes. We went over some things and I -- you know, I
22  believe I provided this through discovery. I actually have a
23  sheet where he put the duties in his handwriting, you know,
24  what the things were that he wanted me to be working on.
25      Q. Did you suggest any duties?

**Page 36**

1      A. Yes.
2      Q. What did you suggest?
3      A. Some of the things that I would have liked to have
4  worked on was proactive things, you know, coming up with
5  additional investigations, you know, contacting HUD program
6  staffs and seeing how we might be able to, you know, get more
7  work in terms of recoveries for HUD like on fraud matters.
8  You know, I could be doing that type work. I really felt like
9  I could go over some of the cases, that there might be not
10  that many steps to do and come up -- you know, troubleshoot
11  those and come up with some ideas to talk to the agents about,
12  you know, what they might be doing to get the matters
13  resolved.
14      Q. Okay. Wouldn't going over open investigations and
15  telling the agents what they might need to do to get resolved
16  be miniature supervisory duties?
17      A. Well, I mean I wouldn't mind -- I would certainly
18  have no problem talking to their supervisor, you know.
19      Q. During your conversation with Mr. Davis on December
20  19th, 2002 about your duties, was he receptive to your ideas?
21      A. No. He told me that I could have nothing to do with
22  the -- that Headquarters had told him that I could have
23  nothing to do with the agents and I could have nothing to do
24  with any investigations. And I'll tell you what he told me --
25  I can certainly tell you what he -- the things he told me to

Page 41

1    MS. LYONS: Okay. I appreciate that clarification.
2  Sounds like a foundation objection.
3    BY MS. LYONS:
4    Q. You were involved, Mr. Malloy, with the settlement
5  negotiations for your EEO complaint?
6    A. Mr. Seldon was apprising me of what was going on in
7  that process.
8    Q. Okay. Without telling me in any way what Mr. Seldon
9  said, please tell me whether you ever indicated to Mr. Seldon
10 that as part of the settlement you would be willing to retire
11 from HUD OIG, presumably in early 2003.
12    MR. SELDON: Could I just make this -- you want to
13 say as he understood it whether he ever offered to retire as
14 opposed to whether he told me.
15    MS. LYONS: I'm not sure what the relevant
16 distinction there is, but I'll take the answer to either
17 question.
18    MR. SELDON: Well, he might have told me and I might
19 have said no, don't do that.
20    MS. LYONS: And that's exactly what I don't want you
21 to tell me.
22    MR. SELDON: Right. So that's what I'm saying, if
23 he offered something, that's -- you know, it's not what -- I
24 don't need you to ask him whether he told me. I think you can
25 say whether in his understanding he offered something in

Page 42

1  settlement.
2    MS. LYONS: We'll try it that way.
3    BY MS. LYONS:
4    Q. Mr. Malloy, are you aware of whether on your behalf
5  Mr. Seldon ever communicated to HUD OIG that you would be
6  willing to retire as a part of a settlement of your EEO
7  complaint?
8    A. Now my understanding of the situation is, you know,
9  I never made any agreement like that. You know, I --
10    Q. I'm not talking about an agreement. I'm talking
11 about whether you are aware that Mr. Seldon communicated to
12 the Agency that you would be willing to retire as part of a
13 settlement of your EEO complaint.
14    A. I do remember that we had, you know, conversations,
15 but as far as whether or not -- you know, I don't remember
16 what the terms of the -- you know, whatever they were
17 settling. I do remember, you know, what was offered, you
18 know, the things that were offered as a settlement and I know
19 that they were not acceptable to me. I do know that.
20    Q. Okay. What do you recall having been offered, I
21 guess, by the Agency?
22    A. Yes.
23    Q. What do you recall about that?
24    A. That if I would drop the EEO, they would return me
25 to duty in a non-supervisory capacity, that, you know, I would

Page 43

1  have to agree to retire at -- I believe it was, you know, in
2  February of 2003, and that, you know, if all they had in terms
3  of allegations against me was what they had on their plate at
4  that time, then they basically would let me -- you know, I
5  don't even know exactly what the wordings were, but that I
6  would be able to retire in good standing.
7    Q. You did retire in good standing, did you not?
8    A. I don't feel that I did, no.
9    Q. Okay. Was your retirement at all affected in terms
10 of the monetary amounts by the pendency of your EEO complaint?
11    A. No, but in terms of any future employment, I
12 certainly have serious problems there.
13    Q. All right. We'll get to that in a minute. If Mr.
14 Seldon communicated to the Agency that you were willing to
15 retire in February of 2003, was he acting contrary to your
16 wishes?
17    A. I believe if we could have made this right where --
18 you know, I don't really know how to answer that question. I
19 mean I did not feel like -- I had never made the highest level
20 of salary that you can reach in government. I was getting
21 fairly close to that. You know, your retirement is based on
22 your highest three years of your salary, so I certainly never
23 had any intentions of retiring. You know, I --
24    Q. When you did?
25    A. Yeah. I loved my job. I would have loved to have

Page 44

1  worked for, you know, as long as possible.
2    Q. And how long was that for you?
3    A. I was 51, about to turn 52, when this all happened
4  -- started. I became 52 October 31st of 2002, and, you know,
5  they initiated this investigation on me starting on October
6  the 10th, 2002, so I still -- you know, I still had five
7  years.
8    Q. So it was your intention to work for another five
9  years?
10    A. Yes, ma'am.
11    Q. Going back to the question of why you retired, you
12 basically identified the change in your duties as a reason, is
13 that correct?
14    A. Not being a supervisor anymore, yes, yes, ma'am.
15 Coming back and finding out that they were not going to let me
16 work with case agents or on cases, not being allowed to put in
17 for the -- you know, the ASAIC position or the -- you know,
18 the Houston ASAIC position.
19    Q. Let's slow down there. You came back December 19th,
20 2002, correct?
21    A. Yes, ma'am.
22    Q. Is that the first time you were told that you would
23 not be working in a supervisory position?
24    A. I received a memo or a letter from Joe Haban shortly
25 before December the 19th, and in that document I was told that

Page 45

1  I could no longer serve as a supervisor in the Southwest
2  Region.
3      Q. Did you ever speak to Mr. Haban about the memo he
4  sent you shortly before you returned on December 19th, 2002?
5      A. No.
6      Q. Never asked him any questions about how long that
7  would last?
8      A. No. You know, I never -- you know, from the time
9  that he put me on administrative leave, he -- Salas was the
10  one that did most of the talking when they put me -- the day
11  that they called me over there and put me on administrative
12  leave in Salas' office, and that was October 10th. And, you
13  know, even prior to that, you know, Haban and Salas -- when
14  Salas became the Deputy AIG up there, and I believe he
15  reported like the -- he was on the desk like the first day
16  after Labor Day of 2002. Lester Davis was sitting in his
17  capacity prior to that.
18      And shortly after that, you know, we got an e-mail
19  from our Desk Officer, Barbara Duffy, and she told all the
20  ASAICs in our region that we weren't to talk directly to Joe
21  Haban, that, you know, if we had questions that should go to
22  Joe Haban, that we should go through the Special Agent in
23  Charge, so I really had no contact with Joe Haban, you know,
24  after that other than, you know, him being in this meeting
25  that -- where Salas gave me the letter putting me on

Page 46

1  administrative leave on October the 10th. That's --
2      Q. Okay, but right now we're focused on December of
3  2002 because what we're trying to talk about just for now is
4  why you decided to leave when you left, okay?
5      A. Right.
6      Q. You're telling me you didn't talk to Haban, right?
7      A. Right. I believe I got the memo or letter probably
8  through Seldon.
9      Q. Okay. Did you talk to Dan Salas about the removal
10  of your supervisory duties and how long it might last?
11      A. No. My only conversation was through Lester Davis.
12      Q. Okay. Is there anything else that Mr. Davis told
13  you relevant to either the duties you'd be performing or your
14  supervisory responsibilities that you haven't already told me?
15      A. He told me he didn't know what they were going to do
16  with me but, you know, they had transferred Truxal.
17      Q. Where did Mr. Davis tell you that Mr. Truxal had
18  been transferred to?
19      A. Well, you know, Lester -- well, I knew that. They
20  transferred him to Boston, but Truxal had actually told me
21  when I came back.
22      Q. What did he tell you?
23      A. That he had been transferred to Boston, that he had
24  put in -- that he applied for the Fort Worth Special Agent's
25  position and that he didn't get that job, and that when Haban

Page 47

1  told him that he didn't get the job, Haban told him that he
2  was also being transferred to Boston as the ASAIC there.
3      Q. So when Mr. Truxal went to Boston as the ASAIC, he
4  had supervisory responsibilities to your knowledge?
5      A. But he ultimately ended up not going. He retired.
6  But, yeah, he would have been a supervisor up there. He would
7  have been the Assistant Special Agent in Charge.
8      Q. That was your understanding, correct?
9      A. Yes.
10      Q. And instead of doing that Mr. Truxal decided to
11  retire?
12      A. Yes.
13      Q. Okay.
14      A. He retired on the same day I did, January 3rd.
15      Q. That's January 3rd of 2003, correct?
16      A. Yes, ma'am.
17      Q. Did you ever ask Mr. Davis whether it would be
18  possible to transfer you out of the Southwest Region?
19      A. I told him I would -- of course, you know, when I
20  came back I found out about the vacancy in Houston and, you
21  know, I had always -- I mean I had even talked to Chapman
22  about relocating down there because of the, you know, locality
23  pay and the fact that I had family down there, and he said --
24  and I would have paid for my own move down there, you know, if
25  I could have laterally transferred, you know, non-

Page 48

1  competitively, and he said no, and I said --
2      Q. Whoa, whoa, whoa. I'm sorry, Mr. Malloy, you're
3  getting off track on me. Did you ever talk to Mr. Davis about
4  the possibility of transferring you out of the Southwest
5  Region is the question.
6      A. Oh, okay, I'm sorry.
7      Q. That's okay. I'll hear about this other thing in a
8  minute, but I got to stay on track.
9      A. Yeah. I thought you said supervisory position
10  anywhere. I didn't know it was outside Southwest. I'm sorry.
11  I misunderstood you.
12      Q. That's all right. So what is the answer to my
13  question?
14      A. He just said he didn't know what they were going to
15  do with me.
16      Q. Okay. And that was on or around December 19th,
17  2002?
18      A. Yes.
19      Q. When did you put in your paperwork for retirement?
20      A. I think as close to January 3rd as I could possibly
21  do it.
22      Q. Sometime before January 3rd presumably?
23      A. Well, it was real close and, you know, actually, you
24  know, the lady there was extremely nice and helpful and she
25  told me that -- and one of the reasons I put it in is she told

Deposition of                    Condenselt™                    James Malloy

---

Page 49

1  me I could pull it off the table at 4:29 on January 3rd, you
2  know, if I decided that I didn't want to retire.
3      Q. Is that when -- this is kind of a strange question,
4  but is that when you decided to retire, 4:29 on January 23rd
5  or January 3rd?
6      A. It was pretty close to then. You know, part of the
7  deal is -- you know, the other thing through the negotiation
8  process is, you know, through Seldon -- you know, I felt like
9  they were going to be continuing to investigate me.
10     Q. Okay. What is the basis for your -- what was the
11 basis for your concern that HUD OIG was going to continue to
12 investigate you?
13     A. Because Rick Johnson told Seldon that -- you know,
14 that if I didn't settle with them, you know, it probably
15 wouldn't be good for me in terms of, you know, what the
16 results might be.
17     Q. Okay. But that --
18     A. They said it would not go away basically if I didn't
19 -- my problem would not go away if I didn't accept their deal.
20     Q. Okay. But by December 19th, 2002 when you returned
21 the deal had fallen through, correct?
22     A. Right.
23     Q. And you came back to work and you had some
24 assignments to do, but you didn't have supervisory duties,
25 right?

Page 50

1      A. Right.
2      Q. And Mr. Truxal was scheduled, at least, for a
3  reassignment outside of the Southwest Region with supervisory
4  duties, right?
5      A. Right.
6      Q. But you never asked anybody if that would be a
7  possible scenario to solve your problem, did you?
8      A. I have no recollection of requesting that, no -- of
9  asking that.
10     Q. Would you have been willing to, say, take the ASAIC
11 position in Boston if it meant getting your supervisory duties
12 back?
13     A. I certainly would have considered that. I mean
14 there's another big part of this, and that is, you know, they
15 even not agreeing to restore my use or lose leave. That was
16 the other thing, is I had a substantial amount of use or lose
17 leave that was going to go away effective January 3rd if he
18 didn't restore my use or lose leave.
19     Q. How much use or lose leave did you have when you
20 returned on December 19th, 2002?
21     A. I've provided that through discovery. I think it
22 was something like 146 hours, but --
23     Q. Give or take, but --
24     A. Yeah, something like that.
25     Q. -- around that number? Did you request leave

Page 51

1  between -- annual leave between December 19th, 2002 and
2  January 3rd, 2003?
3      A. No, I did not.
4      Q. Why not?
5      A. Because I had -- I believe that's about ten days. I
6  don't know if that's excluding holidays or not between
7  December 19th and January 3rd work days where I had -- you
8  know, I had been on administrative leave for, you know,
9  whatever, a month-and-a-half. I certainly had a substantial
10 amount of e-mails to go through. I had an EEO that I needed
11 to deal with and find out information since I basically had
12 been put in the dark for, you know, five or six weeks.
13     Q. You weren't in the dark on your EEO matter, right?
14 You were actively negotiating a settlement with the Agency
15 through your lawyer, correct?
16     A. I had absolutely no idea what was going on in terms
17 of the investigation. I was not allowed to talk to the agents
18 or be in the office or, you know, have my computer or access
19 to anything, you know, related to my job during that period of
20 time.
21     Q. Okay. But between December 19th, 2002 and January
22 3rd, 2003 you didn't request any annual leave, right?
23     A. Right.
24     Q. So no annual leave request was denied because you
25 didn't make one, right?

Page 52

1      A. Right.
2      Q. Okay. While you were on administrative leave, you
3  were on full pay status, correct?
4      A. Yes, I was.
5      Q. And you continued to accrue annual and sick leave,
6  correct?
7      A. Yes.
8      Q. And none of your other benefits through your
9  employment were affected by your being on administrative
10 leave, correct?
11         MR. SELDON: If you'll define what you mean by
12 benefits, I won't object. I said I'll object if you don't
13 define what you mean by benefits. You mean monetary benefits?
14         MS. LYONS: Monetary benefits.
15         WITNESS: Will you ask that question one more time
16 because I may be -- I'm formulating too much of an answer
17 here, I'm sure, and, you know, I really want to answer your
18 questions.
19         BY MS. LYONS:
20     Q. I appreciate that, Mr. Malloy. The question is
21 while you were on administrative leave, were any of your
22 monetary benefits affected in any way?
23     A. Not in terms of pay. I certainly feel like my
24 capacity for future law enforcement, you know, pay was.
25     Q. Well, let's talk about the time since you've

---

Page 53

1  retired. It's been four years, correct?
2    A. Yes.
3    Q. Have you applied for any positions?
4    A. No, I have not.
5    Q. Why not?
6    A. Because the issue of security clearance would come
7  up when they ask, you know, was I under investigation at the
8  time that I retired.
9    Q. Based on your federal employment, isn't it your
10  understanding, though, that you would have an opportunity to
11  explain the circumstances and your side of the story if you
12  made such an application for a security clearance?
13    A. I don't even know how I would begin to explain this
14  situation.
15    Q. You're doing pretty well here today.
16    MR. SELDON: Now, now.
17    WITNESS: You know, I really do not -- that would be
18  certainly -- I certainly didn't think it would go four years.
19  You know, I gave them two years to work out the EEO situation
20  and nothing ever got accomplished there. Believe me, I had no
21  idea it would go this long. But, you know, until I get this
22  thing resolved, no, I don't feel comfortable about explaining
23  my situation to any potential employer.
24    BY MS. LYONS:
25    Q. And does that include employers where a security

Page 54

1  clearance would not be required?
2    A. No. I'm sure I could go to work for Wal-Mart as a
3  greeter or something. Yeah, I could certainly try to do
4  something like that.
5    Q. But you haven't made any job applications, right?
6    A. Other than raising cows, you know, which I'm
7  certainly not making money on that. You know, I'm keeping the
8  tax exemption on the property, but that's it.
9    REPORTER: Can we pause? I'm going to switch tapes.
10    MS. LYONS: Okay.
11    (OFF THE RECORD)
12    (ON THE RECORD)
13    MR. SELDON: What is this on the 171?
14    MS. LYONS: Just one minute.
15    REPORTER: Would you like me to go off the record
16  for a minute?
17    MS. LYONS: Yes.
18    (OFF THE RECORD)
19    (ON THE RECORD)
20    MS. LYONS: Mr. Malloy, I'm going to hand you a
21  document to see if you recognize it.
22    MR. SELDON: If he recognizes the document?
23    BY MS. LYONS:
24    Q. I've handed you two pages, correct, Mr. Malloy?
25    A. Yes, ma'am, you have.

Page 55

1    Q. And is that your signature on the bottom of the
2  second page?
3    A. Yes, it is.
4    Q. And you see the date on it, 12/26/02?
5    A. Yes.
6    Q. Does that document refresh your recollection as to
7  the date your put in for your retirement?
8    A. If I dated it, it's probably real close to that.
9    Q. Okay. Do you often date documents and sign them and
10  put a different date next to your name?
11    A. Oh, I definitely dated it the same day that I signed
12  it. I thought you asked me when I sent -- if I sent it to the
13  Bureau of Public Debt that same day and I don't know that.
14    Q. That's fine. I'm really just asking you to confirm
15  that that's your signature and the date.
16    A. Yes. I wrote my signature and I wrote that date.
17    Q. And that would have been the date you decided to put
18  in your retirement papers, whether you did it that day or the
19  next, correct?
20    A. I know I filled out that document on that date. I
21  do not know when I sent this document to Bureau of Public
22  Debt.
23    Q. Okay, fair enough.
24    A. But I mean it was fairly -- you know, I retired on
25  January 3rd and this was December the 26th, so we're somewhere

Page 56

1  in that time frame.
2    Q. Okay. We'll get a copy of that made and marked as
3  Exhibit 1 in your deposition --
4    A. Okay.
5    Q. -- at the break.
6    MS. LYONS: Can you remind me?
7    MR. SELDON: Okay.
8    BY MS. LYONS:
9    Q. All right.
10    A. I do want to restate that Ms. Koontz (phonetic sp.)
11  told me that I could pull that retirement off the table at
12  4:25 or 4:29 if I was going out the door at 4:30 of that last
13  day.
14    Q. But you didn't do that, right?
15    A. No, but I mean when I -- whenever I sent it in, I
16  knew that I had that open window.
17    REPORTER: Sorry. You said Ms. Koontz?
18    WITNESS: Koontz.
19    BY MS. LYONS:
20    Q. Is her name on there?
21    A. Yeah.
22    Q. All right. Mr. Malloy, I'm going to change gears
23  here now and talk about the discipline that you were part of
24  with -- oh, wait a second. I can't go on just yet.
25    A. Okay.

Page 57

1    Q. I need to finish this off. When you retired on
2 January 3rd, 2003, had you been told by anyone at HUD OIG
3 outside of the settlement negotiations that you had to either
4 retire or would be subject to being reassigned?
5    A. No. I mean it was just, you know, Davis, you know,
6 implying that he couldn't tell me what was going to happen to
7 me, but, you know, just based on some of the, you know, other
8 situations that Truxal or, you know -- he didn't even know
9 that I'd ever be able to serve as a supervisor again.
10    Q. He didn't know one way or the other, correct?
11    A. He said he wasn't sure, but he said you know what
12 happened to Truxal and, you know, he may have even -- it seems
13 like he may have brought up another manager.
14    Q. Did Lester Davis say to you you know what happened
15 to Mr. Truxal or is that something you understood?
16    A. He did specifically say that, and then he also told
17 me that I should have taken the deal which --
18    Q. Is there anything else that Mr. Davis said that had
19 any impact on your thinking about what your future at HUD OIG
20 held as of December 2002?
21    A. Well, it didn't make me feel real good that he
22 didn't like having me as a 14 doing, you know, the duties that
23 he'd been told he could assign me.
24    Q. Didn't you understand Mr. Davis to be saying that he
25 wished he could make better use of your talents in his

Page 58

1 organization?
2    A. No. I kind of took it that it was a burden for him
3 to have to come up with busy work for me to do and that, you
4 know, he wanted a GS-14 that could supervise people and make
5 his life easier. It's just like, you know, when he met me, I
6 went over to the Relocation Center with him. His interests
7 are his own. You know, he was interested in how much money he
8 was going to make on his house on relocating from Chicago to
9 here -- I mean to --
10    Q. To Fort Worth?
11    A. -- Fort Worth, yes.
12    Q. So we have statements that Mr. Davis made to you
13 about your duties and future with the organization, and the
14 denial of the restoration of your annual leave. Those are the
15 two things we've talked about, right?
16    A. Right.
17    MR. SELDON: Objection. We've talked about several
18 other things.
19    MS. LYONS: Well, in terms of reasons why you
20 retired in January 2003.
21    MR. SELDON: We talked about several other things.
22    BY MS. LYONS:
23    Q. We talked about other things beyond those two?
24    A. Uh-huh.
25    Q. What else influenced your thinking in December 2002

Page 59

1 when you decided to retire from HUD OIG?
2    A. I certainly felt like if I retired without any
3 written disciplinary action that, you know, I might be able to
4 get employment elsewhere in law enforcement. In fact, the
5 Agency had actually closed the investigation prior to me
6 retiring.
7    Q. Did anyone ever give you any indication that the
8 investigation was likely to result in discipline?
9    A. Yes.
10    Q. Who said what?
11    A. That was through the conversations between Rick
12 Johnson and Seldon.
13    Q. Who said anything that you ever heard directly and
14 not through your lawyer?
15    A. That was the main focus there. It was that
16 basically if I didn't take the government's deal that, you
17 know, the results would be less than favorable for me.
18    Q. But nobody ever said what those results might be?
19    A. Well, less than favorable doesn't sound real good to
20 me.
21    Q. I understand that. Did you ever hear anyone
22 directly speak to what might happen as a result of the
23 Agency's investigation to you?
24    A. Just based on -- other than the conversations
25 between the two lawyers, you know, I had just looked at two

Page 60

1 disciplinary matters in which, you know, they had gone over a
2 year investigating these two individuals, and initially it was
3 one allegation and they basically would open up, you know,
4 four or five other allegations against those people.
5    Q. You're talking about Cortez Richardson and Steve
6 Romero?
7    A. I'm talking about Steve Romero and Cortez
8 Richardson. So I had that also as a background of what to
9 expect.
10    REPORTER: Can I clarify? You just said two
11 different names, Cortez Richardson and --
12    WITNESS: C-O-R-T-E-Z, R-I-C-H-A-R-D-S-O-N.
13    REPORTER: The name before that, Steve?
14    WITNESS: Steve Romero, R-O-M-E-R-O.
15    REPORTER: Thank you.
16    BY MS. LYONS:
17    Q. Mr. Malloy, I've ended up doing this all backwards
18 and it's going to confuse me perpetually. If I confuse you,
19 let me know, all right? Let's talk about the reasons why you
20 were placed on administrative leave, at least according to the
21 Agency, all right? You understand that the reason was -- the
22 comment that was attributed to you by at least somebody about
23 circling the wagons or not remembering things in connection
24 with the investigation of Mr. Chapman, correct?
25    A. I know that's what the Agency is claiming the reason

Page 65

1    Q. -- be devoted to that purpose?

2    A. No, no.

3    Q. Okay.

4    A. I certainly don't feel -- yeah, I certainly don't

5 feel like if people have the benefit or privilege of having a

6 take home government car, you know, they shouldn't be using it

7 for non-government duties. I certainly understand that and

8 that goes with the cell phone, as well. So that's what I told

9 them. I said certainly, you know, if you do your job and

10 don't abuse the cell phone and don't abuse the government car,

11 you know, you'll do fine here.

12    Q. All right. Let's go back a little bit. What I

13 understood you to be saying is that before the meeting, staff

14 meeting, in September of 2002 you and Mr. Chapman had not

15 discussed his intent to bring up anything related to the

16 investigation of him, correct?

17    A. That's correct.

18    Q. I got that right. What did he say at the meeting to

19 the best you can recollect sitting here today about the

20 investigation?

21    A. I do recall that he said that, you know, if you got

22 a call by Internal Affairs that they were investigating you,

23 that, you know, you had to cooperate, that you did have a

24 right to talk to, you know, FLEOA or, you know, an attorney.

25 That's really the main thing that I remember that he

Page 66

1 discussed, was that.

2    Q. Did Mr. Chapman at any time use the phrase circle

3 the words or words to that -- circle the wagons or words to

4 that effect?

5    A. I have no -- I do not believe that he made that

6 statement, no.

7    Q. Were you present during the entire meeting?

8    A. I was. Mr. Eamiguel wasn't. You know, I do know

9 that he was going and using the telephone, I think probably

10 calling Mr. Salas from time to time.

11    Q. Okay.

12    A. But I believe that one of the -- I believe, you

13 know, that -- you know, it comes out in some of their

14 statements that he was not in the meeting at all times.

15    Q. All right. Well, let's focus on his statement here

16 just for a minute --

17    A. Okay.

18    Q. -- and the part I read earlier. Did you find that

19 in the statement?

20    A. Yes.

21    Q. So I read it correctly?

22    A. Yes.

23    Q. Mr. Eamiguel attributes to you a statement during

24 the meeting about circling the wagons, correct?

25    A. Correct.

Page 67

1    Q. In this document?

2    A. Yes.

3    Q. Do you know of any reason why Mr. Eamiguel would

4 make such a statement or have any reason to make it if it

5 didn't happen?

6    A. He may have misunderstood what was -- he obviously

7 misunderstood what was said. I mean there's -- I don't

8 remember how many people were in the meeting. I think it was

9 at least 30. And I believe he's the only one that is this

10 specific about, you know, that I said circle the wagons, and

11 that there was something sinister about, you know, me even

12 saying it.

13    Q. So do you know of any personal thing between you and

14 Mr. Eamiguel that would explain his statement?

15    A. I felt like I was Eamiguel's mentor. You know, if

16 anything, you know, he came on board with me, but I do know,

17 you know, he was also extremely ambitious and he thought that

18 he was going to be the SAIC there.

19    Q. Have you ever spoken to Mr. Eamiguel about his

20 signed sworn statement?

21    A. No.

22    Q. How would you characterize your relationship with

23 Mr. Eamiguel today?

24    A. Non-existent.

25    Q. Does he still work for the Agency?

Page 68

1    A. No. He moved on to another agency, is my

2 understanding.

3    Q. Do you know which one?

4    A. I want to say Postal, Postal OIG, I believe.

5    Q. Did you and he ever have any conversation about his

6 reasons for leaving HUD OIG?

7    A. No. I have no idea why he left.

8    Q. When's the last time you spoke to him so far as you

9 can recall?

10    A. I believe it was the day that -- when I returned

11 from Washington, the following day I was supposed to report to

12 the office and, you know, turn in all my government equipment,

13 and he was the person that I turned in my weapon, my badge,

14 you know, all my equipment, and I believe -- I guess that

15 would be October the 11th.

16    Q. And that was the last time you saw him?

17    A. Yes.

18    Q. Mr. Malloy, would you agree that if a manager during

19 a staff meeting had made a remark in substance that the

20 employees should circle the wagon if Internal Affairs came

21 calling, would you agree that kind of remark would have been

22 inappropriate?

23    A. You know, I guess it would -- you know, it depends

24 on in what context, you know, that would be. If, you know,

25 the context is let's circle the wagons and not cooperate with

Deposition of                                    Condenseit™                                    James Malloy

Page 69

1  Internal Affairs or, you know, let's circle the wagons and not
2  given -- no, give them limited information, then yes, I do
3  consider that that would be a derogatory comment.
4      Q.  Inappropriate?
5      A.  Yes.
6      Q.  If the context were let's circle the wagons and they
7  can't make you remember things, how about that, would that be
8  enough of a context to be inappropriate?
9          MR. SELDON:  I have to object on the grounds it's
10  hypothetical.
11          BY MS. LYONS:
12      Q.  You can answer.
13      A.  I'm not sure that, you know, they can't make you
14  remember things, you know, to tell the truth.  You know, I do
15  remember Chapman saying to tell the truth.  I don't remember
16  -- you said don't -- they can't make you remember things, but
17  I think Chapman did tell them it was important to tell the
18  truth.
19      Q.  I understand.  My question was if a supervisor
20  during a staff meeting told agents to circle the wagons if
21  Internal Affairs was coming and that they couldn't make you
22  remember things, would those two things in combination,
23  regardless of what else might have been said in terms of
24  telling the truth, would those remarks be inappropriate?
25          MR. SELDON:  I'll object to that because it is

Page 70

1  hypothetical, and then I will say that he did answer the
2  question in the exact context a minute ago, but you can go on
3  from there.
4          WITNESS:  You know, that limited -- you know, I just
5  can't -- you know, it's out of context.  I just really don't
6  feel comfortable.  You know, I feel like I've answered it as
7  best as I can.
8          MS. LYONS:  Do you think it's possible that a remark
9  concerning circling the wagons and being reminded that people
10  can't make you remember things could be interpreted by an
11  agent to suggest that cooperation with Internal Affairs was
12  not desirable?
13          MR. SELDON:  I'll object on the grounds it's a
14  double hypothetical.
15          BY MS. LYONS:
16      Q.  You can answer.
17      A.  I'll tell you what my participation in that meeting
18  was, and it was basically to, you know, calm them down, to
19  tell them not to worry about it, to do their job, to not
20  misuse their equipment, to work with each other.  I do
21  remember also saying that, you know, resolve your personality
22  conflicts because they were very status oriented at the time,
23  you know, resolve your -- you know, we don't need to be
24  having, you know, personality conflicts.  If you're in a two
25  person duty station, you need to work with each other in terms

Page 71

1  of getting productivity and stats.  You know, that's the
2  context of what my comments were in that meeting.
3      Q.  What was the relationship of your comments to the
4  comments that Mr. Chapman had made during the meeting?
5      A.  The fact that Chapman brought up the investigation
6  on him which brought up, you know, Internal Affairs issues.
7      Q.  And you said a moment ago that you were trying to
8  calm people down.  What was it that made people need calming
9  down during the meeting?
10      A.  That they might have a GPS tracking system put on
11  the bottom of their car or, you know, that they might be
12  investigated.  They were more apt to be investigated since,
13  you know, there was certainly a lot more agents in Internal
14  Affairs than there had been before and there was a big focus
15  on -- you know, this even was before Stevens or Donahue got in
16  power.  This was when Gaffney was there.  You know, they
17  really escalated Internal Affairs issues and, you know, had a
18  disciplinary panel and now allegations were going to be, you
19  know, sent to those people, so I mean it had been escalated in
20  terms of, you know, possible Internal Affairs issues where it
21  had not been as big a focus before.
22      Q.  Did Mr. Chapman tell the agents or anybody present
23  during the September 2002 staff meeting that he, Mr. Chapman,
24  was the subject of an investigation then?
25      A.  I believe he told them that he had been or he had

Page 72

1  been visited by Internal Affairs.  It was either that he had
2  been investigated or he had been visited by, you know, a
3  couple of agents from Internal Affairs.  He couched it one way
4  or the other.  I don't really remember.
5      Q.  Okay.  You're using in your response past tense
6  verbs.  Did Mr. Chapman indicate through what he said that he
7  had been visited recently by people from Internal Affairs?
8      A.  I don't remember.  Yeah, I really don't remember
9  whether he said recently or not.  The reality was that it was
10  -- you know, it was recent.
11      Q.  And you knew that before the meeting?
12      A.  Well, I was interviewed by Internal Affairs on, I
13  believe, September the 19th, and I believe the meeting was the
14  week after that.
15      Q.  Okay.
16          MR. SELDON:  Whenever you get to a natural breaking
17  point, Jane, if we could take a break I'd appreciate it.
18          MS. LYONS:  Well, now is just as good a time.  Let's
19  take a break.
20              (OFF THE RECORD)
21              (ON THE RECORD)
22          BY MS. LYONS:
23      Q.  Mr. Malloy, when we broke I think we were talking
24  about the staff meeting in September of 2002, is that -- are
25  you roughly oriented with me there?

Page 93

1 that they put the GPS tracking system on the car.
2    Q. Okay. Were you involved in Stan Mercer's
3 discipline?
4    A. Haban wanted somebody to give him his Letter of
5 Suspension and Chapman was not available to do that. I
6 believe he was out of town at the time. And so Haban called
7 me and asked me to give the letter to Mercer, which I did.
8    Q. Okay. But you had no role in --
9        MR. SELDON: You were the proposing official in
10 this?
11       MS. LYON: -- proposing --
12       WITNESS: No, other than to give him the letter.
13 That was it.
14       BY MS. LYONS:
15    Q. And your only involvement in that capacity was
16 because Mr. Chapman was unavailable to do it himself?
17    A. Right.
18    Q. Did you think it was appropriate for Mr. Haban to
19 ask you to do what he asked you to do in connection with Mr.
20 Mercer's letter?
21    A. Yes. I didn't have -- yeah, yeah.
22    Q. You didn't have any problem with it?
23    A. Yeah. He normally -- if he could not get in touch
24 with Chapman, it was standard procedure that Haban would then
25 talk to me since I was -- you know, that's who he was used to

Page 94

1 dealing with since I had been the one, you know, ASAIC there
2 for the longest. You know, normally if Chapman wasn't there,
3 I would be the logical person that he would then contact.
4    Q. Okay. So if I understand your testimony correctly,
5 you had never been the proposing or deciding official in any
6 disciplinary action against a HUD OIG employee prior to Cortez
7 Richardson and Steve Romero, is that right?
8    A. That's correct.
9    Q. How did you become aware that you were going to be
10 the proposing -- you were the proposing official for Cortez
11 Richardson, correct?
12    A. Yes.
13    Q. And you were the proposing official for Steve
14 Romero, correct?
15    A. Yes.
16    Q. And it was Mr. Chapman who was the deciding official
17 in both cases, correct?
18    A. Yes.
19    Q. Okay. I understand your complaint in this lawsuit
20 to be that HUD OIG took the view that your disciplinary
21 recommendations were too light, is that right?
22    A. Yes.
23    Q. Okay. More specifically, your allegation seems to
24 be that HUD OIG wanted Cortez Richardson to be fired, is that
25 right?

Page 95

1    A. Right.
2    Q. And let me be more specific and ask a better
3 question. Was it --
4        MR. SELDON: For him to propose that he be fired.
5        MS. LYONS: Right.
6        BY MS. LYONS:
7    Q. Was it your understanding at the time you made your
8 recommendation to suspend Cortez Richardson for five days that
9 HUD OIG management wanted him to be fired?
10    A. Ms. Lyons, I'm kind of stuck on the last question.
11    Q. Okay.
12    A. Can I add something to that? I guess really I had
13 been told by -- I had heard from others that they had --
14 certainly the talk in the Agency was that they wanted Cortez
15 Richardson fired.
16    Q. Okay. Well, this is a deposition and when you say
17 --
18    A. And I'm going to give you --
19    Q. -- there was talk in the Agency, well, you need to
20 probe that.
21    A. I'm going to go -- I'm getting there.
22    Q. Okay. Tell me what you heard directly, only that
23 you had heard directly.
24    A. Davis told me --
25    Q. Lester Davis?

Page 96

1    A. Yes.
2    Q. What did Davis tell you?
3    A. That Brian Sadler wanted Cortez Richardson fired.
4    Q. Okay. But did you ever ask Mr. Sadler what he
5 wanted?
6    A. No. And, you know, the same thing with Michael
7 Stevens. I heard that from Davis, that Michael Stevens wanted
8 Cortez fired.
9    Q. Okay. Anything else?
10    A. Well, when Nuhfer called me in August and told me
11 that I was going to be proposing official, he told me that he
12 was recommending, you know, serious days off.
13    Q. Did he say what he meant by serious?
14    A. I can't really remember if he told me at that point
15 in time that -- you know, what he meant by serious.
16    Q. When did Mr. Davis tell you that Mr. Sadler and Mr.
17 Stevens wanted Cortez Richardson fired?
18    A. When this first came up in -- I believe it was
19 around November of 2001.
20    Q. Is that when you spoke to Mr. Davis about it?
21    A. Yeah. I was at an FHA -- I was doing my last FHA
22 training deal here in Washington, D.C.
23    Q. Tell me everything you can remember about that
24 conversation.
25    A. Let's see, was 9/11 in 2001?

Page 105

1    MS. LYONS: Really, we'll get out of here quicker if
2  you just answer that. All right. So that's what Mr. Davis
3  told you.
4        MR. SELDON: He hasn't answered that question.
5        WITNESS: Yeah. I'm not sure I answered it.
6  BY MS. LYONS:
7    Q. All right. Well, all I'm trying to do is draw a
8  circle around what Mr. Davis told you --
9    A. Okay.
10    Q. -- okay?
11    A. Okay.
12    Q. I understood, you tell me when I'm wrong, I
13  understood you to say that Mr. Davis told you in November of
14  2001 that Brian Sadler wanted Cortez Richardson fired, is that
15  correct?
16    A. Right.
17    Q. Is that all he said in November of 2001 regarding
18  Cortez Richardson?
19    A. That's all I remember but, you know, obviously at
20  some point -- well.
21    Q. Okay.
22        MR. SELDON: That's all you need to answer.
23        WITNESS: Right.
24  BY MS. LYONS:
25    Q. And at some later point you had another conversation

Page 106

1  with Mr. Davis, right?
2    A. Right.
3    Q. And that's when he told you that Mr. Stevens wanted
4  Mr. Richardson fired, is that right?
5    A. Right.
6    Q. Are those the only conversations you ever had with
7  Mr. Davis concerning Cortez Richardson's discipline?
8    A. Those are the ones that I can recall.
9    Q. Okay. Now let's talk about Mr. Nuhfer. Did you
10  have one or more than one conversation with him regarding Mr.
11  Richardson's discipline?
12    A. I had at least two with Mr. Nuhfer.
13    Q. When was the first one?
14    A. It was in August when he told me -- he asked me if
15  I'd received a copy of the Report of Investigation on him.
16    Q. Okay. Who called whom on that occasion in August of
17  2002? Did you call him or did he call you?
18    A. Nuhfer called me.
19    Q. Okay. Tell me the best you can recollect sitting
20  here today what Mr. Nuhfer said and what you responded.
21    A. Well, you know, this one I definitely have provided
22  through discovery and, you know, I'll try to -- you know, I
23  certainly would want that to be, you know, part of the record,
24  but I'll certainly try to answer as best as I can today. He
25  called me and asked me if had, you know, received the Report

Page 107

1  of Investigation on Cortez Richardson as yet, and I said I
2  don't know what you're talking about..
3    Q. So you hadn't received it at that point?
4    A. No.
5    Q. Okay. What did Mr. Nuhfer say then, if anything?
6    A. I think he told me that it was his understanding
7  that I was going to be the proposing official on this matter
8  and, you know, I was pretty upset, you know, about finding out
9  about this because this is not how it had been explained to
10  me.
11    Q. So that was the first time you had heard you would
12  be the proposing official?
13    A. Yeah, yeah. I mean I had heard before then that
14  Chapman was going to be involved in it as, you know, an
15  official, but I'm not sure I knew whether he was going to be
16  proposing or deciding official when he was complaining about
17  it. But I knew he was -- you know, he was upset because he
18  felt like the agreement was that basically Cortez would come
19  with a fresh start.
20    Q. Okay. When was the next -- was there anything else
21  about that conversation with Mr. Nuhfer that you can recall?
22    A. Yeah. You know, I told him that the SAIC -- the new
23  SAIC in Denver had gotten a promotion and, yeah, when he put
24  in for the job, that he knew as part of the package in getting
25  that job is that he was going to have to deal with the

Page 108

1  problems in Denver in terms of these investigations, and that
2  -- you know, I felt like, you know, me as a diverse supervisor
3  was getting dumped on with this situation.
4    Q. Okay. Did you say that to Mr. Nuhfer?
5    A. Yes, I did.
6    Q. What exactly did you say to Mr. Nuhfer?
7    A. I said something along the lines of that I had
8  always been a good soldier, I had done everything that, you
9  know, had ever been asked of me by the Agency, that, you know,
10  I didn't feel like, you know, it was right that I get, you
11  know, this handed -- you know, put upon me, that I felt like
12  it was because I was a diverse, you know, supervisor with no
13  prior -- with no EEO complaints against me, and that, you
14  know, that that's why they were, you know, doing it.
15    Q. Okay. But Mr. Nuhfer didn't have any role in
16  deciding who would be the proposing official, did he, to your
17  knowledge?
18    A. I don't know.
19    Q. Okay. When was your next conversation with Mr.
20  Nuhfer concerning Mr. Richardson's discipline?
21    A. I think it was probably early October, about the
22  time frame, you know, after we had already made the decisions
23  --
24    Q. Okay.
25    A. -- that he called.

Page 109

1    REPORTER: Can we pause for a minute?

2    MS. LYONS: Sure.

3         (OFF THE RECORD)

4         (ON THE RECORD)

5    BY MS. LYONS:

6    Q. Mr. Malloy, did you ever raise the concern you

7 voiced to Mr. Nuhfer about being a diverse supervisor with Mr.

8 Haban?

9    A. No.

10    Q. Did you ever raise it with Mr. Stevens?

11    A. No.

12    Q. Did you ever raise it with Mr. Donahoe?

13    MR. SELDON: That's Donahue.

14    MS. LYONS: Whatever.

15    WITNESS: NO.

16    BY MS. LYONS:

17    Q. Okay. Did you raise it with anybody other than Mr.

18 Nuhfer?

19    A. Yeah. I raised it with Mr. Davis.

20    Q. Okay. What did you tell Mr. Davis and when?

21    A. The same -- I told him the same thing I told Nuhfer,

22 you know, on the same day that I told Nuhfer.

23    Q. And that was in August of 2002?

24    A. Yes.

25    Q. How did Mr. Davis respond?

Page 110

1    A. You know, he made some kind of comment that was a

2 little bizarre to me which was kind of like, you know, why are

3 things always so negative down in Texas? That was his

4 comment. And I basically said well, I don't think it has --

5 you know, I don't think that's true.

6    Q. Was that the end of the discussion?

7    A. Yeah, and I ultimately called back and apologized to

8 him for venting on him.

9    Q. Okay.

10    A. And, you know --

11    MR. SELDON: I think the actual question was did you

12 ever communicate with anyone other than the three people you

13 specifically said no to whether you objected to participating

14 in the disciplinary matter because of your diverse background

15 or did I get that wrong?

16    MS. LYONS: And he said Lester Davis. You know, we

17 talked about --

18    MR. SELDON: We have absolutely no information so

19 far. I'm wondering if he's following your question, his

20 responses to the question.

21    BY MS. LYONS:

22    Q. Mr. Malloy, are you confused about my question?

23    A. I guess I am. You know, Davis was the acting -- you

24 know, Assistant Deputy -- the Deputy AIGI at the time.

25    Q. That's fine.

Page 111

1    A. Okay.

2    Q. And you told me you raised this with him, and you

3 subsequently called back and apologized for venting at him,

4 correct?

5    A. Yeah.

6    Q. Did you raise the issue of your being a diverse

7 supervisor with anybody besides Mr. Nuhfer or Mr. Davis?

8    A. Well, I certainly talked about it with Chapman and

9 Truxal.

10    Q. Okay. When you raised it with Mr. Chapman, did he

11 offer to switch the proposing official duties to somebody

12 else?

13    A. No.

14    Q. Did you ask him to?

15    A. No.

16    Q. Would he have had the authority to switch the

17 proposing official duties to another person as far as you

18 know?

19    A. You know, I wouldn't -- I think that's the whole

20 point that they beat on me, was the fact that I was his first

21 line supervisor and that, as such, I should be the proposing

22 official.

23    Q. Was that your understanding of how HUD OIG

24 ordinarily identified the proposing official in disciplinary

25 matters?

Page 112

1    A. Not in my experience it had not been that way.

2    Q. What was it in your experience?

3    A. That when Kesaris was the AIGI, he was the deciding

4 official and, you know, Haban did that on, you know, some of

5 them prior to that. He did it on the Mercer case. He was the

6 deciding official on the Mercer case. He was the deciding

7 official on the Lingard case.

8    Q. Who is Mr. Lingard?

9    A. He's one of the agents that was up in the Finn deal.

10    Q. And he was also present at the dinner you were

11 telling me about earlier, right?

12    A. Yes.

13    Q. Okay. What discussions did you have with Mr.

14 Chapman about Mr. Richardson's discipline prior to September

15 30th, 2002?

16    MR. SELDON: Can I just ask, do you mean discipline

17 and/or disciplinary process or just you want discipline?

18    MS. LYONS: Whatever matters would be connected with

19 the discipline or disciplinary process.

20    WITNESS: I mean we were aware, you know, of what

21 the allegations were.

22    BY MS. LYONS:

23    Q. Right, and you had received the Reports of

24 Investigation, right?

25    A. No.

## Page 113

1    Q. At some point you did, didn't you?

2    A. Yeah. We received them about the middle of

3 September 2002, yes.

4    Q. Okay. Let's focus on that. After you received the

5 Reports of Investigation, what happened with regard to Mr.

6 Richardson's discipline or disciplinary process?

7    A. He asked me to -- Chapman asked me to read them, you

8 know, to basically come up with, you know, my position on them

9 and what I thought about them, and to come up with a proposed

10 -- you know, determine which ones were substantive in terms of

11 the allegations and then, you know, make a proposal on what I

12 felt like, you know, a disciplinary, you know, action, if any,

13 was warranted.

14    Q. Did you do that?

15    A. Yes.

16    Q. Did you write the proposal?

17    A. I drafted some of it.

18    Q. How much of it did you draft?

19    A. I can't remember how many allegations there were,

20 but, you know, I believe that I did two of them.

21    Q. Okay. Who else contributed to the document?

22    A. Chapman. Chapman drafted up -- I can't remember if

23 it was three or four of the allegations.

24    Q. So is it fair to say that Mr. Chapman drafted more

25 than half of the proposal for Cortez Richardson to get a five

## Page 114

1 day suspension?

2    A. He drafted it but, you know, it was my input as far

3 as what I wanted him to put in there in terms of the -- you

4 know, what I thought the discipline should be.

5    Q. Did you and Mr. Chapman discuss what the discipline

6 would be prior to your finalizing the proposal?

7    A. Yeah, I think we did. I think we did have some

8 discussion about that. After reading it I told him what I

9 thought about some of the different things.

10    Q. And how did he respond?

11    A. He was okay with it. I think he actually thought

12 that, you know, I proposed a harsher penalty than what, you

13 know, he would have.

14    Q. What did Mr. Chapman think was appropriate?

15    A. Three days.

16    Q. And you recommended five days?

17    A. Yes.

18    Q. Did you at any time, even in discussions with Mr.

19 Chapman before you wrote anything, recommend anything other

20 than a five day suspension?

21    A. No.

22    Q. So you read the report and you arrived at a five day

23 suspension on your own, correct?

24    A. Yes.

25    Q. And you didn't contact anybody at the Bureau of

## Page 115

1 Public Debt to consult about that, right?

2    A. Other than the contact that I had with Nuhfer in

3 August where he told me what he thought about it, that he

4 thought that it should be a serious -- that it was serious.

5    Q. Was that in your mind when you were reaching --

6 analyzing the Cortez Richardson file, your conversation with

7 Mr. Nuhfer?

8    A. I certainly was aware that that's what he thought

9 about it.

10    Q. Okay. Did you contact anyone in the Office of

11 General Counsel to consult about the proposed five day

12 suspension for Cortez Richardson?

13    A. No.

14    Q. How did you know how to write up a proposal for

15 discipline if you had never been involved with one before?

16    A. There had been other disciplinary matters in the

17 office and so, you know, we had some go-bys to go by.

18    Q. And did you obtain something similar to go by?

19    A. Yeah. I can't remember if it was on the Cortez

20 matter or the Romero matter but, you know, I know that Wendell

21 Durant had had a matter that he had dealt with and, you know,

22 I did have that correspondence, and it seems like I may have

23 had -- I may or may not have had the Mercer deal, but it

24 seemed like there was a clerical employee that had been fired

25 that I believe I had that -- Janeen Hess actually was the

## Page 116

1 supervisor on that, that I, you know, had access to that -- to

2 those files.

3    Q. Did Ms. Hess have any input into the proposal for

4 Mr. Richardson's suspension?

5    A. No.

6    Q. Did you ever discuss your proposal to suspend Cortez

7 Richardson for five days with Mr. Haban?

8    A. No.

9    Q. Did you ever discuss your proposal for a five day

10 suspension for Mr. Richardson with Mr. Stevens?

11    A. No.

12    Q. You understood, didn't you, that Mr. Chapman was

13 going to make the final decision about what discipline Mr.

14 Richardson would get, right?

15    A. Right.

16    Q. What about Mr. Salas? I'm confused from many -- and

17 I'm not blaming you. I'm confused because I think it was a

18 period of some change, but did you discuss Mr. Richardson's

19 proposed suspension with Mr. Salas at any time?

20    A. No.

21    Q. Did Mr. Salas ever express any opinion to you one

22 way or another about what Mr. Richardson's punishment should

23 be?

24    A. No.

25    Q. So how did you arrive at the conclusion that a five

Page 117

1 day suspension was appropriate for Mr. Richardson?
2      A. I looked at each of the allegations. You know, one
3 of the big issues was the, you know, altering of the document
4 and, you know, I felt like he had been coerced by his second
5 line supervisor to do that. He had, you know, objected
6 strongly about it. His first line supervisor had come in an
7 hour after he'd been instructed by his second line supervisor
8 to do that. He'd reported what happened to his first line
9 supervisor and his first line supervisor told him that, you
10 know, he would take care of it.
11     Q. I understand all of those factual scenarios. I'm
12 asking you specifically how did you arrive at the conclusion
13 based on all those factors that a five day suspension was
14 warranted as opposed to a three day or a ten day or something
15 else?
16     A. Oh, they had a table that had, you know, different
17 -- the disciplinary chapter in the manual had a table that
18 had, you know, recommendations for, you know, what -- a kind
19 of in between. You can go from here to here, you know, if
20 it's this type of conduct issue or performance issue or
21 whatever, generally more conduct, that is, but it was, you
22 know, looking at the table.
23     Q. So you looked at a table in -- and where was that
24 table located?
25     A. It was in the OIG Investigation Manual.

Page 118

1      Q. So you consulted that manual, as well, in your
2 review of Mr. Richardson's ROI?
3      A. Actually, my recollection is that Janeen Hess had a
4 folder that had the disciplinary -- the section of the manual
5 out, so I mean I didn't look at all the manual, but I
6 certainly looked at that chapter. And the table, I think, was
7 kind of in the back of that chapter.
8      MR. SELDON: Do you suppose that if we took a moment
9 it would jeopardize our finishing today or is that completely
10 out of the question anyway?
11     MS. LYONS: It's not completely out of the question,
12 and I don't think a moment is going to disturb us, so let's go
13 off the record.
14             (OFF THE RECORD)
15             (ON THE RECORD)
16     BY MS. LYONS:
17     Q. Mr. Malloy, you were telling me a little bit earlier
18 about a table that you consulted in connection with arriving
19 at a suspension for Mr. Richardson. Do you remember that?
20     A. Yes.
21     Q. Do you remember what the table recommended when you
22 figured out where on the table you belonged for the conduct
23 you had found for Mr. Richardson?
24     A. No. It was just, you know, somewhere where five
25 days was somewhere in between what the parameters were.

Page 119

1      Q. Right. Can you remember what those parameters were
2 is my question?
3      A. No.
4      Q. Is it possible that the table indicated that you
5 could remove Mr. Richardson for the conduct that you had
6 found?
7      A. It's possible, but I don't remember that.
8      Q. Okay. After -- okay. Strike that. You proposed
9 Mr. Richardson's suspension on September 30th, 2002, correct?
10     A. Correct.
11     Q. And Mr. -- oh, boy --
12     MR. SELDON: Chapman.
13     BY MS. LYONS:
14     Q. -- Chapman decided that that was appropriate that
15 day, as well, correct?
16     A. Yes.
17     Q. And Mr. Richardson was given his suspension on
18 September 30th, 2002, the same day, correct?
19     A. Yes.
20     Q. And Mr. Chapman retired that day or the following
21 day, correct?
22     A. Yeah. He retired at 4:30 on that day, yes.
23     Q. On September 30th, 2002?
24     A. Yes.
25     Q. Okay. So it all happened on the same day, right?

Page 120

1      A. Right.
2      Q. Did you have any understanding on September 30th,
3 2002 whether that procedure comported with the Agency's
4 policies and procedures for discipline?
5      A. You know, I had some knowledge that I knew that they
6 had the right to appeal.
7      Q. They being the person who --
8      A. Yeah.
9      Q. -- received the discipline?
10     A. Yeah, exactly.
11     Q. Right. That's the only understanding you had about
12 the procedures?
13     MR. SELDON: You mean after the proposal was issued
14 or what?
15     MS. LYONS: In connection with the proposal and the
16 giving it to Mr. Richardson.
17     WITNESS: Yeah. I think that's pretty much what I
18 knew.
19     BY MS. LYONS:
20     Q. Okay. Was there ever a time after Mr. Richardson's
21 suspension was imposed that anybody said anything to you about
22 Mr. Richardson's discipline being too light?
23     A. I believe that whenever Nuhfer called me that he
24 wanted to start arguing about, you know, the discipline on
25 that.

Page 121

1    Q. Okay, but that's --
2    A. I may be confusing that with Romero, but I do
3 remember that Nuhfer did -- you know, that's, again, one that
4 I know I wrote up, you know, the notes of what that
5 conversation was and I've provided it through discovery.
6    Q. When did you start taking notes about Mr.
7 Richardson's discipline or any other employment related
8 matter?
9    A. On Richardson?
10    Q. Or anything.
11    A. I think about the time that I found out that he was
12 going to come to work for us, so it would have been, I guess,
13 late June or July.
14    Q. This is of 2002, right?
15    A. Right.
16    Q. Why did you start doing that?
17    A. Because that's pretty much the way that, you know, I
18 documented things of substance, you know, during the day. I
19 would just write an e-mail to myself or to Chapman or, you
20 know, to Truxal or to the other managers. You know, I did it
21 that way.
22    Q. So other than Mr. Nuhfer did anybody ever say
23 anything to you about Mr. Richardson's suspension having been
24 too light or too heavy, for that matter?
25    A. Well, during the -- when I was interviewed by

Page 122

1 Internal Affairs, Robinson and Napleone -- I believe Napleone
2 made the statement that -- you know, that what -- the days
3 that we had recommended, you know, they weren't that upset
4 with that.
5    Q. Who was he referring to when he said they?
6    A. See, I don't remember whether they said they, that
7 that basically -- that that was not the problem, that it was,
8 you know, me not following the manual procedures.
9    Q. Okay. Any other statements relating to Mr.
10 Richardson's actual level of discipline imposed?
11    A. Well, I mean they -- Napleone and Robinson then
12 turned around and interviewed Truxal and asked him if we were
13 trying to show them up, Headquarters up, on the decisions that
14 we made.
15    Q. Okay, but you don't have personal knowledge of that
16 because you just read about that, correct?
17    A. Not until I got the statements, no
18    Q. Okay. Any other statements that were made to you?
19    A. No.
20    Q. Let's talk about Steve Romero. I think that's the
21 simpler of the two. Steve Romero's discipline was also
22 imposed on September 30th, 2002, correct?
23    A. Yes.
24    Q. And Mr. Romero received a Letter of Caution, is that
25 appropriate?

Page 123

1    A. Right.
2    Q. And you had received his -- do you recall when you
3 had received his Report of Investigation?
4    A. I think we first heard about it in July in a
5 managers meeting when McCarty and Haban asked to meet with us
6 and talk to us about it, and this was prior to us getting the
7 Report of Investigation.
8    Q. I'm sorry. Who? Haban and --
9    A. Haban and McCarty.
10    Q. And what did they say to you about Mr. Romero's
11 disciplinary situation?
12    A. They just went over what the allegations were and,
13 of course, we didn't have the benefit of looking at, you know,
14 the report, so we were just going by what they were telling
15 us.
16    Q. What was your impression of what they were telling
17 you in terms of appropriate dispositions?
18    A. That they wanted us to do something.
19    Q. Did they say what?
20    A. Well, I mean, they went over each one of the
21 allegations.
22    Q. I understand that. Did they tell you what they
23 wanted you to do by way of resolving it?
24    A. They just said look at it, but I mean, you know,
25 they did -- I think they made a reference that he was, you

Page 124

1 know, a dumb ass or something like that on some of the things
2 that he did. I think McCarty made that comment.
3    Q. That Mr. Romero was a dumb ass?
4    A. Yeah. I think he didn't report on a financial
5 disclosure statement that his FHA insured loan on his house
6 was -- you know, he didn't declare that. And, you know, he's
7 not -- you know, I did talk to General Counsel and he's not
8 required to do that.
9    Q. Was that research that you did in connection with
10 deciding on an appropriate proposal for discipline?
11    A. Yes, yes.
12    Q. Can you recall anything else that either Mr. Haban
13 or Mr. McCarty said to you about Mr. Romero's discipline?
14    A. Just that the Report -- I think the Report of
15 Investigation, and then they cut off a separate, you know,
16 group of allegations that they didn't consider to be as
17 serious and, you know, and we were supposed to look at both of
18 them, but the ones that were in the Report of Investigation
19 were more serious and should be considered as such as opposed
20 to the ones that were in the memo.
21    Q. At some point did the memo and Report of
22 Investigation arrive?
23    A. Right, right.
24    Q. And when it did, did you review them?
25    A. Yes.

Page 125

1    Q. And you did some additional research on the
2  allegations?
3    A. Yeah. Well, no, I called on that FHA insured issue,
4  and then, you know, there was a question about his past credit
5  history, and -- you know, now on both of these, you know, I
6  did have the opportunity to talk to the agent, you know, so I
7  certainly talked to Romero about what his side of -- you know,
8  what his defenses or his side of the story was about these
9  different allegations, and he brought up the fact that his
10 credit problems -- his credit that he had resolved before kept
11 coming back on the credit report, and that he needed to do
12 some research or get additional documentation to support that,
13 and so I gave him time -- I think I asked Haban if I could,
14 you know, have time for him to research that and he said okay,
15 Haban did.
16   Q. Okay. Was the issue with Mr. Romero's credit that
17 he had -- that the credit itself was a problem or that he
18 hadn't reported the credit problems properly when asked?
19   A. No. I think it was, you know, that -- it wasn't
20 that he had not reported them accurately. It was that he had
21 credit problems.
22   Q. Okay. So you took all of the information that you
23 developed about Mr. Romero's discipline into account when you
24 made your proposal?
25   A. Yes.

Page 126

1    Q. Did you type the proposal for Mr. Romero's --
2    A. Yes.
3    Q. You typed it all yourself?
4    A. Yes.
5    Q. Unlike Mr. Richardson, you actually did the whole
6  thing yourself?
7    A. No. Actually I was working on that while Chapman
8  was working on, you know, getting his part of the other.
9    Q. When did you begin writing Mr. Romero's discipline
10 up?
11   A. I believe I started probably the -- I believe it was
12 Thursday the week before.
13   Q. Without a calendar that's going to be tough for me.
14   A. Well, and I think it was probably two or three days.
15 I believe the 30th may be a Monday. September the 30th is a
16 Monday.
17   MR. SELDON: Is a Monday.
18   WITNESS: So I believe it was on Thursday. See, we
19 were in training the week before, and up until Thursday I
20 think I was tied up on training.
21   BY MS. LYONS:
22   Q. Okay. When did you begin writing the proposal for
23 Mr. Richardson's suspension?
24   A. Probably sometime during that same --
25   Q. Same week?

Page 127

1    A. -- time frame, yes.
2    Q. All right, fair enough. What conversations have you
3  ever had -- well, let me break it down. Mr. Chapman agreed
4  with your proposal for a Letter of Caution for Mr. Romero,
5  correct?
6    A. Yes.
7    Q. And that was what Mr. Romero received on September
8  30th, 2002?
9    A. Yes.
10   Q. Did you ever have any conversations with anyone
11 other than Mr. Chapman concerning Mr. Romero's discipline that
12 weren't related to your investigation of what you should do?
13   A. Well, I do recall the conversations with Nuhfer in
14 August and then, you know, after the proposals.
15   Q. Okay. Wait a second. The conversation with Nuhfer
16 in August was about when he called you to ask if you had
17 received the ROI in Richardson. Did he also ask you about the
18 ROI for Romero in August?
19   A. I'd have to actually read, you know, my notes on
20 that. I can't remember if it was -- if Romero came up. My
21 recollection was that it probably did come up in --
22   MR. SELDON: If you need to review your notes --
23   WITNESS: Yeah, I probably need to do that. You
24 know, I can't -- but it was either then or after because I do
25 remember what, you know, some of the conversation was.

Page 128

1    BY MS. LYONS:
2    Q. Okay. What did Mr. Nuhfer say to you about Mr.
3  Romero's disciplinary situation prior to your imposing the
4  Letter of Caution?
5    A. Just that, you know, it was another, you know,
6  serious matter, that he, you know, hadn't reported properly
7  what had happened, you know, at the Austin Police Department
8  that had come up in a background investigation on him, and the
9  reasons for him leaving the Austin Police Department.
10   Q. Did Mr. Nuhfer give you any indication of what he
11 thought might be appropriate for Mr. Romero?
12   A. Well, he made it seem like it was a serious matter
13 because I remember bringing up the fact that Romero had a --
14 he basically had a document in the Report of Investigation
15 that was an exhibit, a document, that was buried in the
16 exhibits -- it wasn't even reported in the Report of
17 Investigation -- where the supervisors at Austin Police
18 Department -- that it indicated that Romero did have a problem
19 with signing off on a document that showed that he left the
20 Austin Police Department for personal reasons, for -- yeah,
21 for personal reasons. And I, you know, basically --
22   Q. Okay, but I asked you if Mr. Nuhfer ever indicated
23 any view as to what would be an appropriate punishment for Mr.
24 Romero, and when you talked to him you had not yet received
25 the ROI.

Page 137

1 because I couldn't get a flight to get me in there at 9:00.
2   Q. Okay, but you did report to Headquarters --
3   A. Yes, ma'am, yes.
4   Q. -- in Washington, D.C. on the 10th?
5   A. Yes.
6   Q. Okay. Now I want to maximize confusion by jumping
7 back in time to the --
8      MR. SELDON: Isn't there a rule against doing that?
9      MS. LYONS: There should be. I apologize for my own
10 confusion.
11  Q. In the course of the investigation of Mr. Chapman,
12 you were interviewed, correct?
13  A. Yes.
14  Q. And the allegations -- you were interviewed about
15 allegations about Mr. Chapman's use of government time and/or
16 resources for personal use, is that generally the substance of
17 the investigation?
18  A. I think it was misuse of government time and misuse
19 of government equipment, something --
20  Q. That's how you understood the allegations, correct?
21  A. Yes, yes.
22  Q. And in the course of that investigation you were
23 asked to turn over some records of your own concerning your
24 own activities on behalf of the Agency, correct?
25

Page 138

1      MR. SELDON: Wait, wait. Activities on behalf of
2 the Agency? That's kind of assuming something that no one's
3 said yet.
4      MS. LYONS: You're making an objection to the fact
5 that he has no activity on behalf of the Agency?
6      MR. SELDON: You said he was asked to turn over some
7 records that he had --
8      MS. LYONS: Let me not characterize it.
9      BY MS. LYONS:
10  Q. In connection with the investigation into Mr.
11 Chapman's conduct, were you asked to turn over documents?
12  A. Yes.
13  Q. And you refused to do so on the advice of counsel,
14 correct?
15  A. Yes.
16      MR. SELDON: Predecessor counsel.
17      MS. LYONS: I understand that.
18      BY MS. LYONS:
19  Q. Have you ever provided those documents to HUD OIG?
20  A. During the discovery process.
21  Q. In this litigation?
22  A. Yes.
23  Q. You have provided them?
24  A. Through the discovery process, yes.
25  Q. Okay. You didn't ever provided them while you were

Page 139

1 still working at the Agency, correct?
2   A. No.
3   Q. All right. Now we're going to jump forward again
4 now to the investigation of you, okay, that started in October
5 10th of 2002. You were placed on administrative leave,
6 correct?
7   A. Yes, ma'am.
8   Q. By Mr. Salas?
9   A. The memo had his signature on it. Haban and Salas
10 were both in the meeting when they gave me the memo, and Salas
11 did most of the talking in the meeting.
12  Q. Okay. And when was that meeting, October 12th?
13  A. October the 10th.
14  Q. That same day. So on October 10th you came to D.C.
15 and you were interviewed by who?
16  A. By John Robinson, who was a special agent with
17 Special Investigations Division, and Michael Napleone, who was
18 the Assistant Special Agent in Charge with Special
19 Investigations Division.
20  Q. And how long after that interview concluded did you
21 meet with Mr. Salas and Mr. Haban?
22  A. Probably an hour.
23  Q. Okay. And they gave you a document that we've
24 looked at in other depositions about your being placed on
25 administrative leave, correct?

Page 140

1      MR. SELDON: They meaning Haban and Salas?
2      MS. LYONS: Yes.
3      WITNESS: Correct.
4      BY MS. LYONS:
5   Q. In addition to that document, which I'm not going to
6 pull out, what did they tell you to the best of your
7 recollection?
8   A. Just, you know, any time I tried to say anything
9 they wouldn't -- they didn't want to hear it. They said, you
10 know, we don't want you to talk about this now, you know,
11 we're going to do an investigation and, you know, maybe you'll
12 have the opportunity to -- you know, we're going to do this
13 investigation, you don't need to be talking to us now about
14 this. That was the extent of it. You know, I tried to talk
15 to them and really they would not let me have any say in any
16 of this.
17  Q. Okay. What did they tell you about your placement
18 on administrative leave, if anything?
19  A. That I was to talk to no personnel at HUD OIG, that
20 I could, you know, return to the office the next day and get
21 my personal effects. I was to turn in all my equipment,
22 couldn't turn my computer on.
23  Q. You couldn't turn your computer on when you went in
24 the next day?
25  A. No.

Page 141

1    Q. Okay. Did you follow their instructions?
2    A. Yes, ma'am, I did. And that I wasn't to talk to
3 anybody until, you know, I was told by them, and that if --
4 you know, that basically Salas, I guess, or above would be the
5 contact person.
6    Q. While you were on administrative leave?
7    A. Yes, ma'am.
8    Q. So if you had a question while you were on
9 administrative leave, they instructed you to contact Mr.
10 Salas?
11    A. Yeah, I believe Salas said that.
12    Q. Okay. Did you contact Mr. Salas at any time while
13 you were on administrative leave?
14    A. I did through my lawyer or after I had gotten Bob.
15 I wrote a letter -- I handwrote a letter up there to Salas,
16 and then I think my attorney also sent a letter to Salas.
17    Q. Did you make any other communications with Mr.
18 Salas?
19    A. No, ma'am.
20    MS. LYONS: Will you mark that, please?
21    REPORTER: Number 5.
22    MS. LYONS: Okay.
23 (Whereupon, the document that was referred to as Exhibit
24 Number 5 was marked for identification.)
25    MS. LYONS: Mr. Malloy, I'm going to hand your

Page 142

1 lawyer, Mr. Seldon, a copy of what's been marked as Exhibit
2 Number 5 and ask him to pass it to you since it's my only
3 copy.
4    MR. SELDON: Okay. Just so we understand, there's
5 two documents in there.
6    MS. LYONS: Okay.
7    MR. SELDON: I'm not saying they weren't together
8 before.
9    BY MS. LYONS:
10    Q. Do you recognize Exhibit Number 5, Mr. Malloy?
11    A. Yes, ma'am.
12    Q. What is that first page?
13    A. It's a memo that, you know, I sent to Daniel Salas
14 on October -- it's cut off, but I believe it says October
15 15th, 2002, and the subject is personal records.
16    Q. Is that the letter you were just telling me about a
17 moment ago that you said you sent to Mr. Salas while you were
18 out?
19    A. Yes, yes, and then I think, you know, Mr. Seldon
20 also sent a letter to Salas --
21    Q. Okay.
22    A. -- but this is the one that I handwrote.
23    Q. Okay. Does that represent -- except for the
24 blacking out at the bottom of your personal information
25 perhaps -- a fair and -- is that how you sent it to him when

Page 143

1 you sent it to him? Is this an accurate copy?
2    MR. SELDON: One question for attorney.
3    WITNESS: Yeah, Other than the redactions involving
4 personal information, I don't see where there's any other, you
5 know, mark outs, so yeah, this looks accurate.
6    BY MS. LYONS:
7    Q. Okay. And Mr. Seldon indicated that there was
8 another document attached to that. Could you turn to the
9 second page and just identify for me the second page?
10    A. It's a memo to Salas, another handwritten memo to
11 Salas, from me.
12    Q. Is there a date on that?
13    A. Yes, ma'am. It's October 15th, 2002.
14    Q. Do you recall sending that document to Mr. Salas?
15    A. Yes, ma'am, I do.
16    Q. Why did you send that document to Mr. Salas?
17    A. To notify him that I had hired Mr. Seldon as my
18 lawyer and that, you know, he would be the contact person for
19 me from that point forward.
20    Q. Were you intending to designate Mr. Seldon as your
21 contact person for all matters or just matters related to your
22 EEO complaint?
23    A. I don't really remember.
24    Q. You don't remember what your intent was?
25    A. No.

Page 144

1    Q. Okay.
2    A. It was probably -- you know, I'm sure it was after
3 talking --
4    MR. SELDON: If you don't recall, leave it there,
5 Jim.
6    WITNESS: Okay.
7    BY MS. LYONS:
8    Q. You are aware, are you not, that Mr. Seldon had
9 communications with Mr. Salas and others at HUD OIG concerning
10 your being on administrative leave after October 15th of 2002,
11 right? You're aware of that generally?
12    A. Yes.
13    Q. And you are aware, are you not, that Mr. Seldon
14 communicated a request for you to remain on administrative
15 leave through the end of the year in 2002, correct?
16    A. I know he did at some point in time in the process,
17 yes, ma'am.
18    Q. And was that consistent with your direction to Mr.
19 Seldon, that he communicate that request?
20    A. Yes.
21    Q. Now while you were out on administrative leave, the
22 Special Agent in Charge vacancy announcement for Fort Worth
23 was issued, correct?
24    A. Yes, ma'am.
25    Q. That's a passive voice disaster right there. You

Page 145

1 knew that Mr. Chapman had retired by the time you were placed
2 on administrative leave, correct?
3     A. Yes.
4     Q. And so you knew there was an opening, correct?
5     A. No, I didn't know when they were going to announce
6 it.
7     Q. I understand that, but you knew there was a vacancy
8 at the time?
9     A. Yes.
10     Q. In your experience with the Agency of nearly 20
11 years by that point, was it customary for the Agency to fill
12 those vacancies promptly?
13     A. No.
14     Q. Okay. Was it your -- did you know whether or not
15 HUD OIG placed its vacancy announcements on publicly available
16 web sites?
17     A. Yes.
18     Q. Yes, you knew that --
19     A. Yes.
20     Q. -- in this case? Did you make any attempts while
21 you were out on administrative leave to monitor publicly
22 available web sites for announcements from HUD OIG for
23 vacancies?
24     A. No. Actually I did once I got a personal computer.
25 I think I did -- I think the announcement was from October

Page 146

1 10th through October 31st, and I think I did look at the
2 Internet on, you know, like October 30th.
3     Q. Did you find the announcement?
4     A. Yes.
5     Q. And what did you do?
6     A. They said it had to be in Headquarters by the
7 following day, and there would be no way that I could get --
8 you know, put it together and get it in the following day.
9     Q. Did you call Mr. Salas to let him know that you had
10 found it and you were interested in applying?
11     A. No.
12     Q. Did you call anybody at the Agency to indicate that
13 you would like to apply for the position?
14     A. I mean there would be -- yeah, there would be --
15 just basically I did not have the records. Most of my records
16 regarding my employment was at my office, and there would be
17 no way that I could meet the time constraints of getting the
18 package to D.C. the following day and they were very strict
19 about that kind of stuff.
20     Q. Okay. My question was did you call anybody at HUD
21 OIG?
22     A. No, no.
23     Q. You say in the amended complaint that you filed in
24 this case that you asked senior OIG management whether you
25 could be considered for the ASAIC position in Houston if you

Page 147

1 applied. Are you aware of that?
2     A. Yes.
3     Q. Who were you referring to when you're talking about
4 the senior OIG management there?
5     A. Davis.
6     Q. Anybody else?
7     A. Well, I certainly -- you know, prior to this I'd
8 talked to Larry Chapman about relocating down there --
9     Q. Okay, but Chapman --
10     A. -- but that particular job, no. Davis was the guy.
11     Q. By the time the ASAIC position in Houston was being
12 filled, Bernard Chapman had retired, correct?
13     A. Yes.
14     Q. Okay. So what conversation did you have with Mr.
15 Davis about whether you could be considered for the ASAIC
16 position in Houston?
17     A. Just whether or not, you know, I could, you know,
18 either laterally transfer down there or apply for that
19 position, that I had interest in, you know, that job.
20     Q. And when did you ask him that?
21     A. The day that I returned, on December the -- I guess
22 it was December the 19th, I believe. That was the first time
23 I knew about that as I actually, you know, pulled up an e-mail
24 where I believe -- you know, Davis sent an e-mail out to all
25 the eligible -- I guess all the agents in the region urging

Page 148

1 them to apply for the vacancy.
2     Q. Okay. The vacancy announcement had gone out on
3 December 12th, 2002, correct?
4     A. Yeah. I'm not sure if I knew that on December 19th,
5 but I did know that that -- you know, I didn't know if it was
6 an e-mail or not, but yeah, I did know that Davis had put that
7 information out to the troops, that he was urging them to put
8 in for that job.
9     Q. Did you understand when you returned to duty on
10 December 19th, 2002 that the ASAIC Houston vacancy
11 announcement was still open?
12     A. Yes.
13     Q. And so you asked Mr. Davis if you could be
14 considered for the position, right?
15     A. Yes.
16     Q. Did you apply?
17     A. No.
18     Q. Why not?
19     A. Because of what Davis told me and because of the
20 memo that Haban had sent returning me to duty where he said I
21 could no longer serve as a manager in the -- as a supervisor
22 in the Southwest District.
23     Q. Any other reason?
24     A. No.
25     Q. Okay. What did Mr. Davis tell you specifically when

Page 149

1 you asked him whether you could be considered for the ASAIC
2 position in Houston?
3    A. That Headquarters wouldn't allow me to be a
4 supervisor in the Southwest District.
5    Q. Was that his opinion or did he relate a specific
6 statement?
7    A. He said he had been told by Headquarters.
8    Q. Did he say by whom?
9    A. No.
10   Q. Did he say that Headquarters wouldn't allow you to
11 be a supervisor in the region ever?
12   A. No.
13   Q. Who made the decision about who would become the
14 ASAIC in the Houston office?
15       MR. SELDON: I'm sorry. Did you say who made the
16 decision who would become the ASAIC?
17       MS. LYONS: Yeah, who made the selection.
18       MR. SELDON: To the extent he knows.
19       BY MS. LYONS:
20   Q. To the extent you know.
21   A. Well, I mean, I certainly sat in on Davis'
22 deposition, so I mean I know that he made the decision.
23   Q. Okay, but --
24   A. And, you know --
25   Q. -- did you know at the time who was going to make

Page 150

1 the decision, at the time the selection was being made?
2    A. He either told me or he told the other agents that
3 he would make a recommendation, but that it was -- Davis would
4 make a recommendation, but that it was out of his hands, that
5 Stevens would, you know, have the ultimate decision on who was
6 the manager -- who was the ASAIC.
7    Q. Okay.
8    A. And it wasn't just on that. It was on all the ASAIC
9 positions, I think.
10   Q. Did you make any inquiry at Headquarters about
11 whether you could be considered for the ASAIC Houston
12 position?
13   A. No, ma'am, I didn't.
14   Q. You also say in your amended complaint that you were
15 told by, once again, senior OIG management in Headquarters,
16 this time, that unless you resigned you would remain under
17 investigation and subject to involuntary reassignment outside
18 the region. Does that allegation sound familiar to you?
19   A. Yes.
20   Q. And were you told that you would remain under
21 investigation and subject to involuntary reassignment outside
22 of the region?
23   A. Again, there was some, you know, discussion between
24 the General Counsel's Office of HUD OIG and my attorney that,
25 you know, if I didn't come to an agreement with them, you

Page 151

1 know, that I probably wouldn't like what the results -- the
2 outcome would be.
3    Q. Okay. Did anybody ever tell you directly that
4 unless you resigned you'd be kept under investigation and
5 subject to involuntary reassignment?
6    A. Well, Davis told me -- no. I mean David did tell me
7 I should have taken the deal, and Davis also told me that, you
8 know, look what happened to Truxal, you know, the same thing
9 could happen to you. You know, he did say he wasn't sure what
10 was going to happen, but that that certainly was an option.
11   Q. Okay. Did Mr. Davis ever indicate that anybody was
12 actively contemplating reassigning you outside of the region?
13   A. No, I don't think he did.
14       MR. SELDON: this is the first chronology.
15       BY MS. LYONS:
16   Q. When you came back to work on December 19th, 2002,
17 Mr. Davis was your supervisor, correct?
18   A. Yes. You know, I guess. I don't know if they'd
19 actually made him acting, but he was the one that actually
20 called me and said he was coming over, and that basically I
21 would be working for him, you know -- so yes.
22   Q. Okay. Whatever your understanding exactly of his
23 status was on the 19th, you understood generally that he was
24 coming into the region as --
25   A. Yeah, he'd been selected. I knew that.

Page 152

1    Q. So he was going to be your boss working in Fort
2 Worth, right?
3    A. Yes.
4    Q. Did he treat you respectfully when he came back?
5    A. Yeah. I mean he did in some ways, but I mean,
6 again, here I feel like I've got a pretty traumatic situation
7 here and, you know, the main thing on the guy's mind is going
8 over to the Relocation Center and checking on, you know, how
9 much money he's going to make on this move, and then, you
10 know, he didn't spend -- you know, I get a call at 8:00 from
11 him and, you know, I waited around until 1:30 for him to show
12 up, you know, and he basically -- you know, some of the ideas
13 that I thought, you know, would be something worthwhile for me
14 to be doing, you know, he didn't really, you know, let me do
15 and, you know, he gave me pretty de minimis duties to do, you
16 know, something that basically are -- I wouldn't say de
17 minimis, but certainly are -- we already had three clerical
18 staff that could handle, you know, most of those types of
19 support issues.
20       You know, one of the three. Getting in touch with
21 the HUD program people, that's something that a manager -- and
22 I certainly had a lot of experience in dealing with those
23 folks and that would have been something that -- you know, it
24 would have been something that was productive and that a
25 person in my position should do because I knew those people

Page 153

1 and, you know, would get them on board as far as cooperating
2 with our office. But, you know, the rest of -- and then he
3 had me --
4         You know, like I say, he spent a couple of hours
5 with me, I think from 1:30 to 4:30, and I don't know how long
6 he took -- spent over the Relocation Center, but then I had to
7 drive him to the airport, and then I never saw him again after
8 that. I think I called him, you know, several times after
9 that.
10    Q. That was going to be my next question. Did you ever
11 have any other communication with Mr. Davis about what your
12 future duties and assignments would consist of?
13    A. No.
14    Q. Did anybody after you returned to duty indicate that
15 you were subject to removal in December of 2002?
16         MR. SELDON: Can I just ask you to clarify? What do
17 you mean subject to removal?
18         BY MS. LYONS:
19    Q. Did anybody ever mention the possibility of your
20 being removed from your job in December of 2002?
21    A. No. They never explained any of this as far as what
22 the reasons were.
23    Q. I'm not talking about the reasons. I'm talking
24 about possible outcomes. Did anybody ever suggest that you
25 might be removed?

Page 154

1    A. No, just whatever went on between the conversations
2 of the two lawyers.
3    Q. Okay. I'm talking -- I want to limit my questions
4 to you, to things that you were told or that you heard
5 directly, okay? By December of 2002 -- when you returned to
6 duty on December 19th, discussions between them and the
7 lawyers had ceased as far as you knew, right?
8    A. No. They were still talking about things, and they
9 basically -- you know, I was told that -- you know, they gave
10 me this time to think the thing over and decide what I was
11 going to do, and basically if I didn't make the decision to
12 go, that I might not like the outcome -- you know, what the
13 outcome would be.
14    Q. Did anybody ever say anything more specifically to
15 you about what the outcome might be?
16    A. No. You know, I know one of my biggest concerns was
17 having a written disciplinary issue against me and, you know,
18 certainly I was hopeful that they would give me some, you
19 know, good things to be working on and that didn't happen.
20 And then I was under the gun as far as the administrative
21 leave. If I didn't retire by January 3rd, I was going to lose
22 that money.
23    Q. How much money did that represent to you, Mr.
24 Malloy?
25    A. I think it was 10- to $15,000.

Page 155

1    Q. Where did you get that estimate? What's it based
2 on?
3    A. I think they -- you know, they pay you that in a
4 lump sum after you retire. I think that's kind of the first
5 paycheck that you get. It takes them awhile to process your
6 retirement, but I think --
7    Q. Yes, but you by your own testimony earlier today
8 weren't going to retire for five more years, correct?
9    A. Right.
10    Q. You could have used the leave or you were going to
11 lose it?
12    A. Right. It was going to evaporate come January 3rd.
13    Q. Okay.
14    A. That's exactly -- you know, that's why I retired on
15 that day, to get --
16    Q. To get the monetary value of that leave --
17    A. Right.
18    Q. -- which was 10- to $15,000?
19    A. I think it was more like 15,000 but, you know, after
20 the taxes and everything it gets whittled down.
21         MR. SELDON: Did he say it was 170 hours? Is that
22 what he said?
23         MS. LYONS: He said 146.
24         WITNESS: Yeah, it was 146.
25         MR. SELDON: It's a 2,000 hour work year, so it's

Page 156

1 about --
2         MS. LYONS: We don't need math.
3         MR. SELDON: It's less than 10 percent. It's about
4 7 percent times 146 --
5         BY MS. LYONS:
6    Q. What was your total salary and leave for 2002?
7    A. They gave us like -- I believe it was $122,000 or
8 something like that. I was getting real close to the cap. I
9 may have actually just reach it or was --
10         MR. SELDON: Jim. I wouldn't have done that except
11 I know that Ms. Lyons was perfectly happy.
12         MS. LYONS: I would have altered the dynamic if I
13 were unhappy, believe me.
14         MR. SELDON: That's what I thought.
15         MS. LYONS: It's 5:30. I'll probably gather --
16         MR. SELDON: We're not going to finish.
17         MS. LYONS: We're not going to finish tonight. I
18 can gather my thoughts. We will be much more quick tomorrow,
19 so let's go off the record at this point and we'll talk about
20 a time to come back.
21         (Reading and signature not waived.)
22         (Whereupon, at 5:30 p.m., on Tuesday, March 6, 2007,
23 the deposition was adjourned.)
24
25

**CSRS** CANCELLED SUMMARY OF FEDERAL SERVICE
CIVIL SERVICE RETIREMENT SYSTEM

U.S. Office of Personnel Management

| Information for Agency | Instructions for the Employee |
|---|---|
| 1. A certified copy of this form must accompany the employee's Application for Immediate Retirement (SF 2801) or an Application for Death Benefits (SF 2800) for a deceased employee if a survivor annuity appears to be payable. | 1. Your employing office will complete and certify this form for you. |
| 2. This form may also be used:<br>• for retirement counseling purposes<br>• to respond to an employee's request for a record of creditable service | 2. Review this form carefully. Be sure it contains all of your service.<br><br>3. Complete Section E, Employee's Certification, and return it to your employing office. |
| 3. See FPM Supplement 830-1 for detailed instructions for completion and disposition of this form. | |

## Section A - Identification

| 1. Name of employee (Last, first, middle initial)<br>Malloy, James M. | 2. Date of birth (Month, day, year)<br>10/31/1950 | 3. Social Security Number<br>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 |
|---|---|---|
| 4. List all other names used (Maiden name, AKA, spelling variants) | 5. Other birth dates used | 6. Military Serial Number |
| | 7. Service computation date for retirement purposes<br>09/16/1973 | |

**8a. Does the applicant receive military retired pay?**

☐ YES   Attach a copy of the applicant's military retired pay order, if available and complete 8b.

☒ NO

**8b. If YES, has the applicant waived military retired pay to credit military service for civil service retirement?**

☐ YES   Attach a copy of the military finance center's letter to the employee accepting waiver, if available

☐ NO   (Includes cases where a waiver is unnecessary)

## Section B - Verified Service History Documented in Official Records

| Federal Agency or Military Service Branch | Appointment, Separation, or Conversion Dates for Civilian and Active Honorable Military Service — From | Appointment, Separation, or Conversion Dates for Civilian and Active Honorable Military Service — To | Name of Retirement System* (e.g., CSRS, CSRS Offset, etc.) | Remarks and Non-Creditable Time (Indicate if service is Part-Time) |
|---|---|---|---|---|
| Interstate Commerce Commission | 09-16-1973 | 10-01-1983 | CSRS-Special | 1811 (OPM Letter creditable svc LEO) |
| HUD-OIG | 10-02-1983 | 01-03-2003 | CSRS-Special | 1811 |

* Give details of creditable civilian service not subject to retirement deductions in Section C.

U.S. Office of Personnel Management
FPM Supplement 830-1
National Stock Number: 7540-00-634-4250

Standard Form 2801-1
Previous editions are not usable
Revised January 1990

Product of Government Retirement & Benefits, Inc. (GRB)

OPM Approved Form 12/01



EXHIBIT

Section C - Details of Civilian Serv     ot Subject to Contributory Retirement    tem for Certain Federal Employees

## This information is required to compute the portion of annuity    used on such service.

Detail below (1) any period of Federal civilian service subject to "FICA" deductions, and (2) any other Federal civilian service not subject to a Federal employee (or D.C. Government) retirement system. If total basic salary earned for any such period of service is known, a summary entry may be entered on the right hand side below. Otherwise, show each change affecting basic salary during the period of service. Show part-time tour of duty if applicable. If part-time service is after April 6, 1986, also provide total number of hours employee worked during that period and show what a full-time tour of duty would be.

| Nature of Action Appl., pro.. res., etc.) | Effective Date (Month, day, year) | Basic Salary Rate | Salary Basis (per annum, per hour, WAE, etc.) | Leave Without Pay | If Basic Salary Actually Earned Is Available Make Summary Entry Below | | Total Earned |
|---|---|---|---|---|---|---|---|
| | | | | | From (Month, day, year) | To (Month, day, year) | |
| | | | | | | | |

## Section D - Agency Certification

I certify that the information on this form accurately reflects certified information contained on the official personnel and/or payroll records in the custody of this agency and that if retiring, the retiring employee has sufficient service to support title to an immediate annuity.

| Signature of Authorized Agency Personnel Official | Agency Name and Address, including ZIP Code, and Telephone Number, including Area Code |
|---|---|
| | TREASURY/PUBLIC DEBT  ROOM 207 |
| | PARKERSBURG WV  26106-1328 |

| Official Title | Date |
|---|---|
| HUMAN RESOURCES SPECIALIST | 12-23-2002 |

## Section E - Employee's Certification

[X] **The above service is complete.**

[ ] I have additional service. *(If you claim additional service, attach signed statement(s) giving dates, positions, titles and locations of employment, including agency, bureau, and division. Claimed service cannot be credited for retirement until it has been verified, including unverified service listed on a SF 144, Statement of Prior Federal Civilian and Military Service, or similar affidavit.)*

Note:    If you have performed Federal civilian service subject to social security deductions (FICA) or not subject to retirement deductions, be sure that your agency has correctly completed Section C above.

If you have active military service on or after January 1, 1957, for which you have not made a deposit, be sure to read Section B of the "Instructions for Completing Application for Immediate Retirement" for information on how this decision affects your annuity. You CANNOT change your decision after you retire.

| Signature | Date |
|---|---|
| | 12/26/02 |

U.S. Office of Personnel Management
FPM Supplement 830-1
National Stock Number: 7540-00-634-4250

Standard Form 2801-1
Previous editions are not usable
Revised January 1990

OPM Approved Form 12/01

Product of Government Retirement & Benefits, Inc. (GRB)