1               UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLUMBIA

2

3

4   JAMES MALLOY,             )
                         )

5       Plaintiff,     )
                         )

6   V.                   )   Civ. Action No. 05-1117(RCL)
                         )

7   ALPHONSO R. JACKSON,   )
    Secretary of Housing and )

8    Urban Development,     )
                         )

9       Defendant.     )
       ——————————————————————)

10

11      Deposition of R. Joseph Haban, taken on behalf of

12   the Plaintiff, pursuant to Notice of Taking Deposition in

13   the above-entitled action, on the 5th day of March, 2007,

14   at 9:30 a.m., at the offices of Hedquist & Associates,

15   345 East Forsyth Street, Jacksonville, Florida, before

16   Mary Ann Beck, Court Reporter and Notary Public in and

17   for the State of Florida at Large.

18                   - - -

19

20

21

22

23

24

25

1

2    BY MR. SELDON:

3        Q    Now, Mr. Haban, I will represent to you that

4    Daniel Salas, at that time your deputy, gave deposition

5    testimony that he had reviewed no documents and did not

6    speak to criminal investigators of your organization when

7    he was asked to sign this document or when he did sign

8    this document.  Is that different from your recollection?

9        A    I didn't work on this document.

10       Q    So you're saying you had nothing to do with the

11   issuance of this document?

12       A    This document was not prepared by me.  It was

13   probably prepared when -- between Silas and BPD and

14   counsel.

15       Q    What about the decision to place Mr. Malloy on

16   administrative leave?  Did you --

17       A    That was my decision.

18       Q    That was yours?

19       A    Yes.

20       Q    Correct.  But you did not sign the document

21   having it done?

22       A    No.

23       Q    Now, at that time, I take it one of the reasons

24   for doing that was to -- was because Mr. Malloy had

25   supposedly not turned over diaries in connection with an

1    investigation that was open into him; is that right?

2         A    That --

3              MS. LYONS:  Objection.

4         Q    Do you know that to be true one way or the

5    other, sir?

6              MS. LYONS:  Objection still to the form of the

7         question.

8              MR. SELDON:  Go ahead and answer it.

9         A    I was -- I was told by the investigators that

10   he did not cooperate and turn over documents that were

11   asked of him.  And then I was also told that he had made

12   comments to agents down in his region about how to handle

13   the inquiry of -- if the investigators came around.  They

14   wanted to circle the wagons.  That's the phrase that I

15   was told.

16        Q    Correct, sir.

17        A    Circle the wagons so . . .

18        Q    So let's take that one at a time --

19        A    All right.

20        Q    -- if we could.

21             You were briefed on the investigation insofar

22   as it concerned Mr. Malloy and giving or not giving

23   documents over to investigators; is that right, sir?

24        A    Well, this -- I was briefed periodically.  This

25   wasn't something that I dealt with on a daily basis.

1   This wasn't -- you know, other people did the

2   investigation.  And I was told that he wasn't

3   cooperating, and that he wasn't turning over whatever it

4   is that they wanted him to turn over for review.

5         And then I was told that he was further making

6   comments to agents in Region 6 about how they were going

7   to handle people that were asking questions.  And so

8   that's what I -- that's what I was told.

9         I wasn't the agent that was doing the case.  I

10   was far removed from it at that time.  But --

11      Q   You did prepare -- sorry, sir.  Go ahead, I

12   didn't mean to cut you off.

13      A   Yeah, I was far removed from it.

14      Q   You did -- you did get ready for your

15   deposition today, did you not, sir?

16      A   Yeah.

17      Q   Did you or did you not review documents in

18   getting ready for it?

19      A   I reviewed some documents.

20      Q   You did know that this would be a subject of

21   the deposition, did you not, sir?

22      A   Whether I placed him on administrative leave?

23      Q   The circumstances surrounding placing

24   Mr. Malloy on administrative leave.

25      A   I just told you the circumstances.  I was told

1    that he wasn't cooperative, and I was told that he was

2    rallying the troops in Region 6 to circle the wagons.

3    And I took that to mean that he was opposing any type of

4    investigation that was being conducted down there.

5              MR. SELDON:  Let's do this step-by-step.  I'll

6         ask the reporter to mark Haban Exhibit 5.

7              (Haban's Exhibit No. 5 was marked for

8         identification.)

9    BY MR. SELDON:

10        Q    Now, sir, I take it you recognize the format of

11   this document?

12        A    I recognize the format, yes.

13        Q    This is a document or a Report of Investigation

14   of your Special Investigations Division; is that right?

15        A    This would be SID, that's correct.

16        Q    And we have taken the deposition testimony of

17   John McCarty.  Can you identify for the record, sir, who

18   he is?

19        A    John McCarty, on the date that this is dated,

20   October 9, 2002, was the special agent in charge of the

21   Special Investigations Division.

22        Q    Now, Mr. McCarty has testified that in the

23   ordinary course of business he would have signed this

24   document.  Is that the same as your understanding?

25        A    Normally.

1      Q    Good, sir.  This document is dated October 9,

2  2002, is it not?

3      A    Correct.

4      Q    And it was the next day that you made the

5  decision to place Mr. Malloy on administrative leave;

6  correct?

7      A    I don't know.  Whatever it's dated.

8  October 10th was the admin leave memo from Mr. Salas,

9  that's right.

10      Q    The memo from Mr. Salas that you made the

11  decision about; correct?

12      A    Correct.

13      Q    Correct.

14      This document does not only say that Mr. Malloy

15  -- this Report of Investigation does not only say that

16  Mr. Malloy supposedly didn't give over his diaries in

17  connection with your investigation, but also that another

18  person, another supervisor, Daniel Truxal, didn't give

19  over his diaries; correct?

20      A    If that's what it says.  I didn't read it.  Do

21  you want me to read it?

22      Q    Do you want to read it?  Go ahead, sir.

23      A    (Witness reviewing document.) Yes.

24      Q    That's what it says, sir, that Daniel Truxal,

25  another supervisor at the same level as Mr. Malloy in the

1     Q     When he asked you to give the file over.  Do

2  you recall one way or another before placing Mr. Malloy

3  on administrative leave, the day after this report, that

4  you directed him to get in touch with the representative

5  of your Bureau of Public Debt to go over why he had not

6  removed -- proposed to have removed --

7     A     I don't -- I don't --

8     Q     I need to finish the question.

9     A     Yes, sir.

10    Q     -- why he had not proposed to remove Cortez

11 Richardson?

12    A     What's the question?

13    Q     Did you -- isn't that true that by that time

14 you had directed Mr. Malloy to get in touch with a

15 representative of your Bureau of Public Debt and go over

16 the sequence of events that led him to do something short

17 of proposing to remove Cortez Richardson?

18    A     I don't know.

19    Q     Okay.  So the next day then -- I think we do

20 know, one thing we do know is Dan Truxal didn't have

21 anything to do with the decision not to remove Cortez

22 Richardson, did he?

23    A     I don't know who the ASAC was for Cortez until

24 it was all over with.  And then I found out that it was

25 Truxal -- I mean, that it was Malloy.

1    Q    But you had no reason to believe Truxal was

2    involved, did you?

3    A    I don't -- I don't know that Truxal was or was

4    not involved.  I don't -- normally, when we send ROIs to

5    the field for some sort of review, the supervisory ASAC

6    is the one who is the recommending official, and the SAC

7    is the deciding official.  I didn't know what ASAC was

8    involved down there with Cortez.

9    Q    Really?  I'm going to show you a document to

10   refresh your recollection.  I do not have copies.  I'll

11   show it to counsel for the defense, and then I'll

12   ask this -- we'll place it in the record, but it's the

13   only copy I've got.  It's Haban Exhibit 6.

14            MR. JOHNSON:  Is there more to this?

15            MR. SELDON:  One person can talk at a time,

16       Mr. Johnson.

17            MR. JOHNSON:  There should be more to it.  It

18       looks like it got cut off.

19            MS. LYONS:  Our questions is:  Is this a

20       complete copy of the document?

21            MR. SELDON:  No, I'm going to use this -- oh,

22       I'm going to use this to refresh his recollection.

23       I don't know -- it is a complete copy of this.

24       There are other documents which have more e-mails

25       strung along.  But it's also not necessary to have a

1          And I said: "That would be your standard

2     practice, right?"

3          And he said: "Certainly."

4          I asked him again, that was page 45.  On page

5     46:  "Okay.  But you're sure that you gave them a

6     balanced view of the investigation"?

7          And he answered, Mr. McCarty did:  "Yes, sir."

8          Is that your understanding of what was done

9     during this investigation?

10    A    Well, you say, Both sides and balanced.  I

11    don't know what you're referring to there but,

12    periodically, on all of these investigations, McCarty

13    would sit down and give an update.  So I would have no

14    reason to believe that he would not be, you know, given a

15    thorough update of whatever had transpired to that time.

16    Q    During the course of that investigation, isn't

17    it true, sir, that Jim Sang Svang, an investigator under

18    Mr. -- formerly, under Mr. Malloy's supervision, was

19    asked whether or not he heard anyone at a meeting say, We

20    have to circle the wagons, let's get our story straight,

21    they can't make you remember things, and Mr. Sang Svang

22    responded, No.  Do you recall that one way or another?

23    A    No.

24    Q    I'll give you a copy of Mr. Sang Svang's

25    statement that is attached to the McCarty deposition as

1   **Exhibit 8.**

2          MR. SELDON:  If counsel for the defense would

3      like to review it first, I'll be glad to show it to

4      you.

5          MS. LYONS:  No, thank you.

6   BY MR. SELDON:

7      Q    **That is exactly the sworn statement that**

8   **Mr. Sang Svang gave, did he not, sir?**

9          MS. LYONS:  Objection, foundation.

10     Q    **Were you briefed on this or not?**

11     A    You're asking me details -- details of what

12   every agent in Region 6 said.

13     Q    **Well, I --**

14     A    My understanding was that a number of agents

15   were interviewed, and if -- and some of them said they

16   heard Jim say things; some of them said they did not hear

17   him say things.  So what I ended up with was different

18   testimony, conflicting testimony.  That's how I remember

19   it.  You're asking me about one particular agent.  Then

20   if that's what Sang Svang said, then that's what he said.

21     Q    **Sang Svang said he did not hear anybody --**

22     A    Okay.

23     Q    **-- make a statement.**

24     A    That's what I --

25     Q    **I need to finish the question.**

1      A     All right.

2      Q     He did not hear anybody make a statement about

3   circling the wagons; right?

4      A     If that's what he said, then that's what he

5   said.  And I explained that some of the agents said they

6   did not hear it; some of the agents said they did.

7      Q     And by name, which were the agents who said --

8      A     I have no idea.

9      Q     Strike -- hold on, Mr. Haban.  By name?

10     A     I don't know the names.  You'd have to look at

11   the report.

12     Q     How many?

13     A     I don't know.

14     Q     I'm going to show you another document, okay.

15   It's going to be Mr. McCarty's deposition Exhibit No. 9.

16   It's a statement given by Andre Ramos, III.

17           He is asked by Investigator John Robinson, Did

18   you hear anyone at a particular meeting make statements

19   similar to the following:  We have to circle the wagons.

20   Let's get our stories straight.  They can't make you

21   remember things.  He asked in the negative.  Do you

22   remember Mr. McCarty briefing you on this, because I will

23   tell you, sir, he has given deposition testimony already,

24   but I will not tell you his answer?

25     A     No.

1    Q    Did you hear anyone at the meeting make

2    statements similar to the following:  We have to circle

3    the wagons.  Let's get our story straight.  They can't

4    make you remember things.  The statement says, No.

5         Does this in any way assist you in recalling

6    whether or not you were briefed on what special agents

7    and Richard said -- Richardson said when asked those

8    questions?

9    A    No.

10    Q    You don't have any reason to doubt that that's

11    what he said sitting here today, do you?

12    A    If that's what's in the record.

13    Q    I'm trying to find out what you were briefed

14    on, sir.

15    A    I've told you what I was briefed on was in the

16    totality.  I wasn't briefed on every little piece of

17    paper that they overturned and what each agent down there

18    said.

19    Q    So name a single agent who said Mr. Malloy did

20    say he told people to circle the wagons?

21    A    I don't -- I don't know one.  I was -- I was --

22    I don't know one.

23    Q    Donald Driskill gave a statement in connection

24    with this investigation which I'll give to you.  Did you

25    hear anyone at the meeting make statements similar to the

1   following:  We have to circle the wagons.  Let's get our

2   story straight.  They can't make you remember things.  He

3   answered, No.

4            Does this refresh your recollection in any way

5   whether you were briefed on Mr. Driskill's statement?

6       A    No.

7       Q    Jason Constantine, Exhibit 15 to Mr. McCarty's

8   deposition was also asked:  Did you hear anyone at the

9   meeting make statements similar to the following:  We

10  have to circle the wagons.  Let's get our story straight.

11  They can't make you remember things.  He answered, No, I

12  did not.

13           Does this refresh your recollection of whether

14  you were briefed during the course of this investigation

15  on what Mr. Constantine said?

16      A    No.

17      Q    Now, I'm going to ask you another question,

18  sir.  Was Mr. McCarty briefing you, or was he not

19  briefing you in this investigation as it went along?

20      A    There were some briefings, but I don't remember

21  exactly when those briefings took place.  And --

22      Q    Were they balanced?  I'm sorry, sir, I didn't

23  mean to cut you off.

24      A    Well, my recollection of what was said was some

25  of the agents corroborated the allegations; some of them

Page 41

1    didn't.  I didn't get into who said what when.  I mean,

2    that was the investigator's job.

3        Q    Eventually, you made the decision to remove

4    Mr. Malloy from supervision, did you not, sir?

5        A    Yes.

6        Q    And that was in December of 2002?

7        A    That was when he came back from -- when he came

8    back to work.

9        Q    That was when he came back after you'd placed

10   him on administrative leave, right?

11       A    Right.  There were -- when the settlement fell

12   apart sometime in, I think, December, and we brought --

13   and we asked Jim to come back then -- yes, I brought him

14   back as a regular agent.

15            MR. SELDON:  I'd like to have this marked as

16       Haban Exhibit -- what number are we up to?

17            THE COURT REPORTER:  We're on 7.

18            MR. SELDON:  Haban Exhibit 7.  The reporter

19       will give you the official copy in a moment.

20            (Haban's Exhibit No. 7 was marked for

21       identification.)

22   BY MR. SELDON:

23       Q    Do you recognize this document, sir?

24       A    Yes.

25       Q    Correct me if I'm wrong.  It's a memorandum

1  dated December 17, 2002, to Mr. Malloy from you; is that

2  right?

3      A    Correct.

4      Q    Subject, returned to duty?

5      A    Correct.

6      Q    When he was brought back, you relieved him from

7  all supervisory responsibility; did you not?

8      A    Correct.

9      Q    So let me ask you, sir.  The statements I just

10  read to you to refresh your recollection, and you can

11  look at them if you'd like, they were all made in October

12  2002.  I'll let you look at them if you'd like just to be

13  sure.  Would you like to look at them?

14      A    What statements?

15      Q    All the ones that I just went over to you.  For

16  example, Agent Constantine and Mr. Pileggi and

17  Mr. Romero, Mr. Richardson, Mr. Driskill.  Would you want

18  to refer those to those to confirm that they were given

19  in October of 2002?

20      A    No.

21      Q    So when you placed Mr. Malloy -- when you

22  removed Mr. Malloy from supervision, I'd like to know at

23  that time how you weighed the statements of those agents,

24  if at all, into your decision to remove him from

25  managerial responsibilities?

1    stating that upon request he is perfectly willing to turn

2    over all records relating to OIG's investigation, whether

3    business or personal, so long as OIG will define the

4    scope of the investigation for him.

5        Do you recall learning about that, sir?

6    A    I might have been told, but I don't -- it

7    doesn't ring a bell with me as I read it.

8    Q    The next page states the only limitation of

9    Mr. Malloy's offer is that OIG's request either pertain

10   to the investigation of Region 6, his region, or to OIG's

11   official business.

12       Do you recall that issue, that request, that

13   limitation being brought to your attention?

14   A    No.  Again, I -- I don't recall this letter.

15   Q    I was asking if you recall the issues.

16   A    I don't recall Jim ever saying, Hey, I'll work

17   with you.  I don't -- I don't recall that.

18   Q    Whether by letter from me or otherwise?

19   A    Right.  My -- my recollection is I was told he

20   wasn't cooperative, and he wasn't getting that way, and

21   he wanted to circle the wagons.  That's --

22   Q    -- what you were told?

23   A    That's what I was told.

24   Q    By Mr. McCarty?

25   A    Well, it had to be coming from McCarty or

1    came to sit down and talk about well, you know, Jim wants

2    to cooperate.  He wants to turn over records.  He wants

3    to  come back to work.  What do we do?  I would have been

4    involved in those decisions; yes, I would.  I don't

5    remember this letter here or these issues that you're --

6    that's being discussed in this letter.

7          Q     **The letter being Exhibit 12, the one keeping**

8    **Mr. Malloy on administrative leave?**

9          A     Right.  But my understanding is, is that he

10   stayed on admin leave while there was some sort of

11   agreement that was being formulated.

12         Q     **So then who did keep Mr. Malloy -- make the**

13   **decision to keep Mr. Malloy on administrative leave as**

14   **reflected in the letter October 28, 2002, from Mr. Silas**

15   **to me?**

16         A     Well, anything that happened I'm responsible

17   for.

18         Q     **I asked you who made the decision?**

19         A     I'm responsible for it.

20         Q     **Who else made the decision with you, if**

21   **anybody?**

22         A     Decisions were made in a collective manner with

23   the front office.

24         Q     **Who would that have been, sir?**

25         A     It would have been Stephens.

1    this memorandum of October 28, 2002.

2         "The memorandum denying Mr. Malloy's request to

3    be restored, taken off of administrative leave, were you

4    the sole author of the letter?"

5         And Mr. Salas answered, "No."

6         "QUESTION:  Did you write any of it yourself?

7         'ANSWER:  It was drafted by legal counsel.

8         'QUESTION:  And did you have input into the

9    decisions here at all?

10         'ANSWER:  The decisions having to do with

11    placing Mr. Malloy on administrative leave was made by

12    AIGI Haban.

13         'QUESTION:  And what about keeping on --

14    keeping him on administrative leave, not restoring it?"

15         And he says:  "That was made by him as well."

16         So now I'm going to ask you the question:  That

17    memo that went out on October 28 under Mr. -- strike

18    that.

19         Is any of that inconsistent with your

20    recollection, what I just read to you?

21    A    What Salas said?

22    Q    Yes.

23    A    Well, Salas is saying what I'm saying.  I mean,

24    he's not taking ownership that he made the decision in

25    any of this.  I'm the boss.  The buck stops with me.  I'm

1    the guy who's in charge, and I'm the one who's

2    responsible.  But did I make the decision?  It was a

3    collaborative decision with a lot of different people

4    having input.

5         Q    I appreciate that, sir.  Thank you for

6    clarifying that.

7              Mr. Salas, during the course of being your

8    deputy, at one point filed a discrimination complaint of

9    his own; is that right sir?  Do you recall that?

10        A    Discrimination against me?

11        Q    I don't know who it was against, sir.  Just

12   discrimination.

13        A    I never saw the documents, but he did file a

14   complaint.

15        Q    An EEO complaint?  Or if you don't --

16        A    It was --

17        Q    -- know that's --

18        A    It was an EEO.  I saw a preliminary EEO that he

19   had filed, yes, but then I didn't see anything else.

20        Q    And after that, sir, was Mr. Salas then

21   reassigned and no longer your deputy?

22        A    Eventually, that's what happened.

23        Q    What involvement, if any, sir, did you have in

24   selecting the Assistant Special Agent in charge for the

25   Houston office which is part of Region 6?

Page 72

1    Assistant Special Agent in Charge?  Is that right?

2        A    He had been one.

3        Q    Until you relieved him of supervisory duties;

4    correct, sir?

5        A    Right.  Right.

6        Q    And prior to that time, do you recall one way

7    or another whether or not Mr. Malloy was at one time

8    given an award as the Office of Inspector General Manager

9    of the Year?

10        A    I think he was.  I can cut to the chase here,

11    Mr. Seldon.

12        Q    Okay.

13        A    I have always regarded Jim as an old-time HUD

14    guy as one of the solid guys out there.  He was a good

15    ASAC.  He ran a region down there that was seven years

16    into narcotics and violent crime, and he did an excellent

17    job.  That's not what the issue was with me, with Jim.

18        Q    At that point in time, you're saying it was the

19    issue of -- what these investigations were about;

20    correct?

21        A    It was what I was told was he would not

22    cooperate --

23        Q    Okay.

24        A    -- in an investigation.  And that was a conduct

25    issue to me.  That was a loyalty issue to me.  Here's a

1    guy that's solid.  We want some paperwork, and he won't

2    give it to us.

3         Q    Okay.

4         A    That's what the issue was.  Now -- that's what

5    the issue was.

6         Q    Okay.  Mr. Haban, first of all I'd like to say

7    thank you for cutting to the issue because it is the

8    issue we are concerned with.  It is the issue before this

9    conduct came up with Mr. Malloy, this alleged misconduct

10   which is the focus of this lawsuit.

11        And so prior to that time, Malloy was really

12   rated very, very highly in your organization, was he not?

13        A    I always viewed Jim Malloy as one of the

14   old-time guys.  Now, I don't know whether he was or not,

15   but I viewed him.  I think he actually came over in the

16   early '90s; you'd have to ask him.  But I viewed Jim as

17   coming in there out to -- that Region 6 was, you know,

18   imploded back in those early years when some of those

19   folks left and went to RTC, and it was -- you know, he

20   came in with a management group and he was in my mind --

21   I never new Jim, personally, that much, but I also viewed

22   him as being a HUD guy.

23        Q    Okay.  That's fair enough, sir.  And so when

24   you say that Mr. Malloy came in in the '90s, I think you

25   testified already that Mr. Donahue, the inspector

Page 102

1          (A short recess was taken at this time.)

2          THE VIDEOGRAPHER:  Back on the record at 12:04.

3   BY MS. LYONS:

4       Q     Mr. Haban, a few more questions, please.  As

5   you sit here today, do you know that Jim Malloy claims to

6   be of Native American descent?

7       A     I know now that he claims to be.

8       Q     When did you come to have that understanding?

9       A     In a document that he filed.  I don't know what

10  date it was, but I understand that that's what he says.

11      Q     What kind of document are you talking about?

12      A     It was one of the complaints that came in.

13      Q     In connection with this litigation?

14      A     Yes.

15      Q     So would that have been after Mr. Malloy had

16  retired from HUD OIG?

17      A     I really -- I really don't know when it came

18  in.

19      Q     Can you -- so can you tell me a year in which

20  you saw this document?

21      A     It would have been after all this had started.

22  Sometime -- I don't remember.  I don't even know what it

23  looks like, but I remember either somebody telling me or

24  maybe I saw -- saw it.  I don't know.  It might have been

25  a complaint, the EEO maybe that came in.

1    Q    Okay.  Could it have been when the EEO

2  investigator came to interview you in connection with the

3  claim?

4    A    It might have been.

5    Q    You testified earlier that you, I believe, made

6  the decision to fill the position vacated by Larry

7  Chapman in Region 6; correct?

8    A    Correct.

9    Q    Would you have promoted Mr. Malloy into the

10  Special Agent in Charge position when you made that

11  selection?

12    A    Had he applied?

13    Q    Had he applied, would you have promoted him

14  into that --

15    A    No.

16    Q    -- position?

17    A    No.

18    Q    Why not?

19    A    Because I was in the process of assessing all

20  of the offices and had set in motion a desire to move

21  blood around, move experiences around, and not promote a

22  sitting ASAC that kind of grew up in that region to be

23  the SAC of the region.  I wanted those ASACs to go

24  somewhere else.

25    Q    And why was it that you thought it was better

Page 104

1    for ASACs to go to other offices?

2        A    Well, because of the possibility of a power

3    structure being built in regions and having the same

4    people there controlling those regions.

5            I think you have to understand that I was the

6    guy who was charged with changing an organization.  We

7    came off of a seven or eight or nine year narcotics

8    mission.  We lost 20 million dollars a year in funding.

9    My FTEs were slipping from 841 -- I mean, from 341 down

10   to 301.  I had to get these narcotics agents back in tune

11   running white collar investigations.  We moved from a

12   decentralized SAC and powered management structure to a

13   headquarters-driven structure, and I wanted to get these

14   managers moved around.

15       Q    And all of this process that you're talking

16   about, was that taking place in 2002?

17       A    Yes.  All funding for safe -- what was called

18   operation safe home ended in fiscal 2002.

19       Q    And to your knowledge, was Mr. Malloy part of

20   that drug trafficking work that you're talking about?

21       A    Well, Malloy's duties were both, white color

22   and narcotics as an ASAC.  I don't personally know, you

23   know, what -- who he managed or what areas he managed.  I

24   know he's based out of Ft. Worth, and he would have been

25   in charge of all of the cases that were assigned to him

1   by the SAC and all of the people assigned by the SAC.

2       Q    Did anybody at headquarters or anywhere else

3   ever tell you that they wanted Cortez Richardson to be

4   fired?

5       A    No.

6       Q    Was it your opinion that Cortez Richardson

7   should be fired?

8       A    You're asking for my opinion?

9       Q    Yes, sir.

10      A    No.

11           MR. SELDON:  I just, obviously, need to object

12   for the record.

13      A    No.

14      Q    It was not your opinion?

15      A    No.

16      Q    Did you have any opinion about what discipline

17   Steve Romero should receive in 2002?

18      A    No.

19      Q    Did you have any expectation of what would

20   happen with Cortez Richardson or Steve Romero's cases

21   when you sent them down to Ft. Worth?

22      A    I had an expectation, yes.

23      Q    What was your expectation?

24      A    Nothing would happen.  I didn't expect anything

25   to happen.

1    Q    **What do you mean by that?**

2    A    I had to close those cases out because I had an

3    open file. I sent them down to Region 6 to be

4    adjudicated. I didn't expect any action. I thought it

5    was going to be a no change or no action warranted. They

6    surprised me, they took some action.

7    Q    **So but you did expect the proposing and**

8    **deciding officials to review the files and come to some**

9    **conclusion, didn't you?**

10    A    I expected them to do that, but I was pretty

11    sure nothing would come of it.

12    Q    **Okay. When Mr. Malloy retired from HUD OIG,**

13    **had you decided what to do with him as far as his**

14    **position?**

15    A    No, it was in process.

16    Q    **What I'm asking you to refer back to and I**

17    **didn't ask you was, you testified before that he had been**

18    **removed of his supervisory duties temporarily; correct?**

19    A    Right.

20    Q    **Had you made any decision one way or another**

21    **when he retired about changing or altering that status?**

22    A    I don't understand your question. If the

23    question is -- I had not come to fruition. We were in

24    the process of trying to close that out when he retired.

25    It was an ongoing investigation, if you will.

1        So to answer your question, no, I had not made

2  any decisions on what Jim would be doing after this was

3  closed out and, you know, put it behind us, no.

4        Q    So if I understand you correctly, the

5  triggering event for a decision would have been closing

6  the investigation; is that right?

7        A    Right.  Close it all out.  See what -- you

8  know, let it go through the process.  It never got to

9  that point.

10       Q    Did you give Mr. Davis any instructions about

11  the sort of duties that Mr. Malloy should be assigned

12  while he was back in his position but relieved of his

13  supervisory duties?

14       A    I don't believe I did.  I might have told

15  Lester give him something meaningful, you know, but not

16  supervising any of those agents right now.

17            MS. LYONS:  Can we go off the record briefly?

18            MR. SELDON:  Sure.

19            THE VIDEOGRAPHER:  Off the record at 12:12.

20            (Short recess was taken at this time.)

21            THE VIDEOGRAPHER:  Back on the record.  It's

22       12:13.

23            MS. LYONS:  Thank you, Mr. Haban.  I don't have

24       any further questions.

25            MR. SELDON:  Mr. Haban, we've just got a few

Page 125

1    questioning but to the extent I needed to preserve

2    that objection.  I just wanted to . . .

3                    RECROSS EXAMINATION

4    BY MS. LYONS:

5        Q    Mr. Haban, why did you keep Mr. Malloy on

6    administrative leave if there were settlement

7    negotiations going on?

8        A    Well, two reasons.  One is legal told me to,

9    and my understanding was, was Jim wanted to stay on it

10   until after the first of the year.  I mean, that's what I

11   understand.

12       Q    He wanted to -- Mr. Malloy wanted to stay on

13   administrative leave until the first of the year meaning

14   January --

15       A    Well, after the -- after the first of the year,

16   in January.

17       Q    This was January of 2003?

18       A    Yeah.

19       Q    Did you have any other understanding from any

20   source about Mr. Malloy being on administrative leave or

21   remaining on it?

22       A    No.  He -- my understanding was, was there's

23   negotiations taken place.  Malloy wanted to stay on this

24   leave so we left him on it.

25       Q    You understood as part of the negotiations

1    **that's what was being requested?**

2         A    Uh-huh, yes.  He had requested that he stay on

3    leave.  That's my understanding.

4              MS. LYONS:  Okay.  That's all I have.

5              Mr. Stephens, you have the opportunity --

6              MR. SELDON:  Excuse me for one second.  I don't

7         think there's anything I want to ask, but I just

8         want to think for one second.

9              MS. LYONS:  Please.

10             MR. SELDON:  Okay.  I do have one last

11        question.

12             MS. LYONS:  Okay.

13                    FURTHER REDIRECT EXAMINATION

14   BY MR. SELDON:

15        Q    **And you didn't -- I didn't hear your testimony,**

16   **and Mr. Malloy certainly when he came back at your order**

17   **didn't want to be relieved of supervisory duties, did he?**

18        A    I don't know whether he did or he didn't.  I

19   didn't talk to Jim.

20        Q    **So he never gave you a reason to think that he**

21   **wanted to be relieved of supervisory duties I take it?**

22        A    That he wanted to be?

23        Q    **Yes, sir.**

24        A    No.

25        Q    **Wouldn't have thought that he did?**



U.S. Department of Housing and Urban Development

**Office of Inspector General**

451 7ᵗʰ St., S.W.

Washington, D.C. 20410-4500

December 17, 2002

**MEMORANDUM FOR:** James Malloy, Assistant Special Agent in Charge, 6AGI

**FROM:** R. Joseph Haban, Assistant Inspector General for Investigation, GI

**SUBJECT:** Return To Duty

By a memorandum dated October 10, 2002, the Deputy Assistant Inspector General for Investigations (DAIGI) placed you on administrative leave pending completion of an investigation into allegations against you, effective that date. By this memorandum, I am returning you to duty and terminating your administrative leave. You will report to duty on Thursday, December 19, 2002, at the Fort Worth, Texas Regional Office. I am however relieving you of all managerial responsibilities and you shall no longer serve as an Assistant Special in Charge for Region 6, the Southwest Region. Effective immediately, you may not make any managerial decisions regarding personnel or finances.

I also note that you have accumulated annual leave in excess of 240 hours. Should you decide to take annual leave, your request to do so is hereby approved for all or any portion of your accumulated leave. You should submit an SF-71 directly to this office for approval for purposes of documentation. That is solely your decision. Your failure to take annual leave can result in your loss of that leave. My prior approval of your Request for Restoration of Forfeited Annual Leave/Documentation of Exigency of the Service was approved based upon circumstances that have changed and is hereby rescinded.

If you have any questions regarding this letter or your duties or responsibilities, please contact Daniel Salas, DAIGI. Please inform DAIGI Salas immediately if any difficulties or problems arise. In any event, once you have returned to the Fort Worth office, please inform DAIGI Salas, and he can provide you further instructions.

*faxed to Mr Seldon — 12/17/02*
*1508 —*

*Seldon said he would*
*inform his client.*

*Rick*

PLAINTIFF'S
EXHIBIT
# 7 - HABAN
3-5-07 mab
PENGAD 800-631-6989