```
                                                                    1

  1                 UNITED STATES DISTRICT COURT

  2                 FOR THE DISTRICT OF COLUMBIA

  3

  4  - - - - - - - - - - - - - - -x

  5  JAMES MALLOY,                 :

  6              Plaintiff,         :

  7      vs.                       :    Case No: 05-1117 (RCL)

  8  ALPHONSO R. JACKSON,          :

  9              Defendant          :

 10  - - - - - - - - - - - - - - -x

 11

 12                              Washington, D.C.

 13                              Wednesday, March 7, 2007

 14

 15

 16  Deposition of:

 17                 JAMES MALLOY

 18  the Deponent, called for examination by counsel for the

 19  Defendants, pursuant to notice and agreement as to time and

 20  place, at 501 3rd Street, N.W., Washington, D.C., before

 21  Jack L. Becker, a Notary Public in and for the District of

 22  Columbia.

 23

 24

 25
```

those three offices, but that's probably where an agent assigned to Oklahoma City would be doing the majority of his work.

Q. What misconduct did you find warranted a five day suspension for Cortez Richardson?

A. The kicking the tow vehicle, you know, in an after hours incident with other -- the predominant deal is that there were certainly other law enforcement agencies at this function, and I certainly haven't thought of this in a while, but I think it was something along the lines of that they were towing a vehicle -- a tow driver came up and was towing a vehicle away. The officers that were together at a social function saw this, went out, started, you know, arguing with the tow driver that -- you know, that they were taking one of their vehicles away, and the tow driver proceeded to go ahead and pull the car away, and it was alleged that Agent Richardson kicked the vehicle and caused damage to the tow truck as it was driving away.

Q. And you found that he had done that, in fact, when you disciplined him?

A. Yes.

Q. Okay. I'm not trying to trick you this morning, really, and I'm not going to get the document out, but you stand by the proposal that you gave to Mr. Chapman regarding Cortez Richardson today, right?

1    A.    Yes.

2    Q.    Have you reviewed that document lately, in the last
3    two years?

4    A.    No.

5    Q.    Okay. Do you have any reason that your proposal
6    would be different today if you looked through those facts
7    today?

8         MR. SELDON:   Well, you have to ask him first if he
9    remembers it.  He hasn't enough foundation.

10        BY MS. LYONS:

11   Q.    You can answer the question, Mr. Malloy.

12   A.    My recollection was that it was the tow truck
13   incident that was my major concern.  You know, I may have
14   included other things there, but yeah, I probably would need
15   to remember that -- yeah, I'd probably have to go back over
16   that again.

17   Q.    Do you remember whether Mr. Cortez [sic] was accused
18   of falsifying a receipt?

19   A.    Well, if you're talking about the altering the
20   document issue, yes, I believe I discussed that earlier in the
21   --

22   Q.    I think we talked about that yesterday, right?

23   A.    Yes, ma'am.

24   Q.    And did you find that Mr. Cortez [sic] had falsified
25   a receipt or a document?

```
 1       A.    Under instruction of his second line supervisor.
 2       Q.    Right, but that he had done it?
 3       A.    Yes.
 4       Q.    You found it was a mitigating circumstance perhaps
 5  because his supervisor had directed him to do it, right?
 6       A.    Right.
 7       Q.    Well, I guess yeah.  I mean I certainly can
 8  empathize with anybody that would be put in that position to -
 9  - you know, under duress from a second line supervisor to be
10  told that to do something that you don't agree with and then
11  tell your first line supervisor immediately what happened, and
12  the first line supervisor says he's going take care of the
13  matter.
14       Q.    A false statement -- an agent found to have made a
15  false statement -- well, strike that.  Special Agents are
16  expected to testify in court, right?
17       A.    Yes, ma'am.
18       Q.    And if an agent has been in the past found to have
19  made a false statement, what are the consequences of that when
20  an agent gets prepared to testify in court?
21            MR. SELDON:  Objection.  Can you identify the
22  context, please?
23            MS. LYONS:  You can answer the question.
24            MR. SELDON:  Are you including like lying to his
25  wife?
```

1          MR. SELDON:  Is that a question?
2          MS. LYONS:  Yes.
3          BY MS. LYONS:
4     Q.   Based on your training and experience as a trained
5  law enforcement investigator, you weren't surprised that they
6  wanted to look behind your conclusions and to get some facts
7  from you, were you?
8     A.   I was extremely surprised when they asked for my
9  personal diaries.
10    Q.   Let's go back to these documents you say supported
11 your LEAP pay.  Did you give those to the investigators?
12    A.   When I came back and told them that I was -- under
13 advice of counsel that I was not going to produce the diaries
14 to them, I told them that that wasn't the information that I
15 used to support my LEAP pay, that I maintained a log on my
16 desk and every day I put the hours that I worked.
17    Q.   Okay.  My question is did you --
18         MR. SELDON:  He's not done with his answer.
19         MS. LYONS:  Oh, I'm sorry.
20         MR. SELDON:  Are you?
21         WITNESS:  And, you know, basically I showed it to
22 them and basically it's just got the days -- the hours that I
23 work each day on it, and they said we don't want to look at
24 those.  I said here's a couple of them.  I can go back three
25 years and give these to you if you're interested and they said

1  no, we're not interested in them.
2          BY MS. LYONS:
3      Q.   Does the log on your desk contain any -- did at the
4  time the log on your desk contain any information other than
5  the hours that you would have worked?
6      A.   I think it may have had limited -- you know, like if
7  I, you know, ran in the morning or, you know, because you
8  certainly have to include that when you're documenting your
9  LEAP, so there was limited other information in there.  I
10 provided these records through discovery.
11     Q.   Okay.  So you agree that you refused to turn over
12 your diaries after lunch and you had spoken to the lawyer,
13 correct?
14     A.   Yes, ma'am.
15     Q.   And as of September 30th, 2002 when Mr. Chapman
16 retired you still had not turned over the diaries or offered
17 to turn them over to the SID investigators, correct?
18     A.   No, I had not, nor had they ever contacted me about
19 it.
20     Q.   Did you ever talk to Larry Chapman about your
21 decision not to turn the diaries over to the SID
22 investigators?
23     A.   I'm probably sure that I did, yes.
24     Q.   What did he say?
25     A.   You know, nothing.  I mean he -- of course, he was

67

1  on October 10th.
2      Q.   Since that time has Mr. Nuhfer or anybody else ever
3  indicated that that was improper?
4      A.   No.
5           MS. LYONS:  To him?
6           MR. SELDON:  Yes.
7           WITNESS:  No.
8           BY MR. SELDON:
9      Q.   Your decision to retire, what role, if any, did your
10 being under investigation have in your making that decision?
11     A.   Everything.
12     Q.   Why?
13     A.   You know, I knew that I was no longer going to be a
14 supervisor.  You know, when I came back, they gave me de
15 minimis duties to do and, you know, they put it upon me to
16 come up with ideas of things that I could be working on and,
17 you know, basically -- you know, the ideas that I thought
18 might be worthwhile things, they basically -- I was told that
19 I couldn't have anything to do with investigations and agents.
20     Q.   So were those duties you were given, and then we'll
21 go back, commensurate with your background and experience as a
22 special agent?
23     A.   No, sir, they were not.
24     Q.   Who typically performed those duties?
25     A.   Our clerical support staff.

1    Q.   And what were the duties again they gave you to do
2  that were typical of clerical and support staff?
3    A.   I was to contact the GSA fleet management and tell
4  them that we were no longer going to be using the Crown
5  Victoria vehicles assigned to us because of the expense, and
6  that we needed to turn those back to GSA fleet and that they
7  would get us cheaper vehicles, which I believe they wanted --
8  you know, it was the Taurus that was going to be a cheaper
9  vehicle, and that -- for some reason I do believe it was -- I
10 don't know if it was when Lester Davis was going to be back or
11 after the first of the year that this was all going to take
12 place, so really all I had to do was call and alert them of
13 what was going to happen.
14   Q.   Was there -- I'm sorry, sir.
15   A.   And then, you know, they -- which I did.  And then I
16 was to contact -- this was the most substantive thing he gave
17 me to do, and that was that I was going to contact the HUD
18 program officials -- compile a list of HUD program officials
19 that the agents -- you know, put this list together and have
20 it -- or, you know, provide it to each agent so they would
21 have go to people, you know, if they had questions or needed
22 expertise on any particular program.  Now this was just in the
23 region that he wanted that to happen.
24   Q.   A list compiled?
25   A.   Yeah.  And we talked about the fact that, you know,

1   most of those people were going to be, you know, on federal
2   holiday in that time frame, but that, you know, once they came
3   back that, you know, I could start putting that list together.
4           And then there were some duties that -- regarding
5   the case binders, the investigative case files, and, you know,
6   I'm assuming probably -- yeah, it had something to do with the
7   case files which was probably to, you know, go through and
8   make sure that the -- yeah, make sure that everything was in
9   the file that needed to be in the file and/or process the aged
10  files and get them out of the file system.
11      Q.  Was this also a clerical type duty?
12      A.  Yes, sir.
13      Q.  Were you given investigative duties to do?
14      A.  No.  I was told that I couldn't do anything in that
15  area.
16      Q.  Anyway, we talked about your being under
17  investigation.  We began on how it contributed to your
18  decision to retire.
19      A.  Right.  I know there was some other -- I've still
20  got some other areas.
21      Q.  Okay.
22      A.  Once I came back, I was told that, you know, he
23  wasn't -- he was going to renege on his agreement to restore
24  my use or lose leave.
25      Q.  He being who?