UNITED STATES OF AMERICA
DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
OFFICE OF THE INSPECTOR GENERAL

INTERVIEW OF JAMES MALLOY

Washington, D.C.

Friday, October 10, 2002

(202) 638-2400

BETA

Nationwide Court Reporting & Videography Services
There is No Substitute for Quality
1-800-522-BETA

(703) 684-BETA

6

1   MR. NAPOLEONE: Yes, why don't we
2   make you a copy of that?
3   MR. MALLOY: That'll help.
4   MR. NAPOLEONE: So, Jim, you
5   understand your advisement of rights?
6   MR. MALLOY: Yes, I do.
7   MR. ROBINSON: What I'd like to do
8   now, Jim, is to swear you in. Could you
9   just please raise your right hand? Do you
10  swear that the information you're about to
11  provide will be the truth and nothing but
12  the truth so help you God?
13  MR. MALLOY: I do.
14  MR. ROBINSON: Jim, let me just go
15  into some of the issues. First of all, for
16  the record I'm interviewing in the capacity
17  of being a possible target of an
18  investigation. What I'd like to do is get
19  into an area, just to begin with since Larry
20  Chapman has just currently retired, correct?
21  MR. MALLOY: Yes, sir.
22  MR. ROBINSON: And just for the

37

1  looked at the allegations, trouble-shot
2  them. First I came to him and -- came to
3  him and told him what my, you know,
4  recommendation was going to be, verbally,
5  and he seemed to be, you know, okay with it.
6      MR. ROBINSON: Who was okay with
7  it?
8
9      MR. MALLOY: Larry Chapman as far
10 as what my process, my thought process, was
11 on this, you know, on the Steve Romero
12 matter. Yeah, there was allegations about
13 his -- him not reporting truthfully
14 information about his time with the Austin
15 Police Department.
16     There was a letter of resignation
17 in there where he put down that he was
18 leaving for personal reasons and it was
19 signed off by the academy instructors there.
20 Apparently during a background investigation
21 these same people had basically said that he
22 had left under adverse conditions. And, you
   know, I felt like that letter, that memo of

                                                                    38

1    resignation where he said he's leaving for
2    personal reasons and signed off on by these
3    two people that were basically saying he
4    didn't leave for personal reasons, I mean,
5    why did they sign that letter and why didn't
6    they dispute that if he was leaving for some
7    other reason?  I felt like that was a very
8    compelling document.
9         And it was not anything that was
10   brought up in the course of the report of
11   investigation.  It was just an attachment
12   there.  So, I mean, I felt like -- I felt
13   like, you know, Romero, if anybody charged
14   Romero for not being truthful about that
15   particular allegation that that document
16   would come up and be a major thing for his
17   defense.  That was the one issue.
18        And then on the credit card part
19   of it Steve Romero went to Birmingham,
20   Alabama, transferred from our district to
21   Birmingham, Alabama, at some point in time.
22   I think it was probably about '98 or '99.

39

1   The government credit card bills apparently
2   transferred down to that region when he went
3   -- he went to Birmingham. When he came back
4   to our district I think -- I think '99,
5   2000, something like that, we never got
6   those records back.
7         So I explained to Joe -- and I
8   talked to -- I think I sent an e-mail to Joe
9   Haven explaining to him that I was going to
10  need a little bit more time to look at that
11  case because I think Romero -- I'd also
12  talked to Romero when Romero wanted to get
13  his personal credit information together and
14  then I wanted to also look at the stuff
15  that, you know, regarding the government
16  travel card.
17        And so once I gathered that from
18  Steve he had quite a bit -- apparently back
19  in -- which I think I explained that in the
20  memo that -- the letter of caution that I
21  sent to Romero -- he had -- his wife had
22  medical problems during her pregnancy. She

54

1  my review of the report and what my analysis
2  of the evidence was.
3          MR. NAPOLEONE: Did you coordinate
4  with our human resources or our Bureau of
5  Public Debt after you evaluated the facts
6  concerning Cortez Richardson?
7          MR. MALLOY: I did not.
8          MR. NAPOLEONE: You did not. Did
9  you coordinate with our Office of General
10 Counsel concerning either of these two cases
11 before you as the proposing official?
12         MR. MALLOY: I did not.
13         MR. NAPOLEONE: Why didn't you?
14         MR. MALLOY: Well, I was -- I
15 basically talked to Chapman and -- for one
16 thing this is the first time I've ever been
17 a proposing official on any of this.
18         MR. BERGER: Were you aware of any
19 rules or processes or procedures that
20 applied to you as a proposing official?
21         MR. MALLOY: No. All I know is
22 that I was getting calls from Nufer that,

56

1   MR. NAPOLEONE: So did you refer
2   to that chapter? That's the only current
3   chapter in existence.
4   MR. MALLOY: Right.
5   MR. NAPOLEONE: According to that
6   chapter, and I'm reading it right here, the
7   proposing official is responsible for
8   evaluating the facts, and I'm reading this,
9   and developing the notice with the
10  assistance of the Human Resources Division,
11  which is our VPD, and it says or our service
12  contractor when one exists, which one does,
13  and the Office of Counsel. That's your
14  responsibility. Did you do that?
15  MR. MALLOY: I did not.
16  MR. NAPOLEONE: You did not. Why
17  didn't you do that?
18  MR. MALLOY: Because I was
19  instructed by my SAC that we didn't need to
20  do that, that we needed to get these
21  adjudicated before he left so somebody else
22  didn't have to deal with it once he was --

88

1   again because we're both in the same
2   business. We have a conflict here now,
3   inconsistent stories, and that is I want to
4   give you one more opportunity. Did you make
5   any of those statements or anything similar
6   to those statements?
7       MR. MALLOY: Mike, the only thing
8   that I can recall is that we had a staff
9   meeting with the entire staff and we were
10  talking about Internal Affairs issues and
11  mainly using it as a method of making sure
12  that the agents took care of their business
13  with cell phones and with the government
14  cars. In some way it was kind of a positive
15  thing for us to bring the message to the
16  agents that they'd better take care of their
17  business.
18      And if he said they needed to
19  circle their wagons or take care of their
20  business, I mean, that may -- he may have
21  said that --
22      MR. NAPOLEONE: Who's he?

89

1  MR. MALLOY: Larry Chapman. And,
2  I mean, I probably -- I said some things
3  there, too, about it, mainly because I went
4  to the administrative officers meeting and I
5  knew the questions that Stevens was asking
6  about of the administrative officers on
7  using the cell phones and was their abuse
8  there, that type stuff, so, I mean, there
9  may have been that type of information about
10 circling the wagons but as far as let's
11 circle the wagons on the Chapman
12 investigation I have no recollection or
13 knowledge of that.
14     MR. NAPOLEONE: And with respect
15 to the other two statements allegedly you
16 made or you were present when they were
17 made, "Let's get our story straight
18 regarding Chapman," and, "They can't make
19 you remember things," are those attributed
20 to you in any form or fashion?
21     MR. MALLOY: I have no
22 recollection of that, making those