MGB Reporting, Inc.

1

2        UNITED STATES DISTRICT COURT

3        FOR THE DISTRICT OF COLUMBIA

4    - - - - - - - - - - - - - - -X

5    JAMES MALLOY,                    :

6              Plaintiff            :

7         v.                    : No. 04-1117(RJL)

8                                   :

9    ALPHONSO R. JACKSON,            :

10             Defendant            :

11   - - - - - - - - - - - - - - -X

12             DEPOSITION OF DAVID NUHFER

13                   Washington, D.C.

14                   Tuesday, November 28, 2006

15        Deposition of DAVID NUHFER, called for

16   examination at 11:27 a.m., at the law offices of Robert

17   C. Seldon & Associates, P.C., 1319 F Street, N.W., Suite

18   305, Washington, D.C., before Gary S. Howard, a notary

19   public in and for the District of Columbia, when were

20   present on behalf of the respective parties:

21

22

MGB Reporting, Inc.

Page 4

```
 1                     P-R-O-C-E-E-D-I-N-G-S

 2    Whereupon,

 3                     DAVID NUHFER

 4    was called as a witness and, having been first duly

 5    sworn, was examined and testified as follows:

 6                     DIRECT EXAMINATION

 7              BY MR. SELDON:

 8         Q     Mr. Nuhfer, for the record, would you

 9    please give us your full name?

10         A     David A. Nuhfer.

11         Q     And you are presently employed by whom,

12    sir?

13         A     Department of Treasury, Bureau of Public

14    Debt.

15         Q     Okay. Mr. Nuhfer, I'm going to begin by

16    saying something, and I think we've got an

17    agreement with Ms. Lyons.

18                     It is sometimes necessary in cases like

19    this that people are, deponents are subsequently

20    subject to subpoena. Typically, in cases, we ask

21    people for their home addresses so that we can

22    subpoena them.
```

Page 13

1           BY MR. SELDON:

2        Q      Does BPD also perform functions for other

3    elements of the Department of Housing and Urban

4    Development, if you know?

5        A      My particular branch, no.

6        Q      Then let's go back and set the stage.

7    What is your position?

8        A      I'm the manager of the franchise,

9    employee and labor relations branch.

10       Q      What does that mean?  What does that

11   branch do?

12       A      Okay. Actually, there's three areas of

13   program responsibility, employee and labor

14   relations. The workers compensation program falls

15   under me. We contract out with several other

16   agencies to make sure that their workers

17   compensation are processed timely.

18               And the security staff also works for me.

19   Basically, the group that initiates background

20   investigations.

21       Q      What I'd like to do today, unless I tell

22   you otherwise, is to concentrate on what you've

MGB Reporting, Inc.

1    called employee labor relations, what we might call

2    human resources or we might call a personnel

3    function.

4              We really have no interest in workers

5    comp and no interest today in what goes on in

6    security.

7              You said you were the manager of -- and

8    this time we'll say franchise labor relations. Do

9    you have a grade level, sir?

10        A    14.

11        Q    To whom do you answer by title?

12        A    The division director.

13        Q    And who is that by name?

14        A    Nancy Smith.

15        Q    Are you the senior most person who

16   provides this HR function to the Department of

17   Housing and Urban Development, office of inspector

18   general?

19        A    In my branch, yes.

20        Q    And what made you give that qualifier?

21        A    There's a number of other human resources

22   functions, such as staffing, processing. I can't

MGB Reporting, Inc.

```
 1      A       L-a-w-r-i-e.

 2      Q       A lot -- in fact, all -- of what we're

 3   here to talk about today occurred in the year 2002.

 4           Do you recall if Mr. Lawrie was the

 5   primary point of contact then?

 6      A       No, she wasn't.

 7      Q       Do you recall who it was?

 8      A       It would probably be me.

 9      Q       Would you tell us -- and again, from here

10   on in, unless I say to the contrary, when I say

11   BPD, I think you know who I mean -- we are

12   concerned exclusively with the provision of labor,

13   employee relations, HR and personnel functions for

14   the HUD office of inspector general.

15           I will probably refer to it from here on

16   in as BPD. But that's what we mean, unless I tell

17   you to the contrary.

18           Is there a particular person or persons

19   with whom you typically interact at HUD OIG?

20      A       Typically, it would be the first- and

21   second-line supervisors, is where most of the

22   contact is, the vast majority of the contact.
```

MGB Reporting, Inc.

1          Certainly, we have contact with counsel

2    staff, and with our HR counterparts as well.

3          Q    We'll get into some of this. I was asking

4    you because if it was one rule and one rule only,

5    it sometimes saves time.

6          To your knowledge, sir, are there other

7    human resource components or counterparts to yours,

8    meaning BPD, that work with HUD office of inspector

9    general?

10         A    They have their human resources staff.

11         Q    Do you know what the function of OIG's

12   human resources staff is, and how it differs from

13   yours?

14         A    It's basically policy development.

15         Q    What I'd like to do next is go through

16   some of the functional areas that BPD may or may

17   not have a relationship with, with HUD OIG.

18         Is it fair to say that in disciplinary

19   matters, that is something, a function that BPD

20   provides to HUD OIG, in a sense of providing

21   personnel services?

22         A    That's correct.

Page 23

1    matters.

2              Are you with me there?

3    A     Okay.

4    Q     These are matters that I think you said

5    you provide -- is it advice and guidance to HUD

6    OIG, or is it more than that?

7    A     We provide general advice, guidance. If

8    there are documents that need to be drafted, we

9    will draft those.

10             We will work with managers if a 50

11   documenting the action is necessary to make sure

12   that they get it done, that it's in, that it's done

13   properly, that it's placed in the employees

14   official personnel folder.

15             And try to work with the managers to

16   ensure that everything is legally sufficient, and

17   work with them getting through the process.

18   Q     Okay. What I want you to do because this

19   is an important part here, I want you to take a

20   moment and think -- if not, we'll move on.

21             Are there any other functions that you

22   perform for -- you, meaning, BPD -- for HUD OIG

MGB Reporting, Inc.

Page 37

1      2002?

2      A      Yes.

3      Q      What I'd like to ask you, then, if you

4      could elaborate on what the function -- and I don't

5      want you to tell me about the advice they gave you

6      or the advice you solicited.

7              But I would like you to tell me what the

8      function or functions were in 2002 of the office of

9      legal counsel of OIG in disciplinary matters, as

10     you understood it.

11     A      It's simply, once the decision had been

12     made to take a particular action, we would draft

13     the document, the proposal, the decision notice,

14     and then flip it to them for an opportunity for

15     them to comment on, for review for legal

16     sufficiency, basically.

17     Q      You say, once a decision had been made to

18     take disciplinary action.

19     A      Right.

20     Q      Let's talk about, then, that part of the

21     process or processes where such decisions were

22     made.

MGB Reporting, Inc.

Page 38

1          Where were they made as a matter of

2     standard business practice in 2002?

3          A     The immediate supervisor of the employee.

4          Q     Is it fair to say, then, the decision

5     whether or not to take disciplinary action would be

6     the proposed disciplinary action by the immediate

7     supervisor?

8          A     Yes. The immediate supervisor would make

9     their decision to propose an action.

10          Q     Now let's talk about the immediate

11     supervisor's coming up with that decision to

12     propose a particular penalty.

13          How does that process work, or how did it

14     work in 2002?

15          A     Okay. If we were directly involved with

16     it, and --

17          Q     And I take it the standard practice is

18     that you were.

19          A     Okay, yes. And it could develop any

20     number of ways, depending on the severity of the

21     issue at hand.

22          If it's minor misconduct, such as

MGB Reporting, Inc.

Page 39

1   somebody being absent without leave, the supervisor

2   would call us and this is what we have. What do I

3   do?

4           And we would look at the table of

5   penalties, consider what we know the agency as a

6   whole, consider consistency of application across

7   the agency as a whole, and basically give a

8   recommendation.

9           Typically, it would be a range in

10  something like that. Well, you might want to

11  consider reprimanding or a short suspension of one

12  or two days. And then it would be their decision to

13  make.

14          If there was an actual report of

15  investigation, which would typically be where an

16  individual is involved in something more serious,

17  the immediate supervisor and our office would

18  simultaneously be provided a copy of the report of

19  investigation.

20          After we had an opportunity to review it,

21  as well as the immediate supervisor, we would get

22  in contact with them to discuss a possible range of

MGB Reporting, Inc.

Page 40

1    penalties.

2          Here again, consistent with the table of

3    penalties in the HUD OIG policy document,

4    consistent with the past practice of the

5    organization for similar offenses across the board,

6    taking into consideration leave for consistency as

7    much as we could.

8          And from our end of it, we would

9    certainly consider various Douglas factors and

10   provide what we would consider advice, guidances,

11   what we would consider to be an appropriate

12   sanction.

13         Then it pretty much fell up to the

14   proposing official to make the decision.

15   Q    Let's stop right there. You said pretty

16   much fell to the proposing official. I want to know

17   whether --

18   A    It did.

19   Q    Thank you. Good. I had stopped you in

20   mid-sentence for that reason. Is there something

21   more you'd like to add?

22   A    No. It was after a general discussion was

MGB Reporting, Inc.

Page 41

1    held and it was up to the proposing people to make

2    the decision what they wanted to do.

3             And once that decision was made, we would

4    work with drafting the document for them.

5        Q    Okay. The decision on the penalty is up

6    to the proposing official, the supervisor, I take

7    it.

8        A    When you refer to the concept of decision

9    --

10       Q    ~~The proposed penalty is up to the~~

11   supervisor.

12       A    As to what's proposed, right.

13       Q    Okay. Now what I want to do, we've talked

14   a little bit about this. This was an unusual

15   situation where the person only had one supervisor

16   in the field at the time.

17       A    Uh huh.

18       Q    And what I want to make clear is we're

19   not talking about that situation, unless you say

20   today for some reason, that's what applied here.

21       A    No. This was an exception.

22       Q    Right.

MGB Reporting, Inc.

Page 156

1                 ACKNOWLEDGEMENT OF DEPONENT

2         -------------------------------------

3   Re: James Malloy vs. Alphonso R. Jackson

4       Deposition of David Nuhfer, 11/28/06

5         -------------------------------------

6

7

8         I, David Nuhfer, hereby acknowledge

9   that I am the witness testifying in the above-

10   mentioned matter.

11

12   _1/12/07_____    _____

13   Date                     Signature

14           Sworn to before me this

15

16   _____ day of_____

17

18            OFFICIAL SEAL
           NOTARY PUBLIC

19        STATE OF WEST VIRGINIA
       TERESA C. MURRAY
       One Sommerville PCU
       531 5th Street
       Parkersburg, West Virginia 26101
       My Commission Expires Nov. 17, 2007

20                    Notary Public

21

22   My commission expires: