## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **JAMES MALLOY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civ. Action No. 05-1117 (RCL)** |
| | ) | |
| **ALPHONSO R. JACKSON,** | ) | |
| **Secretary of Housing And** | ) | |
| **Urban Development,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### PRELIMINARY STATEMENT

Jim Malloy had an exceptionally successful 29 year career in federal law enforcement (Malloy Decl., ¶¶1, 10-15). In 1993, Mr. Malloy was appointed Assistant Special Agent in Charge ("ASAC") with the Office of Inspector General ("OIG") of the Department of Housing and Urban Development ("HUD") in Ft. Worth, Texas (Id., ¶1). There, he supervised as many as 25 Special Agents and oversaw his Region's most complex criminal investigations (Id., ¶11). Mr. Malloy was "known at the national level in HUD OIG as a top manager" and named National HUD OIG Investigation Manager of the Year in 1999; two years later, he was elected Chair of the federal government's twenty-five agency Southwest Regional Inspector General Council (Chapman Decl., ¶10; Malloy Decl., ¶12). At no time before the events that gave rise to this suit was Mr. Malloy ever placed under investigation, denied a security clearance, disciplined, or even counseled (Malloy Decl., ¶14; Chapman Decl., ¶12).

In October of 2002, Mr. Malloy's unblemished career was ruined, after senior management in OIG Headquarters directed him to start disciplinary proceedings against an African American Special Agent, Cortez Richardson (Malloy Decl., ¶¶51-53; Chapman Decl., ¶¶14-22, 39). Mr. Richardson had been pursuing an EEO complaint against a senior OIG official in Washington, D.C., since May of 2001 (Richardson Dep. at 8-17 & Dep. Exh. 1, 4 at 2). In May of 2002, OIG's Headquarters Office of Legal Counsel received a disciplinary package concerning Mr. Richardson about events that occurred two years earlier (Nuhfer Dep. at 100-02, 138 & Exh. 7, 8). Although the package came with a recommended 60 day suspension, upon its reading, the Legal Counsel's Office concluded that "removal is appropriate" (Id. & Exh. 8).

At that time, OIG Headquarters had the ability to take disciplinary action against Richardson (Nuhfer Dep. at 41 & Dep. Exh. 1 at 2). But it faced an insurmountable problem. Mr. Richardson was the prime witness in a prosecution against his former supervisor, entitled United States v. Finn, 01-CR-184 (D. Colo.). Due to OIG's perjury, destruction of evidence, and attempted intimidation of defense witnesses, the majority of the indictment against Mr. Finn was dismissed on January 11, 2002 (Malloy Decl., Att. A). The remaining counts "proceeded to trial on July 29, 2002;" eventually, they too were thrown by the Tenth Circuit. U.S. v. Finn, 375 F.3d 1033, 1037 (10th Cir. 2004).

The core of Mr. Richardson's EEO complaint was that he was threatened with termination after he testified at the Finn trial (Richardson Dep. at 9-10 & Exh. 1 at 2). OIG was free to do just that once Mr. Richardson testified in late summer of 2002. By that time, however, OIG Headquarters had lost control over Mr. Richardson's career, because in June he had been given a hardship transfer to Mr. Malloy's Region (Malloy Decl., Att. B). That meant that Mr.

Malloy and his supervisor in the field rather than OIG Headquarters became responsible for any discipline for Mr. Richardson (Nuhfer Dep. at 52-53 & Dep. Exh. 2, §1-6.P.).

Mr. Malloy studied the Richardson investigative file very closely for 30 hours, beginning on September 23, 2002 (Malloy Decl., ¶¶29-30). He focused on the evidence of record, Mr. Richardson's conduct, the fact that he was not on-duty, his status as a law enforcement officer, and Mr. Richardson's excellent record (Id., ¶¶38-39, 45). Mr. Malloy also knew that OIG took little or no action in response to misconduct that was off-duty or unrelated to its core mission (Id., ¶¶39-43). He was also "well-aware" that ""non-minority agents in OIG … were not disciplined severely or at all for misconduct like Mr. Richardson's" (Id., ¶44).

On September 30, 2002, Mr. Malloy recommended a five day suspension, which his supervisor imposed and Mr. Richardson served (Malloy Decl., ¶46, Att. C, D; Richardson Dep. at 28-29 & Exh. 8-9). A few days later, OIG Headquarters learned that Mr. Richardson had not been removed (Haban Dep. at 29-31 & Dep. Exh. 6). Inside of a week, OIG placed Mr. Malloy on administrative leave and ordered him off its premises (Haban Dep. at 18 & Dep. Exh. 4; Malloy Decl., ¶¶51-52; Chapman Decl., ¶11). Mr. Malloy filed an EEO complaint in response and was left dangling for over two months (Malloy Decl, ¶62). When it finally allowed Mr. Malloy to return, OIG Headquarters issued a Memorandum "relieving" him "of all managerial responsibilities" and advising him that he "shall no longer serve as an Assistant Special Agent in Charge" (Haban Dep. at 41-42 & Dep. Exh. 7).

When the Richardson file was sent to Mr. Malloy, he was also directed to commence disciplinary proceedings against Steve Romero (Malloy Decl., ¶¶48-49; Chapman Decl., ¶33). A Hispanic agent, Mr. Romero had been cleared of the most serious charge several years earlier (Romero Decl., ¶¶3-4). After studying the file closely, Mr. Malloy issued him a Memorandum

of Caution (Malloy Decl., Att. E).  Mr. Romero had been taunted as a "wetback" by the same agent who ridiculed Mr. Malloy's Native American heritage with verbal assaults like Indians were proof that white men had sex with buffalos (Romero Decl., ¶5; Malloy Decl., ¶18).  Senior OIG management in Washington, D.C., took no action on a complaint filed by Mr. Malloy and eventually appointed the offending agent his successor (Chapman Decl., ¶43).

In three separate ways, Mr. Malloy is entitled to protection under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-16 (incorporating 42 U.S.C. §§2000e-2, 3(a)).  His refusal to discipline two minorities, one of whom had filed an EEO complaint, was protected activity under the Act's opposition clause.  E.g., EEOC v. St. Anne's Hospital of Chicago, 664 F.2d 128, 131-32 (7th Cir. 1981).  Having himself "made a charge" of discrimination and retaliation after being placed on administrative leave, Mr. Malloy was also entitled to protection under the Act's participation clause.  42 U.S.C. §2000e-3(a)).  Singletary v. District of Columbia, 351 F.3d 519, 524 (D.C. Cir. 2003).  Mr. Malloy's Native American heritage, displayed in Region 6 Headquarters and known to OIG, meant that his national origin was protected, as well.  E.g., Nanty v. Barrows, 660 F.2d 1327, 1329 (9th Cir. 1981).

Mr. Malloy also suffered actionable changes in his employment, when he was removed from his supervisory ASAC position, placed under investigation twice, ordered off OIG premises, placed on extended administrative leave, and eliminated from competition for a higher paying supervisory position.  E.g., Velikonja v. Gonzales, 466 F.3d 122, 124-25 (D.C. Cir. 2006); Stewart v. Ashcroft, 352 F.3d 422, 427 (D.C. Cir. 2004); EEOC Compliance Manual on Retaliation, Directive No. 915.003 at 8-14.  Mr. Malloy's prima facie case is cemented by the fact that OIG Legal Counsel's Office viewed removing Mr. Richardson as "appropriate;" by OIG's commencement of an investigation right after learning that Mr. Malloy did not terminate

4

him; and by its initiation of another investigation for Mr. Malloy's "personnel actions taken regarding … Special Agents Cortez Richardson and Steve Romero" (McCarty Dep. at 19-24 & Dep. Exh. 2, 3; Nuhfer Dep. at 100-02, 138 & Exh. 7, 8; Haban Dep. at 29-31 & Dep. Exh. 6).

Since OIG's challenges to plaintiff's prima facie case are painfully ineffectual, its burden is to produce evidence of a "legitimate, nondiscriminatory" or nonretaliatory "reason" for its actions. Czekalski v. Peters, 475 F.3d 360, 364 (D.C. Cir. 2007). OIG argues that Mr. Malloy was punished because he refused "to cooperate fully with an internal investigation" about his former supervisor and for failing to fully coordinate the proposed disciplinary actions involving Mr. Richardson and Mr. Romero (Def. Mot. at 2). Rather than justifying its actions, OIG's reliance on a "flawed investigation" and its failure to consider ten exculpatory witness statements when Mr. Malloy's "reputation and livelihood" were in the balance, is further evidence of its discrimination and retaliation (Haban Dep. Exh. 4, 7; McCarty Dep. at 49-61 & Exh. 8-17). Mastro v. PEPCO, 447 F.3d 843, 855 (D.C. Cir. 2006).

OIG's more favorable treatment of comparators is particularly damning (Salas Dep. at 36-48 & Exh. 1-3; McCarty Dep. Exh. 3; Malloy Decl., ¶24). In May of 2002, Daniel Salas was being promoted from an OIG SAC in the field to Deputy Assistant Inspector General for Investigations, when the Secretary of HUD and senior management in OIG Headquarters were notified that he had been charged with domestic violence involving a handgun (Haban Dep. at 5-16 & Dep. Exh. 1-2). The charges were corroborated in a restraining order (Id., Exh. 3). Senior OIG management never opened a formal investigation into Mr. Salas or required him to give a statement under oath, never placed Mr. Salas on administrative leave, and never relieved him of supervisory duties (Haban Dep. at 8-10, 53-54; Salas Dep. at 36-38, 41-43).

Even the investigation cited by OIG proves how differently it treated Mr. Malloy and another ASAC in Texas, Dan Truxal, who was not involved in the Richardson and Romero disciplinary proceedings (Malloy Decl., ¶24).  Mr. Malloy and Mr. Truxal were both asked to produce personal diaries in an investigation in their former supervisor's supposed misconduct (McCarty Dep. at 24 & Dep. Exh. 3).  Both refused (Id., Dep. Exh. 3 at 2).  OIG's Report of Investigation documents that Mr. Truxal actually "snickered" at the investigators (Id.).  Nonetheless, OIG took no action of any kind against him (Truxal Aff.).

Mr. Malloy's "prima facie case, combined with sufficient evidence to" create a genuine issue of material fact that OIG's "asserted justification" for its actions is "false," mandates the denial of summary judgment.  Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148 (2000).  There is also another, independent ground for denying summary judgment.  Defendant's dispositive motion asserts that the decisions concerning Mr. Malloy were made by Joseph Haban, OIG's Assistant Inspector General for Investigation (Def. Mem. at 5, 6, 7).  But Mr. Haban testified that the most significant actions concerning Mr. Malloy were "collaborative decision[s]" made with Deputy Inspector General Michael Stephens (Haban Dep. at 65-67).  The Deputy Inspector General, however, denied being an active participant in the decisional process or even being aware of most of it (Stephens Dep. at 16-20).  And Daniel Salas, OIG's Deputy Assistant Inspector General for Investigations who issued the Memoranda placing Mr. Malloy on administrative leave and keeping him there, testified that every single word was authored by OIG's Legal Counsel (Salas Dep. at 13, 32-34 & Exh. 1, 11).  This evidence also warrants denying summary judgment, because it shows that OIG's explanation "was fabricated after the fact."  Aka v. Washington Hospital Center, 156 F.3d 1284, 1295 (D.C. Cir. 1998) (en banc).

## STATEMENT OF THE CASE[1]

### Ms. Malloy's Service With HUD OIG

Jim Malloy joined the HUD Office of Inspector General as a Criminal Investigator in October of 1983 (Malloy Decl., ¶10).  He was assigned to the OIG office in Ft. Worth, Texas, which is a part of the agency's Southwest Region or Region 6 (Id.).  In 1993, Mr. Malloy was appointed Assistant Special Agent in Charge ("ASAC") of that office at Grade 14; several years later, he was named National HUD OIG Investigation Manager of the Year in 1999 (Id., ¶1). Mr. Malloy led his office's joint task force with the Federal Bureau of Investigation, and supervised all federal law enforcement support activities after the 1995 bombing attack in Oklahoma City (Id., ¶3; Chapman Decl., ¶¶9-11).

OIG's Southwest Region spans all of Texas, Louisiana, New Mexico, Oklahoma, and Arkansas.  http://www.hud.gov/offices/oig/locations/index.cfm (Malloy Decl., ¶1).  Mr. Malloy made it known for five years that he was interested in the position of ASAC in the Southwest Region's office in Houston, a position that carried with it a higher salary and would place him nearer to his family (Chapman Decl., ¶12 Malloy Decl., ¶15 & Att. Q, R).  The position was opened for competition in mid-December of 2002 (Haban Dep. at 68-69 & Exh. 13).

The Assistant Inspector General for Investigations in HUD Headquarters always viewed Mr. Malloy as doing "an excellent job" as an ASAC in Region 6 (Haban Dep. at 71-74). Nonetheless, OIG selected a far less qualified GS-13 agent who lacked supervisory experience over Mr. Malloy for a higher paying ASAC position in Houston (Haban Dep. at 69-72 & Exh. 14; Chapman Decl., ¶13).  Mr. Malloy was on enforced administrative leave when the position opened, and removed from supervision by the time it closed (Haban Dep. at 18, 41 & Exh. 4, 7).

---

[1]    The abbreviation "Att." refers to documents that are part of the Malloy Declaration. Those identified as "Dep. Exh." were originally attached to depositions.  An "Exh." is attached directly to this Opposition.

Before it did, the new SAC of Region 6 told Mr. Malloy that he would never be considered for it or another supervisory position in the Region (Malloy Decl., ¶¶15, 66; Malloy Dep. II at 56).

Mr. Malloy is a descendent of Native Americans, specifically the Cherokee Indian tribe (Malloy Decl., ¶16). He kept a sculpture in his office of a Native American on a horse that was inscribed "Chief Malloy;" had other Native American artwork in his office; and served as a member of OIG's national recruitment and diversity committee and the Southwest Region's, where he openly discussed his Native American heritage (Id.; Chapman Decl., ¶43).

One of plaintiff's former subordinates harangued Mr. Malloy about his heritage, called him a "half breed," and made comments about Indians being proof that white men had sex with buffalo (Malloy Decl., ¶19). A complaint by Mr. Malloy triggered an investigation in April of 2001 by the OIG Office of Special Investigations (Id.). The individual who headed that office and took no action on the complaint was, when the actions are at issue here arose, the Assistant Inspector General for Investigations in OIG Headquarters (Id.; Haban Dep. at 5). He appointed the offending agent to succeed Mr. Malloy as ASAC (Malloy Decl., ¶19; Chapman Decl., ¶43).

## Organization Of OIG and the Office of Investigations

The mission of the HUD Office of Inspector General includes preventing and detecting fraud, waste, and abuse by individuals and entities who are engaged in the business of providing HUD-sponsored and HUD–financed housing and housing programs through administrative audits and criminal investigations (Am. Cplt./Answ., ¶6). HUD OIG is headquartered in Washington, D.C.; and is headed by the Inspector General, Kenneth Donahue; and the Deputy Inspector General, Michael Stephens (Stephens Dep. at 4-5; Malloy Decl., ¶6).

As Deputy Inspector General, Mr. Stephens serves as the chief operating officer for OIG (Stephens Dep. II at 4, 11-14; Malloy Decl., ¶6). Answering to Mr. Stephens or one of his

subordinates are various OIG Offices, each with a different function (Stephens Dep. II at 11-14). One of these is the Office of Investigations, in which Mr. Malloy was employed, the primary function of which is to conduct the investigations within OIG's jurisdiction that are of a potentially criminal nature (Id.; Malloy Decl., ¶4; Chapman Decl.,¶¶3-5).

The Office of Investigations is headed by an Assistant Inspector General for Investigations, at all times relevant R. Joseph Haban (Stephens Dep. at 12-14: Haban Dep. at 5; Malloy Decl., ¶7). Mr. Haban's Deputy, at all times relevant, was Daniel Salas (Salas Dep. at 5). The investigative activities of the Office of Investigations are carried out in Regional and field offices around the country (Stephens Dep. II at 13-14). These offices are headed by Special Agents in Charge ("SAC's") and Assistant Special Agents in Charge ("ASAC's") (Malloy Decl., ¶8). Both at the supervisory and non-supervisory level, the professional employees of the Office are all Criminal Agents GS-1811's, and are all held to the same standards of conduct for and as federal law enforcement officers (Malloy Decl., ¶5; Chapman Decl., ¶4; Nuhfer Dep. at 57 & Dep. Exh. 2 at 1-3, 6; Nuhfer Dep. at 101-02 & Dep. Exh. 8 at 8).

### Other Components of the OIG and the Office of Investigations

There are several other components of OIG Headquarters with relevance to this case. Each played an important role in the actions that underlie Mr. Malloy's complaint. One is the OIG Office of Legal Counsel, which is separate and apart from HUD's Office of General Counsel itself (Stephens Dep. at 8-9). Another is the Bureau of Public Debt, which contracts to be a personnel department for OIG separate and apart from HUD's (Id. at 9; Nuhfer Dep. at 11-12). The third is the Special Investigations Division, which is responsible for internal investigations of OIG employees including investigations with potential criminal prosecution (McCarty Dep. at 12-13; Malloy Decl., ¶9; Chapman Decl., ¶3).

The Headquarters Office of Legal Counsel plays an active role in the EEO and disciplinary processes. Counsel's Office is present and active at every phase of the administrative complaints process: it represents the agency itself and makes itself available as counsel to individual managers; engages directly in settlement negotiations with complainants, supervises litigation before the EEOC; and serves as co-counsel in federal court (Richardson Dep. at 8-17 & Dep. Exh. 4 at 5; Malloy Decl., Att. F-H; Def. Mot. at 35).

The Office of Legal Counsel is also involved in the disciplinary process, once a decision is made to take disciplinary action (Nuhfer Dep. at 37, 100-02, 138 & Exh. 7, 8). When an agent who is subject to adverse action has only one supervisor in the field or holds a position in OIG Headquarters, the deciding official is in Headquarters with the Office of Legal Counsel (Nuhfer Dep. at 41 & Dep. Exh. 1 at 2 & 2 at 15). Counsel was directly involved in decisions concerning Mr. Malloy and prepared the entire Memorandum placing him on administrative leave and the letter keeping him there (Haban Dep. at 63-64; Salas Dep. at 13, 32-34).

### OIG Headquarters, Mr. Richardson's EEO Complaint, and His Discipline

When Mr. Richardson filed his formal EEO complaint in May of 2001, he was a Special Agent assigned to the OIG field office in Denver, Colorado (Richardson Dep. Exh. 1). That same month, Mr. Richardson's former supervisor, Jeffrey Finn, was indicted for misconduct committed in his official capacity as Special Agent in Charge of that office. U.S. v. Finn, supra, 375 F.3d at 1035-37. Mr. Richardson alleged, among other matters, that a senior OIG official threatened to terminate him, once he testified at the Finn trial (Richardson Dep. at 9-10 & Exh. 1 at 2). That official, Robert Groves, became OIG Headquarters Assistant Inspector General for Investigations; Mr. Haban succeeded Mr. Groves early in 2002, after first serving as his Deputy (Groves Decl., at 1; Haban Dep. at 5; Chapman Decl., ¶6).

Mr. Richardson's EEO complaint would have been settled in April of 2002, but for the fact that OIG's Office of Legal Counsel reneged on the agency's own proposed agreement (Richardson Dep. at 8-17 & Dep. Exh. 2, 3, 4 at 5). That same month, an investigation concerning Mr. Richardson that was begun over two years earlier was completed (Malloy Decl., Att. I). David Nuhfer, who heads up employee and labor relations support for OIG, received the Richardson Report of Investigation and drafted a proposed 60 days suspension in May of 2002 (Nuhfer Dep. at 13-14; 100-02, & Exh. Dep. 7, 8).

According to standard OIG disciplinary practice, Mr. Nuhfer would only draft the Richardson proposed suspension after OIG made a decision to take adverse action (Nuhfer Dep. at 37). Since Mr. Richardson was assigned to the OIG field office in Denver in May of 2002, it would be up to his first line supervisor to propose adverse action (Nuhfer Dep. at 35 & Exh. 1 at 2). For that reason, the proposed 60 day suspension for Mr. Richardson bore the name of his immediate supervisor, Michael Groszkiewicz (Nuhfer Dep. at 101-02, 138 & Dep. Exh. 8).

Mr. Nuhfer has no recollection of ever speaking with Mr. Groszkiewicz about a proposed action (Nuhfer Dep. at 65-66, 104-05). He did, however, send the proposed Richardson disciplinary action to OIG's Office of Legal Counsel (Nuhfer Dep. at 100-02, 138 & Exh. 7, 8). After its initial review, the Legal Counsel's Office concluded that "removal is appropriate" (Id. & Exh. 8).

## Mr. Richardson's Role in the Finn Trial

There is no record of any further action on Mr. Richardson's potential discipline at that time (Malloy Decl., Att. I). There is, however, no doubt about his importance to OIG in the Finn trial, one so important that it prevented HUD OIG from moving forward with its Legal Counsel's recommendation (Richardson Dep. at 9-10 & Exh. 1 at 2). Mr. Richardson was "the special

agent who prepared [a] case expenditure form at" Finn's direction.  U.S. v. Finn, supra, 375 F.3d at 1039.  Finn's expenditure of HUD funds pursuant to this form comprised the remaining charges against him.  Id. at 1037-38.

Richardson unquestionably acted properly in following Finn's direction, and would have been guilty of insubordination had he not (Malloy Decl., Att. C at 3).  Nickerson v. USPS, 49 MSPR 451, 459 (1991); Gragg v. U.S. Air Force, 13 MSPR 296, 299 (1982), dismissed 717 F.2d 1343 (Fed. Cir. 1983).  Mr. Richardson was also forthright in immediately reporting Mr. Finn (Malloy Decl., Att. C at 3).  The proposed 60 day suspension which the Office of Legal Counsel viewed as too lenient faulted Mr. Richardson for his behavior and for allegedly not reporting Finn's misconduct (Nuhfer Dep. Exh. 7, 8 at 6).  That was false (Malloy Decl., Att. C at 3).

### Mr. Richardson's Reassignment

The settlement of Mr. Richardson's EEO complaint which the OIG Office of Legal Counsel reneged on provided for him to be reassigned to Mr. Malloy's office, to be given three weeks of leave to move from Denver to Ft. Worth, and to make himself available for the Finn trial (Richardson Dep. at 12-13 & Dep. Exh. 2 at 2).  That led Assistant Inspector General Haban to seek the concurrence of Mr. Malloy's supervisor Larry Chapman, the Special Agent in Charge of the Southwest Region, in Mr. Richardson's reassignment (Chapman Decl., ¶14).

Mr. Chapman was very leery of being dragged into the matter (Chapman Decl., ¶15).  He "strongly objected" to Mr. Haban and insisted on being "assured" that neither he nor his "management staff was to be involved in any EEO or disciplinary matters directed towards Mr. Richardson" (Chapman Decl., ¶15).  Mr. Haban "assured" Mr. Chapman that any discipline for Mr. Richardson "would be handled either by OIG headquarters or" in Denver (Id.).[2]

---

[2]     Mr. Chapman pursued an appeal to the Merit Systems Protection Board over his treatment by OIG after the disciplinary proceedings against Mr. Richardson and Mr. Romero

Anticipating that his EEO case was going to be settled, Mr. Richardson sold his home in Denver and relocated his family to Oklahoma City (Malloy Decl., Att. B). When the settlement fell through, Mr. Richardson wound up living in a basement apartment in Denver (Id.). Virtually days later, Mr. Richardson's wife was called up for active military duty in a combat zone in Korea (Richardson Hardship Memo.) That left him with three school age children living in Oklahoma while he was in Colorado (Id.). On May 15, 2002, Mr. Richardson requested a hardship transfer (Id.). In mid-June, he arrived in the Southwest Region under Mr. Malloy and Mr. Chapman (Malloy Decl., ¶19; Chapman Decl., ¶17).

## The Disposition of Mr. Richardson's Discipline

Haban broke his word. The month after Mr. Richardson was reassigned, with his role in the Finn trial having ended, Mr. Chapman was contacted about beginning disciplinary proceedings (Chapman Decl., ¶18). In mid-August of 2002, Mr. Haban directed him to do so (Id., ¶19). On September 5, 2002, he was sent a Report of Investigation concerning Mr. Richardson (Chapman Decl., ¶21 & Malloy Decl., Att. I). The ROI boiled down to several charges against Mr. Richardson – two of which related to his alleged "falsification" of an expenditure form at Finn's direction – each emanating years earlier when he had been assigned to Denver (Malloy Decl., ¶¶32, 34 & Att. C).

By the time that the Richardson ROI arrived in Region 6, Mr. Malloy had already spoken to Mr. Nuhfer, who headed OIG's employee and labor relations unit at BPD (Malloy Decl., ¶25 & Att. P. Mr. Nuhfer told Mr. Malloy that Mr. Richardson's conduct warranted "serious" discipline (Id., ¶26). Mr. Malloy objected to OIG trying to "dump this on a diverse supervisor to

---

were completed. Chapman v. HUD, MSPB Docket DA-0752-06-0093-I-3. The case was settled after OIG agreed to clear Mr. Chapman of all charges (Exh. 1).

deal with a diverse employee" (Malloy Decl., ¶27 & Att. P).[3]  Mr. Malloy also disagreed with Deputy Inspector General Stephens and Legal Counsel Saddler that Mr. Richardson deserved to be fired, which he had been told by senior OIG management (Id., ¶46).

Once the ROI arrived, Mr. Chapman gave it to Mr. Malloy, as Mr. Richardson's immediate supervisor, and directed him to review it and decide what disciplinary action to propose (Chapman, Decl., ¶21; Malloy Decl., ¶28).  Mr. Chapman also directed Mr. Malloy to do so before he retired at the end of September (Chapman, Decl., ¶22).

Mr. Chapman had already discussed the Richardson matter with OIG Headquarters and knew that Mr. Malloy had discussed it with Mr. Nuhfer (Chapman, Decl., ¶28).  He understood that the two "were fully empowered to decide the appropriate level of discipline to impose (Id.). For his part, Mr. Malloy understood that Mr. Chapman had coordinated the matter with OIG Legal Counsel and the Bureau of Public Debt (Malloy Dep. II at 51).

Mr. Malloy began his review of the Richardson Report of Investigation during the week of September 23, 2002 (Malloy Decl., ¶29).  Since Mr. Chapman was about to retire, Mr. Malloy only had until the following Monday to complete his work (Id., ¶28; Chapman Decl,, ¶29).

The determination of what penalty to propose was up to Mr. Malloy (Nuhfer Dep. at 38). He took his responsibilities very seriously, beginning by studying the ROI for at least 30 hours (Malloy Decl., ¶36).  Mr. Malloy concluded that Mr. Richardson had acted in accordance with federal personnel law by following Finn's order in preparing an expenditure form and in promptly reporting his suspected misconduct; that he had been truthful and candid with investigators looking into Finn's misconduct; and that he had not misused his agency cell phone (Id.¶¶ 32, 34, 35 & Att. C).  Mr. Malloy sustained two charges of conduct unbecoming an

---

[3]    Mr. Nuhfer has no basis for disputing that Mr. Malloy spoke with him about Mr. Richardson's discipline (Nuhfer Dep. at 92-94).

officer, relating to Mr. Richardson's damage to a truck while off-duty and providing an "X" rated video-tape to other agents (Id. at 33, 36 & Att. C).

Mr. Malloy knew that Mr. Richardson's misconduct was "unrelated to OIG core missions" and "off-duty" (Malloy Decl., ¶¶37, 39). He also knew that misconduct of that nature and worse was not disciplined at all or only lightly when committed by non-minority agents and supervisors under the direction of Headquarters officials or Region 6 (Id., ¶¶ 40-44).

Two non-minority SAC's under the supervision of OIG Headquarters, one of whom acted as SAC of Region 6, had engaged in improper sexual relations with subordinates did so without penalty by Mr. Haban (Malloy Decl., ¶40). Two non-minority agents under the supervision of OIG Headquarters, including the lead investigator in the investigations of Mr. Malloy, had illegally entered the property of Mr. Chapman's neighbors while investigating him; OIG Headquarters knew of the offense and took no action despite the involvement of local Texas police (Id., ¶41). Another non-minority OIG employee assigned to Headquarters had allegedly been untruthful in an official OIG investigation into a lost service weapon and had allegedly sexually harassed a female auditor; yet another had no action taken after being convicted of off-duty drunken driving (Id., ¶42) Headquarters took no action against either man, despite knowing of the charges (Id.). It also took no action against a non-minority agent who improperly referred a matter for criminal prosecution without authority, which later became the subject of litigation in two separate proceedings (Id., ¶43).

On September 30, 2002, Mr. Malloy issued a detailed Memorandum codifying his proposal to suspend Mr. Richardson for five days and his reasons for doing so (Malloy Decl., ¶47 & Att. C). Final disposition was up to Mr. Chapman. With his retirement set to be effective, Mr. Chapman arranged an informal oral reply session with Mr. Richardson to discuss the

proposal later that day (Richardson Dep. at 28-29; Chapman Decl., ¶25). Mr. Richardson had no objection to the procedure or to a five day suspension (Richardson Dep. at 28-29 & Dep. Exh. 9). He asked permission of Mr. Chapman to serve his suspension "as quickly as possible" (Id., Dep. Exh. 9 at 2). Mr. Chapman imposed the suspension on Mr. Richardson in a Memorandum dated September 30, 2002, just before he retired (Id.; Chapman Decl., ¶25).

### The Disposition of Mr. Romero's Discipline

Mr. Malloy was also directed by Mr. Chapman to commence the disciplinary process against Steve Romero, a Hispanic agent (Malloy Decl., ¶48). Mr. Romero had been cleared of the most serious charge several years earlier (Romero Decl., ¶¶3-4; Malloy Decl., ¶49). As he did with the Richardson Report of Investigation, Mr. Malloy studied the ROI concerning Mr. Romero thoroughly (Id.). After doing so, Mr. Malloy concluded that Mr. Romero did not engage in any substantive offense, but that he had not paid close enough attention in filling out certain HUD forms (Id.). Mr. Malloy also knew that an offense of this nature did not warrant a formal reprimand or harsh discipline and, from his experience, that it would not be imposed on a non-minority (Id., ¶50). For that reason, on September 30, 2002, he issued Mr. Romero a Memorandum of Caution, which Mr. Chapman approved before retiring (Id., ¶50 & Att. E).

### Reaction By OIG Headquarters

The reaction of OIG Headquarters to Mr. Malloy's proposals was staggering and career-ending for a member of federal law enforcement. Mr. Haban first learned of the proposals on October 2, 2002, and promptly directed Mr. Malloy to "fax a copy of both the documents" concerning Mr. Richardson and Mr. Romero "to headquarters and the Counsel's Office;" his e-mail mentioned OIG Legal Counsel Brian Saddler by name (Haban Dep. at 27-31 & Dep. Exh. 6). Mr. Malloy did so the next day (Malloy Decl., ¶51 & Haban Dep. Exh. 6).

On October 10, 2002, OIG Headquarters placed Mr. Malloy on administrative leave, ordered him to turn in all of his OIG equipment including computer equipment, prohibited him from entering OIG premises, and "directed to have no contact (verbal, telephonic, electronic, or in writing) with any HUD OIG employees (Salas Dep. at 9 & Dep. Exh. 1; Malloy Decl., ¶52). At the same time, OIG Headquarters opened two overlapping investigations into Mr. Malloy (McCarty Dep. at 12-24 & Dep. Exh. 1-3; Malloy Decl., ¶53). The distinguishing feature of one was its focus on "the personnel actions he took against Special Agents Romero and Richardson" (McCarty Dep. at 12-24 & Dep. Exh. 1-4). OIG Headquarters also elevated Mr. Malloy from a witness to a subject in the investigation of supposed misconduct by Mr. Chapman (McCarty Dep. at 12-24 & Dep. Exh. 1, 3; Malloy Decl., ¶¶55-57, Att. J, K). Over the next two months, these same empty charges would be used to deny Mr. Malloy's request to be taken off administrative leave; and then to remove him as ASAC and relieve him of supervisory duties (Haban Dep. at 41-42 & Dep. Exh. 7; Salas Dep. at 31-34 & Dep. Exh. 10, 11).

## OIG's Pretextual Investigations

The irony of placing Mr. Malloy on administrative leave is apparently wasted on OIG Headquarters. The official who issued the Memo that did so was Daniel Salas, the former Deputy Assistant Inspector General for Investigations (Salas Dep. at 9 & Dep. Exh. 1). Mr. Salas had been the subject of allegations of misconduct several months earlier. They were far more sinister than any ever leveled against Mr. Malloy, but had no repercussions on his career.

Mr. Salas was alleged to have used a weapon and engaged in domestic violence (Haban Dep. at 5-16 & Dep. Exh. 1-2). In May of 2002, these allegations were specifically brought to the attention of the Secretary of HUD, Inspector General Donahue, and Assistant Inspector General Haban (Haban Dep. at 5-16 & Dep. Exh. 1-2). The letter that brought the charges to

their attention identified a specific police report; and they were easily corroborated by Mr. Salas' entry into a restraining order which required him to relinquish his "Sig Sauer 380 caliber pistol" to the local Police Department (Id., Dep. Exh. 1-3). The matter was handled by Mr. Donahue, Deputy Inspector General Stephens, and Mr. Haban; they never had a formal investigation opened, much less placed Mr. Salas on administrative leave or relieved him of supervisory duties (Haban Dep. at 8-10, 53-54; Salas Dep. at 36-38, 41-43). Instead, his ex-wife was interviewed and Mr. Salas asked to provide a written statement not under oath (Salas Dep. at 37).[4]

There was another irony to this whole affair that is apparently also wasted on OIG Headquarters. Mr. Salas himself filed an EEO complaint in 2005 (Salas Dep. at 7). Inspector General Donahue responded by personally removing Mr. Salas from his position (Id. at 8).

### Mr. Malloy's Supposed Violation of OIG Personnel Policies

The unique feature of one of OIG's two sham investigations into Mr. Malloy was that it focused on "the personnel actions he took against Special Agents Romero and Richardson" and "potentially violating the due process rights of SA Cortez Richardson" (McCarty Dep. Dep. Exh. 2 at 3). Neither man was interviewed by Special Agent John Robinson, who headed the "investigation" (Robinson Dep. at 11, 15-26). Furthermore, Richardson had absolutely no problem with the due process he was afforded (Richardson Dep. at 28-29).[5]

### Mr. Malloy's Supposed Interference with the Chapman Investigation

On September 19, 2002, before the disciplinary actions involving Mr. Richardson and Mr. Romero, Mr. Malloy was interviewed as a witness in an investigation into Mr. Chapman (Malloy Decl., ¶56 & Att. J; Robinson Dep. at 52-54 & Dep. Exh. 4 at 2). Mr. Chapman came

---

[4]     The only decisive action OIG took was to seize records from the office of undersigned counsel while he was taking Mr. Salas' deposition, in an attempt to ascertain who had disclosed information concerning his alleged domestic abuse (Haban Dep. at 54-57 & Dep. Exh. 8-10).

[5]     It bears repeating that Mr. Malloy understood that Mr. Chapman had coordinated the matter with OIG Legal Counsel and the Bureau of Public Debt (Malloy Dep. II at 51).

under investigation for supposedly attending to the construction of a new house while on government time (Robinson Dep. at 73-74 & Exh. 5).   The charge was years old and Mr. Chapman had been cleared of it while Mr. Haban headed the division that investigated it (Groves Decl. at 1-2; Chapman Decl., ¶22).

Mr. Malloy was directed to travel to OIG Headquarters and give a follow-up witness statement on October 10, 2002, the week after word of the Richardson and Romero disciplinary matters reached OIG Headquarters (Malloy Decl., ¶¶51, 57).   When he arrived, however, Mr. Malloy was advised that he was now a subject of the investigation (Id., ¶57 & Att. K).   That afternoon, Mr. Malloy was placed on administrative leave (Salas Dep. at 31-34 & Dep. Exh. 10).

OIG asserts that it placed Mr. Malloy on administrative leave for refusing to turn over his personal diaries during the investigation of Mr. Chapman and interfering with it (Salas Dep. at 9 & Dep. Exh. 1; Robinson Dep. at 52-54 & Dep. Exh. 4 at 2).   Mr. Malloy's fellow ASAC in the Southwest Region was also directed to give statements in the same investigation (Robinson Dep. at 52-54 & Dep. Exh. 4).   Like Mr. Malloy, Mr. Truxal also refused to turn over diaries that he considered to be personal in nature (Robinson Dep. at 52-54 & Dep. Exh. 4 at 2).   He even "snickered" at OIG investigators when asked for the documents (Id.).   Unlike Mr. Malloy, Mr. Truxal had not been involved in the Richardson and Romero disciplinary proceedings, and OIG never took any action against him (Malloy Decl., ¶24; Truxal Aff.).

Mr. Malloy was also accused of making a comment at a Region 6 staff meeting that they should "circle the wagons" when investigators asked questions about Mr. Chapman (Def. Mot. at 6).   Janeen Hess, who took official notes of the staff meeting and was present the entire time, denied hearing such a comment; OIG investigators had no reason to doubt her credibility (Robinson Dep. at 42, 44, 46-47, 50-51, 90-91 & Dep. Exh. 3).   At least ten witnesses exonerated

Mr. Malloy during the investigation (McCarty Dep. at 49-61 & Exh. 8-17). He never made the statements attributed to him (Malloy Decl., ¶58 & Att. K at 15-16; Chapman Decl., ¶37).

John McCarty, who was the SAC of the Special Investigations Davison, "[c]ertainly believes that he gave Mr. Haban and Mr. Salas "both sides of the results of the investigation" into Mr. Malloy and Mr. Truxal while it was going on (McCarty Dep. at 12, 28-29, 45). That would have included directing their attention to the ten witnesses who exonerated Mr. Malloy (McCarty Dep. at 49-61 & Exh. 8-17). Although OIG claims that three witnesses implicated Mr. Malloy, Mr. Haban has "no idea" who implicated him (Compare Haban Dep. at 35 with Def. Mem. at 6). Even though one witness alleged that Mr. Truxal had made improper statements, no action was ever taken against him (Malloy Decl., ¶24 & Att. L).

Mr. McCarty also admitted that without a subpoena, OIG had no legal basis for requiring Mr. Malloy to turn over personal diaries (McCarty Dep. at 12, 38). Hoping to be restored to active duty, Mr. Malloy handwrote a letter advising Mr. Salas that he would turn over all of his documents that were not strictly personal and assured Mr. Salas that he wanted to cooperate fully (Salas Dep. at 31-34 & Dep. Exh. 10; Malloy Decl., ¶60). In the interim, Mr. Malloy filed his administrative complaint (Malloy Decl., ¶60 & Att. M). Mr. Salas then refused to return him to active duty (Salas Dep. at 31-34 & Dep. Exh. 11).

**OIG Denies Mr. Malloy's Request To Be Restored To Active Duty**

The week after he was placed on administrative leave, Mr. Malloy's counsel also made a written request that he be restored to active duty (Salas Dep. at 32-34 & Dep. Exh. 10). That request assured Deputy Assistant Inspector General Salas that Mr. Malloy had not withheld any business-related documents and that he had and would cooperate fully with OIG's investigation (Malloy Decl., ¶60). The letter also advised Mr. Salas about Mr. Malloy's use of the EEO

complaints process, which Mr. Malloy had initiated the day before (Salas Dep. Exh. 10 at 2; Malloy Decl., ¶60 & Att. M, N).  Mr. Salas wrote back that Mr. Malloy's actions were viewed as "threats" by "us," stated that Mr. Malloy "acts at his own peril," and directed all further inquiries to OIG's Office of Legal Counsel (Salas Dep. at 31-33 & Exh. 11).

OIG's account of how it reached the decision to keep Mr. Malloy on administrative leave is pure fiction.  Deputy Inspector General Stephens <u>denied</u> <u>knowing</u> that Mr. Malloy had been asked to be restored to active duty, much less that he participated in the decision (Stephens Dep. at 18-19).  Mr. Haban claims that the decision was "made in a collective manner with" Mr. Stephens and the Legal Counsel's Office (Haban Dep. at 63-64).  Mr. Salas testified that the letter he signed denying Mr. Malloy's request was written entirely by the Office of Legal Counsel (Salas Dep. at 34).

## Mr. Malloy Is Relieved of Supervisory Duties

For close to two months after Mr. Malloy's request to be returned to active duty, OIG kept him on administrative leave, barred from the office and from any contact with the office, and under orders not to communicate with any OIG employees (Malloy Decl., ¶62; Salas Dep. at 9 & Dep. Exh. 1,10).  On December 17, 2002, OIG Headquarters returned Mr. Malloy to active duty, but simultaneously "reliev[ed]" him "of all managerial responsibilities" and stripped him of his position as an ASAC (Haban Dep. at 41-42 & Dep. Exh. 7; Malloy Decl., ¶63).

## Mr. Malloy's Elimination from Consideration as ASAC of Houston

Before it returned Mr. Malloy to the workplace as a line agent, OIG announced a vacancy for an ASAC position in Houston (Haban Dep. at 68-69 & Exh. 13; Malloy Decl, ¶64).  The position was on a higher pay scale and Mr. Malloy had expressed an interest in working in Houston to be nearer his family for five years (Malloy Decl., ¶64 & Att. Q, R; Chapman Decl.,

¶12).  Mr. Malloy, at the time, was barred from OIG's computer systems and from speaking with OIG employees ((Haban Dep. Exh. 4; Malloy Decl., ¶65).  For that reason, he had no knowledge that the position was open for competition (Malloy Decl., ¶65).

When Mr. Malloy returned to the office, he did learn about the vacancy (Malloy Decl., ¶66).  By that time, he had just been officially stripped of all supervisory duties, remained under investigation, would never have been considered for the position (Haban Dep. at 70-73 & Exh. 7; McCarty Dep. Exh. 2 at 3).  When the new Special Agent in Charge told Mr. Malloy that he would never be returned to supervisory ranks, despite his interest in the position, Mr. Malloy knew that applying would be futile (Malloy Decl., ¶66; Malloy Dep. II at 56).

With Mr. Malloy out of the competition, OIG selected a former non-supervisory, lower-graded subordinate (Haban Dep. at & Dep. Exh. 15).  Mr. Malloy was eliminated from consideration solely because he was under investigation (Id. at 71-72).  Mr. Haban, Deputy Inspector General Stephens, and Inspector General Donahue were personally involved in the decision to select someone else (Id. at 66-67).

### Mr. Malloy Is Constructively Discharged

Mr. Malloy, like all special agents in the OIG Office of Investigations, is a federal law enforcement officer and serves under especially strict standards of conduct (Malloy Decl., ¶68 & Att. O).  Mr. Malloy had no intention of retiring before he was 57 years old, the mandatory retirement age for federal law enforcement officers under 5 U.S.C. §8336 (Malloy Decl., ¶70). He was 52 when he was constructively discharged, effective January 3, 2003 (Id. & Att. Q).  Mr. Malloy also had aspirations of moving up one level in the Southwest Region and becoming Special Agent in Charge (Id., ¶71).  The position has been filled twice since October of 2002 and is now encumbered by Mr. Salas (Salas Dep. at 4).

Senior OIG management always viewed Mr. Malloy very highly and had no reason to exclude him from promotional opportunities but for its investigations of him (Haban Dep. at 71-74).  Once that happened, the new Special Agent in Charge of the Southwest Region told Mr. Malloy that he had no future in management (Malloy Decl., ¶66).  After he was returned to active duty and stripped of his supervisory duties, OIG gave Mr. Malloy humiliating tasks such as coordinating his office's fleet of cars (Id., ¶72).

A federal law enforcement officer's credibility is vital (Malloy Decl., ¶73; Chapman Decl.,¶40).  A special agent who is under investigation is useless in a criminal prosecution, because any questions about his integrity must be disclosed to the defense (Id.).  Giglio v. United States, 405 U.S. 150, 154 (1972).  Being relieved of supervisory responsibility while under investigation would make Mr. Malloy's continued participation on inter-agency task forces and councils impossible (Malloy Decl., ¶73; Chapman Decl., ¶40).  He was under two on-going investigations; never given any reason to believe that being removed from a supervisory position was temporary; and assigned nothing but menial, non-investigative tasks (Malloy Dep. II at 56, 69; Malloy Decl., ¶74; Haban Dep. at 44-45 & Dep. Exh. 7).

Significantly, OIG refused to close out its investigations favorably and restore Mr. Malloy's reputation before he left (Malloy Decl., ¶76 & Att. F).  The investigations were ended, however, the minute Mr. Malloy left HUD OIG's employ (McCarty Dep. at 14-15, 20 & Dep. Exh. 1 at 3, 2).  With his credibility in tatters, Mr. Malloy's career in OIG was ruined, as are his chances now for outside employment (Chapman Decl., ¶¶41-42; Malloy Decl., ¶¶77-78).

### OIG's Continued Attempt to Discharge Mr. Richardson

OIG made one more attempt to secure Mr. Richardson's termination, this one four and a half months after the Finn trial was over.  On December 9, 2002, Mr. Richardson was ordered to

obtain written opinions from three separate U.S. Attorney's Offices that his preparation of the case expenditure form at Finn's direction did not disqualify him from testifying on <u>Giglio</u> grounds (Richardson Dep. at 31-35 & Dep. Exh. 10).  This is the same alleged offense that Mr. Malloy found did not warrant the imposition of discipline, because Mr. Richardson was required to follow Finn's instruction (Malloy Decl., ¶32 & Att. C).  It occurred in March of 2000 and Mr. Richardson reported it that same day (Richardson Dep. at 31-35 & Dep. Exh. 10).

There was one other highly unusual aspect of OIG's direction to Mr. Richardson.  It was contained in a Memorandum from the new SAC of Region 6 (Richardson Dep. Exh. 10).  The Memo, however, was printed on OIG Headquarters letterhead; and Mr. Davis told Mr. Richardson that OIG's Office of Legal Counsel "prepared the document" (<u>Id</u>. at 35).  In point of fact, this last attempt to secure Mr. Richardson's termination was "another one of those collaborative meetings "with Mr. Haban, "the front office and legal" (Haban Dep. at 86-87).

### OIG's Continued Harassment of Mr. Romero

OIG's actions toward Mr. Romero did not end when Mr. Malloy issued him a Memorandum of Caution (Romero Decl., ¶¶3-4, 6-8).  After he left HUD OIG and joined the IG's Office of another federal agency, Mr. Romero was contacted on two separate occasions by HUD OIG, once as a supposed target of an investigation (<u>Id</u>., ¶11).  Mr. Romero, who had been repeatedly been the subject of unfounded investigations and disciplinary action at HUD OIG, was named "Agent of the Year for the NRC Office of Investigations in 2006" (Romero Decl., ¶12).

**ARGUMENT**

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
MUST BE DENIED**

The framework for analyzing Mr. Malloy's claims was essentially handed down by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Under it, Mr. Malloy can establish a prima facie case of discrimination by demonstrating that he enjoys membership in a protected class and sustained an actionable change in his employment in a circumstance which "gives rise to an inference of discrimination." Stella v. Mineta, 284 F.3d 135, 145 (D.C. Cir. 2002) (quotation omitted); accord, George v. Leavitt, 407 F.3d 405, 412 (D.C. Cir. 2005); Teneyck v. Omni Shoreham Hotel, 365 F.3d 1139, 1150 (D.C. Cir. 1150). A prima facie case of retaliation turns on the causal relationship between protected activity and subsequent action by an employer, and can be established by timing or with the same types of evidence that support an inference of discrimination. E.g., Lathram v. Snow, 336 F.3d 1085, 1094 (D.C. Cir. 2003); Gipson v. Wells Fargo, N.A., 460 F.Supp.2d 15, 25 (D.D.C. 2006).[6] Any "factor" is not relevant." Stella v. Mineta, supra, 284 F.3d at 145.

The burden to establish a prima facie cases is "not onerous." St. Mary's Honor Center v. Hicks, 509 U.S. 502, 515 (1993). Once any challenges to a prima facie case have been surmounted, an employer must produce evidence of a "legitimate, nondiscriminatory" or nonretaliatory "reason" for its actions. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 255 (1981). At that point, "the focus of proceedings … will be on whether the jury could infer discrimination" or retaliation. Aka v. Washington Hospital Center, 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc).

---

[6]    The differing standards of changes in employment that are actionable as retaliatory and those that are cognizable as discriminatory are discussed in Section I.C. of this Opposition, infra.

"Summary judgment is appropriate only if 'there is no genuine issue as to any material fact and … the moving party is entitled to a judgment as a matter of law.'" Lathram, supra, 336 F.3d at 1088 (quoting Rule 56, Fed. R. Civ. P.; citing Anderson v. Liberty Lobby, 477 U.S. 242, 244 (1986)).  The evidence must be viewed "'as favorably to'" a plaintiff "'as reason will permit.'"  Aka, supra 156 F.3d 1294-95 (quoting Shager v. Upjohn Co., 913 F.2d 398, 401 (7th Cir. 1990)).  Mr. Malloy can defeat summary judgment by establishing a "prima facie case, combined with sufficient evidence to" create a genuine issue of material fact that OIG's "asserted justification[s]" for its actions are "false."  Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150-51 (2000); citing Aka, supra, 156 F.3d at 1290.  This he can do handily.

I.     **Mr. Malloy Has Established Prima Facie Cases of Discrimination And Retaliation**

A.     **Mr. Malloy's Protected Activities**

Mr. Malloy engaged in two types of protected EEO activities.

The first was protected under Title VII's opposition clause, which makes it unlawful for "an employer to discriminate against any of his employees" who have "opposed any practice made an unlawful employment." 42 U.S.C. §2000e-16 (incorporating 42 U.S.C. § 2000e-3(a)).[7] Mr. Malloy knew that misconduct similar to and far worse than Mr. Richardson's and Mr. Romero's was either not punished at all or only mildly by OIG when committed by non-minorities; and that OIG Headquarters and BPD wanted Mr. Richardson terminated or severely disciplined (Malloy Decl., ¶¶40-46, 50; Nuhfer Dep. at 13-14; 100-02, & Exh. Dep. 7, 8).  Mr. Malloy engaged in protected opposition, when he refused to propose such disparate, excessive penalties.  E.g., EEOC v. St. Anne's Hospital of Chicago, 664 F.2d 128, 131-32 (7th Cir. 1981);

---

[7]     The imposition of excessive discipline on minority employees is the most basic of unlawful employment practices.  E.g., Villa v. City of Chicago, 924 F.2d 629, 631 (7th Cir. 1991); Trujillo v. Grand Junction Regional Center, 928 F.2d 973, 977 (10th Cir. 1991).

Aman v. Cort Furniture Rental Corp., 85 F.3d 1074 at 1079, 1085 (3rd Cir. 1996).

Mr. Malloy's second EEO activity was protected under Title VII's participation clause, 42 U.S.C. §2000e-3(a). The clause is broad. Its protection extended to Mr. Malloy, when he himself "made a charge" of discrimination and retaliation (Malloy Decl., Att. M). E.g., Singletary v. District of Columbia, 351 F.3d 519, 524 (D.C. Cir. 2003).

### B.    Mr. Malloy's Protected Status

Mr. Malloy's Native American origin has long been recognized as a protected category under Title VII. E.g., Nanty v. Barrows, 660 F.2d 1327, 1329 (9th Cir. 1981). Mr. Malloy kept a statue inscribed "Chief Malloy" on plain view in the Region 6 headquarters office (Malloy Decl., ¶16; Chapman Decl., ¶43). Mr. Malloy served on OIG's recruitment and diversity committees, where he openly discussed his heritage (Id.). When OIG was required to report the number of minorities, Region 6 reported a supervisor with Native American origin; that had to be Mr. Malloy (Malloy Decl., ¶17; Chapman Decl., ¶¶43). Mr. Haban, as SAC of the division that investigated Mr. Malloy's complaint that he had been harassed on account of his national origin, all but certainly knew his national origin (Malloy Dep. II at 40-42; Chapman Decl., ¶43).

### C.    Actionable Changes in Mr. Malloy's Employment

Although largely if not entirely academic here, there are different standards of changes in employment that are cognizable in cases of discrimination and retaliation. The adverse employment action standard which applies to claims of discrimination is higher than the change in employment needed to support a claim of retaliation. Burlington Northern & Santa Fe R.R. v. White, __ U.S. __.126 S.Ct. 2405 (2006). As far as retaliation is concerned, all actions, personnel or otherwise, constitute retaliation if they may have been "materially adverse," meaning that they "well might have dissuaded a reasonable worker from making or supporting a

charge of discrimination." Burlington Northern, 126 S.Ct. at 2415 (internal quotation marks omitted). Discrimination, by contrast, is actionable when it produces material and objective, adverse changes in employment. Brown v. Brody, 199 F.3d 446, 452 (D.C. Cir. 1999).[8]

### i.    Removal of Supervisory Duties and Denial of Consideration for Houston ASAC Position

"[W]ithdrawing an employee's supervisory duties … constitutes an adverse employment action." Stewart v. Ashcroft, 352 F.3d 422, 427 (D.C. Cir. 2004); accord, Burke v. Gould, 286 F.3d 513, 522 (D.C. Cir. 2002). So does denial of consideration for promotion or for a position with higher pay; reassignment with significantly different responsibilities; and impairment of future employment opportunities. Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 761 (1998) (quoting Crady v. Liberty Nat. Bank & Trust Co. of Ind., 993 F.2d 132, 136 (7th Cir. 1993); Stewart v. Ashcroft, supra, 352 F.3d at 426-27. OIG's removal of Mr. Malloy's supervisory duties unquestionably constituted an adverse employment action and sustains a claim of discrimination, as did being denied consideration for a higher paying position as an ASAC in Houston (Malloy Decl., ¶¶65-66; Haban Dep. at 68-73). Stewart, supra; Burke, supra. A fortiori, under Burlington Northern, these actions are also cognizable as retaliatory.[9]

### ii.    Placement On Administrative Leave and Under Investigation

The Supreme Court's decision in Burlington Northern recognized that the EEOC's Compliance Manual on Retaliation speaks authoritatively about adverse actions that support retaliation claims. 126 S.Ct. at 2713-14; accord, Griggs v. Duke Power Co., 401 U.S. 424, 433-34 (1971). The Compliance Manual expressly recognizes that an employer who merely directs a

---

[8]    These standards are different from an adverse action under the Civil Service Reform Act of 1979, which is defined as suspension greater than 14 days, demotion, furlough longer than 30 days, reduction in pay, or removal. 5 U.S.C. §7512.

[9]    Mr. Malloy has withdrawn his claims pertaining to his nonselection for the position of Special Agent in Charge of the entire Southwest Region.

complainant's co-workers to keep him "under surveillance," much less opens a potentially criminal investigation, is liable for retaliation.  EEOC Directive No. 915.003 at 8-14 (Exh. 2). Although the D.C. Circuit has deferred deciding whether an investigation without more is cognizable under Title VII, it has expressly held that an investigation that "placed a cloud over" an employee's "career, which effectively prevents her from obtaining other career-enhancing assignments" or "from receiving promotions" is actionable as discriminatory and retaliatory. Velikonja v. Gonzales, 466 F.3d 122, 124-25 (D.C. Cir. 2006).  OIG's investigations surely placed a "cloud" over Mr. Malloy's continued service as a supervisor, participant in prestigious inter-agency law enforcement enterprises, and eliminated him from consideration as an ASAC in Houston (Chapman Decl., ¶¶40-42; Malloy Decl., ¶¶68-75; Haban Dep. at 70-73 & Exh. 7).

The Supreme Court has also held that "indices that might be unique to a particular situation" can make an employment action cognizable under Title VII.  Burlington Industries, Inc. v. Ellerth, supra, 524 U.S. at 761 (quoting Crady v. Liberty Nat. Bank & Trust Co. of Ind., supra, 993 F.2d at 136).  As a federal law enforcement officer, Mr. Malloy's credibility was essential to the performance of his duties (Chapman Decl., ¶40; Malloy Decl., ¶43).  Being placed on administrative leave and under investigation prevented Mr. Malloy from carrying out even the most basic agent functions.  Giglio v. United States, 405 U.S. 150, 154 (1972).  That made him "tainted in a criminal prosecution" (Chapman Decl., ¶40; accord Malloy Decl., ¶73).

### iii.    Future employment opportunities

Impairment of future employment opportunities also qualifies as adverse employment action under Title VII.  Stewart v. Ashcroft, supra, 352 F.3d at 426-27; Brown v. Brody, supra, 199 F.3d at 457.  OIG's actions "have made it virtually impossible for Mr. Malloy to obtain law enforcement work outside of HUD OIG" (Chapman Decl., ¶¶41-42; Malloy Decl., ¶¶77-78).

The law enforcement community "is a small and insular group;" and "even assuming that any potential future employer would not know about them," Mr. Malloy would be required to disclose OIG's actions and explain "why his supervisory duties were removed" (Chapman Decl., ¶41). Further, in "applying to law enforcement positions, Mr. Malloy would normally have had to undergo a background check" and "disclose that he left HUD after being accused of misconduct," which would all but certainly eliminate him from consideration (Id., ¶42).

### D.    Additional Evidence of OIG's Discrimination and Retaliation

The Supreme Court's original decision which articulated the shifting burdens in employment cases, McDonnell Douglas, sounded in discrimination and retaliation. 411 U.S. at 796. That is why circumstantial evidence that provides a basis for inferring discrimination also provides grounds for establishing a causal connection between adverse action and protected activity. E.g., Lathram v. Snow, supra, 338 F.3d at 1094 The only difference in proof relevant here is that a prima facie case of retaliation may also be established, but need not be established, with nothing more than close temporal proximity between protected activity and subsequent adverse action. E.g., Mitchell v. Baldridge, 759 F.2d 80, 86 (D.C. Cir. 1985). Temporal proximity, however, is not an element of retaliation, but proof of it. E.g., Shirley v. Chrysler First, Inc., 970 F.2d 39, 44 (5th Cir. 1992).

### a.    Temporal Proximity

Although not required, retaliation "may be established by showing that … the employee's protected activity" was followed by "adverse personnel action … shortly after." Mitchell v. Baldridge, supra, 759 F.2d at 86; accord, Shirley v. Chrysler First, Inc., 970 F.2d 39, 44 (5th Cir. 1992). The evidence of close temporal proximity between HUD OIG's knowledge of Mr. Malloy's protected activities and its reactions is undeniable and highly probative.

At the end of the first week or the beginning of the second week of October of 2002, OIG Headquarters learned that Mr. Malloy had not terminated Mr. Richardson or disciplined him or Mr. Romero harshly (Malloy Decl., ¶52; Haban Dep. at 27-31 & Dep. Exh. 6). Within days, it placed Mr. Malloy on administrative leave, prohibited him from entering OIG premises, and "directed" him to have no contact with any HUD OIG employees (Salas Dep. at 9 & Dep. Exh. 1; Malloy Decl., ¶51). At the same time, OIG Headquarters opened two overlapping investigations into him (McCarty Dep. at 12-24 & Dep. Exh. 1-3; Malloy Decl., ¶53). One focused on "the personnel actions he took against Special Agents Romero and Richardson" (McCarty Dep. Dep. Exh. 2 at 3). OIG also elevated Mr. Malloy from a witness to subject in the investigation of Mr. Chapman (Malloy Decl., ¶¶56-57 & Att. J, K).

On October 18, 2002, Mr. Malloy wrote to OIG, requested that OIG return him to active duty, and advised it about his use of the informal EEO process, which he had initiated the day before (Salas Dep. at 32-34 & Dep. Exh. 10; Malloy Decl., & Att. N). On October 28, 2002, Mr. Salas responded in a letter that refused to restore Mr. Malloy and admitted that OIG viewed his use of the administrative complaints process as a threat (Salas Dep. at 31-33 & Exh. 11). In the coming two days, no fewer than ten witnesses exonerated Mr. Malloy, which was brought to the attention of Haban and Salas (McCarty Dep. at 31, 49-61 & Exh. 8-17). Nonetheless, OIG kept Mr. Malloy under investigation and on administrative leave for close to two more months (Haban Dep. Exh. 4, 7; McCarty Dep. Exh. 1-3).

### b.    Treatment of Comparators

"Especially relevant" in establishing a prima facie case is the comparative treatment of employees. McDonnell Douglas, supra 411 U.S. at 804; accord Cones v. Shalala, 199 F.3d 512, 519 (D.C. Cir. 2000). The professional employees of the Office of Investigations at every level,

in the field and in Washington, D.C., are all federal law enforcement officers (Malloy Decl., ¶5; Chapman Decl., ¶4; Nuhfer Dep. at 57 & Dep. Exh. 2 at 1-3, 6; Nuhfer Dep. at 101-02 & Dep. Exh. 8 at 8).  All of them at every level are held to the same standards of conduct (Id.).  An act of misconduct that is arguably an offense for a line agent is also an offense for a senior manager (Malloy Decl., ¶5; Chapman Decl., ¶4).  Therefore, all of these agents are comparators to Mr. Malloy.  Neuren v. Adduci, Mastriani, Meeks & Schill, 43 F.3d 1507, 1514 (D.C. Cir. 1995) (quoting Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 802 (6th Cir. 1994)); Radue v. Kimberly Clark Corp., 219 F.3d 612, 617-18 (7th Cir. 2003).[10]  OIG's treatment of two supervisory agents in particular in comparison to Mr. Malloy is highly revealing.

Dan Truxal, the other ASAC in the Southwest Region, who was also placed under investigation with Mr. Malloy (Malloy Decl., ¶24; Robinson Dep. at 52-54 & Dep. Exh. 4 at 2; McCarty Dep. at 32; Truxal Aff.).  He refused to turn over diaries that he considered to be personal in nature and "snickered" at OIG investigators (Robinson Dep. at 52-54 & Dep. Exh. 4 at 2).  At least one employee gave a statement that Mr. Truxal made improper statements to interfere with the investigation of Mr. Chapman (Malloy Decl., Att. L).  Both men's actions were reported to OIG Headquarters (Robinson Dep. at 70-72; McCarty Dep. at 32).  Nonetheless, OIG took no action against Mr. Truxal, who was uninvolved in the Richardson and Romero disciplinary actions (Truxal Aff.; Malloy Decl., 24).[11]

---

[10]  Any doubt about whether they are "similarly situated … presents a question of fact for" the trier of fact.  George v. Leavitt, 407 F.3d 405, 415 (D.C. Cir. 2005); accord, Gipson v. Wells Fargo, N.A., supra, 460 F.Supp.2d at 30.

[11]  Mr. Haban recalled that Mr. Truxal provided documents to investigators at a later date (Haban Dep. at 22-24).  Even if there were any evidence to support this recollection, which there is not, it would not matter.  Mr. Malloy offered to provide copies to investigators after refusing initially (Salas Dep. at 9 & Dep. Exh. 1).  At that point, the investigator assigned to the case believed that his offer was no longer "relevant" (Robinson Dep. at 99-100).

In May of 2002, when Daniel Salas was an SAC in the field and about to begin as OIG's Deputy Assistant Inspector General for Investigations, he was reported to have engaged in domestic violence involving a handgun (Haban Dep. at 5-16 & Dep. Exh. 1-3). The allegations were reviewed by Mr. Haban, Mr. Stephens and Inspector General Donahue (Id.). None of them ordered the commencement of a formal investigation, placed Mr. Salas on administrative leave, or relieved him of supervisory duties (Haban Dep. at 8-10, 53-54; Salas Dep. at 36-38, 41-43).

### c.    Departure From OIG Standard Business Practices

Retaliation and discrimination can also be proven by "evidence from" the trier of fact "could find" adverse action "inconsistent with the … process that [an employer] established." Lathram v. Snow, supra 336 F.3d at 1093. In addition: "A jury could infer that" when a standard "procedure was not followed," it was due to the fact that an employee "had filed EEOC complaints." Miller v. Fairchild Indus., Inc., 885 F.2d 498, 504 (9th Cir. 1989); accord, Gipson v. Wells Fargo, N.A., supra, 460 F.Supp.2d at 30. In the words of Mr. Nuhfer: "It's just not a matter of business practice to, whenever somebody is being investigated … to immediately place them on administrative leave" (Nuhfer Dep. at 76; accord Nuhfer Dep. at 73-75 & Dep. Exh. 4).

### d.    Slanted Investigation

Evidence of an "investigation" that "was not just flawed but inexplicably unfair" is powerful evidence that an employer's adverse action is discriminatory and retaliatory. Mastro v. PEPCO, 447 F.3d 843, 855 (D.C. Cir. 2006). That is particularly true of "an inquiry on which an employee's reputation and livelihood depended." Id. OIG's investigation of Mr. Malloy was not only slanted and flawed, but used as a device to force Mr. Malloy out. Despite the fact that Mr. Haban and Mr. Salas were advised that Mr. Malloy was cleared early on, he was kept on

administrative leave during his investigation and then removed from OIG's supervisory ranks (McCarty Dep. at 31, 49-61 & Exh. 8-17; Haban Dep. Exh. 4, 7).[12]

### e.    Conflicting Accounts of OIG's Actions

Since this is an employment case, there is another crucial rule of law which must guide the Court on summary judgment.

> [I]t may not make credibility determinations . . .
>
> "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Liberty Lobby, supra, 477 U.S. at 255.

Reeves, supra 530 U.S. at 150-51 (emphasis supplied).    A jury would be well within its province to "conclude that an employer who fabricates a false explanation has something to hide; that 'something' may well be discriminatory" or retaliatory "intent."    Aka v. Washington Hospital Center, supra 156 F.3d at 1294; accord, Holcomb v. Powell, 433 F.3d 889, 897 (D.C. Cir. 2006).  HUG OIG is transparently dishonest and unashamed to boot.

Deputy Inspector General Stephens denies being an active participant in the decisional processes concerning Mr. Malloy and even being aware of many of OIG's actions towards him (Stephens Dep. at 16-20).  That denial is irreconcilable with the account of Assistant Inspector General Haban, who claims that the most significant actions concerning Mr. Malloy were "collaborative decision[s]" made with Mr. Stephens (Haban Dep. at 65-67).[13]    Special Investigation Division SAC McCarty claims to have briefed Mr. Haban and Mr. Salas on the investigations of Mr. Malloy as they proceeded (McCarty Dep. at 31).  Mr. Salas denies that this

---

[12]    Mr. Malloy was the only ASAC Mr. Haban ever placed on administrative leave for misconduct (Haban Dep. at 98).

[13]    This evidence also defeats one of OIG's basic contentions, which is that there is no genuine issue of fact as to whether Mr. Haban acted with discriminatory or retaliatory. Even could this be proven – which it cannot – summary judgment could still not be awarded unless the absence of animus on Mr. Stephens' part were also proven.  Griffin v. Washington Convention Center, 142 F.3d 1308 (D.C. Cir. 1998).

happened (Salas Dep. at 16-27). Furthermore, although Mr. Salas issued the Memoranda placing

Mr. Malloy on administrative leave and keeping him there, every single word was written by

OIG's Legal Counsel (Salas Dep. at 13, 32-34 & Exh. 1, 11).

### II.    OIG's Legal Responses To Plaintiff's Prima Facie Cases Are Erroneous Deficient, And Genuinely In Dispute

Defendant has offered a variety of reasons which purportedly justify an award of

summary judgment (Def. Mem. at 12-35). They are ineffectual and, for the most part,

undifferentiated between challenges to plaintiff's prima facie cases and defenses on the merits.

A recent decision by the D.C. Circuit has refined the application of the McDonnell

Douglas analysis where, as here, an employer offers a factual explanation for its actions:

> [O]nce a defendant has proffered such a nondiscriminatory explanation, it has "done everything that would be required of [it] if the plaintiff had properly made out a *prima facie* case." U.S. Postal Serv. Bd. Of Governors v. Aikens, 460 U.S. 711, 715, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983). At that point, "whether the plaintiff really did so is no longer relevant," and the only question is "'whether the defendant intentionally discriminated against the plaintiff.'" Id. (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)); see Morgan v. Fed. Home Loan Mortgage Corp., 328 F.3d 647, 653-54 (D.C. Cir. 2003); Waterhouse, 298 F.3d at 993 n. 6.)

Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007). The following Sections of this

Memorandum refute defendant's legal challenges to plaintiff's prima facie cases, demonstrate

that its factual arguments are in dispute, and identify key issues that defendant failed to address.

### A.    OIG's Deficient Legal Arguments

### i.    Mr. Malloy's Protected Opposition

Opposition to discriminatory employment practices is protected under Title VII, so long

as it is based on a reasonable belief that the employer's action is unlawful. Parker v. Baltimore

& Ohio R.R. Co., 652 F.2d 1012, 1020 (D.C. Cir. 1981). The protection of the opposition clause

is available even when there is a mistake about an employer's intentions or the legality of its

action.  Id.  OIG contends that Mr. Malloy's opposition was not objectively justified or made in good faith (Def. Mem. at 17).  Its argument is baseless legally and factually.

Even an "erroneous belief that an employer engaged in an unlawful employment practice is <u>reasonable</u>, and thus actionable under §704(a), if premised on a mistake made in good faith.  A good-faith mistake may be one of fact or of law."  <u>Moyo v. Gomez</u>, 40 F.3d 982, 984 (9th Cir. 1994), <u>cert. denied</u>, 513 U.S. 1081 (1995) (emphasis in original) (quoting <u>EEOC v. Crown Zellerbach Corp.</u>, 720 F.2d 1008, 1013 (9th Cir. 1983) (internal quotation marks omitted)).  Mr. Malloy was unquestionably justified in believing that OIG wanted him to propose harsh disciplinary against Mr. Richardson and Mr. Romero.

Even before receiving the Richardson Report of Investigation, Mr. Malloy objected to being involved in his disciplinary proceeding as attempt to force "a diverse supervisor to deal with a diverse employee" whom senior OIG Headquarters officials wanted to fire (Malloy Decl., ¶¶27, 46 & Att. P).  In assessing the Richardson record, Mr. Malloy was keenly aware, from eight specific instances, that by non-minority agents in OIG Headquarters, Region 6, and the remainder of OIG's field operations were not disciplined severely or at all for misconduct like Mr. Richardson's" (<u>Id.</u>, ¶¶40, 43, 46).  He also "believed in good faith that … to discipline Mr. Richardson more severely or to terminate him would have been disparate treatment" (<u>Id.</u>).

The EEOC's Compliance Manual on Retaliation, which the Supreme Court recognizes as authoritative[14], specifically states that:  "Opposition may be nonverbal."  EEOC Directive No. 915.003 at 8-4.  "Opposition can, of course, consist of a refusal to carry out an order or policy," whether stated or implicit.  <u>Moyo v. Gomez</u>, <u>supra</u>, 40 F.3d at 984.  There is no doubt that refusing, as Mr. Malloy did, to cooperate in taking disparate adverse action against minorities is protected opposition.  <u>E.g.</u>, <u>EEOC v. St. Anne's Hospital of Chicago</u>, <u>supra</u>, 664 F.2d at 131-32

---

[14]    <u>Burlington Northern</u>, <u>supra</u>, 126 S.Ct. at 2713-1; <u>Griggs</u>, <u>supra</u>, 401 U.S. at 433-34.

("an employee with" disciplinary "authority" who "is subsequently" subject to adverse action because he took favorable action toward a minority employee "is similarly protected"); Aman v. Cort Furniture Rental Corp., supra, 85 F.3d at 1079 ("refusal to 'gather' more derogatory information" about a minority employee who filed an EEO complaint and "place" it in his "file … represent activities protected under Title VII."); Patterson v. PHP Healthcare Corp., 90 F.3d 929, 942 (5th Cir. 1996); EEOC v. HBE Corporation, 135 F.3d 543 (8th Cir. 1998).

The OIG Office of Legal Counsel unambiguously expressed OIG Headquarters' desire to terminate Mr. Richardson when it wrote that his "removal is appropriate" (Nuhfer Dep. at 100-02, 138 & Exh. 8). That this was the Headquarters' view was confirmed for Mr. Malloy by a senior official in OIG Headquarters (Malloy Decl., ¶46). The head of OIG's personnel servicing area had written a complete disciplinary package for the Office of Legal Counsel after OIG decided to discipline Mr. Richardson, and informed Mr. Malloy that Richardson's misconduct warranted serious discipline (Nuhfer Dep. at 37 & Dep. Exh. 7, 8; Malloy Decl., ¶26). Mr. Romero had already been cleared of the most serious charges against him, and the charges against Mr. Richardson were years old (Romero Decl., ¶¶3-4; Nuhfer Dep. at 13-14; 100-02, & Dep. Exh. 7, 8). OIG continued to threaten the careers of both Mr. Richardson and Mr. Romero when Mr. Malloy would not discipline them excessively and disparately (Richardson Dep. at 31-35 & Dep. Exh. 10; Romero Decl., ¶¶3-4, 6-8). Mr. Malloy's opposition was reasonable, well-justified, and undeniably protected under Title VII.

### ii.    Mr. Malloy's Protected Status

Well before the actions at issue here, Mr. Malloy filed an internal charge that he had been subject to harassment about his Native American origin, a charge that was investigated by a division then headed by Mr. Haban (Malloy Decl., ¶18; Chapman Decl., ¶43). Mr. Malloy

actively participated in OIG national and regional recruitment programs and discussed his Native American heritage when doing so. The Southwest Region, in response to a directive from an Inspector General, identified itself as having a Native American supervisor; it could only have been Mr. Malloy (Id.). Mr. Malloy displayed Native American artwork in his office and learned through his family's rich oral history that he had Cherokee ancestors (Malloy Decl., ¶16; Exh. 3).

OIG offers two equally deficient objections to Mr. Malloy's status as a Native American. One is factual; the other legal. OIG first contends that Mr. Malloy "cannot show that HUD OIG officials were aware of" his national origin (Def. Mot. at 16). Mr. Haban's oversight of the investigation into Mr. Malloy's harassment as a Native American makes that very unlikely (Malloy Dep. II at 41-43; Chapman Decl., ¶43; Malloy Decl., ¶¶18). So does OIG's reporting of Native American supervisor in the Southwest Region (Chapman Decl., ¶43; Malloy Decl., ¶17).

OIG's legal argument is not only meritless, it is also offensive, at least to minorities in this country. OIG contends that Mr. Malloy's national origin is irrelevant, without "documentary proof that he is Native American" (Def. Mot. at 8). In the United States, unlike the Third Reich, minority citizens are not issued identity cards or emblems that identify their religion or national origin. The EEOC's regulations also confirm that an individual's national origin need not be accompanied by membership certificates. 29 C.F.R. §1606.1.[15]

### iii.    Temporal Proximity and Retaliation

A "causal connection … may be established" with evidence that "adverse personnel action took place shortly after" protected activity. Mitchell v. Baldridge, supra, 759 F.2d at 86

---

[15]    OIG's argument is not even supported by a sound interpretation of the one unpublished decision it cites, Becker v. Federal Express Corp., 1996 U.S. Dist. LEXIS 971 at *5, aff'd 1997 U.S. App. LEXIS 3649 (6th Cir. 1997). Becker cannot be read "as holding that [documentary] proof always is necessary" to prove national origin; but only in that case, where the plaintiff had nothing supporting her claim to Native American status except unproven and "self-serving" assertions attesting to her national origin. Eriksen v. Allied Waste Systems, Inc., 2007 WL 1003851 *3 (E.D. Mich.).

(emphasis supplied). There is, however, no requirement that causation be proven in this manner. Shirley v. Chrysler First, supra, 970 F.2d at 44; accord, Kachmar v. SunGard Data Systems, Inc., 109 F.3d 173, 177-78 (3rd Cir. 1997); Gipson v. Wells Fargo, N.A., 460 F.Supp.2d 15, 25 (D.D.C. 2006). Nonetheless, defendant argues that the die was cast about Mr. Malloy's treatment before he engaged in protected activity, which renders temporal proximity meaningless (Def. Mem. at 26-28). This argument is both untrue and irrelevant.

Mr. Malloy had never been subject to discipline of any nature before the Richardson and Romero disciplinary actions (Malloy Decl., ¶14; Chapman Decl., ¶12). Immediately after learning of his protected refusal to discipline them excessively and disparately, OIG opened two investigations into Mr. Malloy – one specifically concerning his actions in these personnel matters; placed him on administrative leave; and barred him from the office (Salas Dep. at 9 & Dep. Exh. 1; Malloy Decl., ¶¶52-53; McCarty Dep. at 12-24 & Dep. Exh. 1-3; Malloy Decl., ¶53). And immediately after learning about Mr. Malloy's informal EEO complaint, OIG refused to return Mr. Malloy to active duty even though he was exonerated by ten witnesses (McCarty Dep. at 49-61 & Exh. 8-17; Salas Dep. at 31-33 & Exh. 11).

Mr. Malloy's prima facie case therefore, properly rests in part on temporal proximity. Section I.D. of this Opposition marshals considerably more evidence, including OIG's treatment of comparators (§I.D.b.); departure from its standard business practices (§I.D.c.); reliance on a slanted investigation (§I.D.d.); and conflicting accounts of its actions (§I.D.e.). This evidence establishes Mr. Malloy's prima facie independent of proximity. E.g., Lathram v. Snow, supra, 338 F.3d at 1094. When combined together, the case is especially powerful.

iv.    **Adverse Employment Actions and Material Adverse Actions**

OIG's fails to mention the most basic principle governing arguments about whether particular actions are cognizable under Title VII.

> Whether a particular [personnel action] constitutes an adverse action for purposes of Title VII is generally a jury question.

Czekalski v. Peters, supra, 475 F.3d at 365.  It also relies on precedent that OIG admits was "[p]rior to the Supreme Court's decision in Burlington Northern" (Def. Mot. at 21).

The short of this matter is that Mr. Malloy was placed on administrative leave and barred from the office, placed under investigation, relieved of supervisory duties, and prevented from applying or even being considered for another higher paying position (Malloy Decl., ¶¶64-66 & Att. Q, R; Haban Dep. ¶70-73).  Section I.C. of this Opposition demonstrates that these are decidedly adverse employment actions and constituted discrimination, and material adverse actions that amounted to retaliation.  Ellerth, supra, 524 U.S. at 761; Velikonja v. Gonzales, supra, 466 F.3d at 124-25; Stewart v. Ashcroft, supra, 352 F.3d at 427.  Mr. Malloy's status as a federal law enforcement officer, "unique to [his] particular situation," means that the adverse changes in his employment are actionable.  Ellerth, supra, 524 U.S. at 761.  "Context matters" and in the context of Mr. Malloy's employment, OIG's actions were fatal to his career (Chapman Decl., ¶¶39-42; Malloy Decl., ¶¶66-77).  Burlington Northern, supra, 126 S.Ct. at 2416 (quoting Washington v. Illinois Dept. of Revenue, 420 F.3d 658, 661 (7th Cir. 2005)).

OIG makes a last ditch effort to defend keeping Mr. Malloy dangling under investigation on the ground that "he remained on administrative leave longer than he might have otherwise at his own request" (Def. Mot. at 2, 30).  There is no evidence cited in support of this contention and it is absurd.  For a total of five business days in December of 2002, while the parties were in settlement talks, Mr. Malloy remained on administrative leave in order to avoid the humiliation

of being relieved of duty or having an adverse investigative report issued (Malloy Decl., ¶76 & Att. F). On December 17, 2006, the day after OIG refused to clear Mr. Malloy, it stripped him of his supervisory position and returned him to duty (Id.; Haban Dep. Exh. 7).

### iv.    Consideration for Houston ASAC Position

The position of an ASAC in Houston is a higher paying one than the ASAC position held by Mr. Malloy (Malloy Decl., Att. Q, R). Mr. Malloy had expressed his interest in becoming ASAC in Houston to Mr. Chapman for five years, in order to be closer to his family (Malloy Decl., ¶15; Chapman Decl. ¶12). Mr. Malloy had no knowledge that the position became open because, at the time, he was barred from OIG's computer systems (Haban Dep. Exh. 4, 13; Malloy Decl., ¶65). When he returned, he was relieved of all supervisory duties, remained under investigation, and was informed that he would not be considered for another supervisory position in Region 6 (Id., ¶66 Haban Dep. at 70-73 & Exh. 7; McCarty Dep. Exh. 2 at 3).

With Mr. Malloy out of the competition, OIG selected a former non-supervisory, lower-graded subordinate (Haban Dep. at 70-74 & Dep. Exh. 15: Malloy Decl., ¶67 & Att. R). OIG nonetheless argues that Mr. Malloy's claim over the Houston ASAC position is inchoate, because "he did not apply for" it (Def. Mot. at 25). The EEOC Compliance Manual on Retaliation deals with this very issue and specifies that: "Retaliatory acts designed to interfere with an individual's prospects for employment are unlawful regardless of whether they cause a prospective employer to refrain from hiring the individual;" the "fact that the reference did not affect the individual's job prospects may affect the relief." EEOC Directive No. 915.003 at 8-12, 13 (citing, among other authorities, Hashimoto v. Dalton, 118 F.3d 671, 676 (9th Cir. 1997); Smith v. Secretary of Navy, 659 F.2d 1113, 1120 (D.C. Cir. 1981). Moreover: "When a person's desire for a job is not translated into a formal application solely because of his

unwillingness to engage in a futile gesture, he is as much a victim of discrimination as is he who goes through the motions … " International Brotherhood of Teamsters v. United States, 431 U.S. 324, 365-66 (1977); accord, EEOC v. Metal Serv. Co., 892 F.2d 341, 349 (3rd Cir. 1990).

### B. Defendant's Failure To Adduce Evidence About Critical Factual Issues Demands The Denial of Summary Judgment

With defendant's legal objections to plaintiff's prima facie case having been surmounted, Mr. Malloy's prima facie case was "properly made out." Czekalski, supra, 475 F.3d at 364. Once established, it gave rise to an inference of discrimination which, like inferences of every nature, is mandatory on summary judgment. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993). In order to be awarded summary judgment, this inference compelled HUD OIG to "'produc[e] evidence' that" its "actions were taken 'for a legitimate, nondiscriminatory [and nonretaliatory] reason.'" Aka, supra 156 F.3d at 1289 (emphasis supplied). It did not.

The written recommendation by OIG's Headquarters Office of Legal Counsel to terminate Mr. Richardson was produced by OIG and among the subjects of the deposition of its head personnel specialist (Nuhfer Dep. at 100-02, 138 & Exh. 7, 8). The contrast between Mr. Malloy and his comparators was thoroughly fleshed out in discovery (Haban Dep. at 5-16, 53-54 & Dep. Exh. 1-3; Salas Dep. at 36-38, 41-43; Robinson Dep. at 52-54 & Dep. Exh. 4 at 2). So were the conflicting accounts of OIG's actions toward Mr. Malloy, the role of its Legal Counsel, and OIG's departure from its standard practice in placing Mr. Malloy on administrative leave and  (Stephens Dep. at 16-20; Haban Dep. at 65-67, 98; Salas Dep. at 13, 16-27, 32-34; Nuhfer Dep. at 76). Failing to respond to the inferences created by this evidence compels the denial of summary judgment. St. Mary's Honor Center, supra, 509 U.S. at 506.

C.      There Are Many Genuine Issues Of Material Fact About
        The Reasons Advanced By Defendant For Its Actions.

Any number of times, in both en banc and panel decisions, the "D.C. Circuit [has] observed that '[u]sually, proffering evidence from which a jury could find that [the employer's] stated reasons ... were pretextual ... will be enough to get a plaintiff's claim to a jury.'"  Kalinoski v. Gutierrez, 435 F.Supp.2d 55, 68 (D.D.C. 2006) (Bates, J.) (quoting George v. Leavitt, supra, 407 F.3d at 413; Carpenter v. Federal National Mortgage Ass'n, 165 F.3d 69, 72 (D.C. Cir. 1999)).  At this stage, all of the evidence plaintiff presents must be considered and all of it viewed in the light most favorable to plaintiff.  "This includes '(1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanations … and (3) any further evidence."  Teneyck, supra, 365 F.3d at 1151; (quoting Dunaway v. Int'l Bhd. of Teamsters, 310 F.3d 758, 763 (D.C. Cir. 2002); Waterhouse v. Dist. of Columbia, 298 F.3d 989, 993 (D.C. Cir. 2002)).  The D.C. Circuit has stressed that the "'prima facie case is part of the evidence we must consider in addressing'" the propriety of summary judgment.  Czekalski v. Peters, supra, 475 F.3d at 365-66 (quoting George v. Leavitt, supra, 407 F.3d at 413).

Defendant has offered only one defense on the merits for its actions toward Mr. Malloy: he was under investigation for not having coordinated the Richardson and Romero disciplinary actions and because he had supposedly said in a staff meeting that agents should "circle the wagons" if questioned by the Special Investigations Division about Mr. Chapman (Def. Mot. at 2, 4).  OIG's defense is deficient as a matter of law, because "Title VII is violated when an employer is motivated by retaliatory animus, even if valid objective reasons for the [adverse action] exist."  Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2nd Cir. 1993); accord, Mastro, supra 447 F.3d at 843.  The issue is whether the employer's response was disparate or

excessive.  E.g., Jalil v. Advel Corp., 873 F.2d 701 (3rd Cir. 1989), cert. denied 493 U.S. 1990);

Leonard v. City of Frankfort, 752 F.2d 182, 195 (6th Cir. 1985).

Placing an agent on administrative leave is "not customary;" it is done "very rarely," and

was never done by Mr. Haban (Nuhfer Dep. at 73-75 & Dep. Exh. 4; Haban Dep. at 98; Haban

ROI Aff. at 3).  Mr. Malloy understood that Mr. Chapman had coordinated the matter with OIG

Legal Counsel and the Bureau of Public Debt (Malloy Dep. II at 51).  Moreover, Mr. Richardson

was completely satisfied with his disciplinary process (Richardson Dep. at 28-29), and as it was

unquestionably proper, as OIG admitted (Nuhfer Dep. at 153).  DeSarno v. Department of

Commerce, 761 F.2d 657, 660 (Fed. Cir. 1985).  In Mr. Chapman's experience as a SAC, "no

HUD OIG manager has ever been criminally investigated … had his supervisory responsibilities

removed, or disciplined for not coordinating a personnel issue" (Chapman Decl., ¶¶30).[16]

### III.    Plaintiff Was Constructively Discharged

A constructive discharge is established with proof that an employer has rendered an

employee's "working conditions … so intolerable that a reasonable person … would have felt

compelled to resign."  Pennsylvania State Police v. Suders, 124 S.Ct. 2342, 2351 (2004).[17]

There is also a requirement to show that "aggravating factors" triggered the employee to resign.

Clark v. Marsh, 665 F.2d 1168, 1174.  (D.C. Cir. 1981).  It is satisfied by "extreme mistreatment

or thinly veiled (or even overt) threats of termination."  Kalinoski, supra, 435 F.Supp.2d at 78.

When a "constructive discharge is based on a collection of events that precipitated an

employee's resignation" it is not a claim but a remedy relating to "potential recovery."

---

[16]    Mr. Truxal's treatment bore this out.  He was not placed on administrative leave
or stripped of his supervisory position, even though he also refused to provide his personal
records (McCarty Dep. at 24 & Exh. 3).  Mr. Truxal was treated more favorably, despite the fact
that one witness heard him make a statement interfering with OIG's investigation (Malloy Decl.,
Att. L).

[17]    Suders aligned precedent in the Circuits and relieved a plaintiff of having to prove that
the employer intended to force his resignation.  124 S.Ct. at 2351.

Kalinoski, supra, 435 F.Supp.2d at 73 (citing Knabe v. Boury Corp., 114 F.3d 407, 407 n. 1 (3rd Cir. 1997); EEOC v. R.J. Gallagher Co., 959 F. Supp. 405, 408 (S.D. Tex .1997), rev'd on other grounds, 181 F.3d 645 (5th Cir. 1999).  Unless and until Mr. Malloy recovers, there is no imperative to consider whether he was constructively discharged and remains entitled to backpay following the date of his resignation.

Even if considered now, Mr. Malloy was a federal law enforcement officer whose very career turned on his satisfying uniquely high standards of conduct and being free from any hint of misconduct much less being under active investigation (Chapman Decl., ¶¶40-42,Malloy Decl., ¶73-78).  "Context matters" in ascertaining the severity of an employer's actions, as do "indices that might be unique to a particular situation."  Burlington Northern, supra, 126 S.Ct. at 2416; Ellerth, supra, 524 U.S. at 761.  Defendant's actions toward Mr. Malloy were career-ending (Chapman Decl., ¶¶41-42; Malloy Decl., ¶¶77-78).  OIG all but ensured that Mr. Malloy will never clear another background check and work in law enforcement again (Chapman Decl., ¶¶41-42).  Only being assigned menial tasks while facing investigations of indeterminate length caused Mr. Malloy's constructive discharge (Malloy Dep. II at 69; Malloy Decl., ¶¶72-74).

Respectfully submitted,


_____/s/_____
Robert C. Seldon, Esq.,
 D.C. Bar No. 245100


_____/s/_____
Molly E. Buie, Esq.,
 D.C. Bar No. 483767
Robert C. Seldon & Associates, P.C.
1319 F Street, N.W., Suite 305
Washington, D.C.  20004
(202) 955-6968