# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **JAMES MALLOY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 05-1117 (RCL)** |
| | ) | |
| **ALPHONSO R. JACKSON,** | ) | |
| **Secretary of the U.S. Dept. of** | ) | |
| **Housing and Urban Development,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

### PLAINTIFF'S STATEMENT OF GENUINE ISSUES

Plaintiff to the above action respectfully submits the following Statement of Genuine Issues, in accordance with LCvR 56.1.

I.    Plaintiff hereby responds to Defendant's Statement of Material Facts, utilizing the same system of paragraph numbering, as follows:

<u>Employment Background</u>

1. James Malloy, the Plaintiff, is a former Assistant Special Agent in Charge (ASAC) in Region 6 of HUD OIG, assigned to Fort Worth, Texas. (Complaint (hereinafter Compl.) paras, 1, 3, 8). Plaintiff began his employment with HUD OIG in 1983. Exhibit 1, Malloy Deposition (Malloy) 12:14-16. For the entirety of his employment with the Agency, he only worked at the Fort Worth, Texas office. Exh. 1, Malloy 13:3-5.

Response:    Admit.

2.  Larry Chapman became the Special Agent in Charge ("SAC") at Fort Worth in 1991. Plaintiff 21:19-20.  SAC Chapman promoted Plaintiff to ASAC in 1993. Exh. 1, Malloy 21:21-25.

    Response:        Admit.

<u>Richardson and Romero Disciplinary Cases</u>

3.  In July 2002, Jeffrey Finn, a former SAC for the Rocky Mountain Region, was convicted of knowingly and willfully making a false document.  Exhibit 2, (Richardson Deposition Exhibit 6); <u>see also United States v. Finn</u>, 375 F.3d 1033, 1036-37, 1040 (10th Cir. 2004).[1]  Special Agent ("SA") Cortez Richardson, who worked under Finn's supervision in the Rocky Mountain Region, had a role in falsifying the document, and he testified for the Government at Finn's trial. Exhibit 3 (Richardson Deposition ("Richardson")), 11:13-17; 32:15-19; 32:1-6, 20-22; 33:1-5, and Deposition Exhibit 9; <u>see also Finn</u>, 375 F.3d at 1036.

    Response:        Plaintiff denies the allegations contained in the first sentence of this paragraph.  By way of further answer, plaintiff states that due to OIG's perjury, destruction of evidence, and attempted intimidation of defense witnesses, the majority of the indictment against Mr. Finn was dismissed on January 11, 2002 (Malloy Decl., Att. A).  The remaining counts "proceeded to trial on July 29, 2002;" eventually, they too were thrown by the Tenth Circuit.  <u>U.S. v. Finn</u>, 375 F.3d 1033, 1037 (10th Cir. 2004).

    Plaintiff denies the allegations contained in the second sentence of this paragraph, except to admit that Mr. Richardson testified for the Government in

---

[1] Specifically, the Court of Appeals reversed Finn's conviction on the grounds that the government's evidence  necessary to support a finding of materiality were not submitted during the government's case-in-chief.  <u>Finn</u>, 375 F.3d at 1039-40.

U.S. v. Finn, 01-CR-184 (D. Colo.); that he acted involuntarily and as required by federal personnel law in following Mr. Finn's instructions and would have been guilty of insubordination had he not (Malloy Decl., Att. C at 3); Nickerson v. USPS, 49 MSPR 451, 459 (1991); Gragg v. U.S. Air Force, 13 MSPR 296, 299 (1982), dismissed 717 F.2d 1343 (Fed. Cir. 1983); and that Mr. Richardson was also forthright in immediately reporting Mr. Finn to his immediate supervisor (Malloy Decl., Att. C at 3).

4. Around June 2002, HUD OIG transferred SA Richardson from the Rocky Mountain Region to the Fort Worth Region, i.e., Region 6.  (Compl. para. 15). While he was assigned to the Rocky Mountain Region, SA Richardson was investigated for his role in the misconduct at issue in the Finn case.

Response:      Plaintiff admits the allegations contained in the first sentence of this paragraph.  Plaintiff objects to the allegations contained in the second sentence of this paragraph because they are unsupported by citation to undisputed evidence of record, as required by LCivR 56.1, and because as demonstrated above, Mr. Richardson did not engage in any misconduct.

5. The Assistant Inspector General for Investigations ("AIGI") R. Joseph Haban sent the Report of Investigation ("ROI") regarding the SA Richardson investigation to SAC Chapman on or about September 5, 2002, telling SAC Chapman that the "recommending official for this matter will be the [ASAC] currently supervising Agent Richardson and the deciding official will [be] the [SAC], Region 6." Exhibit 4, Richardson Deposition at Exhibit 7.

Response:      Admit.

6.  At about the same time, Region 6 also received an ROI for a separate
    investigation on SA Steve Romero for consideration and action. (Compl. para.
    22).

    Response:    Admit.

7.  AIGI Haban did not know who the proposing official would be for any discipline
    imposed on SA Richardson until after the disciplinary action was completed.
    Exhibit 5, Haban Deposition ("Haban") 27:23-25; 28:3-8.  AIGI Haban was not
    aware that ASAC Malloy, as opposed to one of two other ASACs in the region,
    was SA Richardson or SA Romero's immediate supervisor. See id.

    Response:    Plaintiff denies the allegations contained in this paragraph
    (Chapman Decl., ¶20).

8.  As the first-line supervisor for SA Richardson and SA Romero, Plaintiff was the
    recommending or proposing official for imposing discipline on those special
    agents; SAC Chapman, as the second-line supervisor, was the deciding official in
    both cases.  Exh. 1, Malloy 94:9-18.

    Response:    Plaintiff denies the allegations contained in this paragraph, except
    as specifically admitted below.  By way of further answer, plaintiff states that the
    designation of him and Mr. Chapman to serve as proposing and deciding officials
    respectively was made by Mr. Haban (Chapman Decl., ¶15) as permitted by OIG
    Policy (Nuhfer Dep. Exh. 2, §§1-1.A., 1-4.  Plaintiff admits the allegations
    contained in this paragraph, insofar as the Romero disciplinary matter is
    concerned.

9. Plaintiff considered the following allegations against SA Richardson in proposing

discipline: 1) damaging private property owned by a third party (i.e., a tow truck)

by kicking it; and 2) altering a receipt supporting a federal expenditure in order to

conceal inappropriate behavior of Finn.  Exhibit 6, Malloy Deposition II ("Malloy

II") 15:4-21, 16:17-25, 17:1-3.

Plaintiff denies the allegations contained in this paragraph, except to admit that

the allegations against Mr. Richardson identified by defendant comprised some of

the allegations that were considered by Mr. Malloy and some of the factors that he

considered in the Richardson disciplinary matter (Malloy Decl., ¶¶32-44 & Att.

C).

10. For SA Romero's proposed discipline, Plaintiff considered the following

allegations: 1) not being truthful about the reasons for his departure from the

Austin Police Department; and 2) not paying credit card bills.  Exhibit 7, Sworn

Interview of James Malloy, Oct. 10, 2002, 37-39.

Response:    Plaintiff denies the allegations contained in this paragraph, except

to admit that the allegations against Mr. Romero identified by defendant

comprised some of the allegations that were considered by Mr. Malloy and some

of the factors that he considered in the Romero disciplinary matter (Malloy Decl.,

¶¶49-50 & Att. E).

11. Prior to October 2002, Plaintiff testified that he had one conversation with

personnel specialist, Dave Nuhfer, regarding SA Richardson's discipline. Exh. 1,

Malloy I, 106:9-25; 107: 1-2; 108:21-25.

Response:    Plaintiff admits the allegations contained in this paragraph and, by way of further answer, states that on or about August 29, 2002, he spoke with Mr. Nuhfer and objected to being involved in the Richardson disciplinary proceeding as attempt to force a diverse supervisor to deal with a diverse employee who OIG Headquarters wanted to fire (Malloy Decl., ¶¶27, 46 & Att. P).

12. Plaintiff never had discussions with AIGI Haban, Deputy Inspector General ("DIG") Stephens, or Inspector General Donohue regarding his concerns as the proposing official on SA Richardson. Exh. 1, Malloy I, 109:6-15.

Response:    Plaintiff admits the allegations contained in this paragraph and, by way of further answer, states that Lester Davis, who was acting as Mr. Haban's Deputy Assistant Inspector General for Investigations, told Mr. Malloy that Deputy Inspector General Stephens and IG Counsel Saddler wanted Mr. Richardson fired (Malloy Decl., ¶46).

13. AIGI Haban did not believe SA Richardson should be fired for his misconduct, and no one ever told AIGI Haban that SA Richardson should be fired. Exh. 5, Haban 105:2-10.  When AIGI Haban sent the SA Richardson and SA Romero cases to Region 6, he expected nothing would happen.  Exh. 5, Haban 105:19-25 and 106:1-11.

Response:    Plaintiff denies the allegations contained in this paragraph and, by way of further answer, states that Lester Davis, who was acting as Mr. Haban's Deputy Assistant Inspector General for Investigations, told Mr. Malloy that Mr. Haban among other OIG Headquarters officials wanted Mr. Richardson fired (Malloy Decl., ¶46); and that OIG Legal Counsel, which is located in OIG

Headquarters and serves as counsel to OIG management in EEO complaints and disciplinary matters, expressed the belief on behalf of senior OIG management that removal was the appropriate penalty for Mr. Richardson (Stephens Dep. at 8-9; Richardson Dep. at 8-17 & Dep. Exh. 4 at 5; Malloy Decl., Att. F-H; Def. Mot. at 35; Nuhfer Dep. at 37, 100-02, 138 & Exh. 7, 8).

14. Although Plaintiff was the proposing official for the discipline of SA Richardson, SAC Chapman drafted most of the document proposing a five-day suspension for SA Richardson. Exh. 1, Malloy I, 114:16-25; 114:1.

Response:      Plaintiff admits the allegations contained in this paragraph and, by way of further answer, states that doing so was perfectly proper under federal personnel law (Nuhfer Dep. at 153).  DeSarno v. Department of Commerce, 761 F.2d 657, 660 (Fed. Cir. 1985); and that all of the reasoning, analysis, and penalty determination were his either entirely or in great part (Malloy Decl., ¶47).

15. On September 30, 2002, the Plaintiff proposed a five-day suspension for SA Richardson, and on the same date SAC Chapman decided to impose Plaintiff's proposal.  Malloy 119:8-19.  In addition, on September 30, 2002, Plaintiff gave SA Romero a Letter of Caution for not accurately reporting his reasons for leaving the Austin Police Department.  Exh. 1, Malloy I, 122:20-25; 123:1; 128:1-9; Compl. para. 25.

Response:      Plaintiff admits the allegations contained in the first sentence of this paragraph.  Plaintiff denies the allegations contained in the second sentence of this paragraph (Malloy Decl., ¶¶49-50 & Att. E).

16. At the end of the business day on September 30, 2002, SAC Chapman retired
from HUD OIG employment.  Exh. 1, Malloy I, 20-24.

Response:     Plaintiff admits the allegations contained in this paragraph.

17. Under OIG's policies and procedures on employee misconduct, the Plaintiff was
the proper proposing official for any disciplinary action for both SA Richardson
and SA Romero.  Exhibit 8, Nuhfer Deposition Exhibit 3, HUD OIG Manual
Chapter 1752, "Disciplinary and Adverse Actions," July 19, 2002 ("HUD OIG
Manual Chapter 1752"), § 1-6(Q); Compl. paras. 19, 23).

Response:     Plaintiff denies the allegations contained in this paragraph, except
as specifically admitted below.  By way of further answer, plaintiff states that Mr.
Malloy and Mr. Chapman were fully authorized to decide the appropriate level of
discipline, if any, to impose on Mr. Richardson (Chapman, Decl., ¶28) as
permitted by OIG Policy (Nuhfer Dep. Exh. 2, §§1-1.A., 1-4; and that Mr.
Chapman had coordinated the matter with OIG Legal Counsel and the Bureau of
Public Debt (Malloy Dep. II at 51).  Plaintiff admits the allegations contained in
this paragraph, insofar as the Romero disciplinary matter is concerned.

18. The proper deciding official on an adverse action for both employees was the next
level supervisor, SAC Larry Chapman.  Exh. 8, HUD OIG Manual Chapter 1752,
§ 1-6(F).

Response:     Plaintiff denies the allegations contained in this paragraph, except
as specifically admitted below.  By way of further answer, plaintiff states that the
designation of him and Mr. Chapman to serve as proposing and deciding officials
respectively was made by Mr. Haban (Chapman Decl., ¶15).  Plaintiff admits the

allegations contained in this paragraph, insofar as the Romero disciplinary matter
is concerned.

19. The proposing and deciding officials are required to consult with the Human
Resource Division and the Office of Legal Counsel before taking any disciplinary
or adverse action.  Exh. 8, HUD OIG Manual Chapter 1752, § 1-7(B)(3).  The
Bureau of Public Debt is the human resources service contractor that provides
advice to the proposing and deciding officials at HUD OIG. Id. at 1-7.D.4, 1-
7.E.1, 2-1.d.; Exhibit 9, Nuhfer Deposition (Nuhfer) 13, 17-18, 23, 38-40.

Response:     Plaintiff denies the allegations contained in this paragraph
Chapman, Decl., ¶28), except to admit that the Bureau of Public debt is the
contractor who provides employee and labor relations services to defendant
(Nuhfer Dep. at 13-14); and, by way of further answer, to state all decisions
concerning the imposition of discipline on Mr. Richardson and Mr. Romero
resided with plaintiff and Mr. Chapman (Nuhfer Dep. at 38); that HUD OIG
Manual Chapter 1752 sets forth policies and not requirements in taking
disciplinary and adverse action against OIG employees; that those policies may be
waived as they were in the case of the Richardson and Romero disciplinary
actions (Chapman Decl., ¶28; Nuhfer Dep. at 13-14, 38, & Dep. Exh. 2 at 1-1.A.,
1-4); and that Mr. Malloy understood that Mr. Chapman had coordinated the
matter with OIG Legal Counsel and the Bureau of Public Debt (Malloy Dep. II at
51).

20. Plaintiff did not coordinate with the Bureau of Public Debt or the Office of Legal
Counsel after reviewing the ROI on SA Richardson.  Exh. 7, Sworn Interview of

James Malloy, Oct. 10, 2002, 54:3-12. In failing to do so, Plaintiff admits that he

violated OIG policy and procedures in proposing the disciple, and explains that he

did so because SAC Chapman told him "we didn't need to do that, that we needed

to get these adjudicated before he left so somebody else didn't have to deal with it

once he was [gone]." Exh. 7 Sworn Interview of James Malloy, Oct. 10, 2002,

56:5-22.

Response:      Plaintiff denies the allegations of this paragraph, except to admit

that it cites correctly to select portions of his interview; and, by way of further

answer, states that plaintiff consulted with the Bureau of Public Debt (Mr.

Nuhfer) before he reviewed the Report of Investigation concerning Mr.

Richardson (Malloy Decl., ¶27 & Att. P); that all decisions concerning the

imposition of discipline on Mr. Richardson and Mr. Romero resided with plaintiff

and Mr. Chapman (Nuhfer Dep. at 38); that HUD OIG Manual Chapter 1752 sets

forth policies and not requirements in taking disciplinary and adverse action

against OIG employees; and that those policies may be waived as they were in the

case of the Richardson and Romero disciplinary actions; and that plaintiff

understood that Mr. Chapman had coordinated the matter with OIG Legal

Counsel and the Bureau of Public Debt (Malloy Dep. II at 51; Chapman Decl.,

¶28; Nuhfer Dep. at 13-14, 38, & Dep. Exh. 2 at 1-1.A., 1-4; Malloy Decl., Att. K

at 54-58).

### HUD-OIG's Internal Investigation of SAC Larry Chapman

21. On August 30, 2002, John McCarty, as SAC for the Special Investigations

Division ("SID"), assigned an investigation into SAC Chapman to the SID staff.

The investigation concerned allegations that SAC Chapman used his government-owned vehicle and official time for personal business.  Exhibit 10, Affidavit of John McCarty, November 4, 2003 at page 4, ques. 16; page 5, ques. 19.

Response:        Plaintiff denies the allegations contained in this paragraph and, by way of further answer, states that a previously closed investigation into SAC Chapman was re-opened on or about August 30, 2002, and assigned to the staff of the Special Investigations Division ("SID"); that this previously closed investigation concerned allegations that SAC Chapman used his government owned vehicle and official time for personal business ((Robinson Dep. at 73-74 & Exh. 5).  The charge was years old and Mr. Chapman had been cleared of it while Mr. Haban headed the division that investigated it (Groves Decl. at 1-2; Chapman Decl., ¶22).

22. On September 19, 2002, SID interviewed the Plaintiff regarding the allegations against SAC Chapman.  Exhibit 11, Robinson Deposition 58:6-11.  The investigators asked Plaintiff to provide copies of the diaries he maintained.  Exh. 11, Robinson Deposition 58:17-22, 59:17-22.  Plaintiff initially agreed to provide the documents but a short time later Plaintiff recanted and told the investigators that he would not provide them with his diaries based on the advice of an attorney.  Exh. 6, Malloy II, 21:8-16, 22:11-19; Exhibit 12, Sworn Interview of James Malloy, Sep. 19, 2002 at 38:8-22; 39:1-2; Exh. 11, Robinson Deposition 58:1-22, 59:5-22; Exh. 1, Malloy I, 137:12 – 138:15.  Plaintiff never provided the documents to HUD OIG while he was still working at the Agency.  Exh. 1, Malloy I, 138:25 – 139:2.

Response:     Plaintiff admits the allegations contained in the first sentence of this paragraph; denies the allegations contained in the remainder of this paragraph; and, by way of further answer, states that in addition to business documents and diaries plaintiff was asked to provide his personal diaries to OIG investigators, that that request exceeded the investigators' lawful authority, that plaintiff offered the investigators the chance to review copies of his personal diaries while they were in his office which they refused, that plaintiff offered the Deputy Assistant Inspector General for Investigations the opportunity to review his diaries, that OIG never took him up on the offer, and that the diaries contain no information related to the business of OIG (Malloy Decl., ¶¶59, 60; Malloy Dep. II at 43; McCarty Dep. at 12, 38; Salas Dep. at 31-34 & Dep. Exh. 10).

23. On September 19 or 20, 2002, SAC McCarty advised Deputy Inspector General for Investigations ("DAIGI") Daniel Salas and AIGI Haban that ASAC Malloy was not cooperating in the investigation of SAC Chapman. Exhibit 13, McCarty Deposition 31:8-18.

Response:     Plaintiff denies the allegations contained in this paragraph and, by way of further answer, states that on or about September 19 or 20, 2002, SAC McCarty falsely advised Deputy Inspector General for Investigations ("DAIGI") Daniel Salas and AIGI Haban that ASAC Malloy and ASAC Truxal were both not cooperating in the investigation of SAC Chapman (McCarty Dep. at 30-31).

24. Further, DAIGI Salas received allegations that there was a meeting of the Region 6 special agents in September 2002 at which the SAC Chapman investigation was discussed.  DAIGI Salas was informed that the Plaintiff told the agents under

Chapman's command that they needed to "circle the wagons." Exhibit 14, Salas

Deposition ("Salas") 15:1-12; Exh. 13, McCarty 43:1-22. AIGI Haban was told

that the Plaintiff "had made comments to agents down in his region about how to

handle the inquiry of – if the investigators came around. They wanted to circle the

wagons." Exh. 5, Haban 19:9-19, 21:1-4.

Response:     Plaintiff denies the allegations contained in this paragraph and, by

way of further response, states that AIGI Haban has no recollection of any OIG

employee who implicated Mr. Malloy in making statements about interfering with

OIG's investigation of Mr. Chapman, that Mr. Salas did not have available to him

information from investigators or witnesses, that his entire knowledge of this

subject came from Mr. Haban; that Mr. Malloy had denied making any such

comments; and that the Memorandum which placed Mr. Malloy on administrative

leave for allegedly making the statements in question was drafted in its entirety by

Bryan Saddler, Counsel to the Inspector General and head of the OIG Office of

Counsel  (Salas Dep. at 10-13; Haban Dep. at 35; Malloy Decl., ¶58 & Att. K at

15-16).

25. On October 10, 2002, DAIGI Salas informed Plaintiff that he was being placed on

administrative leave pending an investigation into his misconduct in Region 6.

AIGI Haban made the decision to place Plaintiff on administrative leave, which

was approved by DIG Stephens.  Compl. paras. 33, 35; Exh. 14, Salas 10:2-14;

Exh. 5, Haban 18:15-19; 22:10-12; 65:20-25 and 66:1-4; Exhibit 15, Stephens

16:18-22.

Response:     Plaintiff admits the allegations contained in the first sentence. Plaintiff denies the allegations contained in the second sentence and, by way of further answer, states that the substantive decision to place Mr. Malloy on administrative leave was a collaborative decision made by Mr. Haban and DIG Stephens (Haban Dep. at 65-67).

26. AIGI Haban made the decision to place Plaintiff on administrative leave during the investigation of Plaintiff because AIGI Haban had been told that 1) the Plaintiff refused to cooperate with the SAC Chapman investigation and 2) the Plaintiff had made comments to agents in Region 6 about how to handle the inquiry into SAC Chapman, using the phase "circle the wagons."  Exh. 5, Haban 19:9-15; 20:1-10; 21:1-4; 60:19-25; 72:13-25 and 73:1-5.

Response:     Plaintiff denies the allegations contained in this paragraph and, by way of further answer, states that the substantive decision to place Mr. Malloy on administrative leave was a collaborative decision made by Mr. Haban and DIG Stephens in order to discriminate and retaliate against Mr. Malloy (Haban Dep. at 5-16, 27-31, 65-67 & Dep. Exh. 1-4, 6, 7; Malloy Decl., ¶¶5, 24, 51-57 & Att. J, K, N; Salas Dep. at 9, 13, 16-27, 31-34, 36-38, 41-43 & Dep. Exh. 1, 10, 11; McCarty Dep. at 12-24, 31, 32 & Dep. Exh. 1-3, 6-17; McCarty Dep. at 31, 32, 49-61 & Dep. Exh. 1-3, 8-17; Chapman Decl., ¶4; Nuhfer Dep. at 57, 73-76, 101-02 & Dep. Exh. 2 at 1-3, 4, 6, 8 at 8; Robinson Dep. at 52-54, 70-72 & Dep. Exh. 4 at 2; Truxal Aff.; Malloy Decl., Att. L Nuhfer Dep. at 73-75 & Dep. Exh. 4; Stephens Dep. at 16-20).

27. Plaintiff admits that it would be improper if a manager told his subordinates to "circle the wagons" in order to obstruct an official investigation.  Exh. 1, Malloy 68:18-25 and 69:1-5.

    Response:    Admit.

28. Plaintiff admits either he or Chapman may have said "that type of information about circling the wagons," but not in the context of the Chapman investigation. Exh. 7, Malloy Interview Oct. 2002, 88-89

    Response:    Plaintiff denies the allegations contained in this paragraph (Malloy Decl., ¶58 & Att. K at 15-16, 88-89).

29. Max Eamiguel, Windell Durant, and Tammy Gilbert—Region 6 employees who attended the September 2002 meeting—all provided sworn statements stating that the Plaintiff said "circle the wagons" during this staff meeting.  Exhibit 16 Affidavit of Max Eamiguel, October 15, 2002; Exhibit 17 Sworn Interview of Windell Durant, October 21, 2002; Exhibit 18 Affidavit of Tammy Gilbert, October 28, 2002.

    Response:    Plaintiff denies the allegations contained in this paragraph, except to admit that Max Eamiguel and Windell Durant, Region 6 employees who attended the September 2002 meeting, provided sworn statements stating that Plaintiff said "circle the wagons" during this staff meeting and, by way of further answer, states that no fewer than ten witnesses exonerated Mr. Malloy (McCarty Dep. at 49-61 & Exh. 8-17); that Mr. Malloy never made the statements attributed to him by OIG (Malloy Decl., ¶58; Chapman Decl., ¶37); that the notes of the staff meeting, the credibility of which are not in doubt, do not reflect any such

statement (Robinson Dep. at 42, 44, 46-47, 50-51, 90-91 & Dep. Exh. 3).  ; and that at least one employee of Region 6 gave a sworn statement that Mr. Truxal made statements at the staff meeting in question to interfere with OIG's investigation (Malloy Decl., Att. L).

30.  Other Region 6 employees—Steve Romero, Zelma Howell, and Gary Haley— stated under oath that the words similar to "circle the wagon" were said at the staff meeting but they were unsure who said them.  Exhibit 19 Affidavit of Steve Romero, October 28, 2002; Exhibit 20 Affidavit of Zelma Howell, October 28, 2002; Exhibit 21 Affidavit of Gary Haley, October 25, 2002.

Response:        Plaintiff admits the allegations contained in this paragraph and, and, by way of further answer, states that no fewer than ten witnesses exonerated Mr. Malloy (McCarty Dep. at 49-61 & Exh. 8-17); that Mr. Malloy never made the statements attributed to him by OIG (Malloy Decl., ¶58; Chapman Decl., ¶37); that the notes of the staff meeting, the credibility of which are not in doubt, do not reflect any such statement (Robinson Dep. at 42, 44, 46-47, 50-51, 90-91 & Dep. Exh. 3).  ; and that at least one employee of Region 6 gave a sworn statement that Mr. Truxal made statements at the staff meeting in question to interfere with OIG's investigation (Malloy Decl., Att. L).

31. Michael Kepler, another Region 6 employee, provided an affidavit in which he stated that the Plaintiff said we "should close ranks" in relation to SAC Chapman's discussion of visits from internal affairs. Exhibit 22 Affidavit of Michael Kepler, October 28, 2002.

Response:     Plaintiff admits the allegations contained in this paragraph and, and, by way of further answer, states that no fewer than ten witnesses exonerated Mr. Malloy (McCarty Dep. at 49-61 & Exh. 8-17); that Mr. Malloy never made the statements attributed to him by OIG (Malloy Decl., ¶58; Chapman Decl., ¶37); that the notes of the staff meeting, the credibility of which are not in doubt, do not reflect any such statement (Robinson Dep. at 42, 44, 46-47, 50-51, 90-91 & Dep. Exh. 3).  ; and that at least one employee of Region 6 gave a sworn statement that Mr. Truxal made statements at the staff meeting in question to interfere with OIG's investigation (Malloy Decl., Att. L).

32.  During the course of the investigation of Plaintiff, AIGI Haban was briefed about the fact that some agents heard the Plaintiff say things like "circle the wagons" and some did not, but he was not briefed on what each agent said. Exh. 5, Haban 33:10-15; 34:14-20; 35:4-6; 39:15-18; 40:22-25 and 41:1-2.

Response:     Plaintiff admits the allegations contained in this paragraph and, and, by way of further answer, states that Mr. Haban was also briefed on the fact that no fewer than ten witnesses exonerated Mr. Malloy by SID SAC McCarty (McCarty Dep. at 12, 28-29, 45, 49-61 & Exh. 8-17

33. While Plaintiff was on administrative leave pending the SID investigation, he continued to receive his same pay and accrue sick and annual leave.  Exh. 1, Malloy 52:2-23.

Response:     Admit.

34. On October 17, 2002, the Plaintiff filed an informal administrative complaint of discrimination. Compl. at para. 55.

Response:     Admit.

35. AIGI Haban continued to keep the Plaintiff on administrative leave because he was told that Plaintiff wished to remain on administrative leave pending negotiations to settle his administrative discrimination complaint. Exh. 5, Haban 63:7-11; 125:5-25; 126:1-3.

Response:     Plaintiff denies the allegations contained in this paragraph (Malloy Decl., ¶76 & Att. F).

36. Plaintiff admits that as part of the settlement negotiations, Plaintiff's counsel requested that the Plaintiff be allowed to remain on administrative leave until early January 2003.  Exhibit 23 Plaintiff's Responses to Defendant's Requests for Admissions.

Reponses:     Plaintiff denies the allegations contained in this paragraph (Malloy Decl., ¶76 & Att. F; Def. Exh. 23 at 2).

37. By memorandum dated December 17, 2002, and one day after settlement negotiations failed, AIGI Haban notified the Plaintiff that he could return to work on December 19, 2002.  Exh. 5, Haban 42:1-5 and Depo. Exhibit 7.  Plaintiff returned to duty on December 19, 2002.  Exh. 1, Malloy 44:19-21.

Response:     Plaintiff admits the allegations contained in this paragraph and, by way of further answer, states that AIGI Haban's Memorandum simultaneously "reliev[ed]" plaintiff "of all managerial responsibilities" and stripped him of his position as an Assistant Special Agent in Charge (Haban Dep. at 41-42 & Dep. Exh. 7; Malloy Decl., ¶63).

38. AIGI Haban also authorized the Plaintiff to take any leave he had accumulated. Plaintiff decided not to take any leave between his return to duty and his retirement because he wanted to check on his e-mail and work on his EEO case. Exh. 1, Malloy 51:1-25.

Response:     Plaintiff admits the allegations contained in the first sentence of this paragraph. Plaintiff denies the allegations contained in the second sentence and, by way of further answer, states that ascertaining the status of OIG's investigation[s] into his activities and the facts underlying them and going through his e-mails were the reasons why he did not take annual leave (Def. Exh. 1, Malloy Dep. at 51).

39. AIGI Haban made the decision to remove the Plaintiff's supervisory responsibilities because he "didn't think Jim left [him] any choice to do – what to do what I did. I needed to get him back to work, but I didn't want him in a position where he could influence other people." Exh. 5, Haban 41:3-14; 42:6-8.

Response:     Plaintiff denies the allegations contained in this paragraph (Haban Dep. at 5-16, 27-31, 65-67 & Dep. Exh. 1-4, 6, 7; Malloy Decl., ¶¶5, 24, 51-57 & Att. J, K, N; Salas Dep. at 9, 13, 16-27, 31-34, 36-38, 41-43 & Dep. Exh. 1, 10, 11; McCarty Dep. at 12-24, 31, 32 & Dep. Exh. 1-3, 6-17; McCarty Dep. at 31, 32, 49-61 & Dep. Exh. 1-3, 8-17; Chapman Decl., ¶4; Nuhfer Dep. at 57, 73-76, 101-02 & Dep. Exh. 2 at 1-3, 4, 6, 8 at 8; Robinson Dep. at 52-54, 70-72 & Dep. Exh. 4 at 2; Truxal Aff.; Malloy Decl., Att. L Nuhfer Dep. at 73-75 & Dep. Exh. 4; Stephens Dep. at 16-20).

40. When the Plaintiff returned to the office, Lester Davis (SAC for Region 6) told
    Plaintiff that he did not know what was going to happen to the Plaintiff.  Exh. 1,
    Malloy 46:15-16; 48:12-15.  No one in Headquarters ever told SAC Davis why
    the Plaintiff was on administrative leave or why Plaintiff was returning to duty.
    Exhibit 24, Davis Deposition (Davis) 33:9-16.

    Response:     Plaintiff denies the allegations contained in this paragraph and, by
    way of further answer, states that Mr. Davis told Mr. Malloy that he would never
    be returned to management in Region 6 (Def. Exh. 1 (Malloy Dep.) at 34; Malloy
    Decl., ¶66; Malloy Dep. II at 56).

41.  SAC Davis assigned Plaintiff non-supervisory work to do when Plaintiff returned
    to work in December, 2002.  See Exh. 6, Malloy II, 68:1-69:10.

    Response:     Plaintiff admits the allegations contained in this paragraph and, by
    way of further answer, states that upon plaintiff's return Mr. Davis assigned Mr.
    Malloy humiliating tasks such as coordinating his office's fleet of cars (Malloy
    Decl, ¶72).

42.  On Plaintiff's return to duty, Dan Truxal, another ASAC in Region 6, told him
    that ASAC Truxal had been reassigned to the Boston office to a supervisory
    position.  Exh. 1, Malloy 47:1-2.

    Response:     Admit.

43. According to Plaintiff, he retired on January 3, 2003 because he lost his
    supervisory responsibilities, could no longer be a supervisor in the region, he was

supposed to lose about 146 hours of annual leave after January 3, 2002,[2] and he did not want any written disciplinary action taken against him.  Exh. 1, Malloy 34:1-12; 50:13-18; 58:12-15; 59:2-6; 154:14-22;   Exh. 6, Malloy II 67:9-19.

Response:      Plaintiff denies the allegations in this paragraph, except to admit that these were among the reasons that plaintiff chose to retire, which included being subject to investigation, no longer being able to participate in inter-agency law enforcement councils and task forces, no longer being permitted to be in contact with other agents (Malloy Decl., ¶¶72-75; Def. Exh. 1 at 34-34; Def. Exh. 6 at 67).

44. At Plaintiff's request, a Human Resource Specialist at the Bureau of Public Debt created a retirement application for Plaintiff on December 23, 2002.  Exh. 1, Malloy Depo. Exhibit 1.  Plaintiff signed the application on December 26, 2002. Exh. 1, Malloy 55:1-25.

Response:      Plaintiff admits the allegations contained in this paragraph.

45. The Human Resource Specialist told Plaintiff he could "pull his retirement off the table at 4:25 or 4:29 if [he] was going out the door at 4:30 that last day." Exh. 1, Malloy 56:10-16.

Response:      Plaintiff admits the allegations contained in this paragraph.

46. As of January 3, 2003, AIGI Haban had not decided what would happen to Plaintiff nor had he made any decision regarding Plaintiff's status.  Exh. 5, Haban 107:1-9.

---

[2] The 146 hours of leave that Plaintiff contends he would have lost on January 3, 2003 were accumulated annual leave Plaintiff was required to take or relinquish because they exceeded the number of carry over hours allowed; it is also called "use or lose" leave.

Response:    Plaintiff denies the allegations contained in this paragraph (Malloy

Decl., ¶74; Haban Dep. at 44-45 & Dep. Exh. 7).

47. No one at HUD OIG ever told Plaintiff that he had to either retire or that he would

be subject to being involuntarily reassigned.  See Exh. 1, Malloy I, 57:1-9.  No

one ever told the Plaintiff that unless he resigned he would be subject to

investigation and reassignment.  Exh. 1, Malloy I, 151:3-13.

Response:    Plaintiff denies the allegations contained in this paragraph (Malloy

Decl., ¶74).

48. When he retired, Plaintiff was compensated monetarily for the 146 hours of

annual leave he had in a use-or-lose status.  See Exh. 1, Malloy I, 154-55.

Response:    Plaintiff admits the allegations contained in this paragraph.

49. Since his retirement, the Plaintiff has not applied for any jobs. Exh. 1, Malloy

53:1-4; 54:5-8.

Response:    Plaintiff admits the allegations contained in this paragraph.

Vacancy Announcements

50.  On October 10, 2002, the Agency published vacancy announcement 03-FESB-

002 for the position of the SAC of Region 6, which was vacant because of SAC

Chapman's retirement.   Am. Compl. para. 40.[3]

Response:    Plaintiff objects to the inclusion of the allegations contained in this

paragraph in defendant's Statement of Material Facts; because plaintiff has

withdrawn his claims over not being selected for the position of SAC of Region 6,

---

[3]   By letter dated March 12, 2007, Plaintiff, through his counsel, indicated an intent to abandon his claim involving the selection of Special Agent Lester Davis to fill this position.  See Exh. 23.

they are not material to the adjudication of defendant's motion and therefore cannot be included in a Statement of Material Facts. LCivR 56.1.

51. Plaintiff was aware that HUD OIG advertised their vacancy announcements on a publicly available website. Exh. 1, Malloy 145:14-19.

Response:     Plaintiff admits the allegations contained in this paragraph.

52. Plaintiff learned about the vacancy announcement for the SAC position on October 30, 2002, and was not able to put together a package in time to meet the filing deadline. Exh. 1, Malloy 146:119.

Response:     Plaintiff objects to the inclusion of the allegations contained in this paragraph in defendant's Statement of Material Facts; because plaintiff has withdrawn his claims over not being selected for the position of SAC of Region 6, they are not material to the adjudication of defendant's motion and therefore cannot be included in a Statement of Material Facts. LCivR 56.1.

53. Plaintiff did not make any effort to contact anyone at HUD OIG, including Daniel Salas, to make his interest in applying for the vacant SAC position known. See Exh. 1, Malloy I, 141:8-19; 145:20-146:22.

Response:     Plaintiff objects to the inclusion of the allegations contained in this paragraph in defendant's Statement of Material Facts; because plaintiff has withdrawn his claims over not being selected for the position of SAC of Region 6, they are not material to the adjudication of defendant's motion and therefore cannot be included in a Statement of Material Facts. LCivR 56.1.

54. AIGI Haban would not have promoted the Plaintiff to the SAC vacancy in Region 6 because he had a policy of not promoting sitting ASACs to be SACs in the same region.  Exh. 5, Haban 103:13-25; 104:1-14.

Response:     Plaintiff objects to the inclusion of the allegations contained in this paragraph in defendant's Statement of Material Facts; because plaintiff has withdrawn his claims over not being selected for the position of SAC of Region 6, they are not material to the adjudication of defendant's motion and therefore cannot be included in a Statement of Material Facts.  LCivR 56.1.

55. On December 12, 2002, the Agency published vacancy announcement No. 03-FESB-100 for the position of ASAC in the Houston, Texas office.  Malloy 148:2-4.  Plaintiff learned of the vacancy announcement for the Houston ASAC position on December 19, 2002.  Am. Compl. para. 51; Exh. 1, Malloy 148:2-8.  Although he had time to do so, Plaintiff did not apply for the position.  Exh. 1, Malloy 148:1-17.

Response:     Plaintiff admits the allegations contained in this paragraph and, by way of further answer, states that the incoming SAC of Region 6, Lester Davis, told Mr. Malloy that he would never be returned to management in Region 6, and that Mr. Haban eliminated him from consideration for the position of ASAC in Houston because he was under investigation (Haban Decl., at 71-72; Def. Exh. 1 (Malloy Dep.) at 34; Malloy Decl., ¶66).

<u>Personal Background</u>

56. Plaintiff has no documentary proof that he is a Native American.  Exh. 1, Malloy 7:10-14.

Response:     Plaintiff admits the allegations contained in this paragraph.

57. Plaintiff has never attempted to verify that he is truly Native American.  Exh. 1,

Malloy 8:16-23.

Response:     Plaintiff admits the allegations contained in this paragraph.

58. The only information Plaintiff has regarding his Native American ancestry comes

from what his relatives told him about his great-grandmother being a Cherokee

Indian.  Exh. 1, Malloy 10:14-22.

Response:     Plaintiff denies the allegations contained in this paragraph (Exh.

3).

59. Plaintiff is not, and has not ever been, a member of any organization related to

Cherokee ancestry.  Exh. 1, Malloy 19:20-22.

Response:     Plaintiff admits the allegations contained in this paragraph.

60. AIGI Haban first learned that the Plaintiff was claiming to be a Native American

when Plaintiff filed his complaint of discrimination.  Exh. 5, Haban 102:4-14.

Response:     Plaintiff denies the allegations contained in this paragraph (Malloy

Decl., ¶¶16, 19; Chapman Decl., ¶43).

        II.     Plaintiff respectfully submits that the following material facts are

genuinely at issue:

        Whether plaintiff was subject to discrimination and retaliation when:

        A.     Plaintiff joined the Office of Inspector General ("OIG") of the Department

of Housing and Urban Development ("HUD") as a Criminal Investigator in October of

1983 (Malloy Decl., ¶10).

B.      Plaintiff was assigned to the OIG office in Ft. Worth, Texas, which is a part of the agency's Southwest Region or Region 6 (Id.).

C.      In 1993, Plaintiff was appointed Assistant Special Agent in Charge ("ASAC") of that office at Grade 14; several years later, he was named National HUD OIG Investigation Manager of the Year in 1999 (Id., ¶1).

D.      Plaintiff led his office's joint task force with the Federal Bureau of Investigation, and supervised all federal law enforcement support activities after the 1995 bombing attack in Oklahoma City (Id., ¶3; Chapman Decl., ¶¶9-11).

E.      OIG's Southwest Region spans all of Texas, Louisiana, New Mexico, Oklahoma, and Arkansas.   http://www.hud.gov/offices/oig/locations/index.cfm (Malloy Decl., ¶1).

F.      Plaintiff made it known for five years that he was interested in the position of ASAC in the Southwest Region's office in Houston, a position that carried with it a higher salary and would place him nearer to his family (Chapman Decl., ¶12 Malloy Decl., ¶15 & Att. Q, R).

G.      The position was opened for competition in mid-December of 2002 (Haban Dep. at 68-69 & Exh. 13).

H.      The Assistant Inspector General for Investigations in HUD Headquarters always viewed Plaintiff as doing "an excellent job" as an ASAC in Region 6 (Haban Dep. at 71-74).

I.      OIG selected a far less qualified GS-13 agent who lacked supervisory experience over Plaintiff for a higher paying ASAC position in Houston (Haban Dep. at 69-72 & Exh. 14; Chapman Decl., ¶13).

J.      Plaintiff was on enforced administrative leave when the position opened, and removed from supervision by the time it closed (Haban Dep. at 18, 41 & Exh. 4, 7).

K.      Before it did, the new SAC of Region 6 told Plaintiff that he would never be considered for it or another supervisory position in the Region (Malloy Decl., ¶¶15, 66 & Att. K at 15-16; Malloy Dep. II at 56).

L.      Plaintiff is a descendent of Native Americans, specifically the Cherokee Indian tribe (Malloy Decl., ¶16 & Exh. 3).

M.      Plaintiff kept a sculpture in his office of a Native American on a horse that was inscribed "Chief Malloy;" had other Native American artwork in his office; and served as a member of OIG's national recruitment and diversity committee and the Southwest Region's, where he openly discussed his Native American heritage (Id.; Chapman Decl., ¶43).

N.      One of Plaintiff's former subordinates harangued Plaintiff about his heritage, called him a "half breed," and made comments about Indians being proof that white men had sex with buffalo (Malloy Decl., ¶19).

O.      A complaint by Plaintiff triggered an investigation in April of 2001 by the OIG Office of Special Investigations (Id.).

P.      The individual who headed that office and took no action on the complaint was, when the actions are at issue here arose, the Assistant Inspector General for Investigations in OIG Headquarters (Id.; Haban Dep. at 5).

Q.      He appointed the offending agent to succeed Mr. Malloy as ASAC (Malloy Decl., ¶19; Chapman Decl., ¶43).

R.      The mission of the HUD Office of Inspector General includes preventing and detecting fraud, waste, and abuse by individuals and entities who are engaged in the business of providing HUD-sponsored and HUD–financed housing and housing programs through administrative audits and criminal investigations (Am. Cplt./Answ., ¶6).

S.      HUD OIG is headquartered in Washington, D.C.; and is headed by the Inspector General, Kenneth Donahue; and the Deputy Inspector General, Michael Stephens (Stephens Dep. at 4-5; Malloy Decl., ¶6).

T.      As Deputy Inspector General, Mr. Stephens serves as the chief operating officer for OIG (Stephens Dep. II at 4, 11-14; Malloy Decl., ¶6).

U.      Answering to Mr. Stephens or one of his subordinates are various OIG Offices, each with a different function (Stephens Dep. II at 11-14).

V.      One of these is the Office of Investigations, in which Plaintiff was employed, the primary function of which is to conduct the investigations within OIG's jurisdiction that are of a potentially criminal nature (Id.; Malloy Decl., ¶4; Chapman Decl.,¶¶3-5).

W.      The Office of Investigations is headed by an Assistant Inspector General for Investigations, at all times relevant R. Joseph Haban (Stephens Dep. at 12-14: Haban Dep. at 5; Malloy Decl., ¶7).

X.      Mr. Haban's Deputy, at all times relevant, was Daniel Salas (Salas Dep. at 5).

Y.      The investigative activities of the Office of Investigations are carried out in Regional and field offices around the country (Stephens Dep. II at 13-14).

Z.    These offices are headed by Special Agents in Charge ("SAC's") and Assistant Special Agents in Charge ("ASAC's") (Malloy Decl., ¶8).

AA.    Both at the supervisory and non-supervisory level, the professional employees of the Office are all Criminal Agents GS-1811's, and are all held to the same standards of conduct for and as federal law enforcement officers (Malloy Decl., ¶5; Chapman Decl., ¶4; Nuhfer Dep. at 57 & Dep. Exh. 2 at 1-3, 6; Nuhfer Dep. at 101-02 & Dep. Exh. 8 at 8).

BB.    The OIG Office of Legal Counsel, which is separate and apart from HUD's Office of General Counsel itself (Stephens Dep. at 8-9).

CC.    The Bureau of Public Debt which contracts to be a personnel department for OIG separate and apart from HUD's (Id. at 9; Nuhfer Dep. at 11-12).

DD.    The Special Investigations Division is responsible for internal investigations of OIG employees including investigations with potential criminal prosecution (McCarty Dep. at 12-13; Malloy Decl., ¶9; Chapman Decl., ¶3).

EE.    The Headquarters Office of Legal Counsel plays an active role in the EEO and disciplinary processes.  Counsel's Office is present and active at every phase of the administrative complaints process:  it represents the agency itself and makes itself available as counsel to individual managers; engages directly in settlement negotiations with complainants, supervises litigation before the EEOC; and serves as co-counsel in federal court (Richardson Dep. at 8-17 & Dep. Exh. 4 at 5; Malloy Decl., Att. F-H; Def. Mot. at 35).

FF.     The Office of Legal Counsel is also involved in the disciplinary process, once a decision is made to take disciplinary action (Nuhfer Dep. at 37, 100-02, 138 & Exh. 7, 8).

GG.     When an agent who is subject to adverse action has only one supervisor in the field or holds a position in OIG Headquarters, the deciding official is in Headquarters with the Office of Legal Counsel (Nuhfer Dep. at 41 & Dep. Exh. 1 at 2 & 2 at 15).

HH.     Counsel was directly involved in decisions concerning Mr. Malloy and prepared the entire Memorandum placing him on administrative leave and the letter keeping him there (Haban Dep. at 63-64; Salas Dep. at 13, 32-34).

II.     Mr. Richardson filed his formal EEO complaint in May of 2001, he was a Special Agent assigned to the OIG field office in Denver, Colorado (Richardson Dep. Exh. 1).

JJ.     That same month, Mr. Richardson's former supervisor, Jeffrey Finn, was indicted for misconduct committed in his official capacity as Special Agent in Charge of that office.  U.S. v. Finn, supra, 375 F.3d at 1035-37.

KK.     Mr. Richardson alleged, among other matters, that a senior OIG official threatened to terminate him, once he testified at the Finn trial (Richardson Dep. at 9-10 & Exh. 1 at 2).

LL.     That official, Robert Groves, became OIG Headquarters Assistant Inspector General for Investigations; Mr. Haban succeeded Mr. Groves early in 2002, after first serving as his Deputy (Groves Decl., at 1; Haban Dep. at 5; Chapman Decl., ¶6).

MM.   Mr. Richardson's EEO complaint would have been settled in April of 2002, but for the fact that OIG's Office of Legal Counsel reneged on the agency's own proposed agreement (Richardson Dep. at 8-17 & Dep. Exh. 2, 3, 4 at 5).

NN.   That same month, an investigation concerning Mr. Richardson that was begun over two years earlier was completed (Malloy Decl., Att. I).

OO.   David Nuhfer, who heads up employee and labor relations support for OIG, received the Richardson Report of Investigation and drafted a proposed 60 days suspension in May of 2002 (Nuhfer Dep. at 13-14; 100-02, & Exh. Dep. 7, 8).  According to standard OIG disciplinary practice, Mr. Nuhfer would only draft the Richardson proposed suspension after OIG made a decision to take adverse action (Nuhfer Dep. at 37).

PP.   Since Mr. Richardson was assigned to the OIG field office in Denver in May of 2002, it would be up to his first line supervisor to propose adverse action (Nuhfer Dep. at 35 & Exh. 1 at 2).

QQ.   For that reason, the proposed 60 day suspension for Mr. Richardson bore the name of his immediate supervisor, Michael Groszkiewicz (Nuhfer Dep. at 101-02, 138 & Dep. Exh. 8).

RR.   Mr. Nuhfer has no recollection of ever speaking with Mr. Groszkiewicz about a proposed action (Nuhfer Dep. at 65-66, 104-05).

SS.   He did, however, send the proposed Richardson disciplinary action to OIG's Office of Legal Counsel (Nuhfer Dep. at 100-02, 138 & Exh. 7, 8).

TT.   After its initial review, the Legal Counsel's Office concluded that "removal is appropriate" (Id. & Exh. 8).

UU.     There is no record of any further action on Mr. Richardson's potential discipline at that time (Malloy Decl., Att. I).

VV.     Mr. Richardson was "the special agent who prepared [a] case expenditure form at" Finn's direction.  U.S. v. Finn, supra, 375 F.3d at 1039.

WW.     Finn's expenditure of HUD funds pursuant to this form comprised the remaining charges against him.  Id. at 1037-38.

XX.     Richardson acted properly in following Finn's direction, and would have been guilty of insubordination had he not (Malloy Decl., Att. C at 3).  Nickerson v. USPS, 49 MSPR 451, 459 (1991); Gragg v. U.S. Air Force, 13 MSPR 296, 299 (1982), dismissed 717 F.2d 1343 (Fed. Cir. 1983).

YY.     Mr. Richardson was also forthright in immediately reporting Mr. Finn (Malloy Decl., Att. C at 3).

ZZ.     The proposed 60 day suspension which the Office of Legal Counsel viewed as too lenient faulted Mr. Richardson for his behavior and for allegedly not reporting Finn's misconduct (Nuhfer Dep. Exh. 7, 8 at 6).  That was false (Malloy Decl., Att. C at 3).

AAA.  The settlement of Mr. Richardson's EEO complaint which the OIG Office of Legal Counsel reneged on provided for him to be reassigned to Plaintiff's office, to be given three weeks of leave to move from Denver to Ft. Worth, and to make himself available for the Finn trial (Richardson Dep. at 12-13 & Dep. Exh. 2 at 2).

BBB.  That led Assistant Inspector General Haban to seek the concurrence of Plaintiff's supervisor Larry Chapman, the Special Agent in Charge of the Southwest Region, in Mr. Richardson's reassignment (Chapman Decl., ¶14).

CCC.   Mr. Chapman was very leery of being dragged into the matter (Chapman Decl., ¶15).  He "strongly objected" to Mr. Haban and insisted on being "assured" that neither he nor his "management staff was to be involved in any EEO or disciplinary matters directed towards Mr. Richardson" (Chapman Decl., ¶15).

DDD.   Mr. Haban "assured" Mr. Chapman that any discipline for Mr. Richardson "would be handled either by OIG headquarters or" in Denver (Id.).

EEE.   Anticipating that his EEO case was going to be settled, Mr. Richardson sold his home in Denver and relocated his family to Oklahoma City (Malloy Decl., Att. B).

FFF.   When the settlement fell through, Mr. Richardson wound up living in a basement apartment in Denver (Id.).

GGG.   Virtually days later, Mr. Richardson's wife was called up for active military duty in a combat zone in Korea (Richardson Hardship Memo.)

HHH.   That left him with three school age children living in Oklahoma while he was in Colorado (Id.).

III.   On May 15, 2002, Mr. Richardson requested a hardship transfer (Id.).  In mid-June, he arrived in the Southwest Region under Mr. Malloy and Mr. Chapman (Malloy Decl., ¶19; Chapman Decl., ¶17).

JJJ.   The month after Mr. Richardson was reassigned, with his role in the Finn trial having ended, Mr. Chapman was contacted about beginning disciplinary proceedings (Chapman Decl., ¶18).

KKK.   In mid-August of 2002, Mr. Haban directed him to do so (Id., ¶19).

LLL.   On September 5, 2002, Mr. Chapman was sent a Report of Investigation concerning Mr. Richardson (Chapman Decl., ¶21 & Malloy Decl., Att. I).

MMM. The ROI boiled down to several charges against Mr. Richardson – two of which related to his alleged "falsification" of an expenditure form at Finn's direction – each emanating years earlier when he had been assigned to Denver (Malloy Decl., ¶¶32, 34 & Att. C).

NNN.  By the time that the Richardson ROI arrived in Region 6, Plaintiff had already spoken to Mr. Nuhfer, who headed OIG's employee and labor relations unit at BPD (Malloy Decl., ¶25 & Att. P.

OOO.  Mr. Nuhfer told Plaintiff that Mr. Richardson's conduct warranted "serious" discipline (Id., ¶26).

PPP.   Plaintiff objected to OIG trying to "dump this on a diverse supervisor to deal with a diverse employee" (Malloy Decl., ¶27 & Att. P).

QQQ.  Plaintiff also disagreed with OIG Headquarters that Mr. Richardson deserved to be fired, which he knew it wanted from the acting Deputy Assistant Inspector General for Investigations. (Id., ¶46).

RRR.  Once the ROI arrived, Mr. Chapman gave it to Plaintiff, as Mr. Richardson's immediate supervisor, and directed him to review it and decide what disciplinary action to propose (Chapman, Decl., ¶21; Malloy Decl., ¶28).

SSS.   Mr. Chapman also directed Plaintiff to do so before he retired at the end of September (Chapman, Decl., ¶22).

TTT.   Mr. Chapman had already discussed the Richardson matter with OIG Headquarters and knew that Plaintiff had discussed it with Mr. Nuhfer (Chapman, Decl., ¶28).

UUU.   Mr. Chapman understood that the two "were fully empowered to decide the appropriate level of discipline to impose (Id.).

VVV.   Plaintiff understood that Mr. Chapman had coordinated the matter with OIG Legal Counsel and the Bureau of Public Debt (Malloy Dep. II at 51).

WWW.      Plaintiff began his review of the Richardson Report of Investigation during the week of September 23, 2002 (Malloy Decl., ¶29).

XXX.   Since Mr. Chapman was about to retire, Plaintiff had until the following Monday to complete his work (Id., ¶28; Chapman Decl,, ¶29).

YYY.   The determination of what penalty to propose was up to Plaintiff (Nuhfer Dep. at 38).

ZZZ.   Plaintiff took his responsibilities very seriously, beginning by studying the ROI for at least 30 hours (Malloy Decl., ¶36).

AAAA.      Plaintiff concluded that Mr. Richardson had acted in accordance with federal personnel law by following Finn's order in preparing an expenditure form and in promptly reporting his suspected misconduct; that he had been truthful and candid with investigators looking into Finn's misconduct; and that he had not misused his agency cell phone (Id.¶¶ 32, 34, 35 & Att. C).

BBBB.Plaintiff sustained two charges of conduct unbecoming an officer, relating to Mr. Richardson's damage to a truck while off-duty and providing an "X" rated video-tape to other agents (Id. at 33, 36 & Att. C).

CCCC.Plaintiff knew that Mr. Richardson's misconduct was "unrelated to OIG core missions" and "off-duty" (Malloy Decl., ¶¶37, 39).

DDDD.    Plaintiff also knew that misconduct of that nature and worse was not disciplined at all or only lightly when committed by non-minority agents and supervisors under the direction of Headquarters officials or Region 6 (Id., ¶¶ 40-44).

EEEE. Two non-minority SAC's under the supervision of OIG Headquarters, one of whom acted as SAC of Region 6, had engaged in improper sexual relations with subordinates did so without penalty by Mr. Haban (Malloy Decl., ¶40).

FFFF. Two non-minority agents under the supervision of OIG Headquarters, including the lead investigator in the investigations of Mr. Malloy, had illegally entered the property of Mr. Chapman's neighbors while investigating him; OIG Headquarters knew of the offense and took no action despite the involvement of local Texas police (Id., ¶41).

GGGG.    Another non-minority OIG employee assigned to Headquarters had allegedly been untruthful in an official OIG investigation into a lost service weapon and had allegedly sexually harassed a female auditor; yet another had no action taken after being convicted of off-duty drunken driving (Id., ¶42)  OIG Headquarters took no action against either man, despite knowing of the charges (Id.).

HHHH.    OIG Headquarter also took no action against a non-minority agent who improperly referred a matter for criminal prosecution without authority, which later became the subject of litigation in two separate proceedings (Id., ¶43).

IIII.     On September 30, 2002, Plaintiff issued a detailed Memorandum codifying his proposal to suspend Mr. Richardson for five days and his reasons for doing so (Malloy Decl., ¶47 & Att. C).

JJJJ.     With his retirement set to be effective, Mr. Chapman arranged an informal oral reply session with Mr. Richardson to discuss the proposal later that day (Richardson Dep. at 28-29; Chapman Decl., ¶25).

KKKK.     Mr. Richardson had no objection to the procedure or to a five day suspension (Richardson Dep. at 28-29 & Dep. Exh. 9).

LLLL. He asked permission of Mr. Chapman to serve his suspension "as quickly as possible" (Id., Dep. Exh. 9 at 2).

MMMM.     Mr. Chapman imposed the suspension on Mr. Richardson in a Memorandum dated September 30, 2002, just before he retired (Id.; Chapman Decl., ¶25).

NNNN.     Plaintiff was also directed by Mr. Chapman to commence the disciplinary process against Steve Romero, a Hispanic agent (Malloy Decl., ¶48).

OOOO.     Mr. Romero had been cleared of the most serious charge several years earlier (Romero Decl., ¶¶3-4; Malloy Decl., ¶49).

PPPP. As he did with the Richardson Report of Investigation, Plaintiff studied the ROI concerning Mr. Romero thoroughly (Id.).

QQQQ.     After doing so, Plaintiff concluded that Mr. Romero did not engage in any substantive offense, but that he had not paid close enough attention in filling out certain HUD forms (Id.).

RRRR. Plaintiff also knew that an offense of this nature did not warrant a formal reprimand or harsh discipline and, from his experience, that it would not be imposed on a non-minority (Id., ¶50).

SSSS. For that reason, on September 30, 2002, Plaintiff issued Mr. Romero a Memorandum of Caution, which Mr. Chapman approved before retiring (Id., ¶50 & Att. E).

TTTT. Mr. Haban first learned of the proposals on October 2, 2002, and promptly directed Plaintiff to "fax a copy of both the documents" concerning Mr. Richardson and Mr. Romero "to headquarters and the Counsel's Office;" his e-mail mentioned OIG Legal Counsel Brian Saddler by name (Haban Dep. at 27-31 & Dep. Exh. 6).

UUUU.     Plaintiff did so the next day (Malloy Decl., ¶51 & Haban Dep. Exh. 6).

VVVV.     On October 10, 2002, OIG Headquarters placed Plaintiff on administrative leave, ordered him to turn in all of his OIG equipment including computer equipment, prohibited him from entering OIG premises, and "directed to have no contact (verbal, telephonic, electronic, or in writing) with any HUD OIG employees (Salas Dep. at 9 & Dep. Exh. 1; Malloy Decl., ¶52).

WWWW.     At the same time, OIG Headquarters opened two overlapping investigations into Plaintiff (McCarty Dep. at 12-24 & Dep. Exh. 1-3; Malloy Decl., ¶53).

XXXX.     One focused on "the personnel actions" Plaintiff "took against Special Agents Romero and Richardson" (McCarty Dep. at 12-24 & Dep. Exh. 1-4).

YYYY.       OIG Headquarters also elevated Plaintiff from a witness to a subject in the investigation of supposed misconduct by Mr. Chapman (McCarty Dep. at 12-24 & Dep. Exh. 1, 3; Malloy Decl., ¶¶55-57, Att. J, K).

ZZZZ. Over the next two months, these same charges would be used to deny Plaintiff's request to be taken off administrative leave; and then to remove him as ASAC and relieve him of supervisory duties (Haban Dep. at 41-42 & Dep. Exh. 7; Salas Dep. at 31-34 & Dep. Exh. 10, 11).

AAAAA.       The  official who issued the Memorandum placing Plaintiff on administrative leave was Daniel Salas, the former Deputy Assistant Inspector General for Investigations (Salas Dep. at 9 & Dep. Exh. 1).

BBBBB.       Mr. Salas was alleged to have used a weapon and engaged in domestic violence (Haban Dep. at 5-16 & Dep. Exh. 1-2).

CCCCC.       In May of 2002, these allegations were specifically brought to the attention of the Secretary of HUD, Inspector General Donahue, and Assistant Inspector General Haban (Haban Dep. at 5-16 & Dep. Exh. 1-2).

DDDDD.       The letter that brought the charges to their attention identified a specific police report; and they were easily corroborated by Mr. Salas' entry into a restraining order which required him to relinquish his "Sig Sauer 380 caliber pistol" to the local Police Department (Id., Dep. Exh. 1-3).

EEEEE.       The matter was handled by Mr. Donahue, Deputy Inspector General Stephens, and Mr. Haban; they never had a formal investigation opened, much less placed Mr. Salas on administrative leave or relieved him of supervisory duties (Haban Dep. at 8-10, 53-54; Salas Dep. at 36-38, 41-43).

FFFFF.        Instead, his ex-wife was interviewed and Mr. Salas asked to provide a written statement not under oath (Salas Dep. at 37).

GGGGG.        Mr. Salas filed an EEO complaint in 2005 (Salas Dep. at 7).

HHHHH.        Inspector General Donahue responded by personally removing Mr. Salas from his position (Id. at 8).

IIIII.   Neither Mr. Richardson nor Mr. Romero was interviewed by Special Agent John Robinson, who headed the investigations of Plaintiff (Robinson Dep. at 11, 15-26).

JJJJJ.   Mr. Richardson had absolutely no problem with the due process he was afforded (Richardson Dep. at 28-29).

KKKKK.        On September 19, 2002, before the disciplinary actions involving Mr. Richardson and Mr. Romero, Plaintiff was interviewed as a witness in an investigation into Mr. Chapman (Malloy Decl., ¶56 & Att. J; Robinson Dep. at 52-54 & Dep. Exh. 4 at 2).

LLLLL.        Mr. Chapman came under investigation for supposedly attending to the construction of a new house while on government time (Robinson Dep. at 73-74 & Exh. 5).

MMMMM.        The charge was years old and Mr. Chapman had been cleared of it while Mr. Haban headed the division that investigated it (Groves Decl. at 1-2; Chapman Decl., ¶22).

NNNNN.        Plaintiff was directed to travel to OIG Headquarters and give a follow-up witness statement on October 10, 2002, the week after word of the Richardson and Romero disciplinary matters reached OIG Headquarters (Malloy Decl., ¶¶51, 57).

OOOOO.     When he arrived, Plaintiff was advised that he was now a subject of the investigation (Id., ¶57 & Att. K).

PPPPP.     That afternoon, Plaintiff was placed on administrative leave (Salas Dep. at 31-34 & Dep. Exh. 10).

QQQQQ.     Plaintiff's fellow ASAC in the Southwest Region was also directed to give statements in the same investigation (Robinson Dep. at 52-54 & Dep. Exh. 4).

RRRRR.     Mr. Truxal refused to turn over diaries that he considered to be personal in nature (Robinson Dep. at 52-54 & Dep. Exh. 4 at 2).

SSSSS.     Mr. Truxal snickered at OIG investigators when asked for the documents (Id.).

TTTTT.     Unlike Plaintiff, Mr. Truxal had not been involved in the Richardson and Romero disciplinary proceedings, and OIG never took any action against him (Malloy Decl., ¶24; Truxal Aff.).

UUUUU.     Plaintiff was also accused of making a comment at a Region 6 staff meeting that they should "circle the wagons" when investigators asked questions about Mr. Chapman (Def. Mot. at 6).

VVVVV.     Janeen Hess, who took official notes of the staff meeting and was present the entire time, denied hearing such a comment; OIG investigators had no reason to doubt her credibility (Robinson Dep. at 42, 44, 46-47, 50-51, 90-91 & Dep. Exh. 3).

WWWWW.   No fewer than ten witnesses exonerated Plaintiff during the investigation (McCarty Dep. at 49-61 & Exh. 8-17).

XXXXX.     Plaintiff never made the statements attributed to him by OIG (Malloy Decl., ¶58; Chapman Decl., ¶37).

YYYYY.    John McCarty, who was the SAC of the Special Investigations Davison, "[c]ertainly" believes that he gave Mr. Haban and Mr. Salas "both sides of the results of the investigation" into Plaintiff and Mr. Truxal while it was going on (McCarty Dep. at 12, 28-29, 45).

ZZZZZ.    That would have included directing their attention to the ten witnesses who exonerated Plaintiff (McCarty Dep. at 49-61 & Exh. 8-17).

AAAAAA.    Mr. Haban has "no idea" who implicated Plaintiff (<u>Compare</u> Haban Dep. at 35 <u>with</u> Def. Mem. at 6).

BBBBBB.    Even though one witness alleged that Mr. Truxal had made improper statements, no action was ever taken against him (Malloy Decl., ¶24 & Att. L).

CCCCCC.    Mr. McCarty also admitted that without a subpoena, OIG had no legal basis for requiring Mr. Malloy to turn over personal diaries (McCarty Dep. at 12, 38).

DDDDDD.    Plaintiff handwrote a letter advising Mr. Salas that he would turn over all of his documents that were not strictly personal and assured Mr. Salas that he wanted to cooperate fully (Salas Dep. at 31-34 & Dep. Exh. 10; Malloy Decl., ¶60).

EEEEEE.    In the interim, Plaintiff filed his administrative complaint (Malloy Decl., ¶60 & Att. M).

FFFFFF.    After he did so, Mr. Salas refused to return Plaintiff to active duty (Salas Dep. at 31-34 & Dep. Exh. 11).

GGGGGG.    The week after he was placed on administrative leave, Plaintiff's counsel also made a written request that he be restored to active duty (Salas Dep. at 32-34 & Dep. Exh. 10).

HHHHHH.     That request assured Deputy Assistant Inspector General Salas that Plaintiff had not withheld any business-related documents and that he had and would cooperate fully with OIG's investigation (Malloy Decl., ¶60).

IIIIII. The letter also advised Mr. Salas about Plaintiff's use of the EEO complaints process, which Plaintiff had initiated the day before (Salas Dep. Exh. 10 at 2; Malloy Decl., ¶60 & Att. M, N).

JJJJJJ. Mr. Salas wrote back that Plaintiff's actions were viewed as "threats" by "us," stated that Mr. Malloy "acts at his own peril," and directed all further inquiries to OIG's Office of Legal Counsel (Salas Dep. at 31-33 & Exh. 11).

KKKKKK.     Deputy Inspector General Stephens denied knowing that Plaintiff had been asked to be restored to active duty, much less that he participated in the decision (Stephens Dep. at 18-19).

LLLLLL.     Mr. Haban claims that the decision was "made in a collective manner with" Mr. Stephens and the Legal Counsel's Office (Haban Dep. at 63-64).

MMMMMM. Mr. Salas testified that the letter he signed denying Mr. Malloy's request was written entirely by the Office of Legal Counsel (Salas Dep. at 34).

NNNNNN.     For close to two months after Plaintiff's request to be returned to active duty, OIG kept him on administrative leave, barred from the office and from any contact with the office, and under orders not to communicate with any OIG employees (Malloy Decl., ¶62; Salas Dep. at 9 & Dep. Exh. 1,10).

OOOOOO.     On December 17, 2002, OIG Headquarters returned Plaintiff to active duty, but simultaneously "reliev[ed]" him "of all managerial responsibilities" and

stripped him of his position as an ASAC (Haban Dep. at 41-42 & Dep. Exh. 7; Malloy Decl., ¶63).

PPPPPP.     Before it returned Plaintiff to the workplace as a line agent, OIG announced a vacancy for an ASAC position in Houston (Haban Dep. at 68-69 & Exh. 13; Malloy Decl, ¶64).

QQQQQQ.     The position was on a higher pay scale and Plaintiff had expressed an interest in working in Houston to be nearer his family for five years (Malloy Decl., ¶64 & Att. Q, R; Chapman Decl., ¶12).

RRRRRR.     Plaintiff, at the time, was barred from OIG's computer systems and from speaking with OIG employees ((Haban Dep. Exh. 4; Malloy Decl., ¶65).

SSSSSS.     For that reason, Plaintiff had no knowledge that the position was open for competition (Malloy Decl., ¶65).

TTTTTT.     When Plaintiff returned to the office, he did learn about the vacancy (Malloy Decl., ¶66).

UUUUUU.     By that time, Plaintiff had just been officially stripped of all supervisory duties, remained under investigation, would never have been considered for the position (Haban Dep. at 70-73 & Exh. 7; McCarty Dep. Exh. 2 at 3).

VVVVVV.     When the new Special Agent in Charge told Plaintiff that he would never be returned to supervisory ranks, despite his interest in the position, Plaintiff knew that applying would be futile (Malloy Decl., ¶66; Malloy Dep. II at 56).

WWWWWW. OIG selected a former non-supervisory, lower-graded subordinate of Plaintiff for the position (Haban Dep. at & Dep. Exh. 15).

XXXXXX.    Plaintiff was eliminated from consideration solely because he was under investigation (Id. at 71-72).

YYYYYY.    Mr. Haban, Deputy Inspector General Stephens, and Inspector General Donahue were personally involved in the decision to select someone else (Id. at 66-67).

ZZZZZZ.    Plaintiff and all special agents in the OIG Office of Investigations is a federal law enforcement officer and serves under especially strict standards of conduct (Malloy Decl., ¶68 & Att. O).

AAAAAAA.  Plaintiff had no intention of retiring before he was 57 years old, the mandatory retirement age for federal law enforcement officers under 5 U.S.C. §8336 (Malloy Decl., ¶70).

BBBBBBB.   Plaintiff was 52 when he was constructively discharged, effective January 3, 2003 (Id. & Att. Q).

CCCCCCC.   Plaintiff had aspirations of moving up one level in the Southwest Region and becoming Special Agent in Charge (Id., ¶71).

DDDDDDD.  The position has been filled twice since October of 2002 and is now encumbered by Mr. Salas (Salas Dep. at 4).

EEEEEEE.    Senior OIG management always viewed Plaintiff very highly and had no reason to exclude him from promotional opportunities but for its investigations of him (Haban Dep. at 71-74).

FFFFFFF.    Once that happened, the new Special Agent in Charge of the Southwest Region told Plaintiff that he had no future in management (Malloy Decl., ¶66; Malloy Dep. II at 56).

GGGGGGG.   After he was returned to active duty and stripped of his supervisory duties, OIG gave Plaintiff humiliating tasks such as coordinating his office's fleet of cars (Id., ¶72).

HHHHHHH.  A federal law enforcement officer's credibility is vital (Malloy Decl., ¶73; Chapman Decl.,¶40).

IIIIIII. A special agent who is under investigation is useless in a criminal prosecution, because any questions about his integrity must be disclosed to the defense (Id.).  Giglio v. United States, 405 U.S. 150, 154 (1972).

JJJJJJJ.Being relieved of supervisory responsibility while under investigation would make Plaintiff's continued participation on inter-agency task forces and councils impossible (Malloy Decl., ¶73; Chapman Decl., ¶40).

KKKKKKK.  At the time he left federal service, Plaintiff was under two on-going investigations; never given any reason to believe that being removed from a supervisory position was temporary; and assigned nothing but menial, non-investigative tasks (Malloy Dep. II at 56, 69; Malloy Decl., ¶74; Haban Dep. at 44-45 & Dep. Exh. 7).

LLLLLLL.    OIG refused to close out its investigations favorably and restore Plaintiff's reputation before he left (Malloy Decl., ¶76 & Att. F).

MMMMMMM.      The investigations were ended once Plaintiff left HUD OIG's employ (McCarty Dep. at 14-15, 20 & Dep. Exh. 1 at 3, 2).

NNNNNNN.  Plaintiff's career in OIG was ruined by its actions toward him, as are his chances now for outside employment (Chapman Decl., ¶¶41-42; Malloy Decl., ¶¶77-78).

OOOOOOO.  On December 9, 2002, Mr. Richardson was ordered to obtain written opinions from three separate U.S. Attorney's Offices that his preparation of the case expenditure form at Finn's direction did not disqualify him from testifying on <u>Giglio</u> grounds (Richardson Dep. at 31-35 & Dep. Exh. 10).

PPPPPPP.    This is the same alleged offense that Plaintiff found did not warrant the imposition of discipline, because Mr. Richardson was required to follow Finn's instruction (Malloy Decl., ¶32 & Att. C).

QQQQQQQ.  The alleged offense occurred in March of 2000 and Mr. Richardson reported it that same day (Richardson Dep. at 31-35 & Dep. Exh. 10).

RRRRRRR.  OIG's direction to Mr. Richardson was contained in a Memorandum from the new SAC of Region 6 (Richardson Dep. Exh. 10).  The Memo was printed on OIG Headquarters letterhead; and Mr. Davis told Mr. Richardson that OIG's Office of Legal Counsel "prepared the document" (<u>Id</u>. at 35).

SSSSSSS.    This was "another one of those collaborative meetings "with Mr. Haban, "the front office and legal" (Haban Dep. at 86-87).

TTTTTTT.    After he left HUD OIG and joined the IG's Office of another federal agency, Mr. Romero was contacted on two separate occasions by HUD OIG, once as a supposed target of an investigation (Romero Decl., ¶11).

UUUUUUU.  Mr. Romero was named "Agent of the Year for the NRC Office of Investigations in 2006" (Romero Decl., ¶12).

Respectfully submitted,


_____/s/_____
Robert C. Seldon, Esq.
  D.C. Bar No. 245100


_____/s/_____
Molly E. Buie, Esq.
  D.C. Bar No. 483767
Robert C. Seldon & Associates, P.C.
1319 F Street, N.W.
Suite 305
Washington, D.C.  20004
(202) 955-6968
Counsel for Plaintiff