**ATTACHMENT A**

## EXCERPT FROM U.S. v. FINN DISTRICT COURT RULING

The testimony of Ms. Distad and her colleagues about OIG's perjury, destruction of evidence, and attempted intimidation of defense witnesses led U.S. District Judge Walker Miller to dismiss most of the indictment against Ms. Distad's former supervisor, Jeffrey Finn, US v. Finn, No. 01-CR-184 (D. Colo.). In pertinent part, on January 11, 2002, Judge Miller found:

> It is significant that [administrative assistant Christine] Navarro was ordered [by former Assistant Inspector General] Groves to destroy numerous files and boxes of documents in January of [2001], several weeks, indeed I think months before the indictment . . .
>
> [OIG's] response was an affidavit from Bob Groves that he instructed Navarro to keep the best copy and destroy the rest as unnecessary duplicates . . . The fact is, however, that no such policy was presented . . . and Navarro contradicted specifically that language of the affidavit.
>
> \* \* \* \*
>
> **The factual findings should also include that several defense witnesses, including Navarro and [Special Agents] Meeks, Distad, Lingard, Raney, testified of intimidation in different ways by Mr. Groves and Mr. [XXX], but in essence, that it was their jobs or job consequences, negative job consequences were at risk if they didn't help get the defendant.**
>
> We have uncontested testimony that Groves threatened or intimidated witnesses who might give information favorable to defendant.
>
> \* \* \* \*
>
> [T]he government, through its agents, in particular Mr. Groves, acted in bad faith . . . . therefore I conclude that Counts 3 through 6 should be dismissed.

(Tr. Jan. 11, 2002 at 4-7, 10-11 (emphasis supplied).

A

THIS CERTIFIED COPY IS A PERMANENT RECORD OF THE U.S. DISTRICT COURT FOR THE DISTRICT OF COLORADO

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 01-CR-184

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

JEFFREY S. FINN,

    Defendant.

FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO
FEB 2 1 2002
JAMES R. MANSPEAKER
CLERK
BY_____

---

REPORTER'S TRANSCRIPT
Oral Ruling

---

Proceedings before the HONORABLE WALKER D. MILLER, Judge, United States District Court for the District of Colorado, commencing at 3:00 p.m., on the 11th day of January, 2001, in Courtroom C-203, United States Courthouse, Denver, Colorado.

APPEARANCES

Thomas O'Rourke and James Allison, Assistant United States Attorneys, 1225 17th Street, Suite 700, Denver, Colorado 80202, appearing for Plaintiff.

Harvey Steinberg and Stacey Ross, Attorneys at Law, 1600 Broadway, Suite 1950, Denver, Colorado 80202, appearing for Defendant.

Proceeding Recorded by Mechanical Stenography, Transcription Produced via Computer by Janet Morrissey, 1929 Stout Street, Room C-109, Denver, Colorado, 80294, (303) 893-2835

COPY

PROCEEDINGS

1    THE COURT: We are here on Case No. 01-CR-184, United
2  States of America versus Jeffrey S. Finn. Counsel enter your
3  appearance.
4    MR. O'ROURKE: Thomas O'Rourke for the United States.
5    MR. ALLISON: Likewise, James Allison, Assistant
6  United States Attorney, Your Honor.
7    THE COURT: You are likewise --
8    MR. ALLISON: For the United States, Your Honor. I
9  should have been more explicit. I am sorry.
10   MS. ROSS: Stacey Ross for the defendant. And with me
11 at counsel table is Harvey Steinberg.
12   THE COURT: All right. We are here for a ruling on
13 several motions. We have had several hearings, arguments
14 submitted, transcripts completed and reviewed by the parties
15 and myself. The cases that have been submitted have been
16 reviewed by us. The motions are a motion to dismiss for
17 various reasons, motion to suppress statements, motion for
18 severance.
19
20   The motion to suppress, I will address that first.
21 It's not clear specifically which statements the defendant
22 seeks to suppress, and I am assuming that they are statements
23 made by the defendant to FBI agents on the day the FBI appeared
24 at the HUD Office of Inspector General in Denver. The
25 testimony and what I find from the testimony is that the

defendant made these statements apparently at a table in a conference room with the presence of two agents who factually were armed and were between the defendant and the door.

The position of the government is that the defendant was not under arrest or in custody, was not threatened, was not forced to talk, and was free to terminate the interview at any time, which indeed the defendant did. The basic proposition is that absent a custodial interrogation, there is no requirement of a <u>Miranda</u> warning, and the custody does involve the limitation of freedom of action. And that's basic law of <u>Berkemer v. McCarty</u>, 468 U.S. 420; and, of course, recognized in this circuit that <u>Miranda</u> warnings aren't required absent custody.

My conclusion is there was no custody and it's simple as the fact that the defendant left the conference room when he decided he was going to stop the questioning, and therefore I conclude there was no custody and therefore no need for <u>Miranda</u> warnings. And again, I am not sure what specific statements are at issue; therefore, the motion to suppress is denied.

As to the motion to dismiss, that, of course, is much more involved and has some conflict and necessitates details of findings. The bases for dismissal are destruction of evidence, selective prosecution and outrageous conduct. The circumstances involve in general some destruction of documents, some intimidation, and at least an unusual prosecution for

1 the -- criminal prosecution for the improper use of sick leave.
2 As I believe the defense counsel observed after the
3 first or second hearing, there is a very unfortunate
4 circumstance where law enforcement officers are directly
5 contradicting themselves. And I, of course, know the
6 distinction between different perceptions as we learn early on
7 as lawyers, but some of these things are in direct conflict.
8 And it is -- I just observe that I am sure I reflect not simply
9 someone in my position, but just a citizen of our country, that
10 we have sworn enforcers of the law getting up here and giving
11 contrary versions of some direct facts.
12 This isn't like the four witnesses on the street
13 corners who happen to be present when two cars run together.
14 This is much more precise. And I do want to express my concern
15 particularly to the government side. I am not going to resolve
16 all of these things, including people's sex lives, but I am
17 going to have to resolve some matters to make some rulings
18 here, and I will try to indicate that as I go through it.
19 Certainly an important witness in all of this was
20 Christine Navarro, who had been the defendant's secretary and
21 works for Mr. Bob Groves and continues to work for, as it's
22 referred to, HUD-OIG. It is significant that she was ordered
23 to destroy numerous files and boxes of documents in January of
24 this year, several weeks, indeed I think months before the
25 indictment. It was after, of course, the defendant had been

removed. And there is no question but that there was an ongoing criminal investigation into Finn's actions that had not been filed. As she indicated, she was -- she categorized what she was ordered to shred in the three different categories, the weekly staff meeting notes which included the defendant's handwritten notes that were taken during the meetings. Those notes were destroyed. And Navarro, however, was able to retrieve the final version of the notes from her computer.

She also shredded e-mails that the defendant had maintained as a matter of his own personal policy that he exchanged with people, printed versions, apparently, in the belief that the computer people may be looking at his e-mails and he didn't want that, so he would delete them. And I guess he was right, because the parties then stipulated that indeed those e-mails were not recoverable from the computer system and therefore were destroyed.

And finally, there were personal files which included information such as press releases and other things stored as, quote, "Jeff personal," close quote, and included handwritten notes. And again, all of those documents were shredded. No specific log was maintained of what was shredded; and, importantly, no copies were maintained of what was shredded. It is a significant amount. It took several days, three to five days, I guess my notes indicate. And Navarro was concerned about this and ultimately filed a complaint, I guess,

in August of 2001 concerning this order.

She did testify she wasn't -- she didn't know if she shredded anything that related to the defendant's use of leave or the charges being made, but she also testified that in general she would not have any idea beyond the top document what she was putting in a pile under the shredder. I found Navarro to be credible. She was concerned. She was concerned about testifying.

The government's response was an affidavit from Bob Groves that he instructed Navarro to keep the best copy and destroy the rest as unnecessary duplicates, and that he was supposedly following policy and bringing the office into compliance. And in that affidavit he says he never directed any original documents or where there was only one copy of the document to be shredded, and what I find to be a very self-serving statement quoted here that he did not direct the destruction of any document that even could remotely be considered evidence in the ongoing investigation in the office.

The fact is, however, that no such policy was presented at the hearing, and Navarro contradicted specifically that language of the affidavit. I, as I say, find her to be credible and note that the government failed to produce Mr. Groves, and I therefore could not judge his credibility. And I do, as part of these findings, make the inference that had he been called, it would have been injurious to the

government's view of this. That witness, of course, is particularly available to the government, and again one can infer from these circumstances that the testimony of Mr. Groves would not have helped the government's case, cite United States v. DYBA, 554 F.2d 417, a "older" case from 1977, 10th Circuit. Law still applies in the United States v. Hoenscheidt, H-O-E-N-S-C-H-E-I-D-T, 7 F.3d 1528, (10th Cir., 1993).

So I resolve that conflict and note that it is also unrebutted that the defendant testified that he indeed kept handwritten notes of conversations he had with supervisors and that included notes about his leave, and the conversation he allegedly -- conversations he allegedly had with Kesaris about he needed to take time off and so forth. And the defendant testified that those were indeed kept in his files and that both he and his counsel asked for those files, and when given access to what the government still had, they were not contained in the information provided.

The factual findings should also include that several defense witnesses, including Navarro and Meeks, Distad, Lingard, Raney, testified of intimidation in different ways by Mr. Groves and Mr. Freyermuth, but in essence, it was that their jobs or job consequences, negative job consequences were at risk if they didn't help get the defendant. And I use that phraseology intentionally. It was in short in essence what they testified to.

Again, I am presented with this testimony by people who are working for the government and who believe they were testifying at risk and did testify, and that lends credibility which is underscored by the absence of Mr. Groves and Mr. Freyermuth. I guess it wasn't important to the government to have these people come and let me observe them and decide who is telling the truth. If indeed Mr. Groves is out there threatening people with their job or adverse job consequences, if they come to court to testify under oath, then that's of great concern to this Judge. And it's very, very difficult for me to ignore this. I want to underscore the importance of these people so testifying and in essence the persons accused of it not showing up.

I do want to except out the Distad interview. I certainly want to recognize that there is some disparity, and this may be well more in line with the classic law school example of four witnesses on four different corners to a car accident, but I would even note there that there was inconsistencies between FBI agents and responding to Distad. And when Distad was here, she seemed credible. I don't want to -- I guess maybe just to make sure it's clear on the record, then post-hearing I get who did or didn't have sex with whom, and I have got two affidavits from agents again, one saying black is black and the other saying black is white, and very, very troubling circumstances. But returning -- I do find that

intimidation and threats were involved concerning this particular issue of what happened here, and I have indicated the reasons as to whom I believe.

And what law do I apply to these circumstances? It is correct that as far as the destruction of the evidence goes, that I cannot conclude from this record that there was a destruction of evidence under the so-called Trombetta standard, 467 U.S. 479, 1984 decision. Under that decision, the evidence needs to be constitutionally material that has apparent obvious exculpatory value and defendant would be unable to obtain by other reasonably available means.

Without addressing the second issue, I really don't have any evidence that this was obviously or apparently exculpable, but we also have the standard of Arizona v. Youngblood, 488 U.S. 51, (1988), and that is that the evidence was potentially useful to the defense. And I find that as the evidence was presented to me, that this was potentially useful evidence, but the defendant must also show bad faith. Under the Youngblood standard mere negligence, it says, is not sufficient.

Is there evidence of bad faith? Again, the law is that if evidence was destroyed as a matter of standard procedure, we are going to get rid of excess copies or we are going to get rid of documents that are more than six years old or whatever, that's not bad faith. But that's hardly the

10

circumstances of this case. Again, we have a situation where an ongoing criminal investigation concerning this particular individual is being made. We have uncontested testimony that there was, quote, bad blood between Groves and Finn. We have uncontested testimony that Groves threatened or intimidated witnesses who might give information favorable to defendant. We have a direct conflict of testimony of what Groves purportedly did with what Navarro said he did and an individual who perhaps thought he was a white knight riding in on a charger, but from the testimony presented sounds more like a cowboy on a mustang trampling over people and people's rights.

Again, there is no response to this. Is that in and of itself sufficient for bad faith? It's unclear whether this would fit neatly within standards, such as in the Bohl case, which is B-O-H-L, 25 F.3d -- well, where is the original citation? It's in the 900s, page 900. I can't find the direct citation. The potential for this information to be useful seems to me obvious, and it's not clear that it was done in disregard of a specific request for return. The request for return seems to -- the evidence I have would indicate it was actually after destruction, but there likewise is no evidence that the defendant was told to come get his stuff.

And again, I just -- it's hard for me to imagine this happening without at least some log or other way of monitoring it being maintained. And I guess I should add that hearing the

news, I am giving you findings that were made before Enron information of destruction of documents was made public. And this is, I suppose, small potatoes, but it's the same problem, why information in the hands of law enforcement are being destroyed concerning someone you are intending to prosecute, and if you add to that the other factors which I neglected to make findings, I believe, but there was testimony by different people that no one was aware of anyone being prosecuted criminally for violation of sick leave.

Our research could find no case using key words where a government employee was criminally charged with abuse of sick leave. At least a factor is involved there that I consider, as well as what I have already indicated concerning the threats and intimidation. They are all a part of my conclusion that the government, through its agents, in particular Mr. Groves, acted in bad faith. With regard to -- therefore I conclude that Counts 3 through 6 should be dismissed.

With regard to the outrageous conduct claim -- excuse me, with regard to the selective prosecution, the law appears to be that in order to result in dismissal, it isn't just an individual was picked out for prosecution when others may have been allegedly guilty of the same crime. It had to be tied to additional matters, such as race, religion, and desire to prevent the exercise of constitutional rights. I am not going to conclude that the government is guilty of selective

1 prosecution. I will leave it unresolved as to those counts
2 because I do believe that the destruction was done in bad
3 faith. I am reluctant to extend that, given the involvement of
4 the United States Attorney, to the filing of the action.
5 Likewise, with regard to the outrageous conduct claim,
6 it is, of course, recognized under the <u>Mosley</u> decision, which
7 was frequently cited, I believe, 965 F.2d 906, (10th Cir.,
8 1992), you need to be talking about the most egregious
9 circumstances and may well be limited to where the government
10 in effect induces or is overly involved in the creation of the
11 crime, I think is the language for <u>Mosley</u>.
12 I just would observe that I, again, am not making that
13 conclusion, but that it would be only a small step to say that
14 the government was overly involved in the creation of a crime
15 of misuse of sick leave. But I am not, for the record,
16 dismissing on either selective prosecution or outrageous
17 conduct.
18 With regard to the motion to sever, it's now moot.
19 And we only have the first two counts remaining and they will
20 remain pending. The evidence was not tailored to the Montana
21 issues, and therefore the criminal charges Counts 1 and 2
22 remain pending.
23 Any questions about my ruling?
24 MR. O'ROURKE: I had a couple, Your Honor. Your
25 Honor, I think you and I perhaps read the motion differently.

I read the motion to say that the Counts 3 through 6 should be dismissed because of outrageous government conduct, and then the defendant broke down its government outrageous conduct into three separate instances, three separate sets of allegations. They were selective prosecution, destruction of documents, and the government's intimidation of witnesses. And I understand you to say that you are not dismissing because of outrageous government conduct, and simply I guess I am asking for clarification. I don't see how you can both say you are not dismissing for the reason that was set forth in the motion and also grant the motion at the same time.

THE COURT: Well, I don't know what to say to you other than you can have a dismissal for improper destruction of evidence, and that's what I am dismissing for. I don't read -- I don't limit the defendant to how they may have organized their table of contents.

MR. O'ROURKE: The other question I had, Your Honor, was that -- I am not sure my notes are clear. You said the intimidation and the threats by Groves concerned this particular issue, and I wasn't sure what you meant by "this particular issue."

THE COURT: The issue of the defendant's conduct, if that's what I said, but that's -- I assume -- you would have to give me a little bit more context. What I was talking about is that maybe it was with regard to Navarro, she also felt she was

1 intimidated and her role was limited. The other witnesses
2 included one, whose name I am not able to remember the name
3 specifically, but had meetings with the FBI and was essentially
4 accused of lying or covering up, so there are unique
5 circumstances to each. And if I used that language, I intended
6 to say that the intimidation was directed at these people to
7 not assist the defendant by providing testimony or otherwise
8 that might be helpful to him. And that if they didn't help,
9 quote, get him, adverse job consequences could result.

10 MR. O'ROURKE: The only other thing, Your Honor, I
11 guess I wanted to clarify was you said several witnesses
12 testified, and you said those witnesses included Mr. Lingard.
13 And it's my recollection that Lingard never did testify, but,
14 rather, the private investigator came in and summarized his
15 interview with Mr. Lingard.

16 THE COURT: I will accept that. That would be true of
17 standard -- that's correct. And who was the other fellow with
18 Distad? His view was presented in the limited fashion in a
19 similar way.

20 MR. O'ROURKE: Mr. Cooley.

21 THE COURT: Yeah, Cooley.

22 MR. O'ROURKE: Could I have a second, Your Honor?

23 THE COURT: Yes.

24 MR. O'ROURKE: Thank you, Your Honor.

25 THE COURT: Defendant have any questions?

MS. ROSS: No, Your Honor.

THE COURT: I don't know where we are on speedy trial, so you are directed to schedule trial and trial preparation conference consistent with the constraints of speedy trial. I am assuming we don't need as much time, so let's get her going. The bond will continue and we will be in recess.

(Recess at 3:40 p.m.)

* * * * *

## REPORTER'S CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter. Dated at Denver, Colorado, this 19th day of February, 2002.

_____
Janet M. Morrissey