**ATTACHMENT K**

UNITED STATES OF AMERICA

DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

OFFICE OF THE INSPECTOR GENERAL

INTERVIEW OF JAMES MALLOY

Washington, D.C.

Friday, October 10, 2002

BETA

(202) 638-2400    Nationwide Court Reporting & Videography Services
                  . . . There is No Substitute for Quality        (703) 684-BETA
                  1-800-522-BETA

2

```
 1              P R O C E E D I N G S
 2                                          (11:27 a.m.)
 3          MR. ROBINSON:  This is Assistant
 4  to the Special Agent in Charge John C.
 5  Robinson for the HUD OIG, Special
 6  Investigations Division.  It is October 10,
 7  2002, approximately 11:27 a.m. in the
 8  morning.  I am physically located here in
 9  this SID office located in Washington, DC.
10  I'm here for the purpose of interviewing
11  Assistant to the Special Agent in Charge of
12  the Southwest OIG HUD District in Fort
13  Worth, Texas, James Malloy, who is present
14  here this morning for the purpose of an
15  administrative inquiry.  Also present is
16  Mike Napoleone, who's an ASAC with HUD OIG.
17          Before we get started could you
18  just go and, Jim, say your name for the
19  record?
20          MR. MALLOY:  My name is James M.
21  Malloy.
22          MR. ROBINSON:  Mike, could just
```

1    add your name to the record?

2              MR. NAPOLEONE: First name is

3    Michael, last name Napoleone, Assistant

4    Special Agent in Charge, Special

5    Investigations Division, HUD Office of

6    Inspector General.

7              MR. ROBINSON: Jim, what we're

8    going to do now before we go any further is,

9    as I said to you, this is an administrative

10   inquiry we're making at this time and for

11   the record I'm going to read into the record

12   and also share this form that you can read

13   over about the administrative advisement of

14   rights. And this is to James Malloy, ASAC,

15   HUD OIG, form entitled Administrative

16   Advisement of Rights: "Before we ask you

17   any questions you must understand your

18   responsibilities as an employee of the

19   United States Department of Housing and

20   Urban Development otherwise known as HUD.

21   This is purely administrative inquiry. The

22   purpose of this interview is to obtain your

4

1   responses to questions concerning
2   allegations or part of the inquiry of
3   failure to follow OIG policy and
4   unprofessional conduct.
5           "You have a duty as an employee of
6   HUD to answer any questions concerning
7   employment.  Your failure to answer relevant
8   and material questions as they relate to
9   your official duties may cause you to be
10  subjected to disciplinary action, including
11  possible removal by HUD.  Any information or
12  evidence you furnish in response to
13  questions put to you during this interview
14  or any information or evidence which is
15  gained through your answers may be used
16  against you in an administrative
17  proceeding."
18          If you could go and read that,
19  Jim, and understand that those are the areas
20  we're going to be talking about and I'll
21  obviously elaborate on them.
22          Larry, just for the record while

5

1   Jim is reading over the document, could you
2   just identify yourself, please?
3           MR. BERGER: Sure. Lawrence
4   Berger, and I'm the General Counsel to the
5   Federal Law Enforcement Officers
6   Association.
7           MR. ROBINSON: Thanks, Larry.
8           MR. BERGER: And I represent
9   Mr. Malloy in this interview.
10          MR. MALLOY: John, would you read
11  just exactly what the questions are
12  concerning because I can't read that.
13          MR. ROBINSON: Yes, concerning
14  failure to follow HUD OIG policy and
15  unprofessional conduct.
16          MR. MALLOY: All right, and those
17  questions are relating to that about me or
18  Chapman or both?
19          MR. ROBINSON: You.
20          MR. MALLOY: Okay. All right, I
21  understand that. Might we have a copy of
22  that?

                                                                    15

1  training?

2           MR. MALLOY:  Right.

3           MR. ROBINSON:  It was a week of

4  training is the way it was described to me.

5  Did you make any comments or was there any

6  comments that you heard during that training

7  in terms of a strategy that the office would

8  take concerning this internal investigation,

9  a strategy that you all should abide by?

10          MR. MALLOY:  No.  No, there was

11 not.

12          MR. ROBINSON:  Did Larry tell you

13 what to say or what to do or what not to do

14 or give you any advisement?

15          MR. MALLOY:  No, he did not.

16          MR. ROBINSON:  Did you ever hear

17 anybody else make a statement that now is

18 the time due to the situation from Internal

19 Affairs being involved to circle the wagons

20 on this issue and join forces?

21          MR. MALLOY:  Did you ask if I made

22 that statement or did I hear that?

16

1  　　　　　MR. ROBINSON: Did you make it,
2  Jim, or did you hear somebody make that
3  statement?
4  　　　　　MR. MALLOY: I did not make that
5  statement.
6  　　　　　MR. ROBINSON: And you never heard
7  nobody else make that statement?
8  　　　　　MR. MALLOY: I did not. I never
9  heard anybody make that statement. I will
10 clarify this, though. We had an
11 administrative meeting as part of the weekly
12 training and Janine Hess and I had gone to
13 an administrative officers meeting and we
14 discussed things that the agents needed to
15 watch out for like using -- misuse of the
16 cellular phones, misuse of the government
17 cars.
18 　　　　　Larry mentioned at that time that
19 Internal Affairs had been down to come look
20 at him. And I don't really recall whether
21 or not he said what the specifics -- he was
22 pretty general.

54

my review of the report and what my analysis of the evidence was.

MR. NAPOLEONE: Did you coordinate with our human resources or our Bureau of Public Debt after you evaluated the facts concerning Cortez Richardson?

MR. MALLOY: I did not.

MR. NAPOLEONE: You did not. Did you coordinate with our Office of General Counsel concerning either of these two cases before you as the proposing official?

MR. MALLOY: I did not.

MR. NAPOLEONE: Why didn't you?

MR. MALLOY: Well, I was -- I basically talked to Chapman and -- for one thing this is the first time I've ever been a proposing official on any of this.

MR. BERGER: Were you aware of any rules or processes or procedures that applied to you as a proposing official?

MR. MALLOY: No. All I know is that I was getting calls from Nufer that,

55

1   you know, basically, you know, we needed to
2   get -- and from Haven -- that they wanted to
3   get the thing adjudicated. We also had the
4   situation where Larry Chapman was resigning
5   or leaving on September 30th.
6          MR. NAPOLEONE: Did you ever get a
7   copy of the OIGM penalty guide?
8          MR. MALLOY: Yes.
9          MR. NAPOLEONE: You did. And do
10  you recall what manual chapter that's
11  attached to, the penalty guide, penalty of
12  offenses?
13         MR. MALLOY: Now, wasn't that part
14  -- I think that was when the council was in
15  place, right?
16         MR. NAPOLEONE: Jim, it's part of
17  OIGM 1752. It came out in November of 2001.
18  Of course, you had to have used it because
19  you gave him five days suspension and you
20  gave him a letter of counseling. You had to
21  refer to something, correct?
22         MR. MALLOY: That's correct.

                                                                56

1          MR. NAPOLEONE:  So did you refer
2     to that chapter?  That's the only current
3     chapter in existence.
4          MR. MALLOY:  Right.
5          MR. NAPOLEONE:  According to that
6     chapter, and I'm reading it right here, the
7     proposing official is responsible for
8     evaluating the facts, and I'm reading this,
9     and developing the notice with the
10    assistance of the Human Resources Division,
11    which is our VPD, and it says or our service
12    contractor when one exists, which one does,
13    and the Office of Counsel.  That's your
14    responsibility.  Did you do that?
15         MR. MALLOY:  I did not.
16         MR. NAPOLEONE:  You did not.  Why
17    didn't you do that?
18         MR. MALLOY:  Because I was
19    instructed by my SAC that we didn't need to
20    do that, that we needed to get these
21    adjudicated before he left so somebody else
22    didn't have to deal with it once he was --

57

1  MR. NAPOLEONE: What's the
2  urgency? I don't understand. I don't
3  understand the urgency. Can you explain it
4  to me?
5  MR. MALLOY: You might want to ask
6  Nufer and Haven.
7  MR. NAPOLEONE: Well, I'm asking
8  you. You're here today. Can you explain
9  the urgency?
10  MR. BERGER: Look, you're entitled
11  to ask him questions and he's got to answer
12  them and all that, but I want to make sure.
13  I don't know whether he's giving you
14  precisely how this was presented to him. He
15  said this is the first time he's ever been a
16  proposing official and I'm not even sure how
17  it was presented to him. Normally it goes
18  through Human Resources, I would imagine,
19  but I guess in this case for some reason it
20  didn't.
21  MR. MALLOY: I was told by Nufer
22  at Bureau of Public Debt --

```
                                                         58

 1              MR. BERGER:  Who is Nufer?

 2              MR. NAPOLEONE:  He is our Human

 3     Resources person.

 4              MR. BERGER:  So you did have

 5     contact with this Mr. Nufer?  Is that

 6     correct?

 7              MR. MALLOY:  Yes.

 8              MR. BERGER:  Well, tell him what

 9     the guy said.  Obviously he must have been

10     aware of what you were doing, correct?

11              MR. MALLOY:  He called me at least

12     on two occasions wanting to know if I'd

13     gotten the report of investigation in and --

14              MR. BERGER:  What else?

15              MR. MALLOY:  That was pretty much

16     all that he --

17              MR. BERGER:  Was he aware of the

18     proposal?  Who typed up the proposal?

19              MR. MALLOY:  Janine Hess typed it

20     up.

21              MR. NAPOLEONE:  Who wrote it?

22              MR. BERGER:  Who wrote it?  Good
```

59

1  question.

2     MR. MALLOY: On Cortez Richardson
3  I went to Chapman and I basically discussed
4  with him what the allegations -- you know,
5  what my impression of the allegations was.
6  I told him, I said, Larry, you have -- you
7  went to the meetings, the SAC meetings. You
8  know what the particulars were as far as how
9  information came down to the field on Safe
10 Home matters, and I need you to put in that
11 information as far as when that information
12 came about.

13    MR. BERGER: Who actually wrote
14 the proposal?

15    MR. MALLOY: Larry wrote -- Larry
16 Chapman wrote the first -- the allegation --
17 the issue about the Safe Home money. He
18 wrote that part up. So, I mean, we
19 basically kind of both did part of it.

20    MR. BERGER: I see.

21    MR. MALLOY: While I was working
22 on the Romero draft he was working on the

88

again because we're both in the same business. We have a conflict here now, inconsistent stories, and that is I want to give you one more opportunity. Did you make any of those statements or anything similar to those statements?

    MR. MALLOY: Mike, the only thing that I can recall is that we had a staff meeting with the entire staff and we were talking about Internal Affairs issues and mainly using it as a method of making sure that the agents took care of their business with cell phones and with the government cars. In some way it was kind of a positive thing for us to bring the message to the agents that they'd better take care of their business.

    And if he said they needed to circle their wagons or take care of their business, I mean, that may -- he may have said that --

    MR. NAPOLEONE: Who's he?

89

1   MR. MALLOY: Larry Chapman. And,
2   I mean, I probably -- I said some things
3   there, too, about it, mainly because I went
4   to the administrative officers meeting and I
5   knew the questions that Stevens was asking
6   about of the administrative officers on
7   using the cell phones and was their abuse
8   there, that type stuff, so, I mean, there
9   may have been that type of information about
10  circling the wagons but as far as let's
11  circle the wagons on the Chapman
12  investigation I have no recollection or
13  knowledge of that.
14       MR. NAPOLEONE: And with respect
15  to the other two statements allegedly you
16  made or you were present when they were
17  made, "Let's get our story straight
18  regarding Chapman," and, "They can't make
19  you remember things," are those attributed
20  to you in any form or fashion?
21       MR. MALLOY: I have no
22  recollection of that, making those