UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JAMES MALLOY, )<br>)<br>   Plaintiff, )<br>)<br>   v. )<br>)<br>ALPHONSO R. JACKSON, )<br> Secretary Of Housing And )<br> Urban Development, )<br>)<br>   Defendant. )<br>_____) | Civ. Action No. 05-1117 (RCL) |

## DECLARATION OF LARRY CHAPMAN

I, Larry D. Chapman, being first duly sworn, do hereby depose and state as follows:

1) From March of 1991 until September of 2002, when I retired from the federal government, I served as the Special Agent in Charge (SAC), formerly known as Regional Inspector General of Investigations, GS-1811-15, of the Southwest Region[1] of the Department of Housing and Urban Development (HUD), Office of the Inspector General (OIG), Office of Investigations. In that position, I reported to Assistant Inspector General for Investigation (AIGI), as normally my second line supervisor, the last one being R. Joseph Haban, who had responsibility for HUD OIG Office of Investigation activities in Regional and District Offices. Shortly before I retired, Daniel Salas was promoted to the position of Deputy AIGI and became my first-level supervisor.

2) I make this Declaration based upon my extensive experience as a Special Agent in Charge of one of the largest HUD OIG Regions. This experience gave me familiarity with OIG standard operating procedures, which are contained in a large number of very lengthy

---

[1]     The Southwest Region is now called Region VI.

manuals and are also known to me and throughout HUD OIG, and are also based upon less formal written memoranda and letters and oral communication. As a SAC, I had overall responsibility for the activities of the Office of Investigations in my Region and am familiar with the operations of OIG, including OIG's structure, its investigative activities, requirements for service as agents, standards of conduct of agents, and procedures that are expected of agents. My knowledge of these and other matters was cemented in regular national conferences and day-to-day interaction with other SACs and senior OIG officials in Headquarters.

3) The HUD Office of Inspector General was created as a result of the Inspector General Act of 1979. Its basic function is to prevent and detect fraud, waste, and abuse by individuals and entities who are engaged in the business of providing, or are the residents of, HUD-sponsored and HUD–financed housing and housing programs through administrative audits and criminal investigations. The Office of Investigations concentrates on potential criminal prosecutions arising from these investigations. There are also other activities and/ or divisions within the Office of Investigation, for example the Special Investigations Division; and joint task forces with federal, state and local agencies concerning matters of mutual interest.[2]

4) The professional employees of the Office of Investigations at every level, in the field and in Washington, D.C., are all federal law enforcement officers, and known alternately as Special Agents and/or Criminal Investigators. All of them at every level are held to the same standards of conduct, and an act of misconduct that is arguably an offense for a line agent, for example, is also an offense for a senior manager.

---

[2]    OIG also has a separate analogue to the Office of Investigations; known as the Office of Audits, it focuses on financial reviews and potential civil and administrative sanctions. The professionals in that Office are auditors.

2

5) The investigative activities of the Office of Investigations are eventually headed up by the Inspector General himself or herself. The current Inspector General and the last one I served under was Kenneth Donahue. His immediate subordinate is the Deputy Inspector General; in this case, the last one I served under was Michael Stephens. It was my understanding that the Deputy Inspector General Stephens served over all Regions, Divisions, and other offices in HUD OIG, in Headquarters and around the country.

6) Reporting directly to the Deputy Inspector General is the Assistant Inspector General for Investigations, here R. Joseph Haban, who assumed his position in the early part of 2002 after the retirement of his predecessor Robert Groves. The Deputy Assistant Inspector General for Investigations when I retired was Daniel Salas, who now serves in my former position as SAC of the Southwest Region.

7) The majority of OIG's investigative activities are conducted around the country in Regional and/ or smaller District Offices. Usually each of those offices is headed by a Special Agent in Charge who reports to the Assistant Inspector General for Investigations and/or his Deputy. OIG offices in the field normally have one or more Assistant Special Agents in Charge (GS-14), who are the first line supervisors for staff agents and normally have daily responsibility for and oversight of the investigative activities in their offices.

8) At the time of my retirement the Headquarters Office of Investigation activities included those of the Special Investigations Division that I mentioned above. Each Division is headed by a Special Agent in Charge who answers to the Assistant Inspector General for Investigations and/or to the Deputy Assistant Inspector General for Investigations. The Special Agent in Charge of the Special Investigations Division when I retired was John McCarty. He

succeeded Mr. Haban in that position and has, in turn, followed Mr. Haban as Assistant Inspector General for Investigations.

9) Jim Malloy joined HUD OIG in 1983 and became an ASAC in the Southwest Region in 1993. Throughout the time I was SAC, I supervised Mr. Malloy, initially at the second level and then at the first level after his promotion to ASAC. Mr. Malloy was an exemplary employee and an exceptionally hard-working manager who achieved excellent results for the OIG.

10) Mr. Malloy was known at the national level in HUD OIG as a top manager, for his original and creative work in important investigations and criminal prosecutions including, for example, equity skimming. His hard work and excellent reputation were the primary reasons why I had him serve on joint task forces with other law enforcement bodies, including the Federal Bureau of Investigation.

11) During our working together, I never had any reason to consider counseling Mr. Malloy, much less disciplining him. I saw him as a trusted subordinate who had no blemishes on or questions about his performance or conduct, and it was my belief that he had a good chance of becoming a SAC himself.

12) On several occasions while Mr. Malloy was under my supervision, he asked me if he could transfer as an ASAC from Fort Worth to the Houston office, which was also part of the Southwest Region. Although I knew that this was a matter of importance to Mr. Malloy, I did not agree to his request because I preferred for all of my managers to be in the same office as me. If there was an ASAC position in Houston, there is no doubt in my opinion that Mr. Malloy would have been a leading candidate for the position.

13) I have learned through this litigation that Mike Kepler was selected for an ASAC position in Houston. As Mr. Kepler's second line supervisor, I can say that he was not as well qualified for the position as Jim Malloy. While I was employed by HUD OIG, Kepler was never a supervisor in HUD OIG, while Malloy had distinguished himself as a supervisor and a line agent. Malloy had far more substantive knowledge and experience than Kepler about HUD and, as an ASAC, had come to deal with senior OIG management in Headquarters. Together with Mr. Malloy, I interviewed Mr. Kepler for his initial agent position with HUD OIG. Mr. Kepler was willing to be hired by HUD OIG as a GS-13, below his previous grade. Malloy, by contrast, had distinguished himself as an agent, a manager and a supervisor. He represented the Southwest Region at meetings with other federal law enforcement agencies for a number of years and had an excellent rapport with management from other agencies. He was elected Chairman of the Southwest Inspector General Council; was well respected by U.S. Attorney's Offices in the region, including Houston. Malloy was also selected by OIG Headquarters management to periodically instruct new HUD OIG agents on conducting fraud investigations.

## Richardson Disciplinary Action

14) On or about March 7, 2002, during a meeting in Tampa, Florida, I was asked by Assistant Inspector General Haban for my concurrence in transferring Special Agent Cortez Richardson to the Southwest District. Mr. Haban explained that he wanted to transfer Mr. Richardson in order to facilitate the settlement of Richardson's then-pending EEO complaint. At that time, Mr. Richardson was stationed in the OIG District Office in Denver, Colorado. That office's former Special Agent in Charge, Jeff Finn, had been previously indicted for his activities as a SAC.

15) I strongly objected to Mr. Richardson's reassignment to my region. I insisted on being assured by Mr. Haban that if Richardson was transferred to my region that neither I nor my management staff was to be involved in any EEO or disciplinary matters directed towards Mr. Richardson. I did not feel that it would be appropriate for my office to be involved since I had never supervised Mr. Richardson, and his alleged misconduct had occurred in Denver. During this March 7, 2002 meeting, Mr. Haban assured me that any disciplinary actions toward Mr. Richardson would be handled either by OIG headquarters or by the Denver office. I have attached e-mails exchanged between Mr. Haban and me related to this matter to this Declaration as Attachments and attest to the fact that they are true and correct copies of what they purport to be.

16) In a subsequent conversation with Mr. Haban, he asked me whether I thought Mr. Richardson could be rehabilitated, which is a term used in connection with the Douglas Factors that must be taken into consideration in imposing discipline on federal employees. I answered that I thought he could be, but in order to make that happen, Mr. Richardson needed to be given an opportunity to make a truly "fresh start" in the Southwest Region, with as previously agreed, no disciplinary action on our part.

17) Mr. Richardson, I came to learn, made a request to Inspector General Donahue for a hardship transfer to Region VI. Subsequently Mr. Richardson was transferred to the Oklahoma City office, which is a part of the Southwest Region, in June of 2002. Mr. Malloy became his first-level supervisor, and I became his second-level supervisor.

18) In mid-July of 2002, I was contacted by Dave Nuhfer, who was responsible for the HUD OIG employee and labor relations and was employed by its personnel contractor, the Bureau of Public Debt (BPD). Mr. Nuhfer asked whether Mr. Malloy and I had received the

6

investigative report regarding Mr. Richardson's alleged misconduct. I replied that we had not, and explained that pursuant to my conversations with Mr. Haban, the Southwest Region was not going to be involved in Mr. Richardson's disciplinary proceedings. I referred Mr. Nuhfer to Mr. Haban and assumed that this was the end of the matter. I subsequently sent an e-mail to Mr. Haban concerning this contact. I have attached a true and correct copy of this e-mail to this Declaration as Attachment 1.

19) During a conversation on or about July 17, 2002, with Mr. Haban in Ft. Worth, I informed him of Mr. Nuhfer's contact and of my response. Mr. Haban again assured me that either Denver or Headquarters would handle Mr. Richardson's potential discipline.

20) In approximately mid-August of 2002, I received a telephone call from Mr. Haban in which he directed me to serve as the deciding official, and Mr. Malloy to serve as the proposing official, in the Richardson disciplinary matter. In that conversation and in a subsequent e-mail to Mr. Haban dated August 19, 2002, a true and correct copy of which is appended here as Attachment 2, I again voiced my strong disagreement with this decision for the same reasons I had given previously and reminded Mr. Haban of his assurances that we would not be responsible for this matter.

21) In early September of 2002, I received a copy of the Richardson Report of Investigation. As I recall, at some time during the week of September 16 to September 20, 2002, I gave the report to Mr. Malloy, and directed him to review it and decide whether to propose disciplinary action against Richardson. Also, around this time I also instructed Mr. Malloy to finalize his proposal so that I could make my final determination before I retired. This decision was mine.

7

22) I advanced my retirement date to September 30, 2002, because after I advised Mr. Haban that he had broken his commitment concerning Richardson to me and Region VI, the Special Investigations Division which he supervised re-opened a previously closed investigation of me into an alleged construction of a home. The allegation was stale and baseless, as I had been cleared of it years earlier by Mr. Haban's predecessor, Assistant Inspector General for Investigations Groves. Additionally, Mr. Haban was at that time the supervisor of the investigations unit that reported to Mr. Groves.

23) Mr. Malloy's review of the Richardson ROI was happening simultaneously with training and other official duties, so I met with him shortly before my retirement to hear his thoughts. I could tell that Mr. Malloy had reviewed the Richardson Report of Investigation thoroughly and thought long and hard about a resolution of this matter. I did too, and both of us discussed the appropriate discipline to propose for Mr. Richardson.

24) Mr. Malloy felt, and I agreed, that harsh discipline was unwarranted based on our review of the information provided in the investigative report. Mr. Richardson was being supervised by Finn when he had been given certain directions by Finn, and furthermore, we felt that there was a question of timeliness concerning the investigation. The acts on Richardson's part had occurred in 2000. We did not receive the investigation report in April of 2002, when it was produced for Mr. Haban, but rather received it on or about September 9, 2002. I raised the timeliness issue in a September 23, 2002 e-mail with Mr. Nuhfer.

25) After weighing all the evidence, Richardson's culpability, his acceptance of responsibility, his prompt reporting to his immediate supervisor in Denver of his objections to Finn's direct instructions to alter a receipt, and the timeliness issue, Mr. Malloy advised me that he felt that a 5 day suspension was appropriate. I agreed. As the proposing official, Mr. Malloy

prepared a proposal to suspend Mr. Richardson. I reviewed it and prepared a final decision. Before I retired, I discussed the matter with Mr. Richardson; and he informed me that he was satisfied with the outcome, did not want to appeal, and wanted to serve the suspension promptly.

26) Mr. Malloy asked me about some of the technical programmatic information that was included in the report with which he was unfamiliar. Since I had more knowledge about those issues, I helped him draft the portions of the notice of proposed discipline letter that dealt with those subjects.

27) Mr. Malloy advised me that he had been in contact with Mr. Nuhfer in BPD, and that Nuhfer had indicated that he believed that the offense was "serious" and that Mr. Richardson should be given "serious time off."

28) I did not specifically instruct Mr. Malloy that he needed to do anything further to coordinate Richardson's discipline with Headquarters, such as consulting with HUD OIG legal counsel or Headquarters management. Headquarters was fully aware of my concerns and objections well before they assigned the Richardson disciplinary matter to the Southwest District and knew that I felt Richardson could be rehabilitated and should be given a fresh start in our district. From my understanding, Mr. Malloy and I were fully empowered to decide the appropriate level of discipline to impose.

29) Additionally, I wanted to complete the Richardson disciplinary matter before I retired in September of 2002; therefore, time was of the essence for Mr. Malloy to get the proposed discipline issued.

30) I can also add that in my experience, and to my knowledge, no HUD OIG manager has ever been criminally investigated, placed on annual leave, had his supervisory responsibilities removed, or disciplined for not coordinating a personnel issue with Headquarters.

There was no reason, in my opinion, for this sort of reaction for Mr. Malloy's supposed failure to coordinate the discipline of one of his subordinate employees with Headquarters or BPD.

### Romero Disciplinary Action

31) In approximately mid-July of 2002, Mr. Malloy and I discussed a Special Investigations Division (SID) investigation concerning Special Agent Steve Romero with Mr. McCarty and Mr. Haban at a meeting in Arlington, Texas. Mr. Romero was also a subordinate employee of mine in the Southwest District. As I recall, the SID investigation centered around whether Mr. Romero had supposedly falsified information on his application to join HUD OIG. During the meeting, Mr. Haban and Mr. McCarty emphasized the alleged "seriousness" of Mr. Romero's conduct, with Mr. McCarty stating that Mr. Romero had been "stupid" in his actions.

32) At that point, Mr. Malloy and I had not seen the SID report of investigation. I emphasized that I would reserve judgment about Mr. Romero's actions until I had an opportunity to review the ROI.

33) After we received the report of investigation about Mr. Romero in August, 2002, Mr. Malloy and I both reviewed it and eventually agreed that it did not include evidence to support the strong comments Mr. Haban and Mr. McCarty had made about Mr. Romero during the July meeting. As I recall some of these same charges against Mr. Romero had previously been investigated and adjudicated by then-Deputy Assistant Inspector General for Investigations, Phil Newsome. Our own independent review led both of us to decide that Mr. Romero needed a letter of counseling as his formal discipline. Mr. Malloy put one into effect and, again with instructions by me to conclude the matter before I retired, I approved it on September 30, 2002.

34) I was aware that Mr. Malloy had not spoken to Headquarters or BPD about his proposed discipline of Mr. Romero, and I did not require him to do so. It was and remains my

understanding that Mr. Malloy and I had the authority to make the disciplinary decision based on the information that had been provided.

35) As with Mr. Richardson, I wanted to get the Romero disciplinary matter finalized before I retired in September of 2002; therefore, time was of the essence for Mr. Malloy to complete his part of the process.

### HUD's Treatment of Other Managers

36) I am aware that the agency claims that Mr. Malloy refused to cooperate during an internal investigation of me, which supposedly led to his being placed on administrative leave in the fall of 2002, when Mr. Malloy apparently declined to turn over personal diaries under advice from his attorney.

37) HUD OIG also alleges that Mr. Malloy made a comment about "circling the wagons" during a staff meeting in an attempt to dissuade our staff from cooperating with investigators. I can state categorically that in my presence he said nothing of the sort in that meeting.

38) Dan Truxal, another Assistant Special Agent in Charge under my supervision, was also involved in this investigation, and I understand also initially declined to hand over his personal diaries to an SID investigator. As an ASAC, Mr. Truxal was subject to the exact same standards of conduct as Mr. Malloy, yet he was apparently not treated the same as Mr. Malloy.

### The Effect of The Agency's Actions on Mr. Malloy's Law Enforcement Career

39) I am aware that after Mr. Malloy and I refused to impose what we believed was unwarranted, overly-harsh disciplinary action on Agents Richardson and Romero, Mr. Malloy was placed on administrative leave, subjected to an internal investigation, and had his

supervisory duties removed. I believe those actions make it impossible for Mr. Malloy to continue to serve effectively in federal law enforcement.

40) A federal law enforcement officer's credibility is essential. A special agent who is under investigation is tainted in a criminal prosecution, because any questions about his integrity must be disclosed to the defense. I believe that being relieved of supervisory responsibility while under investigation would make Mr. Malloy's continued participation on inter-agency task forces and councils ineffectual.

41) I also believe from my experience that HUD OIG's actions toward Mr. Malloy have made it virtually impossible for Mr. Malloy to obtain law enforcement work outside of HUD OIG. Because the law enforcement community is a small and insular group, I believe he would have to disclose these actions by HUD OIG, and he would be questioned about why his supervisory duties were removed.

42) As a requirement of applying to law enforcement positions, Mr. Malloy would normally have had to undergo a background check. The above events would have a severe impact on his opportunities to be considered for another law enforcement position.

43) I knew from Mr. Malloy that he was of Native American national origin. He kept a sculpture in his office of a Native American on a horse that was inscribed "Chief Malloy" on view to everyone in our Regional office. He served as a member of OIG's national recruitment and diversity committee and for the Southwest Region, as well, where he openly discussed his Native American heritage. When a former Inspector General asked all OIG to identify the number of its minorities, my region reported a supervisor with Native American origin. That could only have been Mr. Malloy. In addition, one of the agents who eventually became Mr. Malloy's successor made derogatory comments about his national origin. These were formally

investigated by the Special Investigations Division while Mr. Haban was the SAC. My

understanding of SID procedure would have Mr. Haban, as the SAC, review a close out report,

which would have given him knowledge of Mr. Malloy's national origin.

I hereby declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge, information, and belief.

*[Signature]*

Larry D. Chapman
Executed on July 10th, 2007.

**Larry Chapman**
08/19/02 10:26 AM

To: Rudolph Haban/WHV/HUDOIG
cc:
Subject: Cortez Richardson

You telephoned me yesterday morning, August 19, 2002, telling me, among other things, that you had decided to send the Cortez Richardson investigation concerning the Denver Region actions to me to adjudicate. As you well know, when you and I met in Tampa, Florida on March 7, 2002 for my evaluation, you asked me if I would be willing to allow Cortez to transfer to my Region so that you could settle Cortez's EEO complaint. I objected strongly to the possibility of such a transfer in light of the ongoing issues regarding the Denver Region. You stated you needed to settle the EEO complaint

**Larry Chapman**
07/15/02 05:17 PM

To: Rudolph Habon/WHV/HUDOIG@HUDOIG
cc: Richard Johnson/WHQ/HUDOIG@HUDOIG,
davenuhfer@bpd.treas.gov, (bcc: Larry Chapman/FTW/HUDOIG)
Subject: Cortez Richardson

Joe, today I received a telephone call from Dave Nuhfer at BPD advising that he wished to discuss a ROI regarding Cortez Richardson and pending disciplinary action concerning this report. As I understood it involved actions occurring while Cortez was stationed in Denver Region. I advised Mr. Nuhfer that since the incident occurred while in Denver he needed to send the report to Denver SAC or to you for action.

As you recall, when we were in Tampa you asked me if Cortez could transfer to my Region as part of an EEO settlement. One of the agreements in this transfer was that all/any disciplinary incidents that occurred while Cortez was stationed in the Denver Region would be handled through your office and/or the Denver Office.

**Larry Chapman**
07/15/02 05:17 PM

To: Rudolph Habon/WHV/HUDOIG@HUDOIG
cc: Richard Johnson/WHQ/HUDOIG@HUDOIG, davenuhfer@bpd.treas.gov, (bcc: Larry Chapman/FTW/HUDOIG)
Subject: Cortez Richardson

Joe, today I received a telephone call from Dave Nuhfer at BPD advising that he wished to discuss a ROI regarding Cortez Richardson and pending disciplinary action concerning this report. As I understood it involved actions occurring while Cortez was stationed in Denver Region. I advised Mr. Nuhfer that since the incident occurred while in Denver he needed to send the report to Denver SAC or to you for action.

As you recall, when we were in Tampa you asked me if Cortez could transfer to my Region as part of an EEO settlement. One of the agreements in this transfer was that all/any disciplinary incidents that occurred while Cortez was stationed in the Denver Region would be handled through your office and/or the Denver Office.

**Larry Chapman**
08/19/02 10:26 AM

To: Rudolph Haban/WHV/HUDOIG
cc:
Subject: Cortez Richardson

You telephoned me yesterday morning, August 19, 2002, telling me, among other things, that you had decided to send the Cortez Richardson investigation concerning the Denver Region actions to me to adjudicate. As you well know, when you and I met in Tampa, Florida on March 7, 2002 for my evaluation, you asked me if I would be willing to allow Cortez to transfer to my Region so that you could settle Cortez's EEO complaint. I objected strongly to the possibility of such a transfer in light of the ongoing issues regarding the Denver Region. You stated you needed to settle the EEO complaint

During the March 7, 2002 meeting, we touched on the issues that were currently occurring in Denver, Co. regarding Cotez's involvement and I sought specifics of those issues. You stated to me that you could not elaborate as you had not seen the final report. My central reservation in this transfer proposal was my strong belief, which I conveyed to you, that none of the Denver issues should involve me, or this office, in any disciplinary actions that could arise from Cortez's activities while assigned to the Denver Region. After some additional discussions, I again restated these concerns and emphasized that in order for the transfer of Cortez to work well and to truly give Cortez a fresh start in settling this EEO objectively, neither I, nor any of my management staff, should ever be involved in disciplinary decisions of any nature regarding Cortez while he was assigned to the Denver Region. You **expressly** agreed that I, nor my managers, would ever be required to be involved in any disciplinary actions involving Cortez's actions in Denver. With this assurance, we then agreed to transfer him to the Fort Worth office so he could have close supervision by ASAC James Malloy.

Subsequently in a later conversation, you asked me if I thought that Cortez could be rehabilitated and I answered in the affirmative, but emphasized that he needed to be given a truly fresh opportunity in my Region. Between March 7, 2002 and June 16, 2002, however, ( when Cortez arrived in Region 6) you telephoned me several times to advise that the transfer was either "off" or "not sure what was going to happen" as it concerned a settlement agreement. Then when one of my OKC employees left the agency, you later called and we agreed to transfer him to OKC (instead of FTW) to help settle the EEO. After receiving a 7/15/2002 telephone call from Nuhfer of BPD telling me he was sending the Cortez Richardson report to me, I referred Nuhfor to you and outlined our agreement that this office was not to be involved in any decisions regarding Denver actions. As you know, I sent you an e-mail on July 15, 2002 regarding Nuhfer's contact, and we also discussed this July 15th e-mail subject on July 17, 2002 at the SAC meeting here in FTW with regards to your commitment to adjudicate these Denver issues in HQ or Denver. You agreed.

Now when I object to this adjudication action in your August 19, 2002 telephone conversation and specifically inquired as to what happened to your promise to keep the Denver issues out of my office, your reply is "things change" and cite a "fresh face" is needed. It is clear to me that the appropriate manager who was involved in these issues, and who testified as to activities regarding Cortez in Federal Court in US vs. Finn, is Mike Groszkiewicz, the current manager of the Denver Region, and that is where issues concerning the Denver actions should rest, as Mike applied for the position of SAC in Denver knowing full well of the pending personnel matters.

I wish to continue to object to this action and believe that neither you, nor the Agency, is giving this employee the best possible opportunity for a fresh start in this Region by forcing this office to intercede on issues that did not occur under this management watch.