<u>**AFFIDAVIT**</u>

**WASHINGTON**

**DISTRICT OF COLUMBIA**

I, R. Joseph Haban, make the following statement freely and voluntarily to Frank Longoria, who has identified himself to me as a Contract EEO Investigator for the following federal agency: Department of Housing and Urban Development, investigating a complaint of discrimination filed by James Malloy, knowing that this statement may be used in evidence. I understand that this statement is not confidential and may be shown to the interested parties (those with a legal right to know). I hereby solemnly swear or affirm:

1. What is your full name, current position title, grade, and organizational units?

A. R. Joseph Haban, Assistant Inspector General for Investigation, ES-00, Office of Inspector General, U.S. Department of Housing and Urban Development (HUD).

2. How long have you been in this position?

A. Since February 10, 2002

3. Who are your first and second-level supervisors, by name, position title, and when did they become your supervisors?

A. Michael P. Stephens, Deputy Inspector General has been my first line supervisor since approximately January 2002. Kenneth M. Donohue, Inspector General has been my second line supervisor since approximately March 2002.

4. Explain your organizational relationship to James Malloy, former Assistant Special Agent in Charge (hereinafter the Complainant), John McCarty, Special Agent in Charge, Lester Davis, Special Agent in Charge, and Larry Chapman, former Special Agent in Charge.

A. As Assistant Inspector General for Investigation all employees working for the Office of Investigation are under my chain of command. Special Agent in Charge Lester Davis, Special Agent in Charge John McCarty and Former Special Agent in Charge Larry Chapman reported

directly to the Deputy Assistant Inspector General for Investigation as their first line supervisor and to me as their second-line supervisor. Former Assistant Special Agent in Charge Jim Malloy reported to Former Special Agent in Charge Larry Chapman as his first line supervisor and to the Deputy Assistant Inspector General for Investigations as his second-line supervisor.

5. How long have you known Complainant with dates?

   A. I have known the Complainant for at least ten years.

6. Please identify your race, DOB, and prior EEO activity (accepted bases for investigation).

A. Caucasian, April 19, 1947, and I have been named in EEO complaints.

7. Were you aware of Complainant's opposition to take disciplinary action against Special Agent Cortez Richardson (African-American) and Steve Romero (Hispanic)? If so when did you learn that for the first time?

A. To the best of my recollection, the first time I was aware of the complainant's opposition to be the recommending official in the Richardson and Romero matter was after the actions had been taken.

8. According to Complainant, you should have known of his opposition to discipline Mr. Richardson and Mr. Romero. Complainant had informed Lester Davis, (when he was Acting Deputy IG for Investigation) and Larry Chapman, former Special Agent in Charge and Complainant's immediate supervisor, about Complainant's opposition based on Complainant's perception that the two minority agents were being singled out because of their race. Also, according to Complainant, through the chain of command Mr. Chapman had informed you about Complainant's opposition. Please respond.

A. It is possible Former SAC Chapman used the complainant's name when we discussed the ROI, but I did not understand that he was opposed to taking any action. In any event, that would be his decision. I am not aware that the Complainant discussed this matter with the Acting DAIGI Lester Davis.

**Issue 1 administrative investigation:** (1) Initiated through John McCarty, Special Agent in Charge (SAC), Special Investigation Division (SID), an unwarranted investigation of him within the OIG Fort Worth Regional Office, and, pending completion of the investigation, (b) placed him on administrative leave on October 10, 2002, and prohibited him access to his government computer and OIG records and any contact with OIG personnel:

9. Please explain specifically why Complainant was investigated?

A. He was investigated for his failure to cooperate in an official investigation and possible obstruction of an investigation.

10. Why was it necessary to place Complainant on administrative leave?

A. To keep Complainant from interfering with an ongoing investigation.

11. Is it customary to place HUD OIG employees on administrative leave pending the outcome of an administrative investigation?

A. It's an option, and under these circumstances, it was appropriate.

12. Explain why it was necessary to prohibit Complainant to access OIG/Government property and to contact OIG staff while he was on administrative leave. Please explain.

A. To keep Complainant from interfering with an ongoing investigation.

13. Is it customary to prohibit HUD OIG employees who are awaiting the result of an administrative investigation to access of OIG/Government property? Please explain.

A. Under such circumstances, yes.

14. Have you recommended or issued instructions to place on administrative leave similarly situated employees (i.e., awaiting the outcome of an investigation on the employee) in the two-year period prior to the employment action at issue? If yes, identify them by name, race, DOB, prior EEO activity, date of employment action, and circumstances.

A. I do not know of any similarly situated employees that I placed on administrative leave.

15. Respond to the Complainant's contentions regarding the treatment of similarly situated employees in similar circumstances: (1) Daniel Truxal, (White, unknown age, unknown prior EEO activity), assigned to Fort Worth, Texas, also refused to provide his personal diaries to SID. However, Mr. Truxal was not told that he was the subject of an investigation, nor was he placed on administrative leave. Mr. Truxal had complete access to his office computer, office phones, and employment files maintained in his HUD OIG office. Additionally, Mr. Truxal did not have his supervisory duties removed, and he remained a GS-14 ASAC. (2) Robert F. Tighe, (White, unknown age, unknown prior EEO activity) Special Agent in Charge in Fort Worth, had numerous allegations raised against him which included racial comments he had made, yet he was never placed on administrative leave. (3) Glen Fox (White, unknown age, unknown prior EEO activity) an auditor assigned to SID, was never placed on administrative leave nor was he ever investigated for serious allegations that included sexual harassment accusations against him and failing to provide information during an internal affairs investigation involving one of his coworkers. Mr. Fox merely received a letter of caution for the sexual harassment issues and the other aforementioned allegation was never investigated. (4) Charles Freyermouth, (White, unknown age, unknown prior EEO activity) former Denver Assistant Special Agent in Charge, was involved in serious misconduct and was never investigated, disciplined or retaliated against by OIG management for his actions.
(5) Michael Groskiewicz, (White, unknown age, unknown prior EEO activity) committed perjury in a hearing regarding a criminal matter in April 2002 and was never placed on administrative leave, investigated, disciplined or retaliated against by HUD OIG management. (6) Michael Napoleone, (White, unknown age, unknown prior EEO activity) failed to follow OIG policy, when he sent a referral letter dated March 29, 2001 that was not on official letterhead, to Montana law enforcement authorities. Mr. Napoleone was never placed on administrative leave, investigated, disciplined or retaliated against by OIG management.

A.  I do not agree with Complainants contentions regarding alleged behavior by the individuals listed in paragraph 15.

16. Is there anything you would like to add?

A.   No

**Issue 2:** Based on the restrictions placed on his administrative leave, Complainant was denied the opportunity to apply for the position of Supervisory Criminal Investigator, GS-1811-15, Bureau of Public Department [Debt] under Vacancy Announcement Number 03-FESB-002 that opened on October 10, 2002 and closed on October 31, 2002, the same period of time the complainant was on administrative leave and was prohibited to access facilities housing HUD OIG employees:

17. What is the effective date shown in the Request for Personnel Action, SF-52, to advertise the position in question? What is the effective date shown in the Notification of Personnel Action, SF50, for the position in question?

A.   I do not know.

18. Complainant contends that he was placed on administrative leave, prohibited from accessing facilities housing HUD employees and accessing his HUD assigned computer so that he could not apply for the position in question. Please respond.

A.   That is not so.

19. Complainant contends that he was stripped of his managerial responsibility as Assistant Special Agent in Charge so that he could not have applied for the position in question. Please respond.

A.   Again, that is not so. I had lost confidence in him to be an ASAC.

**Issue 3:** Forced him to be the Proposing Official in disciplinary action taken against an African American SAC and an Hispanic SAC based on reports from the SID Internal Affairs Division and wherein it was implied that he was to give the Agents the harshest discipline possible:

20. When was it the first time Complainant and you talked about the Richardson and Romero's investigations?

A. My general recollection is that I had some discussions concerning Romero during the period when SA Romero was being interviewed by SID. I do not recall any conversations relative to recommending official responsibilities for SA Romero or SA Richardson ROI's until after Former SAC Larry Chapman retired.

21. Explain why the Complainant was instructed to be the proposing official in the disciplinary actions against Mr. Richardson and Mr. Romero. Please be specific.

A. He was first line supervisor for both SA Romero and SA Richardson.

22. According to Complainant, you had agreed to allow former Special Agent in Charge Larry Chapman, Complainant's former supervisor, not to be the deciding official in the investigations of Mr. Richardson and Mr. Romero. Please explain.

A. I had discussions with Mr. Chapman along those lines during negotiations in settlement of Richardson's EEO complaint. These negotiations fell through and when it finally came time to take action, I decided it was appropriate for Mr. Chapman to be the deciding official. I never had such discussions regarding Mr. Romero.

23. Whose decision was it to assign Mr. Chapman to be the deciding official on the disciplinary action against Mr. Richardson?

A. My decision.

24. Whose decision was it to assign Mr. Chapman to be the deciding official on the disciplinary action against Mr. Romero? If it was not your decision, did you advise Mr. Haban to appoint Mr. Chapman to be the deciding official and if so explain your reasons?

A. My decision.

25. Did you ever have conversations with Mr. Chapman or the Complainant or both in which you informed one of the two or both about the possibility that Mr. Chapman would be the

deciding official before the Richardson and Romero ROIs were assigned to Complainant's district? Please explain.

A.    I had conversations with Former SAC Larry Chapman. I did not have any conversations with the complainant.

26. When were the Richardson and Romero ROIs officially assigned to Mr. Chapman's office?

A.    Richardson ROI was assigned September 5, 2002. Romero ROI was assigned August 8, 2002.

27. According to the Complainant, assigning the determination of the disciplinary actions on the Richardson and Romero's matters to Mr. Chapman and Complainant was discriminatory because the subject investigations were not done objectively and Mr. Richardson and Mr. Romero had been singled out because of their race. Please respond.

A.    None of this is true.

28. According to the Complainant, he did not coordinate the disciplinary action against Mr. Richardson and Mr. Romero with Human Resources, Office of Legal Counsel because Mr. Chapman as a deciding official was supposed to have coordinated the proposed disciplinary actions against Mr. Richardson and Mr. Romero. Please respond.

A.    I have no knowledge of why the complainant would think this.

29. Do you have any witnesses who may have relevant knowledge about any of the issues accepted for investigation? If so, please identify them by name, position title, telephone number, and briefly explain what you expect them to say.

A.    No

**Issue 4:** **Complainant was** relieved of all managerial responsibilities regarding personnel and finances and of his service as an Assistant Special Agent in Charge for Region 6, upon termination of his administrative leave by memorandum dated December 17, 2002:

29. Explain why was it necessary to relieve Complainant of his managerial responsibility after he came back to duty on December 19, 2002?

A.   I had lost confidence in him.

30. Did Mr. Salas or any member of your staff advise you to relieve Complainant of his managerial responsibilities? If so please explain.

A.   No, but Mr. Salas would have been aware of the decision and understood my reasons.

**Issue 5:** Rescinded prior approval of restoration of his 146 hours of annual leave in the use or lose category on December 17, 2002.

31. According to Complainant and a memorandum from you dated December 17, 2002, you rescinded prior approval of Complainant's request for Restoration of Forfeited Annual Leave. Please explain your reasons for rescinding your prior approval.

A.   After the complainant was returned to duty there was time remaining in the year for him to take annual leave. The regulations would not authorize restoration of the leave he decided not to take. I told him he could take any leave he wanted.

32. Did you approve Robert F. Tighe's annual leave restoration? If so please explain why Mr. Tighe's annual leave was restored and Complainant was not?

A. Mr. Tighe's situation was different.

**Issue 6:** Threatened to transfer him to another geographic location and/or disciplinary action, if he did not cooperate with Headquarters and retire; and **Issue 7:** Forced him to retire effective January 3, 2003:

33. When did the Complainant retire?

A.   I am not exactly sure.

34. What were the circumstances that led to the Complainant's departure? Please be specific.

A.     The Complainant made a voluntary decision to retire. I don't know what his reasons were.

35. According to Complainant, he refused to provide copies of his diaries to SID agents concerning his involvement in the Chapman matter. Did Complainant's refusal result in any adverse action other than the administrative investigation? Please explain.

A.     The complainant was not subject to any adverse action.

36. Did you threaten Complainant with a disciplinary action or with a transfer away from his duty station in Fort Worth to another geographical area if he did not retire?

A.     No.

37. Complainant contends that the reason why his managerial duties were taken away from him upon his return to duty on December 19, 2002 was to force him into retirement. Please respond.

A.     This is not so.

38. Was the Complainant treated disparately because of his race, age, and prior EEO activity as a result of any your actions relevant to any of the issues accepted for investigations?

A.     No.

39. Do you have any documents relevant to any of the issues that you would like to introduce? If so, identify them.

A.     No

40. Do you have any relevant comments to the issues accepted for investigation that were not covered?

No.

I have read this statement, consisting of __10__ pages, and it is true, complete, and correct to the best of my knowledge and belief.

*R. Joseph Huban*
Signature

10-30-03
Date

Signed and sworn to before me
On this 30th day of October, 2003,
At Washington, DC.

_____
Neutral witness, notary, or Investigator