UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


JAMES MALLOY,                    )
                                 )
        Plaintiff,               )
                                 )
V.                               )    Civ. Action No. 05-1117(RCL)
                                 )
ALPHONSO R. JACKSON,             )
 Secretary of Housing and        )
 Urban Development,              )
                                 )
        Defendant.               )
_____)


        Deposition of R. Joseph Haban, taken on behalf of

the Plaintiff, pursuant to Notice of Taking Deposition in

the above-entitled action, on the 5th day of March, 2007,

at 9:30 a.m., at the offices of Hedquist & Associates,

345 East Forsyth Street, Jacksonville, Florida, before

Mary Ann Beck, Court Reporter and Notary Public in and

for the State of Florida at Large.

                        - - -

1          THE VIDEOGRAPHER:  Swear him in, please.

2          THE COURT REPORTER:  Would you raise your right

3     hand.  Do you swear to tell the truth, the whole

4     truth and nothing but the truth so help you God?

5          THE WITNESS:  I do.

6                    DIRECT EXAMINATION

7 BY MR. SELDON:

8     Q    Mr. Haban, I take it you were formerly the

9 Assistant Inspector General for Investigations of the HUD

10 office of Inspector General; is that right, sir?

11     A    That's correct.

12     Q    And I take it in some time, at least in the

13 spring of 2002, you had begun that post; is that right?

14     A    I don't know the exact date.  I can give you

15 some reference points.

16     Q    You were in the post in May of 2003, I take it;

17 right?

18     A    In 2003 --

19     Q    2002, I am sorry, sir.

20     A    I believe I became the AIGI sometime around

21 February or March of 2002.

22     Q    My recollection, too.

23          Mr. Haban, in May of 2002, was a letter

24 directed to you?  Do you recall bringing your attention

25 to the fact that a gentleman by the name of Daniel Salas

1 had a police report in Anaheim, California, involving his

2 activity and potential criminal activity?

3     A    I don't know the date, but I am familiar with

4 what you're talking about.

5     Q    So why don't we identify in May of 2002, who

6 and what Mr. Salas was.  He was an applicant for a job

7 under your supervision, was he not?

8     A    Again, I don't know the exact dates.  I do know

9 that after I became AIGI, which was either in February or

10 March of 2002, the decision was made to put an

11 announcement out for the deputy.  That announcement went

12 out probably, I don't have the documents in front of me,

13 probably sometime in March, and applications were

14 solicited.  So it would have been March, April, May, that

15 that process took place maybe.  It might have been

16 earlier, I don't know.

17     Q    Daniel Salas was one of the applicants for that

18 positions, was he not, sir?

19     A    For Deputy AIGI, that's correct.

20     Q    Your deputy?

21     A    Correct.

22     Q    And he was selected for that position; is that

23 right?

24     A    Correct

25     Q    And during the application process, did you get

1 information about a family disturbance report in Anaheim,

2 California, involving Mr. Salas and his ex-wife, Rhonda

3 Salas?

4     A     I don't know what --

5           MS. LYONS:  Excuse me, Mr. Haban.  I'm going to

6      object for the record on relevance grounds, because

7      I don't know where you're going with this, but you

8      can answer the question, Mr. Haban.

9           MR. SELDON:   Thank you.

10     A     I don't know the timing of that.  I know -- but

11 I do know the information that you're speaking of.  But I

12 don't know exactly when we received it.

13           MR. SELDON:  I'm going to ask for this document

14      to be marked as Haban Exhibit 1, and I'll give it to

15      the reporter.

16           And, Mr. Haban, the way this works, the

17      reporter will give you the marked copy in a moment.

18           (Haban's Exhibit No. 1 was marked for

19      identification.)

20     Q     Mr. Haban, do you recognize this document

21 and/or the information in it?

22     A     I do not recognize the document, but I

23 recognize the information in it.

24     Q     I will represent to you that this is a letter

25 that was delivered to the Department of Housing and Urban

1 Development concerning Mr. Salas during the selection

2 process.  You were aware of this information during the

3 selection process I take it?

4      A    I don't know if it was during the selection

5 process or not, but I'm aware of this information; yes, I

6 am.

7      Q    I'll represent to you, sir, that in his

8 deposition Mr. Salas testified that he was selected for

9 the position as your deputy in August 2002.  So I'd like

10 to go on this information did come to your attention in

11 or about 2002 I take it?

12      A    Again, I don't know when it was received.  This

13 is dated May 3, 2002.

14      Q    Very good, sir.  Any reason to doubt it came to

15 your attention during the selection process when

16 Mr. Salas was applying for Assistant Inspector General,

17 Deputy Assistant Inspector General under your

18 supervision?

19      A    I don't know when we received the information.

20      Q    Okay.  But you do remember getting it?

21      A    Yes, I do.

22      Q    You never placed Mr. Salas on administrative

23 leave after getting this, did you?

24      A    No, I did not.

25      Q    You never opened an investigation in which

1 Mr. Salas was required to be interviewed by investigators

2 when you got this information, did you?

3     A     No, there wasn't -- there was a review of this

4 information.

5     Q     Oh, please, you never put him under oath and

6 required him to give a statement of an investigation, did

7 you?

8          MS. LYONS:  Objection --

9     A     Well, I didn't personally.

10          MS. LYONS:  -- to the form of the question.

11     Q     Go ahead and answer the question, Mr. Haban.

12     A     I didn't personally conduct the investigation,

13 but the agency did conduct a review of these allegations.

14     Q     And the people who conducted the review, were

15 they -- they were under your supervision, were they not?

16     A     Yes, they were -- yes.

17     Q     Yes, they were.  Mr. Salas testified in his

18 deposition at page 37 that he was never interviewed by

19 investigators.  Do you have any reason to doubt that?

20     A     I don't know.

21     Q     He said he was never removed from the premises

22 at your direction or any of the investigators under

23 supervi- -- his sup- -- under your supervision.  Do you

24 have any reason to doubt that?

25     A     No.

1    Q    He's testified that he was never told to avoid

2 contact with OIG employees.  Do you have any reason to

3 doubt that?

4    A    No.

5    Q    You never placed him on administrative leave

6 although you did place James Malloy on administrative

7 leave when you got so-called allegations involving them;

8 did you not, sir?

9         MS. LYONS:  Objection to the form of the

10        question.

11   Q    Please go ahead and answer that question, sir.

12   A    I didn't place Mr. Salas on admin leave, no.

13   Q    Now, these allegations actually -- against

14 Mr. Salas, they didn't only come into you, did they sir?

15        MS. LYONS:  Objection, foundation.

16   Q    Do you know?

17   A    I don't know.  They might have come into our

18 hot line.  They might have come into the front office.  I

19 remember that these allegations did come in.

20   Q    Good, sir.

21        MR. SELDON:  I'll ask the reporter to mark as

22        Exhibit -- Haban Exhibit 2.  And we'll show you the

23        official copy in a second.

24        (Haban's Exhibit No. 2 was marked for

25        identification.)

1       MS. LYONS:  Mr. Seldon, due to the nature of

2    the allegations -- I'm sorry.

3       Mr. Seldon, due to the nature of the

4    allegations contained in the exhibits that you've

5    produced here, I would ask that you join me in

6    placing this portion -- the subject matter of this

7    portion under a protective order in place in this

8    case.

9       MR. SELDON:  I will not agree to that.  I

10   wouldn't in any event but since Mr. Salas has

11   already testified about it, I most certainly would

12   not agree with it.

13      MS. LYONS:  Very well.  It's something we can

14   take up later.

15 BY MR. SELDON:

16   Q    Now, Mr. Haban, I will represent to you that

17 this is a letter signed by me conveying those allegations

18 of spousal abuse by Mr. Salas to the secretary of Housing

19 and Urban Development, Mel Martinez, as well as Kenneth

20 Donahue.  And you do know who Mr. Donahue was, do you

21 not, sir?

22   A    Yes, sir.

23   Q    Who was he for the record?

24   A    He was the Inspector General for U.S. HUD.

25   Q    Now, Mr. Donahue had a deputy, did he not, sir?

Page 12

1    A    Yes.

2    Q    And that person's name was?

3    A    Michael P. Stephens.

4    Q    Correct, sir.

5         And my question is:  When these allegations

6 came to you to do whatever you did with, whatever was

7 done, did you discuss these with the inspector general

8 given that the letter, bringing them to his attention,

9 was directed to him and to the secretary of Housing and

10 Urban Development?

11    A    I don't know whether I discussed them with

12 Mr. Donahue.  It's most likely I discussed them with

13 Mr. Stephens.

14    Q    And that was because Mr. Stephens was basically

15 the day-to-day operational officer of HUD OIG; is that

16 right, sir?

17    A    Yes, he was my boss.

18    Q    Good.  Did Mr. Stephens ever direct you or

19 anyone, to your knowledge, to place Mr. Salas on

20 administrative leave?

21    A    No.

22    Q    Did Mr. Stephens ever direct you or anybody to

23 have Mr. Salas removed from the premises while these

24 complaints were investigated?

25    A    Not that I'm aware of.

1    Q    And did he ever tell you to have Mr. Salas

2 told -- directed to avoid all contact with OIG employees?

3    A    No.

4    Q    Did he ever tell you to have one or more

5 investigations opened up against Mr. Salas?

6    A    One or more?

7    Q    Yep.  Investigation --

8    A    Yes.

9    Q    -- an investigation with investigators assigned

10 to take sworn statements from Mr. Salas?

11    A    Well, that was -- that was an investigation

12 that was opened up at the direction of the front office.

13    Q    It was in -- he was only interviewed and gave

14 an unsworn statement.  Isn't that the way it worked out,

15 if you know?

16    A    I'm not sure how -- what the investigative

17 steps were, but I do know that these allegations were

18 looked into.

19    Q    So you were not involved in the investigation;

20 is that your testimony, sir?

21    A    No, I wasn't involved in this investigation.

22 This was -- this was an investigation that was requested

23 by the front office, and it wasn't my investigation that

24 I can recall.

25    Q    So was it -- but it was people under your

1 supervision; isn't that right, sir?

2    A    Well, every agent that works for HUD

3 technically is under my supervision so that would be

4 right.

5    Q    But are you saying, correct me if I'm wrong,

6 sir, that this inquiry was actually done by the front

7 office, meaning Mr. Stephens or Mr. Donahue?

8    A    Well, it was done at their direction.

9    Q    Not yours, sir?

10    A    Not my direction.  It was done at their

11 direction using an agent that was on the eighth floor, I

12 believe on the eighth floor.

13    Q    Do you ever recall there being a report of

14 investigation produced as a result of this?

15    A    That was -- not that I recall, no.

16    Q    Did you ever recall whether the front office

17 ever discussed with you, meaning Mr. Stephens and

18 Mr. Donahue, that there was a report of investigation

19 prepared?

20    A    No, not a -- not an ORI.

21    Q    Were you or -- that is the formal way of

22 closing out a formal investigation --

23    A    Right.

24    Q    -- an internal matter, is it not?

25    A    Right.

1    Q    And that was never something you saw?

2    A    No.

3    Q    Do you recall that these allegations against

4 Mr. Salas involved the use or the possession of a handgun

5 involving his ex-wife?

6    A    Yes.

7    Q    Were you at all concerned, sir, that Mr. Salas

8 might try and interfere with the course of this inquiry

9 by getting ahold of his ex-wife?

10    A    No.  Again, I wasn't -- no.

11    Q    Did you ever hear Mr. Stephens or Mr. Donahue

12 express concern that Mr. Salas might interfere with the

13 course of this investigation by contacting his ex-wife?

14 This inquiry, I'm sorry.

15    A    No.  My best recollection is his wife is

16 deceased.

17        (Haban's Exhibit No. 3 was marked for

18        identification.)

19 BY MR. SELDON:

20    Q    And now, sir, I'm going to give to you a copy

21 of Haban Exhibit 3.  Oh, and by the way, did you ever

22 direct Mr. Salas not to contact the children he'd had of

23 that marriage so he wouldn't get them to perhaps

24 interfere with their testimony?  Did that ever happen?

25        MS. LYONS:  Objection, foundation.

1    Q    Did that ever happen to your knowledge?

2    A    I don't -- not to my knowledge.

3    Q    Did the front office ever tell you that they

4 had done that, Mr. Stephens or Mr. Donahue?

5    A    No.

6    Q    I'm going to give you a copy of Haban Exhibit

7 3.  This is a document, sir, this is a Stipulation and

8 Order on an Order to Show Cause issued by the Superior

9 Court of the State of California in and for the County of

10 Orange.  This was issued involving Rhonda Salas,

11 Mr. Salas' previous wife.  And it talks about Mr. Salas

12 being required to surrender a weapon, a .380-caliber

13 pistol to the police department of Anaheim, California.

14         Do you recall ever seeing this, getting ahold

15 of this Order in the course of this inquiry of Mr. Salas?

16    A    This might have come in from somewhere.

17    Q    You don't recall, do you?

18    A    I do -- I do remember seeing this.

19    Q    You do?

20    A    Or something similar to it, yes.

21    Q    So even though this was seen, Mr. Salas was

22 never at any time, when this inquiry was going on, placed

23 under administrative leave; is that right?

24    A    Not that I'm aware of.

25    Q    Just so the record's clear, the supposed reason

1

2 BY MR. SELDON:

3      Q    Now, Mr. Haban, I will represent to you that

4 Daniel Salas, at that time your deputy, gave deposition

5 testimony that he had reviewed no documents and did not

6 speak to criminal investigators of your organization when

7 he was asked to sign this document or when he did sign

8 this document.  Is that different from your recollection?

9      A    I didn't work on this document.

10      Q    So you're saying you had nothing to do with the

11 issuance of this document?

12      A    This document was not prepared by me.  It was

13 probably prepared when -- between Silas and BPD and

14 counsel.

15      Q    What about the decision to place Mr. Malloy on

16 administrative leave?  Did you --

17      A    That was my decision.

18      Q    That was yours?

19      A    Yes.

20      Q    Correct.  But you did not sign the document

21 having it done?

22      A    No.

23      Q    Now, at that time, I take it one of the reasons

24 for doing that was to -- was because Mr. Malloy had

25 supposedly not turned over diaries in connection with an

1      Q    Good, sir.  This document is dated October 9,

2 2002, is it not?

3      A    Correct.

4      Q    And it was the next day that you made the

5 decision to place Mr. Malloy on administrative leave;

6 correct?

7      A    I don't know.  Whatever it's dated.

8 October 10th was the admin leave memo from Mr. Salas,

9 that's right.

10      Q    The memo from Mr. Salas that you made the

11 decision about; correct?

12      A    Correct.

13      Q    Correct.

14           This document does not only say that Mr. Malloy

15 -- this Report of Investigation does not only say that

16 Mr. Malloy supposedly didn't give over his diaries in

17 connection with your investigation, but also that another

18 person, another supervisor, Daniel Truxal, didn't give

19 over his diaries; correct?

20      A    If that's what it says.  I didn't read it.  Do

21 you want me to read it?

22      Q    Do you want to read it?  Go ahead, sir.

23      A    (Witness reviewing document.) Yes.

24      Q    That's what it says, sir, that Daniel Truxal,

25 another supervisor at the same level as Mr. Malloy in the

1 same region did not turn over his diaries; correct?

2      A     Correct.

3      Q     And, for the record, you made a decision to

4 place Mr. Malloy on administrative leave, but you did not

5 make any such decision with regard to Mr. Truxal, did

6 you?

7      A     No.  Mr. Trux- -- my understanding from these

8 investigators was that Truxal did cooperate.  There was a

9 period of time when he did not, but then he did.  And

10 they were talking to him about what exactly they wanted

11 and how to obtain that from Truxal.

12      Q     Truxal didn't give over those diaries when he

13 was originally asked for them, did he?

14      A     Initially, he bulked, but then he came around.

15 At least that's what I was told.

16      Q     And how far after, a week, two weeks?

17      A     I don't remember.

18      Q     So in other words, but he didn't give the

19 diaries over.  So did you or did you not know that the

20 documents that he gave over were all of his documents?

21      A     All I know is what the investigators told me,

22 that he originally bulked but then he cooperated.

23      Q     Right.  John Robinson has already given

24 deposition testimony about whether or not it was the

25 same, that Mr. Malloy gave his documents over sometime

1 later.  Does that make a difference to you either way?

2    A    My understanding is that Mr. Malloy never gave

3 anything.

4    Q    I meant Mr. Truxal, I'm sorry, sir.

5    A    Mr. Truxal -- my understanding from what was

6 happening was that Malloy refused.  Truxal originally

7 refused but did cooperate.

8    Q    He never gave over all the documents he had

9 that your agents wanted, did Mr. Truxal, or do you not

10 know?

11    A    My understanding is that -- is that he did.

12    Q    But not at the time that they were asked for

13 originally, were they?

14    A    Well, I don't know the time.

15    Q    And as of this report, a Report of

16 Investigation, that closed the investigation out or this

17 phase of it, October 9, 2002, the report said that they

18 refused to cooperate with an investigation, both Malloy

19 and Truxal, right?

20    A    This piece of paper did, but I don't know that

21 this is the whole report.

22    Q    Well, obviously, it might not be, sir, but this

23 is the official report of the investigation, the cover

24 part of it, signed off by Mr. McCarty and the agent who

25 conducted it, right, sir?

1    Q    When he asked you to give the file over.  Do

2 you recall one way or another before placing Mr. Malloy

3 on administrative leave, the day after this report, that

4 you directed him to get in touch with the representative

5 of your Bureau of Public Debt to go over why he had not

6 removed -- proposed to have removed --

7    A    I don't -- I don't --

8    Q    I need to finish the question.

9    A    Yes, sir.

10    Q    -- why he had not proposed to remove Cortez

11 Richardson?

12    A    What's the question?

13    Q    Did you -- isn't that true that by that time

14 you had directed Mr. Malloy to get in touch with a

15 representative of your Bureau of Public Debt and go over

16 the sequence of events that led him to do something short

17 of proposing to remove Cortez Richardson?

18    A    I don't know.

19    Q    Okay.  So the next day then -- I think we do

20 know, one thing we do know is Dan Truxal didn't have

21 anything to do with the decision not to remove Cortez

22 Richardson, did he?

23    A    I don't know who the ASAC was for Cortez until

24 it was all over with.  And then I found out that it was

25 Truxal -- I mean, that it was Malloy.

1    Q    But you had no reason to believe Truxal was

2 involved, did you?

3    A    I don't -- I don't know that Truxal was or was

4 not involved.  I don't -- normally, when we send ROIs to

5 the field for some sort of review, the supervisory ASAC

6 is the one who is the recommending official, and the SAC

7 is the deciding official.  I didn't know what ASAC was

8 involved down there with Cortez.

9    Q    Really?  I'm going to show you a document to

10 refresh your recollection.  I do not have copies.  I'll

11 show it to counsel for the defense, and then I'll

12 ask this -- we'll place it in the record, but it's the

13 only copy I've got.  It's Haban Exhibit 6.

14         MR. JOHNSON:  Is there more to this?

15         MR. SELDON:  One person can talk at a time,

16    Mr. Johnson.

17         MR. JOHNSON:  There should be more to it.  It

18    looks like it got cut off.

19         MS. LYONS:  Our questions is:  Is this a

20    complete copy of the document?

21         MR. SELDON:  No, I'm going to use this -- oh,

22    I'm going to use this to refresh his recollection.

23    I don't know -- it is a complete copy of this.

24    There are other documents which have more e-mails

25    strung along.  But it's also not necessary to have a

1      complete copy of any document to refresh his

2      recollection.

3           MS. LYONS:  I was simply asking for my own

4      edification.

5           MR. SELDON:  Yeah.  As I under- -- I don't

6      know.  We can look for a longer version.  I think it

7      is here in the Report of Investigation, and we can

8      look at it -- for it at a break.

9           MS. LYONS:  All right.  Do you want to mark

10      this before you show it to the witness?

11           MR. SELDON:  Yes, I would like to mark this as

12      Haban Exhibit 6.

13           (Haban's Exhibit No. 6 was marked for

14      identification.)

15 BY MR. SELDON:

16     Q    And what I'll do is -- since we don't have too

17 many copies, Mr. Haban, you can look at as little or as

18 much of this document as you like.  But what I'd like you

19 in particular to do, I would like you to look at the

20 bottom and verify for us first just that this is an

21 e-mail from you to Mr. Malloy or a part of an e-mail

22 dated October 2, 2002.

23     A    I remember this, yes.

24     Q    And this is an e-mail -- and I will give this

25 back to you as you need it, sir, because we've only got

1 this one copy.

2           You were directing on October 2, 2002,

3 Mr. Malloy to be in touch with the Bureau of Public Debt,

4 your contract Human Resources office for certain matters

5 concerning one of which was the proposal to suspend but

6 the decision not to remove Cortez Richardson.  Isn't that

7 right, sir?

8     A    What I was telling Jim here was -- I think

9 they had already made some decision, and there was a

10 question about the ROI, and he was supposed to have

11 coordinated with Nuhfer over at BPD.  And I think Janeen

12 had sent up some requests as -- Janeen worked with Jim --

13 as to whether the ROI should have been sent over to

14 Nuhfer.  And I was responding saying, Well, yeah, you're

15 supposed to send that ROI over to Nuhfer, and I was

16 surprised you haven't coordinated with him earlier, you

17 know, and send it over there.

18     Q    Right.

19     A    That's what I was su- -- that's what I was

20 saying.

21     Q    Right.  And so the question here is, sir, it

22 does say in this document direct Mr. Malloy to forward

23 the documents requested.  In other words, the Report of

24 Investigation on Romero, the Letter of Caution and

25 Proposal to Suspend Cortez Richardson; isn't that right,

1 sir?

2      A      Whatever it is that they had done.  If they had

3 proposed to suspend, then send it over there.  Whatever

4 it is they did they needed to send copies of all that

5 stuff plus the ROI over to Nuhfer.

6      Q      And you had also written to Mr. Malloy that

7 you, quote, thought he would have coordinated this with

8 Mr. Nuhfer previously?

9      A      Right.

10      Q      Earlier?

11      A      Right.

12      Q      So judging by the date of this, October 2,

13 2002, you most certainly knew before you made the

14 decision to place Mr. Malloy on administrative leave that

15 he, in fact, had been involved in the disciplinary action

16 that did not result in Cortez Richardson's removal.  You

17 knew that before you placed him on administrative leave,

18 right?

19      A      I knew early in, I believe, October, it might

20 have been the 2nd, that those two ROIs had been

21 adjudicated down in Region 6, that's correct.

22      Q      Ask that Mr. Richardson had not -- had not been

23 removed, right?

24      A      Right.  Whatever punishment they meted out,

25 that's what -- that's what I knew.

1     Q     And you knew that before October 10, 2002, when

2 you made the decision to place Mr. Malloy on

3 administrative leave; is that correct, sir?

4     A     Right.  That's what the documents are showing.

5     Q     So now we've talked about one part of these

6 matters or two.

7          What I want to ask you is, during the

8 investigation you said you were briefed on the

9 investigation, on the results of it, the investigations

10 concerning Mr. Malloy's supposed refusal to cooperate

11 with investigators and say something like circle the

12 wagons.  Remember that?

13     A     Yes.

14     Q     Now, I'm going to read to you a portion of the

15 deposition testimony of John McCarty.  Can you identify

16 who that is again for the record, sir?

17     A     John McCarty was a special agent in charge,

18 special investigations division.

19     Q     I asked Mr. McCarty at his deposition in my

20 office on November 28, 2006:

21          "QUESTION:  Do you believe that you gave this

22 information about Mr. Malloy's alleged misconduct to

23 Mr. Haban or Mr. Salas, giving them both sides of the

24 result of the investigation?"

25          And he's answered:  "Certainly."

1        And I said: "That would be your standard

2 practice, right?"

3        And he said: "Certainly."

4        I asked him again, that was page 45.  On page

5 46:  "Okay.  But you're sure that you gave them a

6 balanced view of the investigation"?

7        And he answered, Mr. McCarty did:  "Yes, sir."

8        Is that your understanding of what was done

9 during this investigation?

10    A    Well, you say, Both sides and balanced.  I

11 don't know what you're referring to there but,

12 periodically, on all of these investigations, McCarty

13 would sit down and give an update.  So I would have no

14 reason to believe that he would not be, you know, given a

15 thorough update of whatever had transpired to that time.

16    Q    During the course of that investigation, isn't

17 it true, sir, that Jim Sang Svang, an investigator under

18 Mr. -- formerly, under Mr. Malloy's supervision, was

19 asked whether or not he heard anyone at a meeting say, We

20 have to circle the wagons, let's get our story straight,

21 they can't make you remember things, and Mr. Sang Svang

22 responded, No.  Do you recall that one way or another?

23    A    No.

24    Q    I'll give you a copy of Mr. Sang Svang's

25 statement that is attached to the McCarty deposition as

 1 Exhibit 8.

 2          MR. SELDON:  If counsel for the defense would

 3     like to review it first, I'll be glad to show it to

 4     you.

 5          MS. LYONS:  No, thank you.

 6 BY MR. SELDON:

 7     Q    That is exactly the sworn statement that

 8 Mr. Sang Svang gave, did he not, sir?

 9          MS. LYONS:  Objection, foundation.

10     Q    Were you briefed on this or not?

11     A    You're asking me details -- details of what

12 every agent in Region 6 said.

13     Q    Well, I --

14     A    My understanding was that a number of agents

15 were interviewed, and if -- and some of them said they

16 heard Jim say things; some of them said they did not hear

17 him say things.  So what I ended up with was different

18 testimony, conflicting testimony.  That's how I remember

19 it.  You're asking me about one particular agent.  Then

20 if that's what Sang Svang said, then that's what he said.

21     Q    Sang Svang said he did not hear anybody --

22     A    Okay.

23     Q    -- make a statement.

24     A    That's what I --

25     Q    I need to finish the question.

1    A    All right.

2    Q    He did not hear anybody make a statement about

3 circling the wagons; right?

4    A    If that's what he said, then that's what he

5 said.  And I explained that some of the agents said they

6 did not hear it; some of the agents said they did.

7    Q    And by name, which were the agents who said --

8    A    I have no idea.

9    Q    Strike -- hold on, Mr. Haban.  By name?

10   A    I don't know the names.  You'd have to look at

11 the report.

12   Q    How many?

13   A    I don't know.

14   Q    I'm going to show you another document, okay.

15 It's going to be Mr. McCarty's deposition Exhibit No. 9.

16 It's a statement given by Andre Ramos, III.

17        He is asked by Investigator John Robinson, Did

18 you hear anyone at a particular meeting make statements

19 similar to the following:  We have to circle the wagons.

20 Let's get our stories straight.  They can't make you

21 remember things.  He asked in the negative.  Do you

22 remember Mr. McCarty briefing you on this, because I will

23 tell you, sir, he has given deposition testimony already,

24 but I will not tell you his answer?

25   A    No.

1      Q    I'm going to show you, sir, McCarty deposition

2 Exhibit No. 10.  It is the statement of Manuel Ramirez

3 who gave a statement in connection with this

4 investigation, the one that you say you used as part of

5 your reasons to place Mr. Malloy on administrative leave.

6           The question was placed to Mr. Ramirez, Did you

7 hear anyone at the meeting make statements similar to the

8 following:  We have to circle the wagons.  Let's get our

9 story straight.  They can't make you remember things.

10 And he answered in the negative, too.  Did he not, sir?

11           MS. LYONS:  Objection, foundation.  He can read

12      the document, but if you're asking him -- he's

13      already testified that he doesn't remember

14      specifically who said what.

15 BY MR. SELDON:

16      Q    Does this refresh your recollection, sir?

17      A    No.

18      Q    Has your recollection been refreshed now at all

19 about who said they heard Mr. Malloy make the statement,

20 Circle the wagons?

21      A    No.

22      Q    Stephen Romero was at the meeting.  We have a

23 sworn statement by him, Did you hear anyone at the

24 meeting make statements similar to the following:  We

25 have to circle the wagon.  Let's get our story straight.

Page 37

1 They can't make you remember things.  To refresh your

2 recollection, sir, only, I'm going to put this in front

3 of you.  Do you remember Mr. McCarty briefing you on

4 Agent Romero's statement?

5      A    No.

6           MS. LYONS:  Objection, foundation.  The fact --

7      Q    Do you remember --

8           MS. LYONS:  -- that the doc- -- excuse me.

9 Excuse me.

10     A    No.

11          MS. LYONS:  May I finish -- may I finish my

12     objection?

13          MR. SELDON:  Yes, we should go back.

14          MS. LYONS:  Yes, let's slow down.  You're

15     showing him a document to refresh his recollection

16     about what one person said, but you asked him if

17     another person had briefed him on the content of

18     this statement.  It's a compound question.  It has

19     some serious foundation problems.

20          MR. SELDON:  Okay.

21          MS. LYONS:  And I don't know what the dates on

22     the documents are without looking at them myself.

23          MR. SELDON:  The dates on the document are

24     after the 10th of October, 2002.

25 BY MR. SELDON:

1    Q    What I'm asking you is, this is a statement.

2 I'm asking you if in any way you recall Mr. McCarty

3 briefing you on this statement or John Robinson, the

4 investigator?

5    A    No.

6    Q    I have here a statement by a Mr. David Pileggi,

7 another person who was supposedly at the meeting with

8 Mr. Malloy.  He is asked, Did you hear anyone at the

9 meeting make statements similar to the following:  We

10 have to circle the wagons.  Let's get our story straight.

11 They can't make you remember things.  Answer, No.

12         I'm going to ask you if you recall being

13 briefed on this statement by Mr. Pileggi?

14    A    No.

15    Q    Do you recall Mr. McCarty or Mr. Robinson

16 briefing you on the substance of that statement?

17    A    No.

18    Q    Cortez Richardson also attended this supposed

19 meeting on --

20         MS. LYONS:  What's he doing --

21    Q    -- September 23rd, 2002, and gave a statement.

22 And he was asked, Did you hear anyone --

23         MR. SELDON:  I'm using this to refresh his

24    recollection, counsel.

25 BY MR. SELDON:

1     Q    Did you hear anyone at the meeting make

2 statements similar to the following:  We have to circle

3 the wagons.  Let's get our story straight.  They can't

4 make you remember things.  The statement says, No.

5          Does this in any way assist you in recalling

6 whether or not you were briefed on what special agents

7 and Richard said -- Richardson said when asked those

8 questions?

9     A    No.

10    Q    You don't have any reason to doubt that that's

11 what he said sitting here today, do you?

12    A    If that's what's in the record.

13    Q    I'm trying to find out what you were briefed

14 on, sir.

15    A    I've told you what I was briefed on was in the

16 totality.  I wasn't briefed on every little piece of

17 paper that they overturned and what each agent down there

18 said.

19    Q    So name a single agent who said Mr. Malloy did

20 say he told people to circle the wagons?

21    A    I don't -- I don't know one.  I was -- I was --

22 I don't know one.

23    Q    Donald Driskill gave a statement in connection

24 with this investigation which I'll give to you.  Did you

25 hear anyone at the meeting make statements similar to the

1 following:  We have to circle the wagons.  Let's get our

2 story straight.  They can't make you remember things.  He

3 answered, No.

4        Does this refresh your recollection in any way

5 whether you were briefed on Mr. Driskill's statement?

6    A    No.

7    Q    Jason Constantine, Exhibit 15 to Mr. McCarty's

8 deposition was also asked:  Did you hear anyone at the

9 meeting make statements similar to the following:  We

10 have to circle the wagons.  Let's get our story straight.

11 They can't make you remember things.  He answered, No, I

12 did not.

13        Does this refresh your recollection of whether

14 you were briefed during the course of this investigation

15 on what Mr. Constantine said?

16    A    No.

17    Q    Now, I'm going to ask you another question,

18 sir.  Was Mr. McCarty briefing you, or was he not

19 briefing you in this investigation as it went along?

20    A    There were some briefings, but I don't remember

21 exactly when those briefings took place.  And --

22    Q    Were they balanced?  I'm sorry, sir, I didn't

23 mean to cut you off.

24    A    Well, my recollection of what was said was some

25 of the agents corroborated the allegations; some of them

1 didn't.  I didn't get into who said what when.  I mean,

2 that was the investigator's job.

3    Q    Eventually, you made the decision to remove

4 Mr. Malloy from supervision, did you not, sir?

5    A    Yes.

6    Q    And that was in December of 2002?

7    A    That was when he came back from -- when he came

8 back to work.

9    Q    That was when he came back after you'd placed

10 him on administrative leave, right?

11    A    Right.  There were -- when the settlement fell

12 apart sometime in, I think, December, and we brought --

13 and we asked Jim to come back then -- yes, I brought him

14 back as a regular agent.

15        MR. SELDON:  I'd like to have this marked as

16     Haban Exhibit -- what number are we up to?

17        THE COURT REPORTER:  We're on 7.

18        MR. SELDON:  Haban Exhibit 7.  The reporter

19     will give you the official copy in a moment.

20        (Haban's Exhibit No. 7 was marked for

21     identification.)

22 BY MR. SELDON:

23    Q    Do you recognize this document, sir?

24    A    Yes.

25    Q    Correct me if I'm wrong.  It's a memorandum

1 dated December 17, 2002, to Mr. Malloy from you; is that

2 right?

3     A    Correct.

4     Q    Subject, returned to duty?

5     A    Correct.

6     Q    When he was brought back, you relieved him from

7 all supervisory responsibility; did you not?

8     A    Correct.

9     Q    So let me ask you, sir.  The statements I just

10 read to you to refresh your recollection, and you can

11 look at them if you'd like, they were all made in October

12 2002.  I'll let you look at them if you'd like just to be

13 sure.  Would you like to look at them?

14     A    What statements?

15     Q    All the ones that I just went over to you.  For

16 example, Agent Constantine and Mr. Pileggi and

17 Mr. Romero, Mr. Richardson, Mr. Driskill.  Would you want

18 to refer those to those to confirm that they were given

19 in October of 2002?

20     A    No.

21     Q    So when you placed Mr. Malloy -- when you

22 removed Mr. Malloy from supervision, I'd like to know at

23 that time how you weighed the statements of those agents,

24 if at all, into your decision to remove him from

25 managerial responsibilities?

1    A    Well, there was an ongoing process.  What had

2 -- what had happened was I had received information

3 that he was rallying the troops against any type of

4 information gathering on this issue.  And then I think he

5 had filed, and there was some negotiations going on.

6    Q    He had filed an EEO complaint, right?

7    A    Yes.  And we thought, well, maybe we -- this

8 could be resolved.  That didn't happen.  This was still

9 ongoing.  So I -- I didn't think Jim left me any choice

10 to do -- what to do what I did.  I needed to get him back

11 to work, but I didn't want him in a position where he

12 could influence other people.  Until this was resolved,

13 so -- so this was an ongoing matter.  I put him back in

14 for work until we could get this thing to fruition.  This

15 wasn't a final decision; this was a temporary decision.

16 So that was my thought process there.

17    Q    So let's be clear on the thought process there

18 for a minute, Mr. Haban.  Your thought process, I take

19 it, is clear that when you relieved Mr. Malloy of all

20 supervisory responsibility you were aware that he had

21 filed a complaint of discrimination and retaliation; is

22 that right, sir?

23    A    I knew that there was some sort of complaint

24 that had been filed that legal was working to resolve.  I

25 didn't know exactly what it was.  I don't think I'd been

1 contacted by an investigator or anything at that time.

2 But we -- I don't believe I had.

3    Q    So according to your testimony today, when you

4 removed Mr. -- relieved Mr. Malloy of all of his

5 supervisory duties on December 17, 2002, because there

6 was an ongoing quote/unquote investigation; correct?

7    A    When he came back from leave, I wanted to get

8 him back into the office, but I didn't want to put him in

9 a position where he was over those agents until all of

10 this was resolved.

11    Q    Because you were concerned that he --

12    A    He --

13    Q    -- would influence them unlike Mr. Salas, for

14 example, who was never relieved of supervisory duties; is

15 that right?

16        MS. LYONS:  Objection, foundation.

17        MR. SELDON:  Go ahead and answer it.

18    A    On the complaint against Mr. Silas?

19    Q    Yeah.

20    A    Well, Silas was not relieved.  Mr. Silas didn't

21 influence -- didn't try to influence agents either.

22    Q    How do you know he didn't try and influence

23 people outside the agency to lie about whether or not he

24 had been involved in spousal abuse involving a weapon?

25    A    Well, he didn't supervise them.

1    Q    So you didn't care whether or not he

2 interviewed -- he interfered potentially with

3 investigation of people who were not under Mr. Salas'

4 supervision.  Is that your testimony?

5    A    Well, it's apples and oranges.

6    Q    It's a weapon, isn't it sir?  He was alleged to

7 abuse --

8    A    It's apples and oranges.

9    Q    Okay.  Let's go forward.

10        When you relieved Mr. Malloy of supervisory

11 responsibility, did your memo say, I am doing this

12 temporarily until we're done with the investigation?

13    A    No, I don't think it did.

14    Q    What did you do to convey to him that it was

15 just a temporary decision?

16    A    Well, I didn't talk to Jim at all in any of

17 this process.  He didn't -- he didn't work directly for

18 me, he worked for a SAC who worked for Silas who worked

19 for me.

20    Q    And you then said in the memo:  If you have any

21 questions regarding this letter or your duties and

22 responsibilities, please contact Daniel Salas, didn't

23 you?

24    A    Right.  That was the chain of command, Danny

25 Salas.

1    Q    That is the same Mr. Salas we've been talking

2 about today; isn't it, sir?

3    A    Yes.

4    Q    So what did you do to see that this

5 investigation of Mr. Malloy that had now been pending for

6 three months and had all these statements that supported

7 him, what did you do to see that it got wrapped up

8 promptly in December of 2002?

9         MS. LYONS:  Objection, the characterization.

10    Q    What steps, if anything, did you take to see

11 that that investigation was wrapped up as promptly as

12 possible in December of 2002?

13    A    It was in the hands of SID.

14    Q    They worked for you, did they not, sir?

15    A    They worked for me just like everybody else

16 worked for me.

17    Q    No, only in the investigative side.  Everybody

18 doesn't work for you, right?

19    A    Every 1811 that's an IG technically works for

20 me.

21    Q    And you didn't take any steps to see that SID

22 completed its investigation of Mr. Malloy at that point,

23 did you?

24    A    It was on the schedule to be worked.  It was

25 being worked along with a lot of other cases.

1    Q    So what did Mr. -- oh, so in other words, the

2 investigation of Mr. Malloy was no different from any

3 other case?

4    A    I had 2700 cases.

5    Q    How many ASACs had you removed, had you placed

6 on administrative leave or relieved of administrative

7 duties when you did that to Mr. Malloy?

8    A    ASACs or regular SACs?

9    Q    ASACs.

10    A    Let's see.  Let me go over who's been on admin

11 leave.

12    Q    For being under investigation?

13    A    Well, Finn was placed on admin leave.

14    Q    He was ultimately convicted of a crime, right?

15         MS. LYONS:  Objection.

16    Q    Do you know?

17    A    Kasarus (phonetic) was placed on leave.

18    Q    He was not an Assistant Special agent.

19 Strike -- Mr. Haban let's go back.

20    A    I think there was an agent down in San Juan.  I

21 mean --

22    Q    Let's go back.

23    A    Let me -- let me --

24    Q    No, I asked you a question, sir, and you will

25 answer it.

1    A    Well, I can't ignore you.

2    Q    Pardon me.  How many Assistant Special Agents

3 in charge did you place on administrative leave and then

4 ultimately removed of supervisory responsibility while an

5 investigation was open other than Jim Malloy?

6    A    All right.  Admin leave was considered in every

7 case.  Every case that we had open involving an employee.

8 And depending upon the circumstances, that's what led us

9 to make a decision whether we would place an employee on

10 admin leave.  And under Jim's circumstances, I didn't

11 think I had any choice so I placed him on admin leave.

12    Q    How many other Assistant Special Agents in

13 charge did you place on administrative leave supposedly

14 because they were under investigation?

15    A    I'd have to look at the record.

16    Q    Do you recall any?

17    A    I mean, well, maybe Dan Ellis.  Dan Ellis might

18 have been placed on admin --

19    Q    When was Mr. Ellis an Assistant Special Agent

20 in charge?

21    A    He was over at CAP district.

22    Q    And that's when he was placed on administrative

23 leave?  Do you have recall that?

24    A    He might have been.  I mean, when he was under

25 investigation, there was some issues with him.

1     Q    He had a serious medical incident happen at the

2 workplace, did he not sir?

3     A    He had a conduct issue at the workplace.

4     Q    And you're going to say you put him under

5 administrative leave for that?

6     A    I think we considered it.  I'm not sure whether

7 we did or we didn't, but at any rate, we consider it in

8 every case.

9     Q    I understand that, sir.  What I want to find

10 out is where at any other Assistant Special Agent in

11 charge other than Jim Malloy you ever did it?  I

12 understand you considered it in every case.  I want to

13 know when you did it.

14    A    I'd have to look at the record to see.

15    Q    Nobody come -- anybody come to mind?

16    A    No.

17    Q    Jeffrey Finn you said was placed on

18 administrative leave.  Did you make that decision?

19    A    No.

20    Q    Finn was ult- -- so Finn was ultimately

21 convicted of a crime in any event, wasn't he?

22         MS. LYONS:  Objection, foundation.

23    Q    If you know.

24    A    I don't know whether he was or he wasn't.

25    Q    But he wasn't under your supervision when that

1    Q    Correct, sir.

2    A    All right.  We immediately put out an

3 announcement for the deputy.  That would have been

4 sometime in late February or March.  I don't think it

5 look very long to fill that slot.  I would have thought

6 that it would have been filed a long time before

7 June 19th.

8    Q    Okay.  Mr. Salas was the person who was filled?

9    A    Yeah, Danny Salas was selected, but he didn't

10 show up until August.

11    Q    Okay.  And then when the allegations about

12 Mr. Salas allegedly having some involvement in a domestic

13 abuse matter came in, which would have been May of 2002,

14 your recollection is he had already been appointed Deputy

15 Assistant Inspector General?  Your deputy had not

16 reported to work yet?

17    A    I don't -- he had not reported to work that's

18 definite.  Whether he had been selected, I don't know.

19    Q    Well, all right.  So let's go forward then.  He

20 was, prior to a selection in a supervisory job, was he

21 not, sir?

22    A    Danny was a SAC in Atlanta, I believe.  I

23 believe he was in Atlanta.

24    Q    Excuse me for one second.

25         And at the time those allegations came in, sir,

1 did you give any consideration to placing Mr. Salas on

2 administrative leave until they were investigated?  I

3 know you said you didn't place him on leave.

4    A    No, I didn't.

5    Q    Do you know if anyone in the front office did?

6    A    They might have.

7    Q    Did they ever communicate to you that they had?

8    A    No.

9    Q    Now, I think we showed for the record that

10 Mr. Salas' deposition was being taken in Atlanta on

11 June 19, 2002.  Can you identify for us, sir, that

12 deposition in Atlanta, who Special Agent Donna Hatfield

13 is?

14    A    Hatfield?  Donna Hatfield was an agent that

15 worked for HUD IG.

16    Q    She was an agent.  So as an agent she was under

17 your supervision, right?

18    A    Right.  Technically.  I don't know who she

19 worked for.  What time are you talking about?  Some point

20 in time Donna worked for me when I was a SAC in the

21 field.  I hired Donna.  And then as things were

22 reorganized, she went to different offices.  So I don't

23 know what you're driving at here.

24    Q    I'm just trying to lay the foundation, sir.

25    A    All right.

Page 55

1      Q    We started on June 19, 2002, when Mr. Salas'

2  deposition was being taken by me in Atlanta and working

3  there.

4      A    Right.

5      Q    On that date, Ms. Hatfield, who had previously

6  been under your direct supervision was still under your

7  supervision as an agent; is that right, sir?

8      A    Donna left investigations and came back so I

9  don't know -- I would assume that in 2002 Donna was still

10 an agent.

11     Q    And do you know, sir, one way or another on

12 June 19, 2002, while I was taking Mr. Silas' deposition,

13 whether or not Special Agent Hatfield showed up at my

14 office seeking the records of who came to confer with me

15 in my office?

16          MS. LYONS:  Objection, foundation.

17     Q    Do you know it one way or another?

18     A    I don't know for a fact.

19          MR. SELDON:  Let's mark as -- what are we up

20     to, Haban Exhibit 8?

21          THE COURT REPORTER:  9.

22          MR. SELDON:  Haban Exhibit 9.

23          (Haban's Exhibit No. 9 was marked for

24     identification.)

25

1 BY MR. SELDON:

2     Q     Sir, I'll represent to you that this is a

3 letter that went into the Secretary of Housing and Urban

4 Development that I wrote on June 20, 2002, objecting to

5 Ms. Hatfield showing up at my office to find out who from

6 the Office of Inspector General had visited my office as

7 a witness in a case, witnesses potentially, objecting to

8 the fact it was done while I was in -- taking Mr. Salas'

9 deposition in Atlanta.  Does this now refresh your

10 recollection in any way?

11     A     Vaguely.

12     Q     Isn't it true, sir, that you were required to

13 look into this and write back to me to explain it?

14     A     I don't re- -- I don't remember exactly what

15 this is about.

16          MR. SELDON:  Let's show you Haban Exhibit 11.

17     Eleven or ten?

18          THE COURT REPORTER:  Ten.

19          MR. SELDON:  Ten.

20          (Haban's Exhibit No. 10 was marked for

21     identification.)

22 BY MR. SELDON:

23     Q     This is a fax cover sheet, sir.  Do you know

24 who Nancy Brown is?  Page 1 is a fax cover sheet?

25     A     Nancy Brown?

1    Q    Yes.  Who was she?

2    A    Nancy Brown was an agent in Kansas City.

3    Q    The second page of this letter is a letter

4 signed for you by Nancy Brown.  Do you see that, sir?

5    A    Yeah.

6    Q    This is a letter which I'll read to you, sir,

7 to me.  "Thank you for your correspondence dated June

8 20th, 2002."

9         Now, that is the letter I just referenced to

10 you that I had sent to the inspec- -- I'm sorry, to the

11 Secretary of Housing and Urban Development objecting to

12 Ms. Hatfield being at my office looking for records.  And

13 you stated, Neither you, meaning me, nor my organization

14 were the subjects of the particular investigation you

15 reference.  Did you authorize this letter to be issued?

16    A    I don't think I've ever seen this letter.

17    Q    So, in other words, Nancy Brown signed this

18 letter for you without you knowing about it?

19    A    I've never seen this letter.  I don't know -- I

20 don't know why Nancy Brown would be signing this letter.

21    Q    For you?

22    A    For me.

23    Q    If we look at the first page, the fax cover

24 sheet, it gives a fax number, 202/708-1354.  Do you

25 recognize that as your fax number, sir?

1 came to sit down and talk about well, you know, Jim wants

2 to cooperate.  He wants to turn over records.  He wants

3 to  come back to work.  What do we do?  I would have been

4 involved in those decisions; yes, I would.  I don't

5 remember this letter here or these issues that you're --

6 that's being discussed in this letter.

7      Q    The letter being Exhibit 12, the one keeping

8 Mr. Malloy on administrative leave?

9      A    Right.  But my understanding is, is that he

10 stayed on admin leave while there was some sort of

11 agreement that was being formulated.

12      Q    So then who did keep Mr. Malloy -- make the

13 decision to keep Mr. Malloy on administrative leave as

14 reflected in the letter October 28, 2002, from Mr. Silas

15 to me?

16      A    Well, anything that happened I'm responsible

17 for.

18      Q    I asked you who made the decision?

19      A    I'm responsible for it.

20      Q    Who else made the decision with you, if

21 anybody?

22      A    Decisions were made in a collective manner with

23 the front office.

24      Q    Who would that have been, sir?

25      A    It would have been Stephens.

1    Q    Anyone else?

2    A    I doubt it.  Just Mike was probably the one

3 that was more involved than anybody.  I don't ever

4 remember talking to Donahue about any of this stuff.  But

5 we would have -- we -- when -- if -- if we reached a

6 point where we had to make a decision that was -- that

7 was talked about --

8    Q    -- with Mr. Stephens; is that right, sir?

9    A    It would have been talked about, yes, with

10 Mr. Stephens.

11    Q    With anyone else?

12    A    Well, legal would have been there.

13    Q    Can you identify them by name who that would

14 be?

15    A    It would --

16    Q    I don't want you to tell the substance of the

17 communication --

18    A    All right.  It would have been --

19    Q    -- it would be privileged.

20    A    -- it would have been Rick, probably.

21    Q    What about Mr. Sadler, the counsel to the

22 Inspector General?

23    A    Sometimes.  I worked with Rick, primarily.

24    Q    Now at page 34 of Mr. Salas' deposition, I said

25 -- it's a different number there.  It's talking about

1 the guy who's in charge, and I'm the one who's

2 responsible.  But did I make the decision?  It was a

3 collaborative decision with a lot of different people

4 having input.

5      Q    I appreciate that, sir.  Thank you for

6 clarifying that.

7           Mr. Salas, during the course of being your

8 deputy, at one point filed a discrimination complaint of

9 his own; is that right sir?  Do you recall that?

10     A    Discrimination against me?

11     Q    I don't know who it was against, sir.  Just

12 discrimination.

13     A    I never saw the documents, but he did file a

14 complaint.

15     Q    An EEO complaint?  Or if you don't --

16     A    It was --

17     Q    -- know that's --

18     A    It was an EEO.  I saw a preliminary EEO that he

19 had filed, yes, but then I didn't see anything else.

20     Q    And after that, sir, was Mr. Salas then

21 reassigned and no longer your deputy?

22     A    Eventually, that's what happened.

23     Q    What involvement, if any, sir, did you have in

24 selecting the Assistant Special Agent in charge for the

25 Houston office which is part of Region 6?

Page 67

1    A    Well, I was under a mandate that all managers

2 would be coordinated with the front office.

3    Q    Just define if you would for us who the front

4 office was, sir.

5    A    Well, that'd be the IG and the Deputy IG.

6    Q    Mr. Donahue and Mr. Stephens?

7    A    Yeah.

8    Q    Okay.  Please go ahead, sir.

9    A    All right.  So immediately in March of 2002,

10 when Mr. Donahue came on board, my marching orders were

11 no managers are to be hired without coordination from

12 the front office.

13    Q    Okay.

14    A    And so the process in every instance was to put

15 the announcement out -- well, sometimes we didn't put an

16 announcement out.  I think sometimes we lateralled

17 people into positions.  But at any rate, whatever --

18 whoever was chosen was a collaborative effort, also.

19    Q    In other words, you and the front office?

20    A    Yea.

21    Q    Okay.

22         MR. SELDON:  I'd like to give you Haban

23 Exhibit -- 12 are we up to?

24         MS. LYONS:  13, I think.

25         THE COURT REPORTER:  13.

1          MR. SELDON:  Thank you, AUSA Lyons.

2          (Haban's Exhibit No. 13 was marked for

3      identification.)

4 BY MR. SELDON:

5      Q    This is Exhibit 13, and you'll be given this in

6 a moment, sir.

7      A    All right.

8      Q    Either by form or by actual recollection, do

9 you recognize this document, sir?

10     A    I don't think I've ever seen this document, but

11 it's a -- it's an opening for a Houston -- Houston

12 Criminal Investigator, GS14.

13     Q    The Assistant Special Agent in charge; correct,

14 sir?

15     A    Well, in the field, the 14s, except for three

16 14s that were out there, were called -- well, were called

17 ASACs.  There was a group that were called ATSACs.

18     Q    Right.

19     A    But that's what this was, yeah.

20     Q    And so this investigation -- I'm sorry, this

21 selection process, the record here shows that it opened

22 in December 12, '02 and closed January 2, '03.  Does that

23 basically jive with your recollection of when this

24 position was opened?

25          MS. LYONS:  Objection --

Page 69

1     A     I don't have a recollection.

2           MS. LYONS:  -- foundation.

3           MR. SELDON:  I said does it jive with your

4     recollection.

5           MS. LYONS:  I understand, but I haven't -- I

6     can't tell looking at the -- oh, these are the dates

7     right here?

8           MR. SELDON:  Yes, ma'am.

9           MS. LYONS:  Sorry about that.

10    A     I don't recall this at all.  I know that we

11 backfilled or that we were trying to decide what to do.

12 But I don't think I probably -- I've probably never seen

13 this before.

14    Q     Correct, sir.

15    A     I'm not involved in that.

16    Q     I understand, sir.  I'm just using this as a

17 point of reference.

18          In or about that time, is it your recollection

19 that a position as a Grade 14, Assistant Special Agent in

20 Charge was open in the OIG office in Houston, Texas?

21    A     Yes.

22    Q     And is it fair to say, sir, that do you also

23 recall that the person selected was a gentleman by the

24 name of Michael Kepler?

25    A     I remember Kepler was selected.

1    Q    Okay.

2         MR. SELDON:  Let's go up to Haban Exhibit if

3    14.

4         (Haban's Exhibit No. 14 was marked for

5    identification.)

6 BY MR. SELDON:

7    Q    Sir, it would not surprise me if you did not

8 recall having seen this document, but it does indicate,

9 and I'll represent to you that it's a Standard Form 50

10 used to notify an employee of a change -- of a personnel

11 action.

12   A    Yes.

13   Q    And this indicates that Mr. Kepler was selected

14 for that job, as we just referred to, the Special Agent

15 in Charge in the OIG office in Houston, Texas?

16   A    Correct.

17   Q    This document, sir, indicates that Mr. Kepler

18 -- Mr. Kepler was a grade lower, a GS13 when he was

19 selected for that job.  Is that your recollection, sir?

20   A    Right.  He would have been on a competitive

21 list if he was a 13.

22   Q    And that would mean that he was not a

23 supervisor in your organization at the time he was

24 selected, was he?

25   A    No, he wouldn't have been.

1    Q    Had he had prior supervisory experience in your

2 organization at the time he was selected, sir?

3    A    I don't know.

4    Q    Who was involved in the selection?  Were you,

5 sir?

6    A    This would have been whoever the SAC was at

7 that time in Region 6, which is probably -- when was

8 this?  This would have been -- that would have been

9 Lester probably, Lester Davis.  And then it would go up

10 to the deputy, then to me and then the front office.

11    Q    Okay.  Now, what I want to do, sir, is go over

12 a little comparison between Mr. Kepler and Mr. Malloy.  I

13 realize by this time Mr. Malloy had left Federal service.

14 One of the issues in this case is why, but I think we can

15 all agree that he had left Federal service by the time

16 the selection was made.  So Mr. Kepler, you said, was a

17 GS13, right?

18    A    He was a 1310.

19    Q    And Mr. Malloy was already a GS14; correct,

20 sir?

21    A    Correct.

22    Q    Mr. Malloy was already an Assistant Special

23 Agent in Charge, was he not, sir?

24    A    He was a GS14.

25    Q    Just so the record's clear, he was already an

1 Assistant Special Agent in Charge?  Is that right?

2      A    He had been one.

3      Q    Until you relieved him of supervisory duties;

4 correct, sir?

5      A    Right.  Right.

6      Q    And prior to that time, do you recall one way

7 or another whether or not Mr. Malloy was at one time

8 given an award as the Office of Inspector General Manager

9 of the Year?

10      A    I think he was.  I can cut to the chase here,

11 Mr. Seldon.

12      Q    Okay.

13      A    I have always regarded Jim as an old-time HUD

14 guy as one of the solid guys out there.  He was a good

15 ASAC.  He ran a region down there that was seven years

16 into narcotics and violent crime, and he did an excellent

17 job.  That's not what the issue was with me, with Jim.

18      Q    At that point in time, you're saying it was the

19 issue of -- what these investigations were about;

20 correct?

21      A    It was what I was told was he would not

22 cooperate --

23      Q    Okay.

24      A    -- in an investigation.  And that was a conduct

25 issue to me.  That was a loyalty issue to me.  Here's a

1 guy that's solid.  We want some paperwork, and he won't

2 give it to us.

3      Q    Okay.

4      A    That's what the issue was.  Now -- that's what

5 the issue was.

6      Q    Okay.  Mr. Haban, first of all I'd like to say

7 thank you for cutting to the issue because it is the

8 issue we are concerned with.  It is the issue before this

9 conduct came up with Mr. Malloy, this alleged misconduct

10 which is the focus of this lawsuit.

11           And so prior to that time, Malloy was really

12 rated very, very highly in your organization, was he not?

13      A    I always viewed Jim Malloy as one of the

14 old-time guys.  Now, I don't know whether he was or not,

15 but I viewed him.  I think he actually came over in the

16 early '90s; you'd have to ask him.  But I viewed Jim as

17 coming in there out to -- that Region 6 was, you know,

18 imploded back in those early years when some of those

19 folks left and went to RTC, and it was -- you know, he

20 came in with a management group and he was in my mind --

21 I never new Jim, personally, that much, but I also viewed

22 him as being a HUD guy.

23      Q    Okay.  That's fair enough, sir.  And so when

24 you say that Mr. Malloy came in in the '90s, I think you

25 testified already that Mr. Donahue, the inspector

1 general, came in in 2002; is that right?

2    A    Correct.

3    Q    Mr. Stephens, the Deputy Inspector General came

4 in in 2002, too; is that right?

5    A    Correct.

6    Q    And prior to that time, sir, had you ever heard

7 of anyone having any reason to investigate Jim Malloy?

8    A    No.

9    Q    Would it be fair to say, sir, that under

10 Mr. Donahue and Mr. Stephen's loyalty was an

11 exceptionally important characteristic in field managers

12 and managers in general?

13         MS. LYONS:  Object to the form of the question.

14    Q    Would it be fair to say that?

15    A    When you use the word, "fair," I can tell that

16 there was a new management style in town, that were

17 moving from entitlement to a centrally located

18 headquarters management style, and the expectation was

19 that everybody be in step.

20    Q    Okay.  Thank you for your candor, sir.  And

21 without telling me any privileged conversation, sir, what

22 role, if any, did the office of counsel have in insuring

23 that coordination through headquarters?

24    A    What coordination?

25    Q    In other words, of the new step in management.

1     A     It should be.  I was trying to -- I was trying

2 to get ahead of that.

3     Q     Okay.

4     A     Trying to get ahead of it.

5     Q     Understood, sir.

6     A     And so we were trying to help him and to honor

7 his request to go to Oklahoma.  And then that's what I

8 was trying to do with Cortez.

9     Q     To go to Oklahoma?

10          MR. JOHNSON:  Oklahoma City.

11          MR. SELDON:  Thank you, sir.

12    Q     So anyway I had asked Mr. Richardson, we'll

13 just go back, to go ahead and say who authored it.

14          He said, Mr. Davis said he wasn't.  He didn't

15 write the document.  He didn't want any part of it, he

16 was told to do so.

17          So is it your testimony or not that you were

18 the sole person involved in this decision to have

19 Mr. Richardson to go from U. S. Attorney to U. S.

20 Attorney?

21    A     No.

22    Q     Who else was involved?

23    A     This would have been another one of those

24 collaborative meetings where we sat down and we said,

25 Okay, we have a problem.  And the problem is that Cortez

Page 87

1 wants to go home.  All right.  Number one, Do we send him

2 home?  And Number two, If we send him, what do we do

3 about his -- his being tainted?  What do we do about

4 that?

5          And so it was outlined, okay, we'll send him

6 home.  He wants to go home with the three kids.  And then

7 the second part is, Well, we need to make sure that he

8 can operate in all three of those districts in Oklahoma.

9 If he can't, then we've got to decide what we're going to

10 do about it.

11     Q    And the people you discussed this with were

12 who, sir?

13     A    This would have been the front office and

14 legal.

15     Q    This would have been Mr. Stephens and

16 Mr. Donahue?

17     A    Probably just Mr. Stephens.

18     Q    And when you say legal who would that have

19 been?  I don't want you to tell me the substance of what

20 was talked about with the legal office.

21     A    It probably would have been Rick.  That's who I

22 worked with.  It might have been Nuhfer.  I don't know.

23 I don't remember, but I do know that we were trying to

24 get him back home and where he could work.

25     Q    Did Mr. Richardson view it that way?

1 in Charge but employees in an 1811 position, that is a

2 special investigator position, can you identify for me

3 any employees you recall placing on administrative leave

4 and the reason?

5    A    We -- every case that we had we considered

6 whether admin leave was appropriate or not.  I'd have to

7 look at the case files.

8    Q    So sitting here today you can't recall any

9 employees you placed on administrative leave other than

10 Mr. Malloy?

11    A    No.  I mean, I know the agency placed other

12 people on admin leave.

13    Q    Okay.  Let's not limit it to people that you

14 necessarily decided yourself to do but perhaps decisions

15 you were aware of or involved with.  You said at some

16 point there was a collective decision-making model

17 employed.

18         MR. SELDON:  Excuse me.  Just for the record, I

19    realize the deposition, but just for the record

20    we'll have to object unless there's the required

21    similarity to make them comparatives, and having

22    made that, you go ahead.

23         MS. LYONS:  We're just doing discovery here.

24         MR. SELDON:  I understand.

25    Q    Can you recall any other employee besides

May 3, 2002

Mr. Joseph Haban
Assistant Inspector General
 for Investigations
Office of Inspector General
U.S. Department of Housing and Urban Development
451 Seventh Street S.W., Room 8274
Washington, DC 20410-5400

Dear Mr. Haban:

It has come to my attention that Daniel P. Salas is under
consideration to be selected as your Deputy. Mr. Salas has
a history of spousal abuse involving a weapon, which is
captured in detail in The Family Disturbance Report #97-
49738 filed with the Anaheim, CA Police Department. The
complainant in this report is Mr. Salas' ex-wife Rhonda.

The probable selection of Mr. Salas to the position of
Deputy Assistant Inspector General for Investigations for
the Office of Inspector General at the U.S. Department of
Housing and Urban Development should not be made until this
matter is reviewed and investigated by your office.

cc: Mel Martinez

PLAINTIFF'S
EXHIBIT
#1-HABAN
3-5-07 mah

# *Project LAW*

*Project On Liberty And The Workplace*
*1319 F Street, N.W., Suite 305*
*Washington, DC 20004*
*202-955-6968 · fax: 202-318-2287 ·www.projectlaw.org*

May 3, 2002

**VIA TELECOPIER**
Hon. Mel Martinez
Secretary of Housing and Urban Development

Mr. Kenneth M. Donahue
Inspector General
Department of Housing and Urban Development
451 Seventh Street, S.W.
Washington, D.C. 20410-4500

Gentlemen:

Our work involving violations of civil liberties and civil rights by officials of the federal government occasionally leads concerned individuals to bring information to us anonymously. Earlier today, we received a copy of the attached anonymous complaint filed with your offices. It questions the fitness of a senior OIG official who is apparently a candidate for the vacant position as Deputy Assistant Inspector General for Investigations.

There is reason to believe that the individual in question has engaged in domestic abuse, that he lost his government issued weapon during one such incident, and that he has gone undisciplined by OIG. We wanted to bring this to your attention ourselves, to be certain that it was given appropriate attention by HUD and to request that you keep us apprised of your review of this matter and the results of any investigation you may commission.

Very truly yours,

Robert C. Seldon

Cc:    AIGI Joseph Haban



PLAINTIFF'S
EXHIBIT
H2 - HABAN
3-5-07   mab

0 - File
1 - Petitioner
1 - Respondent

# THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
## IN AND FOR THE COUNTY OF ORANGE

**STIPULATION AND ORDER:** ☒ ON ORDER TO SHOW CAUSE
☐ FOR JUDGMENT
☐ FOR JUDGMENT ON RESERVED ISSUES

**A stipulation for Judgment does not replace the formal, typed Judgment.**

Case No. D _____ *Rhonda S. Salas* and *Daniel R Salas*
(Petitioner)                    (Respondent)

_12/24_____ 19_97_ (AM)(PM), Dept _605_          97D012100

Petitioner (Husb)(Wife)(present)(not present) represented by Atty _Carol Leversen_
Respondent (Husb)(Wife), (present)(not present) represented by Atty _Leslee Newman_

### THE PARTIES HEREBY STIPULATE AND AGREE that

☐ **SPOUSAL SUPPORT:**(PET)(RESP) shall pay (PET)(RESP) $ _____ per (WEEK)(MONTH)
payable $ _____ on _____ 19___ and $ _____ on _____
of each (WEEK)(MONTH) commencing _____ until further order of the COURT.

☐ **CHILD SUPPORT:**(PET)(RESP) shall pay (PET)(RESP) child support of $ _____ per (WEEK)(MONTH) per child
payable $ _____ on _____ and $ _____ on _____ of each (WEEK)(MONTH) commencing
_____ until further order of the court or until the child marries, dies, is emancipated, reaches 19, or reaches 18 and is
not a full-time high school student residing with a parent, whichever occurs first.

1. We agree that we are fully informed of our rights under the Minimum Child Support Standards Act.
2. We make this agreement freely without threat or duress **and** the needs of our children will be adequately met under this agreement.
3. The right to support has not been assigned to any county and no application for public assistance is pending.

☒ **OTHER:** Including Division of Property.

(1) *Pending further hearing 1/12/99, Respondent's Sig Sauer 380 Caliber pistol, currently in possession of the Petitioner shall be taken by the Petitioner to the Anaheim Police forthwith for Safe keeping until the gun's possession can be decided at hearing. Petitioner to obtain receipt of possession from Anaheim Police.*

(2) *Neither party shall harass, assault, or disturb the peace of one another pending further hearing.*

(3) *Pending further hearing Petitioner shall have the use and possession of Ericsson cellular phone which is presently in Respondent's possession.*

☐ (if applicable) Time for Appeal is waived

_Leslee J. Newman_                    _Carol J. Leversen_
Attorney for Husband                  Attorney for Wife

### SIGNATURE OF PARTIES

We have read the entire stipulation and agreement. We understand it fully and request the court to make our stipulation and
agreement the Court's order. We understand that willful failure to comply with the provisions of this order will be a contempt of court and
may be punished by fine and imprisonment. We waive all further notice of this order.

_____ Salas_          _Ronnie Salas_
Husband                         Wife

IT IS SO ORDERED ON THIS _____ day of _____, 19___:

PLAINTIFF'S
EXHIBIT
#3 - AABAN
3-5-07  mab

PENGAD 800-631-6989

519 (R9/86)                         _____
                                    Judge of the Superior Court

0 - File
1 - Petitioner
1 - Respondent

97D012100

**CONTINUATION OF STIPULATION AND ORDER**

FILED
ORANGE COUNTY SUPERIOR COURT
DEC 24 1997
ALAN SLATER, Executive Officer/Clerk
BY R. CERASUOLO, Deputy

ase No. D _____

Rhonda S Salas _____ and _____ Daniel _____ Salas
PETITIONER                                    RESPONDENT

12/24 ____ 19 97 (AM) (PM), Dept. ____ 602 ____ 2 ___ of ___ 2

Continued from Page _____ : He shall turn Cellular phone over to Petitioner this date.

(4) Respondent shall vacate the family residence by 4:00 PM this date and return Sunday morning, 12/28/97.

(5) Neither party shall change locks at family residence or confiscate the personal property of the other. Both parties to have possession and or preserve use of residence (with exception of Paragraph 4) pending further hearing.

(6) Either party may spend $5,000.00 of Savings account money in the possession of each party subject to charges or credits at time of trial or final settlement of this action.

(7) Petitioner shall occupy master bedroom, and Respondent shall occupy guest bedroom pending further hearing.

_Leslie J. Plaz_
ATTORNEY FOR HUSBAND

_Carol J. Leversen_
ATTORNEY FOR WIFE

**SIGNATURE OF PARTIES**

We have read the entire stipulation and agreement. We understand it fully and request the court to make our stipulation and agreement the Court's order. We understand that willful failure to comply with the provisions of this order will be a contempt of court and may be punished by fine and imprisonment. We waive all further notice of this order.

_____ Salas
HUSBAND

_Ronnie Salas_
WIFE

IT IS SO ORDERED ON THIS _____ day of __ DEC 24 1997 _____, 19 ___

_Schulte_
JUDGE OF THE SUPERIOR COURT

**COMMISSIONER THOMAS H. SCHULTE**

630 (9/83)

TO BE USED WITH FORMS 284 and 519 as needed.



U.S. Department of Housing and Urban Development

## Office of Inspector General

451 7th St., S.W.
Washington, D.C. 20410-4500

October 10, 2002

MEMORANDUM FOR: James Malloy, Assistant Special Agent in Charge, 6AGI

FROM: Daniel P. Salas, Deputy Assistant Inspector General for Investigations, GI

SUBJECT: Placement on Administrative Leave

As you are aware, Special Investigations Division (SID) opened an investigation of an employee's questionable use of official time and equipment within the Office of Investigation, Fort Worth Regional Office. I have been apprised that you have refused certain information requests that have been made in connection with this investigation. Additionally, allegations have come to light concerning efforts by certain persons to interfere with the investigation and to undermine the disciplinary process associated with two other SID investigations. In the interests of ensuring a thorough and objective investigation of the allegations that have been made, and in light of your position, I cannot allow you to carry on your responsibilities as Assistant Special Agent in Charge during the pendency of the investigation. Accordingly, I am placing you on administrative leave until further notice.

You are hereby ordered to comply immediately with the following terms:

a) Turn in any and all government identification, specifically including your HUD identification badge, and your OIG credentials. Also surrender your weapon(s), vehicle, vehicle keys, office keys, card entry keys, laptop computer(s), palmtop computer(s), cellular telephone(s), pager(s), key fob(s), and any other Government- or OIG-issued equipment. You are directed to return these items to Max Y. Eamiguel, Assistant Special Agent in Charge, immediately, and to disclose any passwords or codes necessary to activate or use such equipment or open security controlled files. Prior to your surrender of such equipment, you shall not log on to, log off of, gain access to, or otherwise manipulate any equipment capable of storing information, nor may you delete any information saved on your computer or electronic storage media. To the extent that you have such identification or equipment at your home or elsewhere, you are directed to arrange to return the same to Mr. Eamiguel by 12:00 p.m. tomorrow.

D 1 of 2



PENGAD 800-631-6989

PLAINTIFF'S
EXHIBIT
#4-HABAN
3-5-07  mab

b)  You are prohibited from entering, or attempting to enter the OIG Fort Worth Regional Office, and any other facility housing HUD or HUD OIG employees anywhere unless your are previously and expressly authorized to do so by me or my supervisors.  Accordingly, you should remove, or make arrangements for the removal of, all of your personal possessions prior to exiting the Fort Worth office tomorrow.  All files (hard-copy or electronic) that you deem to be personal must be reviewed by Mr. Earniguel prior to their removal, and you are hereby expressly advised that you have no expectation of privacy in any materials remaining in the Fort Worth office following your departure tomorrow.

c)  Provide a phone number and an address where you may be reached during this period of Administrative Leave.  Please give this information directly to Mr. Earniguel.

d)  You are hereby directed to have no contact (verbal, telephonic, electronic, or in writing) with any HUD OIG employees, except for me or my supervisors, while you are on Administrative Leave during the course of the investigation.

Should you have any question about any matter regarding your HUD employment benefits, you may call the Bureau of Public Debt.

D282



**James Malloy**
10/03/02 10:05 AM

To: Janeen Hess/FTW/HUDOIG@HUDOIG, Daniel
Truxal/FTW/HUDOIG@HUDOIG
cc:
Subject: Re: Nuhfer

I talked to Nuhfer yesterday about the Cortez Richardson and Steve Romero matters. He indicated both of these files had been on his desk for over a year. I got the impression after talking to him that he did push the background investigation issue regarding Romero over to Internal Affairs. I explained to him that Romero had a letter of resignation citing he left for personal reasons which was signed off on by the two principal instructors at the Academy as well as the Chief of Police. Nuhfer wanted to argue about the fact that Steve answered the question differently on the two backgrounds and I said that Steve answered the question differently the second time because this derogatory info had come to his attention through Chapman and me after the first background. I told Nuhfer I had held off sending him info until I got approval from Haban to do so, particularly regarding ROI. Nuhfer indicated he needed the ROI to adjudicate the discrepancies which were reported in the background. I told him I would send him one per Haban's instructions as soon as I could get one copied. I faxed him Romero's letter of caution and dr yesterday.

Regarding the Cortez matter, Larry apparently did not provide me with a copy of his decision. I had to contact Cortez yesterday afternoon after he had already left the office. Cortez faxed me a copy of this document this morning. I sent the proposal, decision and dr on Cortez to Nuhfer, Haban and Saddler this morning.

I also sent the letter of caution and dr to Haban and Saddler this morning.

Janeen, I will need some help making copies of the Steve ROI to send to Nuhfer. I am copying you in case I need backup down the line that I sent this info forward.
----- Forwarded by James Malloy/FTW/HUDOIG on 10/03/02 09:47 AM -----



**James Malloy**
10/02/02 04:10 PM

To: Rudolph Haban/WHV/HUDOIG@HUDOIG
cc:
Subject: Re: Nuhfer 🗎

The Southwest Region got the Richardson file on 9/5, I probably got it from Larry somewhere around the middle of the month, we had an unexpected internal affairs visit after that, and then had transitional firearms training last week so we did not have a lot of time to get these things done before Larry left. We figured it was in everyone's best interest to get these matters resolved while Larry was here. I would assume that was why Larry chose to not contact Nuhfer prior to this. Anyrate, I will forward the info as you instructed.
Rudolph Haban

**Rudolph Haban**
10/02/02 03:00 PM

To: James Malloy/FTW/HUDOIG@HUDOIG
cc:
Subject: Re: Nuhfer 🗎

Jim,

BP is our contract HR office for certain matters including maintaining personnel files. Please forward to Nuhfer the documents he requested, i.e. ROI on Romero and Letter of Caution, and Proposal to Suspend on Cortez. I thought you would have coordinated with him earlier. Also, please fax a copy of both documents (Letter of Caution) (Proposal to Suspend) here to headquarters and the Counsels Office (Saddler). Thank You. Haban
James Malloy

PLAINTIFF'S
EXHIBIT
# 6 - HABAN
3-5-07 mab
PENGAD 800-631-6989



U.S. Department of Housing and Urban Development

## Office of Inspector General

451 7th St., S.W.

Washington, D.C. 20410-4500

December 17, 2002

**MEMORANDUM FOR:** James Malloy, Assistant Special Agent in Charge, 6AGI

R. Joseph Haban

**FROM:** R. Joseph Haban, Assistant Inspector General for Investigation, GI

**SUBJECT:** Return To Duty

By a memorandum dated October 10, 2002, the Deputy Assistant Inspector General for Investigations (DAIGI) placed you on administrative leave pending completion of an investigation into allegations against you, effective that date. By this memorandum, I am returning you to duty and terminating your administrative leave. You will report to duty on Thursday, December 19, 2002, at the Fort Worth, Texas Regional Office. I am however relieving you of all managerial responsibilities and you shall no longer serve as an Assistant Special in Charge for Region 6, the Southwest Region. Effective immediately, you may not make any managerial decisions regarding personnel or finances.

I also note that you have accumulated annual leave in excess of 240 hours. Should you decide to take annual leave, your request to do so is hereby approved for all or any portion of your accumulated leave. You should submit an SF-71 directly to this office for approval for purposes of documentation. That is solely your decision. Your failure to take annual leave can result in your loss of that leave. My prior approval of your Request for Restoration of Forfeited Annual Leave/Documentation of Exigency of the Service was approved based upon circumstances that have changed and is hereby rescinded.

If you have any questions regarding this letter or your duties or responsibilities, please contact Daniel Salas, DAIGI. Please inform DAIGI Salas immediately if any difficulties or problems arise. In any event, once you have returned to the Fort Worth office, please inform DAIGI Salas, and he can provide you further instructions.

*Faxed to Mr Seldon — 12/17/02 1508 —*

*Seldon said he would inform his client.*

*Rick*

PLAINTIFF'S
EXHIBIT
# 7 - HABAN
3-5-07 mah
PENGAD 800-631-6989

```
00001
   1              IN THE UNITED STATES DISTRICT COURT
   2             FOR THE NORTHERN DISTRICT OF CALIFORNIA
   3
   4      HILDA ANDRADE LOGAN,
   5      an individual,
   6               Plaintiff,
   7
   8         v.            CASE NO.: CV-01-05042 AHM (SHx)
   9
  10      MEL MARTINEZ, Secretary of Housing
  11      and Urban Development, and DOES 1
  12      through 10, inclusive,
  13               Defendants.
  14      -----------------------------------------------
  15                       DEPOSITION OF
  16                       DANIEL SALAS
  17
  18                      June 19, 2002
  19                       10:15 a.m.
  20              at 75 Spring Street, 6th Floor
  21                      Atlanta, Georgia
  22
  23
  24
  25          M. Michelle Drown, CCR-B-2081
00002
   1                 APPEARANCES OF COUNSEL
   2
   3      On behalf of the Plaintiff:
   4         ROBERT C. SELDON, Esq.
   5         Project LAW
   6         1319 F Street, N.W., Suite 305
   7         Washington, D.C., 20004
   8         (202) 955-6968
   9         FAX:  (202) 318-2287
  10
  11      On behalf of the Defendants:
  12         CARLA A. FORD, Esq.
  13         United States Department of Justice
  14         Central District of California
  15         300 N. Los Angeles Street, Room 7516
  16         Los Angeles, CA  90012
  17         (213) 894-3997
  18         FAX:  (213) 894-7819
  19
  20
  21
  22
  23
  24
  25
00003
   1                    INDEX TO EXHIBITS
   2
   3      Plaintiff's
   4      Exhibit   Description                     Page
```



PLAINTIFF'S
EXHIBIT
# 8-HABAN
3-5-07  mub

PENGAD 800-631-6989

```
 5      1            Notification of Personnel Action    63
 6      2            E-mail to Daniel Salas Dated
 7                   12/14/98                            75
 8            (Original Exhibits P-1 and P-2 have been
 9      attached to the original transcript.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
00004
 1                   June 19, 2002
 2                   10:15 a.m.
 3            (Disclosure pursuant to OCGA 9-11-28(d):
 4            The party taking this deposition will receive
 5      the original and one copy based on our standard
 6      and customary per page charges.  Copies to
 7      other parties will likewise be furnished at our
 8      customary page rate.  Incidental direct
 9      expenses of production may be added to either
10      party where applicable.)
11                   DANIEL SALAS,
12            first having been duly sworn, testified
13            as follows:
14                   CROSS-EXAMINATION
15      BY MR. SELDON:
16            Q.     Mr. Salas, good afternoon -- well, good
17      morning.
18            A.     Right.  You're right.
19                   MR. SELDON:  It was a trick question.
20                   MS. FORD:  It's not even afternoon on the
21      west coast, so I don't know where you're --
22                   MR. SELDON:  Well, it's never afternoon
23      on the west coast.
24            Q.     (By Mr. Seldon )  But anyway, for the
25      record would you please give us your full name and
00005
 1      your present place of business.
 2            A.     My name is Daniel P. Salas, S-A-L-A-S.
 3      I'm the special agent in charge of the Office of the
 4      Inspector General in Atlanta, Georgia.
 5                   MS. FORD:  Did you swear him?
 6                   THE COURT REPORTER:  Yes.
 7            Q.     (By Mr. Seldon)  Of the office in Atlanta
 8      of the HUD Office of Inspector General?
 9            A.     HUD Office of Inspector General.
```

```
10          Q.   Mr. Salas, we are not here probing any
11     residence addresses.  As the attorney's office has
12     agreed previously, if the subpoena needed to be
13     issued in this case, would you be available to
14     accept service, the process?
15          MS. FORD:  We have the same stipulations
16     for yesterday.
17          MR. SELDON:  And this afternoon, too, or
18     do we need to --
19          MS. FORD:  Yes.
20          MR. SELDON:  Very good.  We'll spare that
21     time.  Good, sir.
22          Q.   (By Mr. Seldon)  Mr. Salas, your present
23     position, you said, is a special agent in charge of
24     the HUD Inspector General's Office in Atlanta,
25     Georgia?
00006
1          A.   That's correct.
2          Q.   Is that a regional office, a district
3     office, or what?
4          A.   It is a regional office.
5          Q.   How long have you held that position?
6          A.   Approximately one year.
7          Q.   When did you begin?
8          A.   Approximately May the 6th of 2001.
9          Q.   Were you employed by HUD/OIG before then?
10          A.   Yes, I was.
11          Q.   In what capacity?
12          A.   Prior to that I was the assistant special
13     agent in charge of the Office of the Inspector
14     General for HUD in Los Angeles.
15          Q.   And, again, I'm going to speed some of
16     this up because we've been through it with other
17     witnesses.  This is the office that is in Los
18     Angeles as part of the region that's headquartered
19     in San Francisco?
20          A.   That's correct.
21          Q.   What were the dates of your employment in
22     that position?
23          A.   From April of '97 until a year ago.
24          Q.   Very good.  Until you began with --
25          A.   Until I began here in Atlanta.
00007
1          Q.   Prior to then were you employed with the
2     HUD Office of Inspector General, prior to L.A.?
3          A.   No, I was not.
4          Q.   Mr. Salas, what we've done is begun your
5     deposition to get a little bit of background
6     information out of the way.  I'll give you the
7     ground rules for your deposition.  And then if
8     you're ready, we can begin it for real.
9          This is the case brought by Hilda Andrade
10     against the Secretary of Housing and Urban
11     Development, who is the nominal Defendant in the
12     Title 7 action.  The action has a number of claims,
13     part or all of which involves you when you were
14     Ms. Andrade's supervisor.
```

# *Project LAW*

**Project On Liberty And The Workplace**
*1319 F Street, N.W., Suite 305*
*Washington, DC 20004*
*202-955-6968 · fax: 202-318-2287 ·www.projectlaw.org*

June 20, 2002

<u>**VIA TELECOPIER**</u>
Hon. Mel Martinez
Secretary of Housing and Urban Development
451 Seventh Street, S.W.
Washington, D.C. 20410-4500

Re:    <u>Project LAW v. Secretary of Housing and Urban Development</u>

Dear Mr. Secretary:

Project LAW, as I believe you know, is a nonpartisan public interest law firm devoted to redressing violations of civil rights and civil liberties committed by powerful institutions of the government and the corporate world. A considerable portion of our work over the past year has concerned discrimination, retaliation, and misconduct by the most senior officials in your agency's Office of Inspector General, among them the former Inspector General, the former Deputy Inspector General, the current and former Assistant Inspectors General for Investigation, and the office of Counsel to the Inspector General.

Yesterday, OIG Special Agent Donna Hatfield appeared at our office, informed our building's security guard that she was conducting an investigation of HUD employees who had allegedly visited Project LAW, and demanded to see our building's sign-in sheets for the last six months. When the guard refused, S/A Hatfield informed him that she would return with a subpoena to obtain the records. At the time, I was in Atlanta taking the deposition of two OIG officials, one of whom was the newly appointed Deputy Assistant Inspector General for Investigations, whose possible misconduct we wrote to you about on May 3, 2002. One of the subjects of the depositions was the involvement of OIG Special Investigations Division in the removal of a Hispanic female agent, Hilda Andrade. The agent specifically involved was Ms. Hatfield, who acted at the direction of the office of Counsel to the Inspector General.



PLAINTIFF'S
EXHIBIT
# 9 - HABAN
3-5-07  mab
PENGAD 800-631-6989

Hon. Mel Martinez
Secretary of Housing and Urban Development
June 20, 2002
Page 2

The animus of senior officials of OIG toward Project LAW for our successful work is hardly a secret. Until yesterday, its retaliatory actions were usually confined to specific incidents in specific cases, and unprofessional public behavior. OIG's actions yesterday are far different. They strike at the heart of the confidential privilege which Project LAW has with its clients, and its First Amendment right to receive information from individuals about OIG misconduct without retaliation.

Project LAW has no relationship with HUD other than its work on behalf of clients and interested members of the public. For this reason, if we do not have your written assurance by the close of business on Monday June 24, 2002, that OIG has ceased all investigative activities into Project LAW and will not be issuing any subpoenas to Project LAW for records or other tangible materials, we will initiate suit in the U.S. District Court for the District of Columbia and obtain that relief expeditiously.

Very truly yours,

Robert C. Seldon

06/24/2002    12:38    HUD-OIG-INVEST → 93182287    NO.518    P01



U.S. Department of Housing and Urban Development

## Office of Inspector General

451 Seventh Street, SW
Washington, DC 20410-4500
Phone (202) 708-0390
Fax (202) 708-1354

---

## FACSIMILE TRANSMITTAL SHEET

| TO: Robert C. Seldon | FROM: Joe Haban / Nancy Brown |
|---|---|
| LOCATION: Wash, D.C. | DATE: June 24, 2002 |
| FAX NUMBER: 202 318-2287 | TOTAL NO. OF PAGES INCLUDING COVER: 2 |
| PHONE NUMBER: 202 955-6968 x 13 | RE: |

URGENT        FOR REVIEW        PLEASE COMMENT        PLEASE REPLY

---

NOTES/COMMENTS:

---

## OFFICE OF INVESTIGATION
HEADQUARTERS



PLAINTIFF'S
EXHIBIT
# 10-HABAN
3-5-07  mab

PENGAD 800-631-6989

06/24/2002    12:38    HUD-OIG-INVEST → 93182287    NO.518    P02



U.S. Department of Housing and Urban Development
## Office of Inspector General
451 Seventh Street, SW
Washington, DC 20410-4500

June 24, 2002

Robert C. Seldon
Project Law
1319 F Street, Suite 305
Washington, DC 20004

Re: Project LAW v. Secretary of Housing and Urban Development

Dear Mr. Seldon:

Thank you for your correspondence dated June 20, 2002. Neither you nor Project Law are the subjects of the particular investigation you reference. This office has no plans at this time to issue subpoenaes to you or Project Law.

Please contact me with any further questions or concerns. I can be contacted at (202) 708-0390.

Sincerely,

*Nancy S Brown*

for
R. Joseph Haban
Assistant Inspector General
for Investigation

EXHIBIT F16b



# U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
## OFFICE OF THE INSPECTOR GENERAL

### MERIT PROMOTION VACANCY ANNOUNCEMENT

Announcement No.: 03-FESB-100
Position: CRIMINAL INVESTIGATOR (ASSISTANT SPECIAL AGENT IN CHARGE), GS-1811-14
Full Performance Level: 14
Type of Appointment: Permanent

Organization: Office of Investigations
Number of Vacancies: 1
Duty Station: Houston, TX
Salary: $83,270 - $108,249

Opening Date: 12-12-02
Closing Date: 01-02-03

Sensitivity: Public Trust/High Risk
Bargaining Unit: NO

For more information contact: Chris Ferree, (304) 480-7630 or FESBINQUIRIES@BPD.TREAS.GOV

---

### WHO MAY APPLY

U.S. Citizens who meet **ONE** of the following categories:

1. Current permanent Federal employees in competitive positions or former Federal employees with reinstatement eligibility;
2. Individuals eligible for the HUD-OIG Career Transition Assistance Program (CTAP);
3. Individuals eligible for the HUD Career Transition Assistance Program (CTAP) from the local commuting area;
4. Individuals eligible for the Interagency Career Transition Assistance Program (ICTAP) from the local commuting area;
5. Current Federal employees in excepted service positions covered by an interchange agreement;
6. Individuals eligible for the Veterans' Employment Opportunity Act (VEOA). This applies to veterans with preference or veterans separated from the armed forces under honorable conditions after 3 years or more of continuous active service. (Current or former competitive service federal employees who can be appointed under other authorities are not eligible to apply under this Veterans' Employment Opportunities (VEO) provision);
7. District of Columbia Department of Corrections (DC DOC) Priority Placement eligibles;
8. Individuals who are eligible for non-competitive appointment under authorities such as the Veterans Readjustment Act (VRA), disabled individuals, returned volunteers from the Peace Corps or VISTA, etc.

---

### PLEASE NOTE

- Appointment to this position is contingent upon a negative drug test result. Any individual tentatively selected for this position will be required to submit to urinalysis to screen for illegal drug use prior to appointment unless the selectee is a HUD employee currently occupying a testing-designated position.

PLAINTIFF'S
EXHIBIT
# 13-HABAN
3-5-07  mab
PENGAD 800-631-6989

11/10/2003     15:55

NOV-10-2003 MON 01:56 PM                              FAX NO.                    NO.056    P03
                                                                                          P. 03

03-TFSD-100                                                                               Page 2

- The date immediately preceding an individual's 37th birthday is the maximum entry age for original appointment to a position within the OIG as a law enforcement officer.

- Selectee must satisfactorily complete the Basic Criminal Investigative training course at the Federal Law Enforcement Training Center in Glynco, Georgia, if one has not already been completed.

- Selectee may be entitled to Law Enforcement Availability Pay (LEAP) of 25% of base pay for availability to work substantial amounts of "unscheduled duty".

- The selectee will be required to carry a firearm and conduct full law enforcement activities.

- Demands of the position could require irregular unscheduled hours, degree of hazard, and personal risk. Travel is required.

- The selectee for this position must be willing to relocate (change of official duty station) at the direction of management.

- A pre-employment suitability inquiry is required prior to appointment.

- Proof of U.S. citizenship will be required upon appointment.

- A confidential financial disclose report required for selectee.

- Payment of relocation expenses is authorized.

- Satisfactory completion of a one-year supervisory/managerial probationary period is required unless previously completed.

## DUTIES (General)

The incumbent plans, directs, oversees, and coordinates the conduct of criminal investigations. Assigns work to a staff of subordinate investigators. Provides technical direction and guidance to staff when problems of very high complexity and sensitivity arise. Reviews investigative work in progress. Performs investigations that are primarily criminal in nature, are of a wide diversity, and highly sensitive. Develops and implements investigative programs and methods. Provides leadership, coordination, and recommends policy. Prepares and disseminates comprehensive investigative reports and administrative findings. Serves as agency's technical expert witness. Serves as IG's representative with Federal, State, and local law enforcement agencies for all investigative related matters.

## ELIGIBILITY REQUIREMENTS

Candidates must meet all eligibility requirements, including the following, by 30 days after the closing date.

**Time After Competitive Appointment:** Candidates who are current federal employees serving on a nontemporary competitive appointment must have served at least 3 months in that appointment.

**Time-In-Grade:** Candidate must have been a GS-13 for fifty-two (52) weeks (when applicable).

Candidates must be U.S. citizens and possess and maintain a valid state driver's license.

## QUALIFICATION REQUIREMENTS

03-FTSB-100

Candidate must meet all qualification requirements, including the following, by 30 days after the closing date.

**Specialized Experience:** Fifty-two weeks of experience at the GS-13 level, or equivalent, that is directly related to the position as listed above and which has equipped the candidate with the particular knowledge, skills, and abilities to successfully perform the duties of the position.

## PHYSICAL REQUIREMENTS

Selectee must pass a pre-appointment physical examination and meet the physical requirements for this position as required by this agency. The duties of this position require moderate to arduous physical exertion involving walking and standing, use of firearms, and exposure to inclement weather. Manual dexterity with comparatively free motion of finger, wrist, elbow, shoulder, hip, and knee joints is required. Arms, hands, legs, and feet must be sufficiently intact and functioning in order that applicants may perform the duties satisfactorily. Sufficiently good vision and hearing are required to perform the duties satisfactorily. Since the duties of this position are exacting and responsible, and involve activities under trying conditions, applicants must possess emotional and mental stability. Any physical condition that would cause the applicant to be a hazard to himself/herself, or others is disqualifying.

## RATING

**BASIS OF RATING:**

Qualified applicants will be rated on documented experience relating to the following Rating Factors. All applicants are REQUIRED to list each rating factor separately and provide a narrative statement of how they satisfy the factors shown below. Applicants will not receive consideration for this position if this additional information is not submitted. To be well qualified, a CTAP/ICTAP eligible must receive a rating of at least 2.5 on a 3.0 scale.

Rating Factors:

1. Ability to research, analyze and make recommendations on complex investigative and administrative issues.
2. Ability to effectively present information both orally and in writing to convey ideas and concepts, defend rationale, and gain support for a position or proposed activity.
3. Knowledge of the technical aspects of program Fraud Abuse, White Collar, and Violent Crime.
4. Ability to manage and coordinate the efforts of a multi-agency investigative team.
5. Ability to develop and maintain effective working relationships with others from within and outside the agency at a variety of levels and with differing backgrounds and points of view (discuss only those contacts relating to criminal investigations and related activities).
6. Knowledge of OIG Operations or related investigative experience.

## HOW TO APPLY

Applications will not be returned. If the information provided is found to be inadequate or incomplete, candidates will not be solicited for further experience/education background data. Failure to submit any of the required information contained in this announcement will remove applicant from consideration for this position.

All Applicants are required to submit the following:

1. An application (examples: Optional Application for Federal Employment, OF 612; Application for Federal Employment, SF 171; or résumé). Applicants should clearly indicate all experience (including dates and number of hours spent per week), training, education, and awards relevant to the qualification requirements. Training or self-development activities must reflect course title, classroom hours completed and date(s). Do not send position descriptions.

03-FESB-100                                                                                 Page 4

2. A description of any relevant knowledge, training, experience, etc. relating to each specific rating factor (found under the Rating section of this announcement). Address each rating factor separately.
3. A copy of your most recent performance appraisal. If you have not received a performance appraisal, please explain why in your application.
4. Proof of appointment eligibility, if eligible under a special appointment authority such as those listed in #8 in "Who May Apply" on page 1 of this announcement.

**Additionally:**

VEOA or VRA eligibles (#6 or #8 under "Who May Apply" on page 1) are <u>required</u> to submit a copy of a DD 214 or other documentation showing dates of service and type of discharge.

Applicants Claiming Veterans Preference are required to submit the following:

 <u>5-points</u>: A copy of a DD 214, OR other documentation showing dates of service and type of discharge (i.e., Honorable).

 <u>10-points</u>: Application for 10-Point Veteran Preference, SF 15, along with required documentation listed on the back of the SF 15 form.

Career Transition Assistance Program (CTAP)/Interagency Career Transition Assistance Program (ICTAP) eligibles <u>must also submit</u> the following (all four are required):

1. An SF-50, Notification of Personnel Action, or other official documentation, which shows that you a) were declared displaced or surplus while serving as a career or career conditional competitive service employee, in tenure group 1 or 2; <u>OR</u> b) are a current or former Executive Branch Agency employee in the excepted service serving and appointment without time limit, at grade GS-15 or equivalent and below, and who has been conferred non-competitive appointment eligibility and special selection priority by statute for positions in the competitive service.
2. An SF-50, Notification of Personnel Action, or other official documentation which shows the position you may be or are being separated from has the same or higher promotion potential as that of the vacancy;
3. **CTAP eligibles:** a copy of your Reduction in Force (RIF) Separation notice, notice of proposed removal for declining a directed reassignment or transfer of function outside the local commuting area, Certificate of Expected Separation or other official notice indicating you are in a surplus organization or occupation or eligible for discontinued service retirement
   ICTAP eligibles: a copy of your RIF separation notice, notice of proposed removal for declining a directed reassignment or transfer of function outside the local commuting area, documentation showing you were separated as a result of a RIF or declining a directed reassignment or transfer of function outside the local commuting area, or a letter from OPM or your agency documenting other priority consideration status as described in 5 CFR 330.708(a)(2); and
4. A copy of a current (or last) performance rating of record of at least fully successful or equivalent (required unless you are an ICTAP eligible due to compensable injury or disability retirement).

District of Columbia Department of Corrections (DC DOC) Priority Placement eligibles <u>must also submit</u> a copy of your RIF separation notice received as a result of the closure of the Lorton Correctional Complex.

All Applicants are <u>recommended</u> to submit the following:
1. An SF-50, Notification of Personnel Action, which shows your current grade and competitive civil service status.
2. List of awards received while employed with the Federal Government.

## WHERE TO APPLY

The HUD-OIG has contracted with the Treasury's Bureau of the Public Debt (BPD) to provide certain personnel services to its organization. BPD's responsibilities include advertising the HUD-OIG vacancies and extending job offers.

Submit applications and other forms to:
 Bureau of the Public Debt

11/10/2003   15:55
NOV-10-2003 MON 01:58 PM                    FAX NO.                    NO.056   006
                                                                        P. 06

03-FESB-100                                                             Page 5

Franchise Employment Services Branch
200 Third Street, P.O. Box 1328
Parkersburg, WV 26106-1328.

Complete application packages must be postmarked no later than the closing date.

**APPLICATION PACKAGES SUBMITTED ELECTRONICALLY WILL NOT BE ACCEPTED.**

Applicants will be notified as to the status of their applications.

Forms are available at www.usajobs.opm.gov or by calling (304) 480-7374.

Hard of hearing or deaf individuals may obtain information via TDD (304) 480-7755.

Reasonable accommodations are provided to applicants with disabilities on a case-by-case basis. If you need a reasonable accommodation for any part of the application and hiring process, please notify the contact person listed on this vacancy announcement.

## EQUAL EMPLOYMENT OPPORTUNITY

All candidates will be considered without discrimination for any non-merit reason such as race, color, religion, sex, age, national origin, lawful political affiliation, marital status, disability (if not a job factor), or membership in an employee organization.

PLAINTIFF'S
EXHIBIT
# 14 - HABAN
3-5-07 mab
PENGAD 800-631-6989

Standard Form 50-B
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 4

## NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| KEPLER, MICHAEL S | | 08/08/55 | 04/20/03 |

**FIRST ACTION** | **SECOND ACTION**

| 5-A. Code | 5-B. Nature of Action | 6-A. Code | 6-B. Nature of Action |
|---|---|---|---|
| 702 | PROMOTION | | |

| 5-C. Code | 5-D. Legal Authority | 6-C. Code | 6-D. Legal Authority |
|---|---|---|---|
| N3M | REG 335.102 COMP | | |

| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |
|---|---|---|---|
| | | | |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| CRIMINAL INVESTIGATOR<br>99G40735   99G407 | SUPERVISORY CRIMINAL INVESTIGATOR<br>99G40826   99G408 |

| 8. Pay Plan | 9. Occ Code | 10. Grade/Level | 11. Step/Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ Code | 18. Grade/Level | 19. Step/Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 13 | 10 | 117,993.60 | PA | GS | 1811 | 14 | 06 | 125,121.00 | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| 79,629.00 | 14,819.00 | 94,448.00 | 23,545.60 | 84,446.00 | 15,715.00 | 100,161.00 | 24,960.00 |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| | HUD OFFICE OF INSPECTOR GENERAL<br>HOUSTON COMM SRVC CENTER OIG<br>HOUSTON COM SVC CNTR/INVSTIGT<br><br>HU HG0624070040000000      PP 08 2003 |

**EMPLOYEE DATA**

| 23. Veterans Preference | 24. Tenure | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|
| 2  1—None   2—5 Point.   3—10 Point/Disability   4—10 Point/Compensable   5—10 Point/Other   6—10 Point/Compensable/30% | 1  0—None   1—Permanent   2—Conditional   3—Indefinite | | YES ☐  NO ☒ |

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| B0  WAIVED | 9  NOT APPLICABLE | 0 |

| 30. Retirement Plan | 31 Service Comp Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| 6  CS (7 1/2  PL 93-350) | 08/20/77 | F  FULL TIME | |

**POSITION DATA**

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 1  1—Competitive Service  2—Excepted Service  3—SES General  4—SES Career Reserved | E  E—Exempt  N—Nonexempt | | 8888 |

| 38. Duty Station Code | 39. Duty Station (City - County - State or Overseas Location) |
|---|---|
| 48-3280-201 | HOUSTON  HARRIS  TX |

| 40. AGENCY DATA | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| | | | | |

45. Remarks

SELECTED FROM PROMOTION CERTIFICATE #03-FESB-100 DATED 01/27/03.
POSITION IS AT THE FULL PERFORMANCE LEVEL.
SALARY IN BLOCK 12 INCLUDES AVAILABILITY PAY OF $ 23,545.60.
SALARY IN BLOCK 20 INCLUDES AVAILABILITY PAY OF $ 24,960.00.
SUBJECT TO COMPLETION OF  1 YR.   PROBATIONARY PERIOD FOR ASSIGNMENT TO
SUPERVISORY OR MANAGERIAL POSITION BEGINNING  04/20/03 .

| 46. Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| DEPARTMENT OF HOUSING & URBAN DEVELOPMEN | |
| **47. Agency Code** HU HG  **48. Personnel Office ID** 2731  **49. Approval Date** 04/18/03 | SANDRA L HICKS<br>PERSONNEL OFFICER |

Editions Prior to 7/91 Are Not Usable After 6/30/93
NSN 7540-01-333-6237

3-Part  50-315

## 2 – OPF Copy – Long-Term Record – DO NOT DESTROY

U HG0624070040000000      PP 08 1*2003*BATCH 27315836 000-00 201-04 AG/EO HG-2731