UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - -X

JAMES MALLOY,                    :

       Plaintiff        :

     v.                         : No. 04-1117(RJL)

                            :

ALPHONSO R. JACKSON,             :

       Defendant         :

- - - - - - - - - - - - - - -X

DEPOSITION OF DAVID NUHFER

Washington, D.C.

Tuesday, November 28, 2006

Deposition of DAVID NUHFER, called for

examination at 11:27 a.m., at the law offices of Robert

C. Seldon & Associates, P.C., 1319 F Street, N.W., Suite

305, Washington, D.C., before Gary S. Howard, a notary

public in and for the District of Columbia, when were

present on behalf of the respective parties:

1        BY MR. SELDON:

2    Q    Mr. Nuhfer, I take it from what you said,

3 you are employed by the Bureau of Public Debt,

4 which we will call BPD from here on in.  That is

5 not a part of the Department of Housing and Urban

6 Development. That is a part of the Department of

7 Treasury, I take it.

8    A    That's correct.

9    Q    Would you describe for us here, insofar

10 as it's relevant to the Department of Housing and

11 Urban Development, what is it, what are the

12 functions that BPD performs?

13    A    Okay. One of the functions we perform is

14 to provide a variety of administrative functions of

15 the federal agencies who typically are -- they are

16 typically fairly small in nature and it costs them

17 more to hire individuals to perform those functions

18 than to contract those functions out.

19    Q    Okay. So you are then, BPD is then a

20 contractor, I take it.

21    A    In a certain sense, yes. We are federal

22 employees.

1     Q     Is that on a fee-for-service basis?

2     A     It's a fee for service.

3     Q     And one of the ground rules is, because

4 this is not a video deposition, you always need to

5 say yes or no.

6           Insofar as is relevant to this

7 proceeding, and I'm going try to move it along by

8 asking you sometimes broad questions, sometimes

9 leading questions.

10          You perform this function for the

11 Department of Housing and Urban Development office

12 of inspector general, I take it.

13    A     That's correct.

14    Q     Do you also perform it for other

15 functions, other units in the Department of Housing

16 and Urban Development?

17          MS. LYONS:  Can I just interject here and

18 make sure that we're getting testimony that is

19 clear, about you versus BPD?

20          MR. SELDON:  Yes. I meant you, BPD at

21 this point.

22          THE WITNESS:  Correct.

1          BY MR. SELDON:

2    Q     Does BPD also perform functions for other

3 elements of the Department of Housing and Urban

4 Development, if you know?

5    A     My particular branch, no.

6    Q     Then let's go back and set the stage.

7 What is your position?

8    A     I'm the manager of the franchise,

9 employee and labor relations branch.

10   Q     What does that mean?  What does that

11 branch do?

12   A     Okay. Actually, there's three areas of

13 program responsibility, employee and labor

14 relations. The workers compensation program falls

15 under me. We contract out with several other

16 agencies to make sure that their workers

17 compensation are processed timely.

18          And the security staff also works for me.

19 Basically, the group that initiates background

20 investigations.

21   Q     What I'd like to do today, unless I tell

22 you otherwise, is to concentrate on what you've

1 called employee labor relations, what we might call

2 human resources or we might call a personnel

3 function.

4         We really have no interest in workers

5 comp and no interest today in what goes on in

6 security.

7         You said you were the manager of -- and

8 this time we'll say franchise labor relations. Do

9 you have a grade level, sir?

10    A     14.

11    Q     To whom do you answer by title?

12    A     The division director.

13    Q     And who is that by name?

14    A     Nancy Smith.

15    Q     Are you the senior most person who

16 provides this HR function to the Department of

17 Housing and Urban Development, office of inspector

18 general?

19    A     In my branch, yes.

20    Q     And what made you give that qualifier?

21    A     There's a number of other human resources

22 functions, such as staffing, processing. I can't

1 which we'll mark as Nuhfer Exhibit No. 1.

2          What's going to happen is the Reporter is

3 going to give you the original, which you need to

4 give back before we leave. I'm going to give AUSA

5 Lyons a copy.

6          THE COURT REPORTER:  No. 1.

7               (The document referred to

8                was marked for identification

9                as Deposition Exhibit No. 1.)

10         BY MR. SELDON:

11    Q    This is a document I take it you

12 recognize.

13    A    Okay.

14    Q    Do you or don't you?

15    (Pause.)

16    A    Yes, I do. It's a declaration I

17 completed.

18    Q    In connection with a case other than Mr.

19 Malloy's case in this jurisdiction, the Distad

20 versus Martinez case.

21    A    That would be correct.

22    Q    That was temporarily in this

1 2002?

2    A    Yes.

3    Q    What I'd like to ask you, then, if you

4 could elaborate on what the function -- and I don't

5 want you to tell me about the advice they gave you

6 or the advice you solicited.

7        But I would like you to tell me what the

8 function or functions were in 2002 of the office of

9 legal counsel of OIG in disciplinary matters, as

10 you understood it.

11   A    It's simply, once the decision had been

12 made to take a particular action, we would draft

13 the document, the proposal, the decision notice,

14 and then flip it to them for an opportunity for

15 them to comment on, for review for legal

16 sufficiency, basically.

17   Q    You say, once a decision had been made to

18 take disciplinary action.

19   A    Right.

20   Q    Let's talk about, then, that part of the

21 process or processes where such decisions were

22 made.

1          Where were they made as a matter of

2 standard business practice in 2002?

3    A    The immediate supervisor of the employee.

4    Q    Is it fair to say, then, the decision

5 whether or not to take disciplinary action would be

6 the proposed disciplinary action by the immediate

7 supervisor?

8    A    Yes. The immediate supervisor would make

9 their decision to propose an action.

10   Q    Now let's talk about the immediate

11 supervisor's coming up with that decision to

12 propose a particular penalty.

13         How does that process work, or how did it

14 work in 2002?

15   A    Okay. If we were directly involved with

16 it, and --

17   Q    And I take it the standard practice is

18 that you were.

19   A    Okay, yes. And it could develop any

20 number of ways, depending on the severity of the

21 issue at hand.

22         If it's minor misconduct, such as

1 held and it was up to the proposing people to make

2 the decision what they wanted to do.

3          And once that decision was made, we would

4 work with drafting the document for them.

5     Q     Okay. The decision on the penalty is up

6 to the proposing official, the supervisor, I take

7 it.

8     A     When you refer to the concept of decision

9 --

10    Q     The proposed penalty is up to the

11 supervisor.

12    A     As to what's proposed, right.

13    Q     Okay. Now what I want to do, we've talked

14 a little bit about this. This was an unusual

15 situation where the person only had one supervisor

16 in the field at the time.

17    A     Uh huh.

18    Q     And what I want to make clear is we're

19 not talking about that situation, unless you say

20 today for some reason, that's what applied here.

21    A     No. This was an exception.

22    Q     Right.

1 I bring it up, Mr. Seldon said that this didn't

2 count for anything.

3          (Laughter.)

4          MS. LYONS:  I don't think he understands

5 you well enough.

6          MR. SELDON:  That's what I was saying,

7 too. What I'm saying is, because he doesn't, I

8 don't think we're going to get anywhere.

9          MS. LYONS:  It's your deposition. Please

10 proceed.

11          BY MR. SELDON:

12     Q     I'm going to give you a copy of what is

13 going to be marked as --

14          THE COURT REPORTER:  No. 2.

15          MR. SELDON:  Nuhfer Exhibit 2.

16              (The document referred to

17               was marked for identification

18               as Deposition Exhibit No. 2.)

19          BY MR. SELDON:

20     Q     I'm actually going to give you Nuhfer

21 Exhibit 3 at the same time.

22          THE COURT REPORTER:  No. 3.

1 range is.

2          So, in a certain sense, it was a part of

3 that.

4    Q    Okay. And now let's look at Exhibit 3.

5    A    Exhibit 3, the same thing. The appendix

6 referenced in the table of contents were not

7 attached to it.

8    Q    Is it fair to say, then, that in terms of

9 standard practices and procedures, that Exhibit 2

10 defines the standard practices and procedures that

11 are -- I'm sorry -- the standard procedures that

12 are to be followed by the various participants in

13 the adverse action procedure?

14          Is that right?

15   A    That would be correct.

16   Q    So now what I want to do -- and is that

17 true of Exhibit 2 and Exhibit 3?

18   A    That would be correct.

19   Q    Let's take a look at Exhibit 2. And

20 you'll see a little page 9 written at the bottom. I

21 don't know if it really is page 9. But we're

22 looking at subpart G.

1 communications.

2     Q     Right. My question was, if there's a
3 potential adverse action, is it fair to say that
4 there's one or more communications from your office
5 with the potential proposing official and the
6 counsel's office?

7     A     That would be correct. There's at least
8 one or more.

9     Q     Now, if we look at the next answer,
10 Richardson was transferred, is your answer, I
11 believe, from the Denver office, which had formerly
12 been, if I'm not mistaken, Region 10, to Fort
13 Worth, which was Region 6, in June of '02.

14           Are you with me there?

15     A     Okay.

16     Q     What contact, if any, do you remember
17 having with Mr. Richardson's supervisor or
18 supervisors in the Denver office upon your receipt
19 of the ROI, of his potential misconduct?

20     A     I can't honestly say that I recall any
21 specific contact.

22           I may or may not have. I just don't

1 recall it at this point in time, with the passage

2 of time.

3    Q    Anything general?

4    A    As far as communication?

5    Q    Correct.

6    A    Like I said, I can't -- I don't recall

7 how I learned that he was reassigned. So I don't

8 specifically recall having any conversations with

9 his supervisor in Denver.

10    Q    Okay. That's fair.  What I want to ask

11 you next is because this is the other way that we

12 talked about reports of investigation.

13          Is there any practice or procedure by

14 which your office gets or learns about or is

15 briefed upon reports of investigations of

16 administrative EEO complaints by OIG employees?

17    A    In other words -- let me make sure I'm

18 understanding your question.

19          Are you asking me, are we made aware of

20 EEO complaints?

21    Q    Let's start with that, yes.

22    A    Okay. Not until a point until after

1 declaration.

2        Question -- Do you know if it is

3 customary to place employees who are under

4 investigation on administrative leave?

5        Answer -- It is not -- your answer -- It

6 is not customary to place employees on

7 administrative leave who are under investigation.

8        I take it that that was the question put

9 to you and your answer that you actually gave, not

10 in the declaration, but in an affidavit.

11        Is that right?

12    A    Is your question --

13    Q    That was your answer, wasn't it?

14    A    That's correct, that's my answer.

15    Q    How did you know that to be true?

16    A    The answer given there, when it talks

17 about, is it customary to place an employee on

18 leave during an administrative investigation, the

19 vast majority of administrative investigations

20 conducted that result in discipline, result in

21 something significantly less than removal.

22        And it just -- very rarely are the

Page 74

1 charges out there so serious, that an agency would

2 not want an individual in their office.

3          And that's what I'm referring to. No,

4 it's not customary, simply because they're being

5 investigated to place them on that new leave.

6          But it's going to be dependent on the

7 nature of the charges.

8    Q    Can you think of any circumstance when,

9 to your knowledge, that has occurred?  The employee

10 has been placed on admin leave while they were

11 under investigation?

12          MS. LYONS:  Are we limiting this to HUD

13 OIG?

14          MR. SELDON:  Yes.

15          MS. LYONS:  Well, then, I'm going to

16 object to foundation.

17          Go ahead. It's what you know.

18          MR. SELDON:  Correct.

19          THE WITNESS:  With HUD OIG, nothing comes

20 to mind right now. But I don't want to -- like I

21 say, we've dealt with any number of cases with them

22 and we have another 12 different agencies that we

1 deal with.

2          And you're talking literally a lot of

3 cases.

4          MR. SELDON:  Right.

5          THE WITNESS:  But nothing comes to mind

6 right off the top of my head.

7          BY MR. SELDON:

8    Q    And this is one of those times that I

9 want you to sit and think so it's clear that the

10 answer isn't just off the top of your head.

11         Take as long as you like.

12         MS. LYONS:  You don't have to come up

13 with names.

14         MR. SELDON:  Not necessary. We may or may

15 not have to get into that.

16         BY MR. SELDON:

17    Q    Is there a circumstance in which you can

18 recall an employee of HUD OIG being placed on

19 administrative leave while they were under

20 investigation?

21         In other words, before the report of

22 investigation was completed.

Page 76

1          (Pause.)

2     A     Are there any situations that I'm aware

3 of where the employee was placed on admin leave --

4     Q     While the investigation was going on. In

5 other words, before the ROI was produced.

6     A     I'm not aware of any.

7     Q     Your answer said -- It is not customary

8 to do X, Y and Z.

9          What did you base that part of your

10 answer on, it is not customary?

11     A     Here, again, that would tie back to,

12 there are any number of administrative inquiries.

13 It's not just a matter of business practice to,

14 whenever somebody is being investigated, as a

15 matter of custom, to immediately place them on

16 admin leave.

17     Q     Okay. I take it this is was something

18 that you were familiar with.  When you said it is

19 not customary, you are familiar with the custom, I

20 guess.

21          Is that right?

22     A     The custom of placing somebody on admin

1          (Recess.)

2          THE COURT REPORTER:  We're back on the

3 record.

4          MR. SELDON:  What are we up to? No. 6?

5          THE COURT REPORTER:  Six.

6               (The document referred to

7                was marked for identification

8                as Deposition Exhibit No. 6.)

9          BY MR. SELDON:

10    Q    I'm going to have marked as an exhibit an

11 e-mail from James Malloy. It goes to himself. And

12 it concerns a discussion Mr. Malloy said he had

13 with you about the Cortez Richardson ROI.

14    A    Okay.

15    Q    I take it you don't have any recollection

16 of having this discussion with Mr. Malloy, the

17 discussion that's referenced in there.

18          (Pause.)

19    A    Okay.

20    Q    Again, my question was, I take it you

21 don't remember having had that conversation with

22 Mr. Malloy that is referenced in the first sentence

1 of Nuhfer Exhibit 6.

2          Is that right?

3    A    Yes. Here, again, we're talking about --I

4 don't specifically remember the conversation, no.

5    Q    Do you specifically remember not having

6 it with him?

7          Well, that's important.

8    A    That would be a true statement as well.

9    Q    Do you have any general recollection

10 either way?

11   A    No. The only thing that I specifically

12 recall is contacting Chapman, trying to get the

13 individual identified who would be the ASAC in the

14 case. And he indicated Malloy. And then trying to

15 follow up with Malloy.

16         And I do specifically remember them

17 saying, no, we haven't seen a copy of the ROI.

18 Well, we need to get that down to you so that you

19 can take a look at it so that we can discuss this.

20         I remember trying to make follow-up

21 attempts to get a hold of Malloy and hearing, well,

22 he's out of the office. He'll have to get back with

Page 94

1 you, kind of thing, to confirm whether or not they

2 received it and whether or not we were any closer

3 to being in a position where he could take a look

4 at it and we could discuss a possible corrective

5 action.

6     Q     Okay.

7           MR. SELDON:  All right. Let's take a

8 break.

9           THE COURT REPORTER:  We're off the

10 record.

11           (Whereupon, at 1:00 p.m., the taking of

12 the deposition was recessed, to reconvene at 2:00

13 p.m. of the same day.)

14

15

16

17

18

19

20

21

22

1    Q    Yes.

2    A    I don't know whether they saw a copy of

3 it or not.

4    Q    Did you ever discuss it with anyone at

5 counsel's office? Don't tell me what they

6 discussed. That would be a tricky issue.

7    A    I don't specifically recall discussing,

8 other than what we would have gleaned out of the

9 ROI in terms of potential charges and potential

10 action to take with it to address the issues.

11    Q    I think that's something we'll probably

12 cover in some subsequent questions, so we'll let

13 that go for the time being.

14         MS. LYONS:  Okay.

15         MR. SELDON: One thing I'll go over, and

16 we'll just mark this.

17         What I'm going to do is ask to be marked

18 as -- is it Nuhfer 6?

19         THE COURT REPORTER:  Seven.

20         MR. SELDON:  Seven. This is a copy of an

21 e-mail that went from Richard Johnson to you, dated

22 5/16, 2002.

1                    (The document referred to

2                       was marked for identification

3                       as Deposition Exhibit No. 7.)

4          BY MR. SELDON:

5     Q     And attached to it is something which

6 I'll ask you about what it is.

7          Do you recognize the form of this e-mail

8 as being in the format coming from Mr. Johnson to

9 you?

10    A     Okay.

11    Q     Do you recognize that?

12    A     Yes. It came from Rick to me.

13    Q     What is this document that's attached to

14 the first page?

15         And I'll just say for the record -- you

16 know what I'd like to do, actually, Gary. Although

17 they're stapled together, let's make the next

18 document Exhibit 8.

19         In other words, this document that says,

20 Memorandum for Cortez Richardson, on top. Let's

21 make that Exhibit 8.

22         THE COURT REPORTER:  No. 8.

Page 102

1                    (The document referred to

2                        was marked for identification

3                        as Deposition Exhibit No. 8.)

4              BY MR. SELDON:

5     Q     Can you identify this document for us,

6 please?

7              MS. LYONS:  Which one?

8              THE WITNESS:  Which one?

9              MR. SELDON:  Exhibit 8.

10             THE WITNESS:  Yes. It was a draft that I

11 prepared, basically, a draft proposal to suspend

12 Richardson for 60 days that I prepared.

13             BY MR. SELDON:

14    Q     Do you recall discussing this with Mr.

15 Richardson's then immediate supervisor before you

16 prepared this?

17    A     I don't have any recollection of the

18 discussion.

19             Quite often, what I did when we'd get the

20 reports in is, these things are rather voluminous,

21 or can be.

22             We try to go through and glean out the

1     A     And in the spring of '02, in April, May

2 of '02, when this first came out, Groszkiewicz was

3 his immediate supervisor.

4     Q     Okay. I could show you a document if

5 you've got any doubt about that in your mind.

6     A     No, there's no doubt.

7     Q     Okay. This document, this draft proposed

8 adverse action for Mr. Groszkiewicz's signature,

9 was this your first draft of this?

10     A     I don't know. It may or may not have

11 been.

12     Q     Do you recall whether it was the first

13 draft that you sent to the office of legal counsel?

14     A     I can't honestly say whether it was or

15 wasn't.

16     Q     That's fair. The memo from Mr. Johnson to

17 you is dated May 16th, 2002.

18     A     Uh huh.

19     Q     What I want to do is move forward from

20 that point, okay?

21     A     Okay.

22     Q     Do you recall having any discussion with,

1 communication with Mr. Groszkiewicz, on the subject

2 of potential adverse action against Mr. Richardson

3 from May 16th, '02, forward?

4     A     I don't recall any specific communication

5 with him.

6     Q     Anything in general?

7     A     I don't recall anything in general.

8     Q     Do you know of any reason why you didn't?

9           MS. LYONS:   Objection. Assumes facts --

10          MR. SELDON:   I'm sorry.

11          BY MR. SELDON:

12    Q     Do you know of any reason why you would

13 not have had such contact with him?

14    A     No, there's no reason why I would not

15 have had contact with him.

16    Q     This e-mail comes back to you from Mr.

17 Johnson, which says -- about removal being

18 appropriate.

19          I'm going to ask you some questions about

20 this. But what I want you to do -- we don't want to

21 inadvertently encroach on what might be privileged

22 information.

1          MR. SELDON:  No, and I'm about to get to

2  the point, what's the next thing you remember?

3          MS. LYONS:  Okay. But that's hard because

4  he can't put things in time.

5          MR. SELDON:  Okay.

6          MS. LYONS:  So, to the extent that you're

7  going to do that, you're going to characterize it.

8          MR. SELDON:  Let's go this way then.

9          BY MR. SELDON:

10    Q     I think we've got on the record      this

11  exchange with you and Mr. Johnson on May 16th,

12  concerning the potential discipline of Mr.

13  Richardson.

14          I think we've established that.  Yes?

15    A     Yes, the e-mail.

16    Q     What is it that you recall your next

17  communication or information on the subject of the

18  possibility of discipline being imposed on Mr.

19  Richardson?

20    A     The next thing I specifically recall was,

21  after learning that he had been re-assigned out to

22  the Denver office and under Groszkiewicz, to Texas

Page 153

1          MR. SELDON:  Actually, can't they be?

2          MS. LYONS:  That's my question.

3          BY MS. LYONS:

4     Q     Is it improper for it to be the same

5 person who proposes and imposes discipline?

6     A     To my knowledge, there's nothing out

7 there that prohibits it. Typically, that would be

8 reserved for a situation where the head of the

9 agency is taking an action against his subordinate

10 employee and there's really nobody higher.

11          But it's rare.

12    Q     To your knowledge, under HUD OIG's

13 policies, in effect in 2002, would it conform with

14 those policies for the same person to be both the

15 proposing and the imposing, deciding official, for

16 an employee such as Special Agent Richardson?

17    A     Allowing the same person to be the

18 proposing and deciding official would have been

19 contrary to HUD OIG policy.

20          (Pause.)

21    Q     One of the things that you've been asked

22 about here today, Mr. Nuhfer, is the degree to

APR-10-2003 THU 02:23 PM                    FAX NO.                          P. 02
04/10/03 14:19    HUD OIG COUNSEL → 913044807352                    NO.979  P002

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ALEXANDRA DISTAD,** | ) |
| | ) |
| Plaintiff, | ) CASE NUMBER. 1:02CV02513 |
| | ) |
| v. | ) JUDGE: |
| | ) |
| **MEL MARTINEZ,** | ) TYPE: Employment Discrimination |
| In his capacity as, | ) |
| Secretary of Housing and | ) |
| Urban Development, | ) |
| | ) |
| Defendant. | ) |

### DECLARATION OF DAVID NUHFER

I, David Nuhfer, hereby declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following facts are true and correct:

1. I am a Human Resources Specialist employed by the Bureau of Public Debt (BPD), U.S. Department of the Treasury. I have been employed by BPD for 28 years. I have been a personnel specialist in the Federal government for 18 years.

2. Pursuant to an interagency agreement our Human Resource Division began providing personnel services for the Office of Inspector General (OIG), Department of Housing and Urban Development (HUD) in 1999. My specific duties include advising OIG managers and supervisors on disciplinary and adverse actions that are taken against their subordinates. I am familiar with the policies and practices of OIG in taking adverse and disciplinary actions.

3. I am aware of the Federal litigation initiated by Ms. Alexandra Distad, a former OIG employee. I was the BPD personnel specialist who advised OIG management on the removal of Ms. Distad.

4. The statement in the Memorandum of Points and Authorities in Opposition to Defendant's Motion to Dismiss or, in the Alternative, to Transfer, that "Long-standing OIG practice and procedure require that all significant personnel actions involving Special Agents - including those at issue in this case - can only be taken by a senior management official in OIG


DEPOSITION
EXHIBIT
#1
NuhFer

Headquarters in Washington D.C." is untrue. There is no such practice or policy. In fact, the contrary is true. The practice and policy has been that adverse and disciplinary action is taken at the lowest level of management. Generally, if there is an Assistant Special Agent in Charge (ASAC) in a district, the ASAC will be the proposing official and the Special Agent in Charge (SAC) is the deciding official for special agents assigned to that district.

5. There was a period of time between June 2002 and November 2002 when OIG tried to centralize its disciplinary actions, by using a panel composed of SACs and District Inspector Generals for Audit (DIGA), but that system proved to be too unwieldy. Even under the panel system, the decisions were not made at headquarters, but by a panel of senior field supervisors. That was not the system in place when Ms. Distad was removed.

6. The process does require coordination through the Office of Legal Counsel for adverse actions to ensure the proposals and decisions are legally sufficient. However, the Office of Legal Counsel makes no decisions on the deposition of disciplinary matters. They provide a legal review, which should be a standard practice at most organizations, and legal advice as to the action.

7. Regarding the particular removal in this case, Mr. Bryan Saddler was not the staff attorney that was my contact point regarding Ms. Distad's removal and I do not recall Mr. Bryan Saddler being involved at all. I do not recall discussing Ms. Distad's removal with Mr. Saddler. The reason John Dupuy was the Deciding Official in the Distad matter is because the SAC for the Rocky Mountain District, SAC Michael Groskiewicz, was Ms. Distad's immediate supervisor. As I indicated above normally there would be an intervening supervisor, the ASAC. If there had been an ASAC, the decision regarding Ms. Distad's proposed removal would have been made in the Rocky Mountain District in Denver, Colorado.

I declare under the penalty of perjury that the foregoing is true and correct.

Date:                                              DAVE NUHFER



United States Department of Housing and Urban Development
Office of Inspector General

---

| | | |
|---|---|---|
| **MANUAL CHAPTER:** | 1752 | |
| **TITLE:** | **Disciplinary and Adverse Actions** | |

---

| | | |
|---|---|---|
| **MATERIAL TRANSMITTED:** | Chapter 1752 | Disciplinary and Adverse Actions |
| **MATERIAL SUPERSEDED:** | Policy Issuance 752.1 | Disciplinary and Adverse Actions August 2000 |
| | OIG Bulletin 01-IGB-03 | Revisions to Policy Issuance 752.1, Disciplinary and Adverse Actions June 2001 |

**SUMMARY OF CHANGES:** This Chapter eliminates the disciplinary panel process and the Division of Internal Affairs as elements in the handling of misconduct allegations against Office of Inspector General (OIG) employees. In addition, the OIG Table of Penalties at Appendix B is updated and expanded and Appendix C, "Prohibited Personnel Practices," is added.

**PURPOSE:** This Chapter revises the policy and procedures for the U.S. Department of Housing and Urban Development, OIG, relating to employee misconduct.



DEPOSITION
EXHIBIT
#2
NohFer
11-28-06
PENGAD-Bayonne, N.J.

/SIGNED/

**APPROVED:** _____
David C. Williams
Acting Inspector General

---

Disciplinary and Adverse Actions

# TABLE OF CONTENTS

**Paragraph**                                                                **Page**

### Section 1 – General

| | | |
|---|---|---|
| 1-1. | Purpose | 1 |
| 1-2. | References | 2 |
| 1-3. | Supersession | 2 |
| 1-4. | Exceptions to Policy Provisions | 3 |
| 1-5. | Coverage | 3 |
| 1-6. | Definitions | 4 |
| 1-7. | Responsibilities | 6 |

### Section 2 – Procedures

| | | |
|---|---|---|
| 2-1. | Determining Appropriate Management Action | 9 |
| 2-2. | Types of Disciplinary/Adverse Actions and Procedures for Imposing Them | 11 |

### APPENDICES

Appendix A:  Douglas Factors
Appendix B:  The OIG Table of Penalties
Appendix C:  Prohibited Personnel Practices

## Section 1 – General

**1-1.  *Purpose.***

A.    This policy issuance establishes the policies and procedures for the U.S. Department of Housing and Urban Development, Office of Inspector General (OIG), relating to employee misconduct.

B.    It is the OIG's policy to use discipline as a managerial tool to: 1) correct deficiencies in employee conduct; 2) address situations that interfere with efficient agency operations; 3) set an example for the workforce; 4) serve as a deterrent to unacceptable conduct; and 5) ensure that employees meet high ethical standards.

C.    The Inspector General Act of 1978, as amended, 5 U.S.C. App. 3, provides that the OIG will conduct audits and investigations relating to the programs and operations of the Department.  The OIG recommends policies to promote economy and efficiency and to prevent and detect fraud and abuse in programs and operations.  The OIG keeps the Department and the Congress informed concerning fraud and other serious problems, abuses and serious management deficiencies found through audits and investigations.  Accordingly, employees of the OIG must maintain the highest standards of conduct and professionalism.  It is imperative that employees recognize that their acts of misconduct could have an adverse impact not only upon the accomplishment of their work, but also upon the ability of the OIG to function in accordance with its mission.  Specifically:

1.    The OIG Manual Chapter 1083, "Standards of Conduct and other Requirements," Section 1, paragraph 1-2, states clearly that, "OIG employees, by the very nature of their job responsibilities, are required to maintain higher standards of conduct than others in the Department;" and

2.    The OIG, as a law enforcement agency, holds its employees, whether auditors, investigators, or other employees, to a higher standard of conduct than that applied to other HUD personnel. Employees of the OIG must conduct themselves in a principled and ethical manner because they are responsible in their positions for being scrupulous and accurate in their investigative and audit reports and for testifying about their activities in court and in other forums.  In criminal cases, for example, the Assistant United States Attorney (AUSA) is responsible, when requested, for providing defense counsel

with any evidence that is material to either guilt or innocence. Brady v. Maryland, 373 U.S. 83 (1963); Bagley v. United States, 473 U.S. 667 (1985). In addition, the AUSA must disclose impeachment evidence that would challenge the credibility of government witnesses. Giglio v. United States, 405 U.S. 150 (1972). This impeachment evidence extends to the disclosure of prior impeachable convictions (such as for dishonesty, false statements or fraud or those carrying a possible death penalty or more than one year in jail) and a check on every government employee witness who will testify at trial for information from the employee's personnel records to determine whether there is any information concerning dishonesty, perjurious conduct, prior arrests, or other lack of truthfulness. See, e.g., United States v. Henthorn, 931 F.2d 29 (9th Cir. 1991).

D.      Decisions regarding matters covered by this policy will be made without regard to race, sex, religion, color, national origin, age or disability (also see Executive Order 11478, as amended, including but not limited to Executive Order 13087 [1998] and Executive Order 13152 [2000]).

1-2.    **References.** As provided in the Inspector General Act at 5 U.S.C. App. 3, §6 (a)(7), and as confirmed in the FY 1999 HUD Appropriations Act (Pub. Law 105-276, 112 Stat. 2461, 2482) and FY 2000 HUD Appropriations Act (Pub. Law 106-74, 113 Stat. 1047, 1068, or subsequent pertinent fiscal year Appropriations Acts, the Inspector General of HUD has independent authority over all personnel issues within the Office of Inspector General.

This Disciplinary and Adverse Actions policy is based on:

A.      5 U.S.C. Chapter 75;

B.      5 C.F.R. Part 752;

C.      5 C.F.R. Part 2635, as supplemented by 5 C.F.R. Part 7501 and the OIG Manual Chapter 1083, Standards of Conduct and Other Requirements; and

D.      The Investigation/Operations Manual and Audit Operations Manual.

1-3.    **Supersession.** This policy supersedes OIG Policy Issuance 752.1, "Disciplinary and Adverse Actions," dated August 2000; and OIG Bulletin Number 01-IGB-03, dated June 2001.

**1-4.   *Exceptions to Policy Provisions*.** The Inspector General or the OIG Human Resources Director may authorize waivers to the provisions of this policy consistent with applicable laws and regulations.

**1-5.   *Coverage*.**

A.  This policy covers all General Schedule and Senior Executive Service (SES) OIG employees. However, suspensions of 14 days or less <u>do not</u> apply to members of the SES. Other procedures, such as those found in 5 U.S.C. Chapter 75, Subchapter V; 5 C.F.R. Part 752, Subparts E and F; and Executive Order 12993, "Administrative Allegations Against Inspectors General," are applicable to members of the SES.

B.  The applicability of the procedures described in Section 2 will be determined by the status (competitive service or excepted service, completion of probationary period, preference eligibility, length of service, etc.) of the subject employee as prescribed by 5 C.F.R., §§ 752.101, 201, 301, 401, 501, and 601.

C.  The procedures described in Section 2 do not apply to the following actions:

1.  A reduction-in-force action under 5 U.S.C. §3502;

2.  A suspension or removal taken in the interest of national security;

3.  A reduction in grade of a supervisor or manager who fails to complete successfully a new probationary period as a supervisor or manager, if such a reduction in grade is to the grade held immediately before becoming a supervisor or manager;

4.  A voluntary action by an employee;

5.  A separation during probation under 5 C.F.R., §315.804, or a separation during probation based in whole or in part on pre-appointment reasons under 5 C.F.R., §315.805;

6.  The termination of an appointment on the expiration date specified as a basic condition of employment at the time the appointment was made;

7.  A reduction in grade or removal taken under 5 U.S.C. §4303 (for unacceptable performance);

8. An action that terminates a time-limited promotion and returns an employee to the position from which temporarily promoted, or to a different position of equivalent grade and pay, if the employee was informed that the promotion was to be of limited duration;

9. The reduction of an employee's rate of basic pay from a rate that is contrary to law or regulation;

10. An action that entitles an employee to grade retention under 5 C.F.R. Part 536, and an action to terminate this entitlement;

11. An action taken or directed by the Office of Personnel Management (OPM) under 5 C.F.R. Part 731;

12. An action against a reemployed annuitant;

13. A directed reassignment; and

14. Any other action excluded from coverage by 5 C.F.R. Part 752, Subparts A, B, C, D, E, and F.

## 1-6    *Definitions*.

A. **Adverse Action:** A removal, suspension for more than 14 days, furlough for 30 days or less, or reduction in grade or pay, normally a result of misconduct or other management necessity.

B. **Aggravating Factors:** Actions, circumstances, or events that increase or magnify the seriousness or severity of an employee's offense;

C. **Appeal:** A request by an employee to the Merit Systems Protection Board (MSPB) for a review of a suspension of more than 14 days (including an indefinite suspension or an enforced leave action in excess of 14 consecutive days), a reduction in grade or pay, a furlough for 30 days or less, or a removal.

D. **Counseling:** Oral or written actions by a supervisor to provide guidance to an employee concerning conduct in the workplace. Such actions include letters of warning, caution, and requirement. Counseling actions are not disciplinary actions.

E. **Days:** Calendar days.

F. **Deciding Official:** Typically, the management official one level above the official proposing a disciplinary or adverse action. The exception to this is

that when the Inspector General (IG) is the proposing official, he or she is also the deciding official.

G. **Decision Notice:** A written notice from a deciding official to an employee against whom a suspension of 14 days or less or an adverse action (except an emergency furlough) has been proposed, stating the decision on that action.

H. **Disciplinary Action:** A formal action taken by management against an employee, ranging from reprimand to a 14-day suspension.

I. **Douglas Factors:** Factors management must consider when proposing and deciding a suspension or more severe adverse action, as prescribed by Douglas v. Veterans Administration, 5 MSPR 280; 5 MSPB 313 (1981). (See Appendix A to this policy.)

J. **Employee's Reply:** The employee's answer, oral, written, or both, to a proposed suspension or adverse action. The employee may provide affidavits, documents, medical records, or any other information that he or she wishes the deciding official to consider. The oral reply is not a hearing, and the employee does not have the right to call witnesses. The Deciding Official must consider whatever the employee provides.

K. **Enforced Leave:** Placement of an employee in a temporary leave status without duties (or on leave without pay if the employee has no accrued leave) without the employee's consent, pending assessment of appropriate medical documentation and a determination that the employee may safely return to duty. Such action is considered equivalent to a suspension and, if continued for more than 14 days, confers to the employee the right to appeal to MSPB.

L. **Furlough:** Placement of an employee in a temporary status with neither duties nor pay because of lack of work or funds, or for other non-disciplinary reasons.

M. **Indefinite Suspension:** Placement of an employee in a temporary non-duty, non-pay status pending investigation, inquiry or further OIG action. The indefinite suspension continues until the completion of the administrative or legal action that precipitated it. An indefinite suspension is most commonly used when an employee has been indicted for a crime for which a penalty of imprisonment may be imposed.

N. **Mitigating Factors:** Actions, circumstances, or events that lessen the seriousness or severity of the employee's offense.

O. **Nexus:** The relationship or connection between the offense an employee commits and the efficiency of the federal service, including the effective performance of that employee's or any other employee's duties. Any disciplinary or adverse action against an employee must be taken to promote the efficiency of the service.

P. **Proposal Notice:** A written notice to an employee presenting management's intention to impose a suspension of 14 days or less or an adverse action (except an emergency furlough). The proposal notice triggers due process rights for the employee against whom the action is proposed.

Q. **Proposing Official:** Typically, the proposing official is the subject employee's immediate supervisor (or someone at a higher level in the chain of command) who signs and issues the proposal notice.

R. **Reduction in Pay:** Reduction in the rate of basic pay fixed by law or administrative action for the position held by an employee.

S. **Removal:** The involuntary separation of an employee from federal service, except when taken as a reduction-in-force action, or at the expiration of an appointment.

T. **Reprimand:** An official written disciplinary action issued by a supervisor to an employee, and based on misconduct. The reprimand is placed in the employee's Official Personnel Folder (OPF) and remains in effect for two years, unless withdrawn sooner. No proposal notice is required for a reprimand.

U. **Suspension:** Placement of an employee in non-duty, non-pay status for disciplinary reasons.

1-7. *Responsibilities.*

A.    Employees are responsible for:

1.    Conducting themselves in a manner that is above reproach and that enhances and furthers the mission of the OIG;

2.    Familiarizing themselves with governing laws, regulations, and OIG policies pertaining to employee conduct, including 5 C.F.R. Part 2635, "Standards of Ethical Conduct for Employees of the Executive Branch;" 5 C.F.R. Part 7501; OIG Manual Chapter 1083; the Table of Penalties in Appendix B of this Chapter; and either the

Case 1:05-cv-01117-RCL    Document 34-34    Filed 07/18/2007    Page 38 of 67

Investigation/Operations Manual or the Audit Operations Manual, as appropriate.

B.   Supervisors are responsible for:

    1.   Informing employees of, and setting an example of, the scrupulous conduct that is expected and required of members of the OIG;

    2.   Identifying, early, employee misconduct that needs improvement or correction to prevent serious problems from developing. Performance problems may be treated as misconduct in many situations, such as, but not limited to, performance issues not covered by the employee's performance elements, performance plan not signed, or performance problems resulting from inattention or willfulness; and

    3.   Taking appropriate action when misconduct occurs, including ascertaining the facts of the situation, obtaining advice from the Office of Management and Policy (OMAP), Human Resources Division (HRD), or its service contractor (when one exists), and the Office of Counsel; and proposing or taking disciplinary or adverse action, as warranted.

C.   Assistant Inspectors General (AIGs) and Counsel are responsible for:

    1.   Ensuring that employee misconduct issues are handled effectively, fairly, and promptly within their respective organizations;

    2.   Ensuring that managers within their respective organizations follow the policies set forth in this Chapter;

    3.   Serving as a proposing official or deciding official, as appropriate, for actions involving subordinate employees; and

    4.   Through their own personal conduct and performance, serving as examples for subordinates by exhibiting the highest ethical and professional standards and leadership qualities and skills.

D.   Proposing officials are responsible for:

    1.   Conducting inquiries to ascertain the facts concerning alleged employee wrongdoing;

Disciplinary and Adverse Actions

    2.    Requesting support from the Special Investigations Division of the Office of Investigation, if the proposing official needs assistance to examine the allegations and develop the facts;

    3.    Evaluating the facts and developing the proposal notice with the assistance of the HRD or its service contractor, when one exists, and the Office of Counsel; and

    4.    Issuing an appropriate proposed penalty after review of the Douglas Factors, the Table of Penalties, and all of the surrounding facts and circumstances.

**E.**    Deciding officials are responsible for:

    1.    Obtaining advice, arranging for and considering the employee's oral and written reply, if any (including granting short extensions to the time for providing a reply, when appropriate), evaluating the evidence pertaining to each charge and specification, and arranging for legal review of the decision notice;

    2.    Resolving questions of fact by additional inquiry if necessary, providing the subject employee with a written explanation of any adverse facts discovered during the additional inquiry, and allowing the employee an opportunity to respond;

    3.    Hearing, or designating a representative to hear, the employee's oral reply. However, the proposing official for the action may not be a representative. In addition, the representative must not have taken part in the events that led to issuance of the proposal notice nor be under the jurisdiction of the proposing official. A representative must be in a position to recommend or make a decision on the proposed action;

    4.    Arranging for a written summary of the oral reply. If a verbatim transcript is made, the OIG will pay for the transcript. The summary or transcript will become part of the official file and will be made available to the employee upon request;

    5.    Determining the appropriate penalty after reviewing the Douglas Factors, the Table of Penalties, and all of the surrounding facts and circumstances; and

    6.    Issuing the decision and initiating the appropriate personnel

action.

F.   The HRD, or its service contractor, when one exists, is responsible for:

   1.   Providing technical guidance and assistance to supervisors and managers on the provisions of this policy and other aspects of handling employee misconduct;

   2.   Preparing and reviewing non-disciplinary, disciplinary and adverse action notices to assure compliance with law, regulations, and OIG policy;

   3.   Explaining appeal and grievance rights to employees, and providing them with the appropriate documents;

   4.   Serving as technical representative on behalf of the OIG in MSPB appeals; and

   5.   Maintaining official disciplinary and adverse action files.

G.   The Office of Counsel is responsible for:

   1.   Reviewing adverse action notices and decisions before they are issued, and advising AIGs, supervisors, and managers on personnel law;

   2.   Serving as agency representative, as appropriate, on behalf of the OIG on third-party appeals.

H.   OIG staff members wishing to raise allegations of misconduct within the OIG are responsible for doing so through their chain of command, the OIG Hotline, the Special Investigations Division of the Office of Investigation, or other suitable means. Recipients of such allegations are responsible for placing them in the appropriate channels for proper handling as provided in Section 2 below.

## Section 2 – Procedures

**2-1.   *Determining Appropriate Management Action.***

A.   In taking disciplinary and adverse actions, OIG management must ensure that:

   1.   Charges against an employee are factual and appropriate;

2. Nexus exists between the act(s) of misconduct and the employee's job. This can include the impact of the misconduct on other employees and the mission of the OIG; and

3. Penalties imposed are reasonable.

B. An oral or written counseling or letter of caution, warning or requirement may be appropriate in instances of minor misconduct. For example, a first instance of one hour of unexcused absence may warrant only a letter of caution (see OIG Manual Chapter 1630, "Leave Administration," to be issued), while a first instance of more serious misconduct may warrant formal discipline, depending upon the severity of the offense. In choosing a course of action, management must ensure the OIG's high standards of conduct and maintain an appropriate level of discipline within the agency.

C. Evaluating cases of employee misconduct requires the exercise of responsible judgment to discipline in proportion to the nature and severity of the offense with the goal of correcting the misconduct, whenever possible. While the OIG subscribes to the principle of progressive discipline (increasing the severity of adverse action, up to removal, for successive instances of misconduct) serious instances of misconduct may warrant removal for the first offense.

D. Management must seek advice from the HRD, or its service contractor, when one exists, prior to initiating a counseling or letter of caution, warning, or requirement. This technical advice along with a review of the Table of Penalties will be considered prior to the issuance of any oral or written counseling, or letter of caution, warning or requirement. Management must also seek advice from the HRD, or its service contractor, when one exists, when contemplating a disciplinary or adverse action. Management must consult with Counsel when contemplating an adverse action.

E. If an employee is being removed from Federal service for inability to perform the duties and responsibilities of the position for physical or mental disability reasons, the employee will be given information on applying for disability retirement, if he or she has the requisite years of service. If the employee raises physical or mental disability issues before or in response to charges of misconduct, management must consider those issues as described in paragraphs 2-2. B.2. and C.2.

F. The proposing official (or the appropriate AIG in emergency situations) will determine whether an employee remains in a paid duty status during the advance notice period (see paragraphs 2-2.B.1 and C.1.) of an adverse

action process. While the employee normally remains in the workplace during the notice period, there are situations in which this is not advisable. The employee should not remain in the workplace during this period if he or she may pose a threat to himself or herself or others. Nor should the employee remain in the workplace if his or her presence could result in the loss or damage to Government property; risk injury to ongoing OIG audits, investigations or activities; or otherwise jeopardize legitimate Government interests. The proposing official may elect one or a combination of the following alternatives:

1. Assign the employee to duties where he or she is no longer a threat to anyone's safety, the OIG mission, or Government property;

2. Grant leave upon request, or assign an absent-without-leave status if the employee has left the work site without requesting leave; or

3. Place the employee in a paid, non-duty status for such time as is necessary to effect an adverse action.

G. In accordance with 5 C.F.R., §§752.202 and 752.403, disciplinary and adverse actions will only be taken for such cause as will promote the efficiency of the federal service. However, in accordance with 5 C.F.R., §752.603(a), adverse actions against members of the SES may only be taken for reasons of misconduct, neglect of duty, malfeasance or failure to accept a directed reassignment or to accompany a position in a transfer of function.

H. Disciplinary and adverse actions will not be taken against an employee on the basis of any reason prohibited by 5 U.S.C. §2302 (prohibited personnel practices – see Appendix C).

2-2.  *Types Of Disciplinary And Adverse Actions And Procedures For Imposing Them.*

A. Reprimand:

1. A reprimand is the least severe formal disciplinary action available. It is issued in writing to an employee by a supervisor.

2. The reprimand must:

a. Specify the reasons for its issuance;

b. State that it will be filed in the employee's Official Personnel Folder and will remain in effect for two years, unless management rescinds it earlier;

c. Explain that while in effect, management may count the reprimand as a prior offense in determining a penalty for any future misconduct. (Management may consider an expired or rescinded reprimand as an aggravating factor under the Douglas Factor review only to the extent that it clearly put the employee on notice about such conduct); and

d. Specify the employee's right to file an administrative grievance over the reprimand.

B. **Suspensions of 14 Days or Less** (this subsection does not apply to members of the SES):

1. Management must provide an employee against whom a suspension of 14 days or less is proposed an advance written notice stating:

   a. The specific charges and specifications (reasons) for the proposed action;

   b. The name, title and how to contact the deciding official who will hear an oral reply, receive a written reply, or both;

   c. The period of time, not less than 14 days, within which the employee may reply orally and in writing and furnish affidavits and other documentary evidence to support the reply;

   d. The right of the employee to be represented by an attorney, or other representative. However, the OIG may disallow as an employee's representative an individual whose activities as a representative would cause a conflict of interest or position. The OIG may also disallow an employee of the OIG whose release from his or her official position would give rise to unreasonable costs, or whose priority work assignments preclude his or her release. An Equal Employment Opportunity (EEO) official may not serve as an employee representative;

   e. The right of the employee and his or her representative to review the material relied upon by the OIG to support the proposal, and a statement of where this OIG Manual Chapter, pertinent statutes, and the OPM regulations are available for review;

f. The right of the employee, if in duty status, to use up to four hours of official time to review the material relied upon by the OIG, to prepare a reply, and to secure affidavits. An OIG employee representative may not be granted official time, except to attend the oral reply; and

g. That the proposed action will not become effective earlier than 15 days following the date the employee receives the proposal notice.

2. If the employee wishes the OIG to consider any medical condition that may be contributing to a conduct, performance or leave problem, he or she will be given a reasonable time to furnish medical documentation (see 5 C.F.R. Part 339). Whenever possible, the employee will supply such documentation within the time limit allowed for an answer. The OIG will provide reasonable accommodation to qualified employees with disabilities in accordance with 29 C.F.R. Part 1614.

3. A management official at a higher level than the proposing official (see paragraph 1-6.F.) must provide the employee a signed, written decision notice that:

   a. Considers only the charges specified in the proposal notice and any amendment to that notice;

   b. Considers any reply provided by the employee or his or her representative;

   c. Specifies the reasons for the decision, including stating which charges and specifications are sustained and which are not sustained, and stating the appropriate penalty if one or more charges is (are) sustained (the action decided upon may not be more severe than the action proposed);

   d. Specifies the employee's right to file an administrative grievance; and

   e. Ensures that the notice is delivered to the employee on or before the effective date of the action.

C. Suspensions of 15 days or more including indefinite suspensions, enforced leave lasting 15 consecutive days or more, reductions in grade or pay, removals, and furloughs for 30 days or less:

1. A management official must provide an employee against whom one of the above actions is proposed at least a 30-day advance written notice, stating:

    a. The specific charges and specifications (reasons) for the proposed action;

    b. The basis for selecting the particular employee for furlough, as well as the reasons for the furlough, when some but not all employees in a given competitive level are being furloughed;

    c. The name, title and how to contact the deciding official who will hear an oral reply, receive a written reply, or both;

    d. The period of time, but not less than 21 days, within which the employee may reply orally and in writing and furnish affidavits and other documentary evidence to support the reply;

    e. The right of the employee to be represented by an attorney or other representative. However, the OIG may disallow as an employee's representative an individual whose activities as a representative would cause a conflict of interest or position. The OIG may also disallow an employee of the OIG whose release from his or her official position would give rise to unreasonable costs, or whose priority work assignments preclude his or her release. An EEO official may not serve as an employee representative;

    f. The right of the employee and his or her representative to review the material relied upon by the OIG to support the proposal, and a statement of where this OIG Manual Chapter, pertinent statutes, and the OPM regulations are available for review; and

    g. The right of the employee, if in duty status, to use up to 16 hours of official time to review the material relied upon by the OIG, to prepare a reply, and to secure affidavits. An OIG employee representative may not be granted official time, except to attend the oral reply.

2. If the employee wishes the OIG to consider any medical condition that may be contributing to a conduct, performance or leave problem, he or she will be given a reasonable time to furnish medical documentation (see 5 C.F.R. Part 339). Whenever possible, the employee will supply such documentation within the time limit allowed for an answer. The OIG will provide reasonable accommodation to qualified employees with disabilities in accordance with 29 C.F.R. Part 1614.

3. Crime provision (see 5 C.F.R. §752.404)

    a. All of the procedural requirements of paragraph 2-2.C. must be observed, except for the 30-day advance written notice period and the time for an oral or written reply as set forth in paragraph 2-2.C.1. An employee may be suspended indefinitely when there is reasonable cause to believe he or she has committed a crime for which a sentence of imprisonment may be imposed. In such a case, the employee will have at least 7 days to reply orally, in writing, or both. Reasonable cause to suspend indefinitely may be based on an indictment, or formal judicial determination made following a preliminary hearing, an arrest warrant and factual material culled from supporting affidavits, or an investigation of the underlying facts and circumstances conducted by or on behalf of the OIG.

    b. The OPM regulations provide that an employee may be placed in a non-duty status with pay (administrative leave) for such time as may be necessary to effect an action under the crime provision. The OIG managers may also detail an employee to another position or to unclassified duties. When a proposal is issued to suspend indefinitely under the crime provision, the notice must clearly discuss the nexus between the conduct that led to the indictment and the individual's employment with the OIG. An indefinite suspension is temporary. There must be a foreseeable event or condition that will bring the action to an end, such as a conviction, acquittal or plea of guilty.

4. A management official at a higher level than the proposing official (see paragraph 1-6.F.) must provide the employee a written decision notice that:

    a. Considers only the charges specified in the proposal notice and any amendment to that notice;

    b. Considers any reply provided by the employee or his or her representative;

    c. Specifies the reasons for the decision including stating which charges and specifications are sustained and which are not sustained, and stating the appropriate penalty, if one or more charges is/are sustained (the decision cannot be more severe than the action proposed);

---

    d.  Specifies the employee's right to file an EEO complaint or an appeal of the action to the MSPB. It must also state the applicable time limits for filing such an appeal (within 30 days after the effective date of the decision or within 30 days after the date of receipt of the OIG decision, whichever is later), and the appropriate MSPB office with which to file. An appeal form must be provided to the employee as well as a copy of the applicable MSPB regulations;

    e.  Notifies the employee of the opportunity to apply for disability retirement within one year of the effective date of the decision, if he or she raised a medical condition as an issue in the action; and

    f.  Ensures that the notice is delivered to the employee on or before the effective date of the action.

5.  The advance written notice and opportunity to reply are not necessary for furlough because of unforeseen circumstances, such as sudden breakdowns in equipment, acts of God, or sudden emergencies requiring immediate curtailment of activities.

EXHIBIT F14

**AFFIDAVIT**

**COUNTY OF WOOD**

**STATE OF WEST VIRGINIA**

I, David A. Nuhfer, make the following statement freely and voluntarily to Frank Longoria, who has
identified himself to me as a Contract EEO Investigator for the following federal agency: Department of
Housing and Urban Development, investigating a complaint of discrimination filed by James M. Malloy
knowing that this statement may be used in evidence. I understand that this statement is not confidential
and may be shown to the interested parties (those with a legal right to know). I hereby solemnly swear
or affirm:

1.  State for the record your name, position title, grade, and organizational unit?

A.  My name is David A. Nuhfer and my position title is Human Resources Specialist, GS-201-13,
    Benefits and Franchise Employee Relations Branch, Human Resources Division, Administrative
    Resource Center, Bureau of Public Debt, Department of Treasury, Parkersburg, West Virginia.

2.  State for the record your race, DOB, and prior EEO activity.

A.  I am Caucasian, born September 20, 1951. I have no prior EEO activity.

3.  How long have you worked for the government and in your present position?

A.  I have worked for the federal government for approximately 28 years and in my present position,
    with different titles, for approximately 18 years doing employee relations and labor relations type
    work.

4.  Who are your supervisors? Identify them by name, position title, and when they became your
    supervisors?

A.  My first-level supervisor is Nancy Smith, Branch Manager who has been my immediate supervisor
    for a little more than two years; and my second-level supervisor is Sandra Hicks, Division Director,
    who has been my second-level supervisor for about ten years.

5.  Explain your organizational relationship to HUD OIG management officials.

Initials _DN_

DEPOSITION
EXHIBIT
# 4
Nuhfer  1-28-06
PENGAD-Bayonne, N. J.

A. HUD-OIG has contracted with Public Debt for various administrative functions including personnel services.

6. Briefly explain your main duties as Human Resources Specialist and how they related to Complainant (James Malloy)?

A. I provide advice and technical assistance to HUD OIG management officials in the area of employee relations. This would include issues with employee performance, performance management, employee grievances, disciplinary and adverse actions based on employee misconduct, and suitability adjudications based on the results of background investigations. In regard to Mr. Malloy, as a HUD OIG management official, I would have provided him with advice and guidance in the above mentioned personnel arenas.

7. Please explain the policy relevant to the appointment of proposing and deciding officials relevant to disciplinary action.

A. An employee's immediate supervisor would typically be the proposing official and the next individual in the chain of command would be the deciding official.

8. Did the appointment of the proposing and the deciding official in the disciplinary actions against Cortez Richardson occur in accordance with established policy?

A.    Yes.

9. Did the appointment of the proposing and the deciding official in the disciplinary actions against Steve Romero occur in accordance with established policy?

A.    Yes.

10. When did you become aware of the investigations on Special Agents Cortez Richardson?

A. I became aware of the results of the Cortez Richardson investigation in the spring of 2002 when my office received a copy of the Cortez Richardson ROI.

11. When was Mr. Richardson transferred from the Denver office to the Complainant's office, Fort Worth, Texas (USE OPM FILE TO ANSWER)?

A. In June 2002.

Initials _DN_

12. Did you provide advice and guidance to the proposing official, Complainant, or to the deciding official, Larry Chapman, concerning the disciplinary action against Mr. Richardson? If no, please explain why that was not done.

A. I don't recall having any discussions with the Complainant regarding this matter. Typically, any detailed discussions regarding corrective actions are not held until after the proposing official has had an opportunity to review the ROI. After I learned that Mr. Richardson had been reassigned under Mr. Chapman's supervision, I talked to Mr. Chapman to determine who Mr. Richardson's immediate supervisor was and to determine whether he had received a copy of the ROI. As I recall, this initial contact was in July or August 2002. I was informed that Mr. Malloy was Mr. Richardson's immediate supervisor but that they had not received a copy of the Richardson ROI. I followed up with Mr. Chapman by email on September 4, 2002 to determine if the ROI had ever been received. Mr. Chapman responded by email on September 16, 2002 letting me know that he received the ROI on September 15 and that Mr. Malloy would be out of town until the following week. Before I had an opportunity to contact Mr. Malloy to discuss this case and to provide him with my thoughts and recommendations, I learned that Mr. Malloy had issued Mr. Richardson a notice on September 30, 2002 proposing a five-day suspension and that Mr. Chapman issued Mr. Richardson a decision notice on this same date sustaining the proposal

13. Did you provide advice and guidance to the proposing official, Complainant, or to the deciding official, Larry Chapman, concerning the disciplinary action against Mr. Romero? If no, please explain why that was not done.

A. I do not recall any specific conversations with Complainant or Mr. Chapman regarding Steve Romero. If any conversation did occur, the would have been very general since I did not have an ROI on Mr. Romero and, as a result, would not have been in any position to form any opinions or make any recommendations.

14. Were the Douglas factors applicable to assessing the appropriate level of penalty on the Cortez Richardson matter? Please explain.

A. In situations where suspensions, removals or demotions are being considered based on misconduct, the Douglas factors should be applied.

15. Were the Douglas factors applicable to assessing the appropriate level of penalty on the Romero matter? Please explain.

Initials  _DN_

A. If Romero engaged himself in misconduct in which the appropriate corrective action would have been a suspension, removal or demotion, assessing the Douglas factors would have been appropriate.

16. Did you have any conversations with Complainant concerning the investigations or the disciplinary action that should have been taken against either Special Agent Cortez Richardson and or both Steve Romero? Please explain.

A. Not that I recall.     As stated above, these types of conversations generally do not take place until both the proposing official and me have had the opportunity to review the ROI. In the case of Mr. Romero, I never saw the ROI. In the case of Mr. Richardson, Mr. Malloy issued the proposal notice prior to us discussing the matter.

17. What **penalty** did the Complainant assess to Cortez Richardson? Please explain.

A. The Complainant proposed that Cortez Richardson be suspended for five days.

18. What **penalty** did the Complainant assess to Steve Romero? Please explain.

A. The Complainant issued a Letter of Caution to Steve Romero.

19. The Complainant states that he felt the punishment management wanted to impose against Mr. Richardson was too harsh. He further states he felt management wanted to impose a harsh penalty against Mr. Richardson because Mr. Richardson is a minority and had filed an earlier complaint (against Mr. Haban and Mr. Salas). Complainant states management wanted him to retaliate against Mr. Richardson by imposing a harsh penalty against Mr. Richardson. Please address Complainant's allegation. In your response, indicate what punishment management wanted to impose and whether this was too harsh given the nature of the offense.

A. I don't recall having any conversations with either Mr. Salas or Mr. Haban regarding the Richardson case. As a result, I have no idea what their views were regarding this matter. As a part of my job responsibilities, I make recommendations to proposing officials regarding what actions to take after reviewing ROIs. As it related to the Richardson case, I concluded that the misconduct in which Mr. Richardson had engaged himself in warranted a suspension of at least 60 days.

20. The Complainant also states that because Mr. Richardson was in the Denver office when the misconduct for which he was charged occurred, Mr. Richardson's supervisors (i.e., Mr. Haban and Mr. Salas) at the time should have issued the proposal and decision letters. Please address whether this is accurate. If not accurate, please explain why Mr. Malloy served as the proposing official.

A. This is not accurate. As stated earlier, the immediate supervisor typically serves as the proposing official.

21. The Complainant states he was initially advised that he would be the proposing official in Mr. Romero's case on July 17, 2002, in a meeting with Mr. Haban, McCarty, and Mr. Chapman. Mr. Malloy contends that he had never served as a proposing official until he did so, in the Romero and Richardson cases. Mr. Malloy states that management made him the proposing official in both cases because they wanted him to be a target for any resulting law suits. Please address Mr. Malloy's contentions. In your response, indicate whether Mr. Malloy had ever served as a proposing official. If he had not, indicate the reasons why he had not. Also, explain why he was designated as the proposing official in the Romero case.

A. I have no knowledge of the July 17 meeting. However, as stated above, Mr. Malloy serving as the proposing official would be consistent with HUD OIG practice and would be considered a part of his responsibilities and job duties as a supervisor. Since we started servicing HUD OIG in May 1999, I do not recall Mr. Malloy serving as a proposing official. It is possible that Mr. Malloy never served in that capacity because he never had any subordinate employees engaged in misconduct.

22. Did the Complainant coordinate his decisions on the level of punishment that he should have imposed on Mr. Richardson?

A. Not with me or, to my knowledge, with anyone else.

23. Did the Complainant coordinate his decisions on the level of punishment that he should have imposed on Mr. Romero?

A. Not with me or, to my knowledge, with anyone else.

24. Complainant was placed on administrative leave. Please specifically explain and elaborate on what led up to Complainant being placed on administrative leave with the related restrictions. Indicate the management officials involved, their role, and your role as appropriate.

A. I have no idea why the Complainant was placed on administrative leave. I was not involved in any way with this decision.

25. Was the Agency correct in placing the Complainant on administrative leave while he was under internal investigation?

A. Since I don't know what the issues were that were being investigated or the reasons why he was placed on administrative leave, I am in no position to address the appropriateness of placing the complainant on administrative leave.

Initials _DN_

26. Do you know if it is customary to place employees who are under investigation on administrative leave?

A.      It is not customary to place employees on administrative leave who are under investigation.

27. If your duties include merit staffing HUD OIG positions, please explain whether the Complainant should have been personally informed of positions that became available while he was on administrative leave and banned from HUD OIG premises and from using HUD-owned computers?

A. My duties do not include merit staffing functions.

28. Mr. Malloy also states that Mr. Haban rescinded his prior approval for restoration of 146 hours of annual leave as retaliation for his EEO complaint and his refusal to impose unduly harsh disciplinary action against Mr. Richardson and Mr. Romero. He states they also took the action to force him to retire early. Please elaborate of the circumstances relative to the initial approval of the restoration of Mr. Malloy's annual leave. In your response, elaborate on if the leave was initially approved and why it was rescinded.

A. I have no knowledge regarding this matter.

29. Mr. Malloy also states that he was forced to retire early and his supervisory responsibilities were taken away from him. Please elaborate on the circumstances leading to the dissolution of Mr. Malloy's supervisory responsibilities. Be as specific as possible relative to management's rationale for its actions.

A. I was unaware that Mr. Malloy's supervisory responsibilities were taken away from him. To my knowledge, Mr. Malloy's decision to retire was a voluntary act on his part.

30. Do you have any documents that you would like to introduce for the record?

A. No.

31. Do you have any relevant comments that were not covered?

A. No.

Initials ___pN___

I have read this statement, consisting of ___7___ pages, and it is true, complete, and correct to the best of my knowledge and belief.

_____
Signature

12/05/03
_____
Date

Signed and sworn to before me
on this 5th day of December, 2003,
at ___8:04 a.m.___.

_____
Neutral witness, notary, or Investigator

Initials_____



**James Malloy**
08/29/02 06:59 PM

To: James Malloy/FTW/HUDOIG@HUDOIG
cc:
Subject: Dave Neufer Contact

Dave Neufer at BPD called yesterday to ask me if I had received the ROI on Cortez Richardson; I told him I did not know what he was talking about. He said that Rick Johnson had advised him that I would be the proposing official and that you would be the action official. He said that he was not recommending termination but that he was recommending serious time off. I told him that you had told me that you would be receiving the ROI but that noone had ever contacted me about this nor did I know that I would have any part of this. I told him I did not think that I was the appropriate official to be making this decision but that I knew he was only the messenger. I believe I told him that the Denver SAC took his position fully knowing that he would have to deal with the problems out there and that was why he was being paid the big bucks. I told him that we had not received the report as yet and my guess was that it was on Joe Haban's desk. He said he would check on it.

I also talked to Lester Davis about this when he called yesterday about something else that he needed. He said the the Denver SAC is dealing with a number of problems out there and they wanted to relieve him of this problem. I voiced my displeasure about this being forced upon me without any contact from Haban or HQ.

I told both that maybe it was time for me to consider grievance/eeo procedures available to me as I did not feel I was being treated fairly. I told them it appeared that might be trying to dump this on a diverse supervisor to deal with a diverse employee. I told Lester it was my belief that was the reason Ken Taylor had been sent out to the trial to monitor it and then to stay in Denver as Acting ASAC. I asked Lester why didn't they follow through and let Taylor be the proposing official and he just laughed.

Today I talked to Lester again and in the course of talking to him apologized for venting on him. I told him my beef was with Joe and above and not with Lester. He said I should talk to Joe and I said I would if he ever called. I told him I planned on talking to him when we were in Tampa.

Lester asked why things were always negative in Texas. I said Tighe and Beard were two of the reasons. I stood up for our productivity and the fact that we attempted to deal with problem employees unlike other managers. I also told him that managers who had no problems also sometimes had no results or employee issues because they never dealt with them.


DEPOSITION
EXHIBIT
#6
NUHFe

**Richard Johnson**                 To: Dave.Nuhfer@bpd.treas.gov
05/16/2002 10:11 AM              cc:
                                  Subject: Re: Richardson

I've gone through it once.  Just on my reading of it, I think removal is appropriate.  Let me work on it some more this afternoon.  Rick

Richard K. Johnson
Tele: 202-708-1613;  Fax: 202-401-3778
HUD OIG;  Office of Counsel to the Inspector General
451 7th Street, S.W.,  Suite 8260
Washington DC 20410-4500



DEPOSITION
EXHIBIT
#7
NuHFer
11-28-06



PLAINTIFF'S
EXHIBIT
# 15-HABAN
3-5-07   mab

MEMORANDUM FOR:  Cortez Richardson, Special Agent

FROM:   Michael K. Groszkiewicz, Special Agent in Charge
        Rocky Mountain District

SUBJECT:  **PROPOSED SIXTY (60) CALENDAR DAY SUSPENSION**

     This is notice that I am proposing that you be
suspended for sixty (60) calendar days from your position of
Criminal Investigator, GS-1811-13, in the Office of
Inspector General (OIG), U.S. Department of Housing and
Urban Development (HUD), no sooner than thirty (30) calendar
days from the date you receive this memorandum.  This
proposed action is issued in accordance with Part 752 of
Title 5 of the Code of Federal Regulations and OIGM 1752
dated November 2001.  This action is proposed in order to
promote the efficiency of the service.

Background Information

     As you are aware, during the last two years, there have
been a number of ongoing investigations to determine the
validity of a number of allegations of misconduct on the
part of former and current Rocky Mountain District
employees, including yourself.  Based on the results of the
investigation, it was determined that you were engaged in
various acts of misconduct.

     Given the independent status of the OIG as well as the
importance of our mission, it is imperative that the OIG be
staffed with employees who have a high degree of integrity
and can be trusted.  We must have complete confidence in
knowing that the professional judgment demonstrated by any
OIG employee is beyond reproach.  Considering the
information developed during this investigation, I no longer
feel that you demonstrate the high standards expected of
employees in this organization.  Therefore, this proposed
action is necessary to promote the efficiency of the
service.  This action is based on the following charges and
specifications:

     Charge # 1:  Lack of candor during an official
investigation.

DEPOSITION
EXHIBIT
#8
NUhFEN
11-28-06

Specification # 1:

In October 2000, allegations surfaced regarding off duty misconduct involving HUD OIG Special Agents participating in celebrating the conclusion of a "round-up" involving numerous arrests of street level drug dealers in the Billings, Montana area. The celebration occurred during the evening of October 12, 2000, and concluded during the morning of October 13, 2000. During this celebration, it was alleged that you and several other OIG Special Agents were involved in a disturbance that occurred outside of JD's Nightclub in Billings, Montana, that resulted in damage to a tow truck.

On November 17, 2000, HUD OIG Special Agent (SA) Michael Napoleone and FBI SA Kurt A. Remus interviewed you regarding a number of issues, including the events of October 12 mentioned above. You told SA Napoleone and SA Remus that you were standing near the passenger side door of the tow truck. According to you, the tow truck driver asked you to get off the truck. You informed the investigators that you pushed off the door with your foot causing a dent to the door. You told them that you were not aware of the extent of the damage as it was dark. You also informed them that you bumped the front of the truck and bent the license plate.

Based on the information you provided, you misled the investigators to believe that any damage you might have caused to the tow truck was done so unintentionally. However, during the investigation it was determined that you deliberately damaged the door of a tow truck.

It was noted that two individuals present, including a member of the Billings, Montana, Police Department, personally saw you performing what was described as "a mule kick" (i.e., bending your knee, lifting your leg up, and kicking backwards) to the passenger door of the tow truck. After this incident occurred, the tow truck was examined by two other members of the Billings, Montana, Police Department. One stated that the door was "caved in like someone had kicked it." The other officer noted that, based on the extent of the damage, it could not have been accidentally caused by someone just leaning against the door or pushing off. In this officer's opinion the door had a "cave-in" that had to be caused by a forceful blow.

Specification # 2:

2

During the November 17, 2000, interview with SA
Napoleone and SA Remus, you were asked questions regarding
your involvement in the Randy Cooley investigation. You
told the investigators that former Rocky Mountain District
Special Agent in Charge (SAC), Jeffrey Finn, instructed
agents as to what was and what was not appropriate to say to
the investigators conducting the Cooley investigation. You
also told SA Napoleone and SA Remus that you were not fully
truthful or forthcoming with investigators during the Cooley
investigation.

Charge # 2:  Conduct unbecoming a Federal law
enforcement officer.

Specification # 1:

You and a number of other HUD OIG employees
participated in an after hours celebration during the
evening of October 12, 2000, and early morning hours of
October 13, 2000. The group ended up at JD's Nightclub in
Billings, Montana. At one point in the evening, a local tow
truck operator began removing vehicles parked in a parking
lot identified as the Motion Industries parking lot. The
tow truck owner had a contract with the parking lot owner to
remove any vehicles from the Motion Industries parking lot
that should not be parked there. It is noted that the
parking lot in question has a sign posted warning people not
to park.

After it was learned that a member of your party was
having their vehicle towed, your group, including yourself,
exited JD's Nightclub. At that point, members of your group
confronted the tow truck operator. At some point during
this disturbance, you deliberately damaged the door of a tow
truck with your foot. Shortly thereafter, a criminal
complaint, which was later dropped, was filed with the
Billings, Montana Police Department reporting the damage to
the tow truck.

As a Federal law enforcement official and an OIG
employee, you are held to a higher standard than other
Federal employees. Your actions, both off duty as well as
on duty, serve as the basis on which HUD OIG is judged. To
that end, you are always expected to act in a manner that
does not discredit this organization. It is noted that
local law enforcement has expressed a view that the
"drinking celebration" at JD's Nightclub was not
professional and that the OIG agents who were in Billings
that week "were not leaders or professional." The Deputy
Chief of the Billings, Montana Police Department stated that

"muscling people around" is "way behind the times." He also advised that this incident reflected badly on all of the local law enforcement community and expressed a concern with HUD OIG coming to Billings and doing such a thing in his community. Continuing on, he stated that this incident "went way beyond drinking" and that they are "still paying for" the "aftermath of the round-up."

According to a Supervisory Senior Resident Agent with the FBI, the incident at JD's Nightclub has been viewed by local law enforcement as "out of towners coming in from the big city." This incident is viewed with disdain and is considered a "black eye" for the entire law enforcement community.

As an employee of HUD OIG, your actions during the above-mentioned incident has caused significant damage in our working relationship with local law enforcement in the Billings, Montana area and is the source of embarrassment to HUD OIG. In order for this organization to successfully fulfill its mission, we must have the full support and cooperation of local law enforcement. Your notoriously disgraceful misconduct has caused significant damage to our relationship with local law enforcement in the Billings, Montana area.

In summary, your behavior, as described above reflects poorly on OIG and its employees. For obvious reasons, such misconduct cannot be condoned or tolerated.

Specification # 2:

On a number of occasions between March 2000 and October 2000, you became aware of violations of law, fraud, waste, abuse, and corruption, but failed to take any action to correct these problems or prevent their repeated occurrences in the future. 5 CFR 2635.101 (b)(11) states that "employees shall disclose waste, fraud, abuse and corruption to appropriate authorities." OIGM Chapter 1083, Section 4-5 (b)(1) states "Complaints or allegations concerning the attitude or conduct of any OIG employee are to be reported immediately in writing through proper channels to the appropriate AIG. If the subject of the complaint is part of the chain of command, then the complaint should be reported directly to the AIG. Failure to properly report known complaints or allegations may result in disciplinary action." These instances are described below.

4

a.  During the November 17, 2000, interview with SA
Napoleone and SA Remus, you told them former SAC Finn was
rarely in the office from May 2000 to August 2000 because he
was working on the construction of his house.  You also
informed them you knew and had personally observed OIG
employee, Jarred Bundy, working on SAC Finn's house during
office hours.

Based on your observations you knew that former SAC
Finn and Mr. Bundy was receiving compensation by the
Government for hours not worked.  As an OIG employee you had
an obligation to report this wrongdoing.  However, for
whatever reason, you elected to remain silent.

b.  During the January 17, 2001, interview with HUD OIG
representatives, you stated that you knew SA Alexandra
Distad taped a conversation she had with SA Randy Cooley in
which SA Cooley had no knowledge that the conversation was
being taped.

As a law enforcement official familiar with the legal
requirements for electronically recording a conversation,
you knew what SA Distad was doing was wrong.  Nevertheless,
for whatever reason, you failed to report this wrongdoing.
By failing to report this incident, you were covering up the
potentially criminal activity of another OIG employee.
Again, as a Federal law enforcement officer, you are tasked
with upholding the law, not turning your back when you are
aware that a possible violation has occurred.  For obvious
reasons, OIG cannot condone or tolerate such a situation.

c.  As you know, the charges against you for the damage
you caused to the tow truck were dropped as a result of a
settlement having been reached in which the tow truck owner
was paid $3500.  During the November 17, 2000, interview you
told the investigators that you knew the $3500 settlement
transaction had been recorded on audio/video tape in the
local OIG office.

As a Federal law enforcement official, you are well
aware of the fact that there are statutory, both State and
Federal, prohibitions against the non-consensual electronic
monitoring.  As a HUD OIG Criminal Investigator, you should
have been aware that the recording of the settlement meeting
might have been a violation of the law.  Further, there was
no official purpose in recording this settlement.  As a
Criminal Investigator, you are tasked with upholding the
law.  To know that another OIG employee was engaged in an
activity that has the potential of violating the law and
using an OIG office and OIG equipment for other than

5

official Government purposes and not report such misconduct
is unacceptable.  To allow an employee to ignore this
responsibility cannot be condoned or tolerated.

    d.  In March 2000, SAC Finn had his Government vehicle
towed from a no parking zone.  SAC Finn went to the impound
lot and drove the vehicle away without paying for the tow.
When SAC Finn drove the vehicle from the impound lot, he
drove the vehicle through a fence and damaged the fence.

    According to you, SAC Finn contacted you and asked for
your help.  Based on the information you provided to the
investigators during the November 17, 2000, interview, you
contacted the Englewood, Colorado Police Department and
learned that they intended to file a stolen vehicle charge
against SAC Finn.  You also told the investigators that SAC
Finn requested that you take care of the situation by paying
for the tow and damages using money from the HM10-510 Safe
Home account.  Continuing on, you told the investigators
that, pursuant to SAC Finn's instructions, you withdrew cash
from the HM10-510 cash box, met with the tow truck operator,
and paid the amount due for the tow and damages.  In return
the tow truck operator provided you a receipt showing a "tow
in" charge of $100, a "dollies in" charge of $50, and a $200
charge for "damage to fence from driving truck through chain
fence around lot on S. side of building."

    You informed the investigators that when you returned
to the office, SAC Finn instructed you to alter the receipt
to show that the $200 charge was for "storage."  You stated
that at first you refused to alter the receipt but that SAC
Finn became mad, would not let you leave his office and told
you "no you will fucking change this receipt."

    As you knew at the time, the submission of alter
receipts to support payments made with Government funds is
wrong.  Furthermore, given the circumstances surrounding
this matter (i.e., the fact that SAC Finn was possibly
engaged in criminal activity and the misuse of Government
funds) you had the responsibility to report this matter.
Again, for whatever reason, you elected to ignore the
matter.

    e.  During the November 17, 2000, interview you
informed the investigators that SAC Finn had used Operation
Safe Home funds totaling $2385.50 to rent a motor home to
travel to an all agents training conference in April 2000.

    As you are aware, when travel is necessary, there is
the expectation that any cost associated with the travel be

no more than is necessary.  Renting a motor home to travel
to a training conference would be considered wasteful and
should have been reported.

   f.  During the November 17, 2000, interview you
informed the investigators that during the Rocky Mountain
District diversity training that SAC Finn utilized a
Government credit card to purchase paint ball guns and paint
ball ammunition totaling $1400.  You also informed them that
when you arrived, that SAC Finn and the other Agents were
lying around drinking alcoholic beverages and that the only
event that occurred that could remotely be considered
training was when the Agents were riding on jet skis
shooting paint ball guns at each other.

   Again, this is evidence of waste, fraud and corruption
in the Rocky Mountain District that you were aware of and
should have reported.  However, for whatever reason, you
condoned this wrongdoing.

   g.  During the November 17, 2000, interview you told
the investigators that prior to the execution of a search
warrant in South Dakota, SAC Finn used a Government credit
card to purchase large construction lights, drills, hammers,
a space heater, a generator and other tools.  You told them
that the cost was approximately $2500.  You also informed
the investigators that these items later came up missing and
that you remembered seeing many of these items at SAC Finn's
house during the summer of 2000 when you were assisting SAC
Finn with the construction of his house.

   In effect, SAC Finn was using Government funds for
personal use and you knew about it.  This, by any
definition, clearly demonstrates waste, fraud and corruption
and should have been reported.  By failing to report such
misconduct, you, in effect, condoned the activities of SAC
Finn.  Quite clearly, given the mission of OIG, such an
environment cannot be condoned or tolerated.

Summary

   After evaluating the issues I can only conclude that
you committed the misconduct as charged, that the offenses
are egregious, and that proposing the penalty of a sixty
(60) calendar day suspension is appropriate for this
situation.  In coming to this conclusion I have also
considered the following aggravating and mitigating factors:

Aggravation

7

1.    One of the more significant aggravating factors is the nature of your position.  As a Criminal Investigator in OIG, you are held to a high standard of personal integrity, thus your misconduct is all the more unacceptable.  As part of your responsibilities as a Criminal Investigator, you may be required to testify in court on behalf of the government. Government agencies are required to provide negative information through the discovery process regarding their employees who appear as witnesses.  See, United States v. Henthorn, 931 F.2d 29 (9th Cir. 1991)  (Government must disclose information unfavorable about its witnesses to the defendant, including providing information from Federal employee personnel records, as long as the standard of materiality is met.)  This information, especially your lack of candor during an official investigation, could be used against you to attack your credibility as a witness and seriously damage the government's case.  Consequently, your usefulness as a Criminal Investigation has been harmed.

Further, all OIG employees are held to a higher standard.  See OIG Manual Chapter 1083, para. 1-2 ("In addition to these authorities, OIG employees, by the very nature of their job responsibilities, are required to maintain higher standards of conduct than others in the Department.")

The OIG, as you know, was created by the Inspector General Act of 1978 as an independent entity responsible for audit, investigation, fraud control as well as preventing and detecting fraud, waste and abuse in HUD programs and operations as well as the operations of contractors and grantees.  By engaging in the misconduct described in this proposal, you have undermined your credibility and usefulness to the OIG.  Furthermore, the fact that you had detailed knowledge regarding waste, fraud and corruption within the Rocky Mountain District but failed to report such misconduct serves to undermine the mission that HUD OIG was tasked to fulfill.  Your disregard for the trust and confidence placed in you by this organization and by me personally has caused me to lose confidence in your ability to act independently within the expected parameters of employees in positions such as yours.  This aggravating factor, in and of its self, serves to enhance the penalty that should be assessed for your misconduct.  In other words, I believe that you occupy a position that demands a higher level of trust and confidence within the employee/employer relationship, and the essence of your misconduct significantly diminishes that trust.

2. Another significant factor is the effect the offenses have had upon my confidence in your ability to perform assigned duties. I must have complete confidence in knowing that the Criminal Investigator positions under my supervision are staffed with individuals who are beyond reproach and can be fully trusted to fulfill the mission of this organization. Given your lack of candor during an official investigation and your overall unbecoming misconduct, you have negatively impacted the confidence I once had in your integrity. In effect, your misconduct has caused a breach of trust in your professional judgment and has undermined your credibility as an OIG employee.

3. In determining what action to take, I have reviewed the Table of Offenses and Penalties contained in OIGM Chapter 1752. The Table states that all of the charges against you warrant corrective action ranging from a reprimand to removal for a first offense.

I also took into consideration that the offenses that you are charged with were committed prior to the date that OIGM 1752 was issued. As a result, I also reviewed the Table of Penalties found OIG Policy Issuance 752.1 dated August 2000 and HUD Handbook 752.2, REV-2, which were the OIG policy documents in existence prior to our current policy. I noted that the former policies would support an action ranging from a reprimand to removal.

Mitigation

As a mitigating factor, I have considered the fact that you have four years of Federal service, most of which has been with OIG.

Nevertheless, given the nature of your position, the seriousness of the offenses and their relationship to your job duties and responsibilities, as well as the affect these offenses have had upon my confidence in your ability to perform assigned duties, I do not feel that the mitigating circumstances outlined above warrant a less severe penalty. Furthermore, I am not aware of any other mitigating circumstances that could possibly have an impact on this matter. Therefore, I am proposing your sixty (60) calendar day suspension for such cause as will promote the efficiency of the service.

Procedures

The Deciding Official in this case will be John E. Dupuy, Deputy Assistant Inspector General for

Investigations, Room 8274, 541 7th Street, SW, Washington,
DC 20410.  You have a right to reply to this notice orally
or in writing, or both, and to furnish affidavits and/or
other documentary evidence in support of your answer.  Full
and proper consideration will be given to any material or
information you furnish in a timely manner.  You will be
permitted up to 21 calendar days from the date you receive
this proposed action to submit a response.  Consideration
will be given to extending this 21 day period if you submit
a request in writing to the Deciding Official, before the
expiration of the allowed time period, stating your reasons
for the request for additional time to respond to this
proposal.  Within the reply period, you will be granted up
to 16 hours of official time to prepare your oral and/or
written responses.  However, the use of this official time
shall require advance approval from me.

    If you wish to make a written reply, it should be
submitted to the deciding official within the 21 day period
noted above.  If your written reply is mailed, it must be
received prior to the expiration of the 21 day period, and
should be marked "To be opened by Addressee Only."  To
present an oral reply to Mr. Dupuy, please contact him
directly to arrange an appropriate date and time for your
response meeting.  Mr. Dupuy may choose to hear the reply
himself, or he may designate an appropriate official to hear
the reply on his behalf.  Be advised, however, that an oral
reply meeting is not a hearing and the appearance of
witnesses will not be permitted.  If no response is
received, a written notice of final decision will be issued
as soon as practicable after the expiration of the time
allowed you to answer.

    An attorney or other representative of your choice may
represent you.  Before a representative may act on your
behalf on this matter, that person must be designated by
you, in writing, to the deciding official identified in the
preceding paragraph.  However, your representative may be
disallowed if he or she is an employee of the Department
whose activities as representative could cause a conflict of
interest or position, or if his or her release would give
rise to unreasonable costs to the Government, or if he or
she cannot be released from official duties because of work
assignments.  You may present your oral reply on official
time (administrative leave), and if your representative is
an employee of the Department, he or she may attend the oral
reply session on official time.

10

You may review the material upon which this proposal is based.  In the event you desire to review the material, please make such a request directly to me.

No decision on this matter will be made until all material relied upon supporting the reason for the proposed action, including any timely written and/or oral reply, has been considered.  You will be given a letter containing the decision on this matter.  It will state a decision to (1) take the proposed action; (2) take a lesser action; or (3) not take the proposed action and provide specific reasons for that decision.

Copies of the Handbook and pertinent statutes and regulations governing this action may be reviewed by contacting David A. Nuhfer, Human Resources Specialist, Bureau of the Public Debt, Room 206-2, 200 Third Street, Parkersburg, WV 26106-1328, telephone  (304)-480-6126.

11