UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - -X

JAMES MALLOY,                        :

        Plaintiff        :

     v.                            : No. 04-1117(RJL)

                          :

ALPHONSO R. JACKSON,                 :

        Defendant        :

- - - - - - - - - - - - - - -X

DEPOSITION OF CORTEZ RICHARDSON

Washington, D.C.

Thursday, August 10, 2006

Deposition of CORTEZ RICHARDSON, called for examination at 10:17 a.m., at the law offices of Robert C. Seldon & Associates, P.C., 1319 F Street, N.W., Suite 305, Washington, D.C., before Gary S. Howard, a notary public in and for the District of Columbia, when were present on behalf of the respective parties:

1  concern your possibly being terminated by the office

2  of inspector general?

3          MS. LYONS:  Objection. Relevance?

4          MR. SELDON:  I need to get the background

5  out of Mr. Richardson's complaint.

6          MS. LYONS:  I'm not sure how that's

7  related to this proceeding, but I'll give you some

8  latitude.

9          MR. SELDON:  Okay.

10          THE WITNESS:  Can you restate the question

11  for me?

12          MR. SELDON:  Yes.

13          BY MR. SELDON:

14     Q    Did your complaint concern in any way your

15  possibly being terminated by the office of inspector

16  general?

17     A    I'm not sure exactly what you mean as far

18  as terminated, related to my complaint.

19     Q    Okay. Well, let's do this. I'm going to

20  ask to have marked for your deposition, a copy of

21  what we'll call Exhibit 1.

22          THE COURT REPORTER:  No. 1.

abd92b42-32b4-11db-b7ae-0003b3005cf9

1              (The document referred to

2              was marked for identification

3              as Deposition Exhibit No. 1.)

4       BY MR. SELDON:

5    Q    Do you recognize this document, sir?

6    A    Yes.

7    Q    What is it?

8    A    It's one of the documents that I completed

9 during the EEO complaint I filed.

10   Q    And this concerned your formal

11 administrative complaint of discrimination?

12   A    Yes.

13   Q    Okay. I'd like to have you look at the

14 box,  corrective action sought. And it says, request

15 that, and the name is blacked out. Explain why I've

16 been threatened to be fired.

17        That, I take it, was one of the

18 allegations that you made?

19   A    Yes, that was one of the individuals who

20 had threatened to fire me.

21   Q    What was that allegation, if you could

22 just explain to us?

Page 10

1    A    Well, during -- leading up to me filing,

2  or completing this form and filing to EEO, I had

3  been threatened by the supervisor named here that I

4  was going to be fired for lack of cooperation during

5  a -- sorry -- in an investigation. And that was

6  ongoing.

7         And I explained during that process how I

8  was going to cooperate. I just wanted to have all my

9  rights intact during my cooperation, which was I

10 wanted an attorney to advise me.

11   Q    Okay. Now if we look here, the date of

12 Richardson Exhibit 1, which is your formal EEO

13 complaint, this is filed in May of 2001?

14   A    I'm not sure.

15   Q    If you take a look toward the bottom line.

16   A    Yes, May of 2001.

17   Q    Now correct me if I'm wrong. You mentioned

18 something about that you believed that you had been

19 threatened with being fired, but not immediately?

20   A    What do you mean, immediately?

21   Q    In other words, you weren't going to be

22 fired in May of 2001.  That wasn't the threat.

Page 11

1    A    No.

2    Q    Maybe --

3    A    The threat happened prior to that.

4    Q    Okay.

5    A    Prior to me filing that, I was threatened
6    to be fired, or removed from government service.

7    Q    After an investigation was completed of
8    this person --

9    A    The investigation wasn't completed. It was
10   ongoing. It was in the beginning of the
11   investigation, the first few months, and thereafter,
12   up unto this point.

13   Q    And was there subsequently a trial of that
14   person?

15   A    Yes.

16   Q    Were you a witness in that trial?

17   A    Yes.

18   Q    Okay. Now, I'd like to ask -- your formal
19   complaint, did you then appeal that complaint of
20   race discrimination to the Equal Employment
21   Opportunity Commission?

22   A    I'm not sure if it was called an appeal.

Page 12

1    But it was a pretty lengthy process. And as far as

2    the formalities of the names of each part of it, I'm

3    not positive what that is.

4        Q    But that was before the Equal Employment

5    Opportunity Commission?

6             MS. LYONS:  Objection. Asked and answered.

7             MR. SELDON:  I think he said that he was

8    unfamiliar with the proceeding itself.

9             MS. LYONS:  Then the objection is

10   foundation.

11            BY MR. SELDON:

12       Q    Let me show you Richardson Exhibit 2.

13            THE COURT REPORTER:  No. 2.

14                      (The document referred to

15                       was marked for identification

16                       as Deposition Exhibit No. 2.)

17            BY MR. SELDON:

18       Q    Now, sir, I'll represent to you that this

19   is a document entitled, Before the United States

20   Equal Employment Opportunity Commission. And it

21   says, Cortez Richardson, Complainant, against the

22   Secretary of Housing and Urban Development.

1           Does this give you the foundation to know

2   one way or another whether you appealed or proceeded

3   before the Equal Employment Opportunity Commission?

4           A       I did proceed. I recognize the document.

5           Q       Was there a time that you came to

6   understand your complaint would be settled with the

7   HUD office of inspector general?

8           A       Yes.

9           Q       What was your understanding of that?

10          A       I received a document from HUD that part

11  of the settlement would be that if I agreed to

12  settle and drop the complaint, that I would be

13  transferred to Fort Worth.

14          And I don't remember the particulars of

15  what else was in the settlement. But one was that

16  they were going to give me a transfer.

17          Q       That's fine. That's fine.

18          A       And I believe reinstate some leave.

19          Q       That's fine. Do you recall, sir, one way

20  or the other, whether after giving you a settlement

21  proposal, the agency was willing or unwilling to

22  enter into the agreement?

Page 14

1     A     They were -- well, they withdrew the

2     settlement. So I guess they were unwilling.

3     Q     Okay. Now at that time, I guess I should

4     ask you, and let the jury know, were you proceeding

5     on your own until then before the EEOC?

6     A     In the beginning, and then at some point,

7     I hired an attorney.

8     Q     And who was that attorney that you hired?

9     A     Bob Seldon.

10    Q     That was me, I take it.

11    A     Yes.

12    Q     Thanks, Mr. Richardson. Let me give you a

13    document which we'll have marked as Richardson

14    Exhibit 3.

15         THE COURT REPORTER:  No. 3.

16              (The document referred to

17               was marked for identification

18               as Deposition Exhibit No. 3.)

19         BY MR. SELDON:

20    Q     Is this a memorandum that you recall

21    seeing before?

22    A     Yes, I recall.

abd92b42-32b4-11db-b7ae-0003b3005cf9

Page 15

1     Q     What's this all about?

2            MS. LYONS:  Objection. Vague.

3            BY MR. SELDON:

4     Q     Can you identify this document, please?

5     A     Yes.

6     Q     What is it?

7     A     It was after I believe I informed you that

8  HUD had withdrew, had basically called me at home

9  and withdrew their agreement to settle with me on

10  the EEO.

11     Q     Okay. And there's a reference here that

12  there was a telephone conversation about the agency

13  being unwilling to enter into a settlement agreement

14  with a Ms. Lisa Wright.

15            Do you see that?

16     A     Yes.

17     Q     Do you know who Lisa Wright was?

18     A     Yes. She was representing HUD in Denver.

19     Q     And then, did you hear at some point that

20  she couldn't go ahead with the settlement?

21     A     Yes.

22     Q     Did you hear one way or another whether

Page 16

1    she made that decision or someone else did?

2        A    She said it was made by our agency.

3        Q    Did she say which part of it?

4        A    She didn't say -- I don't remember if she

5    said which individual.

6        Q    Okay. Do you remember an office?  Was it

7    her office or not?

8        A    No, it was not her office.

9        Q    Okay. What I'd like to do now is have

10   marked as Richardson Exhibit 4, is what we're up to.

11            THE COURT REPORTER:  No. 4.

12                    (The document referred to

13                     was marked for identification

14                     as Deposition Exhibit No. 4.)

15            BY MR. SELDON:

16       Q    Is this a document, Mr. Richardson, that

17   you recognize?

18       A    Yes.

19       Q    What is it?

20            (Pause.)

21            And actually, it's an excerpt.

22       A    Okay. This looks like -- I'm not positive,

Page 17

1    but it looks like part of, I think, a petition to

2    the EEO from me to have some evidence admitted to

3    support my stand on how I was treated.

4        Q       Okay. And was --

5        A       And also --

6        Q       Sorry.

7        A       -- including the unwillingness of the

8    agency.

9        Q       To settle.

10       A       To settle.

11       Q       Okay. Now, at this point in time, do you

12   recall the investigation you referred to previously?

13              Was that still ongoing?

14       A       I don't know what the date is.

15       Q       Okay. Well, let's go forward, then. I'm

16   going to ask to be marked as Richardson Exhibit 5

17   another document.

18              THE COURT REPORTER:   No. 5.

19                      (The document referred to

20                       was marked for identification

21                       as Deposition Exhibit No. 5.)

22              BY MR. SELDON:

Page 28

1      A      Proposed five days of suspension.

2      Q      Okay. And now I'd like to give you a copy

3      of what we'll mark as Richardson Exhibit

4      9.

5             THE COURT REPORTER:  No. 9.

6                      (The document referred to

7                      was marked for identification

8                      as Deposition Exhibit No. 9.)

9             BY MR. SELDON:

10     Q      Is this a document that you recognize?

11     A      Yes.

12     Q      What is it, sir?

13     A      It was an actual decision to suspend me.

14     Q      Who issued that?

15     A      Larry Chapman.

16     Q      Who was who at the time?

17     A      Special agent in charge of Region 6.

18     Q      Is that the region that you were assigned

19     to?

20     A      Yes.

21     Q      And Mr. Malloy was your immediate

22     supervisor when your suspension was proposed?

1      A      Yes.

2      Q      And again, the disciplinary action that

3   this imposed was a termination?

4      A      No.

5      Q      What was it?

6      A      Five days' suspension.

7      Q      Did you have any problem with the due-

8   process procedures that were used to impose this

9   suspension?

10     A      No.

11     Q      Okay. After that suspension was imposed,

12   are you aware of any action that was taken by the

13   Department of Housing and Urban Development, office

14   of inspector general, that in any way, to your view,

15   threatened your continued employment with that

16   organization?

17     A      Say it one more time.

18     Q      Yes.

19     A      I'm sorry.

20     Q      After your suspension, your five-day

21   suspension, was imposed, are you aware of any action

22   that was taken or threatened to be taken by the

Page 31

1          (Pause.)

2     A     This document is questioning my

3 credibility, when they said the agency became aware

4 of falsifying an official document that I was

5 involved in.

6     Q     And did this document require you to take

7 any action vis-a-vis your credibility?

8     A     Yes.

9     Q     What did it do?

10    A     Well, this document was presented to me by

11 Lester Davis.

12    Q     Okay. Who was at the time --

13    A     Who was the -- it says special agent in

14 charge. But at the time, he was, I believe, acting.

15 He was actually special agent in charge of Chicago.

16    Q     Right. I think it said acting special

17 agent in charge.

18    A     I'm sorry. I didn't see that.

19    Q     That's okay. And what did this require you

20 to do?

21    A     It required me to go to each of the U.S.

22 attorneys' offices in Oklahoma, the three districts.

1       Q      To do what?

2       A      To disclose the contents of this latter,

3    which was concerning falsification of a document.

4       Q      What was the document?

5       A      It was a receipt from a tow service from

6    Denver, the Denver area.

7       Q      And it was one that you had signed, I take

8    it?

9       A      I didn't sign the receipt. But I received

10   the receipt and entered it into a reconciliation

11   book.

12      Q      From whom did you receive the receipt?

13      A      From a tow service. I don't recall the

14   name.

15      Q      Whose actions did it concern?

16      A      Jeffrey Finn's.

17      Q      This was the same person that you had

18   testified at the trial of previously?

19      A      Yes.

20      Q      The information that's here, the

21   falsification of the receipt, was this something

22   that you had let the agency know about previously?

1    A    Yes.

2    Q    Was this also the subject of your

3  testimony at the Finn trial five months earlier, or

4  4-1/2 months earlier, in July of 2002?

5    A    Yes.

6    Q    And again, what were you required to do

7  with this information?

8    A    Pertaining to the letter?

9    Q    Yes.

10    A    The memo?

11    Q    Yes.

12    A    To go to the heads of each criminal

13  division in each district in Oklahoma and disclose,

14  give them a copy of this memo and disclose the

15  facts.

16    Q    And to see whether your credibility was

17  still intact.

18        Is that right?

19    A    Yes.

20    Q    And if it was not, do you know what would

21  happen?

22    A    The memo said -- as a special agent, your

Page 34

1    credibility as a witness is a crucial factor in your

2    working relationship with the United States

3    attorney's office.

4        Q     Correct.

5        A     And it says, it is therefore necessary

6    that you apprise the office of the United States

7    attorney of the incident referred to above and

8    obtain their opinion concerning its impact on your

9    ability to serve as a special agent and potential

10   witness in either of the three Oklahoma districts.

11       Q     And is that as you understood it,  what

12   you had to do and why you had to do it?

13       A     Yes.

14       Q     This memorandum dated December 9, 2002,

15   about this alleged falsification of a document

16   relating to Mr. Finn's vehicle, when did that

17   alleged matter happen?  Your document.

18       A     It was in the spring of 2000.

19       Q     And had you disclosed this to the agency

20   previously?

21       A     Yes.

22       Q     When?

Page 35

1    A        First, I disclosed it to my immediate

2    supervisor, the day that it happened.

3    Q        Which would have been in --

4    A        I believe it's March of 2000.

5    Q        Okay. Now this memorandum is signed by

6    Lester Davis, who at that time was the acting

7    special agent in charge of your region in -- what's

8    that?  Ft. Worth, Texas?

9    A        Yes.

10   Q        Okay. Do you know whether or not, or have

11   reason to believe whether or not Mr. Davis was the

12   author and originator of this document?

13          MS. LYONS:  Objection. Foundation.

14          MR. SELDON:  I said, does he have a reason

15   to know that.

16          MS. LYONS:  Objection. Hearsay. You can go

17   ahead and answer.

18          BY MR. SELDON:

19   Q        Would you go ahead and answer?

20   A        Yes, I do know that he was not the author.

21   Q        Why do you know that?

22   A        He told me.

Apr-02-02 10:16A HUD OIG I                      303 236 1456        P.02

**EXHIBIT A1**

 **EEO Complaint of Discrimination in HUD**

See Instructions and Privacy Act Statement on Reverse

| | | |
|---|---|---|
| 1. Name **CORTEZ E. RICHARDSON** | 2 SSN ~~████████~~ | Case No. (For HUD Use Only) **DE-01-02** |
| 3. Mailing Address **20058 E. KENYON PLACE AURORA, CO. 80013** | 4. Home Phone **720-876-0480** | 8. Are You Now Working for the Federal Government? |
| | 5. Work Phone **303-236-1469** | ☒ Yes  ☐ No |
| 6. Position Title **CRIMINAL INVESTIGATOR** | 7. Grade & Series **GS13 / 1811** | |

| | |
|---|---|
| 9. Office Where You Believe Discrimination Occurred (Include Division, Office, City, State, and ZIP) **HUD OIG INVESTIGATION PO BOX 25327 BLDG 16, DFC DENVER, CO 80225-0327** | 10. Name, Title and Organizational Unit of Person(s) Who Took the Action(s) You Allege Was Discriminatory (e.g., Mary Smith, Asst Dir. Ofc of Housing) ~~████████~~ ASST IG FOR INVESTIGATIONS, HUD OIG |

| | |
|---|---|
| 11. Name and Address of Agency Where You Work **HUD OIG INVESTIGATION PO BOX 25327 BLDG 16, DFC DENVER, CO 80225-0327** | 12. Date Notice of Right to File Complaint Received **MAY 2, 2001** |

| 13. I designate this person to be my representative. | b. Address | c. Home Phone |
|---|---|---|
| a. Name & Title | | d. Work Phone |

| 14. Type of Discrimination Alleged | | 15. Date each Alleged Act of Discrimination Took Place |
|---|---|---|
| ☒ Race (Specify): BLACK AMERICAN | ☒ Sex (Specify): MALE | 2-21-01 |
| ☐ Color (Specify): | ☐ Age (Specify): | 2-19-01 |
| ☐ Religion (Specify): | ☐ Handicap (Specify): | 1-17-01 |
| ☐ National Origin (Specify): | ☐ Reprisal (Specify): | 11-2000 / 11-3-2000 |

16. Explain the specific actions or situation that resulted in your allegation(s) that you were treated differently than other employees or applicants because of race, color, religion, national origin, sex, age, handicap, or reprisal. If your complaint involves more than one allegation of discrimination, list and number each allegation separately and furnish specific, factual information in support of each. Additional pages may be used to explain the alleged act of discrimination.


DEPOSITION EXHIBIT #1
PENGAD 800-631-6989
Richardson 8/15/06

SEE ATTACHED SHEET PREPARED BY EEO COUNSELOR, AND SIGNED BY ME.

| 17. I have discussed the issues in Section 16 with an EEO counselor | 18. Name of EEO Counselor |
|---|---|
| ☒ Yes Date of initial contact: **4-2-01** Date of final interview: **5-2-01** | **JOSEPH DAVALOS** |

19. Corrective Action Sought
1. REQUEST THAT ~~████~~ EXPLAIN WHY I HAVE BEEN THREATENED TO BE FIRED.
2. FOR MY WORK LOAD BE EVALUATED AND DIVIDED, IN A MORE EQUITABLE MANNER.
3. I WANT HUD OIG TO ASSURE ME THAT MY JOB IS NOT IN JEOPARDY.
4. TO ATTEND THE BMLE TRAINING AT MY CONVENIENCE.

| 20. Signature of Complainant | 5/8/01 | 21. Date of Complaint **5-2-01** |
|---|---|---|

Apr-02-02 10:16A HUD OIG I                303 236 1456            P.03

Cortez:

Below are the allegations that you presented during the intake
your complaint and were presented to management for counseling.

I, Cortez E. Richardson, allege I have been subjected to
harassment based on my race (black)and sex (male)by ▓▓▓▓▓
▓▓▓▓▓▓, Assistant Special Agent in Charge, Denver, CO, &
▓▓▓▓▓▓ resulting in a
hostile work environment.   Examples are:

1) on February 21, 2001, ▓▓▓▓▓▓▓▓ told me that the office
no longer needed me after the Jeffrey Finn investigation is
completed,

2) my casework was pulled from me between November 3, 2000
through February 19, 2001, & I was made to perform routine
administrative duties,

3) my casework inventory, when returned, is now the largest of
all agents and I am still required to perform all routine
administrative duties,

4) ▓▓▓▓▓▓ on , 2001, when he learned of the US Attorneys
support for me and wishing to speak to Ms. Gaffney, reacted by
stomping is feet, punching his hand and raising is voice to say
"YOU JUST F---ED ME".

5) in November 2000, ▓▓▓▓▓▓ advised you would not be
attending the PPCT Instructor of Instructors course scheduled for
November 27 to December 8, 2000.

I advised you during the final interview of your complaint on May
2, 2001, I was not able to resolve the complaint to your
satisfaction.

This correspondence constitutes an agreement that you agree that
the above cited allegations are the issues for which you
requested and received counseling.

Be advised that should you elect to file a formal complaint, the
Office of Departmental Equal Employment Opportunity will only
accept those allegations in your formal compliant that are cited
above or that are like and related.

_____          5-2-01
Name of Aggrieved                         DATE

_____          5/2/01
Name of Full-time Counselor               DATE

1

# BEFORE THE UNITED STATES
# EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
# DENVER DISTRICT

|  |  |  |
|---|---|---|
| Cortez E. Richardson | : | EEOC No. 320-A2-8083X |
| Complainant, | : |  |
| vs. | : |  |
| Melquiades R. Martinez, Secretary, | : |  |
| U.S. Dept. of Housing and Urban | : |  |
| Development Agency. | : |  |



## Settlement Agreement and General Release

This Agreement and General Release is made and entered into by and between Cortez E. Richardson (hereinafter "Complainant") and the U.S. Department of Housing and Urban Development (hereinafter "Department" or "Agency").

Complainant filed a complaint of employment discrimination, dated May 2, 2001, which has Agency Case Number DE 01-02. Complainant and the Department have successfully conferred for the purpose of settling the mentioned complaint and Complainant and the Department desire to settle fully and finally all differences between them;

NOW, THEREFORE, in consideration of the premises and mutual promises herein contained, the Parties agree as follows:

First: This Settlement Agreement and General Release shall not in any way be construed as an admission by the Department of any acts of impermissible discrimination or reprisal whatsoever against the Complainant or any other person, and the Department specifically disclaims any liability to or discrimination against the Complainant or any other person, on the part of itself, its employees, or its agents.

Second: The Complainant will withdraw with prejudice his complaint, Equal Employment Opportunity Case Number 320-A2-8083X filed on May 2, 2001. This withdrawal will become effective on the date that the Agreement is approved and executed by the Director of Equal Employment Opportunity.

**Third**: The Complainant agrees to forever release and waive his right to file any complaint, claim, lawsuit, grievance, or appeal against the Department, its officials, employees, former officials or former employees, or their successors and assignees, including any and all claims against Department officials, employees, or former officials or employees, in both individual and official capacities, in any state or Federal court, or before any administrative body, tribunal, board, or commission, regarding any matter that was or could have been raised in connection with the above-captioned matter.

**Fourth**: The Agency agrees to reassign the Complainant to the Office of Inspector General for Investigations in the Southwest Region, Texas State Office, Fort Worth, Texas as a Criminal Investigator, GS-1811-13. The Complainant will pay personally all moving expenses; the Agency will not pay any expenses in connection with this reassignment.

**Fifth**: The Agency will place the Complainant on administrative leave for 120 hours starting on the date that the Complainant executes this Settlement Agreement and General Release. Notwithstanding the previous sentence, the Complainant will cooperate fully with the Office of the United States Attorney for the District of Colorado. This cooperation includes, among other things, the Complainant making himself available to meet in Denver and to talk on the telephone. During such meetings or conversations, the Complainant will be conducting official government business; the Complainant will be on official time and the Agency will pay any travel expenses. During the period that the Complainant is on administrative leave, the Complainant will keep Special Agent in Charge for Investigations Larry Chapman informed of his current address and telephone number. Mr. Chapman can be reached at (817) 978-9310.

**Sixth**: If the Complainant alleges that subsequent acts of discrimination or reprisal violate this Settlement Agreement and General Release, the Complainant will follow the procedures outlined in 29 CFR 1614.105 *et.seq*. The Department will process the new allegations as a separate complaint.

**Seventh**: Should any provision of this Settlement Agreement and General Release be declared or be determined by any court to be illegal or invalid, the validity of the remaining parts, terms or provisions shall not be affected thereby and said illegal or invalid part, term, or provision shall be deemed not to be part of this Settlement Agreement and General Release.

**Eighth**: This Settlement Agreement and General Release sets forth the entire Agreement between the Parties thereto, and fully supersedes any and all prior Agreements or understanding between the Parties hereto pertaining to the subject matter

2

hereof.

**Ninth:** This Settlement Agreement and General Release is not binding on the Department until it is signed by the appropriate EEO Officer or designee and the Director of Equal Employment Opportunity. **The Department will implement the provisions in Term 4 of this Settlement Agreement and General Release within 30 calendar days from the date that this Settlement Agreement and General Release is fully executed by the Director of Equal Employment Opportunity.**

**Tenth:** If the Complainant believes that the Department has failed to comply with the terms, or rescinds, any action specified by this Settlement Agreement for any reason not attributable to acts or conduct of the Complainant, within 30 days of the day he knew or should have known of the alleged noncompliance, the Complainant shall notify the Director of Equal Employment Opportunity **in writing** of the alleged noncompliance. The Complainant may request that the terms of the Settlement Agreement be specifically implemented or that the complaint be reinstated for further processing from the point processing ceased under the terms of the Settlement Agreement. Allegations of noncompliance should be addressed to the following:

U.S. Department of Housing and Urban Development
Attention: William C. King
Director, Office of Departmental Equal Employment Opportunity
451 Seventh Street, S.W., Suite 2134
Washington, D.C. 20410-3000

If after thirty (30) calendar days from the date of the Department's receipt of the Complainant's written notice, the Department has not responded to the Complainant, **in writing**, or if the Complainant is not satisfied with the Department's attempt to resolve that matter, the Complainant may appeal to the Equal Employment Opportunity Commission (EEOC) thirty five (35) days after service of the allegations of noncompliance, but within 30 days of receipt of the Department's response, for a determination as to whether the agency has complied with the terms of the Settlement Agreement. The Complainant must serve a copy of the appeal on the agency and the agency may submit a response to the Commission within 30 days of receiving notice of the appeal.

**Eleventh:** Both Parties agree that a copy of this Settlement Agreement will be retained by the U.S. Department of Housing and Urban Development's Equal Employment Opportunity Office.

3

By signature, we acknowledge that we have read, understand and voluntarily agree to the above Settlement Agreement and General Release in its entirety and in no way were coerced.


_____          _____
Cortez E. Richardson                       Date
Complainant


_____          _____


_____          _____
David C. Williams                          Date
EEO Officer or Designee
 for the Office of Inspector General


**APPROVED:**

_____          _____
William C. King                            Date
Director of EEO


4

# *Project LAW*

*Project On Liberty And The Workplace*
*1319 F Street, N.W., Suite 305*
*Washington, DC 20004*
*202-955-6968 ·fax: 202-318-2287  www.projectlaw.org*

---

**To:**    Lisa Wright, Esq.

**Fr:**    **Bob Seldon**

**Re:**    **Richardson v. HUD, OIG**

**Date:**  **April 15, 2002**

Lisa — To confirm our telephone conversation earlier, the agency is unwilling to enter into the settlement agreement which we both hoped was acceptable.  I've informed S/A Richardson that later this week, he and I can discuss where to go next.



PENGAD 800-631-6989

DEPOSITION
EXHIBIT
#3
Richardson  8/10/06

# BEFORE THE UNITED STATES
# EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
# DENVER DISTRICT

| | | |
|---|---|---|
| Cortez E. Richardson<br>Complainant. | : | EEO No. 320-A2-8083X |
| | : | |
| vs. | : | |
| | : | |
| Melquiades R. Martinez. Secretary,<br>U.S. Dept. of Housing and Urban<br>Development Agency. | : | |
| | : | |

## MEMORANDUM IN RESPONSE TO
## THE NOTICE OF SUMMARY JUDGEMENT
## AND IN FURTHER SUPPORT OF THE COMPLAINANT

### PRELIMINARY STATEMENT

At the conclusion of the Alternative Dispute Resolution (ADR) process the Complainant and the Agency (HUD) were not able to settle the complaint. The Agency's unwillingness to settle shows another concept of unfairness toward the Complainant, which adds to the continuous harassment and retaliation the Complainant is currently experiencing. The Agency was initially willing to settle with the Complainant, only after the complainant verbally agreed to absorb all the cost and sacrifices incurred in the settlement proposed by the Agency. The Complainant retained counsel to assist in the negotiations, because he felt the Agency was being unfair in the ADR negotiations. Once the Complainant notified the Agency that he was represented by counsel the Agency reneged on the agreement and became unwilling to even settle on the initial agreement prepared by the Agency. Furthermore the facts initially presented to the Equal Employment Opportunity Commission in regard to this complaint show that the Complainant was treated unfair based on his race; Black American male. The complaint is corroborated by witness affidavits, e-mails, and memorandums that support the allegations made by the Complainant.

DEPOSITION EXHIBIT
#4
Richardson 8/10/06
PENGAD 800-631-6989

1



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
Denver District Office

303 E. 17th Ave., Suite 510
Denver, CO 80203
PH: (303) 866-1300 / X395
TDD: (303) 866-1950
FAX: (303) 866-1085
1-800-669-4000

June 12, 2002

Sandra Hobson, Director
Equal Employment Opportunity Division
U.S. Dept. of Housing & Urban Development
The Office of the Secretary
Washington, D.C. 20410-0001

RE:     EEO Complaint of Cortez Richardson v. Melquiades R. Martinez, Secretary,
        U.S. Dept. of Housing and Urban Development
        EEOC File No. 330-A2-8083X
        Agency No. DE-01-02

Dear Ms. Hobson:

On June 11, 2002, I received a letter from Complainant withdrawing his request for
hearing.  The parties have agreed to an informal settlement.  Therefore, I am returning
this complaint to your office and closing it as an active case.

Due to financial constraints, this office is unable to return the copy of the report of
investigation the Agency sent to this office. If the Agency wishes the report of investigation
returned, the Agency may provide us with a self-addressed prepaid mailing label or
prepaid mailing container, or the Agency may arrange for a courier or other authorized
individual to retrieve our copy of the report of investigation. If the Agency does not wish
the report of investigation returned, or if the Agency does not otherwise advise us within 60
days following the date of this letter, we will conclude the Agency does not wish to have our
copy of the report of investigation returned and we will destroy the document.

Very truly yours,

Ronald W. Tooks
Administrative Judge

Feb-16-04 12:05P Lisa Richardson          405-741 2317           .1

Feb    -04 12:00P Lisa Richardson          405-741 2317           P.07

## CONCLUSION

The Complainant respectfully request for judgment in his favor and relief based on the foregoing

facts, circumstances and continuous unfair treatment based on his race Black American, and for

the acts of retaliation after the filing of his EEO Complaint.  Without this relief the Complainant

will be subject to even more harassment and retaliation from HUD OIG.  The Complainant also

respectfully request that he be granted a transfer, reimbursed for attorney fees, reimbursed for

relocation expenses, and the restoration of annual leave to be used during the complaint process.

The Complainant accumulated these expenses due to the Agency's unwillingness to settle the

complaint, and by the Agency reneging on its initial settlement agreement they prepared.

Respectfully submitted,

Cortez Richardson,
Complainant

By:
Cortez Richardson
P.O. BOX 25327
DFC. Bldg 16
Denver, CO 80225
(303) 236-1469

9

11/19/2003    15:33    HUD OIG COUNSEL → 918174513997

OCT-03-2002 THU 09:58 AM                    FAX NO.                    P. 02
10/03/2002  07:46    8179789373        SWEST DIST IG
                                                                      PAGE  02



U.S. Department of Housing and Urban Development
Region VI Office of Inspector General for Investigation
819 Taylor, Room 13A09
Post Office Box 17148
Fort Worth, Texas 76102
(817) 978-9310 FAX (817) 978-9373

September 30, 2002

MEMORANDUM FOR: Cortez Richardson, Special Agent, 6AGI

FROM: James M. Malloy, Assistant Special Agent in Charge, 6AGI

SUBJECT: Proposed Five (5) Calendar Day Suspension

This is notice that I am proposing to suspend you for five (5) calendar days from your position of Special Agent, GS-1811-13, in the Office of Inspector General (OIG), U. S. Department of Housing and Urban Development (HUD), no sooner than one day from the date that you received this memorandum. This proposed action is issued in accordance with Part 752 of Title 5 of the Code of Federal Regulations and HUD Handbook 752.2 REV-2. This action is proposed in order to promote the efficiency of the service.

This action is based on a review of the issues presented to me and is based on a part of the following Charges and Specifications:

<u>Charge:</u>  <u>Violation of OIG Policies Governing the Use of Operation Safe Home Expenses.</u>

<u>Specification:</u>

With regard to the Operation Safe Home (OSH) expenses cited as questionable, I found the allegations contained in the report are without merit. The cited audit was performed by an auditor who had no experience in OSH allowed expenses nor was he versed in the activities allowed in the expenditure of OSH funds. I found that this audit was replete with personal opinions and incorrect analysis of records. It is well known with OIG that many District utilized OSH funds to pay for OSH initiative expenses such as guns, police equipment, training for task force officers, vehicles outfitted with OSH logos, cellular telephone rentals, supplies, electronic equipment used in connection with the OSH initiative, automobile rentals, etc. to name a few items allowed and which



DEPOSITION
EXHIBIT
#8
Richardson

were considered as having a germane relationship or nexus to the OSH mission. Inspector General Susan Gaffney in her January 31, 2001 memorandum acknowledged that great confusion exited with respect to OSH Initiatives. Her January 31, 2001 memorandum states in part "this statement of policy eliminates the ambiguity introduced by Section 22-a 'Investigative Expenses'". The memorandum goes on to outline authorized standards for OSH operational funds. Clearly confusion reigned within OIG as to what investigative expenses were in the past. As of late, the former Assistant Inspector General for Investigation (AIGI) acknowledged that there was a broad interpretation allowed for in the Office of Inspector General Manual (OIGM) 3000. (It should be noted that Special Agent (SA) Cortez Richardson never attended the Special Agents in Charge (SACs) meeting wherein OSH expense issues were discussed and thus he (Richardson) had to rely on what SAC Jeffrey Finn told him was proper.) No written documentation was ever disseminated from the Office of Inspector General (OIG) Headquarters to record the contents of these meetings; thus, the OSH rules were subject to broad interpretation by the SACs attending these meetings. Thus, it appears that SA Richardson was only following lawful orders issued by his superior, and on the one occasion where he had serious questions, Richardson almost immediately raised his concern regarding the Denver towing expense to his immediate supervisor, who stated he would hand the issue. Prior to instituting OSH, U. S. Department of Housing and Urban Development (HUD) OIG agents were issued very limited equipment. Using this as a standard for equipment that should be paid for with District funds, any additional equipment purchases could be construed as "for Safe Home purchases" subject to the interpretation of the respective Special Agent in Charge.

Charge: Conduct Unbecoming a Federal Law Enforcement Officer.

Specification:

While there is conflicting information in the witness's statements as the exact intent and/or type of damage done to the tow truck, it is clear that you did cause damage to the tow truck while at JD's Nightclub. In fact, you admit that you had your foot on the tow truck that you pushed off of the door causing damage to the door. Also, it appears that you caused damage to the license plate on the tow truck. It though you stated the damage was accidental; however, you considered the damage of such magnitude that you returned to apologize to the tow truck operator and compensation was made with regard to the damage you caused to the vehicle.

OCT-03-2002 THU 10:00 AM          FAX NO.                    P. 04
10/03/2002  07:46    8179789373
                                  SWEST DIST IG
                                                            PAGE 04

<u>Charge: Falsification of Records Relating to a HUD/OIG Operation Safe Home Expenditure.</u>

<u>Specification:</u>

With respect to the falsification of HUD/OIG records, there are undisputed facts and testimony that you, in fact, did alter the HUD/OIG receipts. The report documents that you, however, were issued a direct order by your supervisor and I believe that your failure to carry out that order could have resulted in insubordination charges against you by SAC Finn. You did, however, make a good faith effort to report the altering of the document to your immediate supervisor, Assistant Special Agent in Charge (ASAC) Charles Freyermuth as soon as possible and placed HUD/OIG on notice of the violation and fulfilled your duty to report the potential misconduct by the SAC. Your immediate supervisor even specifically told you he would handle the issue and you subsequently met with SAC Finn and ASAC Freyermuth to raise your concern regarding the alteration of the Denver towing bill.
Investigation

<u>Charge: Lack of Candor During an Official Investigation.</u>

<u>Specification:</u>

The report of investigation makes the assertion that you were not fully truthful during the OIG investigation, and the report cites a November 17, 2001 interview as the basis. With respect to the potential question as to lack of candor, there is testimony that you only answered questions asked of you. While it is a concern that you did not volunteer information, it appears that you were responsive to the very specific questions asked by those conducting the interview.

<u>Charge: Whether the Special Agent Engaged in and/or Failed to Properly Report Violation of Law, OIG Policy, Fraud, Waste and/or Abuse.</u>

<u>Specification:</u>

I have reviewed the evidence detailed in the OIG Report of Investigation (ROI) and do not feel that I have enough information about the facts of these matters or particularly in your perception of these specific things as they occurred that substantiates the allegations that you failed to properly report violations of law, OIG policy, fraud, waste, and/or abuse. It is clear to me that you did participate in unprofessional conduct by furnishing an "X" rated tape at the request of your (then) Special Agent in Charge (SAC) for an Agency (HUD) related trip.

11/19/2003    15:33    HUD OIG COUNSEL → 918174513997
OCT-03-2002 THU 10:00 AM                    FAX NO.                    NO.095    P10
10/03/2002  07:46  8179789373                                          P. 05
                                    SWEST DIST IG
                                                                        PAGE  05

**Charge:  Whether the Special Agent Engaged in Misuse of Government Telephone Service.**

**Specification:**

I have reviewed the information provided in the ROI regarding an apparent cellular telephone assigned to you while you were stationed in the Denver Office.  I have looked at these cellular telephone records and it appears there may have been some personal telephone calls made even though you have advised me other HUD agents and task force personnel assigned to Operation Safe Home (OSH), often used this telephone as well.

Summary

One of the most fundamental concepts in every employee/employer relationship is the understanding that an employee is expected to uphold the highest standards for the organization.  In fact, no organization can successfully function where the environment is one that allows employees to disregard instructions and principles of conduct as stated to their supervisor or HUD/OIG.

Your actions, as described above, violate this principle, and cannot be condoned or tolerated.  Your misconduct is egregious and proposing a five (5) day suspension is appropriate for this situation and will serve to promote the efficiency of the service.  In coming to this conclusion I have also considered the following mitigating and aggravating factors:

**Aggravation:**

As an aggravating factor is the nature of your position.  All OIG employees are held to a higher standard.  See OIG Manual Chapter 1083, Para. 1-2 ("In addition to these authorities, OIG employees by the very nature of their job responsibilities, are required to maintain higher standards of conduct than others in the Department.")  The OIG was created by the Inspector General Act of 1978 as an independent entity responsible for audit, investigation, fraud control as well as preventing and detecting fraud, waste and abuse in HUD programs and operations as well as the operations of contractors and grantees.  By engaging in the misconduct described in this proposal, you have undermined your credibility.  Your disregard for the trust and confidence placed in you by this organization and by me personally has caused me to lose confidence in your ability to act independently within the expected parameters in positions such as yours.  This aggravating factor, in and of its self, serves to enhance the penalty that should be assessed for your misconduct.  In other words, I believe that you occupy a position that demands a higher level of trust and confidence within the employer/employee relationship.

OCT-03-2002 THU 10:00 AM                    FAX NO.                    P. 06

16/03/2002  07:46    8179789373                SWEST DIST IG

PAGE 06

and the essence of your misconduct harms that trust.

In determining what action to take, I have reviewed the Disciplinary and Adverse Actions, OIGM 1000, August 2000. The Table states that Dishonest, Infamous, or Notoriously Disgraceful Conduct (including discreditable involvement with local or Federal Law Enforcement Officers) is an offense warranting penalties ranging from Reprimand to Removal, for a first offense. Thus, I find that a 5-day suspension is consistent with OIGM 1000, August 2000.

Mitigation.

As a mitigating factor, I have considered the fact that you have over four years of Federal civilian service, all with HUD/OIG. Also, the only charge I find clear cut and appears to be events totally under your sole control is the tow truck damage. The others have mitigating circumstances and to some extent, so does the tow truck incident.

Nevertheless, based on the seriousness of the offenses, the nature of your position, and the effect that your misconduct with respect to the tow truck has had upon my confidence in you, I do not feel that the mitigating circumstances outlined above warrant a less severe penalty. Therefore, I am proposing your five (5) day calendar suspension for such cause as will promote the efficiency of the service.

Procedures.

The Deciding Official in this case will be Larry Chapman, Special Agent in Charge, 819 Taylor Street, Room 13A09, Fort Worth, Texas 76102, telephone 817-978-9310. You have a right to reply to this notice orally or in writing, or both, and to furnish affidavits and/or other documentary evidence in support of your answer. Full and proper consideration will be given to any material or information you furnish in a timely manner. You will be permitted up to fourteen (14) calendar days from the date you receive this proposed action to submit a response. Consideration will be given to extending this fourteen (14) day period if you submit a request in writing to the Deciding Official before the expiration of the allowed time period, stating your reasons for the request for additional time to respond to this proposal. You are not entitled to official time to prepare your oral and/or written responses.

If you wish to make a written reply, it should be submitted to the Deciding Official within the fourteen (14) day period noted above. If you written reply is mailed, it must be received prior to the expiration of the fourteen (14) day period, and should be marked, "To Be Opened by Addressee Only". To present an oral reply to Mr. Chapman, please

contact him directly to arrange an appropriate date and time for your response meeting. Mr. Chapman may choose to hear the reply himself, or he may designate an appropriate official to hear the reply on his behalf. Be advised, however, that an oral meeting is not a hearing and the appearance of witnesses will not be permitted. If no response is received, a written notice of final decision will be issued as soon as practicable after the expiration of the time allowed you to answer.

An attorney or other representative of your choice may represent you. Before a representative may act on your behalf on this matter, you must designate that person in writing to the Deciding Official identified in the preceding paragraph. Your representative, however, may be disallowed if he or she is an employee of the Department whose activities as representative could cause a conflict of interest or position, or if his or her release would give rise to unreasonable costs to the Government, or if he or she cannot be released from official duties because of work assignments. You may present your oral reply on official time (administrative leave), and if your representative is an employee of the Department, he or she may attend the oral reply session on official time.

You will be furnished a written notice of decision with specific reasons for that decision within twenty-five (25) calendar days after receipt of your reply, or as soon as practical following expiration of the time allowed you to reply. If it is necessary for the decision to be delayed beyond that time period, you will be so notified.

You may review the material upon which this proposal is based. In the event you desire to review the material, please make such a request directly to me.

No decision on this matter will be made until all material relied upon supporting the reason for the proposed action, including timely written and/or oral reply, has been considered. You will be given a memorandum containing the decision on this matter. It will state a decision to (1) take the proposed action; (2) take a lesser action; or, (3) not take the proposed action.

Copies of the Handbook and pertinent statutes and regulations governing this action may be reviewed by contacting David A. Nuhfer, Labor Relations Specialist, Bureau of the Public Debt, Room 206-2, Parkersburg, West Virginia 26106-1328, telephone 304-480-6126.

Given the facts above, and the fact that you have been an exemplary agent since transferring to this Region and have "hit the ground running" and become an immediate contributor to this Region, I am recommending that you be given five (5) days suspension.

11/19/2003     15:33     HUD OIG COUNSEL → 918174513997                    NO.095     P13

OCT-03-2002 THU 10:01 AM                          FAX NO.                          P. 08
10/03/2002   07:48    8179789373
                                                  SWEST DIST IG                   PAGE  06

I received a copy of this Memorandum:

Cortez Richardson

9/30/02
Date

OCT-03-2002 THU 10:01 AM                    FAX NO.                    P. 09

10/03/2002  07:46    8179789373    SWEST DIST IG                PAGE  09



U.S. Department of Housing and Urban Development
Region VI Office of Inspector General for Investigation
819 Taylor, Room 13A09
Post Office Box 177449
Fort Worth, Texas 76103
(817) 978-5310  FAX (817) 978-9373

September 30, 2002

MEMORANDUM FOR:  Special Agent Cortez Richardson, 6AGI

FROM:  Larry Chapman, Special Agent in Charge, 6AGI

SUBJECT:  Decision to Suspend for Five (5) Calendar Days

    By memorandum, dated September 30, 2002, you were given a fifteen (15) calendar days advance notice of a proposal to suspend you for five (5) calendar days from your position of Special Agent, GS-1811-13 with the Office of Inspector General (OIG), U. S. Department of Housing and Urban Development (HUD).  James Malloy, Assistant Special Agent in Charge (ASAC), signed the proposed suspension notice.  The proposal to suspend you was based on the charges of conduct unbecoming a Federal Law Enforcement Officer.  This specification was included in the charge and was clearly addressed in the proposal notice.

    As the appointed Deciding Official by Assistant Inspector General for Investigation (AIGI) Haban, I have carefully reviewed and considered all of the material in the official case file that formed the basis for and supported your proposed suspension.  At your request while you were in the Fort Worth Regional Office, you asked to make an immediate oral reply.  I have also fully considered your oral argument to me on September 30, 2002.

    During your oral reply, you specifically informed me that you changed the Denver towing receipt under "extreme duress" and "threat" of retaliation.  You also brought your concerns to your immediate supervisor, ASAC Charles Freyermuth, and ASAC Freyermuth stated that he would "handle it".  After two weeks with no action, you then arranged a personal meeting with SAC Jeffrey Finn and ASAC Freyermuth to



DEPOSITION
EXHIBIT
#9
Richardson  09/10/06

OCT-03-2002 THU 10:02 AM                    FAX NO.                    P. 10

again express your concern over the order from SAC Finn to alter the document. I find that you properly and correctly notified the responsible Agency personnel and placed the Agency on notice.

During your oral reply, you also stated that the damage to the tow truck in Billings, Montana was strictly accidental. Further, you advised that you were only the case agent and the Operation Safe Home (OSH) expenses you paid were only those directed by higher supervisors and you simply followed lawful orders by paying what you believed to be legitimate OSH expenses.

Finally, you contended that you never engaged in any lack of candor in answering questions posed by investigative personnel. Rather, you only answered the specific questions as posed to you. You even told the interviewers during the November 17, 2001 interview that you only commented on "oranges when asked about oranges". Your point was that you never intentionally withheld information, but rather you answered the questions strictly on the subject matter asked by the agents.

In coming to a decision in this matter, I have also considered the following mitigating and aggravating factor:

<u>Aggravation:</u>

During my review, I considered all of the aggravating factors outlined in the proposed notice of September 27, 2002 and concur with each assessment.

To me, the most crucial aggravating factor in the situation is the seriousness of the matter. Your damage to the tow truck in Billings, Montana, was unprofessional on your part. I realize that while you believe your actions were unintentional and accidental, the fact is you did damage the tow truck vehicle in apparently two places.

I have reviewed the OIG Disciplinary and Adverse Actions, Office of Inspector General Manual 1000, August 2000. Given the seriousness of your misconduct, and the minimum punishment guidelines applicable to this case, sanction is warranted and appropriate. Further, I find that the penalty proposed in this matter is consistent with the guidelines.

**Mitigation:**

I have noted with specificity the various mitigating factors and the explanations provided in the proposal notice. I also considered the fact your oral reply stated your actions were not intentional and you made every effort to report acts not consistent with the direction of the OIG, and your willingness to apologize for the tow damage incident suggest to me that your intentions were good and that an excellent potential for rehabilitation exists with you. I also note that the events occurred while assigned to the Denver Office, and have no bearing on your activities since you became a member of this Region. In fact, your work products and conduct have been exemplary since you transferred to the Fort Worth Region and you are held in high regard by ASAC Malloy.

**Conclusions:**

After reviewing this matter in its entirety, I find the other charges listed in the proposal are adequately explained and only the charge of conduct unbecoming is substantiated by the facts presented. Therefore, my decision is to uphold the proposed five (5) day suspension for this latter charge only and to not consider or sustain any additional issued or charges.

Furthermore, I feel the five (5) day suspension is the minimum sanction necessary to effect the efficiency of the service; to impress upon you the seriousness of your misconduct; and, to adequately serve as a deterrent for such misconduct in the future. Future violation on your part could result in disciplinary actions up to and including removal from Federal service.

At your request to bring this matter to a conclusion as quickly as possible, your suspension will commence on October 7, 2002 and conclude on October 11, 2002. You will be expected to report back to work as usual on Tuesday, October 15, 2002. A SF-50 documenting this action will be mailed to you as soon as it is available.

Received:

Cortez Richardson

9/30/02
Date



U.S. Department of Housing and Urban Development

# Office of Inspector General

451 7ᵗʰ St., S.W.

Washington, D.C. 20410-4500

December 9, 2002

**MEMORANDUM FOR:** Cortez Richardson, Special Agent, 6AGI

**FROM:** Lester Davis, Acting Special Agent in Charge, 6AGI

**SUBJECT:** Appraisal by United States Attorneys for the Districts of Oklahoma

Upon being selected as the Special Agent in Charge (SAC) for Region 6, I became aware that you falsified an official document while assigned to the Rocky Mountain Region. As you know, as a special agent your credibility as a witness is a crucial factor in your working relationship with the local United States Attorney. It is therefore necessary that you apprise the Offices United States Attorney of the incident referred to above, and obtain their opinions concerning its impact on your ability to serve as a special agent and potential witness in either of the three Oklahoma districts. Accordingly, I want you to contact the Chiefs of the Criminal Divisions of the Oklahoma districts, and schedule times for us to meet with them on Wednesday through Friday of this week (December 9 – 13, 2002).

During these meetings, you shall describe the falsification incident. At a minimum, you need to provide the information below to facilitate their opinions.

In March 2000, your former SAC Jeffrey Finn had his Government vehicle towed from a no parking zone. Later, SAC Finn went to the impound lot and drove the vehicle away without paying for the tow. When SAC Finn drove the vehicle from the impound lot, he drove the vehicle through a fence and damaged the fence. SAC Finn contacted you and asked for your help. You contacted the Englewood, Colorado Police Department and learned that they wanted to talk to Finn about the removal of the vehicle without paying the tow charges. SAC Finn requested that you take care of the situation by paying for the tow and damages using Federal funds from the HM10-510 Operation Safe Home account. You withdrew cash from the HM10-510 cash box, met with the tow truck operator, and paid the amount due for the tow and damages. In return, the tow truck operator provided you a receipt showing a "tow in" charge of $100, a "dollies in" charge of $50, and a $200 charge for "damage to fence from driving truck through chain fence around lot on S. side of building." When you returned to the office, SAC Finn instructed you to alter the receipt to show that the $200 charge was for "storage." You refused to alter the receipt at first, but you did eventually alter the receipt because SAC Finn became angry and ordered you to do so. Nonetheless, you know that this receipt was a document used to support the payment of government



DEPOSITION
EXHIBIT
#10  8/0/06
RichDsr 8/0/06
PENGAD 800-631-6989

DEC-4-2002  12:06P FROM:HUD OIG OKC 4052314957                TO:918005069511132300938 P:2

funds, and altering the receipt was improper.  Later, you testified as a government witness in the prosecution of SAC Finn.

We will request that the United States Attorneys offices render their opinions on or before January 15, 2003.  Until we have obtained their opinions, you shall coordinate your investigations through your Assistant SAC, and you shall ensure that there is always a second OIG special agent who can provide essential testimony.  You should also make yourself available to assist the United States Attorneys in making the assessments.