UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - -X

JAMES MALLOY,                    :

       Plaintiff        :

      v.                         : No. 04-1117(RJL)

                          :

ALPHONSO R. JACKSON,             :

       Defendant        :

- - - - - - - - - - - - - - -X

DEPOSITION OF JOHN ROBINSON

Washington, D.C.

Friday, August 11, 2006

Deposition of JOHN ROBINSON, called for

examination at 11:15 a.m., at the law offices of Robert

C. Seldon & Associates, P.C., 1319 F Street, N.W., Suite

305, Washington, D.C., before Gary S. Howard, a notary

public in and for the District of Columbia, when were

present on behalf of the respective parties:

1 general for homeland security.

2     Q     Okay.

3     A     And I work in our headquarters function

4 on operational issues.

5     Q     Okay. Prior to then, where were you

6 employed?  Prior to August of '04.

7     A     Prior to August of '04, I was employed by

8 the Housing and Urban Development, office of

9 inspector general, from August of 2002 to August of

10 2004, prior to Homeland Security.

11    Q     Okay. Were you in one particular part of

12 the Department of Housing and Urban Development,

13 office of the inspector general?

14    A     Yes, I was. My entirety, my title was

15 assistant to the special agent in charge, commonly

16 known as ATSAC. And I was assigned to the SID,

17 known as the special investigations division of the

18 HUD OIG.

19    Q     And here in Washington, D.C.?

20    A     Yes, it was in Washington, D.C.

21    Q     Was there one or more special agents in

22 charge during your two-year tenure with HUD OIG?

1    A       In SID, during my tenure, I worked for

2 two.

3    Q       Let's focus on this, so that I can focus

4 it a bit.

5            We are, by coincidence, concerned with

6 events that arose right about the time you started

7 at HUD OIG in August of '02. And I'd say, at the

8 outside, we'd be done by the spring of '03.

9            Who was, or were, the special agent in

10 charge that you were working for?

11           MS. LYONS:  During that period.

12           MR. SELDON:  Yes.

13           THE WITNESS:  His name was John McCarty.

14           MR. SELDON:  Okay.

15           BY MR. SELDON:

16    Q       And I'm sure you've figured this out by

17 now, Mr. Robinson. One reason we're speeding

18 through this is you're not a central figure in this

19 by a long shot.

20           Can you just briefly for us summarize

21 what the functions of the special investigations

22 division were, at least insofar as you performed

1 them?

2     A     Okay. Well, basically, we would be

3 assigned -- the inspector general would decide, or

4 someone in headquarters, certain investigations

5 that usually were more of a complex issues, I would

6 say.

7     Q     Okay.

8     A     Those that involve people of -- I believe

9 it was like any GS-15s or above, or any situations

10 that -- whatever they deemed fit that would be of

11 complexity or of internal issues.

12          Not that they had to be internal issues,

13 but we would do a lot of the internal type of cases

14 involving employees and allegations of HUD, as well

15 as of the OIG itself, of its employees.

16          In addition to that, we also had a

17 function where we would perform internal

18 inspections of our offices.

19          That was somewhat of a collateral thing

20 which we did along with everything else.

21          And we also were responsible for the COOP

22 function -- the continuing operation of, like, say,

1 during, I don't know, like a terrorist thing or

2 whatever the case might be, plans of how to get a

3 lot of significant people in HUD around, or I guess

4 to high land, or whatever the case may be.

5          But we were part and parcel of the COOP

6 process, which, basically, every federal agency has

7 or has to have in place.

8    Q    Okay.

9          THE COURT REPORTER:  I'm sorry. Can I

10 just ask -- the what process?

11          MR. SELDON:  We thought it was kook at

12 first.

13          THE WITNESS:  COOP -- C-O-O-P. It's

14 Continuing --

15          MR. SELDON:  That's what we figured out.

16          THE WITNESS:  I can't give you exactly

17 what it means, but --

18          THE COURT REPORTER:  Okay. It's an

19 acronym.

20          MS. LYONS:  C-O-O-P.

21          THE WITNESS:  It's an acronym.

22          THE COURT REPORTER:  Okay.

1          THE WITNESS:  It's an acronym for the

2 preparation in the event of a terrorist -- such as

3 like 9/11, post-9/11. People are prepared for what

4 you're going to do.

5          It's a map that the Federal Government

6 has to do.

7          MR. SELDON:  Right.

8          BY MR. SELDON:

9    Q    And you reported to the special agent in

10 charge of SID, Mr. McCarty, at that time.

11   A    Yes, he was my second-line supervisor.

12   Q    The first-line would have been whom?

13   A    Well, the ASAC at the time was Michael

14 Napleone.

15   Q    Okay. Going up from Mr. McCarty, by name

16 and title, if you know, to whom did he report?

17          (Pause.)

18   A    I think when I had -- normally, he would

19 report to the deputy assistant inspector general of

20 investigations.

21          And I'm trying to recollect, but I think

22 when I got there, I don't know if that position was

1 void. And I think he actually went at that

2 beginning point to Joseph Haban, who was the

3 assistant inspector general of investigations.

4        For some reason I don't remember a DA IG

5 being in place when I got there. Subsequently,

6 there was.

7    Q    That's exactly what -- and I take it the

8 first one who was then in there was Daniel Salas.

9    A    The first one that I came in contact with

10 was Daniel Salas.

11   Q    That's what another witness said.

12        MR. SELDON:  Give me one second.  There

13 may be a document that's useful that I left on my

14 desk.

15        (Recess.)

16        THE COURT REPORTER:  We're back on the

17 record.

18        BY MR. SELDON:

19   Q    Okay. I take it on one or more occasions,

20 you were assigned to investigations involving the

21 Plaintiff in this action, James Malloy.

22   A    Yes.

1    Q     Let me just show you a document.

2          MR. SELDON:  Jane, if you don't mind, I'm

3 just sort of leading him through this. It will make

4 it faster for all.

5          The Court Reporter will give you the

6 marked copy in a second. This will be Robinson

7 Exhibit No. 1.

8          THE COURT REPORTER:  No. 1.

9               (The document referred to

10               was marked for identification

11               as Deposition Exhibit No. 1.)

12          BY MR. SELDON:

13   Q     Mr. Robinson, this is a document called

14 investigative plan.  And is that your signature on

15 the lower left?

16   A     Yes, it is.

17   Q     Okay. So, first, just tell us briefly,

18 what is an investigative plan?

19   A     Well, once you are assigned a case, you

20 have a sit-down with a supervisor and they explain

21 to you, basically charging you with what they want

22 you to do.

1          One of the steps that HUD was to come up

2 with, as the investigator, come up with an

3 investigative plan, and this would go in the case

4 file. And it would basically involve -- well,

5 what's on this sheet here in terms of allegations.

6          Basically, it was like a roadmap of the

7 initial bedrock foundation of where you initially

8 were going to go with an investigation.

9    Q    Okay. So one of the issues that we see

10 here, the allegations -- let me just actually back

11 up.

12          When we see the allegation, statute,

13 regulation, et cetera, is this something that you

14 prepared or something that a supervisor prepares

15 and gives to you?

16    A    No. I prepared this and I would give it

17 to a supervisor who would give approval to it.

18          Prior to signing it, they would have a

19 discussion with you in terms of this would be

20 accurate. And they may make recommendations to you,

21 or they may not agree with your course or the

22 avenue that you're going to want to take with the

1 investigation.

2        You would mutually agree upon that. And

3 once again, this was just, at the outset, with

4 really knowing very little information. It's just

5 kind of like the first footprint in the sand to go

6 forward.

7    Q    Okay. And so, then, the supervisor's

8 signature -- correct me if I'm wrong -- in the

9 lower right line, is that Mr. McCarty?

10   A    Yes.

11   Q    Okay.

12   A    Yes, it is.

13   Q    Okay. So one of the allegations as we

14 look in this investigation is that Mr. Malloy

15 failed to follow HUD OIG policy and procedure

16 relating to personnel actions taken regarding

17 Southwest Region special agents Cortez Richardson

18 and Steve Romero.

19   A    Yes, I see that.

20   Q    Got that on there. Do you recall what you

21 were investigating, more specifically than that,

22 that particular issue?

1           If you don't, that's okay.

2           MS. LYONS:  I'm not sure I understand the

3 question.

4           MR. SELDON:  If he remembers anything

5 more specific about what that part of the

6 investigation was about.

7           THE WITNESS:  I remember having a

8 conversation with my superiors.

9           MR. SELDON:  Right.

10          THE WITNESS:  And in this part of the

11 investigation that was going on down in Texas, a

12 discussion coming up -- I did not know.

13          MR. SELDON:  Okay.

14          THE WITNESS:  I don't know Cortez

15 Richardson or Steve Romero. I was not part of their

16 investigation.

17          MR. SELDON:  Let me clarify the question.

18 Maybe I see now why you're struggling a bit.

19          BY MR. SELDON:

20    Q    This is your initial framework. I guess

21 what I'm saying is, did that issue expand,

22 contract, change in any way, as you went through

1 the investigation?

2    A    At this stage of the game, yes. Once

3 again, like I said, when we prepared this report,

4 or investigative plan, this is not something that's

5 in stone because at the end of an investigation,

6 things can be completely different than this.

7        This is without me doing any

8 investigative work.

9    Q    It's your framework.

10    A    It's my framework.

11    Q    Forward.

12    A    And when I wrote this, based upon my

13 discussions with my supervisors, this was one of

14 the areas of concern in this investigation, as well

15 as these other ones that are listed lower.

16    Q    Okay.

17    A    So at this stage of the game, this is

18 what they wanted me to work on. This is what I

19 gathered that they wanted to --

20    Q    Do you remember whether you -- let me go

21 back.

22        You worked on the investigation personnel

1 and took interviews, I take it.

2     A     Yes, I did.

3     Q     Did you have another agent who worked

4 with you? I don't know if you did or not.

5     A     Well, there were so many -- when I see

6 Fort Worth, Texas, there are so many aspects to

7 this investigation.

8           But, yes, I did. My primary peer was a

9 fellow by the name of Jerry Thomas. He came on with

10 me at the same time.

11          However, in other interviews, other

12 people sat in. I believe, having an interview with

13 Mr. Malloy, Michael Napleone, my ASAC sat in in the

14 interviews.

15    Q     Okay. Let me make the question a little

16 easier for you, and I appreciate this.

17          Were there any witness interviews in

18 connection with this investigation that you either

19 didn't take or otherwise sit in on?

20          MS. LYONS:  Objection. Foundation.

21          MR. SELDON:  Well, I think he said that

22 he took a lot of the interviews. I just want to see

1 if he's present for all of them.

2          MS. LYONS:  How would he know if he

3 wasn't present?

4          MR. SELDON:  Do you want me to go through

5 it, because he was running the investigation, I

6 think.

7          MS. LYONS:  He can answer the question.

8          MR. SELDON:  Okay.

9          BY MR. SELDON:

10    Q    Do you have a way to -- do you know

11 whether or not you either took or

12 otherwise --

13    A    To the best of my knowledge, being the

14 case agent, I assume that I was in on all

15 interviews.

16    Q    Okay.

17    A    However, I can't swear that somebody

18 spoke to him without my presence. It was not made

19 known to me.

20    Q    Okay.

21    A    However, it could have happened.

22    Q    And just to be clear, it wasn't a trick

1 question.

2      A      Not as far as the investigation. I don't

3 know. There could have been other meetings in

4 headquarters that Mr. Malloy was privy to, and I

5 wasn't.

6           So I don't know.

7      Q      I just want to be clear. It wasn't a

8 trick  question. I didn't know of any that you

9 weren't around for, either.

10      A      I understand.

11      Q      Do you recall whether you interviewed or

12 sat in on an interview of Cortez Richardson?

13      A      No, I've never sat in on. I've never seen

14 Cortez Richardson.

15      Q      What about Steven Romero?

16      A      I believe I interviewed -- and if this is

17 the same Romero, he was in Atlanta. I'm not sure.

18 I'm vague. But I believe I --

19      Q      Let me just tell you, Romero was an agent

20 who himself came under investigation for whether he

21 had accurately stated the circumstances under which

22 he left the Austin police department.

1    A    No, I never spoke to him about that. I

2 did have the occasion at one point in time, I did

3 interview Steve Romero.

4         As a matter of fact, I think we

5 interviewed every agent in the whole Dallas office.

6    Q    Right.

7    A    But it was not on that subject. And he

8 was in Houston assigned at the time as a special

9 agent.

10    Q    So in this investigation, at least the

11 aspect of it, failure to follow policy and

12 procedure relating to personnel actions, do you

13 recall whether you spoke with or sat in on an

14 interview with Romero?

15         (Pause.)

16    A    Yes.

17    Q    Okay. And do you recall what it was that

18 you spoke to him about?

19    A    Yes, I do. And I remember -- I forget. It

20 must have been -- my recollection is refreshed. It

21 was back in probably October, around October. It

22 was Halloween, I know, down in Houston.

1     Q      Okay.

2     A      I remember we went -- and what we were

3 doing -- yes, there was an allegation and whatnot

4 regarding the management in terms of -- how shall I

5 put this? -- the office -- there was

6 something -- I want to use the word, circling the

7 wagons, or some statement was made in a meeting.

8     Q      Okay. And let me focus this to make it

9 easier. It's part of the same investigation which

10 we're going to get to.

11          I'm just trying to see now if you spoke

12 to him about any alleged personnel -- any personnel

13 actions involving Romero.  Did you interview Romero

14 about that?

15    A      About his personnel?  No, no.

16    Q      We're going to get to the other part of

17 the investigation.

18          MS. LYONS:  I'm just concerned that the

19 record now is confused about whether we're talking

20 about personnel actions taken by Steve Romero or

21 taken against Steve Romero.

22          That's all.

1 conversation.

2    Q    Okay. And do you recall whether Mr.

3 Neufer had an opinion or information to convey one

4 way or another about whether the penalty imposed on

5 Mr. Richardson was abnormally low, to use your

6 words?

7    A    I'm sorry. I can't recall specifically.

8    Q    Anything in general?  If you don't,

9 that's okay.

10    A    No.

11    Q    Okay. Did Mr. Neufer or anybody else lead

12 you to believe that it was customary for the bureau

13 of public debt to make recommendations about

14 appropriate disciplinary levels to impose?

15    A    Yes, he did.

16    Q    What did he say?

17    A    What was peculiar about this case, I do

18 recall this because it was kind of unique, in that

19 one of the problems in this case was that he had

20 claimed that he was never consulted.

21         He didn't complain in terms of a formal

22 complaint, but when we were asking him this, I

1 recall one of the phonecalls -- I don't know

2 specifically, as I stated previously, what it was.

3 But when we were talking to him about it, one of

4 the issues came up that Neufer says, look, I'm

5 being hired for our consultation, he says.

6            And we asked him, were you ever consulted

7 prior to this going down?  And he said, no. Which

8 raised concern to us because, in our world, we're

9 hiring these people in every case and apparently,

10 this never did take place.

11           And Neufer was surprised at the time that

12 it never took place.

13    Q    I'm sorry. In the that because we've said

14 that did or didn't take place.

15           Do you mean about consulting about the

16 level of discipline, or something else?

17    A    No. What I recall, more so than the level

18 of discipline, was the fact that he was surprised

19 that nobody utilized his services and had contacted

20 him.

21           I mean, that's what he basically was

22 there for. That's what we utilized him for.

1          We were the investigators and he had the

2  expertise in human relation laws and things of that

3  nature.

4          So I do recall that he voiced surprise.

5  And I think we actually went out of our way to ask

6  him, hey, look, as part of the investigation, did

7  anybody ever contact you about this?

8          And he said, no.

9    Q    Okay. So correct me if I'm wrong, it was

10 about the lack of consultation that Mr. Neufer

11 expressed concern to you, not about the level of

12 discipline that was imposed on Agent Richardson.

13         But it's your testimony that counts.

14   A    He possibly could have. But what I recall

15 is, the crux of my conversation was, or our

16 conversation, was the lack of being consulted or

17 utilized in their services.

18   Q    Okay. Do you recall having or learning

19 anything from Mr. Neufer or, for that matter, from

20 anybody about the role, if any, of the office of

21 legal counsel of the inspector general, in proposed

22 disciplinary actions?

1    A    I don't recall any pertinent conversation

2 to that, no.

3    Q    Okay. Do you recall anyone saying that

4 the disciplinary action against Richardson and/or

5 Romero needed to be coordinated in advance with the

6 office of legal counsel?

7    A    I don't recall that.

8    Q    Okay. Neither do I.  I'll ask you

9 something, and I've got a reference if you need it,

10 to speed it up.

11    A    Yes.

12        MR. SELDON:  And Jane, you can correct me

13 if I'm wrong, too.  And so can you, Rick.

14        BY MR. SELDON:

15    Q    But I gather this investigation, the one

16 that we've identified the investigative plan of,

17 Robinson Exhibit 1, was not completed.

18        If I'm wrong -- that's the same document

19 that you've got.

20        (Pause.)

21        It's, I understand, Interrogatory 3, the

22 answer.

1    A    And it was -- yes, an open forum I think

2 would be a good way to describe it.

3    Q    Okay. And is it correct, and I think it's

4 on that page, but correct me if I'm wrong, that Ms.

5 Hess denied hearing such a comment?

6    A    I believe she did, yes.

7    Q    Okay. And do you have any reason -- do

8 you remember whether Ms. Hess was asked whether or

9 not she had been at the meeting the whole time?

10    A    I'd have to refer back to whatever she

11 said.  The transcript stands on itself.

12    Q    Okay. Let's take a look at page 50 for a

13 second.

14         (Pause.)

15    A    Yes.

16    Q    And at that point, did Ms. Hess indicate

17 that she had been at that meeting the entire time?

18         (Pause.)

19         MS. LYONS:  I'm not sure it's fair to

20 point him to a page and not let him have an

21 opportunity to read the whole thing.

22         MR. SELDON:  He can read whatever he

Page 44

1          BY MR. SELDON:

2     Q     Did you have any reason to disbelieve

3 her?

4     A     At that stage of the game, I was just

5 getting her facts. In terms of believing or

6 disbelieving, I have to corroborate all the facts

7 together.

8          So I don't make that an issue, whether I

9 believe her or I don't believe her.  As an

10 investigator, I just take her facts.

11          Time will tell, once I corroborate. I

12 believe we spoke to a magnitude of people. Everyone

13 in that whole office was spoken to.

14          So she was one of many.

15          MR. SELDON:  Okay.

16          BY MR. SELDON:

17     Q     Did you find Ms. Hess to be cooperative?

18     A     Yes. Ms. Janeen was cooperative.

19     Q     Credible?

20          MS. LYONS:  Objection. Asked and

21 answered.

22          MR. SELDON:  Did I?

1 have called her credibility into question.

2          MR. SELDON:  I'm asking if he made a

3 judgment about her credibility at any time during

4 the investigation.

5          THE WITNESS:  No, I basically took her

6 facts. I don't believe that the time came up in

7 terms of whether I could make her testimony

8 completely credible or not.

9          Once again, it was a fact-finding thing.

10 As I said, a lot of events changed in the

11 investigation which led it in various different

12 ways.

13          So at certain points, some things that

14 could be relevant at one time had changed just due

15 to the course of historical actions of the

16 investigation.

17          BY MR. SELDON:

18    Q    Okay. Did you during the course of your

19 investigation ever get to the point in fact-finding

20 of coming to the conclusion that Ms. Hess had

21 inaccurately or mistakenly conveyed facts to you?

22    A    I had no basis to make that decision upon

1 -- let me put it this way. I never made the basis

2 that she was discredible.

3    Q    Okay.

4    A    All I knew her for was her facts, what

5 she said, or what they said for face value.

6         Period.

7    Q    Okay. Do you recall asking her whether,

8 asking Ms. Hess whether she heard Mr. Malloy make a

9 statement to the effect of circling the wagons?

10    A    Yes, I believe I did.

11    Q    Okay. And do you recall what she said?

12    A    I don't know specifically. I'd have to

13 refer back to the interview once again.

14    Q    Okay. You should read as much or as

15 little of it as you want.  You may want to take a

16 look, it's up to you, at page 24.

17         But you can look at as much or as little

18 of that as you want.

19         (Pause.)

20    A    She gave me an answer, no, with an

21 explanation that it was rowdy. So when I refer back

22 to this old interview, it was, no, with an

Page 50

1 inaccurate as what went on in that meeting?

2    A    I didn't make any assessment of that. I

3 didn't say that they would be accurate or

4 inaccurate.

5    Q    Okay.

6    A    I would assume that she would try to be

7 accurate.

8    Q    Okay.

9         MR. SELDON:  So let's have this marked as

10 Robinson Exhibit 3.

11         THE COURT REPORTER:  No. 3.

12              (The document referred to

13              was marked for identification

14              as Deposition Exhibit No. 3.)

15         THE WITNESS:  Yes.

16         BY MR. SELDON:

17    Q    And are these the notes that Ms. Hess

18 typed up for you?

19         MS. LYONS:  Object as to Ms. Hess' state

20 of mind because --

21         MR. SELDON:  No, this is the thing. He

22 said -- let me go back.

1          MS. LYONS:  Yes, but she may have had

2 multiple purposes in preparing this document. He

3 has no foundation in which to testify about that.

4          MR. SELDON:  No, no. These are the notes

5 that she typed up and sent to him.

6          That's all I'm asking him.

7          MS. LYONS:  You're asking whether this

8 document are that notes.

9          But all I'm pointing out is that it's

10 possible she prepared the notes for multiple

11 purposes.

12          MR. SELDON:  That may or may not be true.

13 I'm just asking him to identify these as her notes

14 that she sent to him.

15          THE WITNESS:  Well, like any true

16 document, I notice that they're not initialled by

17 me. So I don't know.

18          MR. SELDON:  If you don't remember --

19          THE WITNESS:  But it does look, appear,

20 to the best of my recollection, to be the product

21 that she had sent me.

22          MR. SELDON:  Okay. We're going to change

Page 52

1 gears a little bit. Okay?

2          THE WITNESS:  Okay.

3          MR. SELDON:  And what I'll do is we'll

4 mark as Robinson Exhibit 4 -- the Reporter will

5 give you the official one in one second.

6          THE WITNESS:  Okay.

7          THE COURT REPORTER:  No. 4.

8               (The document referred to

9                was marked for identification

10               as Deposition Exhibit No. 4.)

11          BY MR. SELDON:

12    Q     And this is a report of investigation

13 that I gather you signed in the lower left?

14    A     Yes, I did.

15    Q     Just for the record, what is a report of

16 investigation, as you prepared them while at SID?

17    A     A report of investigation would be, once

18 you have finally completed your investigation, it

19 would be like a summarization or basically the

20 facts of what the outcome of the investigation was.

21          It's a took where somebody can, I

22 suppose, get a capsulized version of what the

Page 53

1 investigation was, where it was going. Can be used

2 by either a prosecutor or a manager in terms of

3 making the decision.

4          It's a condensed version of the whole

5 investigation.

6     Q     Okay. Condensed version -- is that right?

7     A     That's fair.

8     Q     Okay. Let's look at page 2 for a second,

9 the last paragraph.

10    A     Okay.

11    Q     This is a condensed version of an

12 interview of Daniel Truxal, I take it.

13    A     Yes.

14    Q     Or a part of the condensed version of the

15 interview of Mr. Truxal.

16    A     Yes.

17    Q     And you interviewed Mr. Truxal, I take

18 it, or you sat in on it, one of the two?

19    A     No, I interviewed Mr. Truxal on at least

20 a couple of occasions, yes.

21    Q     Let's make sure we've got it right here.

22          (Pause.)

Page 54

1          Yes. Okay. So at the bottom of this, it

2 indicates that Truxal was requested to provide any

3 official government ledgers, notes and diaries that

4 he maintained.

5    A    Yes.

6    Q    That would be pertinent to the ongoing

7 investigation relating to Chapman.

8    A    Yes.

9    Q    It states here that Truxal, quote,

10 unquote, snickered, and then stated that he would

11 not share his calendars or diaries, end quote.

12         Is that how you remember Mr. Truxal

13 responding?

14    A    Yes, at the time, and that's why I think

15 I put those little adjectives in there because he,

16 in a very joking way, he snickered and I suppose an

17 air of sarcasm could be taken that, no, he wouldn't

18 do it.

19         It was like he was surprised that I would

20 ask him to, even ask him for those things and

21 whatnot.

22         He refused.

1    Q    Okay. So, essentially, you understood

2 Malloy to be saying that he would not give you his

3 diaries.

4    A    Yes.

5    Q    Okay.

6    A    Bottom line, yes.

7    Q    And did Truxal also, as you understood

8 it, say to you that he would not give you --

9 meaning Truxal, would not give you his diaries?

10    A    Yes.

11    Q    Okay. And then the last thing is -- let

12 me just ask him real quick.

13         This investigation was completed or not?

14         MS. LYONS:  Chapman?

15         MR. JOHNSON: He may have finished the

16 work, but I don't think that anything was ever

17 signed off.

18         MR. SELDON:  Okay.

19         MR. JOHNSON: I don't know how you want to

20 call that.

21         MS. LYONS:  It's a matter of

22 characterization.

1          MR. SELDON:  Right. I remember this one

2 now.

3          BY MR. SELDON:

4    Q     Okay. So the question is, did you

5 communicate that information about what Malloy had

6 withheld and what Truxal had withheld to any of

7 your supervisors?

8    A     Immediately, yes.

9    Q     Who did it you communicate it to?

10   A     After Mr. Malloy gave me the note, I

11 remember, okay.  That's the end of that. Okay,

12 thank you.

13         I remember getting on the phone and

14 contacting -- I believe it was -- I don't remember.

15 But it would either have been John McCarty or Mike

16 Napleone, or both of them in a conference call,

17 saying that, hey, this development has taken place.

18         That's just the fact of the matter.

19   Q     Okay. And did you only tell him about

20 Malloy's position, or did you also tell him about

21 Truxal's position?

22   A     Well, Truxal, I don't know if that

1 was -- I can't recall if that was the same day or

2 it was another time. I don't know the order of

3 events.  I think Truxal might have been after Mr.

4 Malloy.

5          But there was the occasion to do it, and

6 we were in his office as well on the same trip, if

7 you will.

8          Yes, I ended up telling them like three

9 times of people who wouldn't cooperate.

10    Q    Then, being your supervisors?

11    A    Yes.

12    Q    And of the people who wouldn't cooperate,

13 it was Truxal and Malloy?

14          (Pause.)

15          Let's put it this way.  Did it include

16 Truxal and Malloy?

17    A    Yes, that's correct.

18    Q    That's what I need to know. Okay. Let's

19 move on a little bit.

20          MR. SELDON:  Jane, this is the last area.

21          MS. LYONS:  Could I possibly ask for a

22 quick break?

1          MR. SELDON:  Sure. I just wanted you to

2 know that we weren't going for like hours or

3 anything.

4          MS. LYONS:  Right.

5          MR. SELDON:  Sure.

6          THE COURT REPORTER:  We're off the

7 record.

8          (Recess.)

9          THE COURT REPORTER:  We're on the record.

10          MR. SELDON:  What number are we up to,

11 Gary?

12          THE COURT REPORTER:  Five.

13          MR. SELDON:  Let's mark this as Robinson

14 Exhibit 5.

15          THE COURT REPORTER:  No. 5.

16               (The document referred to

17                was marked for identification

18                as Deposition Exhibit No. 5.)

19          BY MR. SELDON:

20    Q    Mr. Robinson, I take it that this is

21 another investigative plan that you prepared.

22          (Pause.)

1    A    Yes.

2    Q    Okay. And this is an investigation

3 concerning a Mr. Larry Chapman.

4    A    Yes.

5    Q    And there's various -- I guess the

6 allegation is that he may have misused his

7 position, government time, and assigned government

8 vehicle while working on construction of his new

9 house during duty hours.

10    A    Yes.

11    Q    Okay. So my question is, in getting this

12 assignment, do you recall whether or not you were

13 informed that Mr. Chapman had already been

14 investigated for that?

15    A    For this same violation?

16    Q    Yes.

17    A    Or allegation?

18    Q    Yes.

19    A    No.

20    Q    Okay. So what I'm going to do is Robinson

21 Exhibit 6, which I'm sure you haven't seen, but I'm

22 going to go over with you in a minute, stuff that's

1        It was just -- that wasn't the whole

2 reason I was doing the investigation, but that was

3 just one aspect.

4        We had different comments and whatnot as

5 I toured the different areas and whatnot. People

6 would come up to me and say, well, I'm like anti-

7 Larry Chapman.

8        And once again, this is just what they

9 said to me that, hey, I've been placed in this

10 office. One guy would have this little office over

11 here with a little metal stool or something.  And

12 then the next guy, who claimed he was -- who was a

13 friend or something like that -- he's like in a

14 bigger office or something like that.

15        So, I don't know. It was an office where

16 I could see that there was divisions in the office.

17 A lot of generalities.

18    Q    Okay. You were asked a series of

19 questions by Mr. Seldon about a woman named Janeen

20 Hess.

21        Do you recall those questions?

22    A    Yes, I do.

1    Q    Where did Ms. Hess fit into the

2 organization, if you know?

3    A    Janeen was the administrative officer in

4 the Dallas/Ft. Worth area. And she had worked there

5 apparently for a long time. She was a life-long

6 career person.

7         She worked for Larry -- when I was there,

8 I could see that she basically -- she seemed like

9 she had a position with Larry where Larry -- she

10 was very entrusted to Larry.

11        I could see she had a lot of power in the

12 office. She was a can-do person, and whatnot.

13        In speaking to different people, I was

14 advised that she was very much of a confidante to

15 Larry, an extreme ally and employee.

16        (Pause.)

17        MS. LYONS:  Thank you, Mr. Robinson.

18        MR. SELDON:  I've got a couple.

19                  REDIRECT EXAMINATION

20        BY MR. SELDON:

21    Q    A quick question. You mentioned Mr.

22 Chapman was distinctly in control of his office, I

1 plan on the 9th. I see.

2          (Pause.)

3          No. Wait. Hold on one second.

4          (Pause.)

5          BY MR. SELDON:

6    Q    Correct me if I'm wrong, and you can look

7 back on Robinson Exhibit 4 if you like.

8          You interviewed Mr. Malloy on September

9 19th, I take it, for the first time?

10   A    For the first time would have been, yes.

11   Q    And then you interviewed him again on

12 October 10th?

13   A    Yes. I think, yes, he came back. He was

14 called back to Washington.

15   Q    And did he offer at that time to give

16 over his diaries, or no, if you recall?

17          (Pause.)

18   A    I don't recall. I don't believe so. I

19 know we didn't take them.

20   Q    Okay.

21   A    At that stage of the game, like I said,

22 just the same way with Mr. Truxal. At that stage of

Page 100

1 the game, they're not relevant to me, anyway.

2     Q     Okay.

3           MR. SELDON:  We're done at least. I don't

4 know about you.

5           MS. LYONS:  I'm done.

6           THE COURT REPORTER:  Signature?

7           MS. LYONS:  Yes. Mr. Robinson, you have

8 the option of reading everything that's been taken

9 down here today to make sure that it's accurate.

10          And I would suggest that, strongly

11 advise, in fact, that you do that.

12          It will come through me, and then I'll

13 get it to you, and then you'll give it back to me

14 and I'll give it back to him.

15          THE WITNESS:  Okay.

16          MS. LYONS:  Right.

17          THE COURT REPORTER:  Signature is not
   waived.

18          We're off the record.

19          (Signature not waived.)

20          (Whereupon, at 12:58 p.m., the taking of

21 the deposition was concluded.)

22

**STAFF MEETING MINUTES**
**REGION VI FORT WORTH**
**SEPTEMBER 23, 2002**

The regular quarterly staff meeting was held on September 23, 2002 at the Housing Fraud Initiative (HFI) conference room, 2201 East Lamar Boulevard, Suite 275, Arlington, Texas 76006 beginning at 1:00 p.m. The following employees were in attendance:

Larry Chapman, Special Agent in Charge, Fort Worth
James Malloy, Assistant Special Agent in Charge, Fort Worth
Daniel Truxal, Assistant Special Agent in Charge, Fort Worth
Max Eamiguel, Assistant Special Agent in Charge, Arlington
Windell Durant, Assistant District Inspector General for Audit, Arlington
Gayle Bowling, Auditor (HFI), Arlington
Loretta Burns, Auditor (HFI), Arlington
Jason Constantine, Special Agent, Oklahoma City
Don Driskill, Special Agent, New Orleans
Tammy Gilbert, Special Agent, Arlington
Gary Haley, Special Agent, Little Rock
Kathy Howell, Auditor (HFI), Arlington
Kimberly Jones, Special Agent, Fort Worth
Robert Jones, Special Agent, Arlington
Michael Kepler, Special Agent, Houston
Robert McClintock, Special Agent, Little Rock
Stan Mercer, Special Agent, Arlington
Orlando Mitchell, Special Agent, New Orleans
Gary Neitzel, Auditor (HFI), Arlington
Carlos Ontiveros, Special Agent, Arlington
David Pileggi, Special Agent, Houston
Alex Ramirez, Special Agent, San Antonio
Manuel Ramirez, Special Agent, Albuquerque
Andy Ramos, Special Agent, Albuquerque
Cortez Richardson, Special Agent, Oklahoma City
Steve Romero, Special Agent, Houston
Jim Sangsvang, Special Agent, San Antonio
Richard Smith, Special Agent, Arlington
Mark Wohl, Special Agent, Fort Worth
Sherry Armstrong, Office Automation Assistant, Fort Worth
Janeen Hess, Administrative Officer

Absent were Special Agent Paula Litz who is on continued detail to



DEPOSITION
EXHIBIT
#3
Robinson

Tampa; Special Agent Kedric McKnight who is on annual leave; Special Agent Robert Tighe who is working on a case in Louisiana; and, Special Agent Brandon Gardner who is attending school at the Federal Law Enforcement Training Center (FLETC), Brunswick, Georgia.

Assistant District Inspector General for Audit (ADIGA) Windell Durant introduced Auditor Leighton Eaves who will be joining our HFI staff beginning October 7, 2002.

Special Agent in Charge (SAC) Larry Chapman advised that a budget for the Office of Inspector General (OIG) had not yet been passed and that it is anticipated that we will be operating under a Continuing Resolution (CR) for some time. He continued that if staff members are asked by support staff for information, to please respond as quickly as possible since they are asking normally in response to a request from Headquarters. SAC Chapman said that the budget forecast for the upcoming year will be tighter.

SAC Chapman related that there will be no private offices in the future for agents and each staff member will be allotted 64 square feet or an 8 x 8 cubicle. This is what Headquarters has allocated and an argument was made by managers, but the decision was made not to allow private offices. This ruling will be in effect for any upcoming changes and several offices will be moving to other spaces in the future.

SAC Chapman said that the new senior management staff in Headquarters believes in the chain of command and all employees were advised to go through their appropriate chain of command. The Criminal Investigations Division (CID) is now the repository for files.

SAC Chapman said that Barbara Duffy is our desk officer and that she has a Monday briefing with the Inspector General and a Tuesday briefing with Deputy Assistant Inspector General for Investigation (DAIGI) Dan Salas and Director John Dupuy of CID on ongoing activities in the Region. He continued that all operations have been centralized with decisions being made by Headquarters.

SAC Chapman continued that agents are to write interviews up immediately and follow all rules as outlined in the manual chapter pertaining to interviews.

SAC Chapman cautioned all staff members to use caution when driving Government Owned Vehichles (GOVs) and to adhere to travel

regulations governing the operation of same. He also advised that rental cars are to be treated as if they are GOVs so all rules and regulations must be adhered to.

SAC Chapman advised that Internal Affairs staff has increased to fourteen agents.

In relation to use of cellular telephones, ASAC Malloy said that Deputy Inspector General Stephens had discussed their use at the recent Administrative Officers Conference in Tampa and he cautioned employees to be prudent when using cellular telephones. ASAC Malloy related that DIG Stephens was not against having cellular telephones, but that employees should use them in connection with official business.

SAC Chapman said that in relation to use of cellular telephones, if staff members go over limits continually, he would take action to remove them from the employee that is not paying attention to guidelines. He warned that the practice of using cellular telephones over and above plans will cease immediately as they account for a rather large portion of the budget.

SAC Chapman stated that in regard to travel, and according to recent GSA rulings that SATO must be used in connection with any official travel unless otherwise instructed by management. He said that he had discussed the matter with Assistant Inspector General for the Office of Management and Planning (OMAP) Nicholas Kehoe and these rules are in place and must be followed. Several comments were made by various staff members that many SATO employees speak with heavy accents and are very difficult to understand. SAC Chapman also said that SATO is now charging a fee for making reservations that will have to be absorbed into our travel budget.

SAC Chapman continued that travelers must pay their credit card bills within the allotted time whether or not they have been reimbursed by the Department. He encouraged all travelers to get their vouchers in as soon as possible after completing their travel. If credit cards are past due, travelers need to check on when and if they submitted payment.

SAC Chapman continued with general announcements of staff changes: Peter Emerzian who has been an ASAC in Atlanta has been selected as the Special Agent in Charge in Boston replacing Ray Carolan who retired; Jim Beaudette who has been an ASAC in Atlanta has been selected as the Special Agent in Charge replacing Dan Pifer who retired. He will be stationed in Los Angeles as the Headquarters for that District

is being moved from San Francisco to Los Angeles; former SAC Nancy Brown who has been assigned to special projects in Headquarters is returning to Kansas City as a GS-14 agent. He continued that there will be vacancies in Atlanta for a SAC as well as ASACs. SAC Chapman also said that the Emergency Medical Technician (EMT) program has been reinstated and those who had been trained would most likely be attending school to update their skills.

ASAC Malloy outlined the schedule for the week and said that firearms transition would take place on Tuesday and Wednesday. He continued that on Thursday, a discussion/training session would take place and among the topics would be the new reports that Headquarters is requiring and other administrative matters as well as a discussion with the auditors as to what they can do to assist agents with their cases. He also said that the discussion would include complaints and cases and missing documentation. ASAC Malloy went on to say that troubleshooting in advance can resolve problems and in relation to loan origination fraud, default rates should be checked. The schedule for Friday would be CPR training with the outstationed agents attending the morning session beginning at 9:00 am and the remainder of local employees would attend the afternoon session beginning at 1:00 pm. In relation to the annual certification forms in the packets that were handed out at the onset of the staff meeting, all documents must be completed and handed in before the day is out. In regard to the financial disclosure documents, if staff members needed to take them home to complete, that would be acceptable; however, they need to be returned as quickly as possible.

ASAC Dann Truxal briefly discussed the transitioning of weapons and advised all agents to bring all of their weapons and magazines on Tuesday and that there would be three documents to sign. Agents can use their current holsters on the range and then transition to the new Sig Sauer 229s. All agents are to meet at the Denton County Range at 9:00 am on Tuesday. He also advised that it had been approved to give 9mm ammunition to any law enforcement officer.

ASAC Malloy said that defensive tactics training would be held next quarter as would the PEB. He reminded agents that they must participate in the PEB even if they did not pass.

It was decided that if a range could be obtained, the next quarterly training session would be held December 2 - 6, 2002; however, an announcement would be forthcoming.

SAC Chapman again cautioned employees to be aware of cellular telephone usage. He continued that if we are under a Continuing Resolution, travel would be a top priority.

ASAC Malloy continued that staff members should take their responsibilities seriously. In relation to Internal Affairs, incidents would be presented to a United States Attorney to determine if it is a criminal matter and if there is prosecutive interest. He also advised that all interviews are being tape recorded.

ASAC Truxal cautioned about the "lack of candor".

SAC Chapman advised that the staff of Internal Affairs had gone from six to fourteen and all allegations are considered seriously. He cautioned staff members to adhere to the rules and don't provide a reason to be investigated or to be caught in a "gotcha" situation. He advised if asked by Internal Affairs and the staff member being questioned is uncertain or doesn't recall, to advise the interviewer that " I don't know" or "I don't recall". He continued that employees have individual rights and if an internal interview is requested, employees may want to call an attorney or at least contact FLEOA as staff members have rights as individuals and they may invoke these rights. He said that invasive questions may be asked and may beyond the scope of employment. SAC Chapman said that the circle has changed from the past. Allegations may have been made and agents may arrive unannounced to do an investigation over which managers have no control. When managers are tasked with reviewing an investigation for a decision on punishment (if warranted), managers must look at each aspect objectively and get down to the actual crux of the matter. Managers have no control over being assigned to make these decisions. He encouraged all staff members to exercise their individual rights and to also ask whether the matter is criminal, administrative or civil. He also advised employees that they have an obligation to tell the truth and must always be underline truthful in their answers if they know the answer to the question being asked. SAC Chapman said if the employee is a bargaining unit employee, that investigators do not have to talk to the subject first.

ASAC Malloy said that there have been no complaints about productivity; however, Headquarters is always pushing for more. He cautioned all staff members to not spread gossip and make every attempt to get along in the workplace.

SAC Chapman continued that federal employees are not protected

from defamation suits beyond the scope of their employment and could be sued by a fellow employee. He cautioned staff members to be aware of their actions and to not cause disruptive behavior in the work place. SAC Chapman expects all employees to treat each other with respect and courtesy; to be attentive; and, to get the job done. He said that he does not want anyone to be "branded" and wants all employees in this Region to keep focused on the mission vs. gossip.

SAC Chapman said there would be mini management reviews conducted by SID (Internal Affairs) on a yearly basis. This Region is scheduled for a full Management Assistance Review (MAR) this upcoming spring. He continued that under the new senior management staff, there is less field control and all matters are very centralized. He cautioned employees that it is critical to take care of business. Several comments were made by staff members in relation to the MAR and SAC Chapman responded that it is for internal controls and these reviews are done to see faults in methods of conducting business. He continued that there may be an amendment to the OIG Act for peer reviews which means that another agency would conduct the MARs.

A question has arisen in regard to pagers and SAC Chapman said that thinking may need to be readjusted and we may need to pare down expenses. Be prepared to talk to supervisors about this matter.

SAC Chapman advised that all employees should watch their e-mails and be cognizant of any personal e-mails vs. official.

In relation to Government Owned (Leased) Vehicles (GOVs), SAC Chapman advised there is a push on to use Alternative Fuel Vehicles (AFVs) although some areas are not conducive to obtaining AFV fuel. He continued that to obtain vehicles through GSA, the vehicles must be ordered at least a year in advance. SAC Chapman said that it was not our intent to order the new Crown Victorias that are police package equipped. He did add, however, that he had discussed our recent transfer from a private vendor to GSA with Assistant Inspector General for Investigation (AIGI) Haban who was happy with the transition and appeared to be satisfied with our current fleet. In relation to the AFV vehicles, there is a law enforcement exemption for vehicles that are used strictly for law enforcement. As it stands, Region VI will keep the fleet that we now have.

ASAC Malloy said that the annual report regarding the vehicles is now due and reminded drivers to keep their estimates close. He continued that drivers are responsible to report the number of gallons

consumed on a monthly basis and that beginning this new upcoming fiscal year, drivers will also need to report the dollar amount of their purchases of fuel by a total for the month and to keep receipts available. He continued that it is time to tighten belts.

ASAC Eamiguel advised that Headquarters is looking nationwide to conserve and currently there are 1.5 cars per person.

There being no further business, the meeting was adjourned.



| **Report of Investigation** | U. S. Department of Housing and Urban Development Office of Inspector General *Office of Investigation* |
|---|---|

| File Number: **SID 02 0047 I** | District/Office: Special Investigations Division (SID) |
|---|---|

Title:

**JAMES M. MALLOY, Assistant Special Agent in Charge (ASAC)**
**GS-1811-14, Investigations Southwest District**
**U.S. Department of Housing and Urban Development**
**Fort Worth, Texas**

**DANIEL JOSEPH TRUXAL, Assistant Special Agent in Charge (ASAC)**
**GS-1811-14, Investigations Southwest District**
**U.S. Department of Housing and Urban Development**
**Fort Worth, Texas**



DEPOSITION EXHIBIT #4 Robinson

Narrative:

This report is predicated upon the fact, that while conducting an official OIG investigation relating to the conduct of Special Agent in Charge (SAC) Larry CHAPMAN, Fort Worth, Texas, ASAC's James MALLOY and Daniel TRUXAL refused to cooperate in the investigation as witnesses, by denying access to their official government ledgers, diaries, and notes. This denial has resulted in a negative impact upon the initial investigation, and has resulted in contributing misconduct on behalf of ASAC's MALLOY and TRUXAL for their failure to cooperate.

**STANDARDS OF CONDUCT**

Refusal/Failure to cooperate in connection with an administrative investigation/during an OIG inquiry.

**DETAILS OF INVESTIGATION**

On September 19, 2002, ASAC James MALLOY was interviewed at the Fort Worth, Texas office in the capacity of a witness, relating to allegations concerning SAC Larry CHAPMAN.

| Report By: *John C. Robinson* JOHN C. ROBINSON Asst. To the Special Agent in Charge | Approved By: JOHN P. McCARTY Special Agent In Charge | Date: 10/09/02 |
|---|---|---|

This report is the property of the Office of Investigation. It contains neither recommendations nor conclusions of the Office of Inspector General. It and its contents may not be reproduced without written permission. The report is FOR OFFICIAL USE ONLY and its disclosure to unauthorized persons is prohibited. Public availability to be determined under 5 U.S.C. § 552.

HUD/SID AT-SAC Jerry Thomas was present for the interview. Prior to starting the interview, MALLOY was provided a written copy of his Administrative Advisement of Rights which he signed and acknowledged (EXHIBIT 1). Malloy provided a taped sworn statement, which was transcribed(EXHIBIT 2).

Prior to the completion of the interview, and while still under oath, MALLOY was requested to provide any official government ledgers, notes and diaries he maintained, that would be pertinent to the ongoing investigation relating to CHAPMAN. MALLOY in response stated that the only diaries that he maintained, were calendar diary books issued by the Federal Law Enforcement Officers Association. MALLOY motioned to these diaries, which were lying on the floor, and initially stated that he would provide copies of the diaries relating to the pertinent years requested.

During the afternoon of September 19, 2002, at approximately 12:20PM and following the completion of the interview with MALLOY, MALLOY approached this writer and ATSAC Thomas with a written typed note. MALLOY's unsigned note stated," I contacted my FLEOA lawyer and he advised me that he did not see the nexus for my agency requesting me as a witness to produce my personal diaries in a matter involving allegations of misuse of a govt vehicle and govt time regarding another federal employee. As such, my lawyer advised me not to release copies of my personal diaries to you." This writer acknowledged the note and initialed it (EXHIBIT 3). Malloy then verbally reiterated that he had changed his mind on providing the diaries as requested, based on the advice of his FLEOA attorney.

On September 19, 2002 ASAC Daniel TRUXAL was interviewed at the Fort Worth, Texas office in the capacity of a witness, also relating to allegations concerning SAC Larry CHAPMAN. HUD/SID ATSAC Jerry Thomas was present for the interview. Prior to starting the interview, TRUXAL was provided a written copy of his Administrative Advisement of Rights which he signed and acknowledged (EXHIBIT 4). TRUXAL provided a taped sworn statement. A transcript of the taped statement is attached as (EXHIBIT 5).

Prior to the completion of the interview, and while still under oath, TRUXAL was requested to provide any official government ledgers, notes and diaries that he maintained, that would be pertinent to the ongoing investigation relating to CHAPMAN. TRUXAL stated that he maintained records of his availability hours, and did keep diaries as well. However, TRUXAL snickered and then stated that he would not share his calendars or diaries. TRUXAL stated that he would consider going through his diaries and provide copies of what he found pertinent to the investigation. However, at time of this report, TRUXAL has not contacted this writer, nor has he provided any of the requested documents.

2

## LIST OF EXHIBITS

Exhibit 1. Administrative Advisement of Rights to ASAC James Malloy dated 09/19/02.

Exhibit 2. Transcript of interview of ASAC James Malloy dated 09-19-02.

Exhibit 3. Note of ASAC James Malloy denying viewing of diaries.

Exhibit 4. Administrative Advisement of Rights to ASAC Daniel Truxal

Exhibit 5. Transcript of interview of ASAC Daniel TRUXAL.

# ADMINISTRATIVE

# ADVISEMENT OF RIGHTS

Before we ask you any questions you must understand your responsibilities as an employee of the U.S. Department of Housing and Urban Development (HUD).

This is a purely administrative inquiry. The purpose of this interview is to obtain your responses to questions concerning Private Work on Govt. Time, Mis-use OGV     as relates to your official duties.

You have a duty as an employee of HUD to answer questions concerning your employment. Your failure to answer relevant and material questions, as they relate to your official duties, may cause you to be subjected to disciplinary action, including possible removal, by HUD.

Any information or evidence you furnish in response to questions put to you during this interview, or any information or evidence which is gained through your answers, may be used against you in administrative proceedings.

I have read the above advisement and understand its contents.

_____
      Signed

9/19/02
_____
                                    Date

_____
      Witness

OIGM 3000 Appendix 3c

I contacted my FLEOA lawyer and he advised me that he did not see the nexis for my agency requesting me as a witness to produce my personal diaries in a matter involving allegations of misuse of govt vehicle and govt time regarding another federal employee. As such, my lawyer advised me not to release copies of my personal diaries to you.

09/19/02 12:20 PM. JP.
Received from ASAC - James Malloy regarding denial of diaries.

# ADMINISTRATIVE

# ADVISEMENT OF RIGHTS

Before we ask you any questions you must understand your responsibilities as an employee of the U.S. Department of Housing and Urban Development (HUD).

This is a purely administrative inquiry. The purpose of this interview is to obtain your responses to questions concerning *Private Work on Govt. Time / Illegal Use of Gov.* as relates to your official duties. *unauthorized.*

You have a duty as an employee of HUD to answer questions concerning your employment. Your failure to answer relevant and material questions, as they relate to your official duties, may cause you to be subjected to disciplinary action, including possible removal, by HUD.

Any information or evidence you furnish in response to questions put to you during this interview, or any information or evidence which is gained through your answers, may be used against you in administrative proceedings.

I have read the above advisement and understand its contents.

_____          _____
Signed                                                        19 Sep 2002
                                                                    Date

_____
Witness

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
OFFICE OF INSPECTOR GENERAL
OFFICE OF INVESTIGATION

# INVESTIGATIVE PLAN
## CASE MANAGEMENT RECORD

Case Number: SID 02 0042 I                     Assigned Agent: JOHN C. ROBINSON

Title of Investigation:     LARRY CHAPMAN GS-15, SAC

                            HUD-OIG-Investigations

                            Fort Worth, Texas

Allegation(s): Subject may have misused his position, government time, and assigned government vehicle, while working on the construction of his new house during duty hours.

Statute/Regulation Violation(s): 18 USC 287-  False Claims
                            641-  Theft of Public Money
                            205-  Activities of Officers and employees in claims against and other matters affecting the Government
                            1001-  False Statements
                    Violations of the Rules of Conduct
                    5CFR 2635.101- Basic Obligation of public service
                            2635.701- Misuse of Position
                            2635.702-Use of Public Office for Private Gain
                            2635.704-Use of Government Property
                            2635.802-Conflicting outside employment and activities

Potential Loss(s): Unknown

Type of Investigation: Employee

---

Part A: Investigative Plan

---

| Initial Facts to<br>be Determined | Sources/<br>Leads |
|---|---|

Subjects HUD employment status-HUD Roster/OPF
Interview of Complainant
Obtain Financial Data-Choice Point/Equifax
Obtain and review time records, government cell phone/private cell phone records.
E-Mail Records

---

OI. 3000 Appendix 2b



Visit construction site
Obtain construction permits, inspection records, county fees paid, contractor data.
Talk to neighbors, workers, relating to construction site.
Photograph Construction site & inspect for related evidence
Consult with U.S. Attorneys Office in related Federal U.S. District, prosecution opinion
Interview of HUD employees, co-workers, and related witnesses
Interview of Subject

_____     _____
Case Agent's Signature           Supervisor's Approval