UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - -X

JAMES MALLOY,                    :

        Plaintiff        :

      v.                       : No. 04-1117(RJL)

                              :

ALPHONSO R. JACKSON,             :

        Defendant        :

- - - - - - - - - - - - - -X

DEPOSITION OF DANIEL SALAS

Washington, D.C.

Thursday, August 10, 2006

Deposition of DANIEL SALAS, called for

examination at 1:12 p.m., at the law offices of Robert

C. Seldon & Associates, P.C., 1319 F Street, N.W., Suite

305, Washington, D.C., before Gary S. Howard, a notary

public in and for the District of Columbia, when were

present on behalf of the respective parties:

1                    P-R-O-C-E-E-D-I-N-G-S

2 Whereupon,

3                    DANIEL SALAS

4 was called as a witness and, having been first duly

5 sworn, was examined and testified as follows:

6                    DIRECT EXAMINATION

7               BY MR. SELDON:

8     Q      Mr. Salas, good afternoon.

9     A      Good afternoon.

10    Q      Thank you for coming. I guess I should

11 ask you to begin with, are you currently employed

12 by the office of inspector general of the

13 department --

14    A      Yes, I am.

15    Q      That's the Department of Housing and

16 Urban Development?

17    A      Yes, sir.

18    Q      What position do you presently hold?

19    A      I'm the special agent in charge of Region

20 6, which is located in Arlington, Texas.

21    Q      Many of the events that we're to talk

22 about occurred in the fall of 2002.

1          Were you with HUD office of inspector

2 general at that time?

3    A     Yes, sir, I was.

4    Q     In what capacity?

5    A     In August of 2002, I was a deputy

6 assistant inspector general for investigations in

7 Washington, D.C., at headquarters.

8    Q     Did you report to the assistant inspector

9 general for investigations?

10   A     Yes, sir, I did.

11   Q     And who was that?

12   A     Joe Haban.

13   Q     Thank you. Mr. Salas, let me explain what

14 we're doing here today and again, to thank you for

15 coming.

16         We represent the Plaintiff, Jim Malloy,

17 in a case of employment discrimination and

18 retaliation that he's brought in the United States

19 District Court here in Washington, D.C.

20         If this case proceeds to trial, we would

21 or could have need of your testimony. And because

22 you are outside of this jurisdiction, and

1    Q      Ready to go?

2    A      I'm ready.

3           MR. SELDON:  Ms. Lyons, ready?

4           MS. LYONS:  Yes. I'd just ask the Witness

5 to remember to let him finish the question and then

6 you answer, and that will help us all get this

7 clearly done.

8           MR. SELDON:  Thanks.

9           BY MR. SELDON:

10   Q      Mr. Salas, let me begin by asking, did

11 you ever have an occasion to file an administrative

12 complaint of discrimination while you were at HUD

13 OIG?

14   A      Are you asking me if I have ever filed an

15 EEO complaint?

16   Q      While you were at HUD OIG?

17   A      Yes, sir, I did.

18   Q      Do you recall when that was,

19 approximately?

20   A      The formal complaint, I believe, was in

21 February of 2005.

22   Q      And that was in connection with your

1 employment, I take it.

2    A    Yes, sir.

3    Q    And at that time, you were the deputy

4 assistant inspector general for investigation?

5    A    Yes, sir, I was.

6    Q    And Mr. Haban was the assistant inspector

7 general for investigation to whom you answered?

8    A    Yes, sir.

9    Q    After that happened, did you remain in

10 that position as deputy assistant inspector

11 general?

12    A    For a period of time, I did. And then I

13 was reassigned as a special assistant to the deputy

14 inspector general for inspections and evaluations.

15    Q    Was that voluntary on your part, to leave

16 the deputy inspector general position?

17    A    No, sir, it was not. I was reassigned.

18    Q    Was that by Mr. Haban?

19    A    I was reassigned by the inspector

20 general.

21    Q    Himself?

22    A    Yes, sir.

1    Q    Did you believe or have reason to believe

2 whether that constituted an act of discrimination

3 or retaliation?

4    A    I thought it was in retaliation for me

5 filing an EEO complaint, yes, sir.

6    Q    Okay. Thank you. Thank you for your

7 candor, Mr. Salas.

8         When did you report as deputy assistant

9 inspector general for investigation?

10    A    In August of 2002.

11    Q    One of the things we'll be doing because

12 we'll have these facts a little more established

13 when we go to trial, my records indicate that it

14 was on or about August 25th, 2002.

15         Is that about your recollection as well?

16    A    Yes, sir.

17    Q    Okay. And then -- and we'll get to the

18 exhibit in a moment -- I take it on October 10th,

19 2002, you issued a memorandum placing James Malloy,

20 the Plaintiff in this action, on administrative

21 leave.

22    A    Yes, sir, I did.

1 decision alone to take those actions?

2     A     No, sir, I did not.

3     Q     Who else participated in those decisions?

4     A     Joseph Haban.

5     Q     And would you tell me what role you

6 played and what role Mr. Haban played?

7     A     The discussion -- there was a discussion

8 based on what Mr. Malloy had been involved in in

9 his office in Texas having to do with him being

10 involved or having knowledge of an investigation

11 that the special investigations division was

12 conducting.

13     Q     Okay. And then, if I read this memorandum

14 correctly, it says, I -- meaning

15 you -- have been apprised that Mr. Malloy refused

16 certain information requests that have been made in

17 connection with an investigation, which I  assume

18 is the one that you just spoke about.

19     A     Yes, sir.

20     Q     Okay.  Now what I'd like to know to begin

21 with was did you speak directly with the special

22 investigation division, or SID, investigators about

1 this?

2    A    No, sir, I did not.

3    Q    Did you speak with the head of SID about

4 this?

5    A    No, sir, I did not.

6    Q    Had you reviewed a report of

7 investigation about this?

8    A    No, I did not.

9    Q    Other documentation in connection with

10 this?

11    A    No, sir.

12    Q    What led you to say, then, that you had

13 been apprised that Mr. Malloy had refused certain

14 information request?

15         Or perhaps I should say here right now,

16 what were the certain information requests that you

17 had been apprised Mr. Malloy refused?

18    A    Mr. Haban had advised me that during the

19 investigation, that he refused to turn over a

20 daytimer, also known as a diary, of his work that

21 reflected some of his work hours.

22    Q    Okay. And was there anything else that he

1 refused?

2     A     Not to my knowledge.

3     Q     Okay. Did Mr. Haban give you any

4 documentation or reports of investigation showing

5 that Mr. Malloy had in fact done this?

6     A     No, sir, he didn't.

7     Q     Did he give you any memoranda of

8 interviews or memos that he had had that showed Mr.

9 Malloy had done this?

10    A     Not that I recall, sir.

11    Q     The memorandum that is here that is Salas

12 Exhibit 1, did you write that yourself, sir?

13    A     No, sir, I did not.

14    Q     Who else participated in the preparation

15 of this document?

16    A     Brian Sadler wrote the memo.

17    Q     Who is he, for the record?

18    A     He is the counsel to the inspector

19 general.

20    Q     Okay. Did he write the entire memo?

21    A     Yes, sir.

22    Q     Okay. Thank you, Mr. Salas. And later in

1 this, there's a statement in here -- Additionally,

2 allegations have come to light concerning efforts

3 by certain persons to interfere with and to

4 undermine the disciplinary process associated with

5 two other SID investigations.

6          Is that again, to your knowledge,

7 referencing Mr. Malloy's undermining the

8 disciplinary process?

9          That's on page one.

10    A    Okay.

11    Q    In the first paragraph.

12         (Pause.)

13    A    Would you repeat the question?

14    Q    Yes. There's a reference in this

15 memorandum, Salas Exhibit 1 -- Additionally,

16 allegations have come to light concerning efforts

17 by certain persons to -- and I'll go dot, dot,

18 dot -- undermine the disciplinary process

19 associated with two other SID investigations.

20         Was that a reference to Mr. Malloy,

21 supposedly undermining the disciplinary process?

22    A    There was -- I received during this time

1 period, or prior to the memo issued for placing Mr.

2 Malloy on administrative leave, a phone call from

3 Max Emogal, who was the assistant special agent in

4 charge in the office there in Arlington, advising

5 me that he had been present during a meeting or

6 training session where Mr. Malloy was present.

7          And he advised me by phone that Mr.

8 Malloy had indicated to him, or had indicated at

9 that training session, that he had told the persons

10 that were present that SID had been conducting an

11 investigation, and it was time to circle the

12 wagons.

13    Q    Okay. And that's what that's a reference

14 to?

15    A    Yes, sir.

16    Q    Okay. And was that subsequently

17 investigated by the special investigations

18 division?

19    A    To my knowledge, it was.

20    Q    Okay.  And did they brief you on the

21 results of that investigation?

22    A    No, they did not.

1     Q     Okay. So what I'm going to do now is I'll

2 mark as Salas Exhibit 2 -- this is a statement of

3 Donald Driskill.

4           THE COURT REPORTER:  No. 2.

5                (The document referred to

6                 was marked for identification

7                 as Deposition Exhibit No. 2.)

8           BY MR. SELDON:

9     Q     Now, I'll sort of represent to you as we

10 go through this, and this will be clear by the time

11 we get to trial, this is a statement that Mr.

12 Driskill signed in connection with an investigation

13 by special investigations division about this

14 quote, unquote, all hands meeting at the Arlington

15 office on September 23rd, 2002.

16           And I think it concerns the question

17 whether anyone at that meeting said, we have to

18 circle the wagons.

19           This is a document from the SID

20 investigation.

21     A     Okay.

22     Q     Now I'll read a bit here and I'll ask you

1 a question.

2          It says to Mr. Driskill -- who is Mr.

3 Driskill, by the way?

4     A    I believe Driskill was special agent with

5 our agency. And I think he was assigned to New

6 Orleans.

7     Q    Okay.

8     A    I believe that's where he was assigned.

9     Q    So as we look down this, it says, to Mr.

10 Driskill -- this is in writing and it's a sworn

11 statement, I believe.

12          (Pause.)

13          Yes, it is.  Question to Mr. Driskill --

14 Did you attend the all-hands meeting at the

15 Arlington HFI office on September 23rd, 2002?

16          Mr. Driskill answers yes.

17          Do you see that at that point?

18     A    Yes.

19     Q    Now the next question is -- Question --

20 Did you hear anyone at the meeting make statements

21 similar to the following:

22          Quote -- we have to circle the wagons,

1 end quote.

2        Quote -- let's get our stories straight,

3 end quote.

4        Quote -- they can't make you remember

5 things, end quote.

6        And the answer by Mr. Driskill was, what,

7 now?

8    A    No.

9        MS. LYONS:  Objection. Where are you

10 going with this?  This is a statement by another

11 witness and you're asking him to confirm that he

12 can read.

13        MR. SELDON:  No. My next question was,

14 did anyone brief you that Mr. Driskill had denied

15 that Mr. Malloy had made such a statement about

16 circling the wagons at this meeting?

17        MS. LYONS:  I don't think it's necessary

18 to read the whole document into the record. But you

19 can ask the Witness to read the document and then

20 ask him questions.

21        MR. SELDON:  Okay. If you want to keep

22 reading it, that's fine. But I don't know how else

1 to get out that Mr. Driskill denied having heard

2 this.

3          And what I'm trying to find out, has

4 anyone briefed you on the fact that Mr. Driskill

5 denied having heard any such statement made?

6          MS. LYONS:  He's already testified --

7 well, I don't think you've asked him if he's ever

8 seen this document before.

9          MR. SELDON:  I didn't say he did. I said,

10 this is a document from the SID investigation.

11          And what I'm trying to find out is if

12 anyone briefed him on the fact that Mr. Driskill

13 denied that Mr. Malloy had made this statement?

14          BY MR. SELDON:

15    Q    Did anyone ever brief you on that, sir?

16    A    I don't recall anyone briefing me on this

17 at all.

18    Q    Okay.

19          MR. SELDON:  Would you mark this as Salas

20 Exhibit 3?

21          THE COURT REPORTER:  No. 3.

22                (The document referred to

1                    was marked for identification

2                    as Deposition Exhibit No. 3.)

3          BY MR. SELDON:

4     Q     This is a statement by a gentleman by the

5 name of Orlando Mitchell, also sworn to as part of

6 the SID investigation.

7          Orlando Mitchell -- do you know who that

8 was, sir?

9     A     Yes, sir. He was formerly an agent with

10 our organization.

11    Q     Okay. Now, once again, the same questions

12 were put to Mr. Mitchell about whether he attended

13 the all-hands meeting at the Arlington office.

14          He answered yes.

15          And then he's asked whether -- did you

16 hear anyone making statements similar to -- we have

17 to circle the wagons?

18          Mr. Mitchell answered no.

19          I'm going to ask you if anyone at SID

20 briefed you that Mr. Mitchell had denied having

21 heard Mr. Malloy make those statements?

22    A     No, sir.

1    Q     Now what I'd like to do next is have

2 marked Salas Exhibit 4.

3            THE COURT REPORTER:  No. 4.

4                   (The document referred to

5                    was marked for identification

6                    as Deposition Exhibit No. 4.)

7            BY MR. SELDON:

8    Q     Mr. Salas, this is a statement made by

9 Jason Constantine, also sworn to.

10           Do you know who he is, sir?

11    A     Yes. He was -- I believe he at the time

12 was an agent with our organization. And I'm not

13 sure if he's still with us.

14    Q     Okay. Was he also in Texas?  If you don't

15 recall, that's all right.

16    A     I don't recall if he was in Texas.

17    Q     Like the other witnesses, Mr. Constantine

18 was asked whether he attended the meeting in Texas

19 on September 23rd, and also asked, did you hear

20 anyone make statements similar to -- we have to

21 circle the wagons?

22           Mr. Constantine answered -- no, I did

1 not.

2         Now what I'm going to ask you is, did Mr.

3 Haban or anyone with the special investigations

4 division brief you on Mr. Constantine's statement?

5    A    I don't recall anyone briefing me on that

6 statement.

7    Q    Was the special investigations division

8 under Mr. Haban's direction at that point in time?

9         MS. LYONS:  At the time the statement was

10 made?

11        MR. SELDON:  Correct.  That's October,

12 '02.

13        THE WITNESS:  I believe he was.

14        MR. SELDON:  Okay.  Now we're up to Salas

15 Exhibit 5.

16        THE COURT REPORTER:  No. 5.

17            (The document referred to

18             was marked for identification

19             as Deposition Exhibit No. 5.)

20        BY MR. SELDON:

21    Q    This is, similarly, a statement by a

22 fellow by the name of Jim Sangsang. It is again a

1 sworn statement, and it was part of the SID

2 investigation into Mr. Malloy supposedly making

3 comments interfering with an investigation.

4          Mr. Sangsang was asked -- did he attend

5 the all-hands meeting in Arlington, Texas?

6          He answered yes.

7          He was then asked -- did you hear anyone

8 at the meeting make statements similar to the

9 following -- we have to circle the wagons?

10          He answered no.

11          What I'm going to ask you, sir, is

12 whether Mr. Haban or SID or anyone else briefed you

13 on the fact that Mr. Sangsang had denied that Mr.

14 Malloy made those statements?

15     A     I don't recall anyone briefing me on

16 that.

17     Q     Okay. Now I'm going to show you Salas

18 Exhibit 6.

19          THE COURT REPORTER:  No. 6.

20               (The document referred to

21               was marked for identification

22               as Deposition Exhibit No. 6.)

Page 24

1          BY MR. SELDON:

2     Q     This is a document, a statement in the

3 same investigation, by Andres Ramos III. He too had

4 the same questions put to him.

5          Did you attend the all-hands meeting at

6 the Arlington, Texas office, the one in question?

7          He answered yes.

8          Did you hear anyone at the meeting make

9 statements similar to the following -- we have to

10 circle the wagons?

11          And he answered no.

12          Did Mr. Haban or SID or anybody else

13 brief you on the fact that Mr. Ramos had denied

14 hearing any such statements?

15    A     I don't recall anyone briefing me on

16 that.

17    Q     Okay.

18          MR. SELDON:  Now we're up to Salas

19 Exhibit --

20          THE COURT REPORTER:  Seven.

21               (The document referred to

22               was marked for identification

1                  as Deposition Exhibit No. 7.)

2          BY MR. SELDON:

3     Q     And this is a statement, sir, in the same

4 investigation by a Mr. Manuel Ramirez, also sworn.

5 He was asked the same questions, whether he

6 attended the all-hands meeting in the Texas office

7 on September 23rd, '02.

8              He answered yes.

9              He was asked -- did you hear anyone at

10 the meeting make statements similar to the

11 following -- we have to circle the wagons?

12             And he answered -- I did not hear anyone

13 make any such or similar statements.

14             Did Mr. Haban, anyone in SID, or anyone

15 else in the office of inspector general

16 headquarters, brief you on the fact that Mr.

17 Ramirez had denied hearing Mr. Malloy make any such

18 statements?

19     A     No, sir, I don't recall anyone doing

20 that.

21             MR. SELDON:  Now let's go to Salas

22 Exhibit 8.

1          THE COURT REPORTER:  No. 8.

2                    (The document referred to

3                     was marked for identification

4                     as Deposition Exhibit No. 8.)

5          BY MR. SELDON:

6     Q     This is a statement, sir, by a David

7 Pileggi. And it's also a sworn statement. It's also

8 in connection with this investigation. And like the

9 other witnesses, Mr. Pileggi had the statement

10 asked of him -- did you attend the all-hands

11 meeting at the Arlington office on September 23rd,

12 '02?

13          He answered yes.

14          The question was put to him -- did you

15 hear anyone at the meeting make statements similar

16 to the following -- we have to circle the wagons?

17          And his answer was no.

18          What I'll ask you, sir, is whether Mr.

19 Haban, anyone in the special investigation

20 division, or anyone else in HUD office of inspector

21 general headquarters, brief you on the fact that

22 Mr. Pileggi had denied hearing Mr. Malloy make

Page 27

1 these statements?

2    A    No, sir, I don't recall that.

3    Q    Okay. At some point, while he was on

4 administrative leave, did Mr. Malloy send you a

5 memo or a note asking to be restored to duty?

6        If you don't recall, that's fine. I've

7 got a document.

8    A    I don't recall exactly what was on the

9 memo that he sent me.

10    Q    Okay.

11    A    It took me a while to read it because of

12 his handwriting.

13    Q    Okay. How about if we give you a copy of

14 what I think it is.

15    A    Okay.

16        THE COURT REPORTER:  That will be Exhibit

17 No. 9.

18             (The document referred to

19              was marked for identification

20              as Deposition Exhibit No. 9.)

21        BY MR. SELDON:

22    Q    And this is on October 15th, 2002?

1    A    Yes, sir. It seems like I've seen this

2 before.

3    Q    This was the memo that Mr. Malloy sent to

4 you, wanting to get restored, I take it, or off

5 administrative leave?

6    A    Okay.

7    Q    And he references in here, I think, that

8 the diaries that were wanted by the investigators

9 were personal diaries.

10        MS. LYONS:  Are you asking the Witness if

11 that's what the document says?

12        MR. SELDON:  Well, I'm pointing it to his

13 attention and I'm going to ask him a question.

14        MS. LYONS:  You can ask if he sees that

15 in this and then ask him a question if you like.

16        MR. SELDON:  Okay.

17        BY MR. SELDON:

18    Q    In the middle of the document, do you see

19 a discussion by Mr. Malloy about him being asked by

20 investigator Jerry Thomas about personal diaries?

21    A    Where it says -- make copies of my

22 personal diaries?

1     Q     Yes.  Well, I see it a little bit farther

2 down.

3     A     Okay. Yes, I see it.

4     Q     Okay. And essentially, Mr. Malloy, did

5 you understand, was telling you that the documents

6 that have been requested of him were personal

7 documents?

8           (Pause.)

9     A     I understood this to mean that the

10 request that the agents were making were diaries.

11 Not only would they be personal, but possibly have

12 information on his day-to-day activities.

13    Q     Okay, that's fair.  So what I'd like to

14 then show you is the next document, which is a

15 letter which I believe -- I know -- went from me to

16 you.

17           THE COURT REPORTER:  No. 10.

18                 (The document referred to

19                  was marked for identification

20                  as Deposition Exhibit No. 10.)

21           BY MR. SELDON:

22    Q     And we'll see if you recognize it.

1 of Region 6 or to OIG's official business.

2         BY MR. SELDON:

3    Q    Do you recall getting this request and

4 seeing that statement in there?

5    A    Yes, sir. I remember getting it and

6 reading it.

7    Q    Okay. Now I'm going to show you what

8 we'll mark as Salas Exhibit 11.

9         THE COURT REPORTER:  No. 11.

10             (The document referred to

11                  was marked for identification

12                  as Deposition Exhibit No. 11.)

13        BY MR. SELDON:

14   Q    And I guess in 10, before we go farther,

15 I suppose, would it be fair to say that Mr. Malloy,

16 through his counsel, me, was asking to be taken off

17 administrative leave and returned to duty?

18        (Pause.)

19   A    Would you repeat the question, please?

20   Q    Yes. This also contained a request that

21 Mr. Malloy would be restored immediately to active

22 duty, I take it.

1    A    Yes, sir.

2    Q    Okay. So now, can you tell us what the

3 document is that's been marked as Salas Exhibit 11?

4         (Pause.)

5    A    It's the letter that I sent you in reply

6 to Exhibit 10.

7    Q    And this is correct, is it not, that it

8 denied the request on behalf of Mr. Malloy to

9 restore him to active duty?

10         (Pause.)

11         MS. LYONS:  I'm sorry, Mr. Seldon. What

12 is your question?

13         BY MR. SELDON:

14    Q    Was this a letter that denied the request

15 on behalf of Mr. Malloy to restore him to active

16 duty?

17         MS. LYONS:  I'm not sure I understand

18 your question. But if the Witness does, he can

19 answer.

20         (Pause.)

21         THE WITNESS:  This is a document telling

22 Mr. Malloy that he is to remain on administrative

1 leave.  And that's what it implies, that he's not

2 going back to active duty, to stay on

3 administrative leave.

4           BY MR. SELDON:

5    Q    Now in Salas Exhibit 10, my letter to

6 you, we had asked that the scope of the office of

7 inspector general investigation involving Mr.

8 Malloy be defined.

9           So let's leave it right there.

10          Was that defined in your memorandum, the

11 one you signed, Salas Exhibit 11?

12          (Pause.)

13          MS. LYONS:  Objection. Foundation. This

14 was an investigation conducted by an organization

15 that this Witness has testified he had no

16 involvement with.

17          MR. SELDON:  If that's his answer, that's

18 fine.

19          THE WITNESS:  That is my answer.

20          MR. SELDON:  Okay.

21          BY MR. SELDON:

22    Q    But you did -- I think you said that your

1 immediate supervisor was Mr. Haban.

2    A    On --

3    Q    October 28th, 2002.

4    A    Regarding Exhibit 10, and also Exhibit

5 11, that information was turned over to AIGI Haban.

6 And as a result of that, the letters were written

7 and sent.

8    Q    Okay. That's fair enough. Salas Exhibit

9 11, the memorandum denying Mr. Malloy's request to

10 be restored, taken off administrative leave, were

11 you the sole author of this letter?

12    A    No.

13    Q    Did you write any of it yourself?

14    A    It was drafted by legal counsel.

15    Q    Okay. And did you have input into the

16 decisions here at all?

17    A    The decisions having to do with placing

18 Mr. Malloy on administrative leave was made by AIGI

19 Haban.

20    Q    And what about keeping him on

21 administrative leave, not restoring him?

22    A    That was made by him as well.

1     A     It depends on how you define regular.

2     Q     Okay. It is part of their mission,

3 though.

4     A     It is part of their mission.

5     Q     Without going into the details of it, or

6 whether they were accurate or not, were there any

7 allegations of misconduct made against you prior to

8 your appointment as deputy assistant inspector

9 general?

10          (Pause.)

11     A     I believe there was in an EEO complaint.

12     Q     Okay. And were these allegations brought

13 to the attention of either the secretary of housing

14 and urban development or Mr. Haban?

15     A     I believe they were.

16     Q     Okay. And was this at the time you were

17 being considered for promotion to deputy assistant

18 inspector general?

19     A     Yes, sir.

20     Q     Were you placed on administrative leave

21 during that time?

22     A     No, sir.

Page 37

1    Q    Were you formally investigated?

2    A    There was an investigation to see if the

3 allegation was true.

4    Q    But were you ever required to give a

5 sworn statement?

6    A    I believe I signed a memo and gave it to

7 the deputy assistant, or the deputy inspector

8 general.

9    Q    Were you ever interviewed in person by

10 investigators in connection with that matter?

11         MS. LYONS:  That matter being the EEO

12 complaint?

13         MR. SELDON:  No. The allegations of

14 misconduct.

15         THE WITNESS:  No, I was not.

16         MR. SELDON:  Let's go off the record.

17         THE COURT REPORTER:  We're off the

18 record.

19         (Recess.)

20         THE COURT REPORTER:  We're back on the

21 record.

22         MR. SELDON:  Mr. Salas, thanks. We don't

1 have any further questions on Direct.

2          MS. LYONS:  Mr. Salas, I have just a few

3 questions for you today.

4                    CROSS EXAMINATION

5          BY MS. LYONS:

6    Q     I want to go back to something you were

7 talking to Mr. Seldon about regarding an

8 investigation of alleged misconduct of you.

9          Do you recall that testimony?

10   A     Yes.

11   Q     You said that, essentially, you were

12 investigated for some sort of alleged misconduct.

13         Can you tell us briefly, what was the

14 allegation?

15   A     It was an EEO complaint by one of Mr.

16 Seldon's former clients. And there was an

17 allegation in the complaint of sexual harassment

18 and some other allegations in that particular

19 complaint.

20         In addition to that, there was some

21 issues where the divorce from my ex-wife came into

22 play.

1 to be unfounded, and it was resolved.

2     Q     Okay. Mr. Seldon asked you before whether

3 you were required to give a sworn statement in

4 connection with an investigation.

5           Am I to understand from what you just

6 said that you were interviewed by Mr. Stevens about

7 it?

8     A     No. He asked me to write up a memo and

9 give it to him, explaining the matter. And I

10 did.

11     Q     Did you feel that you were required to

12 give that statement to deputy IG Stevens?

13     A     Yes, I did.

14     Q     Did you give a statement in connection

15 with the investigation of the EEO complaint by Mr.

16 Seldon's former client?

17     A     I'm not sure I understand the question.

18 Did I give a statement regarding what?

19     Q     A statement regarding the allegations of,

20 I think you said, sexual harassment by Mr. Seldon's

21 former client.

22     A     I believe I did.

Page 42

1    Q    Did you feel at the time that you gave

2 that statement, that you were required to cooperate

3 with the EEO investigation?

4    A    I certainly did.

5         MS. LYONS:  No further questions.

6                  REDIRECT EXAMINATION

7         BY MR. SELDON:

8    Q    Just very quickly, Mr. Salas. I just want

9 to be clear.

10        This matter that you gave a written

11 statement in -- and I'm not saying that any of

12 these allegations by your ex-wife were ever proven

13 and I want to be clear about that.

14        But I take it there was a time when they

15 were under some sort of inquiry or investigation,

16 okay?

17   A    There was an inquiry.

18   Q    And this was during the time you were

19 being considered for, or had been selected for

20 deputy assistant inspector general, or what?

21   A    It was during that period of time.

22   Q    Okay. And were you ever placed on

1 administrative leave?

2    A    No, sir.

3    Q    Were you ever escorted off the premises

4 and told to turn in your ID?

5    A    No, sir.

6    Q    Ever told not to have any contact with
HUD OIG employees?

7    A    No, sir.

   Q    Thanks, sir.

8        MR. SELDON:  No further questions.

        MS. LYONS:  I think we're done.

9        THE WITNESS:  Okay.

        MS. LYONS:  Mr. Salas, you have the

10 option to read and sign the transcript of the
deposition that we've prepared today.

11        I'd like you to exercise that option, if
it's okay with you.

12        THE WITNESS:  Okay.

        MS. LYONS:  Great.

13        THE COURT REPORTER:  Signature is not
waived.

14        We're off the record.

15        (Signature not waived.)

16        (Whereupon, at 2:17 p.m., the taking of
the deposition was concluded.)

17

18                ------------------------

19                        Daniel Salas

20

21

22



U.S. Department of Housing and Urban Development

## Office of Inspector General

451 7th St., S.W.
Washington, D.C. 20410-4500


October 10, 2002


MEMORANDUM FOR: James Malloy, Assistant Special Agent in Charge, 6AGI

FROM: Daniel P. Salas, Deputy Assistant Inspector General for Investigations, GI


SUBJECT: Placement on Administrative Leave


As you are aware, Special Investigations Division (SID) opened an investigation of an employee's questionable use of official time and equipment within the Office of Investigation, Fort Worth Regional Office. I have been apprised that you have refused certain information requests that have been made in connection with this investigation. Additionally, allegations have come to light concerning efforts by certain persons to interfere with the investigation and to undermine the disciplinary process associated with two other SID investigations. In the interests of ensuring a thorough and objective investigation of the allegations that have been made, and in light of your position, I cannot allow you to carry on your responsibilities as Assistant Special Agent in Charge during the pendency of the investigation. Accordingly, I am placing you on administrative leave until further notice.

You are hereby ordered to comply immediately with the following terms:

a) Turn in any and all government identification, specifically including your HUD identification badge, and your OIG credentials. Also surrender your weapon(s), vehicle, vehicle keys, office keys, card entry keys, laptop computer(s), palmtop computer(s), cellular telephone(s), pager(s), key fob(s), and any other Government- or OIG-issued equipment. You are directed to return these items to Max Y. Eamiguel, Assistant Special Agent in Charge, immediately, and to disclose any passwords or codes necessary to activate or use such equipment or open security controlled files. Prior to your surrender of such equipment, you shall not log on to, log off of, gain access to, or otherwise manipulate any equipment capable of storing information, nor may you delete any information saved on your computer or electronic storage media. To the extent that you have such identification or equipment at your home or elsewhere, you are directed to arrange to return the same to Mr. Eamiguel by 12:00 p.m. tomorrow.



b) You are prohibited from entering, or attempting to enter the OIG Fort Worth Regional Office, and any other facility housing HUD or HUD OIG employees anywhere unless your are previously and expressly authorized to do so by me or my supervisors. Accordingly, you should remove, or make arrangements for the removal of, all of your personal possessions prior to exiting the Fort Worth office tomorrow. All files (hard-copy or electronic) that you deem to be personal must be reviewed by Mr. Eamiguel prior to their removal, and you are hereby expressly advised that you have no expectation of privacy in any materials remaining in the Fort Worth office following your departure tomorrow.

c) Provide a phone number and an address where you may be reached during this period of Administrative Leave. Please give this information directly to Mr. Eamiguel.

d) You are hereby directed to have no contact (verbal, telephonic, electronic, or in writing) with any HUD OIG employees, except for me or my supervisors, while you are on Administrative Leave during the course of the investigation.

Should you have any question about any matter regarding your HUD employment benefits, you may call the Bureau of Public Debt.

Memorandum For: Daniel Salas, Deputy Assistant Inspector General for Investigation

From: James M Malloy

Subject: Personal Records

On or about Wednesday, September 18, 2002, I was interviewed by John Robinson and Jerry Thomas from HUD-OIG/SID and was advised that I was a witness regarding allegations that since retired SAC Larry Chapman had misused government equipment and time to build a house on his personal property. This interview occurred in my Fort Worth office and was taped by these agents. At the end of the interview, Thomas requested that I make copies of my personal diaries for calendar year 2001 and 2002 and provide him with these records after I had copied them. After the agents left my office, I contacted FLEOA regarding Thomas' request and Larry Berger, FLEOA counsel, saw no need for Thomas' request for my personal diaries in an investigation involving another employee. After getting off the phone with Berger, and I located Thomas and Robinson in a vacant office in our Fort Worth space and told them what Berger had told me. I also told Thomas, in Robinson's presence, that there was nothing in my personal diaries about any misconduct issues involving Chapman.

This document will serve as notice to you that the documents SID requested are personal in nature. I have reviewed them and there is nothing there which relates to Chapman's alleged misconduct. Although I am reluctant to provide personal information upon request, I will provide any documentation or information categories of documents or information that are specific to the SID investigation or to OIG business.

James M. Malloy

DEPOSITION
EXHIBIT
#9
Salas
8-10-06
PENGAD 800-631-6989

# *Project LAW*

**Project On Liberty And The Workplace**
**1319 F Street, N.W., Suite 305**
**Washington, DC 20004**
**202-955-6968 · fax: 202-318-2287 ·www.projectlaw.org**

October 18, 2002

<u>**VIA TELECOPIER**</u>
Mr. Daniel P. Salas
Deputy Assistant Inspector General For Investigation
Department of Housing and Urban Development
Office of Inspector General
451 Seventh Street, S.W., Room 8274
Washington, D.C. 20410-4500

          Re:    <u>James Malloy</u>

Dear Mr. Salas:


We have been retained to represent James Malloy, ASAC in Region 6, in the pursuit of his reinstatement and other related matters.

On October 10, 2002, you issued a memorandum which relieved Mr. Malloy of his duties and placed him on administrative leave. You took this action after being "apprised that" Mr. Malloy "refused certain information requests . . . in connection with" an on-going "investigation" in Region 6.

I believe that there has been a misunderstanding concerning Mr. Malloy which I am hopeful of correcting, with the aim of seeing Mr. Malloy fully restored to duty immediately.

Mr. Malloy has asked that I assure OIG of his loyalty to the organization, of the fact that he has cooperated fully with the investigation of Region 6, and of this intention to continue cooperating fully.

Apparently, during this investigation, Mr. Malloy was asked to turn over records which are personal. Mr. Malloy has reviewed these records and affirmed that there is nothing which relates to potential misconduct on the part of anyone or to the investigation of Region 6, as he has been advised of its scope. Mr. Malloy has also affirmed that upon request, he is perfectly willing to turn over all records relating to OIG's investigation, whether business or personal, so long as OIG will define the scope of the investigation for him. His offer extends to particular



Mr. Daniel P. Salas, DAIGI
Page 2
October 18, 2002

documents or information which OIG identifies; and to categories of documents or information, as well. The only limitation upon Mr. Malloy's offer is that OIG's request either pertain to the investigation of Region 6 or to OIG's official business.

I sincerely hope that the record has now been set straight and that you will restore Mr. Malloy immediately.

As a courtesy, I wanted you to know that Mr. Malloy either has already or is about to initiate the informal EEO process over being placed on administrative leave, which followed immediately upon his refusal to impose excessively harsh discipline on two minority agents under his immediate supervision. Again, I hope that we can resolve this matter before that process goes any farther.

Please feel free to contact me directly, or to have a member of OIG's Counsel's Office contact me, if doing so would help resolve this matter.

Very truly yours,

Robert C. Seldon

Cc:    James Malloy



U.S. Department of Housing and Urban Development

# Office of Inspector General

451 7th St., S.W.
Washington, D.C. 20410-4500

October 28, 2002

Robert C. Seldon, Esquire
Project Law
1319 F Street, N.W., Suite 305
Washington D.C. 20004

Re: James Malloy

Dear Mr. Seldon,

I have received your letter of October 18, 2002. I have also received a hand-written letter from Special Agent Malloy, dated October 15, 2002, in which he notifies me that you represent him. In that same letter SA Malloy also offers to provide the documents requested earlier of him that are specific to an SID investigation or OIG business. I hope you will explain to your client that when he makes determinations on what documents are relevant to our investigation, or he refuses to cooperate with an investigation, he does so at his own peril, even if it is on the advice of counsel. Further, we disagree that the documents we requested are personal, or outside the scope of OIG business, or not relevant to our investigation. They would not exist except for his employment with OIG, and they are relevant. SA Malloy should mail the documents directly to the agents who requested them.

As to terminating SA Malloy's administrative leave, it would be inappropriate to do that at this time. You have indicated that SA Malloy has filed an informal EEO complaint or will do so soon. That is his prerogative. You should know that threats of filing an EEO complaint or elevating the matter, will not dissuade us from taking the appropriate action in an individual's case. Moreover, the punishment imposed on the two subordinates under SA Malloy does not cause us concern. What causes us concern is the manner in which the disciplinary action was imposed, and SA Malloy's actions and inactions in the process. Additionally, you may advise SA Malloy that he was placed on administrative leave for the reasons provided in the letter, not for some ulterior motive.

Since SA Malloy has asked that any future communications with him be through his attorney, I would ask that you do the same. Any communications to me regarding this matter should be addressed through the counsel's office. Thank you.

Sincerely,

DANIEL P. SALAS
Deputy Assistant Inspector General for Investigations

DEPOSITION
EXHIBIT
#11
Salas
8-10-06
PENGAD 800-631-6989