Page 1

```
     UNITED STATES DISTRICT COURT

     FOR THE DISTRICT OF COLUMBIA
- - - - - - - - - - - - - - -X
 JAMES MALLOY,               :

          Plaintiff          :

     v.                      :

                             : No. 05-1117 (RCL)

 ALPHONSO R. JACKSON,        :

          Defendant          :
- - - - - - - - - - - - - - -X
```

DEPOSITION OF MICHAEL STEPHENS

Washington, D.C.

Tuesday, March 6, 2007

Deposition of MICHAEL STEPHENS, called for examination at 10:10 a.m., at the law offices of Robert C. Seldon & Associates, P.C., 1319 F Street, N.W., Suite 305, Washington, D.C., before Gary S. Howard, a notary public in and for the District of Columbia, when were present on behalf of the respective parties:

Page 4

```
 1                    P-R-O-C-E-E-D-I-N-G-S
 2  Whereupon,
 3                      MICHAEL STEPHENS
 4  was called as a witness and, having been first duly
 5  sworn, was examined and testified as follows:
 6                       EXAMINATION
 7           BY MR. SELDON:
 8      Q    Mr. Stephens, good morning, sir.
 9      A    Good morning, sir.
10      Q    Would you please give us your current
11  position?
12      A    Deputy inspector general, office of the
13  inspector general, Department of Housing and Urban
14  Development.
15      Q    Mr. Stephens, would it be fair to say
16  that your supervisor or the person above you in the
17  chain of command in your organization is the
18  inspector general?
19      A    That's correct.
20      Q    That's currently Kenneth Donohue?
21      A    That's correct.
22      Q    And is that who it has been for as long
```

1  as you have been deputy inspector general?

2      A      No.

3      Q      Has it been at least since before the

4  events in this case arose, which started, let's

5  say, in August of 2002, we'll use as a bookmark?

6      A      I believe I came in in January of 2002 as

7  a deputy IG.

8      Q      Okay.

9      A      And Mr. Donohue followed me by, I think,

10 three or four months. I don't have the exact date.

11     Q      Very good, sir.  Under your supervision,

12 I take it, are one or more large offices in the

13 inspector general's office.

14            Is that right?

15     A      That's correct.

16     Q      One is the office of investigations.

17     A      Yes.

18     Q      And another is the office of audit.

19     A      That's correct.

20     Q      There is in the office of investigation a

21 head of that office known as the assistant

22 inspector general for investigation.

1 appointed by the secretary?

2    A    No.

3    Q    Does he serve at the pleasure of the
4 secretary?

5    A    No.

6    Q    Do you?

7    A    No. I serve at the pleasure of -- well,
8 I'm a career employee. I'm a career employee and
9 Mr. Donohue is presidentially-appointed.

10    Q    That's fair enough, sir. Does your
11 organization have its own administrative EEO or
12 discrimination complaints function, separate from
13 the department of housing and urban development?

14    A    No, I don't believe so. We go through the
15 department on our EEO matters. Generally, the
16 individual that is named in the complaint is
17 Secretary Jackson.

18        And we do coordinate our EEO activities
19 through HUD's department of EEO. I don't believe
20 that's the exact name of it, but the department
21 that handles that.

22    Q    Does your organization have its own

1 counsel's office, separate and apart from the

2 Department of Housing and Urban Development?

3     A     Yes.

4     Q     Does your organization have its own human

5 resources or personnel function separate and apart

6 from the Department of Housing and Urban

7 Development?

8     A     Yes.

9     Q     As part of the administrative complaints

10 process, is there a mechanism known as alternative

11 dispute resolution or mediation?

12    A     Yes.

13    Q     Is that specific, at least insofar as it

14 concerns the office of inspector general, specific

15 to the office of inspector general, as opposed to

16 the Department of Housing and Urban Development?

17    A     No.

18    Q     Okay. Do you have your own ADR officer or

19 officers?

20    A     No.

21    Q     What is your understanding of what the

22 ADR program is, insofar as it concerns complaint of

1    A    That person is to determine the facts of
2 the case and present a report to the department.
3    Q    Is that report to be thorough, in your
4 understanding?
5    A    Yes.
6    Q    And complete?
7    A    Yes.
8    Q    During the course of an investigation, is
9 an investigator entitled to access to current
10 employees and officials of the department of the
11 office of inspector general -- sorry -- the office
12 of inspector general, when a formal administrative
13 complaint has been filed?
14    A    Are you talking about the EEO
15 investigator?
16    Q    Yes.
17    A    Yes.
18    Q    And also, I suppose within limits, the
19 documents  that are relevant to that complaint?
20    A    Yes.
21    Q    Are the officials and employees under
22 your supervision required to give sworn statements

1 in connection with investigations of EEO complaints
2 when asked?
3    A    Yes.
4    Q    Is it your understanding that they are to
5 give thorough answers to questions that are put to
6 them and give those answers under oath?
7    A    To the best of their ability, yes.
8    Q    And are they to give complete answers as
9 well under oath?
10   A    To the best of their ability, yes.
11   Q    And is the office of inspector general
12 committed to seeing that a complete and thorough
13 account of the facts involved in an EEO complaint
14 are given to the investigators?
15   A    We cooperate with the investigators, yes.
16   Q    And does that cooperation entail giving a
17 thorough account of the facts of a complaint?
18   A    Well, we answer whatever the questions
19 that the EEO investigator has.
20   Q    So is it fair to say, then, that if an
21 EEO investigator doesn't answer a complaint in
22 connection with his or her investigation, that the

1  office of inspector general does not provide that
2  information?
3              Is that your testimony?
4     A    I don't understand your question, sir.
5  Repeat it, please.
6     Q    Of course, sir. You said your office
7  gives cooperation and that cooperation entails to
8  answering questions that are put by an
9  investigator.
10             Are you with me so far?
11    A    I've got that, yes, sir.
12    Q    Okay. So my question is, supposing there
13 are relevant facts known to officials of your
14 office, but the investigator doesn't think or
15 doesn't know to ask about those facts.
16             Does your office provide them anyway?
17             MS. LYONS:  Object to the form of the
18 question. It's a hypothetical and calls for
19 speculation.
20             MR. SELDON:  I'm asking about the
21 standard business practice in his experience.
22             BY MR. SELDON:

 1    Q     So if you can go ahead, Mr. Stephens, I'd
 2 appreciate it.
 3    A     An investigator is in charge of the
 4 investigation. We cooperate with whatever the
 5 investigator asks and whatever the investigator
 6 asks for us to provide.
 7          We do so. We do it at every opportunity
 8 that we're requested to do so.
 9    Q     And in other words, then, correct me if
10 I'm wrong, if an investigator doesn't ask for
11 certain information, your office doesn't provide
12 it.
13          Is that right or is that wrong?
14          MS. LYONS:  I have the same objection.
15 Hypothetical, calls for speculation.
16          BY MR. SELDON:
17    Q     Standard business practice, sir. Can you
18 answer the question?
19    A     The investigator is running the
20 investigation. Whatever the investigator wants,
21 whatever the investigator asks, we cooperate.
22    Q     I guess my question is, in your standard

1    A    Generally, you respond to the questions
2  that are asked by the investigator.
3    Q    And that's it?  Is that it?
4    A    Generally, that's it.
5    Q    Okay. Now we have a number of matters
6  that are at issue in this complaint, and were at
7  issue administratively, and I'm going to cover some
8  of those.
9         Okay?
10   A    Uh huh.
11   Q    One of the issues is Mr. Malloy having
12 been placed on administrative leave in or around
13 October 10th, 2002.
14        We've asked a number of other witnesses
15 in their depositions under oath, who was involved
16 in the decision to place Mr. Malloy on
17 administrative leave?
18        And I'd like to ask you, sir, what role,
19 if any, did you play in that decision?
20   A    To the best of my recollection, Joe Haban
21 made that decision and asked for my approval of his
22 decision.

```
 1             I gave it to him.
 2      Q      Is it fair to say, sir, that that was the
 3 extent of your involvement in this?
 4      A      Yes.
 5      Q      Is it fair to say, sir, that you viewed
 6 that as Mr. Haban's decision to make?
 7      A      Correct.
 8      Q      Is it also fair to say that, to your
 9 knowledge, there was no involvement by the
10 inspector general?
11      A      There was none.
12      Q      Is it also fair to say, sir, that you did
13 not view this as, let's say, a collaborative
14 decisional process?
15      A      Rephrase your question.
16      Q      Yes. The decision to place Mr. Malloy on
17 administrative leave, did you or did you not view
18 it as a decision made by Mr. Haban and you in
19 collaboration with one another?
20      A      No. Mr. Haban made the decision and --
21      Q      Okay. Please go ahead, sir.
22      A      And I approved it.
```

1    Q    Now what I'd like to ask you next is,
2 there was a decision made in the latter part of
3 October, 2002, not to restore Mr. Malloy to active
4 duty when he made a request, first through himself
5 and then through me as his counsel.
6         Your understanding, sir, who was involved
7 in that decision?
8    A    I'm sorry?  Repeat the question. To
9 restore?
10   Q    Of course, sir. I'll set the stage first
11 if you don't mind.
12        In the middle of October of 2002, first
13 through himself and then through me, Mr. Malloy
14 asked to be taken off administrative leave and to
15 be restored to active duty.
16   A    Okay.
17   Q    First and foremost, were you even aware
18 of that?
19   A    No.
20   Q    Were you aware that a decision was made
21 in the latter part of October not to restore Mr.
22 Malloy to active duty?

1   A   I was not.

2   Q   Now I'd like to ask you another question,
3 if I may.

4       In or around December 17th, 2002, Mr.
5 Malloy was relieved of his responsibilities as a
6 supervisor.

7       First I'll ask you, sir, if you know
8 about that, or knew about it at the time?

9   A   No, I did not.

10  Q   And --

11  A   Let me, if I might.

12  Q   Yes, of course.

13  A   For clarification purposes. Relieved of
14 his supervisory duties?

15  Q   Yes, sir.

16  A   Is this before the administrative leave?

17  Q   No. What I'll do is I'll show you a
18 document that I'm asking you about, just as a
19 bookmark.

20      And what I'll do is this, just so we've
21 all sort of got copies.

22  A   I'm not sure that that's necessary

 1 because, obviously, I was aware that he was put on
 2 administrative leave and that relieves him of his
 3 supervisory duties.
 4          If you're referring to that, I was aware
 5 of that. If it's something other than that, I was
 6 not.
 7   Q    And just so we're clear, and if a
 8 document would help you, there's a very good chance
 9 I've got it here.
10   A    Sure.
11   Q    Mr. Malloy was placed on administrative
12 leave, which obviously took him out of the office
13 for that period of time.
14          And that was in the early part, October
15 10th, I believe, 2002, or thereabouts.
16          On December 17th, 2002, or thereabouts,
17 Mr. Malloy was taken off administrative leave, but
18 at the same time, relieved of supervisory or
19 managerial duties.
20          Is that something before it happened that
21 you were involved in in any way?
22   A    I don't believe I was involved in that.