# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **JAMES MALLOY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civ. Action No. 05-1117 (RCL)** |
| | ) | |
| **ALPHONSO R. JACKSON,** | ) | |
| **Secretary of Housing And** | ) | |
| **Urban Development,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## ERRATA (SECOND)

Due to an error on page one of his Declaration, plaintiff to the above action respectfully requests that the Court take notice of the attached corrected Declaration of James Malloy, in connection with his Opposition to Defendant's Motion for Summary Judgment.


Respectfully submitted,


_____/s/_____
Robert C. Seldon, Esq.
 D.C. Bar No. 245100


_____/s/_____
Molly E. Buie, Esq.
 D.C. Bar No. 483767
Robert C. Seldon & Associates, P.C.
1319 F Street, N.W., Suite 305
Washington, D.C.  20004
(202) 955-6968
Counsel for Plaintiff

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **JAMES MALLOY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civ. Action No. 05-1117 (RCL)** |
| | ) | |
| **ALPHONSO R. JACKSON,** | ) | |
| **Secretary of Housing And** | ) | |
| **Urban Development,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## DECLARATION OF JAMES MALLOY

I, James Malloy, being first duly sworn, do hereby depose and state as follows:

My name is James Malloy. I am the plaintiff in this action and make this Declaration in support of my Opposition to defendant's Motion for Summary Judgment.

1.) From 1993 until the actions that gave rise to this suit, I served as the Assistant Special Agent in Charge ("ASAC") with the Office of Inspector General ("OIG") of the Department of Housing and Urban Development ("HUD") in Ft. Worth, Texas. The HUD OIG office in Ft. Worth is the headquarters of OIG Region 6, which is also known as the Southwest Region, which spans all of Texas, Louisiana, New Mexico, Oklahoma, and Arkansas.

2.) I make this Declaration based upon my personal knowledge and experience as the ASAC in one of the largest HUD OIG Regions. This has given me familiarity with OIG standard operating procedures, which are contained in a large number of very lengthy manuals and are also known to me and throughout HUD OIG,

and are also based upon less formal written memoranda and letters and oral communication. As ASAC, under the supervision of the Special Agent in Charge ("SAC"), I had responsibility for the activities of the Office of Investigations in my Region and am familiar with the operations of OIG, including OIG's structure, its investigative activities, requirements for service as agents, standards of conduct of agents, and procedures that are expected of agents.

3.) The HUD Office of Inspector General was created by the Inspector General Act of 1979. Its basic mission is to prevent and detect fraud, waste, and abuse by individuals and entities who are engaged in the business of providing, or are the residents of, HUD-sponsored and HUD–financed housing and housing programs through administrative audits and criminal investigations.

4.) The OIG Office of Investigations concentrates on potential criminal prosecutions arising from these investigations. There are also other activities and/ or divisions within the Office of Investigation, for example the Special Investigations Division; and joint task forces with federal, state and local agencies concerning matters of mutual interest. These activities are separate and apart from those conducted by the OIG Office of Audits, which focuses on financial reviews and potential civil and administrative sanctions.

5.) The professional employees of the Office of Investigations at every level, in the field and in Washington, D.C., are all federal law enforcement officers, and known alternately as Special Agents and/or Criminal Investigators. All of us at every level are held to the same standards of conduct, and an act of misconduct that is arguably an offense for a line agent, for example, is also an offense for a senior manager.

6.)     The investigative activities of the Office of Investigations are eventually headed up by the Inspector General himself or herself.[1]  The current Inspector General and the last one I served under was Kenneth Donahue.  His immediate subordinate is the Deputy Inspector General; in this case, the last one I served under was Michael Stephens.  Deputy Inspector General Stephens served over all Regions, Divisions, and other offices in HUD OIG, in Headquarters and around the country, and essentially functioned as the Chief Operating Officer for HUD OIG.

7.)     Reporting directly to the Deputy Inspector General is the Assistant Inspector General for Investigations.  During the matters that are at issue here, R. Joseph Haban was the Assistant Inspector General for Investigations.  He assumed his position in the early part of 2002 after the retirement of his predecessor Robert Groves.   The Deputy Assistant Inspector General for Investigations when I retired was Daniel Salas, who now serves in my former supervisor's position as SAC of the Southwest Region.

8.)     The majority of OIG's investigative activities are conducted around the country in Regional and/ or smaller District Offices.  Usually each of those offices is headed by a Special Agent in Charge who reports to the Assistant Inspector General for Investigations and/or his Deputy.  OIG offices in the field normally have one or more Assistant Special Agents in Charge (GS-14), who are the first line supervisors for staff agents and normally have daily responsibility for and oversight of the investigative activities in their offices.

---

[1]     The Inspector General and other senior officials of OIG, including the Deputy Inspector General, the Assistant Inspector General for Investigations and his Deputy, the SAC of the Special Investigations Division, and the OIG Office of Legal Counsel are all stationed in Washington, D.C.

9.)    At the time of my constructive discharge, the Headquarters Office of Investigation activities included those of the Special Investigations Division which, among other matters, investigates misconduct and potential criminal activity by OIG agents. That Division and other OIG Divisions is headed by a Special Agent in Charge who answers to the Assistant Inspector General for Investigations and/or to the Deputy Assistant Inspector General for Investigations. The Special Agent in Charge of the Special Investigations Division when I was constructively discharged was John McCarty. He succeeded Mr. Haban in that position and has, in turn, followed Mr. Haban as Assistant Inspector General for Investigations.

10.)    I joined HUD OIG as a staff agent in 1983 and was assigned to the Southwest Region or Region 6, where I worked my entire HUD OIG career. Prior to my constructive discharge effective January 3, 2003, I served a total of approximately 29 years in federal law enforcement. Prior to the matters that underlie this suit, I had no intention of retiring before I was 57 years old, the mandatory retirement age for federal law enforcement officers, and HUD's actions ended my career five years before I had planned or it had to end. I had aspirations of moving up one level in the Southwest Region and becoming Special Agent in Charge

11.)    In my position as ASAC in Region 6, my duties and responsibilities included supervising the investigation of entities and individuals who participated in HUD and HUD-sponsored housing programs, did business with HUD, and received funding, grants, or subsidies from HUD, as well as of officials of HUD itself, for potential violations of federal law and regulation. I supervised as many as 25 Special Agents and four nonprofessional personnel; served as the Region 6 liaison with federal,

state, and local law enforcement officials, working groups, and task forces; and coordinated Region 6 activities with HUD OIG Headquarters in Washington, D.C.

12.)    I was one of OIG's most highly recognized, commended managers and received many awards for my investigative and supervisory activities, including awards from the Secretary of HUD.  In 1999, I was named National HUD OIG Investigation Manager of the Year.  In 2001, I was elected Chair of the federal government's prestigious twenty-five agency Southwest Regional Inspector General Council, which I helped found.

13.)    I was also responsible for HUD OIG's initial equity skimming investigations, for organizing the joint task force with Region 6 and the Federal Bureau of Investigation, for the investigation of many cases of highly complex, fraudulent transactions, and for supervising all law enforcement support activities after the bombing of the federal building in Oklahoma City.

14.)    At no time before the events that gave rise to this suit was I ever placed under investigation, denied a security clearance, disciplined, or even counseled.

15.)    For five years before I was constructively discharged, I made it known that I was interested in the position of ASAC in the Southwest Region's office in Houston, a position that carried with it a higher salary and would place me nearer to my family.  Despite my excellent working relationship with the former Special Agent in Charge ("SAC") of Region 6, Larry Chapman, or perhaps because of it, Mr. Chapman wanted me to serve in the Region 6 headquarters office in Ft. Worth.

16.)    I am a descendent of Native Americans, specifically the Cherokee Indian tribe.  I kept a sculpture in my office in Region 6 headquarters of a Native American on a

horse that was inscribed "Chief Malloy;" had other Native American artwork in my office; and served as a member of OIG's national recruitment and diversity committee and the Southwest Region's, where I openly discussed my Native American heritage. I have traced my lineage back two generations to the Cherokee tribe, am proud of it, and have frequently expressed my pride while at HUD OIG.

17.)     When former Inspector General Susan Gaffney asked all OIG to identify the number of its minorities, Region 6 reported a supervisor with Native American origin. That could only have been me.

18.)     In addition, one of my former subordinates, Robbie Tighe, harangued me about my heritage, called me a "half breed," and made comments about Indians being proof of sex between the white man and buffalo. A complaint by me triggered an investigation in April of 2001 by the OIG Office of Special Investigations. The individual who headed that office, Joseph Haban, took no action on the complaint. When the actions at issue here arose, he was the Assistant Inspector General for Investigations in HUD OIG Headquarters. He appointed the agent who harassed me as my successor.

19.)     In June of 2002, Cortez Richardson, was reassigned to Region 6 under my supervision as a result of a hardship transfer.

20.)     At or about the time of his reassignment, I came to learn that Mr. Richardson had been pursuing an EEO complaint against a senior OIG official in Washington, D.C., since May of 2001.

21.)     I also came to learn that Mr. Haban had originally asked the former SAC of Region 6, Larry Chapman, for his concurrence in Mr. Richardson's reassignment earlier in the spring of 2002. Mr. Haban explained that he wanted to transfer Mr.

Richardson as part of the settlement of Mr. Richardson's then-pending EEO complaint. At that time, Mr. Richardson was stationed in the OIG District Office in Denver, Colorado. That office's former Special Agent in Charge, Jeff Finn, had been previously indicted for his activities as a SAC.

22.)    I learned that Mr. Chapman objected to Mr. Richardson's reassignment and insisted on being assured by Mr. Haban that if Richardson was transferred to Region 6, that we would not be involved in any EEO or disciplinary matters directed towards Mr. Richardson. It was not appropriate for us to be involved, since we had never supervised Mr. Richardson, and his alleged misconduct had occurred in Denver.

23.)    I also came to learn that on one or more occasions, Mr. Chapman was assured by Mr. Haban that neither Region 6 nor Mr. Richardson's supervisors would be involved in any disciplinary action toward him.

24.)    When Mr. Richardson was transferred to Region 6, he was assigned to our office in Oklahoma City, Oklahoma, and I became his first line supervisor. Mr. Richardson was not in the chain of command of the other ASAC in Region 6, Dan Truxal, and Mr. Truxal had no involvement at all in the disciplinary proceedings against Mr. Richardson or Mr. Romero. I obtained copies of the investigative files concerning Mr. Truxal and also know from personal knowledge that he was never placed on administrative leave or relieved of his supervisory duties.

25.)    I first learned that I was going to be responsible for the initial phase of disciplinary action against Mr. Richardson on August 29, 2002, when I was contacted by David Nuhfer of the Bureau of Public Debt ("BPD"). BPD is a part of the Treasury Department and contracts to be OIG's personnel department, one that is separate and

apart from HUD's.  Mr. Nuhfer is the senior employee and labor relations specialist that OIG dealt with in matters such as employee discipline.

26.)    When Mr. Nuhfer contacted me, he stated that in his opinion, Mr. Richardson deserved "serious time off," meaning a lengthy suspension.  Mr. Nuhfer told me that the OIG Office of Legal Counsel had determined that I was to serve as the proposing official.  I responded that I had heard nothing about this previously, and had not seen a disciplinary file or a report of investigation concerning Mr. Richardson.

27.)    I also stated to Mr. Nuhfer that I thought OIG was assigning this matter to me because I am a minority and I against a minority. objected to OIG trying to "dump this on a diverse supervisor to deal with a diverse employee so that officials in Mr. Richardson's chain of command or Headquarters would not have to.

28.)    The entire file concerning Mr. Richardson was given to me by SAC Chapman sometime during the week of September 16 to September 20, 2002.  Mr. Chapman directed me to review it and decide whether to propose disciplinary action.  Mr. Chapman instructed me to finalize my proposal in time for him to take final action before he retired on September 30, 2002.

29.)    I was delayed in beginning work on this matter somewhat by scheduled training activities and other pressing responsibilities in Region 6.  My best recollection is that I began during the week of September 23, 2003.

30.)    The first step I took was reviewing the Report of Investigation.  It was very lengthy and my best estimate is that I spent over thirty hours reviewing it.

31.)    I then set about to analyze the charges against Mr. Richardson and their bases and to consider the appropriate level of discipline to propose.

32.)    The first charge against Mr. Richardson centered around expenditures made in a former OIG program known as Operation Safe Home.  As my proposed disciplinary action stated, the proper use and characterization of Operation Safe Home funds was a matter of conflicting and confused policies and procedures of OIG, including the former Inspector General herself.  I did not consider it reasonable to hold Mr. Richardson accountable for supposedly violating OIG procedures when the procedures themselves were in such a confused and conflicting state.

33.)    The second charge against Mr. Richardson was for conduct unbecoming a federal law enforcement officer, specifically for off duty conduct involving damage to a tow truck caused by Mr. Richardson.  I sustained this charge and also noted that Mr. Richardson had apologized to the owner of the truck and offered to compensate him for the damage.

34.)    The next charge of Mr. Richardson related to his preparation of a false invoice at the direction of his former second line supervisor, Jeffrey Finn.  My knowledge of federal personnel law is that an employee must, under penalty of being insubordinate, follow his supervisor's instructions, unless his health or safety or that of the public will be threatened as a result.  Since those circumstances did not enter into this matter, Mr. Richardson had no choice but to follow Finn's instruction.  I was also impressed that Mr. Richardson notified his first line supervisor immediately after he did so.

35.)    The next charge against Mr. Richardson was for allegedly not being candid with OIG investigators.  After detailed review, I did not support this charge.  Mr. Richardson had been honest with investigators, although he did not volunteer

information.  I concluded that Mr. Richardson was not required to do so either as a basic matter or in the context of the investigation in question.

36.)    Next, there was a charge against Mr. Richardson involving a number of elements.  I concluded that with one exception, there was insufficient evidence in the report of investigation charges against Mr. Richardson.  That exception was for providing an "X" rated video-tape to other agents, which I sustained.

37.)    Mr. Richardson was also charged with misuse of his OIG cell phone.  I found that Mr. Richardson's use had been incidental, the custom and practice in OIG, and therefore did not sustain the charge.

38.)    I then turned my attention to the appropriate penalty for Mr. Richardson.

39.)    I did so knowing that the charges that I sustained were off-duty and the limited actions taken by OIG when misconduct that is unrelated to OIG core missions or is off-duty is involved.

40.)    Two circumstances that I knew of involved the non-minority SAC's of entire Regions one of whom became the acting SAC of Region 6 who had sexual relationships with subordinates.  Doing so is unquestionably misconduct in the federal sector generally and for a federal law enforcement officer.  These SAC's conduct was well-known throughout OIG and in Headquarters, specifically Mr. Haban.  Yet no action was taken by Mr. Haban while he was Assistant Inspector General for Investigations.

41.)    Three non-minority OIG employees, two of those being special agents including John Robinson, the lead agent in Mr. Richardson's investigation, trespassed on the property of a neighbor of Mr. Chapman while they were conducting an investigation of him.  Doing so constituted misconduct and they did it while assigned to Headquarters.

Their misconduct was well-known to OIG Headquarters.  The agents' misconduct had drawn a written complaint from the property owners and the local police department was involved.  Mr. Haban's only action was to recall the agents to Headquarters and remove them from the jurisdiction.  No action was taken against any of them.

42.)    I also knew of a non-minority OIG auditor assigned to Region 6, subject to the same standards as investigators, while under the supervision of OIG Headquarters who had allegedly engaged in sex harassment of a female auditor and had also not been truthful in an investigation about an OIG special agent that lost her service weapon.  His conduct was known to Headquarters because he was assigned there and a complaint was made about his behavior, yet no action was taken.  I was also aware of a non-minority supervisory special agent that had been charged with driving under the influence (dui) while he was on travel status conducting an investigation for OIG Headquarters.  Although the charges were known to OIG Headquarters, no action was taken on either employee.

43.)    Making referrals for criminal prosecutions is one of the most important and tightly controlled activities that HUD OIG undertakes.  A non-minority special agent assigned to Headquarters conducting a field investigation who made a criminal referral without proper authorization from Headquarters was not sanctioned for doing so.  The charges were well known to Headquarters and came up in litigation on two separate occasions.

44.)    Overall, I was well-aware that by custom and practice, non-minority agents in OIG Headquarters, Region 6, and the remainder of OIG's field operations were not disciplined severely or at all for misconduct like Mr. Richardson's.  I believed in

good faith that any desire to discipline Mr. Richardson more severely or to terminate him would have been disparate treatment on account of his race and his prior activity.

45.)     I also believed that Mr. Richardson's actions were inappropriate for a federal law enforcement officer and needed disciplinary action.  At the same time, I was aware that Mr. Richardson's service to OIG had been excellent, that he had an untarnished record in state law enforcement before being hired by OIG, that he had owned up to his actions, and that I had no reason to believe that he would repeat misconduct.

46.)     For these reasons, on September 30, 2002, I proposed to suspend Mr. Richardson for five days.  When I did so, I had already consulted with Mr. Nuhfer of the Bureau of Public Debt and was aware of his position, that Mr. Richardson deserved a long suspension.  I also disagreed with the opinion of Deputy Inspector General Stephens and OIG Legal Counsel Saddler that Mr. Richardson deserved to be removed from the service, which I knew to be their view from statements made to me by Mr. Lester Davis, while he was acting as Deputy Assistant Inspector General for Investigations.

47.)     When I decided on my proposal for Mr. Richardson, I was given technical advice and guidance by SAC Chapman and assistance in drafting the document.  However, that all of the reasoning, analysis, and penalty determination were mine either entirely or in great part.  Mr. Chapman had also consulted with me about my proposal, which I understood and still understand to be proper under federal personnel law.  I completed my draft proposal on September 30, 2002, as Mr. Chapman instructed.  It was he who made the decision to impose that penalty before he retired, which I understand he did after talking to Mr. Richardson and learning that he was satisfied.

48.)     In July of 2002, Mr. Chapman and I had occasion to discuss a Special Investigations Division investigation concerning Special Agent Steve Romero, who was of Hispanic origin, with SID SAC McCarty and Mr. Haban at a meeting in Arlington, Texas.  I was Mr. Romero's first line supervisor.  The SID investigation centered around whether Mr. Romero had supposedly not been candid concerning information on his application with HUD OIG about resigning from the Austin, Texas, police department and had given incorrect information in completing HUD financial forms.  During the meeting, Mr. Haban and Mr. McCarty emphasized the alleged "seriousness" of Mr. Romero's conduct, with Mr. McCarty stating that Mr. Romero had been "stupid" in his actions.

49.)     When I had the opportunity to review the report of investigation about Mr. Romero, as was the case with Mr. Richardson, I studied it closely.  Mr. Romero had already been cleared of charges concerning his resignation from the Austin Police Department, which explained why his answers about this were in some ways inconsistent. I also reviewed information he provided on HUD's financial forms and concluded that he had not been careful enough in answering the questions.

50.)     I considered Mr. Romero's exemplary career to date, that his offense was due to inattention and not intentional deception, and my knowledge of OIG's disciplinary practices in the past.  For these reasons, I issued Mr. Romero a memorandum of caution. Like Mr. Richardson, I believed in good faith that any desire to discipline Mr. Romero more severely would have been disparate treatment on account of his race and national origin.

51.)    Mr. Haban first learned of my proposed disciplinary actions on October 2, 2002, and by e-mail directed me to fax a copy of both the proposals to Headquarters and the Counsel's Office.  I did so the next day and followed up with Fed Ex copies of the entire file.

52.)    On October 10, 2002, OIG Headquarters placed me on administrative leave, ordered me to turn in all of my OIG equipment including computer equipment, prohibited me from entering OIG premises, and directed me to have no contact with any HUD OIG employees.

53.)    I came to learn that at the same time, OIG Headquarters opened two investigations into me.

54.)    One focused on my role in the disciplinary actions involving Mr. Richardson and Mr. Romero.

55.)    Both focused on my supposed interference with the investigation of Mr. Chapman, by then a former SAC.

56.)    Originally, I had been a witness in that investigation and given a statement to investigators on September 19, 2002.

57.)    On October 10, 2002, I was directed to travel to OIG Headquarters and give a follow-up witness statement.  When my interview began, I was notified that I had become a subject of the investigation.

58.)    One of the allegations against me was that I had supposedly stated at a staff meeting that agents should circle the wagons when questioned by investigators about Mr. Chapman.  I made no such statement nor anything like it, never have in my entire career in law enforcement, and never would.

59.)    The second allegation concerned my supposed refusal to turn over records that might have been relevant to the investigation of Mr. Chapman.  I never withheld business records from investigators, originally offered my personal diaries for their review which they did not do, and declined to do so later on the advice of counsel.  These diaries contain no information related to the business of HUD OIG.

60.)    The week after I was placed on administrative leave, I made a written request and my counsel made a second request to be restored to active duty and also began the administrative complaints process.  That request assured Deputy Assistant Inspector General for Investigation Salas that I had not withheld any business-related documents and that I had and would cooperate fully with OIG's investigation.  My counsel's letter also advised Mr. Salas about my use of the EEO complaints process, which I had initiated the day before.

61.)    On October 28, 2002, Mr. Salas wrote back and denied my request.

62.)    For over two months, I was kept on administrative leave, barred from the office and from any contact with the office, and ordered not to communicate with any OIG employees.

63.)    On December 17, 2002, OIG Headquarters returned me to active duty, relieved me of all managerial responsibilities, and removed me from my ASAC position.

64.)    I later learned that while I was on administrative, OIG announced a position as an ASAC in Houston, Texas.  The position was on a higher pay scale and I had long expressed my interest in working in Houston to be nearer my family.

65.)     When the position was originally announced, I was barred from OIG's computer systems and from speaking with OIG employees, and knew nothing of the opening.

66.)     When I returned to the office, I did learn about the vacancy and asked about being considered for it.  In response to my inquiry about the opening, I was told by the new SAC of Region 6, Lester Davis, that I would never be considered for a return to management in the Region.

67.)     OIG selected a former non-supervisory, lower-graded subordinate of mine for the job.

68.)     Like all special agents in the OIG Office of Investigations, I was a federal law enforcement officer and served under especially strict standards of conduct.  As an ASAC, I not only supervised as many as many as 25 special agents, I served as my office's liaison with federal, state, and local law enforcement officials, working groups, and task forces.

69.)     In 2001, I was elected Chair of the federal government's prestigious twenty-five agency Southwest Regional Inspector General Council, which I helped found.

70.)     I had no intention of retiring before I was 57 years old, the mandatory retirement age for federal law enforcement officers.  I was 52 when I was constructively discharged, effective January 3, 2003.

71.)     I had aspirations of moving up one level in the Southwest Region and becoming Special Agent in Charge.  The position has been filled twice since October of 2002.

72.)    When I returned to the office, I was not even allowed to perform basic agent duties, but was instead given menial tasks like coordinating our office's fleet of automobiles.

73.)    As a federal law enforcement officer, my credibility was vital.  As a special agent under investigation, I was useless in a criminal prosecution, because any questions about my integrity would have to be disclosed to the defense.  Being relieved of supervisory responsibility while under investigation would make my continued participation on inter-agency task forces and councils impossible.

74.)    I was under two on-going investigations and never given any reason to believe that being removed from a supervisory position was temporary.

75.)    I then retired from the federal service effective January 3, 2003.  I never would have done so, but for the humiliating and career-ending actions that HUD OIG subjected me to.  My decision to retire was not voluntary but was a constructive discharge.  I was also aware that I could be reassigned involuntarily outside of Region 6 if I did not retire.

76.)    Early on, I was prepared to resolve my case if OIG would close out its investigations favorably and restore my reputation.  They refused, even though the investigations were ended once I resigned.

77.)    My chances for future employment in law enforcement have also been ruined.  The law enforcement community is a small and insular group, and I would also have to disclose HUD OIG's actions and would be questioned about why my supervisory duties were removed.

78.)    Also, as a requirement of applying to law enforcement positions, I would normally have had to undergo a background check.  HUD OIG's actions toward me would have a severe impact on, if not totally destroy, my opportunities to be considered for another law enforcement position.

79.)    During the disclosure and discovery processes in this action, the investigation of my formal administrative complaint at the agency level, Freedom of Information Act requests to the agency, and my work as a senior manager in HUD OIG, I had or gained access to the documents, which accompany this Declaration and my Opposition to defendant's Motion for Summary Judgment.  These documents, each of which is a true and correct copy of what it purports to be, are as follows:

a.)    Attachment A is a true and correct copy of a bench ruling by the United States District Court for the District of Colorado in United States v. Finn, No. 01-CR-1084, on January 11, 2001.

b.)    Attachment B is a true and correct copy of the Memorandum from Special Agent Cortez Richardson to Inspector General Kenneth Donahue requesting a hardship transfer to Region 6, dated May 15, 2002.

c.)    Attachment C is a true and correct copy of the Proposal to Suspend Special Agent Richardson for five days that I issued on September 30, 2002.

d.)    Attachment D is a true and correct copy of SAC Chapman's Decision to Suspend Special Agent Richardson for five days that was issued on September 30, 2002.

e.)    Attachment E is a true and correct copy of the Memorandum of Caution that I issued to Special Agent Steven Romero on September 30, 2002.

f.)     Attachment F are true and correct copies of e-mails that were exchanged between my counsel and OIG Legal Counsel Richard Johnson beginning on December 2, 2002, that I was copied on as they were exchanged.

g.)     Attachment G is a true and correct copy of the position paper submitted by the Office of Legal Counsel in my administrative complaint on March 19, 2003.

h.)     Attachment H is a true and correct copy of OIG Manual Chapter 1099 concerning processing of EEO complaints in effect when my administrative complaint was being processed.

i.)     Attachment I is a true and correct copy of a log of a timeline that documented certain dates in the Richardson and Romero disciplinary actions and investigations.

j.)     Attachment J is a true and correct copy of the witness statement I gave to OIG investigators in connection with the investigation of former SAC Chapman on September 19, 2002.

k.)     Attachment K is a true and correct copy of the subject statement I gave to OIG investigators in connection with the investigation of me on October 10, 2002.

l.)     Attachment L is a true and correct copy of the statement given by Tammy Gilbert in the investigations of me and ASAC Truxal on October 28, 2002.

m.)     Attachment M is a true and correct copy of the cover page of my formal EEO complaint dated January 2, 2003.

n.)    Attachment N is a true and correct copy of my handwritten letter to Mr. Salas requesting my restoration to active duty dated October 15, 2002.

o.)    Attachment O is a true and correct copy of certain of the standards of conduct that pertain to HUD OIG agents that was obtained from defendant during discovery.

p.)    Attachment P is a true and correct copy of an e-mail that I wrote on August 29, 2002, documenting my conversations with David Nuhfer concerning the assignment of the Richardson disciplinary matter to me for proposal.

q.)    Attachment Q is a true and correct copy of the SF-50 upon my resignation from OIG effective January 3, 2003.

r.)    Attachment R is a true and correct copy of the SF-50 appointing Michael Kepler as ASAC in Houston, Texas, effective April 20, 2003.

I hereby declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge, information, and belief.

_James Malloy_

James Malloy
Executed on July 12, 2007.