**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JAMES MALLOY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-1117 (RCL) |
| | ) | |
| ALPHONSO R. JACKSON,  Secretary of | ) | **REDACTED PUSUANT** |
| U.S. Department of Housing and Urban | ) | **TO PROTECTIVE ORDER** |
| Development, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**DEFENDANT'S REPLY TO PLAINTIFF'S**
**OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I.    INTRODUCTION

Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant's Motion for

Summary Judgment ("Plaintiff's Opp.") is composed almost entirely of mischaracterizations,

innuendo, subjective and wholly conclusory statements, speculation, and irrelevant information.

Though intricately woven, when stripped down, there is insufficient evidence to establish a genuine

issue of material fact regarding any unlawful discrimination or retaliation.  The case is simple:  when

HUD-OIG managers had reason to believe that Plaintiff had attempted to interfere with an internal

investigation, they placed him on administrative leave and investigated that allegation, and after

Plaintiff returned to work and the investigation had not yet been completed, Plaintiff voluntarily retired

while mired in his own baseless suspicions concerning the supposedly unlawful motivations of others

and what might happen in the future.  By challenging his placement on administrative leave, the

temporary removal of his supervisory duties, and his own failure to apply for a vacant position by

cluttering the record with extraneous, assumptive allegations, and unfounded comparisons to others,

Plaintiff fails to demonstrate evidence on which a reasonable fact-finder could find that his claimed

status as a Native American or his supposed protective activity played any role in these events. Accordingly, Defendant's motion should be granted.

## II.    STATEMENTS OF FACTS

Plaintiff's Opposition relies heavily on a gross mischaracterization of the record, irrelevant facts, speculation, conjecture, and subjective conclusory statements that cannot withstand a motion for summary judgment. Plaintiff's responses to Defendant's Statement of Material Facts ("DSMF") are not adequate denials of the facts stated therein. Further, although Plaintiff submitted 177 supposed genuine issues of material fact, even a cursory inspection of those "facts" reveals that many of them are either not genuinely in dispute, are wildly immaterial, or are so conclusory as to be an exception to the general summary judgment rule that all inferences will be taken in a light most favorable to the nonmovant. See Greene v. Dalton, 164 F.3d 671, 675 (D.C. Cir. 1999).

### A.    Plaintiff's Responses to Defendant's Statement of Material Facts Do Not Create a Genuine Issue

Plaintiff admits many of the essential facts in Defendant's Statement of Material Facts. See DSMF 1-2, 5, 6, 16, 27, 33, 34, 42, 44-45, 49, 51, 56, 59. As to certain others, Plaintiff's purported denials, qualifications, explanations, characterizations or further explanations or rationalizations do not meaningfully contradict the Defendant's facts and/or otherwise attempt to muddle them with immaterial facts. See DSMF Nos. 3,[1] 4,[2] 8,[3] 9[4]-10,[5] 13,[6] 17[7]-26,[8] 29, 38, 40, and 43. The Court should treat these as undisputed.

---

[1] In denying the first part of DSMF No. 3, Plaintiff refers to the dismissal of several counts in the Finn prosecution, however, the counts dismissed do not pertain to the portion of the charge relating to SA Richardson's misconduct. (See Malloy Decl. Att. A, p. 13). In addition, Plaintiff mischaracterizes the findings the court made since it did not find that OIG committed perjury. (See generally id.). With respect to Plaintiff's second denial of DSMF No. 3, Plaintiff cites to his conclusory assumption that SA Richardson would have been guilty of insubordination. (See Malloy Decl. Att. C, p. 4).

[2]   Plaintiff's objection to the notion that SA Richardson had been investigated for possible misconduct while assigned to the Rocky Mountain Region is puzzling in light of Plaintiff's admission that he reviewed the investigation for over thirty hours. See PSF ZZZ.

[3] Although Plaintiff cites to SAC Chapman's declaration and the deposition of Mr. Nuhfer to support his proposition that AIGI Haban made the decision to assign the discipline of SA Richardson to Plaintiff and SAC Chapman, the cited sources do not actually state that proposition. SAC Chapman's declaration only concerns his objections to disciplining SA Richardson. (See Chapman Decl., ¶ 15). Further, the deposition exhibit of Mr. Nuhfer that Plaintiff cites to discusses the

As to certain others, Plaintiff's evidentiary support for his denials is defective, and fails to create a genuine issue because only admissible evidence need be considered. Gleklen v. Democratic Cong. Campaign Comm., Inc., 199 F.3d 1365, 1369 (D.C. Cir. 2000) ("Verdicts cannot rest on inadmissible evidence. "). More specifically, Plaintiff purports to deny certain facts without explanation and these denials are also insufficient since they cite to conclusory declarations that are insufficient to create a genuine issue of material fact. Further, these denials also cite to depositions and other records in an attempt to mischaracterize the testimony. Thus, the denials for the following facts are also not adequate to defeat summary judgment: DSMF Nos. 7,[9] 15,[10] 28,[11] 35-36, 39, 46, 47, 58, and 60. (See Plaintiff's Statement of Genuine Issues, pp. 4, 7, 15, 18-19, 21-22, 25).[12]

---

purpose of HUD OIG Manual Chapter 1752 and that the Inspector General or OIG Human Resources Director has the authority to waive provisions of the policy. (See Nuhfer Depo. Ex. 2, §§ 1-1(A), 1-4). Neither of these sources speak to Plaintiff's assumption that AIGI Haban made the decision regarding the assignment of disciplinary procedures.

[4] Plaintiff cites to conclusory statements and extraneous facts in his July 2007 declaration response to DSMF No. 9. Nothing in the facts stated pertain to all of SA Richardson and Romero's misconduct nor did it discuss the quality of the policies pertaining to the use of Operation Safe Home funds. (See Malloy Decl. ¶¶ 32-39). Further, Plaintiff provides unspecific, conclusory allegations in his declaration pertaining to other agents who supposedly committed misconduct. (See Malloy Decl. ¶¶ 40-44). Plaintiff provides no names, dates, or information on how he learned this information.

[5] As with his response to DSMF No. 9, Plaintiff cites to conclusory, irrelevant facts in his declaration in response to DSMF No. 10. (See Malloy Decl. ¶ 50). Further, in denying this fact, he cites to portions of his declaration that are not material. (See Malloy Decl. ¶ 49; see also Malloy Decl. Att. E).

[6] Plaintiff's citation to paragraph 46 of his July 2007 declaration is an unspecific allegation in which he ascribes statements to SAC Davis regarding information purportedly from Deputy Inspector General Stephens and OIG Legal Counsel. (See Malloy Decl. ¶ 46). Plaintiff also cites to portions of the deposition of SA Richardson that do not stand for the proposition cited.

[7] Again, with his response to DSMF No. 17. Plaintiff cites to sources that do not stand for the proposition he has stated in his purported denial. SAC Chapman's declaration only states that he believed that he and Plaintiff were fully empowered to decide the appropriate level of discipline. (See Chapman Decl. ¶ 28). Further, Plaintiff's citation to OIG's policy manual on discipline does not state that Plaintiff and SAC Chapman were fully authorized to take such action; in fact, the portion cited specifically states that, "[t]he Inspector General or the OIG Human Resources Director may authorize waivers to the provisions of this policy . . . ." (Nuhfer Dep. Ex. 2 § 1-4) (emphasis added). The other section of the policy manual, § 1-1(A), only states the purpose of the manual and does not speak to Plaintiff's supposed unlimited authority to impose discipline. (See id. at § 1-1(A)). Plaintiff's responses to DSMF Nos. 19 and 20 are also riddled with mis-citations – Mr. Nuhfer's deposition at page 38 does not in any way state that Plaintiff and SAC Chapman had unfettered discretion to impose discipline on SAs Richardson and Romero. Nor does Mr. Nuhfer state that the policies on discipline can be or were in fact waived as they pertained to SAs Richardson and Romero. (Cf. Nuhfer Dep. pp. 13-14). Further, since Attachment K to Plaintiff's July 2007 declaration is only sixteen pages long, the Agency is perplexed as to what Plaintiff is referring to in his denial of DSMF No. 20 (See Plaintiff's Statement of Genuine Facts, p. 10). Plaintiff's response to DSMF No. 22 is conclusory as well. Plaintiff's citation to depositions within his response to DSMF No. 22 refer to testimony that does not support the proposition for which it cited.

[8] Plaintiff's response to DSMF No. 26 also includes a legal conclusion that is not appropriate to create a genuine issue of fact. (See Plaintiff's Statement of Genuine Facts, p. 14).

[9] Plaintiff refers to SAC Chapman's Declaration in attempting to deny DSMF No. 7, however, SAC Chapman does not attest to the facts in DSMF No. 7. (See Chapman Decl. ¶ 20).

Additionally, Plaintiff's explanations to facts that he has admitted should be disregarded since he has already admitted the facts and the explanations are extraneous information, which cite to conclusory declarations, state facts that are not material, and/or merely restate the fact. Neither the explanations nor conclusory declarations create a genuine issue of material fact. Thus, the explanations in response to the following facts should be disregarded: DSMF Nos. 11-12, 14, 30-32, 37, 41, and 55. (See Plaintiff's Statement of Genuine Issues, pp. 5-7, 16-18, 20, 24). Thus, these explanations should be disregarded since Plaintiff admits to these facts.[13]

### B.    Plaintiff's Facts Are Not Sufficient to Overcome Summary Judgment

First, Local Rule 7(h) requires that an opposition to a motion for summary judgment be accompanied by "a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied on to support the statement." The opposing statement of genuine issues must respond directly to the factual statements asserted in the motion for summary judgment. As stated in the rule:

> In determining a motion for summary judgment, the court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is disputed in the statement of genuine issues filed in opposition to the motion.

LCvR 7(h) (emphases added). See also LCvR 56.1. Including a host of immaterial facts is neither contemplated by the rule nor helpful to the Court in resolving Defendant's motion.

---

[10] As with his responses to DSMF Nos. 9-10, Plaintiff cites to conclusory, irrelevant facts in his declaration in response to DSMF No. 10. (See Malloy Decl. ¶ 50). Further, in denying this fact, he cites to portions of his declaration that are not material. (See Malloy Decl. ¶ 49; see also Malloy Decl. Att. E).

[11] Plaintiff's citation in response to DSMF No. 28 points to pages 88 and 89 of Attachment K from Plaintiff's July 2007 declaration, however, this attachment has no page 88 or 89 since it ends at page 16. Further, Plaintiff's citation to the sources for this response does not stand for the proposition stated.

[12] Although Plaintiff objects to DSMF No. 4 on the basis that it does not comport with LCivR 56.1, he also objects to this fact "because . . . Mr. Richardson did not engage in any misconduct." (See Plaintiff's Statement of Genuine Issues, p. 3). The denial based on this conclusion is not sufficient since it makes a legal conclusion and does not state an actual fact.

[13] Plaintiff objects to DSMF 50 and 52-54 because he has withdrawn any claim relating to the SAC position (without having amended his pleading). To the extent no claim regarding that selection exists, Defendant agrees that these facts are not material.

Even interpreting the facts favorably to the Plaintiff, this Court should grant Defendant's motion for summary judgment because he fails to demonstrate a dispute of material fact essential to any of his claims. The key is materiality. Materiality is defined by the nature of the claims. Plaintiff's opposition expends boundless energy on many immaterial sideshows to the simple plot of this case to distract the Court from Plaintiff's own misconduct (refusing to turn over diaries in the investigation of Mr. Chapman and instructing his subordinates to "circle the wagons") and the Agency's reasonable response to it. At bottom, Plaintiff's own suspicions, which may help explain his own, voluntary conduct, do not amount to evidence of any unlawful motives.

Second, to the extent that Plaintiff prefaces all 177 facts with the statement: "[w]hether plaintiff was subject to discrimination and retaliation when . . .," this qualification does not automatically create a genuine issue with regard to all 177 facts. For example, Fact A when read with this qualifier would read, "[w]hether plaintiff was subject to discrimination and retaliation when . . . Plaintiff joined the Office of Inspector General ("OIG") of the Department of Housing and Urban Development ("HUD") as a Criminal Investigator in October 1983." (See, e.g., Plaintiff's Statement of Genuine Facts, p. 25). As written, this statement makes no sense. Instead of reading all 177 facts in conjunction with this preliminary statement, each statement of fact should be read independently. Plaintiff's incantation also fails to create a material issue.

The facts Plaintiff contends are in dispute are actually not in dispute, are immaterial, and/or are conclusory, and thus cannot support Plaintiff's opposition to summary judgment. The following facts are not in dispute: Facts A-C, D-E, G, J, R-Z, DD, FF-GG, II-JJ, LL, NN, VV-WW, III-MMM, OOO, YYY, BBBB, IIII, MMMM, SSSS, VVVV, WWWW, AAAAA, KKKKK-LLLLL, NNNNN, OOOOO, PPPPP-QQQQQ, UUUUU-VVVVV, YYYYY-ZZZZZ, EEEEEE-GGGGGG, IIIIII, NNNNNN-PPPPPP, TTTTTT, ZZZZZZ, DDDDDDD-EEEEEEE, HHHHHHH, MMMMMMM. The following facts are not material because they are not "facts that might affect the outcome of the suit

under the governing law . . ." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986): Facts D-E, H-I, K-N, T-V, Y-Z, BB, CC, EE, HH, KK-UU, XX-CCC, DDD, EEE-HHH, JJJ, NNN, PPP, QQQ-UUU, WWW-XXX, AAAA-BBBB, JJJJ-LLLL, NNNN-QQQQ, TTTT-UUUU, XXXX, WWWW, BBBBB-JJJJJ, MMMMM, SSSSS-TTTTT, WWWWW-XXXXX, AAAAAA-DDDDDD, HHHHHH, JJJJJJ (the Agency admits this fact and states that it is not material), KKKKKK-MMMMMM, QQQQQQ -SSSSSS, UUUUUU-VVVVVV, WWWWWW, YYYYYY, AAAAAAA, CCCCCCC, FFFFFFF, IIIIIII-LLLLLLL, NNNNNNN-UUUUUUU.  The reasons for discarding these facts as immaterial are discussed below.

In addition, the following facts are so vague and conclusory that they cannot support an opposition to summary judgment (<u>See</u> <u>Greene</u>, 164 F.3d at 675): Facts F (Plaintiff does not indicate to whom he supposedly made it known that he was interested in the position of ASAC), O (this fact does not indicate what type of complaint Plaintiff filed), P (is conclusory because Plaintiff states no facts to support his contention that no action was taken on his complaint),[14] AA (Plaintiff points to no facts that would support his assumptive conclusion that supervisory and non-supervisory OIG employees are "all held to the same standards of conduct for and as federal law enforcement officers"), CC (even if it is found that this fact is in dispute, it is so vague as to be inadequate for summary judgment purposes since it does not state what the Bureau of Public Debt is separate and apart from), YY (even if this fact is found to be material, it is conclusory because it does not state how Plaintiff arrives at the conclusion that SA Richardson was forthright), VVV (this fact is vague and conclusory in that Plaintiff does not explain how it is he came to understand that SAC Chapman had coordinated the matter with Legal Counsel or BPD), CCCC-HHHH (these facts are conclusory and unspecific because not only do they rely on Plaintiff's unsupported, conclusory declaration, but they also do not provide specific information on the agents involved, the dates of these events, or how Plaintiff came to know these

---

[14] Further, the testimony cited by Plaintiff indicates that AIGI Haban was not in his position until 2002, which is *after* Plaintiff's supposed complaint of harassment in April 2001.  (<u>See</u> Malloy Decl. ¶ 19; <u>see also</u> Haban Dep. at 5).

facts), RRRR (this fact is conclusory in that he does not explain how he knows this information), ZZZZ (although the Agency inquired about the facts surrounding Plaintiff's recommendation for discipline for SAs Romero and Richardson, this was not part of the formal investigation of Plaintiff's misconduct during the course of the internal investigation of (former) SAC Chapman's activities, and neither Mr. Haban's nor Mr. Salas's depositions suggest otherwise), SSSSS (this fact is unspecific in that it does not describe what is meant by "snickered at"), VVVVV (although the Agency admits that Ms. Hess was present at the staff meeting and that she took notes, no credibility determinations were made regarding her statement denying comments attributed by others to Plaintiff, thus, Plaintiff states a conclusory assumption regarding "OIG investigators had no reason to doubt her credibility" without having any knowledge of this), XXXXXX (this fact is conclusory in that Plaintiff assumes without stating how that he was not considered "solely because he was under investigation"), BBBBBBB (this statement is actually a legal conclusion and not a fact), GGGGGGG (this fact is conclusory in that it assumes without explaining that Plaintiff's tasks were humiliating), and IIIIIII (this fact is conclusory in that it assumes without explaining that a special agent under investigation is useless).

## III.     ARGUMENT

### A.     Standard of Review

If Plaintiff is able to establish a prima facie case, then given Defendant's legitimate, nondiscriminatory and non-retaliatory reasons, Mr. Malloy must present evidence that the stated reason merely was a pretext for intentional discrimination or retaliation.  Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981).  Of course, at all times, Mr. Malloy retains the ultimate burden of persuasion to demonstrate that he was in fact the victim of intentional discrimination or retaliation.  Burdine, 450 U.S. at 252-53.  In this context, in Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000), Justice O'Connor recognized occasions where summary judgment would be appropriate:

Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational fact finder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.

Id. at 148. This case is one of those instances, mostly because Plaintiff's speculation about the motives of other people, wild speculation of connections and similarities between and among things, and inapposite comparisons miss the mark.

"To avoid summary judgment, the plaintiff [is] required to produce some objective evidence showing defendant's proffered reasons are mere pretext." Batson v. Powell, 912 F. Supp. 565, 578 (D.D.C. 1996), aff'd, 203 F.3d 51 (D.C. Cir. 1999). At this stage, if [plaintiff] is unable to adduce evidence that could allow a reasonable trier of fact to conclude that [defendant's] proffered reason was a pretext for discrimination [or retaliation], summary judgment must be entered against [plaintiff]." Paquin v. Fed. Nat'l Mortgage Ass'n, 119 F.3d 23, 27-28 (D.C. Cir. 1997) (emphasis added). "Title VII, it bears repeating, does not authorize a federal court to become 'a superpersonnel department that reexamines an entity's business decisions.'" Barbour v. Browner, 181 F.3d 1342, 1346 (D.C. Cir. 1999) (quoting Dale v. Chicago Tribune Co., 797 F.2d 458, 464 (7th Cir. 1986)); see Jackson v. Gonzales, No. 06-5053, slip op. at 6 (D.C. Cir. Aug. 10, 2007) (applying Aka's summary judgment standards and again disclaiming that judiciary should act as a "super-personnel department"). To the contrary, a court "may not 'second-guess an employer's personnel decision absent demonstrably discriminatory motive.'" Fischbach, 86 F.3d at 1183 (quoting Milton v. Weinberger, 696 F.2d 94, 100 (D.C. Cir. 1982)).

**B.**    **Plaintiff Fails to Show Membership in a Protected Group, That He Opposed An Unlawful Practice, and That He Suffered an Adverse Employment Action**

    <u>i.</u>    <u>Plaintiff's Evidence of His Ancestry Is Inadequate and He Has Failed to Show That Agency Officials Were Aware of His Claimed Native American Ancestry</u>

Plaintiff's national origin discrimination claim fails for proof of his ancestry and knowledge by OIG officials of his claimed Native American heritage.  <u>See</u> <u>Singh v. U.S. House of Representatives</u>, 300 F. Supp. 2d 48, 57 (D.D.C. 2004) (plaintiff must make necessary causal connection between plaintiff's protected status and the alleged mistreatment).  In his opposition, Plaintiff contends that he has established that he is a member of a protected group, by the facts that: 1) he actively participated in recruitment programs where he discussed his Native American heritage; 2) displayed Native American artwork in his office in Region 6; 3) an anonymous diversity survey from the early 1990s reported that there was an unnamed employee in Region 6 of Native American ancestry; and 4) he filed a complaint of harassment pertaining to his Native American ancestry.  (Plaintiff's Opp. at 27, 37-38).  Plaintiff further argues that the Agency's contentions regarding his protected status are deficient.  (<u>Id</u>. at 38).  Because Plaintiff's arguments are conclusory and misconstrue the applicable law, the Court should enter judgment in favor of Defendant on the national origin claim.

First, the case Plaintiff cites to attack the Agency's legal argument regarding proof of Native American ancestry does not support his assertions.  (<u>See</u> Plaintiff's Opp. at 38 n.15).  Indeed, as Plaintiff pointed out in his brief, where the only proof of national origin consists of "unproven and 'self-serving' assertions attesting to" that national origin, documentary proof is necessary.  (<u>Id</u>.).  Family lore, <u>i.e.</u>, the unproven assertions, is the only evidence Plaintiff has provided regarding his ancestry.  (<u>See</u> Malloy Dep. I, 7:10-14, 9:7-10).  While no one would begrudge Plaintiff's reliance on family lore to support his *subjective* belief of ancestry, it is insufficient evidence to establish his membership in a protected group.

As the district court observed in <u>Eriksen v. Allied Waste Sys., Inc.</u>, 2007 WL 1003851, at * 5 (E.D. Mich.), "[d]ifference in dress, language, accent and custom associated with a non-American origin are more likely to elicit prejudicial attitudes than the fact of the origin itself. An individual's speech, dress, and mannerisms are his present; his ancestral origin is his past. Only through the medium of characteristics does ancestral origin become apparent in the present."  Significantly, nothing in Plaintiff's presentation even suggests that his dress, language, accent or custom provide any hint about his asserted ancestry such that it would give rise to an inference that Agency officials were aware of it.  Absent a showing of these characteristics, Plaintiff must demonstrate that the Agency had a reasonable belief that he was a member of a protected class, which he has not done.

The facts Plaintiff relies on in support of his argument do not establish that OIG officials responsible for the employment action at issue were aware of his claim of Native American ancestry.[15] Plaintiff has presented no facts, and indeed none exist in the record, that show that AIGI Haban was present at the recruitment meetings where Plaintiff alleges he spoke about his ancestry.  In addition, the display of ethnic artwork does not conclusively establish that a person is of the ethnic group from which the artwork has its origins – e.g., many people *not* of African descent display African artwork, but that does not necessarily correlate that those people are, or are claiming to be, of African descent. More importantly, Plaintiff does not allege, and the facts do not support, any contention that AIGI Haban or other OIG officials outside of Region 6 observed the art displayed in Plaintiff's office.  As for the diversity survey, as the Agency pointed out in its original motion, this survey was *anonymous*. Plaintiff has not presented any facts showing how officials outside of Region 6 could possibly know that the one Native American employee, listed anonymously, for Region 6 was in fact Plaintiff himself.

---

[15] Although Plaintiff melodramatically likens the Agency's arguments to the Third Reich regarding his lack of proof pertaining to his Native American ancestry, he plainly misread the Agency's Motion for Summary Judgment (<u>See</u> Plaintiff's Opp. at 38).  Clearly, the Agency listed documentary proof of ancestry as *one* of several methods by which Plaintiff could establish this element of his prima facie case.  (<u>See</u> Defendant's MSJ at 14-15).

Plaintiff also contends that OIG officials, namely AIGI Haban, were aware of his Native American ancestry when there was an alleged "investigation into Mr. Malloy's harassment as a Native American." (Plaintiff's Opp. at 27, 37). Plaintiff's claim in this regard is simply too tenuous to preclude summary judgment. Plaintiff has offered no credible evidence that the information he provided in connection with the EEO complaint filed by SA Tighe was presented to AIGI Haban. As with most of Plaintiff's Opposition, there is nothing but Plaintiff's speculation that AIGI Haban was aware of Plaintiff's protected status and recalled it years later when considering how to respond to Plaintiff's reported misconduct. Because Plaintiff has failed to raise a genuine issue of fact that his protected status is established, or that Agency officials were aware of his protected status, summary judgment is appropriate as to Plaintiff's national origin claim. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) ("some metaphysical doubt as to the material facts" is not enough to deny summary judgment); see also Greene, 164 F.3d at 675 (accepting plaintiff's "conclusory allegations . . . would defeat the central purpose of the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial.").

ii.    Plaintiff's Discipline of SAs Richardson and Romero is
Not Protected Activity

Plaintiff contends that his recommendation of less harsh discipline than he believed OIG Headquarters intended for SAs Richardson and Romero amounted to opposition to an unlawful employment practice, but he fails to prove it. See Plaintiff's Opp. at 26-27, 35-37. Beyond the questionable nature of Plaintiff's own claim to minority status, he fails to show any connection between the supposed calls for harsher discipline or reaction to the discipline Plaintiff proposed were motivated by the two SA's race, and that missing link breaks the chain. The evidence does not establish that it was reasonable for him to believe that the discipline of the two agents was unlawful. See Parker v. Balt. & Ohio R.R. Co., 652 F.2d 1012, 1020 (D.C. Cir. 1981). In other words, a reasonable jury could *not* find that Plaintiff's assignment as the proposing official for discipline against

two minority employees sends a clear message and carries the distinct tones of racial motivations and implications.[16]  See Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1083 (3d Cir. 1996); Paul v. Fed. Nat'l Mortgage Ass'n, 697 F. Supp. 547, 556 (D.D.C. 1988) ("an employee is not immune from [discipline] merely by claiming that she was opposing discriminatory practices, and . . . an employer remains entitled to loyalty and cooperativeness from employees.") (internal citations omitted).

Nor could a reasonable jury interpret any of the behavior recounted by Plaintiff as part of a "complex tapestry of discrimination when examined in conjunction with the comments made by . . . management." Aman, 85 F.3d at 1083.  Further, Plaintiff has merely made conclusory assertions that his conduct in disciplining Agents Richardson and Romero was made in good faith.  The only evidence established by Plaintiff is that SAs Richardson and Romero are ethnic minorities who were subject to disciplinary action, which is insufficient to establish that his opposition to OIG's recommendation of discipline was an unlawful employment action.

Plaintiff's notion that his discipline proposals should be considered protected activity because he believes that other OIG employees who had engaged in similar or worse misconduct were not punished or were punished mildly is misguided and not supported by sufficient evidence.  (See Plaintiff's Opp. at 36).  Although Plaintiff argues that OIG Headquarters allegedly wanted SA Richardson terminated or severely disciplined (Id. at 36-37), he relies on insufficient evidence and misconstrues the applicable law.  SA Richardson is still employed by OIG, and received only the discipline Mr. Malloy recommended.

The cases Plaintiff relies on to support his conclusory assertions can be distinguished from the undisputed facts in the present case.  First, Plaintiff cites Moyo v. Gomez, 40 F.3d 982 (9th Cir. 1994), to support his conclusory allegation that his mistaken belief was made in good faith, and thus is actionable under §704(a).  (See Plaintiff's Opposition Motion, p. 36).  However, in Moyo, plaintiff

---

[16] This is especially true since Plaintiff has not established that OIG officials were aware of his protected status.  (See supra section III.B.i.)

opposed a policy that denied showers to black inmates after work shifts.  See Moyo, 40 F.3d at 984 (reversing district court's dismissal of complaint for failure to state a claim).  In EEOC v. St. Anne's Hospital of Chicago, 664 F.2d 128 (7th Cir. 1981), the evidence showed that plaintiff was discharged for hiring a black employee because of racial animus of an anonymous caller threatening the security of the hospital.  Even though the employer did not explicitly state that plaintiff's termination was because she hired a black employee, the evidence revealed that the hospital had received security threats directly connected to the hiring of the black employee.  In reaction to these threats, the hospital fired defendant.  St. Anne's Hospital of Chicago, 664 F.2d at 129.  Thus, in St. Anne's Hosp., there was circumstantial evidence showing that the hospital's termination of plaintiff was because of her protected opposition.  Unlike St. Anne's Hosp., the facts in the present case do not demonstrate that the disciplinary actions brought against Agents Richardson and Romero were taken because of their protected status.  Even Plaintiff concluded that some form of discipline was warranted, so the issue is only one of degree and Plaintiff offers no evidence that reasonable minds could not differ on that or any evidence that anyone, other than Plaintiff, ever mentioned Richardon's or Romero's protected status in connection with the discipline or otherwise.  Plaintiff did not communicate with anyone at OIG Headquarters concerning the discipline before it was imposed, and it was never changed.  DSMF 11-12, 20.

Unlike Moyo and St. Anne's Hosp., here, Plaintiff's only evidence of an unlawful employment practice rests on his assertion that his involvement in the disciplinary proceedings of these Agents was an attempt to "'dump this on a diverse supervisor to deal with a diverse employee.'"  (See Plaintiff's Statement of Genuine Issues, ¶ PPP).  Even assuming, as Plaintiff desires, that OIG wanted to impose harsh discipline on Agents Richardson and Romero, the fact that both Plaintiff and these agents belong

to ethnic minority groups does not prove that OIG's motivation was based on prohibited discrimination.  See Welzel v. Bernstein, 436 F. Supp. 2d 110, 125 (D.D.C. 2006).[17]

Plaintiff simply makes an enormous leap of logic to assume that the only reason that these agents were disciplined was because of their protected status.  Plaintiff also cites to his July 2007 declaration in which he vaguely describes "eight specific instances" when other non-minority agents and auditors engaged in misconduct equal to or worse than that of Agents Richardson and Romero without harsh discipline.  Plaintiff's July 2007 declaration is entirely composed of conclusory allegations and is not based on first-hand knowledge.  For example, Plaintiff alleges that several OIG agents and other employees committed various acts of misconduct that were as egregious, or more so, than the misconduct committed by Agents Richardson and Romero.  (See Malloy Decl. ¶¶ 40-44).  In describing these other transgressions, Plaintiff provides no specific information regarding these incidents, and he offers it only as *post hoc* rationalization.  Plaintiff does not provide the names of the OIG employees or the dates when these incidents occurred.  Even further, Plaintiff fails to describe how he came to know of these incidents other than to intimate that the "conduct was well-known throughout OIG and in Headquarters."  (Malloy Decl. ¶ 40; see also id. at ¶ 43 ("The charges were well known to Headquarters . . . .")).  As such, one is required to assume that these stories are based entirely on hearsay, which is not admissible for purposes of attempting to avoid summary judgment.  Glekken, 199 F.3d at 1369 ("Gleklen's evidence about the conversation is sheer hearsay; she would not be permitted to testify about the conversation at trial. . . .  It therefore counts for nothing.").  Not only does Plaintiff decline to explain how he learned of these alleged incidents, he also makes conclusory assumptions about the knowledge held and the action taken by AIGI Haban and other OIG officials regarding this misconduct.  (See Malloy Decl. at ¶¶ 40-44, 46).  Furthermore, Plaintiff's declaration regarding his supposed "good faith" belief calls for the reader to make great inferential leaps from

---

[17]  See also Defendant's Motion for Summary Judgment, pp. 17-20.

Plaintiff's unsupported allegations to the conclusion that Plaintiff believed "in good faith that any desire to discipline Mr. Richardson more severely or to terminate him would have been disparate treatment on account of his race and prior activity." (Malloy Decl. at ¶ 44; see also id. at ¶ 50 (stating the same for Agent Romero)).[18]

Simply put, Plaintiff, unlike the facts in Moyo and St. Anne's Hosp., does not provide the types of specific, substantiated facts demonstrating that he had a good faith reasonable belief that his assignment to propose discipline for Agents Richardson and Romero was an unlawful employment practice. Even taking into consideration Plaintiff's limited knowledge about the factual and legal bases of his claim, it was not reasonable for Plaintiff to conclude that his assignment as the proposing official was unlawful. The fact that the two agents are ethnic minorities does not absolve OIG from considering punishment that it considered appropriate in light of the misconduct alleged. Even assuming that Plaintiff could establish that his activity in disciplining these agents is protected, he cannot show, and has not shown, that his protected activities, including the filing of an EEO complaint, were the cause of the Agency's actions or that the reasons for these actions are a pretext for retaliation.

Plaintiff's theory of discrimination and retaliation hits a brick wall when he accuses the same management officials who recognized him as the National HUD OIG Investigation Manager of the Year in 1999. The common identity of these folks sharply undercuts any inference of unlawful discrimination or retaliation, as well as causation because Plaintiff insists that they knew of his protected status and earlier participation in an EEO harassment investigation before 1999. See Waterhouse v. District of Columbia, 124 F. Supp. 2d 1, 12 (D.D.C. 2000), aff'd, 298 F.3d 989 (D.C. Cir. 2002) ("the Court finds persuasive the fact that the same group of management officials who fired

---

[18] Plaintiff also makes immaterial arguments in support of his contention that his opposition was justified. (See Pl.'s Opp. at 37). None of this putative evidence leads to an inference of retaliation because all of these facts merely presume an ominous motive without showing evidence of one.

plaintiff also hired her only a short time before, thereby raising a presumption or inference of non-discrimination.") (citing cases).[19]

iii.     <u>Plaintiff Did Not Suffer Any Adverse Employment Action Because He Fails to Show That He Suffered Any Objectively Tangible Harm</u>

While actions falling short of an outright firing can be considered adverse for purposes of establishing discrimination, not all personnel decisions with negative consequences for the employee necessarily qualify as adverse actions.  In fact, the action must materially and adversely affect the terms, conditions, or privileges of present or future employment.  See <u>Brown v. Brody</u>, 199 F.3d 446, 457 (D.C. Cir. 1999).  Actions imposing purely subjective harms, such as dissatisfaction or humiliation, are not adverse.  See <u>Forkkio v. Powell</u>, 306 F.3d 1127, 1130-31 (D.C. Cir. 2002).  In other words, when relying on an employment action, an employee must show that it inflicts "objectively tangible harm."  See <u>Holocomb v. Powell</u>, 433 F.3d 889, 902 (D.C. Cir. 2006).  Plaintiff's claims that the removal of his supervisory duties, placement on administrative leave, and nonselection for the ASAC position in Houston he never applied for fail to establish that he suffered objectively tangible harm.

a.     *Removal of Supervisory Duties and Placement on Administrative Leave Were Not Adverse Actions Under the Circumstances Here*

While it is understandable that Plaintiff may have been displeased about being placed on administrative leave and the temporary removal of his supervisory duties on his return to duty while the investigation into his conduct continued, he suffered no objectively tangible harm.  As the Court of Appeals for the Second Circuit noted, "the terms and conditions of employment do include an expectation that an employee is subject to reasonable disciplinary procedures."  <u>Joseph v. Leavitt</u>, 465 F.3d 87, 93 n.1 (2d Cir. 2006) (holding that placement of plaintiff on paid administrative leave pending

---

[19]   See also <u>Buhrmaster v. Overnite Transp. Co.</u>, 61 F.3d 461, 464 (6th Cir.1995), <u>cert. denied</u>, 516 U.S. 1078 (1996) ("An individual who is willing to hire and promote a person of a certain class is unlikely to fire them simply because they are a member of that class.  This general principle applies regardless of whether the class is age, race, sex, or some other protected classification.").

16

criminal charges and continuation of that leave pending internal investigation were not adverse

actions).  Admittedly, placement under investigation and on administrative leave should be evaluated

case-by-case to determine whether they are of such a nature that a reasonable person would be deterred

from making or pursuing a discrimination claim.  See Burlington No. & Santa Fe Ry. Co. v. White,

126 S.Ct. 2405, 2417 (2006).  However, nothing alters the law allowing employers to react

appropriately to problems in the workplace and requiring employees to establish more than mere

temporal proximity to raise an inference of unlawful discrimination or retaliation.  See Milburn v.

West, 854 F. Supp. 1, 14 (D.D.C. 1994).   Thus, in evaluating whether Plaintiff suffered an adverse

action, it is necessary to view the Agency's action in light of the information it possessed relating to

Plaintiff's misconduct.

        In this case, it is undisputed that HUD-OIG management possessed at least some evidence that

Plaintiff had proven himself to be a supervisor who was willing to interfere with an on-going

investigation by instructing his subordinates to "circle the wagons." (DSMF 24).  Plaintiff admits that

such an allegation is serious.  See DSMF 27.[20]  Consequently, the Agency's decision to place Plaintiff

on administrative leave and subsequently, temporarily remove his supervisory duties when he was

returned to duty was an appropriate reaction to Plaintiff's conduct.  Moreover, clearly placing Plaintiff

on administrative leave in no way deterred him from making or pursing his discrimination claim.  In

fact, Plaintiff commenced the EEO complaint process after he was placed on administrative leave and

continued to make careful and deliberate choices to maximize what he believed to be in his best

interest through the administrative process (i.e., his request to continue to be on administrative leave

during settlement negotiations, his resignation from the Agency before the conclusion of the

---

[20]   For DSMF 28, plaintiff may not create a genuine issue of fact by contradicting his own prior sworn testimony.  See, e.g., Adelman-Tremblay v. Jewel Cos., 859 F.2d 517 (7th Cir. 1988) (plaintiff unable to avoid summary judgment by submitting supplemental affidavit of expert witness that conflicted with witness's deposition testimony); Franks v. Nimmo, 796 F.2d 1230, 1237 (10th Cir. 1986) (plaintiff's affidavit disregarded in light of his contrary deposition testimony); Van T. Junkins & Assoc. Inc. v. U.S. Industries, Inc., 736 F.2d 656, 657 (11th Cir. 1984); Camfield Tires Inc. v. Michelin Tire Corp., 719 F.2d 1361 (8th Cir. 1983).

investigation, etc.). (See DSMF 38; see also Malloy Depo. 51:1-25). Thus, the information presented to the Agency regarding Plaintiff's attempt to obstruct an ongoing investigation gave the Agency a reasonable basis for placing Plaintiff on administrative leave.

### b.    The Houston ASAC Position

Plaintiff's claim that being placed on administrative leave or the investigation itself prevented Plaintiff from being considered for the ASAC position in Houston is simply unfounded. Plaintiff has not demonstrated that he made every reasonable attempt to convey his interest in the ASAC vacancy. See Clipper v. Billington, 414 F. Supp. 2d 72, 86 (D.D.C. 2006). In Plaintiff's deposition he admits that he had time to apply for the ASAC Houston position, but he never applied for the position. (Plaintiff's Statement of Genuine Issues, 55). Plaintiff has not pointed to any specific evidence demonstrating that the Agency prevented him from applying for this position. All he says is that he relied on Lester Davis's purported statement to him that Plaintiff was unlikely to be selected while he was under investigation. Nothing about that statement calls into question the reason for placing Plaintiff on administrative leave or is enough to make out a claim for non-selection for a position for which he did not apply. Ware v. Billington, 344 F.Supp.2d at 71 n.1 (rejecting employee's attempt to end-run around the absence of an adverse action by claiming that employer had an "overall scheme" to deny him a position and "destroy his career"); see also Elam v. D.C. Fire & EMS Dep't, 2005 WL 1903557 (D.D.C. 2005) (claim for non-selection in the absence of an application requires proof that plaintiff was unaware that the position was open).

### c.    Future Employment Opportunities

Plaintiff's claim that the Agency's action denied him future employment opportunities at other law enforcement agencies is too speculative to conclude that he suffered materially adverse consequences from these actions. See Nurridin v. Goldin, 882 F. Supp. 2d 79, 94 (D.D.C. 2005) (noting that speculative allegations about future benefits is not sufficient). Plaintiff testified during his

deposition that he has not attempted to apply for other law enforcement positions outside of the Agency. (DSMF 49). Once again substituting his own fears for facts, Plaintiff's own failure to apply for positions negates the notion that the Agency's actions had a materially adverse consequence on his future employment. Plaintiff's contention that "OIG's actions 'have made it virtually impossible for [him] to obtain law enforcement work outside of HUD OIG'" (Plaintiff's Opp. p. 29) is entirely too speculative and conclusory to establish that the Agency impaired his future employment opportunities. Once again, Plaintiff may not manufacture genuine issues of material fact on the basis of "some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).

Thus, because Plaintiff's placement on administrative leave, temporary removal of his supervisory duties, both of which were due to the investigation into his serious misconduct, and his failure to apply for the ASAC position are not adverse actions, summary judgment should be granted. Plaintiff cannot establish that he suffered harm from these actions, other than his subjective embarrassment. Even if Plaintiff could establish that these events are adverse actions, there is no evidence that the Agency's articulated reasons for these actions are pretextual.

     iv.    <u>Plaintiff Misconstrues the Applicable Law Relating to His Contention Regarding the Adducing of Critical Facts</u>

Plaintiff argues that summary judgment is precluded because he claims to have established his prima facie case based on the fact that he supposedly surmounted the Agency's legal objections to it, and the Agency did not produce evidence of its articulated reasons. (<u>See</u> Plaintiff's Opp. at 42). Because Plaintiff misconstrues the applicable law and has otherwise failed to establish his prima facie case, at least for his national origin claim, this argument fails.

First, this Circuit's decision in <u>Aka v. Washington Hosp. Ctr.</u>, 156 F.3d 1284, 1289 (D.C. Cir. 1998), does not mandate that the Agency produce evidence of its articulated reasons as the only method of obtaining summary judgment. In fact, the clear language of that decision states that under

St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993), "the function of the *prima facie* case is to compel the employer to" produce evidence of its articulated reasons. The Aka decision went on to state that the Court does "not read *Hicks* to say that a plaintiff who creates a genuine issue of material fact as to whether the employer has given the real reason for its employment decision will *always* be deemed to have presented enough evidence to survive summary judgment." Aka, 156 F.3d at 1290-91 (explaining that "there may be no legitimate jury question as to discrimination in a case in which a plaintiff has created only a weak issue of material fact as to whether the employer's explanation is untrue, and there is abundant evidence in the record that no discrimination has occurred."). Thus, under Aka and Hicks it is only the *firm* establishment of a prima facie case that requires the Agency to articulate its legitimate, nondiscriminatory reasons for its actions. The evidence Plaintiff provides to support his contention that an inference of discrimination was raised to which the Agency failed to respond does not establish any prima facie inference of discrimination. As discussed below, Plaintiff's comparator data is insufficient, and his contentions that this evidence "has been thoroughly fleshed out" is his own characterization and not binding. (See Plaintiff's Opp. at 42). Because Plaintiff has failed to establish his prima facie case of discrimination, summary judgment is appropriate.

Even if Plaintiff reaches the next step, the Agency has articulated its legitimate, nondiscriminatory and nonretaliatory reasons for its actions, and summary judgment is not precluded. As this Circuit has made clear time and again, in order for a plaintiff to carry his burden of showing pretext, the issue is not the correctness of the decision-maker's reasons, but whether he or she honestly believes them. See Carpenter v. Federal National Mortgage Ass'n, 174 F.3d 231, 237 (D.C. Cir. 1999).[21]

---

[21]  Fischbach v. District of Columbia Dep't of Corrections, 86 F.3d 1180, 1182 (D.C. Cir. 1996); see also Scarborough v. Natsios, 190 F. Supp.2d 5, 18 (D.D.C. 2002); Randall v. Howard Univ., 941 F. Supp. 206, 213 (D.D.C. 1996).

**C.** **Other Than Proximity in Time Due to Events, There is No Connection Between the Agency's Actions and Plaintiff's Protected Activity and Plaintiff Cannot Show that the Agency's Action were a Pretext for Retaliation**

Assuming arguendo that the Plaintiff can make out a prima facie case or that the court accepts that the imposed administrative leave and investigation are adverse personnel actions, Plaintiff has not raised a genuine issue of fact as to whether the Plaintiff's activities were the cause of the Agency's actions or a pretext for retaliation or discrimination (See Plaintiff's Opp. §§ I.D., II.A.iii.). To establish the causation element of a prima facie case of retaliation, a plaintiff must prove that the responsible officials had knowledge of the protected activity and that the adverse action occurred "shortly after" the protected activity. Holbrook v. Reno, 196 F.3d 255, 263 (D.C. Cir. 1999) (quotation omitted).

>    i.    Plaintiff's Protected Activities Were Not the Cause of the Agency's Actions or Pretext for Retaliation

This Court has held that a "subjective reason can be legally sufficient, legitimate and nondiscriminatory [and presumably nonretaliatory] if the Defendant articulates a clear and reasonable specific factual basis" for its subjective opinion." Bowdre v. Richardson, 131 F. Supp. 2d 179, 188 (D.D.C. 2001). Moreover, an employer may change an employee's duties provided the employer has a legitimate reason for doing so. See Jones v. Lyng, 669 F. Supp. 1108, 1122 (D.D.C. 1986). Any reason may be legitimate provided it is not based on Plaintiff's protected status. See Weigert, 120 F. Supp. 2d at 20. Defendant clearly meets its burden of articulating legitimate, nonretaliatory reasons for placing Plaintiff on administrative leave, under investigation and returning him to work without his supervisory duties.

As stated previously, Plaintiff had proven himself to be an untrustworthy supervisor by instructing his subordinates to "circle the wagons" and telling them it was okay to not remember things. Plaintiff must demonstrate that this asserted reason was merely a pretext for illegal retaliation to survive summary judgment and the evidence must establish that the reason offered by the Agency is

false and that the real reason was discrimination or retaliation. See Reeves v. Sanderson Plumbing Products, Inc., 210 S. Ct. 2097, 2108-11 (2000). As noted in this Circuit, "proving that an employer's reason is false will not always be sufficient to demonstrate pretext. This is so because an employer's action may be justified by a reasonable belief in the validity of the reason given even though that reason may turn out to be false." George v. Leavitt, 407 F.3d 405, 415 (D.C. Cir. 2005). Plaintiff has not demonstrated that the Agency's reason was objectively false; merely denying the veracity of the Agency's reason is not sufficient to overcome summary judgment.

Ultimately, in deciding this matter, the issue is whether a reasonable jury could find the Agency would not have taken the action it took except for Plaintiff's protected activity. Federal employees have a duty to cooperate with agency investigators unless criminal proceedings are reasonably feared. Weston v. Dep't of Housing & Urban Dev., 724 F.2d 943 (Fed. Cir. 1983). Moreover, the federal government recognizes that supervisors owe a duty of loyalty to the agency, and it is improper for supervisors to advise their employees not to cooperate with investigators. Brown v. Dep't of Transp., 21 M.S.P.R. 572 (July 3, 1984), aff'd, 735 F.2d 543 (Fed. Cir. 1984).

The undisputed events from the Fall of 2002 support the Agency's actions regarding Plaintiff's alleged misconduct. Plaintiff was interviewed as a witness as a part of an investigation into the conduct of SAC Chapman and he refused to release documents to the investigators. The Agency received allegations that during a meeting of the special agents in September 2002, the Plaintiff discussed the Chapman investigation and told the agents "we need to circle the wagons." All of this occurred prior to Plaintiff filing any EEO complaint and prior to Agency management becoming aware of his recommended penalties for SAs Richardson or Romero. Plaintiff's inappropriate actions set off the chain of events that occurred and which were not in any manner retaliatory. Courts have recognized that employers do not lose the ability to respond to a perceived problem in the workplace because an employee involved in the problem engages in activity protected by Title VII. See Bush v.

Engelman, 266 F. Supp. 2d 97, 103 (D.D.C. 2003).  The evidence clearly shows that the Agency's actions were reasonable and that they were not done because of Plaintiff's protected status or as a pretext for reprisal.

Further, the fact that ten witnesses may have denied that Plaintiff made the statement "circle the wagons" does not prove pretext or that the Agency's actions were based on an unlawful reason. Unlike the evidentiary standard at trial, the reasonableness of the Agency's investigation into Plaintiff's misconduct cannot be analyzed by the fact that a certain number of witness statements supposedly exonerated Plaintiff or that a particular person should be believed over others.  In addition to the exculpatory affidavits regarding the "circle the wagon" meeting, the Agency also had inculpatory statements indicating that Plaintiff made totally inappropriate comments to his subordinates.  Even Plaintiff testified that if a supervisor made the type of statement like "circle the wagon," he would consider it serious misconduct.  (See DSMF 27).  Based on all of the information in its possession, and based on the seriousness of the allegations, it was reasonable for the Agency to temporarily remove Plaintiff from a situation in which he could potentially influence the outcome of an internal investigation.  Thus, the Agency's actions towards Plaintiff were reasonable in light of the information in its possession and were not made based on prohibited reasons.

ii.     Dan Truxal and Daniel Salas are Not Proper Comparators

In order for an employee to show that they are similarly situated to another employee, the employee is required to demonstrate that all of the relevant aspects of their employment situation are "nearly identical."  See Neuren v. Adduci, Mastriani, Meeks & Schill, 43 F.3d 1507, 1514 (D.C. Cir. 1995).  In determining whether two employees are similarly situated a court must look at all relevant factors, the number of which depends on the context of the case. Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617 (7th Cir. 2000) (quoting Spath v. Hayes Wheels Int'l-Ind., 211 F.3d 392, 397 (7th Cir. 2000)).  In some cases, the issue of whether two employees are similarly situated can be resolved as a

matter of law.  See George, 407 F.3d at 415 ("[w]hether two employees are similarly situated *ordinarily* presents a question of fact for the jury.") (emphasis added).  Additionally, in disciplinary cases--in which a plaintiff claims that he was disciplined by his employer more harshly than a similarly situated employee based on some prohibited reason--a plaintiff must show that he is similarly situated with respect to performance, qualifications, and conduct.  Radue, 219 F.3d at 617 (quoting Byrd v. Ronayne, 61 F.3d 1026, 1032 (1st Cir. 1995)).   This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them. Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992).

That is not the case here.  The treatment of ASAC Dan Truxal by the Agency is not an adequate basis for comparison.  Plaintiff's actions during the course of the investigation into SAC Chapman were dissimilar in a critical respect:  ASAC Truxal quickly reversed course and offered his cooperation.  Although Plaintiff contends that ASAC Truxal made improper statements "to interfere with the investigation of Mr. Chapman," (Plaintiff's Opp.  at 32), nothing in the affidavit to which Plaintiff cites indicates that Truxal made any statements like "circle the wagons."  (See Att. L, Malloy Decl.).  Moreover, while initially uncomfortable with turning over his personal diaries, ASAC Truxal was prepared to turn over the documents that he had been instructed by HUD OIG investigators to provide.  (See Robinson Dep. 54:12-22 (attached as Exhibit 30)).  When ASAC Truxal reported to HUD OIG headquarters to be interviewed, he brought the documents with him.  (See id. at 55-56).  Plaintiff never offered the documents prior to his retirement.  DSMF 22.  It is clear that the Agency's actions with respect to Plaintiff were different from its actions with regards to ASAC Truxal because of the substantially mitigating circumstances that distinguished their conduct during the course of the investigation and not because of Plaintiff's protected status.

With regard to Deputy Assistant Inspector General for Investigations ("DAIGI") Daniel Salas, Plaintiff cannot establish that in any way the conduct he was investigated for was similar to the allegations made against DAIGI Salas. The context of the case is completely different. There were allegations that DAIGI Salas [      REDACTED PURSUANT TO PROTECTIVE ORDER

                                                  ] See Salas Dep. at 36-41 (Exh. 28) (SEALED). Those circumstances, involving conduct outside of the workplace, are unlike Plaintiff's circumstances in which he directed his subordinate employees to "circle the wagons" with regard to an internal investigation, thus directly impacting the operations of the Agency. See Haban Dep. at 6-7 (attached as Exh. 27). Further, DAIGI Salas held a different position than Plaintiff held, and thus he was not under the supervision of the same person or persons. Consequently, DAIGI Salas is also not an adequate comparator for purposes of establishing a prima facie case of discrimination and/or retaliation. Thus, as a matter of law, Plaintiff has not established that similarly situated employees were treated more favorably than he, and he fails to establish that the Agency's reasons for its actions were based on his protected status or are a pretext for discrimination or retaliation.

          iv.     The Agency Did Not Depart From Standard Business Practices

Plaintiff is correct that it is not a standard business practice of HUD OIG to place an employee on administrative leave when they are being investigated. HUD OIG has, however, in the past placed agents who were under investigation on paid administrative leave during the pendency of an investigation. Clearly, administrative leave is an available option to the Agency when a supervisor has proven that he is willing to obstruct an investigation. Management at OIG Headquarters in Washington, D.C. had legitimate reasons to question Plaintiff's loyalty to the organization. Plaintiff's refusal to cooperate with the investigation and directing subordinates to be less than honest naturally led to the Agency's loss of confidence in Plaintiff. Under the circumstances it was reasonable and appropriate for the Plaintiff to be placed on administrative leave during the investigation. Plaintiff fails

to establish that there is a genuine issue of material fact in this regard—his reference to the deposition of David Nuhfer omits Mr. Nuhfer's statement that, "very rarely are the charges out there so serious, that an agency would not want an individual in their office. . . . But it's going to be dependent on the nature of the charges."  (Nuhfer Dep. at 73-74).  It is clear that the Agency's actions were taken because of the nature of Plaintiff's disloyal conduct and not because of his protected status.

v.    There Is No Evidence that the Agency's Investigation of Plaintiff's Conduct was Slanted

Plaintiff's statement that he was cleared early on is simply unfounded.  There is nothing in the record to suggest that Plaintiff was cleared, much less early on.  Presumably, Plaintiff is referring to AIGI Haban's testimony that a few of Plaintiff's subordinate employees indicated that they did not hear him make the statement "circle the wagons."  However, several other employees indicated that they did, in fact, hear him make the statement.  (DSMF 29-31).  Moreover, Plaintiff, of his own accord, indicated that he made the statement.  (See DSMF 28).  Additionally, upon Plaintiff's retirement the investigation had not been concluded.  (Plaintiff's Statement of Genuine Issues, ¶ LLLLLLL).  Thus, it seems absurd to suggest that Plaintiff had been cleared early on.  (See Plaintiff's Opp. at 33).  Plaintiff provides no evidence that indicates that the investigation into his conduct was flawed or inexplicably unfair.  Again, it is clear that there was nothing slanted about the Agency's investigation into the Plaintiff's conduct or that the investigation was slanted because of his protected status.

vi.    There is No Credibility Issue with Regard to the Accounts of OIG Actions

Plaintiff's statement that HUD OIG is transparently dishonest and unashamed to boot is simply untrue.  Deputy Inspector General Stephens never denied being an active participant in the decisional process.  Deputy Inspector General Stephens testified that he does not recall if he was an active participant in the decisional process concerning the Plaintiff.  (Stephens Dep. at 21) (attached as Exhibit 29).  However, Deputy Inspector General Stephens goes on to explain the general workings of the decisional process, stating in relevant part: "Normally once a decision is made by a supervisor, and

a comfort level is arrived at by that supervisor, I am notified of that process and then it's

implemented." (Id. at 23-24)  Thus, Deputy Inspector General Stephen's inability to specifically recall

whether or not he was an activate participant with respect to Plaintiff is not irreconcilable with AIGI

Haban's claim that collaborative decisions were made with Mr. Stephens; it is merely a matter of

semantics and not a genuine issue of material fact.[22]

Likewise, DAIGI Salas does not deny being briefed on Plaintiff's investigation.  Again, DAIGI

Salas indicated that he does not recall being briefed on the investigation.  Just because DAIGI Salas

does not recall the briefings, does not mean they did not happen as indicated by SAC McCarty or that

SAC McCarty is fabricating a false explanation or statement.  Moreover, DAIGI Salas acknowledges

that he was the manager who issued the Memorandum to Plaintiff placing him on administrative leave;

thus it goes without saying that at some point he would have been briefed on the investigation.

Plaintiff fails to establish that there is a credibility issue with regard to OIG's accounts of its

actions.  Moreover, Plaintiff fails to show that any of the Agency's actions were taken because of his

protected status.  OIG's accounts of its actions are undisputable; the Agency received allegations that

Plaintiff was interfering with an investigation by instructing his subordinate employees to "circle the

wagons."  Subsequently, the Agency placed Plaintiff on administrative leave.  (DSMF 25).  Two

months later, before the completion of the investigation, Plaintiff was returned to duty without his

managerial responsibilities.  (See id. at 37, 39).  Two weeks later, (prior to the conclusion of the

investigation) Plaintiff voluntary retired.  (Id. at 43).  Those facts are undisputed and fully detailed in

the record.  Thus, Plaintiff fails to establish that there is a genuine issue of material fact with regard to

OIG's accounts of its actions.

---

[22] To the extent that Plaintiff's statement that summary judgment is precluded "unless the absence of animus on Mr. Stephens' part were also proven," (Plaintiff's Response p. 34 n.13), is meant to suggest that the Agency must prove no discrimination on the part of Mr. Stephens, Plaintiff confuses the Title VII burdens.  Plaintiff has not presented any specific, credible facts demonstrating Mr. Stephens's alleged discriminatory animus.

For the same reasons that Plaintiff's arguments fail regarding his putative comparators, departure from standard business practices, the supposed slanted investigation of Plaintiff, and OIG's account of its actions, these arguments also do not support his claim of disparate treatment.

**D.      Plaintiff Was Not Constructively Discharged**

In this case, the uncontested facts show that no aggravating circumstances were present that Plaintiff's work environment became so intolerable as to cause his involuntary retirement.  The main change in Plaintiff's employment upon his return to duty in December 2002 was that he no longer had any managerial responsibilities.  After being on administrative leave for two months (which was extended at his request), Plaintiff returned to duty.  (See DSMF 37).  Two weeks later he decided to retire.  (See id. at 43).  No one ever told Plaintiff that unless he resigned he would be subject to reassignment.  (Id. at 47).  In fact, Plaintiff admits that he was never told by anyone at HUD OIG that he had to either retire or he was subject to being reassigned.  (Id.).  Upon his return to duty, his immediate supervisor told him that he did not know what would happen to him.  (Id. at 40).

There is nothing to suggest that Plaintiff was subjected to anything other than reasonable working conditions under the circumstances during the two weeks he worked before deciding to retire.  Being under investigation does not give rise to coercion.  See Woodward v. Dep't of Treasury, 42 Fed. Appx. 436 (Fed. Cir. 2002) (holding that an employee should cooperate with the investigation and challenge its results rather than resigning before the investigation was complete; to do otherwise makes the retirement or resignation voluntary, not coerced).  The alteration of his duties did not last so long as to be unreasonable.  Plaintiff chose to retire before the completion of the investigation.  He voluntary chose to resign under a self-perceived cloud rather than remain and attempt to clear his name.  Moreover, the investigation did not drag on and it cannot be reasonably concluded that Plaintiff suffered a genuine adverse action.  See Joseph, 465 F.3d at 90-91.  Simply, Plaintiff fails to allege facts

that would lead a reasonable person to believe he had no choice but to resign.  See Pennsylvania State Police v. Suders, 542 U.S. 129 (2004).

Plaintiff asserts that his constructive discharge allegations do not support a separate claim, and only relate to the scope of any remedy.  Because summary judgment on his national origin and retaliation claims is warranted, the remedy is a non-issue.  In any event, Plaintiff misconstrues Kalinoski v. Gutierrez, 435 F. Supp. 2d 55, 73 (D.D.C. 2006) ("constructive discharge is based on a collection of events that precipitated plaintiff's resignation—specifically, the same two events that plaintiff separately alleges were unlawful under Title VII, *plus* decisions that plaintiff does not allege was discriminatory or retaliatory . . .") (emphasis added).   In Kalinoski, plaintiff contended that defendant's decisions to deny her requests for paid medical leave and to place her on leave without pay were not discriminatory or retaliatory but were abusive.  Id.  Unlike Kalinoski, Plaintiff here alleges that the same acts that were discriminatory or retaliatory were the cause of his supposed constructive discharge.  (See Am.Compl. at ¶¶ 69, 82, 95) (stating that all of the allegedly discriminatory/ retaliatory conduct was the cause of his constructive discharge); see also Kalinoski, 435 F. Supp. 2d at 73 n.6 ("there is no independent claim by plaintiff that the decisions [denying her requests for paid medical leave and leave without pay] were made because of her sex or because of her involvement in protected activity.").  Plaintiff has not alleged any additional *non*discriminatory or *non*retaliatory acts that  could have led to a constructive discharge, thus Kalinoski is inapplicable.

## IV.    CONCLUSION

For the reasons and arguments presented above, Defendant asks summary judgment be granted in his favor on all grounds because no reasonable finder of fact could reasonably conclude that the Agency discriminated against the Plaintiff on the basis of his national origin, or that the Defendant retaliated against the Plaintiff based on any protected activity.

Dated:  August 30, 2007.

Respectfully submitted,

_____
JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney


/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


/s/_____
JANE M. LYONS, D.C. Bar # 451737
Assistant United States Attorney
555 4th Street, N.W. - Room E4822
Washington, D.C. 20530
(202) 514-7161
(202) 514-8780 (facsimile)


Of Counsel:
Ariya McGrew, Attorney-Advisor, Office of the General Counsel
United States Department of Housing and Urban Development