## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JAMES MALLOY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-1117 (RCL) |
| | ) | |
| STEVEN C. PRESTION, Secretary of | ) | |
| The United States Department of Housing | ) | |
| And Urban Development, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### JOINT PRETRIAL STATEMENT

Pursuant to the Court's April 11, 2008 Minute Order, the parties respectfully submit this Joint Pretrial Statement. The pretrial statement provides the information specified in Local Rules 16.5(b) and 16.5(d)(1)(2) & (4).

Counsel for plaintiff prepared plaintiff's submissions in anticipation of an exchange of drafts by the parties last week to fulfill their obligation to meet and confer. As counsel for plaintiff informed defendant's counsel, he was scheduled to be in a hearing before the EEOC beginning on Monday August 4, 2008. That is the day for submission of the parties' joint statement to Chief Judge Lamberth. Late last week, counsel for defendant informed counsel for plaintiff that he would not be ready to exchange defendant's pre-trial submission before August 4, 2008. On August 4, 2008, counsel for plaintiff forwarded a copy of Plaintiff's pre-trial statement to counsel for defendant at 9:30 a.m. On August 4, 2008, at 4:50 p.m., counsel for defendant forwarded a copy of a joint pre-trial statement to counsel for plaintiff for his review. In accordance with plaintiff's request that no changes to defendant's pretrial statement be made after counsel for defendant opened plaintiff's pre-trial statement, counsel for defendant did not

review the substance of plaintiff's pre-trial statement until after the proposed joint pre-trial

statement was sent to plaintiff.

## Parties

**Plaintiff**

1.      Plaintiff James Malloy

        Represented by:

        Robert C. Seldon
        Robert C. Seldon & Associates, P.C.
        Attorneys-At-Law
        1319 F Street, N.W., Suite 200
        Washington, D.C. 20004
        Phone: (202) 393-8200 ext. 113
        Fax: (202) 318-2287
        *Counsel for Plaintiff*

**Defendant**

1.      Defendant Steven C. Preston, Secretary,
        U.S. Department of Housing and Urban Development

        Represented by:

        John C. Truong, Assistant United States Attorney
        Robin M. Meriweather, Assistant United States Attorney
        Cindy Owens, Special Assistant United States Attorney
        555 Fourth Street, N.W.
        Washington, D.C.  20530
        Phone: (202) 307-0406 or (202) 514-7198
        Fax: 202-514-8780
        *Counsel for Defendant*

## I.     Plaintiff's Statement of the Case

This is an action brought by plaintiff Jim Malloy, who was formerly employed as the Assistant Special Agent in Charge ("ASAC") with the Office of Inspector General ("OIG") of the Department of Housing and Urban Development ("HUD") in Ft. Worth, Texas.  The case arises under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-16.  Steven Preston, the Secretary of Housing and Urban Development, is the nominal defendant.  The "employer" whose actions are challenged by plaintiff is HUD OIG.

The Court has jurisdiction over this action by virtue of 28 U.S.C. §1332, and 42 U.S.C. 2000e-5.

Mr. Malloy had an exceptionally successful 29 year career in federal law enforcement.  In 1993, Mr. Malloy was appointed ASAC with the OIG Regional Office headquartered in Ft. Worth, Texas.  There, he supervised as many as 25 Special Agents and oversaw his Region's most complex criminal investigations.  Mr. Malloy was known at the national level in HUD OIG as a top manager and named National HUD OIG Investigation Manager of the Year in 1999; two years later, he was elected Chair of the federal government's twenty-five agency Southwest Regional Inspector General Council.  At no time before the events that gave rise to this suit was Mr. Malloy ever placed under investigation, denied a security clearance, disciplined, or even counseled.

In October of 2002, Mr. Malloy's unblemished career was ruined, after senior management in OIG Headquarters directed him to start disciplinary proceedings against an African American Special Agent, Cortez Richardson.  Mr. Richardson had been pursuing an EEO complaint against a senior OIG official in Washington, D.C., since May of 2001.  In May of 2002, OIG's Headquarters Office of Legal Counsel received a disciplinary package

concerning Mr. Richardson about events that occurred two years earlier.  Although the package came with a recommended 60 day suspension, upon its reading, the Legal Counsel's Office concluded that "removal is appropriate".

At that time, OIG Headquarters had the ability to take disciplinary action against Richardson.  But it faced an insurmountable problem.  Mr. Richardson was the prime witness in a prosecution against his former supervisor, entitled <u>United States v. Finn</u>, 01-CR-184 (D. Colo.).  Due to OIG's perjury, destruction of evidence, and attempted intimidation of defense witnesses, the majority of the indictment against Mr. Finn was dismissed on January 11, 2002.  The remaining counts "proceeded to trial on July 29, 2002;" eventually, they too were thrown by the Tenth Circuit.  <u>U.S. v. Finn</u>, 375 F.3d 1033, 1037 (10th Cir. 2004).

The core of Mr. Richardson's EEO complaint was that he was threatened with termination after he testified at the <u>Finn</u> trial.  OIG was free to do just that once Mr. Richardson testified in late summer of 2002.  By that time, however, OIG Headquarters no longer had the ability to terminate Mr. Richardson, because in June he had been given a hardship transfer to Mr. Malloy's Region.  That meant that Mr. Malloy and his supervisor in the field, former Special Agent in Charge ("SAC") Larry Chapman, rather than OIG Headquarters became responsible for any discipline for Mr. Richardson.

Mr. Malloy studied the Richardson investigative file very closely for 30 hours, beginning on September 23, 2002.  He focused on the evidence of record, Mr. Richardson's conduct, the fact that he was not on-duty, his status as a law enforcement officer, and Mr. Richardson's excellent record.  Mr. Malloy also knew that OIG took little or no action in response to misconduct that was off-duty or unrelated to its core mission, and that non-minority agents in OIG were not disciplined severely or at all for misconduct like Mr. Richardson's.

On September 30, 2002, Mr. Malloy recommended a five day suspension, which Mr. Chapman imposed and Mr. Richardson served.[1]  A few days later, OIG Headquarters learned that Mr. Richardson had not been removed.  Inside of a week, OIG placed Mr. Malloy on administrative leave and ordered him off its premises.  Mr. Malloy filed an EEO complaint in response and was left dangling for over two months.  When it finally allowed Mr. Malloy to return, OIG Headquarters issued a Memorandum removing Mr. Malloy of all managerial duties.

This action is being maintained under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-16.  Mr. Malloy's refusal to discipline two minorities, one of whom had filed an EEO complaint, was protected activity under the Act's opposition clause, 42 U.S.C. §2000e-3(a).  Having himself "made a charge" of discrimination and retaliation after being placed on administrative leave, Mr. Malloy was also entitled to protection under the Act's participation clause.  Id.[2]

Mr. Malloy suffered actionable changes in his employment, when he was removed from his supervisory ASAC position, placed under investigation twice, ordered off OIG premises, placed on extended administrative leave, relieved of supervisory and investigative duties, eliminated from competition for a higher paying supervisory position, constructively discharged, stigmatized in the law enforcement community, and foreclosed from future employment

---

[1]    When the Richardson file was sent to Mr. Malloy, he was also directed to commence disciplinary proceedings against Steve Romero.  A Hispanic agent, Mr. Romero had been cleared of the most serious charge several years earlier.  After studying the file closely, Mr. Malloy issued him a Memorandum of Caution.  Mr. Romero had been taunted as a "wetback" by the same agent who ridiculed Mr. Malloy's Native American heritage with verbal assaults like Indians were proof that white men had sex with buffalos.  Senior OIG management in Washington, D.C., took no action on a complaint filed by Mr. Malloy and eventually appointed the offending agent his successor.  Although Mr. Romero has since left HUD OIG, the agency continues to re-investigate stale charges against him.

[2]    Mr. Malloy's administrative complaint also alleged that he had been subject to discrimination based on national origin.  Mr. Malloy is no longer pursuing that claim, as plaintiff's counsel informed defendant's counsel earlier.

opportunities in law enforcement.  Defendant contends that Mr. Malloy was punished because he refused "to cooperate fully with an internal investigation" about his former supervisor and for failing to fully coordinate the proposed disciplinary actions involving Mr. Richardson and Mr. Romero (Def. Mot. SJ at 2).  Rather than justifying its actions, OIG's reliance on a flawed investigation and its failure to consider exculpatory witness statements when Mr. Malloy's reputation and livelihood were in the balance, is further evidence of its discrimination and retaliation.

OIG's more favorable treatment of comparators further refutes its defense.  In May of 2002, Daniel Salas was being promoted from an OIG SAC in the field to Deputy Assistant Inspector General for Investigations, when the Secretary of HUD and senior management in OIG Headquarters were notified that he had been charged with domestic violence involving a handgun.  The charges were corroborated in a restraining order.  Senior OIG management never opened a formal investigation into Mr. Salas or required him to give a statement under oath, never placed Mr. Salas on administrative leave, and never relieved him of supervisory duties.

OIG's investigation of Mr. Malloy proves that it treated him disparately in comparison to another ASAC in Texas, Dan Truxall, who was not involved in the Richardson and Romero disciplinary proceedings.  Mr. Malloy and Mr. Truxall were both asked to produce personal diaries in an investigation in their former supervisor's supposed misconduct.  Both refused.  Although OIG's Report of Investigation documents that Mr. Truxall snickered at the investigators, OIG took no action of any kind against him.

I.      **Defendant's Statement of the Case**

At this stage of the litigation, the only issue that remains for trial is Plaintiff's claim of

retaliation in connection with: his placement on administrative leave during the agency's

investigation of his alleged misconduct; the agency's investigation of Plaintiff between October

2002 and December 2002; the temporary removal of Plaintiff's supervisory duties upon his

return to duty; the fact that Plaintiff was not considered for two vacancies; and alleged threats of

reassignment.   Plaintiff Malloy was placed on administrative leave  by letter dated October 10,

2002, pending completion of an investigation concerning Plaintiff's conduct.   Assistant

Inspector General for Investigations (AIGI) R. Joseph Haban was the agency official that made

the decision to place Plaintiff on administrative leave.  Deputy Assistant Inspector General for

Investigations (DAIGI) Daniel P. Salas issued the letter.

Plaintiff returned to duty on Thursday, December 19, 2002, but was temporarily relieved

of his supervisory responsibilities.  Mr. Haban was also the agency official that decided to

temporarily relieve Plaintiff of those duties.  While Plaintiff was on administrative leave, two

vacancies were announced publicly, but Plaintiff did not apply for, and was not considered for,

either position.   Plaintiff retired on January 3, 2003.

Other claims were raised in the complaint and/or discussed in the summary judgment

briefs, but will not be at issue in trial.  Specifically, Plaintiff has informed Defendant that he is

abandoning his national origin discrimination claim.  In addition, Plaintiff asserted in the

summary judgment briefing that he did not raise a stand-alone constructive discharge claim, but

instead referenced constructive discharge to demonstrate what plaintiff views as an appropriate

remedy.  <u>See</u> Dkt. Entry 34 at 44-45 (Plaintiff's Opposition Memorandum) (stating that constructive discharge is not a claim but is a remedy).  Plaintiff has not formally moved for leave to amend his complaint to withdraw the allegations relating to national origin, and it is not apparent from the complaint that constructive discharge pertains only to the requested remedy and is not an independent claim.  Nevertheless, defense counsel has relied upon Plaintiff's representations regarding those issues for purposes of preparing the pretrial statement and preparing for trial.

II.    Plaintiff's Statement Claims

James Malloy, the plaintiff in this case, is the former Assistant Special Agent in Charge ("ASAC") with the Office of Inspector General ("OIG") of the Department of Housing and Urban Development ("HUD") in Ft. Worth, Texas.

This action is being maintained under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-16.  Mr. Malloy's refusal to discipline two minorities, one of whom had filed an EEO complaint, was protected activity under the Act's opposition clause, 42 U.S.C. §2000e-3(a).  Mr. Malloy filed an EEO complaint on his own behalf, after being placed on administrative leave, which entitled to protection under the Act's participation clause.  Id.[1]

Mr. Malloy suffered actionable changes in his employment, when he was removed from his supervisory ASAC position, placed under investigation twice, ordered off OIG premises, placed on extended administrative leave, relieved of supervisory and investigative duties, eliminated from competition for a higher paying supervisory position, constructively discharged, stigmatized in the law enforcement community, and foreclosed from future employment opportunities in law enforcement.

---

[1]    Mr. Malloy's administrative complaint also alleged that he had been subject to discrimination based on national origin.  Mr. Malloy is no longer pursuing that claim, as plaintiff's counsel informed defendant's counsel earlier.

III.    **Plaintiff's Statement of Defenses**

Not applicable.

**II.    Defendant's Statement of Claims**

Inapplicable.

**III.    <u>Defendant's  Statement of Defenses</u>**

Defendant will show that Plaintiff's protected activity and/or his oppositional activity played no role in any of the personnel decisions at issue in this litigation.

Plaintiff has not established a <u>prima facie</u> case of retaliation.  Plaintiff's purported refusal to impose what he contends the Agency considered sufficiently harsh discipline upon Special Agents Romero and Richardson was not the type of conduct that would trigger Title VII's opposition clause.  In addition, Plaintiff suffered no "adverse employment action."

As noted, Defendant denies any retaliation.  In the alternative, depending upon the evidence presented at trial, Defendant intends to assert, at trial, a "mixed motive" position.  In other words, Defendant intends to argue that, even if Plaintiff could demonstrate that retaliation was a motivating factor, Defendant will show that "would have taken the same action" for other reasons.  <u>See</u> <u>Desert Palace, Inc. v. Costa</u>, 539 U.S. 90 (2003).  Because Defendant will prove by a preponderance of the evidence that it would have made the same disputed employment decision in the absence of the alleged retaliation, Defendant will not be liable for retaliation.  <u>See</u> <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228, 258 (1989); <u>Porter v. Natsios</u>, 414 F.3d 13, 19 (D.C. Cir. 2005).

IV.    **Plaintiff's Witnesses**

James Malloy:
c/o Robert C. Seldon, Esq.
Robert C. Seldon & Associates, P.C.
1319 F Street, N.W.
Suite 200
Washington, D.C.  20004

Mr. Malloy is the plaintiff in this action and will testify about all phases of liability, damages, and equitable relief including, but not limited to, his career with HUD OIG before the events that gave rise to this action; his role in the decision to suspend rather than terminate Cortez Richardson, the special agent who had an EEO complaint pending against OIG management in Headquarters; the pretextual investigations he was then placed under; being removed from official premises and placed on administrative leave; his unsuccessful effort to be returned to active duty status; being relieved of supervisory responsibilities before being returned to duty; and being constructively discharged (Estimated time on direct examination:  3.5 hours).

Larry Chapman:
PO Box 57
Peaster, Texas  76485

Mr. Chapman is the former Special Agent in Charge of Mr. Malloy's former Region, and will testify about Mr. Malloy's career before the events that gave rise to this action; HUD OIG's pretextual decision to place Mr. Chapman and Mr. Malloy in decisional roles over Mr. Richardson; the pretextual investigations that he and Mr. Malloy were placed under; the disparate treatment given to Mr. Malloy; and Mr. Malloy's legitimate, reasonable career expectations that were terminated as a result of defendant's actions (Estimated time on direct examination:  30 minutes).

Cortez Richardson:
c/o HUD Office of Inspector General
451 7th Street, S.W.

Washington, D.C.  20410

Mr. Richardson is the African American special agent who filed an EEO complaint against a HUD OIG Headquarters official who, among other matters, threatened to terminate Mr. Richardson once his testimony against his former supervisor in <u>United States v. Finn</u>, 01-CR-184 (D. Colo.), was no longer needed; and the agency's efforts to terminate him (Estimated time on direct examination:  1 hour).

> Daniel Salas:
> c/o Robert C. Seldon & Associates, P.C.
> 1319 F Street, N.W.
> Suite 200
> Washington, D.C.  20004

Mr. Salas is the former Deputy Assistant Inspector General for Investigation and will testify about his role, and lack of a role, in signing the Memorandum placing Mr. Malloy on administrative leave and refusing Mr. Malloy's request to be returned to active duty.  Mr. Salas will also testify that he was not placed on administrative leave, investigated, or relieved of supervisory duties when credible allegations of spousal abuse with a weapon were reported to the HUD Inspector General.  Mr. Salas will also testify about his  involuntary removal from his position after filing an EEO complaint against the agency (Estimated time on direct examination: 1 hour).

> R. Joseph Haban:
> c/o HUD Office of Inspector General
> 451 7th Street, S.W.
> Washington, D.C.  20410

Mr. Haban is the former Assistant Inspector General for Investigation and will testify about his issuance of the Memorandum that relieved Mr. Malloy of management duties, his role the other employment actions that are at issue in this case, and contradictions in agency

management's account of its treatment of Mr. Malloy (Estimated time on direct examination:  1

hour)..

> John McCarty:
> c/o HUD Office of Inspector General
> 451 7th Street, S.W.
> Washington, D.C.  20410

Mr. McCarty is the former head of HUD OIG's Special Investigations Division and will

testify about the flaws in the investigation and the reports that were given or should have been

given to senior agency management about witness statements that exculpated Mr. Malloy

(Estimated time on direct examination:  30 minutes)..

> John Robinson:
> c/o HUD Office of Inspector General
> 451 7th Street, S.W.
> Washington, D.C.  20410

Mr. Robinson is the special agent primarily responsible for the investigations of Mr.

Malloy and Dan Truxal, Mr. Malloy's co-ASAC, and will testify about the results of his

investigation and the agency's disparate treatment of Mr. Truxal (Estimated time on direct

examination:  30 minutes)..

> Dan Truxal:

Mr. Truxal was Mr. Malloy's co-ASAC and will testify that he was also placed under

investigation, yet not placed on administrative leave or removed from management.  Mr. Truxal

will also testify that he was not involved in the disciplinary action toward Cortez Richardson,

unlike Mr. Malloy (Estimated time on direct examination:  30 minutes)..

> Michael Stephens:
> c/o HUD Office of Inspector General
> 451 7th Street, S.W.
> Washington, D.C.  20410

Mr. Stephens is the Deputy Assistant Inspector General and will testify about his role in the employment actions at issue in this suit and his role in the decisions concerning Daniel Salas (Estimated time on direct examination:  15 minutes)..

David Nuhfer:
c/o HUD Office of Inspector General
451 7th Street, S.W.
Washington, D.C.  20410

Mr. Nuhfer is the personnel specialist employed by HUD OIG's human resources contractor, the Bureau of Public Debt, and will testify about his role and agency actions in the discipline of Mr. Richardson, the reason why OIG Headquarters was no longer in a position to terminate or discipline Mr. Richardson once after he testified in U.S. v. Finn, and his role and the agency's actions toward Mr. Malloy that are at issue in this suit (Estimated time on direct examination:  30 minutes).

IV.    **Defendant's Witness Schedule**

Defendant expects to call the following witnesses at trial:

1.    R. Joseph Haban (1-2 hours)
      357 Memorial Drive
      Jesup, GA 31545-0121
      (912) 588-9970

Mr. Haban has retired from service with HUD-OIG.  At all times relevant to this matter,

Mr. Haban served as HUD-OIG's Assistant Inspector General for Investigations (AIGI).  Mr.

Haban will testify concerning reports of investigation (ROIs) he sent to HUD-OIG's Region 6 for

action.  Mr. Haban will also testify concerning his involvement in this matter, including but not

limited to his knowledge of the investigation of Plaintiff, his decision to remove Plaintiff from

his supervisory position, and the circumstances giving rise to that action.


2.    Daniel P. Salas (1-2 hours)
      405 Forest River Court
      Fort Worth, TX  76112

Mr. Salas has retired from service with HUD-OIG.  At all times relevant to this matter,

Mr. Salas served as Deputy Assistant Inspector General for Investigations (DAIGI); while in that

capacity, Mr. Salas served as Plaintiff's second-level supervisor.  Mr. Salas had become the

Special Agent in Charge (SAC) of Region 6 by the time of his deposition.  Mr. Salas will testify

concerning his involvement in this matter, including but not limited to his placement of Plaintiff

on administrative leave and the circumstances giving rise to that action.


3.    John P. McCarty (1-2 hours)
      Assistant Inspector General for Investigations
      Office of Inspector General,
      U.S. Department of Housing and Urban Development
      451 7th Street SW, Room 8274
      Washington, D.C. 20410
      (202) 708-0390

Mr. McCarty is HUD-OIG's current AIGI.  At all times relevant to this matter, Mr.

McCarty served as SAC of HUD-OIG's Special Investigations Division (SID), which

investigated Plaintiff's alleged conduct and the conduct of other HUD-OIG employees in Region

6.  Mr. McCarty will testify concerning his involvement in this matter, including but not limited

to the investigation of Plaintiff's alleged conduct, and information transmitted to Mr. Haban

concerning same.


4.      John C. Robinson (1 hour)
        Senior Special Agent
        Office of Inspector General,
        U.S. Department of Homeland Security
        245 Murray Drive, Building 410
        Washington, D.C. 20528
        (202) 254-4107

Mr. Robinson has left the employ of HUD-OIG.  At all times relevant to this matter, Mr.

Robinson served as Assistant to the Special Agent in Charge (ATSAC) for SID.  Mr. Robinson

will testify concerning his participation in the investigation of Plaintiff's alleged conduct,

including but not limited to his interviews of Plaintiff and other HUD-OIG personnel.


5.      Jerry Thomas (1 hour)
        193 Spider Barns Road
        Jonesboro, TN 37659
        (423) 753-8263

Mr. Thomas has retired from service with HUD-OIG.  At all times relevant to this matter,

Mr. Thomas also worked as a special agent in SID.  Mr. Thomas will testify concerning his

participation in the investigation of Plaintiff's alleged conduct, including but not limited to his

interviews of Plaintiff and other HUD-OIG personnel.


6.      Lester A. Davis (1 hour)

Deputy Assistant Inspector General for Investigations
Office of Inspector General,
U.S. Department of Housing and Urban Development
451 7th Street SW, Room 8274
Washington, D.C. 20410
(202) 708-0390

Mr. Davis serves currently as a DAIGI.  Mr. Davis was the Region 6 SAC when Plaintiff

returned to full-time duty.  Mr. Davis will testify concerning his knowledge of this matter,

including but not limited to his communications with Plaintiff concerning administrative leave,

Plaintiff's removal from his ASAC position, and Plaintiff's career prospects with HUD-OIG.


7.    Windell L. Durant (1 hour)
      Supervisory Forensic Auditor
      Office of Inspector General,
      U.S. Department of Housing and Urban Development
      2201 East Lamar Boulevard, Room 275
      Arlington, TX 76006
      (817) 978-5440

Mr. Durant serves currently as a HUD-OIG Supervisory Forensic Auditor in Arlington,

Texas.  Mr. Durant served in the same or a similar capacity at all times relevant to this matter.

Mr. Durant will testify concerning statements made by Plaintiff to other HUD-OIG personnel in

connection with an investigation then-pending concerning former Region 6 SAC Larry

Chapman; these statements eventually led to an investigation of Plaintiff.


8.    Tammy L. Gilbert (1 hour)
      Special Agent
      Office of Inspector General,
      U.S. Department of Housing and Urban Development
      2201 East Lamar Boulevard, Room 275
      Arlington, TX 76006
      (817) 978-5440

Ms. Gilbert serves currently as a HUD-OIG Special Agent in Arlington, Texas.  Ms.

Gilbert served in the same capacity at all times relevant to this matter.  Ms. Gilbert will testify

concerning statements made by Plaintiff to other HUD-OIG personnel in connection with an investigation then-pending concerning former Region 6 SAC Larry Chapman; these statements eventually led to an investigation of Plaintiff.

9.      Maximo Eamiguel (1 hour)
        2724 Maple Brook Court
        Bedford, TX 76021
        (817) 399-0555

        Mr. Eamiguel has left the employ of HUD-OIG.  Mr. Eamiguel served as an Assistant Special Agent in Charge (ASAC) in HUD-OIG's Arlington, Texas office at all times relevant to this matter.  Mr. Eamiguel will testify concerning statements made by Plaintiff to other HUD-OIG personnel in connection with an investigation then-pending concerning former Region 6 SAC Larry Chapman; these statements eventually led to an investigation of Plaintiff.

10.     Michael Kepler (1 hour)
        Contact Information Unknown (Counsel for Defendant is searching for this witness's contact information, and will supplement this statement if the contact information is found)

        Mr. Kepler has retired from service with HUD-OIG.  Mr. Kepler served as a Special Agent in HUD-OIG's Arlington, Texas office at all times relevant to this matter.  Mr. Kepler will testify concerning statements made by Plaintiff to other HUD-OIG personnel in connection with an investigation then-pending concerning former Region 6 SAC Larry Chapman; these statements eventually led to an investigation of Plaintiff.

11.     David Nuhfer (1-2 hours)
        Human Resource Specialist
        Administrative Resource Center
        Bureau of the Public Debt
        200 3rd Street
        Parkersburg, WV 26106

Currently and at all times relevant to this matter, Mr. Nuhfer has served as a human resources specialist with the Bureau of the Public Debt, which performs human resources tasks for HUD-OIG pursuant to contract.  Mr. Nuhfer will testify concerning advice he has provided to agency managers in taking action in disciplinary and performance cases, and to Plaintiff in particular.

12.     John E. Dupuy (1 hour)
        Principal Deputy Assistant Inspector General for Investigations
        U.S. Department of the Interior,
        Office of Inspector General
        1849 C Street, N.W.
        Mail Stop 4428
        Washington, D.C. 20240
        (202) 208-5351

Mr. Dupuy has left the employ of HUD-OIG.  At all times relevant to this matter, Mr. Dupuy served as Executive Assistant to the Inspector General for HUD-OIG.  Mr. Dupuy will testify concerning his knowledge of the facts of this matter, including but not limited to communications with Maximo Eamiguel.

13.     Richard K. Johnson (1 hour)
        Deputy Counsel
        Office of Inspector General,
        U.S. Department of Housing and Urban Development
        451 7th Street SW, Room 8260
        Washington, D.C. 20410
        (202) 708-1613

Currently and at all times relevant to this matter, Mr. Johnson has served as Deputy Counsel to the Inspector General.  If necessary, Mr. Johnson would testify concerning his negotiations with Plaintiff's counsel, including but not limited to the request made by Plaintiff's counsel that Plaintiff be allowed to remain on administrative leave until early January 2003 as consideration for a settlement.

Defendant reserves the right to proffer the testimony of any witness necessary for impeachment or rebuttal purposes.   Defendant also reserves the right to call witnesses listed on Plaintiff's witness list.

V.     Plaintiff's Exhibits[1]

Exhibit 1:     E-mail, Richard Johnson to David Nuhfer re: Cortez Richardson with attached Proposed Suspension, May 16, 2002

Exhibit 2:     Unsigned letter to R. Joseph Haban re: Salas Restraining Order, May 3, 2002

Exhibit 3:     Restraining Order re: Salas, Dec. 24, 1997

Exhibit 4:     Richardson EEO complaint, May 2, 2001

Exhibit 5:     Record of bench ruling in U.S. v. Finn, No. 01-CR-184 (D. Colo.), on January 11, 2002 and excerpt thereof.

Exhibit 6:     Memorandum from Special Agent Cortez Richardson to Inspector General Kenneth Donahue requesting a hardship transfer to Region 6, May 15, 2002.

Exhibit 7:     James Malloy, Proposal to Suspend Special Agent Richardson, September 30, 2002.

Exhibit 8:     Larry Chapman, Decision to Suspend Special Agent Richardson, September 30, 2002.

Exhibit 9:     James Malloy, Memorandum of Caution to Special Agent Steven Romero, September 30, 2002.

Exhibit 10:    HUD OIG Manual Chapter 1752

Exhibit 11:    Position paper submitted by the Office of Legal Counsel in EEO complaint of James Malloy, March 19, 2003.

Exhibit 12:    OIG Manual Chapter 1099 concerning processing of EEO complaints.

---

[1]     Plaintiff expects to offer all of the exhibits identified above at trial.  Plaintiff also respectfully reserves the right to offer any exhibits identified by defendant in its pre-trial submission.

Exhibit 13:     Timeline of certain dates in Richardson and Romero disciplinary actions and investigations.

Exhibit 14:     James Malloy statement to OIG investigators, Sept. 19, 2002.

Exhibit 15:     James Malloy statement to OIG investigators, Oct. 10, 2002.

Exhibit 16:     Memorandum Daniel Salas to James Malloy, Placement on Administrative Leave, Oct. 10, 2002.

Exhibit 17:     Letter from James Malloy to Daniel requesting restoration to active duty, Oct. 15, 2002.

Exhibit 17A:   Letter from Robert C. Seldon, Esq.,  to Daniel Salas requesting restoration to active duty of James Malloy, Oct. 18, 2002

Exhibit 18:     Letter from Daniel Salas to Robert C. Seldon, Esq., denying request to return James Malloy to active duty, Oct. 28, 2002.

Exhibit 19:     Cover page, EEO complaint of James Malloy, Jan. 2, 2003.

Exhibit 20:     Tammy Gilbert statement to OIG investigators, Oct. 28, 2002.

Exhibit 21:     Chuman Sangsvang statement to OIG investigators, Oct. 29, 2002.

Exhibit 22:     Andres Ramos statement to OIG investigators, Oct. 30, 2002.

Exhibit 23:     Manuel Ramirez statement to OIG investigators, Oct. 30, 2002.

Exhibit 24:     Steve Romero statement to OIG investigators, Oct. 29, 2002.

Exhibit 25:     David Pileggi statement to OIG investigators, Oct. 28, 2002.

Exhibit 26:     Cortez Richardson statement to OIG investigators, Oct. 29, 2002.

Exhibit 27:     Donald Driskill statement to OIG investigators, Oct. 29, 2002.

Exhibit 28:     Jason Constantine statement to OIG investigators, Oct. 29, 2002.

Exhibit 29:     Marcus Wohl statement to OIG investigators, Oct. 28, 2002.

Exhibit 30:     Orlando Mitchell statement to OIG investigators, Oct. 29, 2002.

Exhibit 31:     HUD OIG investigative materials re: James Malloy

Exhibit 32:     Minutes of staff meeting of Region 6, Sept. 23, 2002

Exhibit 33:     HUD OIG investigative materials re: Larry Chapman

Exhibit 34:     Memorandum from Lester Davis to Cortez Richardson re: Appraisal by U.S. Attorneys, Dec. 9, 2002

Exhibit 35:     E-mails James Malloy to R. Joseph Haban, Janeen Hess, Dan Truxall, Oct. 2-3, 2002

Exhibit 36:     Memorandum from R. Joseph Haban to James Malloy, Return to Duty, Dec. 17, 2002

Exhibit 37:     Vacancy Announcement, ASAC Houston, Texas, Dec. 12, 2002

Exhibit 38:     SF-50 appointing Michael Kepler as ASAC in Houston, Texas, effective April 20, 2003.

Exhibit 39:     E-mail James Malloy to file documenting conversations with David Nuhfer re: Cortez Richardson, Aug. 29, 2002.

Exhibit 40:     James Malloy, SF-50 resignation from OIG, effective January 3, 2003.

Exhibit 41:     Select standards of conduct re: HUD OIG agents

Exhibit 42:     Settlement of Larry Chapman v. HUD, MSPB Docket No. 0752-06-0093, Dec. 28, 2006

Exhibit 43:     EEOC Compliance Manual on Retaliation, Directive No. 915.003, May 20, 1998

Exhibit 44:     Affidavit of David Nuhfer, Dec. 5, 2003

Exhibit 45:     Verdict Elion v. Jackson, Civ. Action No. 05-0992 (PLF) Apr. 10, 2008

Exhibit 46:     E-mails between Robert C. Seldon, Esq. and Richard K. Johnson, Esq., between Dec. 23, 2002, and Jan. 3, 2003

**V. Defendant's Exhibits**

**Defendant intends to introduce the following exhibits:**

1. HUD-OIG Manual Chapter 1752, "Disciplinary and Adverse Actions" (effective in 2002 and 2003)

2. Plaintiff's letter dated September 19, 2002 to SID investigators re: refusal to produce personal diaries

3. Plaintiff's letter dated October 15, 2002 to Daniel Salas re: producing subset of personal diaries

4. Daniel P. Salas memorandum dated October 10, 2002 to Plaintiff

5. Daniel P. Salas letter dated October 28, 2002 to counsel for Plaintiff

6. R. Joseph Haban letter dated December 17, 2002 to Plaintiff

7. Memorandum from Lester Davis dated December 9, 2002 for Cortez Richardson regarding falsification of official document.

8. Report of Investigation dated October 9, 2002, regarding Plaintiff's refusal/failure to cooperate in connection with an administrative investigation/during an OIG inquiry.

9. Memorandum for Cortez Richardson from Plaintiff dated September 30, 2002, regarding proposed five calendar day suspension.

10. Memorandum for Cortez Richardson from Larry Chapman dated September 30, 2002, regarding proposed five calendar day suspension

11. Merit Promotion Vacancy Announcement, No. 03-FESB-100

12. Merit Promotion Vacancy Announcement, No. 03-FESB-002

Defendant reserves the right to introduce any documents necessary for impeachment or rebuttal purposes, and to introduce any document introduced or relied upon by Plaintiff.

## VI.    <u>Plaintiff's Designation of Depositions</u>

Four depositions were taken in this case of witnesses who work and reside over one hundred miles from this jurisdiction, Daniel Salas (by video), Cortez Richardson (by video), R. Joseph Haban (by video), and David Nuhfer.  Although Mr. Salas is no longer employed by the agency, plaintiff's counsel has been given to understand that he will appear voluntarily.  Counsel also has been given to understand that defendant will produce Mr. Richardson, a current agency employee; and Mr. Nuhfer (who is employed by a contractor of the agency).

If Mr. Salas or Mr. Richardson is unavailable for trial, it is plaintiff's intention to present their entire video-taped depositions.  Plaintiff intends to present Mr. Haban's video deposition in its entirety, whether or not he is appears (he is no longer in the agency's employ, although is apparently a contractor).  If Mr. Nuhfer is not made available, it is plaintiff's intention to designate portions of his deposition and have them read at trial.

**VI.**    **Defendant's Designation of Deposition/Hearing Testimony**

**Defendant intends to introduce the following deposition testimony:**

1.    Deposition of R. Joseph Haban (March 5, 2007)

2.    Deposition of Daniel P. Salas (August 10, 2006)

3.    Deposition of David Nuhfer (November 28, 2006)

**VII.    Plaintiff's Itemization of Damages** [1]:     Plaintiff requests that he be awarded compensatory damages under 42 U.S.C. §1981a(b)(3) in the maximum amount permitted by law for pecuniary losses, loss of professional reputation, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and the violation of his civil rights that he experienced as a consequence of defendant's unlawful actions.

---

[1]    Plaintiff's request for backpay and reinstatement or frontpay are equitable remedies for the court to award, as is his request for attorneys' fees and interest, rather than damages.  Pollard v. E.I. DuPont DeNemours & Co., 532 U.S. 843, 849 2001); Martini v. Federal National Mortgage Ass'n, 178 F.3d 1336 (D.C. Cir. 1999); 42 U.S.C. §2000e-16 (incorporating by reference 42 U.S.C. §§1981a(b)(2), 2000e-5(f)).  Accordingly, although awards of backpay and frontpay under Title VII result in the receipt of money, plaintiff has included them in Section VIII entitled "Request For Other Relief."

**VII.**          **Defendant's Response to Plaintiff's Request for Damages**

Because Defendant did not retaliate against Plaintiff, Plaintiff is entitled to no relief

whatsoever.

## VIII.    Plaintiff's Request for Relief Other than Damages

A.    Reinstatement in defendant's employ retroactive to January 7, 2003.

B.    Backpay since January 7, 2003, including cost of living increases, plus lost benefits including, retirement benefits and health insurance.

C.    Reinstatement in a supervisory position in defendant's employ retroactive to December 17, 2002.

D.    An Order retroactively promoting plaintiff to the position of Assistant Special Agent In Charge of defendant's Regional VI office in Houston, Texas.

E.    Interest.

F.    Declaratory and injunctive relief.

G.    Attorneys fees and costs.

## VIII.   Defendant's Request for Other Relief

If the Court finds in favor of Defendant, Defendant reserves the right to file an appropriate bill of costs under 28 U.S.C. § 1924 and Fed. R. Civ. P. 54(d) after the conclusion of the trial.

## IX.  Additional Matters Permitted Under Local Rule 16.5(d)(1), (2), and (4)

**1.**    **Undisputed Issues/Stipulations**

Defendant's Proposed Undisputed Facts/Stipulations

1.    Plaintiff was hired by HUD-OIG in 1983.

2.    At all times relevant to this matter, Plaintiff was employed by HUD-OIG as a Series 1811 Criminal Investigator, also known as a Special Agent.

3.    For the entirety of his employment with HUD-OIG, Plaintiff was stationed in HUD-OIG's Fort Worth, Texas office, which was within HUD-OIG's Region 6.

4.    From 1993 through January 3, 2003, Plaintiff was an Assistant Special Agent in Charge (ASAC) in HUD-OIG's Region 6.

5.    Larry Chapman, former Special Agent in Charge at HUD-OIG's Fort Worth, Texas office, promoted Plaintiff to the ASAC position.

6.    In July 2002, Jeffrey Finn, a former SAC for the Rocky Mountain Region, was convicted of knowingly and willfully making a false document.  Special Agent Cortez Richardson, who worked under Finn's supervision in the Rocky Mountain Region, had a role in falsifying the document, and he testified for the Government at Finn's trial.

7.    On or about August 8, 2002, Assistant Inspector General for Investigations (AIGI) R. Joseph Haban forwarded to Region 6 a Report of Investigation (ROI) concerning Special Agent Steven Romero for possible disciplinary action.

8.    During September 2002, AIGI Haban forwarded to Region 6 a ROI concerning Special Agent Cortez Richardson for possible disciplinary action.

9.   On or about September 18, 2002, Plaintiff was interviewed by Special Agents from HUD-OIG's Special Investigations Division (SID) concerning Region 6 Special Agent in Charge (SAC) Larry Chapman, for allegedly misusing his government automobile and official time.

10.  During his September 2002 SID interview, Plaintiff was asked to provide his personal diaries.  He did not do so at that time.

11.  Assistant Special Agent in Charge (ASAC) Daniel Truxal was also interviewed by SID in September 2002 concerning SAC Chapman, for allegedly misusing his government automobile and official time.  ASAC Truxal was asked to provide his personal diaries at that time.  ASAC Truxal did not provide his personal diaries to SID upon being asked, but he did provide them at a later time.

12.  Following his SID interview, Plaintiff delivered to HUD-OIG Assistant to the Special Agent in Charge (ATSAC) John Robinson a typed letter stating that Plaintiff would not produce his personal diaries.

13.  Plaintiff attended an "all-hands" meeting in HUD-OIG's Arlington, Texas office on or about September 23, 2002, which was attended by other HUD-OIG personnel in Region 6.

14.  On or about September 23, 2002, Plaintiff was an ASAC in HUD-OIG's Region 6.

15.  On or about September 23, 2002, the SAC of Region 6 was Larry Chapman.

16.  During the "all-hands" meeting, SAC Chapman made statements to the assembled Region 6 personnel in attendance.

17.  During the "all-hands" meeting, Plaintiff made statements to the assembled Region 6 personnel in attendance.

18. On or about September 30, 2002, Plaintiff proposed a five-day suspension for Special Agent Richardson.

19. From the time when Plaintiff read the ROI pertaining to Special Agent Richardson until the date when Plaintiff proposed a five-day suspension for Richardson, Plaintiff did not confer with Bureau of the Public Debt (BPD) Human Resources Specialist David Nuhfer regarding Richardson. During that time period, Plaintiff also did not consult with OIG Headquarters OLC or HR.

20. On or about September 30, 2002, Plaintiff issued Special Agent Romero a Memorandum of Caution.

21. From the time when Plaintiff read the ROI pertaining to Special Agent Romero until the date when Plaintiff issued a Memorandum of Caution to Romero, Plaintiff did not confer with David Nuhfer regarding Romero.

22. Larry Chapman retired from service with HUD-OIG on or about October 1, 2002.

23. In October 2002, Plaintiff was directed to travel to HUD-OIG headquarters in Washington, D.C.

24. Deputy Assistant Inspector General for Investigations (DAIGI) Daniel P. Salas placed Plaintiff on administrative leave by letter dated October 10, 2002, pending completion of an investigation concerning Plaintiff.

25. Plaintiff did not apply for the Region 6 SAC position that was advertised in October 2002.

26. Plaintiff was not selected for the Region 6 SAC position that was advertised in October 2002.

27. Plaintiff filed an informal administrative complaint of discrimination on or about October

17, 2002.

28.  Following Plaintiff's filing of an informal administrative complaint of discrimination,

Plaintiff's counsel requested of HUD-OIG Deputy Counsel Richard K. Johnson that

Plaintiff be permitted to remain on administrative leave until early January 2003 as part

of a potential settlement agreement and/or to facilitate settlement of that complaint.

29.  Plaintiff did not apply for the ASAC position in HUD-OIG's Houston, Texas office that

was advertised in December 2002 and closed in January 2003.

30.  By letter dated December 17, 2002, AIGI Haban returned Plaintiff to duty, removed him

from his ASAC position, and rescinded approval for Plaintiff to carry over excess annual

leave to 2003.

31.  Plaintiff returned to duty on or about December 19, 2002.

32.  No one at HUD-OIG told Plaintiff that he would be re-assigned to another office unless

he retired.

33.  No one at HUD-OIG told Plaintiff that he would never be hired as a SAC even if he were

to apply for a SAC position in the future.

34.  Plaintiff retired from service with HUD-OIG on or about January 3, 2003.

35.  Plaintiff was not selected for the ASAC position in HUD-OIG's Houston, Texas office

that was advertised in December 2002 and closed in January 2003.

36.  On or about March 1, 2004, Plaintiff requested a hearing on his discrimination complaint

from the Washington Field Office of the Equal Employment Opportunity Commission

(EEOC).

37.  More than 180 days passed between Plaintiff's request for a hearing from the EEOC and

the filing of his Complaint in the instant litigation.

38.     Since retiring from HUD-OIG, Plaintiff has not applied for employment with any state or
federal law enforcement agency.

2.    **Trial Briefs**

**Defendant's Trial Brief**

Plaintiff brings this case pursuant to Title VII of the Civil Rights Act of 1964. The personnel decisions at issue in this case are: Plaintiff's placement on administrative leave during the agency's investigation of his alleged misconduct; the agency's investigation of Plaintiff between October 2002 and December 2002; the temporary removal of Plaintiff's supervisory duties upon his return to duty; the fact that Plaintiff was not considered for two vacancies; and alleged threats of reassignment. Plaintiff alleges that officials in the Office of Inspector General (OIG) of HUD, made those decisions to retaliate against him for 1) opposing a discriminatory practice when he proposed discipline in September 2002 for two special agents, and 2) participating in protected activity when he filed an EEO administrative complaint in October 2002. Plaintiff cannot carry his burden of showing, by a preponderance of the evidence, that retaliation was the real reason that HUD-OIG took those actions. Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981); St. Mary's Honor Center v. Hicks, 509 U.S. 502, 515 (1993) ("A reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false and that discrimination was the real reason." (emphasis in original)

Defendant will show that Plaintiff's own choices, and not any retaliatory intent, were the cause of all of the personnel decisions of which he complains. Plaintiff chose not to apply for the two vacancies for which he was not selected, and did not convey his interest in those positions to HUD-OIG officials; thus his non-selection is not an adverse action. Plaintiff's refusal to cooperate with an internal investigation into some alleged misconduct by his supervisor caused him to be placed on administrative leave, to be investigated, and to be

temporarily relieved of his supervisory duties pending the completion of that investigation. Plaintiff requested, through his attorney, that his administrative leave be extended through the end of 2002, and thus remained on administrative leave longer than he otherwise might have. Plaintiff chose to retire shortly after returning to work, due to his subjective fear that he might be reassigned, notwithstanding the fact that no HUD-OIG official threatened Plaintiff with reassignment.

Plaintiff cannot establish a prima facie case of retaliation, for several reasons. First, Plaintiff cannot invoke the oppositional clause of Title VII because he is unable to show a discriminatory practice by the Agency that he opposed. His participation as the Recommending Official in the process for terminating two other Special Agents is insufficient because, among other reasons, nobody ever told Plaintiff what penalty was appropriate, let alone that any proposed penalty was motivated by some unlawful discriminatory taint. Under those circumstances, Plaintiff cannot demonstrate "a good faith, reasonable belief that the challenged practice violates Title VII." George v. Leavitt, 407 F.3d 405, 417 (D.C. Cir. 2005). Second, Plaintiff cannot establish that he suffered an adverse employment action, which would be likely to deter him from engaging in protected activity.

Moreover, Plaintiff's steadfast refusal to cooperate with a request for documents in connection with an internal investigation of allegations of misconduct by his supervisor, as well as evidence suggesting that Plaintiff may have attempted to obstruct that internal investigation, establish the legitimate, non-retaliatory reason for HUD-OIG's decision to place Plaintiff temporarily on administrative leave, temporarily remove his supervisory duties on his return to duty, and other actions. Plaintiff's actions were contrary to HUD-OIG policy, and fell well below the high standard of conduct to which law enforcement officers and managers are held.

Defendant respectfully notes that, even if the Court believes that Plaintiff's alleged misconduct warranted a different response,  "it may not second-guess an employer's personnel decision absent demonstrably discriminatory motive."  Fishbach v. District of Columbia Dep't of Corrections, 86 F.3d 1180, 1183 (D.C. Cir. 1996).

Finally, if the Court finds that Plaintiff's oppositional and/or protected activity was a motivating factor in the personnel decisions at issue in this lawsuit, Defendant will show that the "mixed motive" analysis relieves Defendant of any liability.  See Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003); Porter v. Natsios, 414 F.3d 13, 19 (D.C. Cir. 2005) (discussing other circuits' recognition that the Price Waterhouse analysis remains applicable to defendants in retaliation cases).  Specifically, AIGI Haban is expected to testify that he would have placed Plaintiff on administrative leave, initiated an investigation of him, and temporarily relieved him of his supervisory duties, even if Plaintiff had not engaged in protected activity.   AIGI Haban would have taken the same actions because of Plaintiff's refusal to cooperate in the investigation of Larry Chapman.

3.    **Findings of Fact and Conclusions of Law**

**Defendant's Proposed Findings of Fact**

Employment Background

1.  James Malloy, the Plaintiff, is a former Assistant Special Agent in Charge (ASAC) in

    Region 6 of HUD OIG, assigned to Fort Worth, Texas.  Plaintiff began his employment

    with HUD OIG in 1983. For the entirety of his employment with the Agency, he only

    worked at the Fort Worth, Texas office.

2.  Larry Chapman became the Special Agent in Charge ("SAC") at Fort Worth in 1991.

    SAC Chapman promoted Plaintiff to ASAC in 1993.

Richardson and Romero Disciplinary Cases

3.  In July 2002, Jeffrey Finn, a former SAC for the Rocky Mountain Region, was convicted

    of knowingly and willfully making a false document.  See United States v. Finn, 375 F.3d

    1033, 1036-37, 1040 (10th Cir. 2004).  Special Agent ("SA") Cortez Richardson, who

    worked under Finn's supervision in the Rocky Mountain Region, had a role in falsifying

    the document, and he testified for the Government at Finn's trial.  See id. at 1036.

4.  Around June 2002, HUD OIG transferred SA Richardson from the Rocky Mountain

    Region to the Fort Worth Region, i.e., Region 6.   While he was assigned to the Rocky

    Mountain Region, SA Richardson was investigated for his role in the misconduct at issue

    in the Finn case.

5.  The Assistant Inspector General for Investigations ("AIGI") R. Joseph Haban sent the

    Report of Investigation ("ROI") regarding the SA Richardson investigation to SAC

    Chapman on or about September 5, 2002, telling SAC Chapman that the "recommending

official for this matter will be the [ASAC] currently supervising Agent Richardson and the deciding official will [be] the [SAC], Region 6."  Exhibit 4, Richardson Deposition at Exhibit 7.

6.  At about the same time, Region 6 also received an ROI for a separate investigation on SA Steve Romero for consideration and action.

7.  AIGI Haban did not know who the proposing official would be for any discipline imposed on SA Richardson until after the disciplinary action was completed.  AIGI Haban was not aware that ASAC Malloy, as opposed to one of two other ASACs in the region, was SA Richardson or SA Romero's immediate supervisor.

8.  As the first-line supervisor for SA Richardson and SA Romero, in the normal course of business, Plaintiff was the recommending or proposing official for imposing discipline on those special agents; SAC Chapman, as the second-line supervisor, was the deciding official in both cases.

9.  Plaintiff considered the following allegations against SA Richardson in proposing discipline: 1) damaging private property owned by a third party (i.e., a tow truck) by kicking it; and 2) altering a receipt supporting a federal expenditure in order to conceal inappropriate behavior of Finn.

10. For SA Romero's proposed discipline, Plaintiff considered the following allegations: 1) not being truthful about the reasons for his departure from the Austin Police Department; and 2) not paying credit card bills.

11.  Prior to October 2002, Plaintiff testified that he had one conversation with personnel specialist, Dave Nuhfer, regarding SA Richardson's discipline.

12.  Plaintiff never had discussions with AIGI Haban, Deputy Inspector General ("DIG")

Stephens, or Inspector General Donohue regarding his concerns as the proposing official on SA Richardson.

13.  AIGI Haban did not believe SA Richardson should be fired for his misconduct, and no one ever told AIGI Haban that SA Richardson should be fired. When AIGI Haban sent the SA Richardson and SA Romero cases to Region 6, he expected nothing would happen.

14.  Although Plaintiff was the proposing official for the discipline of SA Richardson, SAC Chapman drafted most of the document proposing a five-day suspension for SA Richardson.

15.  On September 30, 2002, the Plaintiff proposed a five-day suspension for SA Richardson, and on the same date SAC Chapman decided to impose Plaintiff's proposal, possibly violating the due process rights that were afforded to SA Richardson by OIG Manual Chapter 1752, Section 2-2B.  In addition, on September 30, 2002, Plaintiff gave SA Romero a Letter of Caution for not accurately reporting his reasons for leaving the Austin Police Department.

16.  At the end of the business day on September 30, 2002, SAC Chapman retired from HUD OIG employment.

17.  Under OIG's policies and procedures on employee misconduct, the Plaintiff was the proper proposing official for any disciplinary action for both SA Richardson and SA Romero.  See HUD OIG Manual Chapter 1752, "Disciplinary and Adverse Actions," July 19, 2002 ("HUD OIG Manual Chapter 1752"), § 1-6(Q).

18.  The proper deciding official on an adverse action for both employees was the next level supervisor, SAC Larry Chapman.  See HUD OIG Manual Chapter 1752, § 1-6(F).

19.  The proposing and deciding officials are required to consult with the Human Resource Division and the Office of Legal Counsel before taking any disciplinary or adverse action.  See HUD OIG Manual Chapter 1752, § 1-7(B)(3).  The Bureau of Public Debt is the human

resources service contractor that provides advice to the proposing and deciding officials at HUD OIG. Id. at 1-7.D.4, 1-7.E.1, 2-1.d.

20. Plaintiff did not coordinate with the Bureau of Public Debt or the Office of Legal Counsel after reviewing the ROI on SA Richardson. In failing to do so, Plaintiff admits that he violated OIG policy and procedures in proposing the disciple, and explains that he did so because SAC Chapman told him "we didn't need to do that, that we needed to get these adjudicated before he left so somebody else didn't have to deal with it once he was [gone]."

<u>HUD-OIG's Internal Investigation of SAC Larry Chapman</u>

21. On August 30, 2002, John McCarty, as SAC for the Special Investigations Division ("SID"), assigned an investigation into SAC Chapman to the SID staff. The investigation concerned allegations that SAC Chapman used his government-owned vehicle and official time for personal business.

22. On September 19, 2002, SID interviewed the Plaintiff regarding the allegations against SAC Chapman. The investigators asked Plaintiff to provide copies of the diaries he maintained. Plaintiff initially agreed to provide the documents but a short time later Plaintiff recanted and told the investigators that he would not provide them with his diaries based on the advice of an attorney. Plaintiff never provided the documents to HUD OIG while he was still working at the Agency.

23. On September 19 or 20, 2002, SAC McCarty advised Deputy Inspector General for Investigations ("DAIGI") Daniel Salas and AIGI Haban that ASAC Malloy was not cooperating in the investigation of SAC Chapman. Further, DAIGI Salas received allegations that there was a meeting of the Region 6 special agents in September 2002 at which the SAC Chapman investigation was discussed. DAIGI Salas was informed that the Plaintiff told the

agents under Chapman's command that they needed to "circle the wagons." AIGI Haban was told that the Plaintiff "had made comments to agents down in his region about how to handle the inquiry of – if the investigators came around. They wanted to circle the wagons."

24.  On October 10, 2002, DAIGI Salas informed Plaintiff that he was being placed on administrative leave pending an investigation into his misconduct in Region 6. AIGI Haban made the decision to place Plaintiff on administrative leave, which was approved by DIG Stephens.

25.  AIGI Haban made the decision to place Plaintiff on administrative leave during the investigation of Plaintiff because AIGI Haban had been told that 1) the Plaintiff refused to cooperate with the SAC Chapman investigation and 2) the Plaintiff had made comments to agents in Region 6 about how to handle the inquiry into SAC Chapman, using the phase "circle the wagons."

26.  Plaintiff admits that it would be improper if a manager told his subordinates to "circle the wagons" in order to obstruct an official investigation.

27.  Plaintiff admits either he or Chapman may have said "that type of information about circling the wagons," but not in the context of the Chapman investigation.

28.  Max Eamiguel, Windell Durant, and Tammy Gilbert—Region 6 employees who attended the September 2002 meeting—all provided sworn statements stating that the Plaintiff said "circle the wagons" during this staff meeting.

29.  Other Region 6 employees—Steve Romero, Zelma Howell, and Gary Haley—stated under oath that the words similar to "circle the wagon" were said at the staff meeting but they were unsure who said them.

30.  Michael Kepler, another Region 6 employee, provided an affidavit in which he stated

that the Plaintiff said we "should close ranks" in relation to SAC Chapman's discussion of visits from internal affairs.

31.   During the course of the investigation of Plaintiff, AIGI Haban was briefed about the fact that some agents heard the Plaintiff say things like "circle the wagons" and some did not, but he was not briefed on what each agent said.

32.  While Plaintiff was on administrative leave pending the SID investigation, he continued to receive his same pay and accrue sick and annual leave.

33.  On October 17, 2002, the Plaintiff filed an informal administrative complaint of discrimination.

34.  AIGI Haban continued to keep the Plaintiff on administrative leave because he was told that Plaintiff wished to remain on administrative leave pending negotiations to settle his administrative discrimination complaint.

35.  Plaintiff admits that as part of the settlement negotiations, Plaintiff's counsel requested that the Plaintiff be allowed to remain on administrative leave until early January 2003.

36.  By memorandum dated December 17, 2002, and one day after settlement negotiations failed, AIGI Haban notified the Plaintiff that he could return to work on December 19, 2002. Plaintiff returned to duty on December 19, 2002.

37.   AIGI Haban also authorized the Plaintiff to take any leave he had accumulated. Plaintiff decided not to take any leave between his return to duty and the ultimate date of his retirement because he wanted to check on his e-mail and work on his EEO case.

38. AIGI Haban made the decision to remove the Plaintiff's supervisory responsibilities because he "didn't think Jim left [him] any choice to do – what to do what I did.  I needed to

get him back to work, but I didn't want him in a position where he could influence other people."

39.  When the Plaintiff returned to the office, Lester Davis (SAC for Region 6) told Plaintiff that he did not know what was going to happen to the Plaintiff.   No one in Headquarters ever told SAC Davis why the Plaintiff was on administrative leave or why Plaintiff was returning to duty.

40.  SAC Davis assigned Plaintiff non-supervisory work to do when Plaintiff returned to work in December, 2002.

41.   On Plaintiff's return to duty, Dan Truxal, another ASAC in Region 6, told him that ASAC Truxal had been reassigned to the Boston office to a supervisory position.

42.  According to Plaintiff, he retired on January 3, 2003 because he lost his supervisory responsibilities, could no longer be a supervisor in the region, he was supposed to lose about 146 hours of annual leave after January 3, 2002,[1] and he did not want any written disciplinary action taken against him.

43.  At Plaintiff's request, a Human Resource Specialist at the Bureau of Public Debt created a retirement application for Plaintiff on December 23, 2002.  Plaintiff signed the application on December 26, 2002.

44.  The Human Resource Specialist told Plaintiff he could "pull his retirement off the table at 4:25 or 4:29 if [he] was going out the door at 4:30 that last day."  As of January 3, 2003, AIGI Haban had not decided what would happen to Plaintiff nor had he made any decision regarding Plaintiff's status.

---

[1] The 146 hours of leave that Plaintiff contends he would have lost on January 3, 2003 were accumulated annual leave Plaintiff was required to take or relinquish because they exceeded the number of carry over hours allowed; it is also called "use or lose" leave.

45.  No one at HUD OIG ever told Plaintiff that he had to either retire or that he would be subject to being involuntarily reassigned.  No one ever told the Plaintiff that unless he resigned he would be involuntarily reassigned.

46.  When he retired, Plaintiff was compensated monetarily for the 146 hours of annual leave he had in a use-or-lose status.

47.  Since his retirement, the Plaintiff has not applied for any jobs.

Vacancy Announcements

48.  On October 10, 2002, the Agency published vacancy announcement 03-FESB-002 for the position of the SAC of Region 6, which was vacant because of SAC Chapman's retirement.

49.  Plaintiff was aware that HUD OIG advertised their vacancy announcements on a publicly available website.

50.  Plaintiff learned about the vacancy announcement for the SAC position on October 30, 2002, and was not able to put together a package in time to meet the filing deadline.

51.  Plaintiff did not make any effort to contact anyone at HUD OIG, including Daniel Salas, to make his interest in applying for the vacant SAC position known.

52.  AIGI Haban would not have promoted the Plaintiff to the SAC vacancy in Region 6 because he had a policy of not promoting sitting ASACs to be SACs in the same region.

53.  On December 12, 2002, the Agency published vacancy announcement No. 03-FESB-100 for the position of ASAC in the Houston, Texas office.  Plaintiff learned of the vacancy announcement for the Houston ASAC position on December 19, 2002.  Although he had time to do so, Plaintiff did not apply for the position.

**Defendant's Proposed Conclusions of Law**

1. Title VII does not authorize this Court "to become a super-personnel department that reexamines an entity's business decisions." Barbour v. Browner, 181 F.3d 1342, 1346 (D.C. Cir. 1999). That principle is particularly apt in this case, which involves a supervisor's assessment of how to respond to a law enforcement agent's refusal to cooperate with an ongoing investigation into another officer's misconduct.

Plaintiff's Non-Selection for Two Vacancies and the Alleged Threats of Reassignment

2. Plaintiff has failed to carry his burden of demonstrating by a preponderance of the evidence that his non-selection for the SAC and ASAC vacancies resulted from unlawful reprisal. Plaintiff did not apply for either vacancy, and did not show that he made any reasonable attempt to convey his interest in the vacancies to HUD-OIG. That defeats his claim of reprisal. See Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).

3. Plaintiff also has failed to carry his burden of demonstrating by a preponderance of the evidence that the alleged threats of reassignment were acts of reprisal. The evidence and testimony presented at trial did not establish that any HUD-OIG official threatened Plaintiff that he would be reassigned if he remained at HUD-OIG. Plaintiff's apparent belief that such a threat existed lacked foundation; the threat was speculative and existed only in his own mind. That entirely speculative and unfounded fear of reassignment cannot establish a prima facie case of reprisal; there was no "action" by HUD-OIG officials, let alone an "adverse action."

Plaintiff's Placement on Administrative Leave, the Investigation of Plaintiff, and Plaintiff's Temporary Loss of Supervisory Responsibilities

4. Plaintiff's failure to follow proper procedure and his rigid loyalty to Larry Chapman led him to make unfortunate decisions which were contrary to HUD-OIG policies and procedures. HUD-OIG had a right to respond reasonably to that situation. The evidence and testimony presented at trial make it clear that the actions of which Plaintiff complains were not reprisal, but instead were a reasonable and appropriate agency response to his own conduct.

5. As a threshold matter, Plaintiff cannot establish a prima facie case based upon the opposition clause of Title VII because he did not demonstrate "a good faith, reasonable belief that the challenged practice violates Title VII." George v. Leavitt, 407 F.3d 405, 417 (D.C. Cir. 2005). The uncontroverted evidence shows that SA Richardson and SA Romero engaged in serious misconduct. There is no evidence that any agency officials wanted to impose any particular discipline on SA Romero. Plaintiff's testimony that one or more officials at HUD-OIG wanted to fire SA Richardson was not credible. But even assuming that the officials did want SA Richardson to be fired, the evidence shows that the officials were motivated by the serious nature of SA Richardson's misconduct. Therefore, HUD-OIG officials could lawfully consider Plaintiff's decision to impose relatively light discipline upon SA Richardson and SA Romero when deciding to place Plaintiff on administrative leave, investigate him, and temporarily relieve his supervisory duties.

6. Moreover, even if Plaintiff had reasonably believed that the discipline of SA Romero and SA Richardson was a discriminatory practice, he still would not have a prima facie case of retaliation. A careful review of the facts of this case demonstrate that the investigation of Plaintiff's conduct was not adverse. No disciplinary actions were taken based on the

investigation, and the pendency of the investigation would not deter a reasonable person

from pursuing protected activity.  Indeed, the investigation did not deter Plaintiff from

filing an EEO complaint.  Therefore, this was not adverse.  See Mack v. Strauss, 134 F.

Supp. 2d.  103, 114 (D.D.C. 2001), aff'd No. 01-5122, 2001 WL 1286263 (D.C. Cir.

Sept. 28, 2001).   Plaintiff's placement on paid administrative leave pending the

completion of the investigation also was not adverse.

7.  Unlike Plaintiff's refusal to impose meaningful discipline against SA Romero and SA

Richardson, Plaintiff's submission of an EEO complaint in October 2002 was protected

activity.  However, HUD OIG placed Plaintiff on administrative leave and initiated the

investigation into Plaintiff's conduct before he engaged in that protected activity;

therefore those decisions could not have been reprisal for Plaintiff's submission of an

EEO complaint.

8.  Plaintiff was relieved of his supervisory duties approximately two months after he filed

the EEO complaint.  However, AIGI Haban's decision to relieve plaintiff of those duties

was not an adverse action.  AIGI Haban credibly testified that the duties were removed

on a purely temporary basis, pending completion of the investigation into Plaintiff's

conduct.  That was not an adverse action because Plaintiff still had duties assigned to

him, and at the time Plaintiff voluntarily retired, no final decision had been made about

future assignments or possible supervisory duties.  Such a temporary shift in

responsibilities — which lasted less than three weeks given Plaintiff's decision to retire

— would not deter a person from engaging in protected activity.

9.  Moreover, even if the change in Plaintiff's duties were sufficiently harmful to be an

adverse action, Plaintiff has not established that his protected activities were the cause of

HUD-OIG's actions, or that the agency's reasons for taking its actions between October 10, 2002 and January 3, 2003 were a pretext for retaliation.  No direct evidence of reprisal was presented at trial.  HUD-OIG's reasons for its actions are quite detailed, and the evidence Defendant presented at trial was credible and persuasive: the allegations of misconduct against Plaintiff justified his placement on administrative leave, the initiation of an investigation of his conduct, and the temporary suspension of his supervisory duties.  AIGI Haban credibly testified that he made those personnel decisions because of the allegations of misconduct, and not because of an intent to retaliate against Plaintiff for engaging in protected activity.

10. The evidence that Plaintiff presented at trial did not support an inference that AIGI Haban's non-retaliatory explanations were pretextual.

11. The Court further finds that, even if Plaintiff had shown that he engaged in protected activity, and that activity was a motivating factor in HUD-OIG's decision to place him on administrative leave, investigate him, and temporarily relieve him of his supervisory responsibilities, Defendants would not be liable for those actions.  Plaintiff's refusal to cooperate in the investigation of Larry Chapman provided grounds for Defendant to place Plaintiff on administrative leave, investigate his conduct, and relieve him of supervisory responsibilities pending the conclusion of that investigation.  AIGI Haban reasonably believed that Plaintiff was obstructing an on-going investigation, and that the obstruction of the investigation violated HUD-OIG rules, and was inappropriate conduct for a supervisor.  AIGI Haban credibly testified that he would have taken those actions regardless of whether Plaintiff and engaged in protected activity.  Therefore, under the

mixed motives analysis set forth in <u>Desert Palace, Inc. v. Costa</u>, 539 U.S. 90 (2003),

Defendant cannot be held liable for those personnel decisions.

<u>Conclusion</u>

12. Accordingly, based on all of the evidence presented at trial, the Court concludes that

judgment should be entered in favor of Defendant because Plaintiff failed to show that he

was the victim of unlawful reprisal.

Respectfully submitted,


_____/s/_____
JEFFREY A. TAYLOR, D.C. Bar #498610
United States Attorney


_____/s/_____
RUDOLPH CONTRERAS, D.C. Bar #434122
Assistant United States Attorney


__/s/   Robin M. Meriweather_____
JOHN C. TRUONG, Bar # 465901
ROBIN M. MERIWEATHER, Bar # 490114
Assistant United States Attorney
Civil Division
555 4th Street, N.W. - Room E4822
Washington, D.C.  20530
(202) 307-0406  or (202) 514-7198

Counsel for Defendant

/s/ by RMM
_____
Robert C. Seldon, D.C. Bar #245100
Molly E. Buie, D.C. Bar # 483767
Robert C. Seldon & Associates, P.C.
Attorneys-At-Law
1319 F Street, N.W., Suite 200
Washington, D.C. 20004
Phone: (202) 393-8200 ext. 113
Fax: (202) 318-2287
*Counsel for Plaintiff*