**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **JAMES MALLOY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civ. Action No. 05-1117 (RCL)** |
| ) | |
| **ALPHONSO R. JACKSON,** ) | |
| **Secretary of Housing And** ) | |
| **Urban Development,** ) | |
| ) | |
| **Defendant.** ) | |
| ———————————————) | |

**PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**INTRODUCTION**

1.      The plaintiff in this action is James Malloy.

2.      Plaintiff had an exceptionally successful 29 year career in federal law enforcement, until the actions that gave rise to this suit.

3.      In 1993, Mr. Malloy was appointed Assistant Special Agent in Charge ("ASAC") with the Office of Inspector General ("OIG") of the Department of Housing and Urban Development ("HUD") in Ft. Worth, Texas.

4.      In that position, Mr. Malloy supervised as many as 25 Special Agents and oversaw his Region's most complex criminal investigations.

5.      Mr. Malloy was known at the national level in HUD OIG as a top manager and named National HUD OIG Investigation Manager of the Year in 1999; two years later, he was elected Chair of the federal government's twenty-five agency Southwest Regional Inspector General Council.

6.     At no time before the events that gave rise to this suit was Mr. Malloy ever placed under investigation, denied a security clearance, disciplined, or even counseled.

7.     In October of 2002, Mr. Malloy was directed to start disciplinary proceedings against an African American Special Agent, Cortez Richardson.

8.     Mr. Richardson had been pursuing an EEO complaint against a senior OIG official in Washington, D.C., since May of 2001.

9.     In May of 2002, HUD OIG's Headquarters Office of Legal Counsel received a disciplinary package concerning Mr. Richardson about events that occurred two years earlier.

10.    Although the package came with a recommended 60 day suspension, upon its reading, the Legal Counsel's Office concluded that removal was appropriate.

11.    At that time, OIG Headquarters had the ability to take disciplinary action against Richardson.  But it could not take action, because Mr. Richardson was the prime witness in a prosecution against his former supervisor, entitled United States v. Finn, 01-CR-184 (D. Colo.).

12.    Due to OIG's perjury, destruction of evidence, and attempted intimidation of defense witnesses, the majority of the indictment against Mr. Finn was dismissed on January 11, 2002.

13.    The remaining counts proceeded to trial on July 29, 2002; eventually, they too were vitiated by the Tenth Circuit.  U.S. v. Finn, 375 F.3d 1033, 1037 (10th Cir. 2004).

14.    The core of Mr. Richardson's EEO complaint was that he was threatened with termination after he testified at the Finn trial.

15.    By that time, however, OIG Headquarters no longer had the ability to do that, because in June, Mr. Richardson had been given a hardship transfer to Region 6.

16.     That meant that Mr. Malloy and his supervisor in the field, Special Agent in Charge ("SAC") Larry Chapman, rather than OIG Headquarters became responsible for any discipline for Mr. Richardson.

17.     Mr. Malloy studied the Richardson disciplinary file very closely for 30 hours, beginning on September 23, 2002.

18.     Mr. Malloy focused on the evidence of record, Mr. Richardson's conduct, the fact that he was not on-duty, his status as a law enforcement officer, and Mr. Richardson's excellent record.

19.     On September 30, 2002, Mr. Malloy recommended a five day suspension, which SAC Chapman imposed and Mr. Richardson served.[1]

20.     A few days later, OIG Headquarters learned that Mr. Richardson had not been removed.

21.     On October 10, 2002, Deputy Assistant Inspector General for Investigations ("DAIGI") Daniel Salas, OIG placed Mr. Malloy on administrative leave and ordered him off its premises.

22.     Mr. Malloy initiated the administrative discrimination complaints process no later than October 17, 2002.

23.     Mr. Malloy was not returned to active duty until December 17, 2002.

24.     Mr. Malloy was returned to active duty in a Memorandum issued by R. Joseph Haban, the Assistant Inspector General for Investigations ("AIGI"), which relieved Mr. Malloy

---

[1]     When the Richardson file was sent to Mr. Malloy, he was also directed to commence disciplinary proceedings against Steve Romero. A Hispanic agent, Mr. Romero had been cleared of the most serious charge several years earlier. After studying the file closely, Mr. Malloy issued him a Memorandum of Caution.

of all managerial responsibilities and advised Mr. Malloy that he would no longer serve as ASAC.

25.    Mr. Malloy is maintaining this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-16 (incorporating 42 U.S.C. §2000e-3(a)), that prohibit the federal government from retaliating against employees who engaged in protected EEO activities.

26.    Mr. Malloy's refusal to discipline two minorities, one of whom had filed an EEO complaint, was protected activity under the Act's opposition clause, 42 U.S.C. §2000e-3(a). E.g., EEOC v. St. Anne's Hospital of Chicago, 664 F.2d 128, 131-32 (7th Cir. 1981).

27.    Mr. Malloy also engaged in protected activity by making a charge of discrimination and retaliation.  Singletary v. District of Columbia, 351 F.3d 519, 524 (D.C. Cir. 2003).  Having himself made a charge of discrimination and retaliation after being placed on administrative leave, Mr. Malloy was also entitled to protection under the Act's participation clause.[2]

28.    Under Title VII's provisions that prohibit retaliation, actionable changes in employment are defined as all actions, personnel or otherwise, that may have been "materially adverse," meaning that they "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  .  Burlington Northern & Santa Fe R.R. v. White, __ U.S. __.126 S.Ct. 2405, 2415 (2006) (internal quotation marks omitted).

29.    Mr. Malloy suffered actionable changes in his employment, when he was removed from his supervisory ASAC position, placed under investigation twice, ordered off OIG premises, placed on extended administrative leave, relieved of supervisory and investigative duties, eliminated from competition for a higher paying supervisory position, constructively

---

[2]    Mr. Malloy's administrative complaint also alleged that he had been subject to discrimination based on national origin.  Mr. Malloy is no longer pursuing that claim, as is reflected in his pre-trial submission.

discharged, stigmatized in the law enforcement community, and foreclosed from future employment opportunities in law enforcement. <u>E.g.</u>, <u>Burlington Industries, Inc. v. Ellereth,</u> 524 U.S. 742, 761 (1998) (quoting <u>Crady v. Liberty Nat. Bank & Trust Co. of Ind.,</u> 993 F.2d 132, 136 (7th Cir. 1993); <u>Velikonja v. Gonzales,</u> 466 F.3d 122, 124-25 (D.C. Cir. 2006); <u>Stewart v. Ashcroft,</u> 352 F.3d 422, 426-27 (D.C. Cir. 2004); EEOC Compliance Manual on Retaliation, Directive No. 915.003 at 8-14.

30.     HUD OIG caused Mr. Malloy to sustain the foregoing actionable changes in his employment in retaliation for not proposing to terminate Mr. Richardson and Mr. Romero or to discipline them disproportionately, and for utilizing the administrative discrimination complaints process on his own behalf.

## **PROPOSED FINDINGS OF FACT**

### **Ms. Malloy's Service With HUD OIG**

31.     Mr. Malloy joined HUD OIG as a Criminal Investigator in October of 1983. He was assigned to the OIG office in Ft. Worth, Texas, which is a part of the agency's Southwest Region or Region 6.

32.     In 1993, Mr. Malloy was appointed ASAC at Grade 14; several years later, he was named National HUD OIG Investigation Manager of the Year in 1999.

33.     Mr. Malloy led his office's joint task force with the Federal Bureau of Investigation, and supervised all federal law enforcement support activities after the 1995 bombing attack in Oklahoma City.

34.     OIG's Southwest Region spans all of Texas, Louisiana, New Mexico, Oklahoma, and Arkansas.

35.     Mr. Malloy made it known for five years that he was interested in the position of ASAC in the Southwest Region's office in Houston, a position that carried with it a higher salary and would place him nearer to his family.

36.     The position was opened for competition in mid-December of 2002.

37.     AIGI Haban always viewed Mr. Malloy as doing an excellent job as an ASAC in Region 6.

38.     Nonetheless, HUD OIG selected a far less qualified GS-13 agent, Michael Kepler, who lacked supervisory experience instead of Mr. Malloy for a higher paying ASAC position in Houston.

39.     Mr. Malloy was on enforced administrative leave when the position opened, and removed from supervision by the time it closed

### Organization Of HUD OIG and the Office of Investigations

40.     The mission of HUD OIG includes preventing and detecting fraud, waste, and abuse by individuals and entities who are engaged in the business of providing HUD-sponsored and HUD–financed housing and housing programs through administrative audits and criminal investigations.

41.     HUD OIG is headquartered in Washington, D.C.; and is headed by the Inspector General, Kenneth Donahue; and the Deputy Inspector General, Michael Stephens.

42.     As Deputy Inspector General, Mr. Stephens serves as the chief operating officer for HUD OIG.

43.     Answering to Mr. Stephens or one of his subordinates are various OIG Offices, each with a different function.

44.     One of these is the Office of Investigations, in which Mr. Malloy was employed, the primary function of which is to conduct the investigations within HUD OIG's jurisdiction that are of a potentially criminal nature.

45.     The Office of Investigations is headed by the AIGI, at all times relevant R. Joseph Haban.  Mr. Haban's Deputy, at all times relevant, was Daniel Salas.

46.     The investigative activities of the Office of Investigations are carried out in Regional and field offices around the country.  These offices are headed by SAC's and ASAC's.

47.     Both at the supervisory and non-supervisory level, the professional employees of the Office are all Criminal Agents GS-1811's, and are all held to the same standards of conduct for and as federal law enforcement officers.

### Other Components of HUD OIG and the Office of Investigations

48.     There are several other components of HUD OIG Headquarters with relevance to this case.

49.     One is the OIG Office of Legal Counsel, which is separate and apart from HUD's Office of General Counsel itself.

50.     Another is the Bureau of Public Debt, which contracts to be a personnel department for OIG separate and apart from HUD's.

51.     The third is the Special Investigations Division, which is responsible for internal investigations of OIG employees including investigations with potential criminal prosecution.

52.     The Headquarters Office of Legal Counsel plays an active role in HUD OIG's EEO and disciplinary processes.

**OIG Headquarters, Mr. Richardson's EEO Complaint, and His Discipline**

53.     When Mr. Richardson filed his formal EEO complaint in May of 2001, he was a Special Agent assigned to the OIG field office in Denver, Colorado.

54.     That same month, Mr. Richardson's former supervisor, Jeffrey Finn, was indicted for misconduct committed in his official capacity as Special Agent in Charge of that office.  U.S. v. Finn, supra, 375 F.3d at 1035-37.

55.     Mr. Richardson's complaint alleged, among other matters, that a senior OIG official threatened to terminate him, once he testified at the Finn trial.

56.     That official, Robert Groves, became AIGI; Mr. Haban succeeded Mr. Groves early in 2002, after first serving as his Deputy.

57.     In May of 2002, OIG's Headquarters Office of Legal Counsel received a disciplinary package concerning Mr. Richardson about events that occurred two years earlier.

58.     Although the package came with a recommended 60 day suspension, upon its reading, the Legal Counsel's Office concluded that removal was appropriate.

59.     There is no record of any further action on Mr. Richardson's potential discipline at that time.

60.     Mr. Richardson was exceptionally important to HUD OIG in the Finn trial, which prevented HUD OIG from moving forward with his removal in the spring of 2002.

61.     Mr. Richardson was "the special agent who prepared [a] case expenditure form at" Finn's direction.  U.S. v. Finn, supra, 375 F.3d at 1039.  Finn's expenditure of HUD funds pursuant to this form comprised the remaining charges against him.  Id. at 1037-38.

62.     Mr. Richardson unquestionably acted properly in following Finn's direction, and would have been guilty of insubordination had he not.  Nickerson v. USPS, 49 MSPR 451, 459

(1991); <u>Gragg v. U.S. Air Force</u>, 13 MSPR 296, 299 (1982), <u>dismissed</u> 717 F.2d 1343 (Fed. Cir. 1983).

63.     Mr. Richardson was also forthright in immediately reporting Mr. Finn.

64.     The proposed 60 day suspension which the Office of Legal Counsel viewed as too lenient faulted Mr. Richardson for his behavior and for allegedly not reporting Finn's misconduct.

65.     That was false.

### Mr. Richardson's Reassignment

66.     The settlement of Mr. Richardson's EEO complaint, which the HUD OIG Office of Legal Counsel reneged on at one point, provided for him to be reassigned to Mr. Malloy's office, to be given three weeks of leave to move from Denver to Ft. Worth, and to make himself available for the <u>Finn</u> trial.

67.     That led AIGI Haban to seek the concurrence of SAC Larry Chapman in Mr. Richardson's reassignment.

68.     Mr. Chapman strongly objected to Mr. Haban and insisted on being assured that neither he nor his management staff was to be involved in any EEO or disciplinary matters directed towards Mr. Richardson.

69.     Mr. Haban assured Mr. Chapman that any discipline for Mr. Richardson would not be handled in his Region.[3]

70.     Anticipating that his EEO case was going to be settled, Mr. Richardson sold his home in Denver and relocated his family to Oklahoma City.

---

[3]     Mr. Chapman pursued an appeal to the Merit Systems Protection Board over his treatment by OIG after the disciplinary proceedings against Mr. Richardson and Mr. Romero were completed.  <u>Chapman v. HUD</u>, MSPB Docket DA-0752-06-0093-I-3.  The case was settled after OIG agreed to clear Mr. Chapman of all charges.

71.     When the settlement fell through, Mr. Richardson wound up living in a basement apartment in Denver.

72.     A few days later, Mr. Richardson's wife was called up for active military duty in a combat zone in Korea.

73.     On May 15, 2002, Mr. Richardson requested a hardship transfer; in mid-June, he arrived in the Southwest Region under Mr. Malloy and Mr. Chapman.

### The Disposition of Mr. Richardson's Discipline

74.     In mid-August of 2002, the month after Mr. Richardson was reassigned, with his role in the Finn trial having ended, AIGI Mr. Haban directed Mr. Chapman to begin disciplinary charges against Mr. Richardson.

75.     On September 5, 2002, Mr. Chapman was sent a Report of Investigation ("ROI") concerning Mr. Richardson.

76.     The ROI boiled down to several charges against Mr. Richardson – two of which related to his alleged "falsification" of an expenditure form at Finn's direction – each emanating years earlier when he had been assigned to Denver.

77.     By the time that the Richardson ROI arrived in Region 6, Mr. Malloy had already spoken to David Nuhfer, who headed OIG's employee and labor relations unit at its contractor, the Bureau of Public Debt.

78.     Mr. Nuhfer told Mr. Malloy that Mr. Richardson's conduct warranted serious discipline.

79.     Mr. Malloy objected to HUD OIG trying to make him responsible for disciplining Mr. Richardson.

80.     Mr. Malloy also disagreed with HUD OIG Headquarters that Mr. Richardson deserved to be fired.

81.     Once the ROI arrived, Mr. Chapman gave it to Mr. Malloy, as Mr. Richardson's immediate supervisor, and directed him to review it and decide what disciplinary action to propose before Mr. Chapman retired at the end of September.

82.     Mr. Malloy began his review of the Richardson ROI during the week of September 23, 2002 (Malloy Decl., ¶29).

83.     Since Mr. Chapman was about to retire, Mr. Malloy only had until the following Monday to complete his work.

84.     Mr. Malloy took his responsibilities very seriously, beginning by studying the ROI for at least 30 hours.

85.     Mr. Malloy concluded that Mr. Richardson had acted in accordance with federal personnel law by following Finn's order in preparing an expenditure form and in promptly reporting his suspected misconduct; that he had been truthful and candid with investigators looking into Finn's misconduct; and that he had not misused his agency cell phone.

86.     Mr. Malloy sustained two charges of conduct unbecoming an officer, relating to Mr. Richardson's damage to a truck while off-duty and providing an "X" rated video-tape to other agents.

87.     Mr. Malloy knew that Mr. Richardson's misconduct was unrelated to OIG core missions and off-duty.  He also knew of other misconduct by HUD OIG agents, including two non-minority SAC's under the supervision of OIG Headquarters, who had engaged in improper sexual relations with subordinates, without penalty by AIGI Haban.

88.     On September 30, 2002, Mr. Malloy issued a detailed Memorandum codifying his proposal to suspend Mr. Richardson for five days and his reasons for doing so.

89.     Final disposition was up to Mr. Chapman.  With his retirement set to be effective, Mr. Chapman arranged an informal oral reply session with Mr. Richardson to discuss the proposal later that day.

90.     Mr. Richardson had no objection to the procedure or to a five day suspension, and asked permission of Mr. Chapman to serve his suspension as quickly as possible.  Mr. Chapman imposed the suspension on Mr. Richardson in a Memorandum dated September 30, 2002, just before he retired.

## The Disposition of Mr. Romero's Discipline

91.     Mr. Malloy was also directed by ASAC Chapman to commence the disciplinary process against Steve Romero, a Hispanic agent.

92.     Mr. Romero had been cleared of the most serious charge several years earlier.

93.     As he did with the Richardson Report of Investigation, Mr. Malloy studied the ROI concerning Mr. Romero thoroughly.

94.     After doing so, Mr. Malloy concluded that Mr. Romero did not engage in any substantive offense, but that he had not paid close enough attention in filling out certain HUD forms.

95.     Mr. Malloy also knew that an offense of this nature did not warrant a formal reprimand or harsh discipline and, from his experience, that it would not be imposed on a non-minority.

96.     For that reason, on September 30, 2002, Mr. Malloy issued Mr. Romero a Memorandum of Caution, which Mr. Chapman approved before retiring.

## Reaction By OIG Headquarters

97.     AIGI Haban first learned of the disciplinary action that Mr. Malloy had proposed on October 2, 2002, and promptly directed Mr. Malloy to fax a copy of the documents concerning Mr. Richardson and Mr. Romero to headquarters and the OIG Counsel's Office.

98.     Mr. Malloy did so the next day.

99.     On October 10, 2002, DAIGI Salas placed Mr. Malloy on administrative leave, ordered him to turn in all of his OIG equipment including computer equipment, prohibited him from entering OIG premises, and directed to have no contact with any HUD OIG employees.

100.    At the same time, OIG Headquarters opened two overlapping investigations into Mr. Malloy, one of which focused on the personnel actions he took against Mr. Romero and Mr. Richardson.

101.    Over the next two months, these same charges would be used to deny Mr. Malloy's request to be taken off administrative leave; and then to remove him as ASAC and relieve him of supervisory duties.

102.    DAIGI Salas, who issued the Memo that placed Mr. Malloy on administrative leave, had himself been the subject of allegations of misconduct several months earlier.

103.    Mr. Salas was alleged to have used a weapon and engaged in domestic violence.

104.    In May of 2002, these allegations were brought to the attention of the Secretary of HUD, Inspector General Donahue, and Assistant Inspector General Haban.

105.    The matter was handled by Mr. Donahue, Deputy Inspector General Stephens, and Mr. Haban; they never had a formal investigation opened, or placed Mr. Salas on administrative leave or relieved him of supervisory duties.

<u>Mr. Malloy's Supposed Interference with the Chapman Investigation</u>

106.    On September 19, 2002, before the disciplinary actions involving Mr. Richardson and Mr. Romero, Mr. Malloy was interviewed as a witness in an investigation into Mr. Chapman.

107.    Mr. Chapman came under investigation for supposedly attending to the construction of a new house while on government time.

108.    The charge was years old and Mr. Chapman had been cleared of it while Mr. Haban headed the division that investigated it.

109.    Mr. Malloy was directed to travel to OIG Headquarters and give a follow-up witness statement on October 10, 2002, the week after word of the Richardson and Romero disciplinary matters reached OIG Headquarters.

110.    When he arrived, however, Mr. Malloy was advised that he was now a subject of the investigation.

111.    That afternoon, Mr. Malloy was placed on administrative leave.

112.    The investigations into Mr. Malloy were pretextual.  OIG asserts that it placed Mr. Malloy on administrative leave for refusing to turn over his personal diaries during the investigation of Mr. Chapman and interfering with it.

113.    Mr. Malloy's fellow ASAC in the Southwest Region was also directed to give statements in the same investigation.

114.    Like Mr. Malloy, Mr. Truxal also refused to turn over diaries that he considered to be personal in nature.

115.    Unlike Mr. Malloy, Mr. Truxal had not been involved in the Richardson and Romero disciplinary proceedings, and OIG never took any action against him.

116.    Mr. Malloy was also accused of making a comment at a Region 6 staff meeting that they should circle the wagons when investigators asked questions about Mr. Chapman.

117.    The official notes of the staff meeting did not reflect that Mr. Malloy made any such comment.

118.    In addition, many witnesses exonerated Mr. Malloy during the investigation.

### HUD OIG Denies Mr. Malloy's Request To Be Restored To Active Duty

119.    Mr. Malloy personally requested to be restored to active duty on October 15, 2002.  The next business day, October 18, 2002, Mr. Malloy's counsel also made a written request that he be restored to active duty.

120.    Counsel's request assured DAIGI Salas that Mr. Malloy had not withheld any business-related documents and that he had and would cooperate fully with OIG's investigation.

121.    The letter also advised Mr. Salas about Mr. Malloy's use of the EEO complaints process, which Mr. Malloy had initiated the day before.

122.    Mr. Salas wrote back that Mr. Malloy's actions were viewed as threats, stated that Mr. Malloy acted at his own peril, and directed all further inquiries to OIG's Office of Legal Counsel.

123.    The accounts of HUD OIG's senior officials about how it reached the decision to keep Mr. Malloy on administrative leave are contradictory.

124.    Deputy Inspector General Stephens denied knowing that Mr. Malloy had been asked to be restored to active duty.

125.    AIGI Haban claims that the decision was made in a collective manner with Mr. Stephens and the Legal Counsel's Office.

126.    Mr. Salas claims that the letter he signed denying Mr. Malloy's request was written entirely by the Office of Legal Counsel

## Mr. Malloy Is Relieved of Supervisory Duties

127.    On December 17, 2002, AIGI Haban issued a Memorandum returning Mr. Malloy to active duty, but simultaneously relieved him "of all managerial responsibilities and stripped him of his position as an ASAC.

## Mr. Malloy's Elimination from Consideration as ASAC of Houston

128.    Before it returned Mr. Malloy to the workplace as a line agent, OIG announced a vacancy for an ASAC position in Houston.

129.    The position was on a higher pay scale and Mr. Malloy had expressed an interest in working in Houston to be nearer his family for five years.

130.    Mr. Malloy, at the time, was barred from OIG's computer systems and from speaking with OIG employees.

131.    For that reason, he had no knowledge that the position was open for competition.

132.    When Mr. Malloy returned to the office, he did learn about the vacancy.

133.    By that time, he had just been officially stripped of all supervisory duties, remained under investigation, and would never have been considered for the position.

134.    When the new SAC of Region 6, Lester Davis, told Mr. Malloy that he would never be returned to supervisory ranks, despite his interest in the position, Mr. Malloy knew that applying would be futile.

135.    With Mr. Malloy out of the competition, OIG selected a former non-supervisory, lower-graded subordinate, Michael Kepler.

136.    Mr. Malloy was eliminated from consideration solely because he was under investigation.

137.    Mr. Haban, Deputy Inspector General Stephens, and Inspector General Donahue were personally involved in the decision to select someone else.

### Mr. Malloy Is Constructively Discharged

138.    Mr. Malloy, like all special agents in the OIG Office of Investigations, is a federal law enforcement officer and serves under especially strict standards of conduct.

139.    Mr. Malloy had no intention of retiring before he was 57 years old, the mandatory retirement age for federal law enforcement officers under 5 U.S.C. §8336, and now seeks reinstatement and to have that age limit waived by HUD OIG as it has done for other Special Agents.

140.    Mr. Malloy had aspirations of moving up one level in the Southwest Region and becoming Special Agent in Charge, before he was constructively discharged.

141.    Senior OIG management always viewed Mr. Malloy very highly and had no reason to exclude him from promotional opportunities but for its investigations of him.

142.    Once that happened, the new Special Agent in Charge of the Southwest Region told Mr. Malloy that he had no future in management.

143.    After he was returned to active duty and stripped of his supervisory duties, OIG gave Mr. Malloy humiliating tasks such as coordinating his office's fleet of cars.

144.    A federal law enforcement officer's credibility is vital.

145.    A special agent who is under investigation is useless in a criminal prosecution, because any questions about his integrity must be disclosed to the defense. Giglio v. United States, 405 U.S. 150, 154 (1972).

146.    Being relieved of supervisory responsibility while under investigation would make Mr. Malloy's continued participation on inter-agency task forces and councils impossible.

147.    Mr. Malloy was constructively discharged when he resigned from HUD OIG, effective January 7, 2003.

## PROPOSED CONCLUSIONS OF LAW

148.    Mr. Malloy's two claims arise under the provisions of Title VII that prohibit employers, including the federal government, from retaliating against employees who engage in protected EEO activities.  42 U.S.C. §2000e-16 (incorporating by reference 42 U.S.C. §2000e-3).

149.    Retaliation, which is among the unlawful employment practices prohibited by Title VII, is proven when a plaintiff demonstrates that his or her protected EEO activity was a motivating factor behind actionable changes in employment (present and future), even though other factors also motivated the employer.  42 U.S.C. §§2000e-2(m).

150.    Mr. Malloy engaged in two types of protected EEO activities.

151.    Mr. Malloy's first such activity was protected under Title VII's opposition clause, which makes it unlawful for "an employer to discriminate against any of his employees" who have "opposed any practice made an unlawful employment."   42 U.S.C. §2000e-16 (incorporating 42 U.S.C. § 2000e-3(a)). [4]

152.    When Mr. Malloy refused to terminate Mr. Richardson or Mr. Romero or to treat each other disparately, he engaged in opposition that was protected under Title VII.  E.g., EEOC v. St. Anne's Hospital of Chicago, 664 F.2d 128, 131-32 (7th Cir. 1981); Aman v. Cort Furniture Rental Corp., 85 F.3d 1074 at 1079, 1085 (3rd Cir. 1996).

---

[4]    The imposition of excessive discipline on minority employees is a basic of unlawful employment practices.  E.g., Villa v. City of Chicago, 924 F.2d 629, 631 (7th Cir. 1991); Trujillo v. Grand Junction Regional Center, 928 F.2d 973, 977 (10th Cir. 1991).

153.    Opposition to discriminatory employment practices is protected under Title VII, so long as it is based on a reasonable belief that the employer's action is unlawful.  Parker v. Baltimore & Ohio R.R. Co., 652 F.2d 1012, 1020 (D.C. Cir. 1981).   The protection of the opposition clause is available even when there is a mistake about an employer's intentions or the legality of its action.  Id.[5]

154.    The EEOC's Compliance Manual on Retaliation, which the Supreme Court recognizes as authoritative[6], specifically states that:  "Opposition may be nonverbal."   EEOC Directive No. 915.003 at 8-4.   "Opposition can, of course, consist of a refusal to carry out an order or policy," whether stated or implicit.  Moyo v. Gomez, supra, 40 F.3d at 984.  There is no doubt that refusing, as Mr. Malloy did, to cooperate in taking disparate adverse action against minorities is protected opposition.  E.g., EEOC v. St. Anne's Hospital of Chicago, supra, 664 F.2d at 131-32 ("an employee with" disciplinary "authority" who "is subsequently" subject to adverse action because he took favorable action toward a minority employee "is similarly protected"); Aman v. Cort Furniture Rental Corp., supra, 85 F.3d at 1079 ("refusal to 'gather' more derogatory information" about a minority employee who filed an EEO complaint and "place" it in his "file … represent activities protected under Title VII."); Patterson v. PHP Healthcare Corp., 90 F.3d 929, 942 (5th Cir. 1996); EEOC v. HBE Corporation, 135 F.3d 543 (8th Cir. 1998).

155.    Mr. Malloy's second EEO activity was protected under Title VII's participation clause, 42 U.S.C. §2000e-3(a), whose protection extended to Mr. Malloy, when he himself

---

[5]    Even an "erroneous belief that an employer engaged in an unlawful employment practice is reasonable, and thus actionable under §704(a), if premised on a mistake made in good faith.  A good-faith mistake may be one of fact or of law."  Moyo v. Gomez, 40 F.3d 982, 984 (9th Cir. 1994), cert. denied, 513 U.S. 1081 (1995) (emphasis in original) (quoting EEOC v. Crown Zellerbach Corp., 720 F.2d 1008, 1013 (9th Cir. 1983) (internal quotation marks omitted)).
[6]    Burlington Northern, supra, 126 S.Ct. at 2713-1; Griggs, supra, 401 U.S. at 433-34.

"made a charge" of discrimination and retaliation. <u>E.g.</u>, <u>Singletary v. District of Columbia</u>, 351 F.3d 519, 524 (D.C. Cir. 2003).

156.    Mr. Malloy also sustained actionable changes in his employment.

157.    Although largely if not entirely academic here, there are different standards of changes in employment that are cognizable in cases of discrimination and retaliation.  The adverse employment action standard which applies to claims of discrimination is higher than the change in employment needed to support a claim of retaliation.  Therefore, any change in employment that rises to the level of a discriminatory adverse employment action is also actionable as a retaliatory, materially adverse action

158.    As far as retaliation is concerned, all actions, personnel or otherwise, constitute retaliation if they may have been "materially adverse," meaning that they "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." <u>Burlington Northern & Santa Fe R.R. v. White</u>, __ U.S. __.126 S.Ct. 2405, 2415 (2006). <u>Burlington Northern</u>, 126 S.Ct. at 2415 (internal quotation marks omitted).

159.    Discrimination, by contrast, is actionable when it produces material and objective changes in employment, commonly referred to as adverse employment actions.  <u>Brown v. Brody</u>, 199 F.3d 446, 452 (D.C. Cir. 1999).  .

160.    "[W]ithdrawing an employee's supervisory duties … constitutes an adverse employment action."  <u>Stewart v. Ashcroft</u>, 352 F.3d 422, 427 (D.C. Cir. 2004); <u>accord</u>, <u>Burke v. Gould,</u> 286 F.3d 513, 522 (D.C. Cir. 2002).

161.    So does denial of consideration for promotion or for a position with higher pay; reassignment with significantly different responsibilities; and impairment of future employment opportunities.  <u>Burlington Industries, Inc. v. Ellereth,</u> 524 U.S. 742, 761 (1998) (quoting <u>Crady</u>

v. Liberty Nat. Bank & Trust Co. of Ind., 993 F.2d 132, 136 (7th Cir. 1993); Stewart v. Ashcroft, supra, 352 F.3d at 426-27.

162.     HUD OIG's removal of Mr. Malloy's supervisory duties unquestionably sustains a claim of discrimination, as did being denied consideration for a higher paying position as an ASAC in Houston.  Stewart, supra; Burke, supra.  A fortiori, under Burlington Northern, these actions are also cognizable as retaliatory.

163.     The Supreme Court's decision in Burlington Northern recognized that the EEOC's Compliance Manual on Retaliation speaks authoritatively about adverse actions that support retaliation claims.  126 S.Ct. at 2713-14; accord, Griggs v. Duke Power Co., 401 U.S. 424, 433-34 (1971).

164.     The Compliance Manual expressly recognizes that an employer who merely directs a complainant's co-workers to keep him "under surveillance," much less opens a potentially criminal investigation, is liable for retaliation.  EEOC Directive No. 915.003 at 8-14.

165.     Although the D.C. Circuit has deferred deciding whether an investigation without more is cognizable under Title VII, it has expressly held that an investigation that "placed a cloud over" an employee's "career, which effectively prevents her from obtaining other career-enhancing assignments" or "from receiving promotions" is actionable as discriminatory and retaliatory.  Velikonja v. Gonzales, 466 F.3d 122, 124-25 (D.C. Cir. 2006).

166.     OIG's investigations placed a "cloud" over Mr. Malloy's continued service as a supervisor and as a participant in prestigious law enforcement enterprises, and eliminated him from consideration as an ASAC in Houston.

167.     The Supreme Court has also held that "indices that might be unique to a particular situation" can make an employment action cognizable under Title VII.  Burlington Industries,

Inc. v. Ellereth, supra, 524 U.S. at 761 (quoting Crady v. Liberty Nat. Bank & Trust Co. of Ind., supra, 993 F.2d at 136).

168.    As a federal law enforcement officer, Mr. Malloy's credibility was essential to the performance of his duties.

169.    Being placed on administrative leave and under investigation prevented Mr. Malloy from carrying out even the most basic agent functions.  Giglio v. United States, 405 U.S. 150, 154 (1972).

170.    Impairment of future employment opportunities also qualifies as adverse employment action under Title VII.  Stewart v. Ashcroft, supra, 352 F.3d at 426-27; Brown v. Brody, supra, 199 F.3d at 457.

171.    HUD OIG's actions have made it virtually impossible for Mr. Malloy to obtain law enforcement work outside of HUD OIG.

172.    The law enforcement community is a small and insular group; and even assuming that any potential future employer would not know about them, Mr.  Malloy would be required to disclose OIG's actions and explain why his supervisory duties were removed.

173.    Further, in applying for law enforcement positions, Mr. Malloy would normally have had to undergo a background check and disclose that he left HUD after being accused of misconduct, which would all but certainly eliminate him from consideration.

174.    A preponderance of the evidence also shows that retaliation was a motivating factor, even if not the exclusive motivating factor, of HUD OIG in taking actions that adversely affected these actionable changes in Mr. Malloy's employment and future employment opportunities.

175.    The Supreme Court's original decision which articulated the shifting burdens in employment cases, McDonnell Douglas, sounded in discrimination and retaliation.  411 U.S. at 796.

176.    That is why circumstantial evidence that provides a basis for inferring discrimination also provides grounds for establishing a causal connection between adverse action and protected activity.  E.g., Lathram v. Snow, supra, 338 F.3d at 1094

177.    The only difference in proof relevant here is retaliation may also be proven, but need not be established, with nothing more than close temporal proximity between protected activity and subsequent adverse action.  E.g., Mitchell v. Baldridge, 759 F.2d 80, 86 (D.C. Cir. 1985).

178.    Temporal proximity is not an element of retaliation, but proof of it.  E.g., Shirley v. Chrysler First, Inc., 970 F.2d 39, 44 (5th Cir. 1992); Kachmar v. SunGard Data Systems, Inc., 109 F.3d 173, 177-78 (3rd Cir. 1997); Gipson v. Wells Fargo, N.A., 460 F.Supp.2d 15, 25 (D.D.C. 2006).

179.    At the end of the first week or the beginning of the second week of October of 2002, OIG Headquarters learned that Mr. Malloy had not terminated Mr. Richardson or disciplined him or Mr. Romero harshly.

180.    Within days, HUD OIG placed Mr. Malloy on administrative leave, prohibited him from entering OIG premises, and directed him to have no contact with any HUD OIG employees.

181.    At the same time, OIG Headquarters opened two overlapping investigations into him.

182.    One focused on the personnel actions he took against Special Agents Romero and Richardson.

183.    HUD OIG also elevated Mr. Malloy from a witness to subject in the investigation of Mr. Chapman.

184.    On October 18, 2002, Mr. Malloy wrote to OIG, requested that OIG return him to active duty, and advised it about his use of the informal EEO process, which he had initiated the day before.

185.    On October 28, 2002, Mr. Salas responded in a letter that refused to restore Mr. Malloy and admitted that OIG viewed his use of the administrative complaints process as a threat.

186.    In the coming two days, many witnesses exonerated Mr. Malloy.

187.    Nonetheless, OIG kept Mr. Malloy under investigation and on administrative leave for close to two more months.

188.    "Especially relevant" in Title VII cases is the comparative treatment of employees.  McDonnell Douglas, supra 411 U.S. at 804; accord Cones v. Shalala, 199 F.3d 512, 519 (D.C. Cir. 2000).

189.    The professional employees of the Office of Investigations at every level, in the field and in Washington, D.C., are all federal law enforcement officers.

190.    All of them at every level are held to the same standards of conduct.

191.    An act of misconduct that is arguably an offense for a line agent is also an offense for a senior manager.

192.    Therefore, all of these agents are comparators to Mr. Malloy.  Neuren v. Adduci, Mastriani, Meeks & Schill, 43 F.3d 1507, 1514 (D.C. Cir. 1995) (quoting Pierce v.

Commonwealth Life Ins. Co., 40 F.3d 796, 802 (6th Cir. 1994)); Radue v. Kimberly Clark Corp., 219 F.3d 612, 617-18 (7th Cir. 2003).

193.    OIG's treatment of two supervisory agents in particular in comparison to Mr. Malloy provides important evidence of retaliation.

194.    Dan Truxal, the other ASAC in the Southwest Region, who was also placed under investigation with Mr. Malloy.

195.    Mr. Truxal refused to turn over diaries that he considered to be personal in nature to OIG investigators.

196.    At least one employee gave a statement that Mr. Truxal made improper statements to interfere with the investigation of Mr. Chapman.

197.    Both men's actions were reported to OIG Headquarters.

198.    Nonetheless, OIG took no disciplinary action against Mr. Truxal, who was uninvolved in the Richardson and Romero actions.

199.    In May of 2002, when Daniel Salas was a SAC in the field and about to begin as DAIGI, he was reported to have engaged in domestic violence involving a handgun.

200.    The allegations were reviewed by AIGI Haban, Deputy Inspector General Stephens, and Inspector General Donahue.

201.    None of them ordered the commencement of a formal investigation, placed Mr. Salas on administrative leave, or relieved him of supervisory duties.

202.    Retaliation can also be proven by evidence that and adverse action was taken in a manner inconsistent with the process that it established.  Lathram v. Snow, supra 336 F.3d at 1093.

203.    When a standard "procedure was not followed," that too provides evidence that an employer took adverse action was due to the fact that an employee "had filed EEOC complaints." <u>Miller v. Fairchild Indus., Inc.</u>, 885 F.2d 498, 504 (9th Cir. 1989); <u>accord</u>, <u>Gipson v. Wells Fargo, N.A.</u>, <u>supra</u>, 460 F.Supp.2d at 30.

204.    HUD OIG does not make it a practice to place an agent under investigation or to immediately place them on administrative leave when an investigation is opened.

205.    Evidence of an "investigation" that "was not just flawed but inexplicably unfair" is powerful evidence that an employer's adverse action is discriminatory and retaliatory.  <u>Mastro v. PEPCO</u>, 447 F.3d 843, 855 (D.C. Cir. 2006).  That is particularly true of "an inquiry on which an employee's reputation and livelihood depended."  <u>Id</u>.

206.    HUD OIG's investigation of Mr. Malloy was slanted and flawed, and used as a device to force Mr. Malloy out.  Despite the fact that there was substantial evidence clearing Mr. Malloy, he was kept on administrative leave during his investigation and then removed from OIG's supervisory ranks.

207.    In employment cases,  a court is well within its province to "conclude that an employer who fabricates a false explanation has something to hide; that 'something' may well be discriminatory" or retaliatory "intent."  <u>Aka v. Washington Hospital Center</u>, <u>supra</u> 156 F.3d at 1294; <u>accord</u>, <u>Holcomb v. Powell</u>, 433 F.3d 889, 897 (D.C. Cir. 2006).

208.    Deputy Inspector General Stephens denies being an active participant in the decisional processes concerning Mr. Malloy and even being aware of many of OIG's actions towards him.

209.    That denial is irreconcilable with the account of Assistant Inspector General Haban, who claims that the most significant actions concerning Mr. Malloy were collaborative decisions made with Mr. Stephens.

210.    Special Investigation Division SAC McCarty claims to have briefed Mr. Haban and Mr. Salas on the investigations of Mr. Malloy as they proceeded.

211.    Mr. Salas denies that this happened.

212.    Other evidence of retaliation includes the unambiguous expression by HUD OIG's Office of Counsel of defendant's desire to terminate Mr. Richardson, which Mr. Malloy frustrated, and the fact that HUD OIG first took action against Mr. Malloy upon learning that he had not proposed to remove Mr. Richardson.

213.    HUD OIG's basic factual defense is that Mr. Malloy was under investigation for not having coordinated the Richardson and Romero disciplinary actions and because he had supposedly said in a staff meeting that agents should "circle the wagons" if questioned by the Special Investigations Division about Mr. Chapman.

214.    This defense is deficient as a matter of law, because "Title VII is violated when an employer is motivated by retaliatory animus, even if valid objective reasons for the [adverse action] exist." Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2nd Cir. 1993); accord, Mastro, supra 447 F.3d at 843.  The issue is whether the employer's response was disparate or excessive. E.g., Jalil v. Advel Corp., 873 F.2d 701 (3rd Cir. 1989), cert. denied 493 U.S. 1990); Leonard v. City of Frankfort, 752 F.2d 182, 195 (6th Cir. 1985).

215.    Furthermore, placing an agent on administrative leave is not customary at HUD OIG; it is done very rarely.

216.    Mr. Malloy understood that Mr. Chapman had coordinated with OIG Legal Counsel and the Bureau of Public Debt the disciplinary action against Mr. Richardson.

217.    Mr. Richardson was completely satisfied with his disciplinary process, and it was unquestionably proper.  DeSarno v. Department of Commerce, 761 F.2d 657, 660 (Fed. Cir. 1985).

218.    In Mr. Chapman's experience as a SAC, no HUD OIG manager has ever been criminally investigated, had his supervisory responsibilities removed, or disciplined over a personnel issue.

219.    By prevailing, Mr. Malloy is entitled to declaratory and injunctive relief, record correction, retroactive promotion, backpay, and other equitable relief.  42 U.S.C. §2000e-5(g).

220.    Mr. Malloy is also entitled to an award of compensatory damages.  42 U.S.C. §1981a.

221.    Mr. Malloy has also demonstrated that he was constructively discharged when he resigned effective January 7, 2003.

222.    A constructive discharge is established with proof that an employer has rendered an employee's "working conditions … so intolerable that a reasonable person … would have felt compelled to resign."  Pennsylvania State Police v. Suders, 124 S.Ct. 2342, 2351 (2004).[7]

223.    There is also a requirement to show that "aggravating factors" triggered the employee to resign.  Clark v. Marsh, 665 F.2d 1168, 1174.  (D.C. Cir. 1981).

224.    It is satisfied by "extreme mistreatment or thinly veiled (or even overt) threats of termination."  Kalinoski v. Gutierrez, 435 F.Supp.2d 55, 78 (D.D.C. 2006) (Bates, J.)

---

[7]    Suders aligned precedent in the Circuits and relieved a plaintiff of having to prove that the employer intended to force his resignation.  124 S.Ct. at 2351.

225.    When a "constructive discharge is based on a collection of events that precipitated an employee's resignation" it is not a claim but a remedy relating to "potential recovery." Kalinoski, supra, 435 F.Supp.2d at 73 (citing Knabe v. Boury Corp., 114 F.3d 407, 407 n. 1 (3rd Cir. 1997); EEOC v. R.J. Gallagher Co., 959 F. Supp. 405, 408 (S.D. Tex .1997), rev'd on other grounds, 181 F.3d 645 (5th Cir. 1999).

226.    Mr. Malloy was a federal law enforcement officer whose very career turned on his satisfying uniquely high standards of conduct and being free from any hint of misconduct much less being under active investigation.

227.    "Context matters" in ascertaining the severity of an employer's actions, as do "indices that might be unique to a particular situation."  Burlington Northern, supra, 126 S.Ct. at 2416; Ellereth, supra, 524 U.S. at 761.

228.    Defendant's actions toward Mr. Malloy were career-ending and ensured that Mr. Malloy will never clear another background check and work in law enforcement again.

229.    Only being assigned menial tasks while facing investigations of indeterminate length contributed to Mr. Malloy's constructive discharge.

230.    Although law enforcement retirement is generally mandatory at age 57, the head of an agency, including HUD OIG, can waive that limit.

231.    HUD OIG has done so before and, even if it had not, its treatment of Mr. Malloy warrants reinstating him for a period equal to the time that he was constructively discharged until the entry of final judgment in this action.

232.    Mr. Malloy is entitled to the following remedies:

A.    Reinstatement in defendant's employ retroactive to January 7, 2003.

B.    Backpay since January 7, 2003, including cost of living increases, plus lost benefits including, retirement benefits and health insurance.

C.    Reinstatement in a supervisory position in defendant's employ retroactive to December 17, 2002.

D.    Retroactive promotion to the position of Assistant Special Agent In Charge of defendant's Regional VI office in Houston, Texas.

E.    Interest.

F.    A declaration that defendant violated Mr. Malloy's civil rights and an injunction prohibiting any future violations.

G.    Compensatory damages in the maximum amount permitted by law.

H.    Attorneys fees and costs.

233.    Judgment will be entered accordingly in favor of plaintiff and against defendant.


Respectfully submitted,


_____/s/_____
Robert C. Seldon, Esq.,
 D.C. Bar No. 245100


_____/s/_____
Molly E. Buie, Esq.,
 D.C. Bar No. 483767
Robert C. Seldon & Associates, P.C.
1319 F Street, N.W., Suite 305
Washington, D.C.  20004
(202) 955-6968


30